**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re:<br><br>KARYOPHARM THERAPEUTICS INC., *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 26-90826 (ARP)<br><br>(Joint Administration Requested) |

**DECLARATION OF RYAN KIELTY IN SUPPORT OF DEBTORS' EMERGENCY MOTION FOR ENTRY OF AN ORDER (I)(A) APPROVING BIDDING PROCEDURES AND AUTHORIZING SALE TRANSACTION; (B) AUTHORIZING DESIGNATION OF STALKING HORSE BIDDER AND APPROVING BID PROTECTIONS; (C) SCHEDULING AUCTION AND SALE HEARING; (D) APPROVING SALE NOTICES; (E) APPROVING ASSUMPTION AND ASSIGNMENT PROCEDURES; AND (II) GRANTING RELATED RELIEF**

I, Ryan Kielty, hereby declare as follows:

1. I submit this declaration (this "Declaration") in support of the *Debtors' Emergency Motion for Entry of an Order (I)(A) Approving Bidding Procedures and Authorizing Sale Transaction; (B) Authorizing Designation of Stalking Horse Bidder and Approving Bid Protections; (C) Scheduling Auction and Sale Hearing; (D) Approving Sale Notices; (E) Approving Assumption and Assignment Procedures; and (II) Granting Related Relief* (the "Bidding Procedures Motion"),[2] filed contemporaneously herewith.

[1] The Debtors in these chapter 11 cases, together with the last four digits of the Debtors' federal tax identification numbers, are: Karyopharm Therapeutics Inc. (1704) and KPT Texas LLC (1815). The Debtors' service address is 85 Wells Avenue, Suite 210, Newton, Massachusetts 02459.

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Bidding Procedures Motion, the *Declaration of Sean A. Gumbs in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings* (the "First Day Declaration"), and the *Joint Prepackaged Chapter 11 Plan of Karyopharm Therapeutics Inc. and Its Debtor Affiliate* (as amended, supplemented, or otherwise modified from time to time, including all exhibits, schedules, and supplements thereto, the "Plan"), each filed contemporaneously herewith, or the Restructuring Support Agreement (as defined in the Bidding Procedures Motion), as applicable.

2. Except as otherwise indicated herein, all statements set forth in this Declaration are based on (a) my personal knowledge or opinion of the Debtors' operations, finances, and restructuring initiatives, (b) my review of relevant documents, (c) information provided to me by the Debtors, the Debtors' management, and/or the Debtors' other advisors, (d) information provided to me by the employees and partners of Centerview Partners LLC ("Centerview") working directly with me or under my supervision, or (e) my experience as a restructuring professional. I have been actively involved in evaluating the Debtors' strategic alternatives and the Marketing and Sale Process. I have been actively engaged in advising the Debtors in the period leading up to the Debtors' Chapter 11 Cases.

3. I am over the age of 18 years and am authorized to submit this Declaration. If I were called to testify, I could and would testify competently to the statements set forth herein. I am not being compensated specifically for this Declaration or related testimony, other than through payments received by Centerview as a professional proposed to be retained by the Debtors, subject to approval by the Court.[3]

## PROFESSIONAL BACKGROUND AND QUALIFICATIONS

4. I am a Partner in the Debt Advisory and Restructuring Group of Centerview, an independent investment banking firm providing mergers and acquisitions, financing, and restructuring advice across a broad range of industries. Centerview's Debt Advisory and Restructuring Group has extensive experience designing, negotiating, and implementing recapitalizations, exchange offers, financings, distressed mergers and acquisitions, and out-of-court and in-court restructurings. Centerview's professionals have collectively advised on

---

[3] The Debtors anticipate filing an application to retain Centerview as their investment banker, effective as of the Petition Date. Pursuant to Centerview's engagement letter with the Debtors, subject to Court approval, Centerview will be entitled to receive certain fees in connection with the transactions described in this Declaration.

transactions representing over $300 billion in restructured debt. Centerview and its professionals have advised on numerous in-court restructurings, including: Leslie's Pool Supplies; JoAnn Stores; Alkegen; Trinseo; Celsius Network; ACA Financial Guaranty; Cloud Peak Energy; Caesars Entertainment; Catalina Marketing; Country Road Communications; Motor Coach Industries International; Patriot Coal; Westmoreland Mining; Performance Sports Group; Residential Capital; Designer Brands; SVB Financial Group; Enjoy Technology; Toys "R" Us; SmileDirectClub; and Revlon, Inc., among others.

5. Prior to and since joining Centerview in 2011, I have advised and continue to advise companies, creditors, and purchasers in numerous in-court and out-of-court financings, restructurings, recapitalizations, reorganizations, and sales. Before joining Centerview, I was an associate at Miller Buckfire & Co., an investment bank and advisory firm that provided financial advisory services to constituents in a broad range of restructuring and corporate finance transactions. I received my B.A. from Villanova University.

**CENTERVIEW'S RETENTION**

6. In July 2025, the Debtors engaged Centerview as their exclusive financial advisor and investment banker in connection with one or more potential transactions, including a restructuring, sale, or financing. Since then, Centerview has worked closely with the Debtors and their advisors to evaluate a range of strategic and financing options.

7. In my representation of the Debtors, I have, among other things, provided advice on strategic transaction alternatives, restructuring options, and financings. I have participated in negotiations among the Debtors, their creditors, and other parties in interest as well as with potential buyers. Members of my team and I have also assisted the Debtors in reviewing the terms, conditions, and potential impact of proposed transactions—including those transactions proposed and considered during the Marketing and Sale Process. Through this and other work, my team

and I have become generally familiar with the Debtors' capital structure, liquidity needs, and business operations, as well as the strategic transaction and financing options available to the Debtors.

**PREPETITION MARKETING PROCESS**

8. As stated above, Centerview was retained by the Debtors in July 2025 and worked with the Debtors to evaluate several strategic and financing options. In July 2026, the Debtors, with the assistance of Centerview, launched a marketing and sale process to evaluate interest in a potential sale transaction for all, substantially all, or a material portion of the Debtors' equity and assets, including, without limitation, (a) the Debtors' rights in and to XPOVIO® (selinexor) and the Debtors' other product candidates and related intellectual property; (b) regulatory approvals, clinical data, and know-how; and (c) inventory, contracts, and license agreements (collectively, the "Assets," and such process, the "Marketing and Sale Process"). While the Marketing and Sale Process began in earnest in July 2026, the Company, with the assistance of Centerview, had conversations with interested potential buyers since Centerview's engagement began in 2025, and the Company had previously marketed itself with the assistance of other advisors prior to Centerview's engagement.

9. Over the course of the Marketing and Sale Process and the months leading up to its official launch, the Debtors, with the assistance of their advisors, reached out to a total of thirty-five (35) potential acquirors and eighty-three (83) potential equity investors, including strategic investors and financial investors. Selection of these parties was informed by discussions with management and a review of investors with a track record of evaluating assets in the oncology and broader biopharmaceutical sectors. In connection with this broad solicitation, the Debtors and their advisors prepared significant volumes of due diligence information made available to all potential bidders through an electronic data room. During the Marketing and Sale Process,

seventeen (17) parties executed confidentiality agreements and were granted access to an electronic data room of over 5,500 documents containing significant diligence and other confidential information about the Debtors' business. The Debtors also responded to diligence requests from such parties and held twenty-six (26) diligence sessions and other transaction-related conversations, including ten (10) management presentations. The Debtors also made information available about the Debtors' existing capital structure, debt agreements, equity account, warrants and authorized share numbers so that potential bidders could understand the impact to the Debtors' stakeholders of bids of any amount and could propose creative bid structures, if desired. On August 31, 2026, after facilitating this due diligence for parties under confidentiality agreements, the Debtors sent an initial process letter to approximately seventeen (17) parties requesting an initial indication of interest (an "IOI") by September 21, 2026 (the "Initial IOI Deadline") with respect to in-court or out-of-court sale or other transactions. As part of this process, the Debtors provided the professionals for the Ad Hoc Group and the Royalty Investors access to substantially all of the information provided to the potential bidders.

10. By, or shortly after, the Initial IOI Deadline, the Debtors received five (5) non-binding IOIs. In evaluating each IOI, the Debtors, with the assistance of their advisors, including Centerview, analyzed, among other things: (a) the structure of the proposed transaction, including whether such transaction was proposed to be consummated in court or out of court; (b) the form and amount of consideration offered, including any contingent consideration; (c) the Assets to be acquired and the treatment of the Debtors' agreements; and (d) regulatory, financing,

contingencies, and other considerations. The Debtors shared the IOIs with, and received input from, the professionals for the Ad Hoc Group and the Royalty Investors.[4]

11. Following receipt of the IOIs, the Debtors and their advisors actively engaged with each of the parties that submitted IOIs to clarify and improve their proposals, and conducted supplemental outreach to certain other parties that had demonstrated sufficient engagement in the Marketing and Sale Process such that continued dialogue regarding a potential transaction was warranted.

12. Four (4) parties provided revised IOIs, and the Debtors determined that the proposal received from Ayrmid represented the highest or otherwise best actionable proposal received in the Marketing and Sale Process. The Debtors worked with Ayrmid to develop the Restructuring Support Agreement and the Plan, and selected Ayrmid as the stalking horse bidder for the Debtors' Assets (in such capacity, the "Stalking Horse Bidder" and its bid, the "Stalking Horse Bid"), subject to higher or otherwise better offers (and subject to approval by this Court). The terms of the Stalking Horse Bid and the proposed Reorganization Transaction are detailed in the Restructuring Support Agreement and the Plan, and will be further documented in the Merger Agreement, a substantially final form of which will be filed with the Plan Supplement. Indeed,

---

4 One of the potential bidders, Ayrmid Ltd. ("Ayrmid"), is majority-owned by funds managed by Highbridge Capital Management, LLC ("Highbridge"), which also holds loans and notes under the First Lien Term Loan Facility, the 2028 Notes, and the 2029 Notes and is a member of the Ad Hoc Group. In light of that relationship with Ayrmid, Highbridge recused itself from the Ad Hoc Group's deliberations regarding the Marketing and Sale Process and the evaluation of Ayrmid's proposal, and the terms of the Reorganization Transaction were negotiated on behalf of the Debtors' secured creditors by the other members of the Ad Hoc Group and their advisors. The Debtors and their advisors did not share information regarding the Marketing and Sale Process with Highbridge in its capacity as a member of the Ad Hoc Group. The Debtors' board of directors, advised by its independent professionals, evaluated Ayrmid's proposal on the same basis as every other proposal received in the Marketing and Sale Process, and the Reorganization Transaction remains subject to the Court-supervised market test described herein. Further, the Plan provides that Highbridge's votes will not be counted for purposes of determining whether an impaired class has accepted the Plan under section 1129(a)(10) of the Bankruptcy Code. The Debtors believe these measures have preserved, and will continue to preserve, the integrity of the Marketing and Sale Process.

the Debtors continued to engage with certain of the parties that submitted revised IOIs in the days leading up to the Petition Date to confirm Aymid was the highest or otherwise best actionable stalking horse proposal.

13. The Stalking Horse Bid consists of the Reorganization Transaction contemplated by the Plan. Upon the effective date of the Plan, the holders of the Debtors' Funded Debt would receive 100% of the common equity of Reorganized KPTI (such equity, the "Reorganized KPTI Equity"). Then, Reorganized KPTI and Ayrmid would engage in a business combination transaction, directly or through one or more of their respective existing or newly formed affiliates (the surviving parent entity of the combined business, "NewCo"), and the holders of the Reorganized KPTI Equity would receive fifty-five percent (55%) of the equity of NewCo (subject to dilution solely by contingent equity tied to the future revenues of Ayrmid's Omisirge product and any applicable management incentive plan). In connection with the Reorganization Transaction, NewCo would enter into a new exit financing facility, the proceeds of which would be used to repay up to $50 million of New Money DIP Claims in cash (with any remaining DIP Claims satisfied in NewCo equity), approximately $14 million of general unsecured claims would be paid in the ordinary course or otherwise rendered unimpaired, and the holders of the Debtors' Funded Debt would also receive contingent value rights entitling them to payments tied to future net sales of XPOVIO (selinexor) for patients with myelofibrosis.

14. The Debtors intend to continue the Marketing and Sale Process on a postpetition basis pursuant to the Bidding Procedures to market test the Stalking Horse Bid against other potential offers and to confirm that the Stalking Horse Bid represents the highest or otherwise best available transaction.

## THE BIDDING PROCEDURES

15. As a result of the Debtors' extensive prepetition Marketing and Sale Process, the Debtors intend to implement a streamlined sale process postpetition. The Debtors will conduct an Auction only if they receive, in addition to the Stalking Horse Bid, one or more Qualified Bids (as defined in the Bidding Procedures), which would require such bids to (a) provide for (i) net proceeds at the closing of the Sale Transaction of not less than $335,384,812, payable in cash (from readily available funds and not subject to any financing contingency); provided that $18,750,000 of such amount allocable to the Allowed RIFA Claims may be satisfied with cash or non-cash consideration, in such form as is acceptable to the holders of RIFA Claims (or their affiliates) in their discretion, having a value of not less than such portion, and (ii) the payment in full in cash, on the effective date of the Sale Transaction, of all Allowed General Unsecured Claims against the Debtors' estates, or such other treatment as renders such Claims Unimpaired; (b) provide for the payment in full in cash of the Bid Protections (as defined herein) payable in accordance with the Bidding Procedures Order; and (c) provide for the funding in cash, at the closing of the Sale Transaction, of the Wind-Down Budget (as defined in the Plan). I believe that continuing the Marketing and Sale Process postpetition will enable the Debtors to market test whether the Stalking Horse Bid represents the highest or otherwise best available transaction and to ensure that the value of the Debtors' estates is maximized for the benefit of all stakeholders.

16. I have reviewed the Bidding Procedures, and I believe that the Bidding Procedures will facilitate an orderly, competitive, and efficient Marketing and Sale Process in a fair and transparent manner. The proposed Bidding Procedures contemplate an open Auction process for the sale of all, substantially all, or a material portion of the Assets. The proposed Bidding Procedures provide for appropriate requirements to submit a Qualified Bid and should provide potential bidders with sufficient time to perform due diligence and acquire the information

necessary to submit a timely and well-informed bid, particularly in light of the prepetition Marketing and Sale Process. The Bidding Procedures will increase the likelihood that the Debtors will obtain the highest or otherwise best value for the Assets and effectuate a value-maximizing transaction for the Debtors' estates. If the Debtors receive no Qualified Bid other than the Stalking Horse Bid, the Bidding Procedures will have served as a robust market test of the Reorganization Transaction.

17. In formulating the Bidding Procedures' proposed timeline, the Debtors balanced the need to consummate a value-maximizing transaction quickly and efficiently against the need to provide adequate time for potential purchasers to conduct due diligence and submit bids. The Bidding Procedures provide for an approximate six-week (6-week) postpetition Marketing and Sale Process, with a Bid Deadline of December 16, 2026 and an Auction, if necessary, to commence on December 21, 2026. I believe that this timeline is appropriate under the facts that exist here, particularly because: (a) the Marketing and Sale Process began months before the Petition Date; (b) the proposed timeline is consistent with the milestones set forth in the Restructuring Support Agreement and the Debtors' proposed DIP Facility; (c) the discussions among the Debtors and their key stakeholders to date have facilitated a clear understanding of beneficial and feasible transaction opportunities; and (d) the Debtors had conducted a broad marketing and sale process of their business prior to Centerview's retention. Accordingly, I believe the Bidding Procedures are reasonable and appropriate under the circumstances of these Chapter 11 Cases.

**DESIGNATION OF AYRMID AS STALKING HORSE BIDDER AND THE BID PROTECTIONS**

18. I understand that the Debtors are seeking approval of the designation of Ayrmid as the Stalking Horse Bidder at the first-day hearing and approval of the Bid Protections set forth in

the Restructuring Support Agreement and the Bidding Procedures Motion at a subsequent hearing, currently anticipated to be held on November 30, 2026, subject to the Court's availability (the "Bid Protections Hearing"). In my view, the Stalking Horse Bid establishes a baseline from which other potential bidders can submit higher or otherwise better offers. A stalking horse bid of this kind fosters competitive bidding, thus raising the likelihood that the value received for the Assets will increase and allowing the Debtors to maximize the value of their estates for the benefit of all stakeholders.

19. Ayrmid has expended, and will continue to expend, time and resources developing the Stalking Horse Bid, negotiating and documenting the Restructuring Support Agreement, the Plan, and the Merger Agreement, and participating in the postpetition Marketing and Sale Process. Those resources have been and will be expended despite the risk to Ayrmid that it will not be the Successful Bidder at the conclusion of this process. For these reasons, stalking horse bidders typically require bid protections. Following arm's-length negotiations, the Debtors propose that the Bid Protections consist of: (a) a cash fee (the "Break-Up Fee") equal to three percent (3%) of $311,432,711 (the "Bid Protection Base"); and (b) reimbursement of Ayrmid's reasonable and documented out-of-pocket fees and expenses, subject to an aggregate cap equal to one percent (1%) of the Bid Protection Base (the "Expense Reimbursement" and, together with the Break-Up Fee, the "Bid Protections"). Subject to the terms of the Restructuring Support Agreement, the Bid Protections would be earned upon the Debtors' selection of a bidder other than Ayrmid as the Successful Bidder and would be payable within three (3) business days after the consummation of an Acceptable Alternative Transaction or an Alternative Restructuring Proposal (each as defined in the Restructuring Support Agreement), from the proceeds thereof. If Ayrmid is designated as the Back-Up Bidder, which designation (if any) would be made no later than the date of the

Auction, and its Back-Up Bid becomes the Successful Bid and the Reorganization Transaction is consummated, no Break-Up Fee or Expense Reimbursement would be payable. In my experience, bid protections of this kind and in this amount are customary and usual in comparable transactions, and I believe that the Bid Protections were necessary to induce Ayrmid to serve as the Stalking Horse Bidder and to remain bound by the Restructuring Support Agreement while the Debtors market test the Stalking Horse Bid.

20. Accordingly, I believe that approving the designation of Ayrmid as the Stalking Horse Bidder at the first-day hearing, and approving the Bid Protections at the Bid Protections Hearing, is in the best interests of the Debtors' estates.

*[Remainder of page intentionally left blank]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated: November 2, 2026

/s/ *Ryan Kielty*
Ryan Kielty
Partner
Centerview Partners LLC