***Solicitation Version***

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| In re:<br><br>KARYOPHARM THERAPEUTICS INC., *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 26-_____ (___)<br><br>(Joint Administration Requested) |

**JOINT PREPACKAGED CHAPTER 11 PLAN OF
KARYOPHARM THERAPEUTICS INC. AND ITS DEBTOR AFFILIATE**

**SIDLEY AUSTIN LLP**
Maegan Quejada (TX Bar No. 24105999)
Chelsea McManus (TX Bar No. 24131499)
1000 Louisiana Street, Suite 5900
Houston, Texas 77002
Telephone: (713) 495-4500
Facsimile: (713) 495-7799
Email: mquejada@sidley.com
cmcmanus@sidley.com

**SIDLEY AUSTIN LLP**
Stephen E. Hessler (*pro hac vice* pending)
Anthony R. Grossi (*pro hac vice* pending)
787 Seventh Avenue
New York, New York 10019
Telephone: (212) 839-5300
Facsimile: (212) 839-5599
Email: shessler@sidley.com
agrossi@sidley.com

*and*

Ian C. Ferrell (*pro hac vice* pending)
Daniela Rakowski (*pro hac vice* pending)
One South Dearborn
Chicago, Illinois 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7036
Email: iferrell@sidley.com
drakowski@sidley.com

*Proposed Counsel to the Debtors
and Debtors in Possession*

Dated: November 2, 2026

[1] The Debtors in these chapter 11 cases, together with the last four digits of the Debtors' federal tax identification numbers, are: Karyopharm Therapeutics Inc. (1704); and KPT Texas LLC (1815). The Debtors' service address is 85 Wells Avenue, Suite 210, Newton, Massachusetts 02459.

# TABLE OF CONTENTS

ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND GOVERNING LAW ..... 1
A. Defined Terms. ..... 1
B. Rules of Interpretation. ..... 19
C. Computation of Time. ..... 20
D. Governing Law. ..... 20
E. Reference to Monetary Figures. ..... 20
F. Reference to the Debtors or the Reorganized Debtors. ..... 20
G. Nonconsolidated Prepackaged Plan. ..... 20
H. Controlling Document. ..... 20
I. Consultation, Information, Notice, and Consent Rights. ..... 21

ARTICLE II. ADMINISTRATIVE CLAIMS, DIP CLAIMS, PRIORITY CLAIMS, AND RESTRUCTURING EXPENSES ..... 21
A. Administrative Claims. ..... 21
B. DIP Claims. ..... 22
C. Professional Fee Claims. ..... 22
D. Priority Tax Claims. ..... 23
E. Payment of Restructuring Expenses. ..... 23

ARTICLE III. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS ..... 24
A. Classification of Claims and Interests. ..... 24
B. Treatment of Claims and Interests. ..... 24
C. Special Provision Governing Unimpaired Claims. ..... 29
D. Elimination of Vacant Classes. ..... 29
E. Voting Classes; Presumed Acceptance by Non-Voting Classes. ..... 30
F. Intercompany Interests. ..... 30
G. Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code. ..... 30
H. Controversy Concerning Impairment. ..... 30
I. Subordinated Claims. ..... 30

ARTICLE IV. MEANS FOR IMPLEMENTATION OF THE PLAN ..... 30
A. General Settlement of Claims and Interests. ..... 30
B. Sale Transaction Election Notice Deadline; Successful Bid. ..... 31
C. Restructuring Transactions. ..... 32
D. Continued Corporate Existence. ..... 33
E. Vesting of Assets in the Reorganized Debtors or Post-Effective Date Debtors. ..... 34
F. Cancellation of Existing Securities and Agreements. ..... 34
G. Cancellation of Certain Existing Security Interests. ..... 34
H. Sources of Consideration for Plan Distributions. ..... 35
I. New Common Stock. ..... 35
J. The Merger. ..... 36
K. MF CVR Agreement; Omisirge Contingent Equity. ..... 36
L. NewCo Facility. ..... 37
M. Corporate Action. ..... 38
N. New Corporate Governance Documents. ..... 38
O. Preservation of Causes of Action. ..... 39
P. Certain Securities Law Matters. ..... 40
Q. 1146 Exemption. ..... 41
R. Additional Sale Transaction Provisions. ..... 41
S. Director and Officer Liability Insurance. ..... 42
T. Indemnification Obligations. ..... 42
U. Winddown of Karyopharm Europe GmbH. ..... 42

V. New Royalty Agreement. 43
W. Management Incentive Plan. 43

ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES 43
A. Assumption and Rejection of Executory Contracts and Unexpired Leases. 43
B. Claims Based on Rejection of Executory Contracts or Unexpired Leases. 44
C. Cure of Defaults for Assumed Executory Contracts and Unexpired Leases. 45
D. Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases. 46
E. Insurance Policies. 46
F. Employee Compensation and Benefits. 46
G. Reservation of Rights. 47
H. Nonoccurrence of Effective Date. 47
I. Contracts and Leases Entered Into After the Petition Date. 47

ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS 47
A. Distributions on Account of Claims Allowed as of the Effective Date. 47
B. Disbursing Agent. 48
C. Rights and Powers of Disbursing Agent. 48
D. Delivery of Distributions and Undeliverable or Unclaimed Distributions. 48
E. Manner of Payment. 50
F. Compliance With Tax Requirements. 50
G. Allocations. 50
H. No Postpetition Interest on Claims. 50
I. Foreign Currency Exchange Rate. 51
J. Setoffs and Recoupment. 51
K. Claims Paid or Payable by Third Parties. 51

ARTICLE VII. PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS 52
A. Disputed Claims Process. 52
B. Allowance of Claims. 52
C. Claims Administration Responsibilities. 53
D. Estimation of Claims and Interests. 53
E. Adjustment to Claims or Interests Without Objection. 53
F. Disallowance of Claims or Interests. 53
G. No Distributions Pending Allowance. 54
H. Distributions After Allowance. 54
I. No Interest. 54
J. Accrual of Dividends and Other Rights. 54

ARTICLE VIII. SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS 54
A. Discharge of Claims and Termination of Interests. 54
B. **Release of Liens.** 55
C. **Releases by the Debtors.** 55
D. **Releases by the Releasing Parties.** 56
E. **Exculpation.** 57
F. **Injunction.** 58
G. Protections Against Discriminatory Treatment. 59
H. Document Retention. 59
I. Reimbursement or Contribution. 59

ARTICLE IX. CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN 59
A. Conditions Precedent to the Effective Date. 59
B. Waiver of Conditions. 62
C. Effect of Failure of Conditions. 62
D. Substantial Consummation. 62

ARTICLE X. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN ........ 62
A. Modification and Amendments. ........ 62
B. Effect of Confirmation on Modifications. ........ 63
C. Revocation or Withdrawal of Prepackaged Plan. ........ 63

ARTICLE XI. RETENTION OF JURISDICTION ........ 63

ARTICLE XII. MISCELLANEOUS PROVISIONS ........ 65
A. Immediate Binding Effect. ........ 65
B. Additional Documents. ........ 65
C. Payment of Statutory Fees. ........ 65
D. Statutory Committee and Cessation of Fee and Expense Payment. ........ 66
E. Reservation of Rights. ........ 66
F. Successors and Assigns. ........ 66
G. Notices. ........ 66
H. Term of Injunctions or Stays. ........ 67
I. Entire Agreement. ........ 67
J. Plan Supplement. ........ 68
K. Severability of Prepackaged Plan Provisions. ........ 68
L. Votes Solicited in Good Faith. ........ 68
M. Closing of Chapter 11 Cases. ........ 68
N. Waiver or Estoppel. ........ 68
O. Creditor Default. ........ 69
P. Deemed Acts. ........ 69

# INTRODUCTION

Karyopharm Therapeutics Inc. and its debtor affiliate, in the above-captioned chapter 11 cases (collectively, the "Debtors"), propose this joint prepackaged chapter 11 plan of reorganization (as modified, amended, or supplemented from time to time, the "Prepackaged Plan") for the resolution of the outstanding claims against, and equity interests in, the Debtors. Although proposed jointly for administrative purposes, the Prepackaged Plan constitutes a separate chapter 11 plan for each Debtor. Holders of Claims against, or Interests in, the Debtors may refer to the Disclosure Statement for a discussion of the Debtors' history, businesses, assets, results of operations, historical financial information, projections of future operations, risk factors, a summary and analysis of the Prepackaged Plan, the Restructuring Transactions, and certain related matters. The Debtors are the proponents of the Prepackaged Plan within the meaning of section 1129 of the Bankruptcy Code.

ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PREPACKAGED PLAN ARE ENCOURAGED TO READ THE PREPACKAGED PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PREPACKAGED PLAN.

## ARTICLE I.
## DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND GOVERNING LAW

*A. Defined Terms.*

As used in the Prepackaged Plan, capitalized terms have the meanings set forth below.

1. "*1125(e) Exculpated Parties*" means, collectively, and in each case solely in its capacity as such and solely for purposes of section 1125(e) of the Bankruptcy Code: (a) the Debtors; (b) the Consenting Stakeholders; (c) Ayrmid; (d) the DIP Lenders; (e) the DIP Agent; (f) the Prepetition Agents; and (g) each Related Party of each Entity in the foregoing clauses (a) through (f).

2. "*1L Agent*" means Wilmington Savings Fund Society, FSB, in its capacity as administrative agent and collateral agent under the 1L Credit Agreement, and any successor thereto.

3. "*1L Credit Agreement*" means that certain Credit and Guaranty Agreement, dated as of May 8, 2024, by and among Parent, as borrower, the guarantors party thereto, the lenders party thereto from time to time, and the 1L Agent, as amended by that certain First Amendment and Waiver to Credit and Guaranty Agreement, dated as of October 7, 2025, that certain Second Amendment to Credit and Guaranty Agreement, dated as of February 27, 2026, and as may be further amended, restated, amended and restated, supplemented, or otherwise modified from time to time.

4. "*1L Equity Distribution*" means, subject to the Restructuring Transactions Memorandum, 36.096% to 37.029% (depending on the amount of Reorganized Parent Common Stock distributed to Holders of Allowed Equitized DIP New Money Claims) of the Reorganized Parent Common Stock issued and outstanding on the Effective Date.

5. "*1L Loan Documents*" means the "Loan Documents" as defined in the 1L Credit Agreement.

6. "*1L Term Loan Claims*" means any Claim for obligations arising under the 1L Credit Agreement and the other 1L Loan Documents, including Claims in respect of all principal amounts outstanding, interest, fees, redemption premiums, expenses, costs, and other charges arising thereunder or related thereto and all other Obligations (as defined in the 1L Credit Agreement), including postpetition interest, as applicable.

7. "*1.5L 2028 Notes*" means the 9.00% Convertible Senior Secured Notes due 2028 issued by Parent and outstanding under the 1.5L 2028 Notes Indenture.

8. "*1.5L 2028 Notes Claims*" means any Claim for obligations arising under the 1.5L 2028 Notes Indenture or the other 1.5L 2028 Notes Documents, including Claims in respect of all principal amounts outstanding, interest, fees, redemption premiums, expenses, costs, and other charges arising thereunder or related thereto and all other Obligations (as defined in the 1.5L 2028 Notes Indenture), including postpetition interest, as applicable.

9. "*1.5L 2028 Notes Documents*" means the "Transaction Documents" as defined in the 1.5L 2028 Notes Indenture.

10. "*1.5L 2028 Notes Indenture*" means that certain Indenture, dated as of October 10, 2025 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time), by and among Parent, as issuer, the guarantors party thereto, and the 1.5L 2028 Notes Trustee, governing the 1.5L 2028 Notes.

11. "*1.5L 2028 Notes Trustee*" means Wilmington Savings Fund Society, FSB, in its capacity as trustee under the 1.5L 2028 Notes Indenture, and any successor thereto.

12. "*1.5L Equity Distribution*" means, subject to the Restructuring Transactions Memorandum, 6.439% to 6.606% (depending on the amount of Reorganized Parent Common Stock distributed to Holders of Allowed Equitized DIP New Money Claims) of the Reorganized Parent Common Stock issued and outstanding on the Effective Date.

13. "*2L 2029 Notes*" means the 9.00% Convertible Senior Secured Notes due 2029 issued by Parent and outstanding under the 2L 2029 Notes Indenture.

14. "*2L 2029 Notes Claims*" means any Claim for obligations arising under the 2L 2029 Notes Indenture or the other 2L 2029 Notes Documents, including Claims in respect of all principal amounts outstanding, interest, fees, redemption premiums, expenses, costs, and other charges arising thereunder or related thereto and all other Obligations (as defined in the 2L 2029 Notes Indenture), including postpetition interest, as applicable.

15. "*2L 2029 Notes Documents*" means the "Transaction Documents" as defined in the 2L 2029 Notes Indenture.

16. "*2L 2029 Notes Indenture*" means that certain Indenture, dated as of October 10, 2025 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time), by and among Parent, as issuer, the guarantors party thereto, and the 2L 2029 Notes Trustee, governing the 2L 2029 Notes.

17. "*2L 2029 Notes Trustee*" means Wilmington Savings Fund Society, FSB, in its capacity as trustee under the 2L 2029 Notes Indenture, and any successor thereto.

18. "*2L Collateral Trustee*" means Wilmington Savings Fund Society, FSB, in its capacity as collateral trustee under the Collateral Trust Agreement, and any successor thereto.

19. "*2L Equity Distribution*" means, subject to the Restructuring Transactions Memorandum, 33.259% to 34.119% (depending on the amount of Reorganized Parent Common Stock distributed to Holders of Allowed Equitized DIP New Money Claims) of the Reorganized Parent Common Stock issued and outstanding on the Effective Date.

20. "*Acceptable Alternative Transaction*" has the meaning set forth in the Restructuring Support Agreement.

21. "*Ad Hoc Group*" means that certain ad hoc group of Holders of, or investment advisors, sub-advisors, or managers of discretionary accounts of funds that hold DIP Claims, 1L Term Loan Claims, 1.5L 2028 Notes Claims, or 2L 2029 Notes Claims represented by the Ad Hoc Group Advisors.

22. "*Ad Hoc Group Advisors*" means, collectively: (a) Latham & Watkins LLP, as counsel; (b) Haynes and Boone, LLP, as local counsel; (c) Houlihan Lokey Capital, Inc., as investment banker and financial advisor; and (d) any other advisor retained by or on behalf of the Ad Hoc Group.

23. "*Administrative Claim*" means a Claim for costs and expenses of administration of the Chapter 11 Cases pursuant to sections 327, 328, 330, 365, 503(b), 507(a), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses of preserving the Estates and operating the businesses of the Debtors incurred on or after the Petition Date and through the Effective Date; (b) Allowed Professional Fee Claims; (c) all fees and charges assessed against the Estates under chapter 123 of the Judicial Code; (d) any Bid Protections, solely to the extent earned in accordance with Article IV.B hereof, the Restructuring Support Agreement, and the Bidding Procedures Order; and (e) Restructuring Expenses.

24. "*Affiliate*" has the meaning set forth in section 101(2) of the Bankruptcy Code as if the referenced Entity were a debtor in a case under the Bankruptcy Code.

25. "*Allowed*" means, with respect to any Claim, except as otherwise provided herein: (a) a Claim allowed pursuant to the Prepackaged Plan or a Final Order; (b) a Claim that is scheduled by the Debtors as not contingent, not unliquidated, and not disputed, and for which no Proof of Claim, as applicable, has been timely Filed; or (c) a Claim that is evidenced by a Proof of Claim or a request for payment of an Administrative Claim, as applicable, timely Filed (or for which Claim a Proof of Claim is not required under the Prepackaged Plan, the Bankruptcy Code, or a Final Order); *provided* that with respect to a Claim described in clauses (b) and (c) above, such Claim shall be Allowed only if and to the extent that with respect to such Claim no objection to the allowance thereof is interposed within the applicable period of time fixed by the Prepackaged Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or such an objection is so interposed and the Claim has been Allowed by a Final Order; *provided further* that the Reorganized Debtors or Post-Effective Date Debtors shall retain all claims and defenses with respect to Allowed Claims that are Reinstated or otherwise Unimpaired pursuant to the Prepackaged Plan. To the extent applicable, any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated, or disputed, and for which no contrary or superseding Proof of Claim is or has been timely Filed, or that is not or has not been Allowed by a Final Order, is not considered Allowed and shall be expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Bankruptcy Court. Unless expressly waived by the Prepackaged Plan, the Allowed amount of Claims or Interests shall be subject to and shall not exceed the limitations or maximum amounts permitted by the Bankruptcy Code, including sections 502 or 503 of the Bankruptcy Code, to the extent applicable. Notwithstanding anything to the contrary herein, no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes the applicable Debtor or Reorganized Debtor.

26. "*Alternative Restructuring Proposal*" has the meaning set forth in the Restructuring Support Agreement.

27. "*Assumed Executory Contracts and Unexpired Leases Schedule*" means, in the event of a Sale Transaction, a schedule of Executory Contracts and Unexpired Leases to be assumed by the Debtors pursuant to the Prepackaged Plan, which shall be included in the Plan Supplement, as the same may be amended, modified, or supplemented from time to time.

28. "*Auction*" means the auction, if any, conducted by the Debtors in accordance with the Bidding Procedures if one or more Qualified Bids are received by the Bid Deadline.

29. "*Avoidance Actions*" means any and all actual or potential avoidance, recovery, subordination, or other Claims, Causes of Action, or remedies that may be brought by or on behalf of the Debtors or their Estates or other authorized parties in interest under the Bankruptcy Code or applicable non-bankruptcy Law, including Claims, Causes of Action, or remedies under sections 502, 510, 542, 544, 545, 547 through 553, and 724(a) of the Bankruptcy Code or under similar local, state, federal, or foreign statutes and common law, including fraudulent transfer Laws.

30. "*Ayrmid*" means Ayrmid Ltd., together with its Affiliates party to the Merger Agreement, party to any other agreement related to the Reorganization Transaction, or otherwise participating in the Restructuring Transactions, in each case in its capacity as such.

31. "*Aymrid Advisors*" means (a) Paul Hastings LLP, as counsel to Aymrid, (b) a single local counsel retained by Aymrid, and (c) any other advisor retained by Aymrid, as may be mutually agreed to by Aymrid and the Debtors.

32. "*Aymrid Term Loan*" means the indebtedness (including all principal, accrued and unpaid interest, fees, and other expenses) of Aymrid and its subsidiaries outstanding under that certain Loan and Security Agreement, dated as of December 12, 2022, as amended by the First Amendment to Loan Agreement, dated as of March 13, 2025, and as further amended, amended and restated, supplemented, or otherwise modified from time to time prior to the date hereof.

33. "*Aymrid Transaction Term Sheet*" has the meaning set forth in the Restructuring Support Agreement.

34. "*Back-Up Bid*" means, if Aymrid is designated as the Back-Up Bidder, Aymrid's commitment to consummate the Reorganization Transaction on the terms set forth in the Restructuring Support Agreement, the Bidding Procedures Order, and the Prepackaged Plan (as such terms may be improved by Aymrid at the Auction), which commitment shall remain open and irrevocable until the Back-Up Bid Termination Date in accordance with the Bidding Procedures Order.

35. "*Back-Up Bid Termination Date*" means the earlier of (a) the date on which the transaction contemplated by the Successful Bid is consummated and (b) the date that is 110 days after the Petition Date.

36. "*Back-Up Bidder*" means Aymrid, if and to the extent designated by the Debtors as the back-up bidder in accordance with the Bidding Procedures Order following the selection of a Successful Bid submitted by an Entity other than Aymrid.

37. "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended from time to time.

38. "*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of Texas.

39. "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure promulgated under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court, each as amended from time to time.

40. "*Bid Deadline*" means the deadline for the submission of Qualified Bids under the Bidding Procedures Order.

41. "*Bid Protections*" means, subject to the Restructuring Support Agreement, any break-up fee, termination fee, expense reimbursement, or other bid protections approved by the Bankruptcy Court pursuant to the Bidding Procedures Order or any other order of the Bankruptcy Court, in the amounts and on the terms set forth therein.

42. "*Bidding Procedures*" means the procedures governing the marketing of the Debtors' assets, the solicitation and evaluation of Qualified Bids, the conduct of any Auction, and the selection of any Successful Bid and the designation of any Back-Up Bidder in connection with the Sale Transaction, as approved in the Bidding Procedures Order and as may be amended from time to time in accordance with their terms.

43. "*Bidding Procedures Motion*" means the motion Filed by the Debtors seeking entry of the Bidding Procedures Order.

44. "*Bidding Procedures Order*" means the order (or, if applicable, the orders, collectively) entered by the Bankruptcy Court, *inter alia*, approving the Bidding Procedures, the Form APA, and the Bid Protections, and establishing the Bid Deadline, the date of any Auction, and related deadlines in accordance with such procedures,

which order shall be consistent in all material respects with the Restructuring Support Agreement and the Prepackaged Plan.

45. "*Business Day*" means any day other than a Saturday, Sunday, or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the State of New York.

46. "*Carve-Out*" has the meaning set forth in the DIP Orders.

47. "*Cash*" or "*$*" means cash in legal tender of the United States of America and cash equivalents, including bank deposits, checks, and other similar items.

48. "*Cash Collateral*" has the meaning set forth in section 363(a) of the Bankruptcy Code.

49. "*Cause of Action*" or "*Causes of Action*" means any claims, interests, damages, remedies, causes of action, demands, rights, actions, controversies, proceedings, agreements, suits, obligations, liabilities, judgments, accounts, defenses, offsets, powers, privileges, licenses, Liens, indemnities, and guaranties, of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, contingent or non-contingent, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable, directly or derivatively, matured or unmatured, suspected or unsuspected, whether arising before, on, or after the Petition Date, in contract, tort, law, equity, or otherwise. Causes of Action also include: (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by Law or in equity; (b) any claim based on or relating to, or in any manner arising from, in whole or in part, tort, breach of contract, breach of fiduciary duty, violation of state or federal Law or breach of any duty imposed by Law or in equity, including securities Laws, negligence, and gross negligence; (c) the right to object to or otherwise contest Claims or Interests; (d) claims pursuant to section 362 or chapter 5 of the Bankruptcy Code; (e) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (f) any other Avoidance Action.

50. "*Chapter 11 Cases*" means (a) when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court and (b) when used with reference to all the Debtors, the procedurally consolidated chapter 11 cases pending for the Debtors in the Bankruptcy Court.

51. "*Claim*" means any claim, as defined in section 101(5) of the Bankruptcy Code, against any of the Debtors.

52. "*Claims and Balloting Agent*" means Stretto, Inc., the notice, claims, and solicitation agent retained by the Debtors in the Chapter 11 Cases.

53. "*Claims Register*" means the official register of Claims and Interests maintained by the Claims and Balloting Agent.

54. "*Class*" means a class of Claims or Interests as set forth in Article III of the Prepackaged Plan pursuant to section 1122(a) of the Bankruptcy Code.

55. "*CM/ECF*" means the Bankruptcy Court's Case Management and Electronic Case Filing system.

56. "*Collateral Trust Agreement*" means that certain Collateral Trust Agreement, dated as of October 10, 2025, by and among Parent, the guarantors party thereto, the 1.5L 2028 Notes Trustee, the 2L 2029 Notes Trustee, and the 2L Collateral Trustee, as amended, restated, amended and restated, supplemented, or otherwise modified from time to time.

57. "*Company Parties*" means Parent and each of its direct and indirect subsidiaries.

58. "*Company-Related Matters*" means anything related to the Company Parties or the Debtors (including the management, ownership, or operation thereof), the purchase, sale, amendment, or rescission of any Claim against or Interest in the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim

or Interest that is treated in the Prepackaged Plan, the business or contractual arrangements between any Company Parties and any Released Party, the distribution of any Cash or other property of the Debtors to any Released Party, the assertion or enforcement of rights or remedies against the Debtors, the Company Parties' in- or out-of-court restructuring efforts, the Company Parties' intercompany transactions, the Chapter 11 Cases and any related adversary proceedings, the formulation, preparation, dissemination, solicitation, negotiation, entry into, or Filing of, as applicable, the Chapter 11 Cases, the Restructuring Support Agreement, the September 2026 Forbearance Agreement (and any other forbearance agreement with respect to prepetition Claims against the Debtors), the Forbearance Fee Agreement, the DIP Facility Documents, the Definitive Documents, the Disclosure Statement, the New Corporate Governance Documents, the Prepackaged Plan (including, for the avoidance of doubt, the Plan Supplement), or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the foregoing (including, for the avoidance of doubt, any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Prepackaged Plan or the reliance by any Released Party on the Prepackaged Plan or the Confirmation Order in lieu of such legal opinion), the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Prepackaged Plan, including the issuance or distribution of Securities pursuant to the Prepackaged Plan, or the distribution of property under the Prepackaged Plan or any other related agreement or upon any other related act, or omission, transaction, agreement, event, or other occurrence related or relating to any of the foregoing taking place on or before the Effective Date.

59. "*Confirmation*" means the Bankruptcy Court's entry of the Confirmation Order on the docket of the Chapter 11 Cases.

60. "*Confirmation Date*" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

61. "*Confirmation Hearing*" means the hearing to be held by the Bankruptcy Court on confirmation of the Prepackaged Plan and the adequacy of the Disclosure Statement, as such hearing may be continued from time to time.

62. "*Confirmation Order*" means the order of the Bankruptcy Court confirming the Prepackaged Plan pursuant to, *inter alia*, section 1129 of the Bankruptcy Code and approving the Disclosure Statement as containing, among other things, "adequate information" as required by section 1125 of the Bankruptcy Code.

63. "*Consenting 2028 Noteholders*" means the holders of 1.5L 2028 Notes Claims that have executed and delivered counterpart signature pages, transfer agreements, or joinders to the Restructuring Support Agreement.

64. "*Consenting 2029 Noteholders*" means the holders of 2L 2029 Notes Claims that have executed and delivered counterpart signature pages, transfer agreements, or joinders to the Restructuring Support Agreement.

65. "*Consenting Funded Debt Parties*" means, collectively, the Consenting Term Loan Lenders, the Consenting 2028 Noteholders, and the Consenting 2029 Noteholders.

66. "*Consenting Preferred Shareholders*" means the holders of Existing Preferred Interests that have executed and delivered counterpart signature pages, transfer agreements, or joinders to the Restructuring Support Agreement.

67. "*Consenting Royalty Investors*" means the holders of RIFA Claims that have executed and delivered counterpart signature pages, transfer agreements, or joinders to the Restructuring Support Agreement.

68. "*Consenting Stakeholders*" means, collectively, the Consenting Funded Debt Parties, the Consenting Royalty Investors, and the Consenting Preferred Shareholders.

69. "*Consenting Term Loan Lenders*" means the holders of 1L Term Loan Claims that have executed and delivered counterpart signature pages, transfer agreements, or joinders to the Restructuring Support Agreement.

70. "*Consummation*" means the occurrence of the Effective Date.

71. "*Covered Employee*" means each individual employed by any Debtor immediately before the Effective Date, other than any individual who is then an "executive officer" of Parent (as defined in Rule 3b-7 under the Exchange Act).

72. "*Cure*" means all amounts, including an amount of $0.00, required to cure any monetary defaults under any Executory Contract or Unexpired Lease (or such lesser amount as may be agreed upon by the parties under an Executory Contract or Unexpired Lease) that is to be assumed by the Debtors pursuant to sections 365 or 1123 of the Bankruptcy Code, other than a default that is not required to be cured pursuant to section 365(b)(2) of the Bankruptcy Code.

73. "*D&O Liability Insurance Policies*" means all insurance policies of any of the Debtors for directors', managers', and officers' liability existing as of the Petition Date (including any "tail policy") and all agreements, documents, or instruments relating thereto.

74. "*Debtors*" means, collectively, Karyopharm Therapeutics Inc. and KPT Texas LLC.

75. "*Debtor Release*" means the release set forth in Article VIII.C of the Prepackaged Plan.

76. "*Definitive Documents*" means (a) the Restructuring Support Agreement; (b) the Prepackaged Plan; (c) the Confirmation Order; (d) the Disclosure Statement; (e) the Disclosure Statement Order; (f) the Solicitation Materials; (g) the First Day Pleadings and all orders sought pursuant thereto; (h) the DIP Facility Documents; (i) the Plan Supplement; (j) the Bidding Procedures Motion and the Bidding Procedures Order; (k) the Sale Order; (l) the Merger Agreement or any Purchase Agreement or other asset purchase agreement with respect to the Debtors' assets; (m) the New Corporate Governance Documents; (n) the NewCo Facility Documents; (o) the MF CVR Agreement; (p) the New Royalty Agreement; (q) the Plan Administrator Agreement; (r) the Wind-Down Budget; and (s) any and all other agreements, deeds, documentation, instruments, notices, filings, pleadings, motions, applications, briefs, objections, responses, declarations, affidavits, schedules, certificates, letters, memoranda, term sheets, stipulations, settlements, releases, and orders (and any amendments, modifications, or supplements to any of the foregoing) that are necessary or advisable (or that are executed or delivered) to implement, consummate, or document the Restructuring Support Agreement, the Prepackaged Plan, and/or the Restructuring Transactions (in each case, including all exhibits, schedules, amendments, modifications, supplements, appendices, annexes, instructions, and attachments thereto).

77. "*DIP Agent*" means the administrative agent, collateral agent, or similar Entity under the DIP Facility.

78. "*DIP Budget*" has the meaning set forth in the DIP Orders.

79. "*DIP Claims*" means any and all Claims arising under, derived from, or based upon the DIP Facility Documents, including Claims in respect of all principal amounts outstanding, interest, fees, redemption premiums, exit fees, expenses, costs, and other charges arising thereunder or related thereto, including postpetition interest, and all other DIP Obligations and Obligations (in each case as defined in the DIP Facility Documents), which DIP Claims shall have the priorities set forth in the DIP Facility Documents.

80. "*DIP Credit Agreement*" means the debtor-in-possession credit and guaranty agreement governing the DIP Facility, to be entered into in connection with entry of the Final DIP Order by and among Parent, as borrower, the Debtor guarantors party thereto, the DIP Agent, and the DIP Lenders, as may be amended, amended and restated, supplemented, or otherwise modified from time to time.

81. "*DIP Facility*" means the senior secured debtor-in-possession financing facility for the DIP Loans, entered into on the terms and conditions set forth in the DIP Facility Documents.

82. "*DIP Facility Documents*" means the DIP Facility Term Sheet, the DIP Credit Agreement, and any other documents governing the DIP Facility that are entered into in accordance with the DIP Facility Term Sheet (or DIP Credit Agreement, as applicable), and the DIP Orders, and any amendments, modifications, and supplements thereto, together with any related notes, certificates, agreements, security agreements, documents, and instruments (including any amendments, restatements, supplements, or modifications of any of the foregoing) related to or executed in connection therewith.

83. "*DIP Facility Term Sheet*" means the term sheet attached as Exhibit D to the Restructuring Support Agreement; *provided* that, following entry of the DIP Orders, the version attached to the applicable DIP Order, which may be the DIP Credit Agreement, shall control.

84. "*DIP Lenders*" means the lenders providing the DIP Facility under the DIP Facility Documents.

85. "*DIP Loans*" means the loans provided under the DIP Facility, which shall be treated in accordance with Article II.B of the Prepackaged Plan.

86. "*DIP New Money Claims*" means any DIP Claim in respect of the new money term loans advanced under the DIP Facility, including accrued but unpaid interest thereon (including interest paid in kind) and fees (including any exit fee) and expenses payable in respect thereof under the DIP Facility Documents, which shall be treated in accordance with Article II.B hereof.

87. "*DIP New Money Equity Distribution*" means, subject to the Restructuring Transactions Memorandum, 0% to 2.521% (depending on the amount of the Allowed Equitized DIP New Money Claims as of immediately prior to the effectiveness of the Prepackaged Plan) of the Reorganized Parent Common Stock issued and outstanding on the Effective Date, to be distributed Pro Rata to Holders of Allowed Equitized DIP New Money Claims in accordance with Article II.B hereof.

88. "*DIP Orders*" means, together, the Interim DIP Order, the Final DIP Order, and any other order approving the DIP Facility.

89. "*DIP Roll-Up Claims*" means any DIP Claim in respect of the loans deemed made under the DIP Facility upon the roll-up of 1L Term Loan Claims in accordance with the DIP Facility Documents, including accrued but unpaid interest thereon and fees and expenses payable in respect thereof under the DIP Facility Documents.

90. "*DIP Roll-Up Equity Distribution*" means, in the event of the Reorganization Transaction and subject to the Restructuring Transactions Memorandum, 21.685% to 22.246% (depending on the amount of Reorganized Parent Common Stock distributed to Holders of Allowed Equitized DIP New Money Claims) of the Reorganized Parent Common Stock issued and outstanding on the Effective Date.

91. "*Disbursing Agent*" means, as applicable, the Debtors, the Reorganized Debtors, the Post-Effective Date Debtors, the Post-Effective Date Plan Administrator, or such other Entity or Entities selected by the Debtors, the Reorganized Debtors, the Post-Effective Date Debtors, or the Post-Effective Date Plan Administrator, in each case, in consultation with the Required Consenting Funded Debt Parties, to make or facilitate distributions pursuant to the Prepackaged Plan.

92. "*Disclosure Statement*" means the disclosure statement for the Prepackaged Plan, including all exhibits and schedules thereto, to be approved by the Confirmation Order, a copy of which is attached to the Restructuring Support Agreement as Exhibit C.

93. "*Disclosure Statement Order*" means the order of the Bankruptcy Court approving the Disclosure Statement on a final basis and approving the Solicitation Materials, which order may be the Confirmation Order.

94. "*Disputed*" means, as to a Claim or an Interest, any Claim or Interest: (a) that is not Allowed; (b) that is not disallowed by the Prepackaged Plan, the Bankruptcy Code, or a Final Order, as applicable; (c) as to which a dispute is being adjudicated by a court of competent jurisdiction in accordance with non-bankruptcy Law; (d) that is

Filed in the Bankruptcy Court and not withdrawn, as to which a timely objection or request for estimation has been Filed; or (e) with respect to which a party in interest has Filed a Proof of Claim or otherwise made a written request to a Debtor for payment, without any further notice to or action, order, or approval of the Bankruptcy Court.

95. "*Distribution Date*" means, except as otherwise set forth herein, the date or dates determined by the Debtors or the Reorganized Debtors, on or after the Effective Date, with the first such date occurring on or as soon as is reasonably practicable after the Effective Date, upon which the Disbursing Agent shall make distributions to Holders of Allowed Claims and Interests entitled to receive distributions under the Prepackaged Plan.

96. "*Distribution Record Date*" means the record date for purposes of making distributions under the Prepackaged Plan on account of Allowed Claims and Interests except with respect to public securities, which date shall be on or as soon as is reasonably practicable after the Effective Date.

97. "*DTC*" means the Depository Trust Company.

98. "*Effective Date*" means, as to the applicable Debtor, (a) the date that is the first Business Day after the Confirmation Date on which (i) no stay of the Confirmation Order is in effect and (ii) all conditions precedent to the occurrence of the Effective Date set forth in Article IX.A of the Prepackaged Plan have been satisfied or waived in accordance with Article IX.B of the Prepackaged Plan, or (b) such other date as may be mutually agreed to by the Debtors, the Required Consenting Funded Debt Parties, and, in the event of the Reorganization Transaction, Ayrmid. Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable thereafter.

99. "*Entity*" has the meaning set forth in section 101(15) of the Bankruptcy Code, including "person" (as defined in section 101(41) of the Bankruptcy Code) and "governmental unit" (as defined in section 101(27) of the Bankruptcy Code).

100. "*Equitized DIP New Money Claims*" means the portion of the Allowed DIP New Money Claims, if any, that exceeds the amount of such Allowed DIP New Money Claims repaid in Cash pursuant to clause (i) of Article II.B.1 hereof.

101. "*Estate*" means, as to each Debtor, the estate created for such Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code upon the commencement of such Debtor's Chapter 11 Case.

102. "*Exchange Act*" means the Securities Exchange Act of 1934, 15 U.S.C. § 78a, *et seq.*, as amended from time to time, and the rules and regulations promulgated thereunder.

103. "*Exculpated Parties*" means, collectively, and in each case in its capacity as such: (a) each of the Debtors; (b) each of the disinterested directors of the board of directors of Karyopharm Therapeutics Inc.; and (c) any statutory committee appointed in the Chapter 11 Cases and each of its respective members, solely in their respective capacities as such.

104. "*Executory Contract*" means a contract to which one or more of the Debtors is a party and that is subject to assumption or rejection under section 365 or 1123 of the Bankruptcy Code.

105. "*Existing Common Stock Interests*" means shares of the class of common stock of Parent, which as of the Petition Date are traded and quoted on the NASDAQ under the symbol "KPTI" and that exist immediately prior to the Effective Date, including shares issuable pursuant to (a) any restricted stock units of Parent that vest upon a "change of control" transaction and (b) the exercise in accordance with their terms prior to the Effective Date of any stock options or warrants issued by Parent.

106. "*Existing Preferred Interests*" means shares of any series of preferred stock of Parent that exist immediately prior to the Effective Date.

107. "*Federal Judgment Rate*" means the federal judgment rate in effect as of the Petition Date.

108. "*File*," "*Filed*," or "*Filing*" means file, filed, or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases.

109. "*Final DIP Order*" means any order approving the DIP Facility and authorizing the Debtors' use of Cash Collateral on a final basis.

110. "*Final Order*" means, as applicable, an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction with respect to the relevant subject matter, which has not been reversed, stayed, modified, or amended, including any order subject to appeal but for which no stay of such order has been entered, and as to which the time to appeal, seek certiorari, or move for a new trial, reargument, or rehearing has expired and as to which no appeal, petition for certiorari, or other proceeding for a new trial, reargument, or rehearing has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be Filed has been withdrawn with prejudice, resolved by the highest court to which the order or judgment was appealed or from which certiorari could be sought, or any request for new trial, reargument, or rehearing has been denied, resulted in no stay pending appeal or modification of such order, or has otherwise been dismissed with prejudice; *provided*, that no order or judgment shall fail to be a "Final Order" solely because of the possibility that a motion under rules 59 or 60 of the Federal Rules of Civil Procedure or any analogous Bankruptcy Rule (or any analogous rules applicable in another court of competent jurisdiction) or sections 502(j) or 1144 of the Bankruptcy Code has been or may be Filed with respect to such order or judgment.

111. "*First Day Pleadings*" means the pleadings Filed by the Debtors on or about the Petition Date seeking ordinary and customary relief in the Chapter 11 Cases.

112. "*Forbearance Fee Agreement*" means that certain letter agreement, Re: Fee Agreement Pursuant to Forbearance Agreement, dated as of September 10, 2026, entered into by and among Parent and each of the Consenting Stakeholders party to the September 2026 Forbearance Agreement, as amended, restated, amended and restated, supplemented, or otherwise modified from time to time.

113. "*Form APA*" means the form of asset purchase agreement attached to the Bidding Procedures.

114. "*General Unsecured Claim*" means any Claim against any of the Debtors that is not (a) paid in full prior to the Effective Date pursuant to an order of the Bankruptcy Court; (b) an Administrative Claim; (c) a DIP Claim; (d) a Secured Claim; (e) an Other Secured Claim; (f) a Priority Tax Claim; (g) an Other Priority Claim; (h) a Prepetition Funded Debt Claim; (i) a RIFA Claim; (j) an Intercompany Claim; or (k) a Section 510(b) Claim.

115. "*German RemainCo*" has the meaning set forth in Article IV.U hereof.

116. "*German RemainCo Winddown Account*" has the meaning set forth in Article IV.U hereof.

117. "*Governing Body*" means, in each case in its capacity as such, the board of directors, board of managers, manager, general partner, special committee, or such similar governing body of any of the Debtors, the Reorganized Debtors, NewCo, or the Post-Effective Date Debtors, as applicable.

118. "*Governmental Unit*" has the meaning set forth in section 101(27) of the Bankruptcy Code.

119. "*Holder*" means an Entity holding a Claim against or an Interest in a Debtor, as applicable.

120. "*Impaired*" means with respect to a Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

121. "*Indemnification Entity*" has the meaning set forth in Article IV.T hereof.

122. "*Intercompany Claim*" means any Claim against a Debtor or an Affiliate of a Debtor held by another Debtor or an Affiliate of a Debtor.

123. "*Intercompany Interest*" means an Interest in a Debtor held by another Debtor.

124. "*Intercreditor Agreement*" means that certain Amended and Restated Intercreditor Agreement, dated as of October 10, 2025, by and among the 1L Agent, the 2L Collateral Trustee, and the Royalty Collateral Agent, as acknowledged by Parent and the other grantors party thereto, as may be amended, restated, amended and restated, supplemented, or otherwise modified from time to time.

125. "*Interest*" means any "equity security" (as such term is defined in section 101(16) of the Bankruptcy Code) in any of the Debtors, including all shares (or any class thereof), common stock, preferred stock, limited liability company interests, membership interests, and any other equity, ownership, or profits interests of any Debtor, and options, warrants, rights, stock appreciation rights, phantom units, incentives, restricted stock units, commitments, calls, redemption rights, repurchase rights, or other securities or arrangements, whether fully vested or vesting in the future, to acquire or subscribe for, or which are convertible into, or exercisable or exchangeable for the shares (or any class thereof) of, common stock, preferred stock, limited liability company interests, membership interests, or any other equity, ownership, or profits interests of any Debtor (in each case whether or not arising under or in connection with any employment agreement), excluding, for the avoidance of doubt, convertible debt securities; *provided* that 1.5L 2028 Notes Claims and 2L 2029 Notes Claims shall not constitute Interests.

126. "*Interim DIP Order*" means one or more orders entered on an interim basis approving the DIP Facility and the DIP Facility Documents and authorizing the Debtors' use of Cash Collateral.

127. "*Judicial Code*" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001, as amended from time to time.

128. "*KPTI Severance Plans*" means each severance, separation pay, salary continuation, and termination pay or benefits plan, policy, program, guideline, and practice of the Debtors, whether written or unwritten, as in effect on the date of the Restructuring Support Agreement; *provided* that any obligations owed to Covered Employees under the KPTI Severance Plans as of the Effective Date shall not exceed the amounts set forth on Annex A to the Ayrmid Transaction Term Sheet.

129. "*Law*" means any federal, state, local, or foreign law (including common law), statute, code, ordinance, rule, regulation, order, ruling, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a governmental authority of competent jurisdiction (including the Bankruptcy Court).

130. "*Lien*" has the meaning set forth in section 101(37) of the Bankruptcy Code.

131. "*Management Incentive Plan*" means the management incentive plan, if any, to be implemented by NewCo on or after the Effective Date on terms acceptable to Ayrmid and the Required Consenting Funded Debt Parties and approved by the New Board.

132. "*Merger*" means, subject to the Restructuring Transactions Memorandum, (a) the merger involving Reorganized Parent and Ayrmid, with Reorganized Parent (and, if NewCo is not Ayrmid, Ayrmid) surviving as wholly owned subsidiaries of NewCo, or (b) such other transactions detailed in the Restructuring Transactions Memorandum designed to combine the businesses or assets of Reorganized Parent and Ayrmid, in each case as set forth in the Merger Agreement and to be consummated on the Effective Date substantially concurrently with the issuance of the Reorganized Parent Equity Distribution as a Restructuring Transaction pursuant to the Merger Agreement and Article IV.J of the Prepackaged Plan.

133. "*Merger Agreement*" means that certain Agreement and Plan of Merger (or other agreement, instrument, or document providing for the combination of the businesses or assets of Reorganized Parent and Ayrmid), including all exhibits and schedules thereto, as may be amended, modified, or supplemented in accordance with the terms thereof and the Restructuring Support Agreement, a substantially final form of which shall be Filed with the Plan Supplement.

134. "*Merger Consideration*" means, subject to the Restructuring Transactions Memorandum, the consideration issued by NewCo in the Merger as set forth in the Merger Agreement to the Holders of Allowed Prepetition Funded Debt Claims, Allowed Equitized DIP New Money Claims, and Allowed DIP Roll-Up Claims, as the holders of the Reorganized Parent Common Stock immediately prior to the Merger, which consideration shall consist of (a) 55.0% of the New Common Stock issued and outstanding on the Effective Date after giving effect to the Merger, subject to dilution solely by any Omisirge Contingent Equity and the Management Incentive Plan, and (b) the MF CVRs issued by NewCo under the MF CVR Agreement.

135. "*MF CVR Agreement*" means that certain contingent value rights agreement, to be entered into on the Effective Date by and among NewCo and the initial holders of the MF CVRs issued thereunder, setting forth the terms and conditions of the MF CVRs, a substantially final form of which shall be Filed with the Plan Supplement.

136. "*MF CVRs*" means the contingent value rights to be issued by NewCo under the MF CVR Agreement and distributed to Holders of Allowed Prepetition Funded Debt Claims, Allowed Equitized DIP New Money Claims, and Allowed DIP Roll-Up Claims as part of the Merger Consideration, in each case on the terms and subject to the conditions set forth in the MF CVR Agreement.

137. "*NASDAQ*" means Nasdaq Stock Market, together with any successors thereto.

138. "*New Board*" means, in the event of the Reorganization Transaction, the boards of directors or members of the applicable Governing Bodies of NewCo, the Reorganized Parent or the other Reorganized Debtors, as applicable, as set forth in the Plan Supplement.

139. "*NewCo*" means, in the event of consummation of the Reorganization Transaction, and subject to the Restructuring Transactions Memorandum, the Entity that, upon consummation of the transactions pursuant to the Merger, shall directly or indirectly own 100% of the equity interests or assets of Reorganized Parent and Ayrmid as identified in the Merger Agreement and the Restructuring Transactions Memorandum.

140. "*NewCo Facility*" means, in the event of the Reorganization Transaction, the senior secured exit term loan facility in an aggregate principal amount of up to $135,000,000 in new money loans entered into by NewCo (or such other borrower identified in the NewCo Facility Documents) and certain other Reorganized Debtors, as applicable, and governed by the NewCo Facility Documents.

141. "*NewCo Facility Documents*" means the credit agreement among NewCo and certain other Reorganized Debtors and Affiliates, as applicable, and the lenders (which may include any Consenting Funded Debt Party, DIP Lender, or any of their respective Affiliates or managed or controlled funds) and administrative and collateral agents party thereto to effectuate the issuance of the exit term loans, any security agreement, and all other documentation governing the NewCo Facility, substantially final forms of which shall be Filed with the Plan Supplement.

142. "*New Common Stock*" means, in the event of the Reorganization Transaction, common equity interests of NewCo to be issued pursuant to the Prepackaged Plan, the Merger Agreement (including the Merger Consideration), and the Restructuring Transactions Memorandum or as otherwise permitted pursuant to the New Corporate Governance Documents.

143. "*New Corporate Governance Documents*" means, in the event of the Reorganization Transaction, the organizational and governance documents of NewCo or the Reorganized Debtors, as applicable, after giving effect to the Restructuring Transactions, including charters, bylaws, operating agreements, or other organizational documents or shareholders' or investors' agreements, as applicable, which shall be Filed with the Plan Supplement (provided that, with respect to the Reorganized Debtors other than NewCo, the New Corporate Governance Documents need only be Filed to the extent of any material amendments to the Prepetition Organizational Documents).

144. "*New Royalty Agreement*" means, in the event of the Reorganization Transaction, the new royalty agreement to be entered into on the Effective Date by and between NewCo, on the one hand, and the Holders of RIFA Claims (or their designee) and the Royalty Collateral Agent (or another collateral agent designated by the Holders of

RIFA Claims), on the other hand, as described in Article IV.V hereof, a substantially final form of which shall be Filed with the Plan Supplement.

145. "*Notice of Non-Voting Status*" means the notice to be provided to Holders of Claims and Interests in Classes that are not entitled to vote to accept or reject the Prepackaged Plan, in the form approved by order of the Bankruptcy Court, which shall include, as applicable, the form by which such Holders may elect to opt out of, or opt in to, the releases set forth in Article VIII.D hereof.

146. "*Omisirge Contingent Equity*" means, in the event of the Reorganization Transaction, the additional New Common Stock issuable to the equityholders of Ayrmid pursuant to the Merger Agreement (and, to the extent applicable, the New Corporate Governance Documents or a separate contingent value rights or similar agreement entered into by NewCo on the Effective Date, a substantially final form of which, if applicable, shall be Filed with the Plan Supplement) as described in Article IV.K hereof.

147. "*Other Equity Interests*" means any and all Interests in the Debtors other than Existing Common Stock Interests, Existing Preferred Interests, or Intercompany Interests, including any and all outstanding and unexercised or unvested warrants, options, or rights to acquire Existing Common Stock Interests or other Interests in the Debtors existing immediately prior to the Effective Date and any Section 510(b) Claims.

148. "*Other Priority Claim*" means any Unsecured Claim, other than an Administrative Claim, a Priority Tax Claim, or a RIFA Claim, entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

149. "*Other Secured Claim*" means any Secured Claim other than a DIP Claim, Prepetition Funded Debt Claim, or RIFA Claim.

150. "*Parent*" means Karyopharm Therapeutics Inc.

151. "*Person*" has the meaning set forth in section 101(41) of the Bankruptcy Code.

152. "*Petition Date*" means the date on which the Debtors commenced the Chapter 11 Cases.

153. "*Plan Administrator Agreement*" means, in the event of a Sale Transaction that results in one or more Post-Effective Date Debtor(s), the agreement between the Post-Effective Date Plan Administrator and the Post-Effective Date Debtor(s) regarding the administration and wind-down of the Post-Effective Date Debtor(s)' assets and other matters related to their applicable Estate(s), which shall be Filed as part of the Plan Supplement and shall be in form and substance acceptable to the Required Consenting Funded Debt Parties.

154. "*Plan Distribution*" means a payment or distribution of consideration to Holders of Allowed Claims and Allowed Interests under the Prepackaged Plan.

155. "*Plan Supplement*" means the compilation of documents and forms of documents, term sheets, agreements, schedules, and exhibits to the Prepackaged Plan (in each case, as may be altered, amended, modified, or supplemented up to and through the Effective Date in accordance with the terms hereof and the Restructuring Support Agreement, including the consent rights contained therein) to be Filed prior to the Confirmation Hearing to the extent available, and any additional documents Filed prior to the Effective Date as amendments to the Plan Supplement, including the following, as applicable: (a) the Schedule of Retained Causes of Action; (b) in the event of the Reorganization Transaction, (i) the New Corporate Governance Documents; (ii) to the extent known, the identities of the members of the New Board of NewCo and Reorganized Parent; (iii) the Rejected Executory Contracts and Unexpired Leases Schedule; (iv) the Merger Agreement; (v) the MF CVR Agreement; (vi) the NewCo Facility Documents; (vii) the New Royalty Agreement; (viii) the Restructuring Transactions Memorandum; and (ix) to the extent known, the identity and compensation of any insiders (as such term is defined in section 101(31) of the Bankruptcy Code) who will be employed or retained by the Reorganized Debtors (including NewCo); (c) in the event of a Sale Transaction, (i) the identity of the Post-Effective Date Plan Administrator; (ii) the Plan Administrator Agreement; (iii) the Assumed Executory Contracts and Unexpired Leases Schedule; and (iv) the Sale Transaction Documents; and (d) any and all other agreements, deeds, documentation, instruments, notices, schedules, certificates,

term sheets, and other documents (and any amendments, modifications, or supplements to any of the foregoing) that are necessary or advisable to implement, consummate, or document the Prepackaged Plan or the Restructuring Transactions or that are contemplated by the Prepackaged Plan, together with all exhibits, attachments, schedules, agreements, documents, and instruments referred to in any of the foregoing, ancillary or otherwise.

156. "*Post-Effective Date Debtors*" means, in the event of a Sale Transaction, the Debtors after the Effective Date.

157. "*Post-Effective Date Plan Administrator*" means, in the event of a Sale Transaction, the Person or Entity selected by the Debtors, with the consent of the Required Consenting Funded Debt Parties, and identified in the Plan Supplement to be appointed on the Effective Date and who will serve as the plan administrator for the Post-Effective Date Debtors as set forth in Article IV.R.2 of the Prepackaged Plan.

158. "*Prepackaged Plan*" means this joint chapter 11 plan of reorganization, the Plan Supplement, and all exhibits and schedules annexed hereto or referenced herein, in each case, as may be amended, supplemented, or otherwise modified from time to time in accordance with the Bankruptcy Code, the Restructuring Support Agreement, and the terms hereof.

159. "*Prepetition Agents*" means, collectively, the 1L Agent, the 1.5L 2028 Notes Trustee, the 2L 2029 Notes Trustee, the 2L Collateral Trustee, and the Royalty Collateral Agent, each in its capacity as such.

160. "*Prepetition Funded Debt Claims*" means, collectively, the 1L Term Loan Claims, the 1.5L 2028 Notes Claims, and the 2L 2029 Notes Claims.

161. "*Prepetition Organizational Documents*" means the formation documents and governance documents for the Debtors as of the Petition Date.

162. "*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

163. "*Pro Rata*" means the proportion that an Allowed Claim or an Allowed Interest in a particular Class bears to the aggregate amount of Allowed Claims or Allowed Interests in that Class, unless otherwise indicated.

164. "*Professional*" means an Entity: (a) employed pursuant to a Bankruptcy Court order in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Confirmation Date, pursuant to sections 327, 328, 329, 330, 331, and 363 of the Bankruptcy Code; or (b) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

165. "*Professional Fee Account*" means an account to be funded by the Debtors with Cash on the Effective Date in an amount equal to the Professional Fee Amount.

166. "*Professional Fee Amount*" means the aggregate amount of Professional Fee Claims and other unpaid fees and expenses that the Professionals estimate they have incurred or will incur in rendering services to the Debtors as set forth in Article II.C of the Prepackaged Plan.

167. "*Professional Fee Claim*" means a Claim by a Professional seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date under sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code.

168. "*Proof of Claim*" means a proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

169. "*Purchase Agreement*" means, if any, the definitive purchase agreement(s) effectuating the Sale Transaction, including all exhibits and schedules thereto, and as may be amended, modified, or supplemented in accordance with the terms thereof, which shall be in form and substance consistent with the Bidding Procedures, the Successful Bid Mandatory Conditions, and the Restructuring Support Agreement.

170. "*Purchaser*" means one or more Entities that are the purchaser or purchasers under the Purchase Agreement(s), if any, together with any successors to and permitted assigns of such purchaser(s).

171. "*Qualified Bid*" means a bid that is determined by the Debtors to be a qualified bid in accordance with the Bidding Procedures, which shall satisfy the Successful Bid Mandatory Conditions.

172. "*Qualifying Termination*" means a termination of a Covered Employee's employment during the Severance Protection Period (a) by NewCo or any of its subsidiaries other than for cause (as defined in the applicable KPTI Severance Plan) or (b) by any Covered Employee for good reason, to the extent the applicable KPTI Severance Plan provides good reason rights or, for any Covered Employee without good reason rights under the applicable KPTI Severance Plan, following (i) a reduction in the Covered Employee's base salary or base wage rate or (ii) a relocation of the Covered Employee's primary work location by more than 35 miles, in each case without the Covered Employee's written consent.

173. "*Reinstate*," "*Reinstated*," or "*Reinstatement*" means with respect to Claims and Interests, that the Claim or Interest shall not be discharged hereunder and the holder's legal, equitable, and contractual rights on account of such Claim or Interest shall remain unaltered by Consummation in accordance with section 1124(1) of the Bankruptcy Code.

174. "*Rejected Executory Contracts and Unexpired Leases Schedule*" means, in the event of the Reorganization Transaction, a schedule of Executory Contracts and Unexpired Leases to be rejected by the Debtors pursuant to the Prepackaged Plan, which schedule shall be included in the Plan Supplement, as the same may be amended, modified, or supplemented from time to time.

175. "*Related Party*" means, collectively, with respect to any Person, such Person's current and former Affiliates, and such Person's and its current and former Affiliates' current and former directors, managers, officers, proxyholders, control persons, investment committee members, special committee members, members of any governing body, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, predecessors, participants, successors, assigns, subsidiaries, affiliates, managed accounts or funds (including any beneficial holders for the account of whom such funds are managed), partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, investment managers, investment advisors, employees, agents, fiduciaries, trustees, advisory board members, financial advisors, attorneys (including any other attorneys or professionals retained by any current or former director or manager in his or her capacity as director or manager of an Entity), accountants, investment bankers, consultants, representatives, heirs, executors, estates, and nominees, and other professionals and advisors, in each case solely in their capacities as such, together with their respective past and present directors, officers, stockholders, partners, members, employees, agents, attorneys, representatives, heirs, executors, and assigns, in each case solely in their capacities as such, and any Person claiming by or through any of them.

176. "*Released Parties*" means, collectively, and in each case in its capacity as such: (a) each Debtor; (b) the Post-Effective Date Plan Administrator or the Reorganized Debtors, as applicable; (c) NewCo; (d) the Prepetition Agents; (e) each Consenting Stakeholder; (f) each Consenting Royalty Investor; (g) each Consenting Preferred Shareholder; (h) the DIP Lenders; (i) the DIP Agent; (j) Ayrmid; (k) each current and former Affiliate of each Entity in the foregoing clauses (a) through (j); and (l) each Related Party of each Entity in clauses (a) through (k); *provided* that any Holder of a Claim or Interest that (x) affirmatively opts out of the releases provided by the Prepackaged Plan by checking the box on the applicable ballot or Notice of Non-Voting Status indicating that it opts not to grant the releases provided in the Prepackaged Plan or (y) in the case of a Holder of a Claim or Interest in a Class that is deemed to reject the Prepackaged Plan, does not affirmatively opt in to the releases provided by the Prepackaged Plan by checking the box on the applicable Notice of Non-Voting Status indicating that it opts to grant the releases provided in the Prepackaged Plan, shall not be a "Released Party."

177. "*Releasing Parties*" means, collectively, and in each case in its capacity as such: (a) each Debtor; (b) each Reorganized Debtor or Post-Effective Date Debtor, as applicable; (c) NewCo; (d) the Prepetition Agents; (e) each Consenting Stakeholder; (f) each Consenting Royalty Investor; (g) each Consenting Preferred Shareholder; (h) the DIP Lenders; (i) the DIP Agent; (j) Ayrmid; (k) all Holders of Claims or Interests that vote to accept the Prepackaged Plan; (l) all Holders of Claims or Interests that are deemed to accept the Prepackaged Plan and who do

not affirmatively opt out of the releases provided by the Prepackaged Plan by checking the box on the applicable Notice of Non-Voting Status indicating that they opt not to grant the releases provided in the Prepackaged Plan; (m) all Holders of Claims or Interests that abstain from voting on the Prepackaged Plan and who do not affirmatively opt out of the releases provided by the Prepackaged Plan by checking the box on the applicable ballot indicating that they opt not to grant the releases provided in the Prepackaged Plan; (n) all Holders of Claims or Interests that vote to reject the Prepackaged Plan and who do not affirmatively opt out of the releases provided by the Prepackaged Plan by checking the box on the applicable ballot or Notice of Non-Voting Status, as applicable, indicating that they opt not to grant the releases provided in the Prepackaged Plan; (o) all Holders of Claims or Interests that are deemed to reject the Prepackaged Plan and who affirmatively opt in to the releases provided by the Prepackaged Plan by checking the box on the applicable Notice of Non-Voting Status indicating that they opt to grant the releases provided in the Prepackaged Plan; (p) each current and former Affiliate of each Entity in the foregoing clauses (a) through (o); and (q) each Related Party of each Entity in clauses (a) through (p).

178. "*Reorganization Transaction*" means the Restructuring Transactions to be effectuated on the Effective Date pursuant to which, among other things, the Reorganized Parent Equity Distribution is issued to the Holders of Allowed Prepetition Funded Debt Claims, Allowed Equitized DIP New Money Claims, and Allowed DIP Roll-Up Claims and the Merger is consummated in accordance with Article IV.J hereof, unless the Debtors, with the consent of the Required Consenting Funded Debt Parties, elect to pursue the Sale Transaction in accordance with Article IV.B hereof and the Restructuring Support Agreement.

179. "*Reorganized Debtors*" means, in the event that the Reorganization Transaction is consummated, collectively, Reorganized Parent and each other Debtor, or any successor or assign thereto, by merger, consolidation, or otherwise (including NewCo), on and after the Effective Date.

180. "*Reorganized Parent*" means, in the event that the Reorganization Transaction is consummated, subject to the Restructuring Transactions Memorandum, Parent, as reorganized on the Effective Date in accordance with the Prepackaged Plan.

181. "*Reorganized Parent Common Stock*" means, in the event of the Reorganization Transaction, the common equity interests of Reorganized Parent to be issued to Holders of Allowed Prepetition Funded Debt Claims and, to the extent provided in Article II.B hereof, Holders of Allowed Equitized DIP New Money Claims and Allowed DIP Roll-Up Claims and exchanged in the Merger for Merger Consideration in accordance with Article IV.J hereof and the Restructuring Transactions Memorandum.

182. "*Reorganized Parent Equity Distribution*" means, in the event of the Reorganization Transaction and subject to the Restructuring Transactions Memorandum, collectively, the DIP New Money Equity Distribution, the DIP Roll-Up Equity Distribution, the 1L Equity Distribution, the 1.5L Equity Distribution, and the 2L Equity Distribution, which together constitute 100.0% of the Reorganized Parent Common Stock issued and outstanding on the Effective Date.

183. "*Required Consenting Funded Debt Parties*" has the meaning set forth in the Restructuring Support Agreement.

184. "*Required Consenting Royalty Investors*" has the meaning set forth in the Restructuring Support Agreement.

185. "*Required DIP Lenders*" has the meaning set forth in the DIP Facility Documents.

186. "*Reserved Purposes*" has the meaning set forth in Article II.B hereof.

187. "*Restructuring Expenses*" means all reasonable and documented out-of-pocket fees, costs, and expenses of the Ad Hoc Group Advisors, the Royalty Investor Advisors (in the case of the Royalty Investor Advisors, solely to the extent constituting Royalty Investors Fees (as defined in the Restructuring Support Agreement) and paid in accordance with the Restructuring Support Agreement and the DIP Orders), and the Ayrmid Advisors (in the case of the Ayrmid Advisors, solely if and to the extent the Bid Protections are earned and payable in accordance with

Article IV.B hereof and the Bidding Procedures Order, and without duplication of any expense reimbursement payable as a Bid Protection) not previously paid by the Debtors, in each case, in connection with the negotiation, formulation, preparation, execution, delivery, implementation, consummation, and/or enforcement of the Restructuring Support Agreement, the Prepackaged Plan, the other Definitive Documents, the Restructuring Transactions, and the transactions contemplated hereby and thereby.

188. "*Restructuring Support Agreement*" means that certain Restructuring Support Agreement, dated as of November 2, 2026, by and among the Company Parties, the Consenting Stakeholders, and Ayrmid (together with all exhibits, supplements, annexes, appendices, schedules, and term sheets attached thereto, and as amended, restated, amended and restated, supplemented, or otherwise modified from time to time), a copy of which is attached to the Disclosure Statement as Exhibit B.

189. "*Restructuring Transactions*" means any transaction and any actions as may be necessary or appropriate to effect a restructuring of the Debtors' respective businesses or a corporate restructuring of the overall corporate structure of the Debtors on the terms set forth in the Prepackaged Plan, the issuance of and entry into, as applicable, all securities, notes, instruments, agreements, certificates, and other documents required to be issued or executed pursuant to the Prepackaged Plan, one or more mergers, consolidations, amalgamations, arrangements, continuances, restructurings, conversions, elections, dissolutions, transfers, sales, purchases, liquidations, or other corporate transactions, as described in Article IV.C of the Prepackaged Plan, the Restructuring Support Agreement, and/or set forth in the Restructuring Transactions Memorandum.

190. "*Restructuring Transactions Memorandum*" means, in the event of the Reorganization Transaction, the memorandum setting forth the steps for, and the sequence of, implementing the Restructuring Transactions (including the Merger), which may include one or more stock transfers, sales, acquisitions, consolidations, combinations, conversions, elections, contributions, mergers, amalgamations, and/or other transactions involving Debtors and/or non-Debtor Entities, and any formula(s) for the issuance, exchange, or allocation of Securities in connection therewith, to be Filed with the Plan Supplement and which shall, to the extent reasonably practicable, structure the Restructuring Transactions in a manner that (a) minimizes any cash taxes payable as a result of the consummation of the Restructuring Transactions, (b) maximizes the favorable tax attributes (including tax basis) of the Reorganized Debtors and NewCo and their respective subsidiaries going forward, and (c) otherwise achieves such tax-planning outcomes as reasonably requested by the Debtors, the Required Consenting Funded Debt Parties, and Ayrmid.

191. "*RIFA*" means that certain Revenue Interest Financing Agreement, dated as of September 14, 2019, by and among Parent, the investors party thereto, and HealthCare Royalty Management, LLC, as investor representative, as amended by that certain Omnibus Amendment to Transaction Documents, dated as of June 23, 2021, that certain Second Amendment to Revenue Interest Financing Agreement, dated as of August 1, 2023, that certain Second Omnibus Amendment to Transaction Documents, dated as of May 8, 2024, that certain Third Amendment to Revenue Interest Financing Agreement, dated August 14, 2025, that certain Fourth Amendment to Revenue Interest Financing Agreement, dated August 27, 2025, that certain Sixth Amendment to Revenue Interest Financing Agreement, dated October 7, 2025, and as may be further amended, restated, amended and restated, supplemented, or otherwise modified from time to time.

192. "*RIFA Claims*" means any Claim arising under, derived from, or based upon the RIFA, including Claims in respect of any revenue interest payments, indemnities, fees, expenses, and other charges arising thereunder or related thereto, whether or not such Claims are secured.

193. "*Royalty Collateral Agent*" means HCR Karyopharm SPV, LLC, in its capacity as collateral agent under the RIFA, and any successor thereto.

194. "*Royalty Investor Advisors*" means Hogan Lovells Cadwalader US LLP and Stifel Financial Corp., as advisors to the Consenting Royalty Investors.

195. "*Sale Hearing*" means a hearing to consider the approval of any Sale Transaction, which may be combined with the Confirmation Hearing.

196. "*Sale Order*" means one or more Bankruptcy Court orders, which may be the Confirmation Order, approving the Debtors' entry into one or more Purchase Agreement(s) in connection with the Sale Transaction, in each case, in form and substance consistent with the Bidding Procedures Order, the Successful Bid Mandatory Conditions, and the Restructuring Support Agreement and the consent rights contained therein.

197. "*Sale Transaction*" means the sale of all, substantially all, or a material portion of the assets of the Debtors' Estates pursuant to section 363 of the Bankruptcy Code or the Prepackaged Plan in accordance with the Bidding Procedures and the Restructuring Support Agreement, which sale, in each case, may be pursuant to a credit bid of the Required Consenting Funded Debt Parties.

198. "*Sale Transaction Documents*" means the documents governing the Sale Transaction, including, without limitation, the Bidding Procedures, the Bidding Procedures Motion, the Bidding Procedures Order, the Purchase Agreement(s), and any Sale Order(s).

199. "*Sale Transaction Election Notice*" means a notice Filed in advance of the earlier of the Confirmation Hearing and the applicable Sale Hearing indicating that the Debtors have (a) received a Successful Bid in accordance with the Bidding Procedures and the Restructuring Support Agreement (and in each case the requirements set forth therein) and the Prepackaged Plan and (b) elected to pursue the Sale Transaction with the consent of the Required Consenting Funded Debt Parties (and, to the extent required under the Restructuring Support Agreement, the Required Consenting Royalty Investors).

200. "*Sale Transaction Election Notice Deadline*" means the date that is the deadline for the Debtors to File the Plan Supplement, as established by order of the Bankruptcy Court.

201. "*Schedule of Retained Causes of Action*" means the schedule of certain Causes of Action of the Debtors that are not released, waived, or transferred pursuant to the Prepackaged Plan, as the same may be amended, modified, or supplemented from time to time.

202. "*Schedules*" means, collectively, the schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases, and statements of financial affairs (if any) Filed by the Debtors pursuant to section 521 of the Bankruptcy Code, including any amendments or supplements thereto.

203. "*SEC*" means the United States Securities and Exchange Commission.

204. "*Section 510(b) Claims*" means any Claim against a Debtor subject to subordination under section 510(b) of the Bankruptcy Code, whether by operation of Law or contract.

205. "*Secured Claim*" means a Claim that is secured by a Lien on property in which any of the Debtors' Estates have an interest or that is subject to setoff under section 553 of the Bankruptcy Code, to the extent of the value of such Claim Holder's interest in such Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code or, in the case of setoff, pursuant to section 553 of the Bankruptcy Code.

206. "*Securities Act*" means the Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, or any similar Law, each as amended from time to time, and the rules and regulations promulgated thereunder.

207. "*Security*" means any security, as defined in section 2(a)(1) of the Securities Act or section 101(49) of the Bankruptcy Code.

208. "*September 2026 Forbearance Agreement*" means that certain Forbearance Agreement and Limited Waiver to Indentures, dated as of September 10, 2026, entered into by and among the Company Parties, certain of the Consenting Stakeholders, and the Prepetition Agents, as amended, restated, amended and restated, supplemented, or otherwise modified from time to time.

209. "*Severance Protection Period*" has the meaning set forth in Article V.F hereof.

210. "*Solicitation Materials*" means the solicitation materials provided by the Claims and Balloting Agent to the parties entitled to vote to accept or reject the Prepackaged Plan.

211. "*Successful Bid*" means the bid selected by the Debtors as the highest or otherwise best bid satisfying the Successful Bid Mandatory Conditions and otherwise in accordance with the Bidding Procedures, the Bidding Procedures Order, and the Restructuring Support Agreement, whether at the conclusion of the Auction or, if no Auction is conducted, otherwise in accordance with the Bidding Procedures Order (which may be a bid submitted by Ayrmid); *provided* that the Debtors shall not select any Qualified Bid submitted by an Entity other than Ayrmid as the Successful Bid unless such Qualified Bid meets the Successful Bid Mandatory Conditions.

212. "*Successful Bid Mandatory Conditions*" has the meaning set forth in Article IV.B of the Prepackaged Plan.

213. "*Third-Party Release*" means the release set forth in Article VIII.D of the Prepackaged Plan.

214. "*Unexpired Lease*" means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 or 1123 of the Bankruptcy Code.

215. "*Unimpaired*" means with respect to a Class of Claims or Interests, a Class of Claims or Interests that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

216. "*Unsecured Claim*" means any Claim that is not a Secured Claim.

217. "*Wind-Down Budget*" means, in the event of a Sale Transaction, the budget for the wind-down of the Post-Effective Date Debtors and the administration of the Prepackaged Plan following the Effective Date (including the funding of the Professional Fee Account), which shall be in form and substance satisfactory to the Debtors and the Required Consenting Funded Debt Parties.

*B. Rules of Interpretation.*

For purposes of the Prepackaged Plan: (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, the feminine, and the neuter gender; (2) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; *provided* that nothing in this clause (2) shall affect any party's consent rights over any of the Definitive Documents or any amendments thereto, as provided for in the Restructuring Support Agreement; (3) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, whether or not Filed, having been Filed or to be Filed shall mean that document, schedule, or exhibit, as it may thereafter be amended, modified, or supplemented in accordance with the Prepackaged Plan or Confirmation Order, as applicable; (4) any reference to an Entity as a Holder of a Claim or Interest includes that Entity's successors and assigns; (5) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (6) unless otherwise specified, all references herein to exhibits are references to exhibits in the Plan Supplement; (7) unless otherwise specified, the words "herein," "hereof," and "hereto" refer to the Prepackaged Plan in its entirety rather than to a particular portion of the Prepackaged Plan; (8) subject to the provisions of any contract, certificate of incorporation, by-law, instrument, release, or other agreement or document entered into in connection with the Prepackaged Plan, the rights and obligations arising pursuant to the Prepackaged Plan shall be governed by, and construed and enforced in accordance with the applicable federal Law, including the Bankruptcy Code and Bankruptcy Rules; (9) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Prepackaged Plan; (10) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (11) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; (12) all references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (13) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from

time to time, and as applicable to the Chapter 11 Cases, unless otherwise stated; (14) the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation"; (15) references to "Proofs of Claim," "Holders of Claims," "Disputed Claims," and the like shall include "Proofs of Interest," "Holders of Interests," "Disputed Interests," and the like, as applicable; (16) any immaterial effectuating provisions may be interpreted by the Reorganized Debtors in a manner that is consistent with the overall purpose and intent of the Prepackaged Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity; and (17) all references herein to consent, acceptance, or approval may be conveyed by counsel for the respective parties that have such consent, acceptance, or approval rights, including by electronic mail.

*C. Computation of Time.*

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein. If the date on which a transaction may occur pursuant to the Prepackaged Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day. Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable after the Effective Date.

*D. Governing Law.*

Unless a rule of law or procedure is supplied by federal Law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the Laws of the State of New York, without giving effect to the principles of conflict of laws (other than section 5-1401 and section 5-1402 of the New York General Obligations Law), shall govern the rights, obligations, construction, and implementation of the Prepackaged Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Prepackaged Plan (except as otherwise set forth in those agreements, in which case the governing Law of such agreement shall control), and corporate governance matters; *provided* that corporate governance matters relating to the Debtors or the Reorganized Debtors, as applicable, not incorporated in New York shall be governed by the Laws of the state of incorporation or formation of the relevant Debtor or the Reorganized Debtors, as applicable.

*E. Reference to Monetary Figures.*

All references in the Prepackaged Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided herein.

*F. Reference to the Debtors or the Reorganized Debtors.*

Except as otherwise specifically provided in the Prepackaged Plan to the contrary, references in the Prepackaged Plan to the Debtors or the Reorganized Debtors shall mean the Debtors and the Reorganized Debtors, as applicable, to the extent the context requires.

*G. Nonconsolidated Prepackaged Plan.*

Although for purposes of administrative convenience and efficiency the Prepackaged Plan has been Filed as a joint plan for each of the Debtors and presents together Classes of Claims against and Interests in the Debtors, the Prepackaged Plan does not provide for the substantive consolidation of any of the Debtors.

*H. Controlling Document.*

In the event of an inconsistency between the Prepackaged Plan and the Disclosure Statement, the terms of the Prepackaged Plan shall control in all respects. In the event of an inconsistency between the Prepackaged Plan and the Plan Supplement, the terms of the relevant provision in the Plan Supplement shall control (unless stated otherwise in such Plan Supplement document, in the Restructuring Support Agreement, or in the Confirmation Order). In the event of an inconsistency between the Confirmation Order and the Prepackaged Plan (including the Plan Supplement), the Confirmation Order shall control; *provided* that nothing in this Article I.H shall limit, impair, or override the

consultation, information, notice, and consent rights set forth in Article I.I; *provided further* that solely with respect to any consultation, information, notice, or consent rights in the Prepackaged Plan, in the event of any inconsistency between the Prepackaged Plan and the Restructuring Support Agreement or any DIP Facility Document, the terms of the Restructuring Support Agreement or such DIP Facility Document shall control.

*I. Consultation, Information, Notice, and Consent Rights.*

Notwithstanding anything herein to the contrary, any and all consultation, information, notice, and consent rights of the parties to the Restructuring Support Agreement set forth in the Restructuring Support Agreement (including the exhibits thereto), and of the DIP Lenders set forth in the DIP Facility Documents and the DIP Orders, with respect to the form and substance of the Prepackaged Plan, all exhibits to the Prepackaged Plan, and the Plan Supplement, and all other Definitive Documents (each of which shall be deemed a "Definitive Document" for all purposes of the Restructuring Support Agreement, whether or not expressly identified therein), including any amendments, restatements, supplements, or other modifications to such agreements and documents, and any consents, waivers, or other deviations under or from any such documents, shall be incorporated herein by this reference (including to the applicable definitions in Article I.A hereof) and fully enforceable as if stated in full herein.

The absence in the Prepackaged Plan of references to, or failure to reference, any and all consultation, information, notice, and consent rights referred to in the immediately preceding paragraph, including with respect to any amendments, restatements, supplements, or other modifications to, and any consents, waivers, or other deviations under or from, any such documents, as such rights relate to any document referenced in the Restructuring Support Agreement, the DIP Facility Documents, or the DIP Orders, or to any other Definitive Document, shall not impair, limit, modify, or negate such rights and obligations.

Solely with respect to any consultation, information, notice, or consent rights in the Prepackaged Plan, in the event of any inconsistency between the Prepackaged Plan or the Confirmation Order, on the one hand, and the Restructuring Support Agreement, the DIP Facility Documents, or the DIP Orders, on the other hand, the terms of the Restructuring Support Agreement, the DIP Facility Documents, or the DIP Orders, as applicable, shall control.

## ARTICLE II.
## ADMINISTRATIVE CLAIMS, DIP CLAIMS, PRIORITY CLAIMS, AND RESTRUCTURING EXPENSES

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, DIP Claims, Professional Fee Claims, Restructuring Expenses, and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III hereof.

*A. Administrative Claims.*

Subject to the provisions of sections 328, 330(a), and 331 of the Bankruptcy Code, unless otherwise agreed to by the Holder of an Allowed Administrative Claim and the Debtors or the Reorganized Debtors, as applicable, or otherwise provided for under the Prepackaged Plan or the Restructuring Support Agreement, each Holder of an Allowed Administrative Claim (other than Holders of Professional Fee Claims and Claims for fees and expenses pursuant to section 1930 of chapter 123 of title 28 of the United States Code) will receive in full and final satisfaction of its Allowed Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim in accordance with the following: (1) if an Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (2) if such Administrative Claim is not Allowed as of the Effective Date, no later than thirty (30) days after the date on which an order allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (3) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim without any further action by the Holder of such Allowed Administrative Claim; (4) at such time and upon such terms as may be agreed upon by such Holder and the Debtors or the Reorganized Debtors, as applicable, and as is consistent with the DIP Budget or otherwise with the consent of the Required Consenting Funded Debt Parties; or (5) at such time and upon such terms as set forth in an order of the Bankruptcy Court.

*B. DIP Claims.*

On the Effective Date, except to the extent that a Holder of an Allowed DIP Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of each Allowed DIP Claim, including, for the avoidance of doubt, all Claims in respect of the outstanding principal amount of DIP Loans and any accrued but unpaid interest thereon and any fees and expenses payable under the DIP Facility Documents, each Holder of an Allowed DIP Claim shall receive:

1. in the event of the Reorganization Transaction, (i) on account of its Allowed DIP New Money Claims, payment in Cash of its Pro Rata share of (a) up to $50,000,000 of Cash loan proceeds funded under the NewCo Facility *plus* (b) any unrestricted Cash (excluding, for the avoidance of doubt, proceeds of the NewCo Facility) on the balance sheet of the Debtors upon the consummation of the Reorganization Transaction after funding (1) the Carve-Out, (2) the amounts to be deposited into the German RemainCo Winddown Account, (3) the amounts that the Debtors have reasonably estimated are necessary to pay Allowed Administrative Claims (including any amounts for Professionals and other professional advisors, including Professional Fee Claims in the amount of the Professional Fee Amount and the Restructuring Expenses), and (4) the amounts set forth in the DIP Budget allocated to Allowed General Unsecured Claims that have not yet been paid (collectively, the purposes set forth in the foregoing clauses (1) through (4), the "Reserved Purposes"), *plus* (c) after payment of amounts for the Reserved Purposes, any remaining unrestricted Cash on the balance sheet of the Debtors, (ii) on account of its Allowed Equitized DIP New Money Claims, its Pro Rata share of the DIP New Money Equity Distribution, and (iii) on account of its Allowed DIP Roll-Up Claims, its Pro Rata share of the DIP Roll-Up Equity Distribution; and

2. in the event of a Sale Transaction, payment in full in Cash from the proceeds of the Sale Transaction on the Effective Date;

*provided* that, for the avoidance of doubt, the Holders of Allowed DIP Claims shall not be deemed to have waived their right to have the DIP Claims paid in full in Cash in connection with any transaction or chapter 11 plan other than the Reorganization Transaction.

*C. Professional Fee Claims.*

1. Final Fee Applications and Payment of Professional Fee Claims.

All requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred through and including the Confirmation Date must be Filed no later than forty-five (45) days after the Effective Date. The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Court. The Reorganized Debtors or the Post-Effective Date Debtors, as applicable, shall pay Professional Fee Claims in Cash in the amount the Bankruptcy Court allows, including from the Professional Fee Account, which the Reorganized Debtors or the Post-Effective Date Debtors, as applicable, will establish in trust for the Professionals and fund with Cash equal to the Professional Fee Amount on the Effective Date.

2. Professional Fee Account.

On the Effective Date, the Reorganized Debtors or the Post-Effective Date Debtors, as applicable, shall establish and fund the Professional Fee Account with Cash equal to the Professional Fee Amount. The Professional Fee Account shall be funded from the proceeds of the DIP Facility or the Debtors' Cash on hand, and NewCo shall not be responsible for any Professional Fee Claims (including any earned and payable restructuring, sale, success, or other transaction or similar fee). The Professional Fee Account shall be maintained solely for the Professionals. The amount of Allowed Professional Fee Claims shall be paid in Cash to the Professionals by the Reorganized Debtors or the Post-Effective Date Debtors, as applicable, from the Professional Fee Account as soon as reasonably practicable after such Professional Fee Claims are Allowed. When such Allowed Professional Fee Claims have been paid in full, any remaining amount in the Professional Fee Account shall promptly be paid to the Reorganized Debtors or the Post-Effective Date Debtors, as applicable, without any further action or order of the Bankruptcy Court.

3. Professional Fee Amount.

Professionals shall reasonably estimate their unpaid Professional Fee Claims and other unpaid fees and expenses incurred in rendering services to the Debtors before and as of the Effective Date, and shall deliver such estimate to the Debtors no later than five (5) days before the Effective Date; *provided* that such estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of each Professional's final request for payment in the Chapter 11 Cases. If a Professional does not provide a timely estimate, the Debtors, the Reorganized Debtors, or the Post-Effective Date Debtors, as applicable, may estimate the unpaid and unbilled fees and expenses of such Professional.

4. Post-Confirmation Fees and Expenses.

Except as otherwise specifically provided in the Prepackaged Plan, from and after the Confirmation Date, the Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation of the Prepackaged Plan and Consummation incurred by the Debtors. Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

*D. Priority Tax Claims.*

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

*E. Payment of Restructuring Expenses.*

The Restructuring Expenses and the outstanding reasonable and documented fees and expenses of the Prepetition Agents incurred, or estimated to be incurred, up to and including the Effective Date (or, with respect to necessary post-Effective Date activities, after the Effective Date), shall be paid in full in Cash on the Effective Date (to the extent not previously paid during the course of the Chapter 11 Cases) in accordance with, and subject to, the terms of the Restructuring Support Agreement (including Section 16.21 thereof), any applicable engagement letter(s), and any DIP Orders, as applicable, without any requirement to File a fee application with the Bankruptcy Court, without the need for itemized time detail, and without any requirement for Bankruptcy Court review or approval; *provided* that any earned and payable restructuring, sale, success, or other transaction or similar fee included in the Restructuring Expenses shall be paid from the proceeds of the DIP Facility or the Debtors' Cash on hand, and NewCo shall not be responsible therefor. All Restructuring Expenses to be paid on the Effective Date shall be estimated prior to and as of the Effective Date and such estimates shall be delivered to the Debtors at least five (5) calendar days before the anticipated Effective Date; *provided* that such estimates shall not be considered an admission or limitation with respect to such Restructuring Expenses. On the Effective Date, or as soon as practicable thereafter, final invoices for all Restructuring Expenses incurred prior to and as of the Effective Date shall be submitted to the Debtors. In addition, the Debtors, the Reorganized Debtors, or the Post-Effective Date Debtors, as applicable, shall continue to pay pre- and post-Effective Date Restructuring Expenses related to implementation, consummation, and defense of the Prepackaged Plan, whether incurred before, on, or after the Effective Date, without any requirement for Bankruptcy Court review or approval.

## ARTICLE III.
## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

A. *Classification of Claims and Interests.*

The Prepackaged Plan constitutes a separate chapter 11 plan proposed by each Debtor. Except for the Claims addressed in Article II hereof, all Claims and Interests are classified in the Classes set forth below in accordance with sections 1122 and 1123(a)(1) of the Bankruptcy Code. A Claim or an Interest, or any portion thereof, is classified in a particular Class only to the extent that any portion of such Claim or Interest fits within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest fits within the description of such other Classes. A Claim or an Interest also is classified in a particular Class for the purpose of receiving distributions under the Prepackaged Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

The classification of Claims against, and Interests in, the Debtors pursuant to the Prepackaged Plan is as follows:

| **Class** | **Type of Claim or Interest** | **Impairment** | **Entitled to Vote** |
|---|---|---|---|
| Class 1 | Other Secured Claims | Unimpaired | No (Presumed to accept) |
| Class 2 | Other Priority Claims | Unimpaired | No (Presumed to accept) |
| Class 3 | 1L Term Loan Claims | Impaired | Yes |
| Class 4 | 1.5L 2028 Notes Claims | Impaired | Yes |
| Class 5 | 2L 2029 Notes Claims | Impaired | Yes |
| Class 6 | RIFA Claims | Impaired | Yes |
| Class 7 | General Unsecured Claims | Unimpaired | No (Presumed to accept) |
| Class 8 | Intercompany Claims | Impaired / Unimpaired | No (Presumed to accept or deemed to reject) |
| Class 9 | Existing Preferred Interests | Impaired | No (Deemed to reject) |
| Class 10 | Existing Common Stock Interests | Impaired | No (Deemed to reject) |
| Class 11 | Other Equity Interests | Impaired | No (Deemed to reject) |
| Class 12 | Intercompany Interests | Impaired / Unimpaired | No (Presumed to accept or deemed to reject) |

B. *Treatment of Claims and Interests.*

Each Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under the Prepackaged Plan the treatment described below in full and final satisfaction, settlement, release, and discharge of and in exchange for such Holder's Allowed Claim or Allowed Interest, except to the extent different treatment is agreed to by the Debtors, the Reorganized Debtors, or the Post-Effective Date Debtors, as applicable, and the Holder of such Allowed Claim or Allowed Interest, as applicable. Unless otherwise indicated, the Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the Effective Date or as soon as reasonably practicable thereafter.

1. Class 1 – Other Secured Claims

(a) *Classification*: Class 1 consists of all Other Secured Claims.

(b) *Treatment*: The legal, equitable, and contractual rights of the Holders of Allowed Other Secured Claims are unaltered by the Prepackaged Plan. Except to the extent that a Holder of an Allowed Other Secured Claim agrees to a less favorable treatment, each Holder of an Allowed Other Secured Claim shall receive, at the option of the applicable Debtor, with the consent of the Required Consenting Funded Debt Parties:

(i) payment in full in Cash of its Allowed Other Secured Claim;

(ii) the collateral securing its Allowed Other Secured Claim;

(iii) Reinstatement of its Allowed Other Secured Claim; or

(iv) such other treatment that renders its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code.

(c) *Voting*: Class 1 is Unimpaired under the Prepackaged Plan. Holders of Other Secured Claims are conclusively presumed to have accepted the Prepackaged Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Prepackaged Plan.

2. <u>Class 2 – Other Priority Claims</u>

(a) *Classification*: Class 2 consists of all Other Priority Claims.

(b) *Treatment*: The legal, equitable, and contractual rights of the Holders of Allowed Other Priority Claims are unaltered by the Prepackaged Plan. Except to the extent that a Holder of an Allowed Other Priority Claim agrees to a less favorable treatment, each Holder of an Allowed Other Priority Claim shall receive, at the option of the applicable Debtor with the consent of the Required Consenting Funded Debt Parties, (i) payment in full in Cash or (ii) such other treatment that renders its Allowed Other Priority Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code.

(c) *Voting*: Class 2 is Unimpaired under the Prepackaged Plan. Holders of Other Priority Claims are conclusively presumed to have accepted the Prepackaged Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Prepackaged Plan.

3. <u>Class 3 – 1L Term Loan Claims</u>

(a) *Classification*: Class 3 consists of all 1L Term Loan Claims.

(b) *Allowance*: 1L Term Loan Claims shall be deemed Allowed in the aggregate principal amount of $128,981,938.62, plus all accrued and unpaid interest at the default rate, fees, redemption premiums, expenses, costs, and other charges due under the 1L Credit Agreement and the other 1L Loan Documents.

(c) *Treatment*: Except to the extent that a Holder of an Allowed 1L Term Loan Claim agrees to different treatment,

(i) in the event of the Reorganization Transaction, each Holder of an Allowed 1L Term Loan Claim shall receive, in full and final satisfaction of such Claim, its Pro Rata share of the 1L Equity Distribution (which shall be, subject to the Restructuring Transactions Memorandum, exchanged in the Merger, substantially concurrently with its issuance, for such Holder's share of the Merger Consideration);

(ii) in the event of a Sale Transaction, each Holder of an Allowed 1L Term Loan Claim shall receive payment in full in Cash, including, for the avoidance of doubt, all principal amounts outstanding under the 1L Credit Agreement and any pre- and postpetition interest at the default rate, fees, redemption premiums, expenses, costs, and other charges arising thereunder or related thereto, as applicable;

*provided* that all distributions to Holders of Allowed 1L Term Loan Claims (in both the Reorganization Transaction and a Sale Transaction) shall be in accordance with the Intercreditor Agreement.

(d) *Voting:* Class 3 is Impaired under the Prepackaged Plan. Holders of 1L Term Loan Claims are entitled to vote to accept or reject the Prepackaged Plan.

4. Class 4 – 1.5L 2028 Notes Claims

(a) *Classification*: Class 4 consists of all 1.5L 2028 Notes Claims.

(b) *Allowance*: 1.5L 2028 Notes Claims shall be deemed Allowed in the aggregate principal amount of $15,648,085.00, plus all accrued and unpaid interest at the default rate, fees, redemption premiums, expenses, costs, and other charges due under the 1.5L 2028 Notes Indenture and the other 1.5L 2028 Notes Documents.

(c) *Treatment*: Except to the extent that a Holder of an Allowed 1.5L 2028 Notes Claim agrees to different treatment,

(i) in the event of the Reorganization Transaction, each Holder of an Allowed 1.5L 2028 Notes Claim shall receive, in full and final satisfaction of such Claim, its Pro Rata share of the 1.5L Equity Distribution (which shall be, subject to the Restructuring Transactions Memorandum, exchanged in the Merger, substantially concurrently with its issuance, for such Holder's share of the Merger Consideration);

(ii) in the event of a Sale Transaction, each Holder of an Allowed 1.5L 2028 Notes Claim shall receive payment in full in Cash, including, for the avoidance of doubt, all principal amounts outstanding under the 1.5L 2028 Notes Indenture and any pre- and postpetition interest at the default rate, fees, redemption premiums, expenses, costs, and other charges arising thereunder or related thereto, as applicable;

*provided* that all distributions to Holders of Allowed 1.5L 2028 Notes Claims (in both the Reorganization Transaction and a Sale Transaction) shall be in accordance with the Intercreditor Agreement and the Collateral Trust Agreement, as applicable.

(d) *Voting:* Class 4 is Impaired under the Prepackaged Plan. Holders of 1.5L 2028 Notes Claims are entitled to vote to accept or reject the Prepackaged Plan.

5. Class 5 – 2L 2029 Notes Claims

(a) *Classification*: Class 5 consists of all 2L 2029 Notes Claims.

(b) *Allowance*: 2L 2029 Notes Claims shall be deemed Allowed in the aggregate principal amount of $107,974,339.00, plus all accrued and unpaid interest at the default rate, fees, redemption premiums, expenses, costs, and other charges due under the 2L 2029 Notes Indenture and the other 2L 2029 Notes Documents.

(c) *Treatment*: Except to the extent that a Holder of an Allowed 2L 2029 Notes Claim agrees to different treatment,

(i) in the event of the Reorganization Transaction, each Holder of an Allowed 2L 2029 Notes Claim shall receive, in full and final satisfaction of such Claim, its Pro Rata share of the 2L Equity Distribution (which shall be, subject to the

Restructuring Transactions Memorandum, exchanged in the Merger, substantially concurrently with its issuance, for such Holder's share of the Merger Consideration);

(ii) in the event of a Sale Transaction, each Holder of an Allowed 2L 2029 Notes Claim shall receive either (x) payment in full in Cash, including, for the avoidance of doubt, all principal amounts outstanding under the 2L 2029 Notes Indenture and any pre- and postpetition interest at the default rate, fees, redemption premiums, expenses, costs, and other charges arising thereunder or related thereto, as applicable; or (y) if the Successful Bid so provides, payment in accordance with the Successful Bid Mandatory Conditions set forth in Article IV.B hereof;

*provided* that all distributions to Holders of Allowed 2L 2029 Notes Claims (in both the Reorganization Transaction and a Sale Transaction) shall be in accordance with the Intercreditor Agreement and the Collateral Trust Agreement, as applicable.

(d) *Voting:* Class 5 is Impaired under the Prepackaged Plan. Holders of 2L 2029 Notes Claims are entitled to vote to accept or reject the Prepackaged Plan.

6. Class 6 – RIFA Claims

(a) *Classification*: Class 6 consists of all RIFA Claims.

(b) *Allowance*: RIFA Claims shall be deemed Allowed in the aggregate amount of $113,536,880.00, plus all fees, expenses, costs, and other charges due under the RIFA as of the Petition Date.

(c) *Treatment*: Except to the extent that a Holder of an Allowed RIFA Claim agrees to different treatment,

(i) in the event of the Reorganization Transaction, each Holder of an Allowed RIFA Claim shall receive, in full and final satisfaction of such Claim, its Pro Rata share of the rights and interests under the New Royalty Agreement;

(ii) in the event of a Sale Transaction, each Holder of an Allowed RIFA Claim shall receive, in full and final satisfaction of such Claim, its Pro Rata share of the consideration payable on account of the RIFA Claims under the Successful Bid, which may consist of Cash or non-Cash consideration in such form as is acceptable to the Holders of RIFA Claims in their discretion and shall have a value of not less than $18,750,000;

*provided* that all distributions to Holders of Allowed RIFA Claims (in both the Reorganization Transaction and a Sale Transaction) shall be in accordance with the Intercreditor Agreement.

(d) *Voting:* Class 6 is Impaired under the Prepackaged Plan. Holders of RIFA Claims are entitled to vote to accept or reject the Prepackaged Plan.

7. Class 7 – General Unsecured Claims

(a) *Classification*: Class 7 consists of all General Unsecured Claims.

(b) *Treatment*: The legal, equitable, and contractual rights of the Holders of Allowed General Unsecured Claims are unaltered by the Prepackaged Plan. Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to different treatment, on and after

the Effective Date, the Debtors shall continue to pay or dispute each General Unsecured Claim in the ordinary course of business as if the Chapter 11 Cases had never been commenced.

(c) *Voting:* Class 7 is Unimpaired under the Prepackaged Plan. Holders of General Unsecured Claims are conclusively presumed to have accepted the Prepackaged Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Prepackaged Plan.

8. <u>Class 8 – Intercompany Claims</u>

(a) *Classification*: Class 8 consists of all Intercompany Claims.

(b) *Treatment*: Each Allowed Intercompany Claim shall be, at the option of the applicable Debtor with the consent of the Required Consenting Funded Debt Parties, either:

(i) Reinstated;

(ii) canceled, released, and extinguished, and will be of no further force or effect; or

(iii) otherwise addressed at the option of each applicable Debtor such that Holders of Intercompany Claims will not receive any distribution on account of such Intercompany Claims.

(c) *Voting*: Class 8 is either Unimpaired or Impaired under the Prepackaged Plan. Holders of Intercompany Claims are conclusively presumed to have accepted the Prepackaged Plan pursuant to section 1126(f) of the Bankruptcy Code or deemed to have rejected the Prepackaged Plan pursuant to section 1126(g) of the Bankruptcy Code. Class 8 is not entitled to vote to accept or reject the Prepackaged Plan.

9. <u>Class 9 – Existing Preferred Interests</u>

(a) *Classification*: Class 9 consists of all Existing Preferred Interests.

(b) *Treatment:* All Existing Preferred Interests shall be canceled, released, and extinguished and will be of no further force or effect.

(c) *Voting*: Class 9 is Impaired under the Prepackaged Plan. Holders of Existing Preferred Interests are conclusively deemed to have rejected the Prepackaged Plan pursuant to section 1126(g) of the Bankruptcy Code. Class 9 is not entitled to vote to accept or reject the Prepackaged Plan.

10. <u>Class 10 – Existing Common Stock Interests</u>

(a) *Classification*: Class 10 consists of all Existing Common Stock Interests.

(b) *Treatment:* All Existing Common Stock Interests shall be canceled, released, and extinguished and will be of no further force or effect.

(c) *Voting*: Class 10 is Impaired under the Prepackaged Plan. Holders of Existing Common Stock Interests are conclusively deemed to have rejected the Prepackaged Plan pursuant to section 1126(g) of the Bankruptcy Code. Class 10 is not entitled to vote to accept or reject the Prepackaged Plan.

11. <u>Class 11 – Other Equity Interests</u>

(a) *Classification*: Class 11 consists of all Other Equity Interests.

(b) *Treatment:* Holders of Other Equity Interests will not receive any distribution on account of such Interests, which will be canceled, released, and extinguished as of the Effective Date, and will be of no further force or effect.

(c) *Voting*: Class 11 is Impaired under the Prepackaged Plan. Holders of Other Equity Interests are conclusively deemed to have rejected the Prepackaged Plan pursuant to section 1126(g) of the Bankruptcy Code. Class 11 is not entitled to vote to accept or reject the Prepackaged Plan.

12. <u>Class 12 – Intercompany Interests</u>

(a) *Classification*: Class 12 consists of all Intercompany Interests.

(b) *Treatment*: Each Intercompany Interest shall be, at the option of the applicable Debtor with the consent of the Required Consenting Funded Debt Parties, either:

(i) Reinstated;

(ii) canceled, released, and extinguished, and will be of no further force or effect; or

(iii) otherwise addressed, in each case as and to the extent provided in the Restructuring Transactions Memorandum, such that Holders of Intercompany Interests will not receive any distribution on account of such Intercompany Interests.

(c) *Voting*: Class 12 is either Unimpaired or Impaired under the Prepackaged Plan. Holders of Intercompany Interests are conclusively presumed to have accepted the Prepackaged Plan pursuant to section 1126(f) of the Bankruptcy Code or deemed to have rejected the Prepackaged Plan pursuant to section 1126(g) of the Bankruptcy Code. Class 12 is not entitled to vote to accept or reject the Prepackaged Plan.

*C. Special Provision Governing Unimpaired Claims.*

Except as otherwise provided in the Prepackaged Plan, nothing under the Prepackaged Plan shall affect the Debtors', the Reorganized Debtors', or the Post-Effective Date Debtors', as applicable, rights regarding any Unimpaired Claim, including all rights regarding legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claim. Unless otherwise Allowed, Claims that are Unimpaired shall remain Disputed Claims under the Prepackaged Plan.

*D. Elimination of Vacant Classes.*

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court in an amount greater than zero as of the date of the Confirmation Hearing shall be deemed eliminated from the Prepackaged Plan for purposes of voting to accept or reject the Prepackaged Plan and for purposes of determining acceptance or rejection of the Prepackaged Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

E. *Voting Classes; Presumed Acceptance by Non-Voting Classes.*

If a Class contains Claims or Interests eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Prepackaged Plan, the Holders of such Claims or Interests in such Class shall be deemed to have accepted the Prepackaged Plan.

F. *Intercompany Interests.*

To the extent Reinstated under the Prepackaged Plan or otherwise addressed in the Restructuring Transactions Memorandum, distributions on account of Intercompany Interests are not being received by Holders of such Intercompany Interests on account of their Intercompany Interests but for the purposes of administrative convenience and due to the importance of maintaining the prepetition corporate structure for the ultimate benefit of the holders of New Common Stock, and in exchange for the Debtors', the Reorganized Debtors', or the Post-Effective Date Debtors', as applicable, agreement under the Prepackaged Plan to make certain distributions to the Holders of Allowed Claims.

G. *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code.*

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Prepackaged Plan by one or more of the Classes entitled to vote pursuant to Article III.B of the Prepackaged Plan. The Debtors reserve the right, subject to the consent rights set forth in the Restructuring Support Agreement, to modify the Prepackaged Plan in accordance with Article X hereof and the Restructuring Support Agreement to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

H. *Controversy Concerning Impairment.*

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

I. *Subordinated Claims.*

The allowance, classification, and treatment of all Allowed Claims and Allowed Interests and the respective distributions and treatments under the Prepackaged Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. Any such contractual, legal, or equitable subordination rights shall be settled, compromised, and released pursuant to the Prepackaged Plan.

## ARTICLE IV.
## MEANS FOR IMPLEMENTATION OF THE PLAN

A. *General Settlement of Claims and Interests.*

As discussed in detail in the Disclosure Statement and as otherwise provided herein, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Prepackaged Plan, upon the Effective Date, the provisions of the Prepackaged Plan shall constitute a good faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, discharged, or otherwise resolved pursuant to the Prepackaged Plan, whether under any provision of chapter 5 of the Bankruptcy Code, on any equitable theory (including equitable subordination, equitable disallowance, or unjust enrichment) or otherwise.

The Prepackaged Plan shall be deemed a motion to approve the good faith compromise and settlement of all such Claims, Interests, Causes of Action, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable, and in the best interests of the Debtors and their Estates. Subject to Article VI hereof, all distributions made to Holders of Allowed Claims and Allowed Interests (as applicable) in any Class are intended to be and shall be final.

*B. Sale Transaction Election Notice Deadline; Successful Bid.*

In accordance with the Restructuring Support Agreement, the Debtors intend to pursue Consummation of the Reorganization Transaction pursuant to the Prepackaged Plan; *provided*, *however*, that if a Successful Bid is received in accordance with the Bidding Procedures that satisfies the Successful Bid Mandatory Conditions (as defined below), the Debtors may, with the consent of the Required Consenting Funded Debt Parties (and, to the extent required under the Restructuring Support Agreement, the Required Consenting Royalty Investors), elect to pursue the Sale Transaction by Filing the Sale Transaction Election Notice by the Sale Transaction Election Notice Deadline. The marketing process for the Debtors' assets, the submission and evaluation of Qualified Bids, any Auction, and the selection of any Successful Bid shall be conducted in accordance with the Restructuring Support Agreement, the Bidding Procedures, and the Bidding Procedures Order, and any Sale Transaction shall be implemented in accordance with the Restructuring Support Agreement, the Bidding Procedures, the Purchase Agreement, and the Confirmation Order or the Sale Order, as applicable.

Subject to the Restructuring Support Agreement, the Debtors shall only designate a Qualified Bid as a Successful Bid if such Qualified Bid meets the requirements to be set forth in the Bidding Procedures and the following mandatory conditions (such conditions, the "Successful Bid Mandatory Conditions"):

1. the Qualified Bid provides for net proceeds at closing of at least $335,384,812; *provided* that $18,750,000 of such amount allocable to the RIFA Claims may be satisfied with Cash or non-Cash consideration, in such form as is acceptable to the Holders of RIFA Claims in their discretion, having a value of not less than such portion;

2. the Qualified Bid provides for the payment in full in Cash of any Bid Protections payable in accordance with the Bidding Procedures Order; and

3. the Qualified Bid provides for the funding in Cash, at the closing of the Sale Transaction, of the Wind-Down Budget.

The Debtors are authorized, subject to the entry of the Bidding Procedures Order, to provide Bid Protections to Ayrmid in respect of the Reorganization Transaction, in the amounts, on the terms, and subject to the conditions set forth in the Restructuring Support Agreement and the Bidding Procedures Order. The Bid Protections shall be earned upon the selection of a Successful Bid submitted by an Entity other than Ayrmid and, once earned, shall constitute Allowed Administrative Claims pursuant to sections 105(a), 503(b), and 507(a)(2) of the Bankruptcy Code with priority over all other Administrative Claims of the kind specified in sections 503(b)(1) and 507(a) of the Bankruptcy Code, subject and subordinate to the DIP Claims and the Carve-Out, without further order of the Bankruptcy Court. The Bid Protections, to the extent earned, shall be payable in Cash within three (3) Business Days after the date on which an Acceptable Alternative Transaction or an Alternative Restructuring Proposal (either of which may constitute the Sale Transaction) is consummated, whether pursuant to the Bidding Procedures Order, a chapter 11 plan (including the Prepackaged Plan), or otherwise, and shall be paid from the Cash proceeds of such Acceptable Alternative Transaction or Alternative Restructuring Proposal, as applicable (or as otherwise provided in the Bidding Procedures Order), in each case subject to (a) Ayrmid's compliance with the terms of the Restructuring Support Agreement and (b) the exceptions set forth in Section 14.07(b) of the Restructuring Support Agreement (including where the termination of the Restructuring Support Agreement as to Ayrmid arises from or is attributable to Ayrmid's breach of the Restructuring Support Agreement, Ayrmid's withdrawal from the sale process, or Ayrmid's failure to consummate the Reorganization Transaction (except, in the case of such a failure, as a result of matters directly or proximately caused by another party to the Restructuring Support Agreement)). Ayrmid's agreement to serve as the Back-Up Bidder, if so designated, shall be without prejudice to its right to payment of the Bid Protections, to the extent earned,

upon the consummation of an Acceptable Alternative Transaction or an Alternative Restructuring Proposal. For the avoidance of doubt, the failure to consummate an Acceptable Alternative Transaction or an Alternative Restructuring Proposal shall not affect the status of the Bid Protections, to the extent earned, as Administrative Claims.

If the Debtors File a Sale Transaction Election Notice and the Sale Transaction does not close on or before the Back-Up Bid Termination Date or the outside date set forth in the applicable Purchase Agreement (or such Purchase Agreement is otherwise terminated), then, subject to the terms of the Bidding Procedures Order and the Restructuring Support Agreement, the Debtors may (a) consummate a Sale Transaction with the Entity (if any) that submitted the next-highest or otherwise best Qualified Bid satisfying the Successful Bid Mandatory Conditions, or (b) if Ayrmid has been designated as the Back-Up Bidder by written notice to Ayrmid delivered on or prior to the conclusion of the auction, designate the Back-Up Bid as the Successful Bid, withdraw the Sale Transaction Election Notice, and consummate the Reorganization Transaction in accordance with the Prepackaged Plan and the Definitive Documents (as modified to reflect any improvements made by Ayrmid at the Auction), which Definitive Documents (including the Merger Agreement) shall be deemed reinstated and in full force and effect from and after the date of such designation (and not during the period between the selection of such Successful Bid and such designation), as promptly as practicable following the satisfaction or waiver of the conditions precedent set forth in Article IX.A hereof, in which case the applicable milestones under the Restructuring Support Agreement and the DIP Facility Documents shall, with the consent of the Required Consenting Funded Debt Parties (such consent not to be unreasonably withheld) and, solely with respect to the Ayrmid Milestones (as defined in the Restructuring Support Agreement), Ayrmid, be deemed extended to the extent reasonably necessary to accommodate the consummation of the Reorganization Transaction. The foregoing shall occur in each case without further solicitation of votes on the Prepackaged Plan and without the need for further order of the Bankruptcy Court other than the Confirmation Order; *provided* that the Confirmation Order shall provide that the Bankruptcy Court retains jurisdiction to resolve any dispute arising in connection therewith.

*C. Restructuring Transactions.*

On or before the Effective Date, the applicable Debtors or the Reorganized Debtors (and their respective officers, directors, members, or managers (as applicable)) shall enter into and shall take any actions as may be necessary or appropriate to effectuate the Restructuring Transactions, including as may be set forth in the Restructuring Transactions Memorandum, and may enter into and may take all actions as may be necessary or appropriate to effectuate any transaction described in, approved by, contemplated by, or necessary to effectuate the Prepackaged Plan and the Restructuring Support Agreement that are consistent with and pursuant and subject to the terms and conditions of the Prepackaged Plan and the Restructuring Support Agreement (and without the need for any approvals, authorizations, or consents except for those expressly required pursuant to the Prepackaged Plan), in each case in the most tax-efficient manner for the Debtors and the Consenting Stakeholders, as reasonably determined by the Debtors and the Required Consenting Funded Debt Parties (and, in the event of the Reorganization Transaction, Ayrmid). These actions to effectuate the Restructuring Transactions may include: (1) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, arrangement, continuance, dissolution, sale, purchase, or liquidation containing terms that are consistent with the terms of the Prepackaged Plan and the Restructuring Support Agreement and that satisfy the applicable requirements of applicable Law and any other terms to which the applicable Entities may agree; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Prepackaged Plan and the Restructuring Support Agreement and having other terms to which the applicable Entities may agree; (3) the filing of appropriate certificates or articles of incorporation, formation, organization, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable Law; (4) the issuance of the Reorganized Parent Common Stock and the New Common Stock, including the Omisirge Contingent Equity; (5) the execution and delivery of the MF CVR Agreement and any filing related thereto, and distribution of the MF CVRs pursuant to the MF CVR Agreement; (6) the execution and delivery of the New Royalty Agreement; (7) the execution and delivery of the New Corporate Governance Documents, and any certificates or articles of incorporation, bylaws, or such applicable formation documents (if any) of each Reorganized Debtor or Post-Effective Date Debtor, as applicable (including all actions to be taken, undertakings to be made, and obligations to be incurred and fees and expenses to be paid by the Debtors or the Reorganized Debtors or Post-Effective Date Debtors, as applicable); (8) the execution and delivery of the Purchase Agreement (if applicable), the Merger Agreement (if applicable) and the NewCo Facility Documents (if applicable), and any filing related thereto, and the incurrence of the obligations

thereunder; (9) the winddown of the German RemainCo; and (10) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable Law in connection with the Prepackaged Plan. All Holders of Claims and Interests receiving distributions pursuant to the Prepackaged Plan and all other necessary parties in interest, including any and all agents thereof, shall prepare, execute, and deliver any agreements or documents, including any subscription agreements, and take any other actions as the Debtors may determine are necessary or appropriate, subject to the consent rights set forth in the Restructuring Support Agreement, including by voting or exercising any powers or rights available to such Holder, including at any board, creditors', or shareholders' meeting, to effectuate the provisions and intent of the Prepackaged Plan.

The Confirmation Order shall, and shall be deemed to, pursuant to sections 363 and 1123 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effectuate any transaction described in, approved by, contemplated by, or necessary to effectuate the Prepackaged Plan, including as may be set forth in the Restructuring Transactions Memorandum.

1. Reorganization Transaction.

If the Reorganization Transaction is to be consummated, on the Effective Date or as soon as reasonably practicable thereafter, the Reorganized Debtors, as applicable, shall issue or enter into all securities, notes, instruments, certificates, and other documents required to be issued or entered into pursuant to the Restructuring Transactions in accordance with the Restructuring Transactions Memorandum.

On the Effective Date, the New Board shall be established, and the Reorganized Debtors shall adopt their New Corporate Governance Documents. The Reorganized Debtors shall be authorized to adopt any other agreements, documents, and instruments and to take any other actions contemplated under the Prepackaged Plan as necessary to consummate the Prepackaged Plan. Cash payments to be made pursuant to the Prepackaged Plan will be made by the Debtors or the Reorganized Debtors, as applicable. The Debtors and the Reorganized Debtors will be entitled to transfer funds between and among themselves as they determine to be necessary or appropriate to enable the Debtors or the Reorganized Debtors, as applicable, to satisfy their obligations under the Prepackaged Plan. Except as set forth herein, any changes in intercompany account balances resulting from such transfers will be accounted for and settled in accordance with the Debtors' historical intercompany account settlement practices and will not violate the terms of the Prepackaged Plan.

From and after the Effective Date, the Reorganized Debtors, subject to any applicable limitations set forth in any post-Effective Date agreement, shall have the right and authority without further order of the Bankruptcy Court to raise additional capital and obtain additional financing, subject to the New Corporate Governance Documents and the NewCo Facility Documents, as the Governing Bodies of the applicable Reorganized Debtors deem appropriate.

2. Sale Transaction.

In the event the Sale Transaction occurs, the Sale Transaction will be effectuated either by (a) one or more equity sale(s) under the Prepackaged Plan or (b) one or more asset sale(s) pursuant to section 363 of the Bankruptcy Code or the Prepackaged Plan, in each case, with such Sale Transaction Documents to be set forth in the Plan Supplement or Filed with the Bankruptcy Court.

## *D. Continued Corporate Existence.*

Except as otherwise provided in the Prepackaged Plan, the Restructuring Transactions Memorandum, or any agreement, instrument, or other document incorporated in the Prepackaged Plan or the Plan Supplement, each Debtor shall continue to exist after the Effective Date as a separate corporate entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable Law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws (or other formation documents) are amended under the Prepackaged Plan or otherwise, in each case, consistent with the Prepackaged Plan, and to the extent such documents are amended in accordance therewith, such documents are

deemed to be amended pursuant to the Prepackaged Plan and require no further action or approval (other than any requisite filings required under applicable state or federal Law). After the Effective Date, the respective certificate(s) of incorporation and bylaws (or other formation documents) of one or more of the Reorganized Debtors or Post-Effective Date Debtors may be amended or modified on the terms therein without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules. After the Effective Date, one or more of the Reorganized Debtors or the Post-Effective Date Debtors may be disposed of, dissolved, wound down, or liquidated without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

*E.* *Vesting of Assets in the Reorganized Debtors or Post-Effective Date Debtors*.

Except as otherwise provided in the Confirmation Order, the Prepackaged Plan, the Restructuring Transactions Memorandum, or any agreement, instrument, or other document incorporated in, or entered into in connection with or pursuant to, the Prepackaged Plan or Plan Supplement, on the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all property in each Estate, all Causes of Action, and any property acquired by any of the Debtors pursuant to the Prepackaged Plan shall vest in each respective Reorganized Debtor or Post-Effective Date Debtor, as applicable, free and clear of all Liens, Claims, charges, or other encumbrances. On and after the Effective Date, except as otherwise provided in the Prepackaged Plan, each Reorganized Debtor or Post-Effective Date Debtor, as applicable, may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

*F.* *Cancellation of Existing Securities and Agreements*.

Except for the purpose of evidencing a right to a distribution under the Prepackaged Plan and except as otherwise set forth in the Prepackaged Plan or the Plan Supplement (including the Restructuring Transactions Memorandum), on the Effective Date, all agreements, instruments, Securities, and other documents evidencing any Claim or Interest (other than Intercompany Interests that are not modified by the Prepackaged Plan) and any rights of any holder in respect thereof shall be deemed canceled and of no force or effect and the obligations of the Debtors thereunder shall be deemed fully satisfied, released, and discharged; *provided* that for the avoidance of doubt, the foregoing shall not impact any Claims that are Unimpaired by the Prepackaged Plan. The holders of or parties to such canceled agreements, instruments, Securities, and other documentation shall have no rights arising from or related to such agreements, instruments, Securities, or other documentation or the cancellation thereof, except the rights provided for pursuant to the Prepackaged Plan.

*G.* *Cancellation of Certain Existing Security Interests*.

Upon the satisfaction or discharge in full pursuant to the Prepackaged Plan of an Allowed Secured Claim (including Allowed DIP Claims), or promptly thereafter, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors or Post-Effective Date Debtors and their successors and assigns. Any Holder of such Secured Claim (and the applicable agents for such Holder) shall be authorized and directed, at the sole cost and expense of the Reorganized Debtors or Post-Effective Date Debtors, to release any collateral or other property of any Debtor (including any Cash Collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder), and to take such actions as may be reasonably requested by the Reorganized Debtors or Post-Effective Date Debtors to evidence the release of such Liens or security interests, including the execution, delivery, and filing or recording of such releases. The presentation or filing of the Confirmation Order to or with any federal, state, or local agency, records office, or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.

To the extent that any Holder of an Allowed Secured Claim (including Allowed DIP Claims) that has been satisfied or discharged in full pursuant to the Prepackaged Plan, or any agent for such Holder, has filed or recorded publicly any Liens or security interests to secure such Holder's Allowed Secured Claim, then as soon as practicable on or after the Effective Date, such Holder (or the agent for such Holder) shall take any and all steps reasonably requested by the Debtors, the Reorganized Debtors, or the Post-Effective Date Debtors that are necessary or desirable

to record or effectuate the cancellation or extinguishment of such Liens or security interests, including the making of any applicable filings or recordings, and the Reorganized Debtors or Post-Effective Date Debtors shall be entitled to make any such filings or recordings on such Holder's behalf.

*H.* *Sources of Consideration for Plan Distributions*.

The Debtors, the Reorganized Debtors, or Post-Effective Date Debtors, as applicable, shall fund distributions under the Prepackaged Plan with (i) the Debtors' Cash on hand, (ii) Cash generated from operations, (iii) if the Reorganization Transaction is consummated, the Reorganized Parent Common Stock, the DIP Facility, and the NewCo Facility, and (iv) if the Sale Transaction is consummated, the proceeds of the Sale Transaction.

*I.* *New Common Stock*.

In connection with the Reorganization Transaction, the issuance of the Reorganized Parent Common Stock (comprising the Reorganized Parent Equity Distribution) pursuant to the Prepackaged Plan and the issuance of the New Common Stock (as part of the Merger Consideration) pursuant to the Merger Agreement shall be hereby authorized without the need for any further corporate or similar action and without any further action by the Holders of Claims or Interests. Reorganized Parent and NewCo, as applicable, shall be authorized to issue the number of shares, units, or equity interests of Reorganized Parent Common Stock and New Common Stock, respectively, required to be issued under the Prepackaged Plan and the Merger Agreement and pursuant to their respective New Corporate Governance Documents. On the Effective Date, the Debtors or Reorganized Debtors, as applicable, shall issue or enter into all Securities, notes, instruments, certificates, and other documents required to be issued or entered into pursuant to the Prepackaged Plan. The New Corporate Governance Documents shall be effective as of the Effective Date and, as of such date, shall be deemed to be valid, binding, and enforceable in accordance with their respective terms. Subject to the agreement of the Required Consenting Funded Debt Parties and Ayrmid, NewCo may be a newly formed or an existing entity for the purposes of consummating the Merger, in either case to be determined on or prior to the Effective Date.

All of the shares, units, or equity interests (as the case may be based on how the New Common Stock is denominated) of New Common Stock issued or authorized to be issued pursuant to the Prepackaged Plan shall be duly authorized, validly issued, fully paid, and non-assessable. Each distribution and issuance referred to in Article VI hereof shall be governed by the terms and conditions set forth in the Prepackaged Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

In the event of the Reorganization Transaction, unless Ayrmid and the Required Consenting Funded Debt Parties otherwise consent in writing, the Reorganized Debtors and NewCo (1) shall be private companies on the Effective Date and the New Common Stock shall not be listed on any stock exchange or market and shall not be registered under the Exchange Act, (2) shall not be voluntarily subjected to any reporting requirements promulgated by the SEC, and (3) shall not be required to list the New Common Stock on any stock exchange or market. The Reorganized Debtors and NewCo shall use commercially reasonable efforts to ensure that, after giving effect to the distributions under the Prepackaged Plan, the Merger, and any Management Incentive Plan, neither Reorganized Parent nor NewCo has a class of equity securities held of record by 300 or more persons so as to avoid triggering the reinstatement of reporting obligations under section 15(d) of the Exchange Act.

On or prior to the Effective Date, the Debtors, the Reorganized Debtors, or the Post-Effective Date Debtors shall, as applicable, (i) take all actions necessary or appropriate to delist the Existing Common Stock Interests from Nasdaq and to deregister all securities of the Reorganized Debtors or Post-Effective Date Debtors, as applicable, under the Exchange Act as promptly as practicable in compliance with SEC rules (such that, in the event of the Reorganization Transaction, the termination of the registration of all securities of Parent under sections 12 and 15(d) of the Exchange Act shall have been completed and shall be effective on the Effective Date concurrently with the consummation of the Merger, to the extent permitted by applicable Law and SEC rules), (ii) file a Form 25 with the SEC to delist the Existing Common Stock Interests from Nasdaq and to deregister the Existing Common Stock Interests from section 12(b) of the Exchange Act (unless Nasdaq has already filed a Form 25 with the SEC providing for such delisting and deregistration), (iii) file post-effective amendments to terminate all of Parent's currently effective registration statements under the Securities Act, (iv) file a Form 15 notifying the SEC of the suspension of

Parent's duty to file reports under section 15(d) of the Exchange Act, and (v) take all actions reasonably necessary or appropriate to ensure (A) that the New Common Stock and the MF CVRs shall not be listed on a stock exchange or market and that the Reorganized Debtors shall not be required to list the New Common Stock or MF CVRs on a stock exchange or market, except, in each case, as otherwise may be required pursuant to the New Corporate Governance Documents or the MF CVR Agreement, as applicable, and (B) that the Reorganized Debtors or Post-Effective Date Debtors, as applicable, shall not be voluntarily subjected to any reporting requirements promulgated by the SEC.

*J.* *The Merger*.

Solely in the event of the Reorganization Transaction, on the Effective Date and immediately after the issuance of the Reorganized Parent Equity Distribution, the Merger shall be consummated in accordance with the Merger Agreement and the Restructuring Transactions Memorandum as a Restructuring Transaction pursuant to sections 1123(a)(5) and 1123(b)(3) of the Bankruptcy Code. In the Merger, NewCo shall issue the Merger Consideration on the terms and subject to the conditions set forth in the Merger Agreement and in accordance with the Restructuring Transactions Memorandum. Each Holder of an Allowed Prepetition Funded Debt Claim, Allowed Equitized DIP New Money Claim, or Allowed DIP Roll-Up Claim shall be deemed to have received its share of the Reorganized Parent Equity Distribution and to have exchanged such Reorganized Parent Common Stock in the Merger for its share of the Merger Consideration, and the applicable Disbursing Agent shall deliver the New Common Stock and the MF CVRs constituting the Merger Consideration directly to or for the benefit of such Holders in accordance with Article VI hereof, without any requirement that certificates or book-entry positions evidencing the Reorganized Parent Common Stock be issued to or delivered by such Holders. For the avoidance of doubt, any New Common Stock or MF CVRs distributed on account of Allowed Equitized DIP New Money Claims and Allowed DIP Roll-Up Claims shall be allocated solely from the Merger Consideration otherwise distributable to the Holders of Allowed Prepetition Funded Debt Claims and shall not reduce or dilute the New Common Stock allocable to the equityholders of Ayrmid or the Omisirge Contingent Equity. On the Effective Date, the Liens and obligations under the Ayrmid Term Loan shall be addressed in the manner set forth in the Merger Agreement and the Restructuring Transactions Memorandum, which shall be acceptable to the Required Consenting Funded Debt Parties and Ayrmid and otherwise consistent with the Restructuring Support Agreement; provided that any Liens and obligations in respect of the Ayrmid Term Loan (or any successor obligations thereto) shall be equitized into pre-Effective Date Ayrmid or structurally subordinated in their entirety to the claims against, and the equity interests in, NewCo, in each case in a manner acceptable to the Required Consenting Funded Debt Parties in their sole discretion, and no proceeds of the NewCo Facility shall be used to prepay the Ayrmid Term Loan. The Merger Agreement, the Merger, and the issuance of the Merger Consideration shall be deemed authorized and approved by the Confirmation Order without the need for any further corporate or similar action or any further action by Holders of Claims or Interests, and the Confirmation Order shall constitute all approvals and consents required under applicable non-bankruptcy Law for the consummation of the Merger. The Reorganization Transaction (including the Merger) shall be structured in a manner reasonably acceptable to the Debtors, the Required Consenting Funded Debt Parties, and Ayrmid that, to the extent reasonably practicable, (a) minimizes any cash taxes payable as a result of the consummation of the Reorganization Transaction, (b) maximizes the favorable tax attributes (including tax basis) of the Reorganized Debtors and NewCo and their respective subsidiaries going forward, and (c) otherwise achieves such tax-planning outcomes as are reasonably requested by the Debtors, the Required Consenting Funded Debt Parties, and Ayrmid, in each case as set forth in the Restructuring Transactions Memorandum, which shall be Filed with the Plan Supplement. The Merger is a transaction contemplated by, and shall be deemed to be effectuated pursuant to, the Prepackaged Plan. Accordingly, and notwithstanding anything to the contrary in any Executory Contract or Unexpired Lease assumed pursuant to the Prepackaged Plan, or any other agreement, instrument, or document to which a Debtor is a party that is Reinstated or otherwise continues in effect after the Effective Date, the consummation of the Merger shall not constitute, give rise to, or be deemed to constitute or give rise to a default, breach, event of default, "change of control," "fundamental change," assignment, termination event, or any similar event, or entitle any counterparty to terminate, modify, accelerate, or exercise any other remedy under any such agreement, and any provision purporting to the contrary shall be unenforceable to the fullest extent permitted by sections 365, 541(c), and 1123 of the Bankruptcy Code.

*K.* *MF CVR Agreement; Omisirge Contingent Equity*.

Solely in the event of the Reorganization Transaction, on the Effective Date substantially concurrently with the consummation of the Merger, NewCo shall enter into the MF CVR Agreement and shall issue the MF CVRs to the Disbursing Agent for distribution as part of the Merger Consideration to the Holders of Allowed Prepetition

Funded Debt Claims, Allowed Equitized DIP New Money Claims, and Allowed DIP Roll-Up Claims in accordance with Article II.B, Article III.B, and Article IV.J hereof. The MF CVRs shall not constitute equity interests in NewCo or confer any voting or governance rights.

Solely in the event of the Reorganization Transaction, the Merger Agreement (and, to the extent applicable, the New Corporate Governance Documents) shall provide for the issuance of the Omisirge Contingent Equity to the equityholders of Ayrmid as of immediately prior to the Merger if and to the extent specified in the Merger Agreement (and, to the extent applicable, the New Corporate Governance Documents). The issuance of the Omisirge Contingent Equity shall dilute solely the New Common Stock issued as Merger Consideration to the Holders of Allowed Prepetition Funded Debt Claims (and any other New Common Stock issued on account of Claims under the Prepackaged Plan), and shall not dilute New Common Stock issued in the Merger to the equityholders of Ayrmid as of immediately prior to the Merger.

The MF CVR Agreement and the provisions of the Merger Agreement and the New Corporate Governance Documents governing the Omisirge Contingent Equity shall be duly authorized without the need for any further corporate or similar action and without further action by the Debtors, the Reorganized Debtors, or the Holders of Claims or Interests. The MF CVR Agreement and the MF CVRs shall be effective as of the Effective Date and, as of such date, shall be deemed to be valid, binding, and enforceable obligations of NewCo in accordance with their respective terms.

*L.* *<u>NewCo Facility</u>.*

In connection with the Reorganization Transaction, on the Effective Date and immediately after the consummation of the Merger, entry into the NewCo Facility Documents by NewCo (or such other borrower identified in the NewCo Facility Documents) and the applicable guarantors, the incurrence of the obligations thereunder, and the granting of the related guarantees, Liens, and security interests shall be authorized without the need for any further corporate or similar action and without any further action by Holders of Claims or Interests. The proceeds of the NewCo Facility shall be available to be drawn in full on the Effective Date and shall be used to (a) refinance up to $50,000,000 of Allowed DIP New Money Claims in Cash in accordance with Article II.B hereof (and, if the Allowed DIP New Money Claims are equal to or less than $50,000,000, to repay such Allowed DIP New Money Claims in full), (b) pay Cure amounts and other amounts payable by the Debtors or the Reorganized Debtors under the Prepackaged Plan, and (c) fund the working capital needs of NewCo and the Reorganized Debtors, in each case subject to the DIP Budget. Confirmation of the Prepackaged Plan shall be deemed authorization for the Debtors or the Reorganized Debtors, as applicable, to, without further notice to or order of the Bankruptcy Court, act or take action under applicable Law, regulation, order, or rule as may be necessary or appropriate to enter into, execute, deliver, and perform the NewCo Facility Documents, including the payment of all fees, indemnities, and expenses provided for therein.

On the Effective Date (or earlier, if provided in an order of the Bankruptcy Court), all Liens and security interests granted pursuant to, or in connection with, the NewCo Facility Documents and the related guarantees (1) shall be deemed to be approved and shall, without the necessity of the execution, recordation, or filing of mortgages, security agreements, control agreements, pledge agreements, financing statements, or other similar documents, be valid, binding, fully perfected, fully enforceable Liens on, and security interests in, the collateral securing the NewCo Facility and the related guarantees, with the priorities established in respect thereof under the NewCo Facility Documents, applicable non-bankruptcy Law, the Prepackaged Plan, and the Confirmation Order; and (2) shall not be enjoined or subject to discharge, impairment, release, avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any applicable non-bankruptcy Law, the Prepackaged Plan, or the Confirmation Order.

The Reorganized Debtors, NewCo, and the Persons granted Liens and security interests under the NewCo Facility Documents are authorized to make all filings and recordings and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, provincial, federal, or other Law (whether domestic or foreign) that would be applicable in the absence of the Prepackaged Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of entry of the Confirmation Order without the need for any filings or recordings) and will thereafter cooperate to

make all other filings and recordings that otherwise would be necessary under applicable Law to give notice of such Liens and security interests to third parties.

*M.* *Corporate Action*.

Upon the Effective Date, all actions contemplated under the Prepackaged Plan, the Plan Supplement, and the Restructuring Transactions Memorandum shall be deemed authorized and approved in all respects, including: (1) the issuance and distribution of the Reorganized Parent Common Stock and the New Common Stock (including the Omisirge Contingent Equity, when and if issuable); (2) the entry into the NewCo Facility Documents; (3) the entry into the Merger Agreement and the consummation of the Merger; (4) implementation of the Restructuring Transactions (including, in the event of a Sale Transaction, the Sale Transaction Documents); (5) entry into the MF CVR Agreement and issuance and distribution of the MF CVRs; (6) entry into the New Royalty Agreement; (7) all other actions contemplated under the Prepackaged Plan (whether to occur before, on, or after the Effective Date); (8) adoption of the New Corporate Governance Documents; (9) the rejection, assumption, or assumption and assignment, as applicable, of Executory Contracts and Unexpired Leases; and (10) all other acts or actions contemplated or reasonably necessary or appropriate to promptly consummate the Restructuring Transactions contemplated by the Prepackaged Plan (whether to occur before, on, or after the Effective Date). All matters provided for in the Prepackaged Plan involving the corporate structure of the Debtors or the Reorganized Debtors, and any corporate, partnership, limited liability company, or other governance action required by the Debtors or the Reorganized Debtors, as applicable, in connection with the Prepackaged Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the Security holders, members, directors, or officers of the Debtors or the Reorganized Debtors, as applicable. On or (as applicable) prior to the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized and (as applicable) directed to issue, execute, and deliver the agreements, documents, Securities, and instruments contemplated under the Prepackaged Plan (or necessary or desirable to effect the transactions contemplated under the Prepackaged Plan) in the name of and on behalf of the Reorganized Debtors (including NewCo), including, as applicable, the Reorganized Parent Common Stock, the New Common Stock, the NewCo Facility Documents, the Merger Agreement, the New Corporate Governance Documents, the MF CVRs, the MF CVR Agreement, and any and all other agreements, documents, Securities, and instruments relating to the foregoing. The authorizations and approvals contemplated by this Article IV.M shall be effective notwithstanding any requirements under non-bankruptcy Law.

*N.* *New Corporate Governance Documents*.

In the event of the Reorganization Transaction, on or immediately prior to the Effective Date, the New Corporate Governance Documents shall be automatically adopted by the applicable Reorganized Debtors and become effective. To the extent required under the Prepackaged Plan or applicable non-bankruptcy Law, each of the Reorganized Debtors will file its New Corporate Governance Documents with the applicable Secretaries of State or other applicable authorities in its respective state or country of organization if and to the extent required in accordance with the applicable Laws of the respective state or country of organization. The New Corporate Governance Documents will prohibit the issuance of non-voting equity Securities, to the extent required under section 1123(a)(6) of the Bankruptcy Code.

After the Effective Date, the Reorganized Debtors may amend and restate their respective New Corporate Governance Documents in accordance with the terms thereof, and the Reorganized Debtors may file such amended certificates or articles of incorporation, bylaws, or such other applicable formation documents, and other constituent documents as permitted by the Laws of the respective states, provinces, or countries of incorporation and the New Corporate Governance Documents.

1. Directors and Officers of the Reorganized Debtors.

As of the Effective Date, the terms of the current members of the board of directors of the Debtors shall expire and the existing officers of the Debtors shall be automatically removed as officers, and the New Board and new officers of each of the Reorganized Debtors (including NewCo) shall be appointed. For subsequent terms, following the Effective Date, members of the New Board and new officers of each of the Reorganized Debtors (including NewCo) shall be appointed in accordance with the New Corporate Governance Documents and other constituent documents of each Reorganized Debtor (including NewCo).

Pursuant to section 1129(a)(5) of the Bankruptcy Code, to the extent known, the identity and affiliation of any Person proposed to serve on the New Board will be disclosed in the Plan Supplement or prior to the Confirmation Hearing, as well as those Persons that will serve as officers of the Reorganized Debtors (including NewCo) and, to the extent known, the identity and compensation of any insider (as such term is defined in section 101(31) of the Bankruptcy Code) that will be employed or retained by the Reorganized Debtors (including NewCo). Provisions regarding the removal, appointment, and replacement of members of the New Board, to the extent applicable, will be disclosed in the New Corporate Governance Documents.

2. Effectuating Documents; Further Transactions.

On and after the Effective Date, the Reorganized Debtors and Post-Effective Date Debtors, and their respective officers, directors, members, or managers (as applicable), are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Prepackaged Plan, and the Securities issued pursuant to the Prepackaged Plan in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorizations, or consents except for those expressly required pursuant to the Prepackaged Plan.

*O. Preservation of Causes of Action.*

In accordance with section 1123(b) of the Bankruptcy Code, but subject to Article VIII hereof, each Reorganized Debtor or Post-Effective Date Debtor, as applicable, shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action of the Debtors, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action, and the Reorganized Debtors' and Post-Effective Date Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Prepackaged Plan, including in Article VIII hereof, which shall be deemed released and waived by the Debtors and the Reorganized Debtors (or Post-Effective Date Debtors, as applicable) as of the Effective Date.

The Reorganized Debtors or Post-Effective Date Debtors, as applicable, may pursue such retained Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors or Post-Effective Date Debtors. **No Entity (other than the Released Parties) may rely on the absence of a specific reference in the Prepackaged Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Reorganized Debtors (or Post-Effective Date Debtors), as applicable, will not pursue any and all available Causes of Action of the Debtors against it. The Debtors and Reorganized Debtors (or Post-Effective Date Debtors, as applicable) expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Prepackaged Plan, including Article VIII hereof.** Unless any Causes of Action of the Debtors against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Prepackaged Plan or a Final Order, the Reorganized Debtors and Post-Effective Date Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation. For the avoidance of doubt, the Debtors and the Reorganized Debtors (or Post-Effective Date Debtors, as applicable) do not reserve any Causes of Action that have been expressly released or exculpated pursuant to the Prepackaged Plan (including, for the avoidance of doubt, Claims and Causes of Action against the Consenting Stakeholders released pursuant to the releases by the Debtors provided in Article VIII.C hereof and the exculpation contained in Article VIII.E hereof).

The Reorganized Debtors and Post-Effective Date Debtors reserve and shall retain such Causes of Action of the Debtors notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Prepackaged Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors or Post-Effective Date Debtors, except as otherwise expressly provided in the Prepackaged Plan, including Article VIII hereof. The applicable Reorganized Debtors or Post-Effective Date Debtors, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Reorganized Debtors or Post-Effective

Date Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

*P.* *Certain Securities Law Matters.*

No registration statement shall be filed under the Securities Act, or pursuant to any state securities Laws, with respect to the offer, issuance, and distribution of the New Common Stock or the MF CVRs under the Prepackaged Plan, the Merger Agreement, the Restructuring Transactions Memorandum, the Confirmation Order, and the MF CVR Agreement.

The offering, issuance (or entry into), and distribution of the New Common Stock and all other Securities entered into or issued in connection with the Prepackaged Plan (including, solely to the extent constituting securities as defined in and for purposes of the Securities Act, the MF CVRs) shall be exempt from, among other things, the registration requirements of section 5 of the Securities Act and any other applicable Law requiring registration prior to the offering, issuance, distribution, or sale of Securities to the maximum extent permitted by Law, in accordance with, and pursuant to, (i) section 1145 of the Bankruptcy Code, (ii) section 4(a)(2) of the Securities Act or Regulation S under the Securities Act, or (iii) any other available exemption from registration, as applicable.

Any Securities issued under section 1145 of the Bankruptcy Code (1) will not be "restricted securities" as defined in Rule 144(a)(3) under the Securities Act and (2) will be freely tradable and transferable in the United States by a recipient thereof that (i) is an entity that is not an "underwriter" as defined in section 1145(b)(1) of the Bankruptcy Code, (ii) is not an "affiliate" of the Debtors or the Reorganized Debtors as defined in Rule 144(a)(1) under the Securities Act, (iii) has not been such an "affiliate" within 90 days of the time of the transfer, and (iv) has not acquired such securities from an "affiliate" within one year of the time of transfer, subject in each case to compliance with applicable securities Laws and any rules and regulations of the SEC or state or local securities Laws, if any, applicable at the time of any future transfer of such Securities, and subject to any restrictions in the agreements, instruments, or other documents governing such Securities or to which the holder of such Securities is a party.

To the extent issuance under section 1145(a) of the Bankruptcy Code is unavailable, the Merger Consideration (to the extent it consists of securities as defined in and for purposes of the Securities Act) will be issued without registration under the Securities Act in reliance upon the exemption set forth in section 4(a)(2) of the Securities Act or Regulation S under the Securities Act, and similar registration exemptions under state or local securities Laws, in each case to the maximum extent permitted thereunder. Any securities issued in reliance on section 4(a)(2) or Regulation S under the Securities Act will be "restricted securities" under the Securities Act or subject to resale restrictions and may be resold, exchanged, assigned, or otherwise transferred only pursuant to registration or an applicable exemption from registration under the Securities Act and other applicable Law and subject in each case to compliance with applicable securities Laws and any rules and regulations of the SEC or state or local securities Laws, if any, applicable at the time of any future transfer of such Securities, and subject to any restrictions in the agreements, instruments or other documents governing such Securities or to which the holder of such Securities is a party.

The issuance of the New Common Stock and any and all other Securities entered into or issued pursuant to the Prepackaged Plan shall not constitute an invitation or solicitation of an invitation or offer to sell or buy any securities in contravention of any applicable Law in any jurisdiction. No action has been taken, nor will be taken, in any jurisdiction that would permit a public offering of any securities (other than securities issued pursuant to section 1145 of the Bankruptcy Code) in any jurisdiction where such action for that purpose is required.

The Reorganized Debtors and NewCo need not provide any further evidence other than the Prepackaged Plan and the Confirmation Order with respect to the treatment of the New Common Stock or the MF CVRs under applicable securities Laws.

Notwithstanding anything to the contrary in the Prepackaged Plan, no Entity (including, for the avoidance of doubt, DTC and any transfer agent) shall be entitled to require a legal opinion regarding the validity of any transaction contemplated by the Prepackaged Plan, including, for the avoidance of doubt, whether the New Common Stock and MF CVRs are exempt from registration or eligible for DTC book-entry delivery, settlement, and depository services.

DTC and any transfer agent shall be required to accept and conclusively rely upon the Prepackaged Plan and Confirmation Order in lieu of a legal opinion regarding whether the New Common Stock or MF CVRs are exempt from registration or eligible for DTC book-entry delivery, settlement, and depository services.

Notwithstanding any policies, practices, or procedures of DTC, DTC and any participants and intermediaries shall fully cooperate and take all actions to facilitate any and all transactions necessary or appropriate for implementation of the Prepackaged Plan or otherwise contemplated thereby, including any and all distributions pursuant to the Prepackaged Plan.

*Q.* *1146 Exemption.*

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to a Reorganized Debtor, Post-Effective Date Debtor, or to any other Person) of property under or in connection with the Prepackaged Plan or pursuant to: (1) the issuance, distribution, transfer, or exchange of any debt, equity Security, or other interest in the Debtors, Reorganized Debtors or Post-Effective Date Debtors, including the Reorganized Parent Common Stock, the New Common Stock, and the MF CVRs; (2) the Restructuring Transactions; (3) the creation, modification, consolidation, termination, refinancing, or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (4) the making, assignment, or recording of any lease or sublease; (5) the grant of collateral as security for NewCo's and the Reorganized Debtors' obligations under and in connection with the NewCo Facility or any other debt instrument; or (6) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Prepackaged Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Prepackaged Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, personal property transfer tax, sales or use tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment. All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(a) of the Bankruptcy Code, shall forgo the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

*R.* *Additional Sale Transaction Provisions.*

Solely if the Sale Transaction occurs and is consummated, the following additional provisions shall apply:

1. Post-Effective Date Debtors.

If the Sale Transaction is an asset sale, following the sale of certain assets of the Debtors under the Prepackaged Plan or the Sale Order(s), on and after the Effective Date, the Post-Effective Date Debtors shall continue in existence for purposes of (a) winding down the Debtors' business and affairs as expeditiously as reasonably possible, (b) resolving Disputed Claims, (c) making distributions on account of Allowed Claims as provided hereunder, (d) funding distributions, (e) enforcing and prosecuting claims, interests, rights, and privileges under the Causes of Action on the Schedule of Retained Causes of Action in an efficacious manner and only to the extent the benefits of such enforcement or prosecution are reasonably believed to outweigh the costs associated therewith, (f) filing appropriate tax returns, (g) complying with their continuing obligations under the Purchase Agreement(s), if any, and (h) administering the Prepackaged Plan in an efficacious manner. In such case, the Post-Effective Date Debtors shall be deemed to be substituted as the party-in-lieu of the Debtors in all matters, including (i) motions, contested matters, and adversary proceedings pending in the Bankruptcy Court, and (ii) all matters pending in any courts, tribunals, forums, or administrative proceedings outside of the Bankruptcy Court, in each case without the need or requirement for a plan administrator to file motions or substitutions of parties or counsel in each such matter.

2. Post-Effective Date Plan Administrator.

If the Sale Transaction is an asset sale and is consummated, on the Effective Date, the Post-Effective Date Plan Administrator shall be appointed with respect to each Post-Effective Date Debtor. The Post-Effective Date Plan Administrator shall be acceptable to the Debtors and the Required Consenting Funded Debt Parties and shall act for the Post-Effective Date Debtors in the same fiduciary capacity as applicable to a Governing Body, subject to the provisions hereof (and all certificates of formation, membership agreements, and related documents shall be deemed amended by the Prepackaged Plan to permit and authorize the same) and retain and have all the rights, powers, and duties necessary to carry out its responsibilities under the Prepackaged Plan on terms which shall be disclosed in the Plan Supplement.

*S. Director and Officer Liability Insurance.*

On or prior to the Effective Date, the Debtors shall place the D&O Liability Insurance Policies in effect as of the Petition Date into runoff (or purchase tail coverage providing substantially equivalent coverage) for a period of six (6) years following the Effective Date, at the Debtors' expense, for the benefit of the Debtors' current and former directors, officers, and managers with respect to conduct occurring prior to the Effective Date. Notwithstanding anything to the contrary in the Prepackaged Plan (including Article V.E hereof), after the Effective Date, none of the Reorganized Debtors (including NewCo) or the Post-Effective Date Debtors shall terminate, amend, or otherwise reduce the coverage under any such runoff or tail policies, and all directors, officers, and managers of the Debtors who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy, to the extent set forth therein, regardless of whether such directors, officers, or managers remain in such positions after the Effective Date. NewCo and the Reorganized Debtors may obtain new D&O Liability Insurance Policies effective as of the Effective Date.

*T. Indemnification Obligations.*

All indemnification provisions in place as of the Effective Date (whether in the bylaws, certificates of incorporation or formation, limited liability company agreements, other organizational documents, board resolutions, indemnification agreements, employment contracts, or otherwise) for current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors, as applicable, shall be assumed by a newly-formed entity, which may be an Affiliate of NewCo (the "Indemnification Entity"), in scope acceptable to the Debtors, Aymid, and the Required Consenting Funded Debt Parties and in scope no less favorable to such current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors than the indemnification provisions in place prior to the Effective Date. The obligations assumed by the Indemnification Entity shall include, for the avoidance of doubt, the obligation to fund and pay, as and when due, any self-insured retention, deductible, or similar amount required to be borne by the insureds under any of the D&O Liability Insurance Policies (including any runoff or tail policies described in Article IV.S hereof) in connection with any claim thereunder against any such current or former director, officer, manager, employee, attorney, accountant, investment banker, or other professional of the Debtors. The obligations of the Indemnification Entity in respect of such indemnification provisions (including any such self-insured retention or deductible amounts) shall be supported by an intercompany promissory note in the principal amount of $2,500,000 issued by NewCo or an Affiliate of NewCo in favor of the Indemnification Entity on the Effective Date, on terms acceptable to the Debtors, Aymid, and the Required Consenting Funded Debt Parties, and the Indemnification Entity shall not incur any indebtedness or other obligations other than the indemnification obligations assumed pursuant to this Article IV.T.

*U. Winddown of Karyopharm Europe GmbH.*

In the event of the Reorganization Transaction, on the Effective Date, the Debtors shall deposit a sufficient amount of Cash (in an amount agreed by the Debtors, the DIP Lenders, and the Required Consenting Funded Debt Parties) into a segregated account (the "*German RemainCo Winddown Account*") in order to conduct an orderly winddown and dissolution of Karyopharm Europe GmbH (the "*German RemainCo*") after the Effective Date.

*V. New Royalty Agreement.*

Solely in the event of the Reorganization Transaction, on the Effective Date, NewCo and each of its subsidiaries that owns or controls any selinexor assets shall enter into the New Royalty Agreement with the Holders of RIFA Claims (or their designee) and the Royalty Collateral Agent (or another collateral agent designated by the Holders of RIFA Claims), pursuant to which NewCo shall pay to the Holders of RIFA Claims (or their designee) an unsecured royalty equal to 3.0% of the net revenues received by NewCo from all products containing selinexor (including XPOVIO® (selinexor) in combination with ruxolitinib for patients with myelofibrosis) for the period of five (5) years following the Effective Date, on the terms and subject to the conditions set forth in the New Royalty Agreement and as more fully described in the Ayrmid Transaction Term Sheet. The obligations under the New Royalty Agreement shall be unsecured obligations of NewCo and its applicable subsidiaries and shall not be secured by any Lien on any assets of NewCo, the Reorganized Debtors, or their respective subsidiaries. The New Royalty Agreement shall include a liquidated damages provision in an amount equal to $18,750,000. Holders of RIFA Claims may pursue the acquisition of the Debtors' interests in certain other royalty agreements for aggregate consideration of up to $35,000,000; provided, however, that there shall be no obligation or requirement for the Debtors or NewCo to consummate such a sale; provided, further, that any such sale shall be subject to the consent of the Debtors, the Required Consenting Funded Debt Parties, and, to the extent that the Debtors have not selected an Acceptable Alternative Transaction, Ayrmid. The New Royalty Agreement shall replace and supersede the RIFA in its entirety, and on the Effective Date the RIFA (including any change of control payment, premium, or similar amount thereunder) shall be canceled, released, and discharged in accordance with Article IV.F hereof. Entry into the New Royalty Agreement and the performance of NewCo's obligations thereunder shall be authorized without the need for any further corporate or similar action and without any further action by the Debtors, the Reorganized Debtors, or the Holders of Claims or Interests.

*W. Management Incentive Plan.*

On or after the Effective Date, NewCo shall implement the Management Incentive Plan on terms acceptable to Ayrmid and the Required Consenting Funded Debt Parties and approved by the New Board, the terms of which, to the extent then available, shall be Filed with the Plan Supplement.

## ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

*A. Assumption and Rejection of Executory Contracts and Unexpired Leases.*

1. Reorganization Transaction.

In the event of the Reorganization Transaction, on the Effective Date, except as otherwise provided in Articles V.E and V.F and elsewhere herein, all Executory Contracts or Unexpired Leases not otherwise assumed or rejected will be deemed assumed by the applicable Reorganized Debtor (and shall remain in effect notwithstanding the consummation of the Merger) in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, other than those that: (a) are identified on the Rejected Executory Contracts and Unexpired Leases Schedule; (b) have previously expired or terminated pursuant to their own terms; (c) have been previously assumed or rejected by the Debtors pursuant to a Final Order; (d) are the subject of a motion to reject that is pending on the Effective Date; or (e) have an ordered or requested effective date of rejection that is after the Effective Date.

2. Sale Transaction.

In the event of a Sale Transaction, on the Effective Date, except as otherwise provided in Articles V.E and V.F and elsewhere herein, all Executory Contracts or Unexpired Leases not otherwise assumed or rejected will be deemed rejected by the applicable Debtor or Post-Effective Date Debtor in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, other than those that: (a) are identified on the Assumed Executory Contracts and Unexpired Leases Schedule; (b) have been previously assumed by the Debtors pursuant to a Final Order; (c) are the subject of a motion to assume that was Filed on or before the Confirmation Date; (d) are to be assumed by the Debtors or assumed by the Debtors and assigned to a third party, as applicable, in connection with any

sale transaction, including the Sale Transaction; or (e) are a contract, instrument, release, indenture, or other agreement or document entered into in connection with the Prepackaged Plan.

3. General Provisions.

Entry of the Confirmation Order shall constitute an order of the Bankruptcy Court approving the assumptions, assumptions and assignments, or rejections of the Executory Contracts or Unexpired Leases as set forth in the Prepackaged Plan, the Rejected Executory Contracts and Unexpired Leases Schedule (or the Assumed Executory Contracts and Unexpired Leases Schedule in the case of a Sale Transaction), pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Except as otherwise specifically set forth herein, assumptions or rejections of Executory Contracts and Unexpired Leases pursuant to the Prepackaged Plan are effective as of the Effective Date. Each Executory Contract or Unexpired Lease assumed pursuant to the Prepackaged Plan or by Bankruptcy Court order but not assigned to a third party before the Effective Date shall re-vest in and be fully enforceable by the applicable contracting Reorganized Debtor or Post-Effective Date Debtor in accordance with its terms, except as such terms may have been modified by the provisions of the Prepackaged Plan or any order of the Bankruptcy Court authorizing and providing for its assumption. Any motions to assume Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by a Final Order on or after the Effective Date but may be withdrawn, settled, or otherwise prosecuted by the Reorganized Debtors or Post-Effective Date Debtors, as applicable.

To the maximum extent permitted by Law, to the extent any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to the Prepackaged Plan or any prior order of the Bankruptcy Court (including any "change of control" or similar provision) prohibits, restricts, or conditions, or purports to prohibit, restrict, or condition, or is modified, breached, or terminated, or deemed modified, breached, or terminated by, or triggers any right or contingent right to any payment or benefit (either alone or in conjunction with any other action or event) as a result of: (i) the commencement of the Chapter 11 Cases or the insolvency or financial condition of any Debtor at any time before the closing of its respective Chapter 11 Case; (ii) any Debtor's, Reorganized Debtor's, or Post-Effective Date Debtor's assumption or assumption and assignment of such Executory Contract or Unexpired Lease; or (iii) the Confirmation or Consummation of the Prepackaged Plan (including the Restructuring Transactions), then such provision shall be deemed modified such that the transactions contemplated by the Prepackaged Plan shall not entitle the non-Debtor party thereto to modify or terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights or remedies with respect thereto, and any required consent under any such Executory Contract or Unexpired Lease shall be deemed satisfied by the Confirmation of the Prepackaged Plan. Notwithstanding anything to the contrary in the Prepackaged Plan, the Debtors, the Reorganized Debtors, or the Post-Effective Date Debtors, as applicable, reserve the right to alter, amend, modify, or supplement the Assumed Executory Contracts and Unexpired Leases Schedule and the Rejected Executory Contracts and Unexpired Leases Schedule at any time up to forty-five (45) days after the Effective Date, so long as such alteration, amendment, modification, or supplement is consistent with the Restructuring Support Agreement.

*B. Claims Based on Rejection of Executory Contracts or Unexpired Leases.*

Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Prepackaged Plan or the Confirmation Order, if any, must be Filed with the Bankruptcy Court within thirty (30) days after the later of (1) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection, (2) the effective date of such rejection, or (3) the Effective Date. **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors, the Reorganized Debtors, the Post-Effective Date Debtors, the Estates, or their property without the need for any objection by the Reorganized Debtors or the Post-Effective Date Debtors or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Proof of Claim to the contrary.** All Allowed Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with Article III.B.7 of the Prepackaged Plan.

C. *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.*

Any monetary amounts by which any Executory Contract or Unexpired Lease to be assumed under the Prepackaged Plan is in default shall be satisfied, under section 365(b)(1) of the Bankruptcy Code, by the Debtors, Reorganized Debtors, or Post-Effective Date Debtors, as applicable, upon assumption thereof.

After the Petition Date and no later than 21 calendar days before the Confirmation Hearing the Debtors shall serve notices of proposed assumption on the counterparties to the Executory Contracts and Unexpired Leases to be assumed reflecting the Debtors' intention to assume the contract, and setting forth the proposed Cure amount (if any) or otherwise indicating that the Cure amount shall be asserted against the Debtors or Reorganized Debtors, as applicable, in the ordinary course of business. Each such notice shall include a description of the procedures for resolving disputes related to the proposed assumption of applicable Executory Contracts and Unexpired Leases. In the event that any Executory Contract or Unexpired Lease is to be assumed after the provision of initial notices of proposed assumptions described above, a notice of proposed assumption with respect to such Executory Contract or Unexpired Lease will be sent promptly to the counterparty thereof. If a counterparty to any Executory Contract or Unexpired Lease that the Debtors or Reorganized Debtors, as applicable, intend to assume does not receive such a notice, the proposed Cure amount for such Executory Contract or Unexpired Lease shall be deemed to be asserted against the Debtors or the Reorganized Debtors, as applicable, in the ordinary course of business.

Unless otherwise agreed in writing by the parties to the applicable Executory Contract or Unexpired Lease, any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption or related Cure amount must be Filed, served, and actually received by counsel to the Debtors no later than the date and time specified in the notice (which shall be not less than fourteen (14) days after such notice is served). The Debtors or the Reorganized Debtors or Post-Effective Date Debtors, as applicable, may reconcile and settle, subject to the consent rights set forth in the Restructuring Support Agreement, in the ordinary course of the Debtors' business any dispute (following a timely Filed objection) regarding any Cure or any other matter pertaining to assumption without any further notice to or action, order, or approval of the Bankruptcy Court.

Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or Cure amount (including any request for an additional or different cure amount) will be deemed to have assented to such assumption or Cure amount and any untimely request for an additional or different Cure amount shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Reorganized Debtor or Post-Effective Date Debtor, without the need for any objection by the applicable Reorganized Debtors or Post-Effective Date Debtors or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court.

The Debtors, the Reorganized Debtors, or the Post-Effective Date Debtors, as applicable, shall pay the Cure amounts, if any, on the Effective Date or as soon as reasonably practicable thereafter, in the ordinary course of business, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may agree; *provided* that if a dispute regarding assumption or Cure is unresolved as of the Effective Date, or any applicable objection period remains pending, then payment of the applicable Cure amount shall occur as soon as reasonably practicable after such dispute is resolved. Any Cure shall be deemed fully satisfied, released, and discharged upon payment of the Cure.

The assumption of any Executory Contract or Unexpired Lease pursuant to the Prepackaged Plan, in connection with the Sale Transaction or Reorganization Transaction, shall result in the full release and satisfaction of any nonmonetary defaults arising from or triggered by the filing of the Chapter 11 Cases, including defaults of provisions restricting the change in control or ownership interest composition or any bankruptcy-related defaults, arising at any time prior to the effective date of assumption, and, in the event of the Reorganization Transaction, any default, change of control, assignment, or similar event that would otherwise arise from the consummation of the Merger or the other Restructuring Transactions. **Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed in the Chapter 11 Cases, including pursuant to the Confirmation Order, shall be deemed disallowed and expunged as of the later of (1) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such assumption, (2) the effective date of such assumption, or (3) the Effective Date, without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court.**

D. *Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases.*

Rejection of any Executory Contract or Unexpired Lease pursuant to the Prepackaged Plan, in connection with the Reorganization Transaction or Sale Transaction, or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors, the Reorganized Debtors, or Post-Effective Date Debtors, as applicable, under such Executory Contracts or Unexpired Leases. In particular, notwithstanding any non-bankruptcy Law to the contrary, the Reorganized Debtors or the Post-Effective Date Debtors, as applicable, expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations with respect to goods previously purchased by the Debtors pursuant to rejected Executory Contracts or Unexpired Leases.

E. *Insurance Policies.*

Each of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto, shall be treated as Executory Contracts hereunder. Unless otherwise provided in the Prepackaged Plan or the Restructuring Support Agreement, on the Effective Date, in connection with all contemplated transactions under the Prepackaged Plan, (1) the Debtors shall be deemed to have assumed all insurance policies and any agreements, documents, and instruments relating to coverage of all insured Claims, excluding all D&O Liability Insurance Policies (other than any runoff or tail policies described in Article IV.S hereof), which shall be rejected, and (2) such insurance policies and any agreements, documents, or instruments relating thereto, shall revest in the applicable Reorganized Debtors or Post-Effective Date Debtors.

Nothing in the Prepackaged Plan, the Restructuring Support Agreement, the Plan Supplement, the Disclosure Statement, the Confirmation Order, or any other Final Order (including any other provision that purports to be preemptory or supervening), (1) alters, modifies, or otherwise amends the terms and conditions of (or the coverage provided by) any of such insurance policies assumed pursuant to the Prepackaged Plan or (2) alters or modifies the duty, if any, that the insurers or third party administrators have to pay claims covered by such insurance policies and their right to seek payment or reimbursement from the Debtors (or the Purchaser, solely to the extent assumed and assigned to the Purchaser under the Purchase Agreement) or draw on any collateral or security therefor. For the avoidance of doubt, insurers and third-party administrators shall not need to nor be required to file or serve a cure objection or a request, application, claim, Proof of Claim, or motion for payment and shall not be subject to any claims bar date or similar deadline governing cure amounts or Claims.

F. *Employee Compensation and Benefits.*

All employee policies, and all compensation and benefits plans, policies, and programs of the Debtors applicable to their respective employees, retirees, and nonemployee directors, including all savings plans, retirement plans, healthcare plans, disability plans, severance benefit plans, incentive plans, COBRA benefits, and life and accidental death and dismemberment insurance plans that are assumed as Executory Contracts under the Prepackaged Plan pursuant to sections 365 and 1123 of the Bankruptcy Code (including, for the avoidance of doubt, the KPTI Severance Plans and the severance and change-of-control payments set forth on Annex A to the Ayrmid Transaction Term Sheet) shall be honored by NewCo in accordance with their respective terms, and NewCo shall abide by all applicable Laws with respect to employee obligations; *provided* that such severance and COBRA benefits, for each eligible employee, retiree, and nonemployee director, shall not exceed the amounts scheduled on Annex A to the Ayrmid Transaction Term Sheet.

From the Effective Date through the first (1st) anniversary of the Effective Date (the "Severance Protection Period"), NewCo (a) shall not, and shall cause its subsidiaries (including the Reorganized Debtors) not to, amend or terminate any KPTI Severance Plan in any manner adverse to any Covered Employee (except as otherwise provided in this Article V.F); and (b) shall provide, or shall cause its applicable subsidiaries to provide, to each Covered Employee who experiences a Qualifying Termination, severance pay and benefits no less favorable than those that the KPTI Severance Plans provide for such Covered Employee upon such termination, in each case up to the amounts for each such Covered Employee scheduled on Annex A to the Ayrmid Transaction Term Sheet. Subject to the foregoing limitations in amount, all KPTI Severance Plans shall be deemed to be, and shall be treated as, Executory Contracts under the Prepackaged Plan and, on the Effective Date, shall be assumed pursuant to sections 365 and 1123 of the

Bankruptcy Code. Nothing herein shall affect NewCo's ability to modify a Covered Employee's division, direct supervisor, or similar changes to NewCo's internal reporting lines.

Severance pay and benefits under this Article V.F exclude equity and equity-based awards, including any awards under any management incentive program. Nothing in this Article V.F shall limit any notice or severance pay or benefits required by applicable Law and nothing herein shall constitute an admission, or otherwise modify or limit any defenses, as to any amounts owed by NewCo and its Affiliates to affected employees under the KPTI Severance Plans. The obligations set forth in this Article V.F shall be binding on NewCo and its successors and assigns.

*G. Reservation of Rights.*

Nothing contained in the Prepackaged Plan, the Restructuring Support Agreement, the Purchase Agreement, the Plan Supplement, or any other Definitive Document shall constitute an admission by the Debtors or any other party that any contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor or Post-Effective Date Debtor has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors, the Reorganized Debtors, or the Post-Effective Date Debtors, as applicable, shall have forty-five (45) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

*H. Nonoccurrence of Effective Date.*

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

*I. Contracts and Leases Entered Into After the Petition Date.*

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed by such Debtor, will be performed by the applicable Debtor, Reorganized Debtor, or Post-Effective Date Debtor in the ordinary course of its business. Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

## ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

*A. Distributions on Account of Claims Allowed as of the Effective Date.*

Except as otherwise provided herein, in a Final Order, or as otherwise agreed to by the Debtors, the Reorganized Debtors, or the Post-Effective Date Debtors, as the case may be, and the Holder of the applicable Allowed Claim, on the first Distribution Date, the applicable Reorganized Debtors or Post-Effective Date Debtors shall make initial distributions under the Prepackaged Plan on account of Claims Allowed on or before the Effective Date, subject to the right of the Reorganized Debtors or the Post-Effective Date Debtors, as applicable, to object to Claims; *provided* that (1) Allowed Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases or assumed by the Debtors prior to the Effective Date shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice, (2) Allowed Priority Tax Claims shall be paid in accordance with Article II.D of the Prepackaged Plan, and (3) Allowed General Unsecured Claims shall be paid in accordance with Article III.B.7 of the Prepackaged Plan. To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, such Claim shall be paid in full in Cash in accordance with the terms of any agreement between the Debtors and the Holder of such Claim or as may be due and payable under applicable non-bankruptcy Law or in the ordinary course of business.

*B. Disbursing Agent.*

The Debtors, the Reorganized Debtors, the Post-Effective Date Debtors, or the Post-Effective Date Plan Administrator, as applicable, shall have the authority to enter into agreements with one or more Disbursing Agents to facilitate the distributions required hereunder. All distributions under the Prepackaged Plan shall be made by the Disbursing Agent. The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court. Additionally, in the event that the Disbursing Agent is so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Reorganized Debtors or the Post-Effective Date Debtors, as applicable.

*C. Rights and Powers of Disbursing Agent.*

1. Powers of the Disbursing Agent.

The Disbursing Agent shall be empowered to: (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Prepackaged Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Prepackaged Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

2. Expenses Incurred On or After the Effective Date.

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes), and any reasonable compensation and expense reimbursement claims (including reasonable attorney fees and expenses), made by the Disbursing Agent shall be paid in Cash by the Reorganized Debtors or Post-Effective Date Debtors, as applicable.

*D. Delivery of Distributions and Undeliverable or Unclaimed Distributions.*

1. Record Date for Distribution.

On the Distribution Record Date, the Claims Register shall be closed and any party responsible for making distributions shall instead be authorized and entitled to recognize only those record holders listed on the Claims Register as of the close of business on the Distribution Record Date. If a Claim is transferred twenty (20) or fewer days before the Distribution Record Date, the Disbursing Agent shall make distributions to the transferee only to the extent practical and, in any event, only if the relevant transfer form contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor.

2. Delivery of Distributions in General.

Except as otherwise provided herein, the Disbursing Agent shall make distributions to Holders of Allowed Claims and Allowed Interests (as applicable) as of the Distribution Record Date at the address for each such Holder as indicated on the Debtors' records as of the date of any such distribution; *provided* that the manner of such distributions shall be determined at the discretion of the Reorganized Debtors or Post-Effective Date Debtors.

3. Minimum Distributions.

No fractional shares of New Common Stock or Reorganized Parent Common Stock, and no fractional MF CVRs, shall be distributed and no Cash shall be distributed in lieu of such fractional amounts. When any distribution pursuant to the Prepackaged Plan on account of an Allowed Claim or Allowed Interest (if applicable) would otherwise result in the issuance of a number of shares of New Common Stock or Reorganized Parent Common Stock that is not a whole number, the actual distribution of such shares shall be rounded to the next lower whole number with no further payment therefor. The total number of authorized shares of New Common Stock and Reorganized Parent Common Stock to be distributed to the Holders of Allowed Claims hereunder shall be adjusted as necessary to account for the foregoing rounding.

None of the Reorganized Debtors, the Post-Effective Date Debtors, or the Disbursing Agent shall have any obligation to make a Cash distribution that is less than two hundred fifty dollars ($250) to any Holder of an Allowed Claim.

4. Undeliverable Distributions and Unclaimed Property.

In the event that any distribution to any Holder of Allowed Claims or Allowed Interests (as applicable) is returned as undeliverable, no distribution to such Holder shall be made unless and until the Disbursing Agent has determined the then-current address of such Holder, at which time all currently-due, missed distributions shall be made to such Holder without interest. Undeliverable distributions shall remain in the possession of the Reorganized Debtors or Post-Effective Date Debtors, as applicable, until such time as a distribution becomes deliverable, or such distribution reverts to the Reorganized Debtors or Post-Effective Date Debtors, as applicable, or is canceled pursuant to this Article VI, and shall not be supplemented with any interest, dividends, or other accruals of any kind.

Any distribution under the Prepackaged Plan that is an unclaimed distribution or remains undeliverable (as reasonably deemed unclaimed or undeliverable by the Reorganized Debtors, the Post-Effective Date Debtors, or the Disbursing Agent) for a period of ninety (90) days after distribution shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and such unclaimed distribution or undeliverable distribution shall revest in the applicable Reorganized Debtor or Post-Effective Date Debtor automatically (and without need for a further order by the Bankruptcy Court, notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property Laws to the contrary) and, to the extent such unclaimed distribution is comprised of New Common Stock or MF CVRs, then such New Common Stock or MF CVRs shall be canceled. Upon such revesting, the Claim of the Holder or its successors with respect to such property shall be canceled, released, discharged, and forever barred notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property Laws, or any provisions in any document governing the distribution that is an unclaimed distribution, to the contrary, and the Claim of any Holder of Claims and Interests to such property or Interest in property shall be discharged and forever barred. The Disbursing Agent shall adjust the distributions of the New Common Stock or the MF CVRs to reflect any such cancellation; however, for the avoidance of doubt, additional Securities shall not be issued to other Holders of Claims due to any such cancellations.

5. Surrender of Canceled Instruments or Securities.

On the Effective Date or as soon as reasonably practicable thereafter, each holder of a certificate or instrument evidencing a Claim or an Interest that has been canceled in accordance with Article IV.F hereof shall be deemed to have surrendered such certificate or instrument to the Disbursing Agent. Such surrendered certificate or instrument shall be canceled solely with respect to the Debtors, and such cancellation shall not alter the obligations or rights of any non-Debtor third parties vis-à-vis one another with respect to such certificate or instrument, including with respect to any indenture or agreement that governs the rights of the Holder of a Claim or Interest, which shall continue in effect for purposes of allowing holders to receive distributions under the Prepackaged Plan, charging liens, priority of payment, and indemnification rights. Notwithstanding anything to the contrary herein, this paragraph shall not apply to certificates or instruments evidencing Claims that are Reinstated under the Prepackaged Plan.

6. Delivery of Distributions on Prepetition Funded Debt Claims.

Except as otherwise reasonably requested by the applicable Prepetition Agent, all distributions to Holders of Allowed Prepetition Funded Debt Claims shall be deemed completed when made to the applicable Prepetition Agent. The applicable Prepetition Agent shall hold or direct such distributions for the benefit of the Holders of the applicable Allowed Prepetition Funded Debt Claims. As soon as practicable in accordance with the requirements set forth in this Article VI, the applicable Prepetition Agent shall arrange to deliver such distributions to or on behalf of its holders, subject to such Prepetition Agent's charging lien. The 1.5L 2028 Notes Trustee and the 2L 2029 Notes Trustee may transfer or direct the transfer of such distributions directly through the facilities of DTC (whether by means of book-entry exchange, free delivery, or otherwise) and will be entitled to recognize and deal for all purposes under the Prepackaged Plan with Holders of Allowed 1.5L 2028 Notes Claims and Allowed 2L 2029 Notes Claims, to the extent consistent with the customary practices of DTC. If a Prepetition Agent is unable to make, or consents to the Debtors, the Reorganized Debtors, or the Post-Effective Date Debtors, as applicable, making such distributions, the Debtors, the Reorganized Debtors, or the Post-Effective Date Debtors, as applicable, with such Prepetition Agent's cooperation,

shall make such distributions to the extent practicable to do so; *provided* that until such distributions are made, such Prepetition Agent's charging lien shall attach to the property to be distributed in the same manner as if such distributions were made through such Prepetition Agent. No Prepetition Agent shall have any duties or responsibilities relating to any form of distribution that is not DTC eligible and the Debtors, the Reorganized Debtors, or the Post-Effective Date Debtors, as applicable, shall seek the cooperation of DTC so that any distribution on account of an Allowed 1.5L 2028 Notes Claim or Allowed 2L 2029 Notes Claim that is held in the name of, or by a nominee of, DTC, shall be made through the facilities of DTC on the Effective Date or as soon as practicable thereafter.

*E. Manner of Payment.*

1. All distributions of the New Common Stock and the MF CVRs to the holders of the applicable Allowed Claims under the Prepackaged Plan shall be made by the Disbursing Agent on behalf of the Debtors or the Reorganized Debtors, as applicable.

2. The MF CVRs shall be distributed in accordance with the MF CVR Agreement.

3. All distributions of Cash to the holders of the applicable Allowed Claims under the Prepackaged Plan shall be made by the Disbursing Agent on behalf of the applicable Debtor, Reorganized Debtor, or Post-Effective Date Debtor.

4. At the option of the Disbursing Agent, any Cash payment to be made hereunder may be made by check or wire transfer or as otherwise required or provided in applicable agreements.

*F. Compliance With Tax Requirements.*

In connection with the Prepackaged Plan, the Restructuring Transactions Memorandum, and all distributions under the Prepackaged Plan, to the extent applicable, the Debtors, the Reorganized Debtors, the Post-Effective Date Debtors, the Disbursing Agent, and any applicable withholding agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions made pursuant to the Prepackaged Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Prepackaged Plan to the contrary, such parties shall (i) be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Prepackaged Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate and (ii) in furtherance of the foregoing, allow distributees a meaningful opportunity to provide any tax forms or other documents permitted by applicable Law to minimize any otherwise applicable withholding. The Debtors, the Reorganized Debtors, and the Post-Effective Date Debtors reserve the right to allocate all distributions made under the Prepackaged Plan in compliance with all applicable wage garnishments, alimony, child support, and similar spousal awards, Liens, and encumbrances.

*G. Allocations.*

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest.

*H. No Postpetition Interest on Claims.*

Unless otherwise specifically provided for in the Prepackaged Plan, the Restructuring Support Agreement, the DIP Orders and the other DIP Facility Documents, the Confirmation Order, any other order of the Bankruptcy Court, or required by applicable bankruptcy and non-bankruptcy Law, postpetition interest shall not accrue or be paid on any prepetition Claims, and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on such Claim.

*I. Foreign Currency Exchange Rate.*

Except as otherwise provided in a Bankruptcy Court order, as of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate for the applicable currency as published in *The Wall Street Journal (National Edition)*, on the Effective Date.

*J. Setoffs and Recoupment.*

Except as expressly provided in the Prepackaged Plan, and except with respect to an Allowed Claim held by a Consenting Stakeholder, each Reorganized Debtor or Post-Effective Date Debtor, as applicable, may, pursuant to section 553 of the Bankruptcy Code, set off or recoup against any Plan Distributions to be made on account of any Allowed Claim, any and all claims, rights, and Causes of Action that such Reorganized Debtor or Post-Effective Date Debtor, as applicable, may hold against the Holder of such Allowed Claim to the extent such setoff or recoupment is either (1) agreed in amount among the relevant Reorganized Debtor(s) or Post-Effective Date Debtor(s), as applicable, and the Holder of the Allowed Claim or (2) otherwise adjudicated by the Bankruptcy Court or another court of competent jurisdiction; *provided* that neither the failure to effectuate a setoff or recoupment nor the allowance of any Claim hereunder shall constitute a waiver or release by a Reorganized Debtor or Post-Effective Date Debtor, as applicable, or its successor of any and all claims, rights, and Causes of Action that such Reorganized Debtor or its successor may possess against the applicable holder. In no event shall any Holder of a Claim be entitled to recoup such Claim against any claim, right, or Cause of Action of the Debtors, the Reorganized Debtors, or the Post-Effective Date Debtors, as applicable, unless such holder actually has performed such recoupment and provided notice thereof in writing to the Debtors in accordance with Article XII.G hereof on or before the Effective Date, notwithstanding any indication in any Proof of Claim or otherwise that such holder asserts, has, or intends to preserve any right of recoupment.

*K. Claims Paid or Payable by Third Parties.*

1. Claims Paid by Third Parties/Insurers.

The Debtors, the Reorganized Debtors, or the Post-Effective Date Debtors, as applicable, shall reduce in full a Claim, and such Claim shall be disallowed without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor, a Reorganized Debtor, or a Post-Effective Date Debtor. Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor, a Reorganized Debtor, or a Post-Effective Date Debtor on account of such Claim, such holder shall, within fourteen (14) days of receipt thereof, repay or return the distribution to the applicable Reorganized Debtor or Post-Effective Date Debtor, to the extent the holder's total recovery on account of such Claim from the third party and under the Prepackaged Plan exceeds the amount of such Claim as of the date of any such distribution under the Prepackaged Plan. The failure of such holder to timely repay or return such distribution shall result in the holder owing the applicable Reorganized Debtor or Post-Effective Date Debtor annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the fourteen (14) day grace period specified above until the amount is repaid.

2. Claims Payable by Third Parties.

No distributions under the Prepackaged Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy. To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

3. Applicability of Insurance Policies.

Except as otherwise provided in the Prepackaged Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy. Nothing contained in the Prepackaged Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

## ARTICLE VII.
## PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS

*A. Disputed Claims Process.*

In light of the Unimpaired status of all Allowed General Unsecured Claims under the Prepackaged Plan, there is no requirement to File a Proof of Claim (or move the Bankruptcy Court for allowance) to have a Claim Allowed for the purposes of the Prepackaged Plan, except as provided in Article V.B of the Prepackaged Plan or Article V.C with respect to a Cure amount, and the Debtors, the Reorganized Debtors, or the Post-Effective Date Debtors, as applicable, shall determine, adjudicate, and resolve any disputes over the validity and amounts of such Claims in the ordinary course of business as if the Chapter 11 Cases had not been commenced (and no approval or authority from the Bankruptcy Court shall be required) except that (unless expressly waived pursuant to the Prepackaged Plan) the Allowed amount of such Claims shall be subject to the limitations or maximum amounts permitted by the Bankruptcy Code, including sections 502 and 503 of the Bankruptcy Code, to the extent applicable; *provided* that the Debtors, the Reorganized Debtors, or the Post-Effective Date Debtors, as applicable, reserve the right to seek to set a future bar date that may require a Proof of Claim to be Filed in the event that a Sale Transaction is pursued (in which case a separate order of the Bankruptcy Court will govern).

On and after the Effective Date, except as otherwise provided in the Prepackaged Plan, all Allowed Claims shall be satisfied in the ordinary course of business by the Reorganized Debtors or the Post-Effective Date Debtors, as applicable. The Debtors, the Reorganized Debtors, or the Post-Effective Date Debtors, as applicable, shall have the exclusive authority to (1) determine, without the need for notice to or action, order, or approval of the Bankruptcy Court, that a claim subject to any Proof of Claim that is Filed is Allowed and (2) File, settle, compromise, withdraw, or litigate to judgment any objections to Claims as permitted under the Prepackaged Plan. If the Debtors, Reorganized Debtors, or Post-Effective Date Debtors dispute any Claim, such dispute shall be determined, resolved, or adjudicated, as the case may be, in the manner as if the Chapter 11 Cases had not been commenced and shall survive the Effective Date as if the Chapter 11 Cases had not been commenced; *provided* that the Debtors, Reorganized Debtors, or Post-Effective Date Debtors may elect, at their sole option, to object to any Claim (other than Claims expressly Allowed by the Prepackaged Plan) and to have the validity or amount of any Claim adjudicated by the Bankruptcy Court; *provided further* that Holders of Claims may elect to resolve the validity or amount of any Claim in the Bankruptcy Court. All Proofs of Claim Filed in the Chapter 11 Cases shall be deemed objected to and Disputed without further action by the Debtors. Upon the Effective Date, all Proofs of Claim Filed against the Debtors, regardless of the time of Filing, and including Proofs of Claim Filed after the Effective Date, shall be deemed withdrawn and expunged, except as otherwise provided herein. Notwithstanding anything in the Prepackaged Plan to the contrary, disputes regarding the amount of any Cure pursuant to section 365 of the Bankruptcy Code and Claims that the Debtors seek to have determined by the Bankruptcy Court shall in all cases be determined by the Bankruptcy Court. **Except as otherwise provided herein, all Proofs of Claim Filed after the Effective Date shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Reorganized Debtor or Post-Effective Date Debtor, as applicable, without the need for any objection by the Reorganized Debtors or Post-Effective Date Debtors, as applicable, or any further notice to or action, order, or approval of the Bankruptcy Court.**

*B. Allowance of Claims.*

After the Effective Date, except as otherwise expressly set forth herein, each of the Reorganized Debtors or Post-Effective Date Debtors, as applicable, shall have and retain any and all rights and defenses such Debtor had with respect to any Claim or Interest immediately prior to the Effective Date. The Debtors, the Reorganized Debtors, or the

Post-Effective Date Debtors, as applicable, may, with the consent of the Required Consenting Funded Debt Parties, affirmatively determine to deem Unimpaired Claims Allowed to the same extent such Claims would be allowed under applicable non-bankruptcy Law, without further notice or order from the Bankruptcy Court.

*C. Claims Administration Responsibilities.*

Except as otherwise specifically provided in the Prepackaged Plan, after the Effective Date, the Reorganized Debtors or the Post-Effective Date Debtors, as applicable, with the consent of the Required Consenting Funded Debt Parties, shall have the exclusive authority: (1) to File, withdraw, or litigate to judgment objections to Claims or Interests; (2) to settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (3) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court. For the avoidance of doubt, except as otherwise provided herein, from and after the Effective Date, each Reorganized Debtor or Post-Effective Date Debtor, as applicable, shall have and retain any and all rights and defenses such Debtor had immediately prior to the Effective Date with respect to any Disputed Claim or Interest, including the Causes of Action retained pursuant to Article IV.O of the Prepackaged Plan.

Any objections to Proofs of Claim (other than Proofs of Claim with respect to Administrative Claims) shall be served and Filed (a) on or before the date that is one hundred eighty (180) days following the later of (i) the Effective Date and (ii) the date that a Proof of Claim is Filed or amended or a Claim is otherwise asserted or amended in writing by or on behalf of a Holder of a Claim, or (b) such later date as ordered by the Bankruptcy Court.

*D. Estimation of Claims and Interests.*

Before, on, or after the Effective Date, the Debtors, the Reorganized Debtors, or the Post-Effective Date Debtors, as applicable, may, with the consent of the Required Consenting Funded Debt Parties, at any time request that the Bankruptcy Court estimate any Disputed Claim or Interest that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party in interest previously has objected to such Claim or Interest or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim or Interest, including during the litigation of any objection to any Claim or Interest or during the appeal relating to such objection. Notwithstanding any provision otherwise in the Prepackaged Plan, a Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim or Interest, that estimated amount shall constitute a maximum limitation on such Claim or Interest for all purposes under the Prepackaged Plan (including for purposes of distributions), and the relevant Reorganized Debtor or Post-Effective Date Debtor, as applicable, may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim or Interest.

*E. Adjustment to Claims or Interests Without Objection.*

Any duplicate Claim or Interest or any Claim or Interest that has been paid, satisfied, amended, or superseded may be adjusted or expunged on the Claims Register by the Reorganized Debtors or the Post-Effective Date Debtors, as applicable, without the Reorganized Debtors or Post-Effective Date Debtors, as applicable, having to File an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest and without any further notice to or action, order, or approval of the Bankruptcy Court.

*F. Disallowance of Claims or Interests.*

Except as otherwise expressly set forth herein, all Claims and Interests of any Entity from which property is sought by the Debtors under sections 542, 543, 550, or 553 of the Bankruptcy Code or that the Debtors, the Reorganized Debtors, or the Post-Effective Date Debtors allege is a transferee of a transfer that is avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code shall be disallowed if: (1) the Entity, on the one hand, and the Debtors, the Reorganized Debtors, or the Post-Effective Date Debtors, as applicable, on the other hand, agree or the Bankruptcy Court has determined by Final Order that such Entity or transferee is liable

to turn over any property or monies under any of the aforementioned sections of the Bankruptcy Code; and (2) such Entity or transferee has failed to turn over such property by the date set forth in such agreement or Final Order. No payment or distribution shall be made on account of such Claim or Interest unless the transferee has paid or turned over such property.

*G. No Distributions Pending Allowance.*

Notwithstanding any other provision of the Prepackaged Plan, if any portion of a Claim or Interest is a Disputed Claim or Interest, as applicable, no payment or distribution provided hereunder shall be made on account of such Claim or Interest unless and until such Disputed Claim or Interest becomes an Allowed Claim or Interest; *provided* that if only the Allowed amount of an otherwise valid Claim or Interest is Disputed, such Claim or Interest shall be deemed Allowed in the amount not Disputed and payment or distribution shall be made on account of such undisputed amount.

*H. Distributions After Allowance.*

To the extent that a Disputed Claim or Interest ultimately becomes an Allowed Claim or Interest, distributions (if any) shall be made to the Holder of such Allowed Claim or Interest in accordance with the provisions of the Prepackaged Plan. As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim or Interest becomes a Final Order, the Disbursing Agent shall provide to the Holder of such Claim or Interest the distribution (if any) to which such Holder is entitled under the Prepackaged Plan as of the Effective Date, without any interest to be paid on account of such Claim or Interest.

*I. No Interest.*

Unless otherwise specifically provided for in the Prepackaged Plan, the Restructuring Support Agreement, the DIP Orders and the other DIP Facility Documents, the Confirmation Order, any other order of the Bankruptcy Court, or required by applicable bankruptcy and non-bankruptcy Law, postpetition interest shall not accrue or be paid on Claims, and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim or right. Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Effective Date to the date a final distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim.

*J. Accrual of Dividends and Other Rights.*

For purposes of determining the accrual of distributions or other rights after the Effective Date, the New Common Stock and MF CVRs shall be deemed distributed as of the Effective Date regardless of the date on which they are actually distributed; *provided*, *however*, that the relevant Reorganized Debtors shall not pay any such distributions or distribute such other rights, if any, until after distribution of the applicable New Common Stock or MF CVRs actually takes place.

## ARTICLE VIII.
## SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

*A. Discharge of Claims and Termination of Interests.*

Pursuant to and to the fullest extent permitted by section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Definitive Documents, the Prepackaged Plan, or in any contract, instrument, or other agreement or document created or entered into pursuant to the Prepackaged Plan, the distributions, rights, and treatment that are provided in the Prepackaged Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors or Post-Effective Date Debtors, as applicable), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the

Prepackaged Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors prior to the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (1) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right, or interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has accepted the Prepackaged Plan. The Confirmation Order shall be a judicial determination of the discharge of all Claims (other than the Reinstated Claims) and Interests (other than the Intercompany Interests that are Reinstated) subject to the occurrence of the Effective Date; *provided* that, in the event of a Sale Transaction, the Debtors shall not receive a discharge pursuant to section 1141(d)(3) of the Bankruptcy Code.

*B.* ***Release of Liens.***

**Except as otherwise provided in the Prepackaged Plan, the Restructuring Support Agreement, the Confirmation Order, the Purchase Agreement, or in any contract, instrument, release, or other agreement or document amended or created pursuant to the Prepackaged Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Prepackaged Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, except for Other Secured Claims that the Debtors elect to Reinstate in accordance with the Prepackaged Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors or Post-Effective Date Debtors and their successors and assigns. Any Holder of such Secured Claim (and the applicable agents for such Holder) shall be authorized and directed, at the sole cost and expense of the Reorganized Debtors or Post-Effective Date Debtors, to release any collateral or other property of any Debtor (including any Cash Collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder), and to take such actions as may be reasonably requested by the Reorganized Debtors or Post-Effective Date Debtors to evidence the release of such Liens or security interests, including the execution, delivery, and filing or recording of such releases. The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency, records office, or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.**

**To the extent that any Holder of a Secured Claim that has been satisfied or discharged in full pursuant to the Prepackaged Plan, or any agent for such Holder, has filed or recorded publicly any Liens or security interests to secure such Holder's Secured Claim, then as soon as practicable on or after the Effective Date, such Holder (or the agent for such Holder) shall take any and all steps requested by the Debtors, the Reorganized Debtors, or the Post-Effective Date Debtors that are necessary or desirable to record or effectuate the cancellation or extinguishment of such Liens or security interests, including the making of any applicable filings or recordings, and the Reorganized Debtors or Post-Effective Date Debtors shall be entitled to make any such filings or recordings on such Holder's behalf.**

*C.* ***Releases by the Debtors.***

**Notwithstanding anything contained in the Prepackaged Plan to the contrary, effective as of the Effective Date, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, including the obligations of the Debtors under the Prepackaged Plan and the contributions and services of the Released Parties in facilitating the implementation of the Restructuring Transactions, the adequacy of which is hereby confirmed, to the fullest extent allowed by applicable Law, each Released Party is hereby deemed conclusively, absolutely, unconditionally, irrevocably, and forever released, waived and discharged by each and all of the Debtors, their Estates, the Reorganized Debtors, the Post-Effective Date Debtors, the Post-Effective Date Plan Administrator, and any Person seeking to exercise the rights of the Debtors or their Estates, including any successors to the Debtors or any Estate representative appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code, each of their respective current and former Affiliates, in each case on behalf of themselves and their Related Parties who may purport to assert any Claim or Cause of Action, directly or**

**derivatively, by, through, for, or because of the foregoing Entities, from any and all Claims, Interests, and Causes of Action, and liabilities whatsoever, including any derivative claims, asserted by or assertable on behalf of any of the Debtors, their Estates, the Reorganized Debtors, or the Post-Effective Date Debtors, as applicable, whether known or unknown, foreseen or unforeseen, asserted or unasserted, matured or unmatured, suspected or unsuspected, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable, directly or derivatively, in Law (or any applicable rule, statute, regulation, treaty, right, duty or requirement), equity, contract, tort, or otherwise, that the Debtors, their Estates, the Reorganized Debtors, or the Post-Effective Date Debtors would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity, or that any Holder of any Claim against, or Interest in, a Debtor or other Entity could have asserted on behalf of the Debtors, based on or relating to (including the formulation, preparation, dissemination, negotiation, entry into, or filing of, as applicable), or in any manner arising from, in whole or in part, the Company-Related Matters, including the Prepetition Funded Debt Claims and the documents governing the same, the DIP Facility, the DIP Facility Documents, the DIP Orders, the ownership and/or operation of the Debtors by any Released Party or the distribution of any Cash or other property of the Debtors to any Released Party, the assertion or enforcement of rights and remedies against the Debtors, any Avoidance Actions (but excluding Avoidance Actions brought as counterclaims or defenses to Claims asserted against the Debtors), and any claim or Cause of Action seeking lender liability or challenging the validity, enforceability, priority, scope, extent, or perfection of, or seeking the recharacterization, subordination, disallowance, or avoidance of, any Claims or Liens held by any Released Party. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (1) any obligations arising on or after the Effective Date of any party or Entity under the Definitive Documents, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Prepackaged Plan; or (2) any Causes of Action included in the Schedule of Retained Causes of Action; *provided* that in no event shall any Cause of Action included in the Schedule of Retained Causes of Action be asserted against any Consenting Stakeholder, the DIP Agent, any DIP Lender, any Prepetition Agent, or any Ad Hoc Group Advisor or Ayrmid Advisor, or any of their respective Related Parties, in each case in their capacities as such.**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in the Prepackaged Plan and, further, shall constitute the Bankruptcy Court's finding that the Debtor Release is: (i) in exchange for good and valuable consideration provided by the Released Parties, including the Released Parties' substantial contributions to facilitating the Restructuring Transactions and implementing the Prepackaged Plan; (ii) a good faith settlement and compromise of the Claims or Causes of Action released by the Debtor Release; (iii) in the best interests of the Debtors, their Estates, and all Holders of Claims and Interests; (iv) fair, equitable, and reasonable; (v) given and made after reasonable investigation by the Debtors and after due notice and opportunity for a hearing; and (vi) a bar to any of the Debtors, their Estates, the Reorganized Debtors, the Post-Effective Date Debtors, the Post-Effective Date Plan Administrator, or any Person seeking to exercise the rights of the Debtors or their Estates asserting any Claim or Cause of Action released pursuant to the Debtor Release.**

### *D. **Releases by the Releasing Parties.***

**Effective as of the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, to the fullest extent allowed by applicable Law, each of the Releasing Parties shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever, released, waived, and discharged each of the Released Parties from any and all Claims, Causes of Action, and liabilities whatsoever, including any derivative claims asserted by or assertable on behalf of any Releasing Party, whether known or unknown, foreseen or unforeseen, asserted or unasserted, matured or unmatured, suspected or unsuspected, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable, directly or derivatively, in Law (or any applicable rule, statute, regulation, treaty, right, duty or requirement), equity, contract, tort, or otherwise, that such Releasing Party would have been legally entitled to assert in its own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Released Party, or that any Holder of any Claim against, or Interest in, a Released Party could have asserted on behalf of the Releasing Party, or otherwise based on or relating to (including the formulation, preparation, dissemination, negotiation, entry into, or filing of, as applicable), or in any manner arising from,**

**in whole or in part, the Company-Related Matters; *provided* that, with respect to Claims against the Debtors, this Article VIII.D shall only apply to Claims arising from any act or omission, transaction, agreement, event, or other occurrence taking place from and including the Petition Date through the Effective Date. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (1) any obligations arising on or after the Effective Date of any party or Entity under the Definitive Documents, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Prepackaged Plan; or (2) any Causes of Action included in the Schedule of Retained Causes of Action.**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained in the Prepackaged Plan, and, further, shall constitute the Bankruptcy Court's finding that the Third-Party Release is: (i) an integrated and global good faith compromise and settlement that is non-severable from the provisions of the Prepackaged Plan; (ii) consensual; (iii) essential to the confirmation of the Prepackaged Plan; (iv) given in exchange for the good and valuable consideration provided by the Released Parties, including the Released Parties' contributions to facilitating the restructuring and implementing the Prepackaged Plan; (v) a good faith settlement and compromise of the Claims or Causes of Action released by the Third-Party Release; (vi) in the best interests of the Debtors and their Estates; (vii) fair, equitable, and reasonable; (viii) given and made after due notice and opportunity for a hearing; and (ix) a bar to any of the Releasing Parties asserting any Claim or Cause of Action released pursuant to the Third-Party Release.**

**Each of the Releasing Parties in each of the Debtor Release and the Third-Party Release contained above expressly acknowledges that although ordinarily a general release may not extend to Claims that the Releasing Party does not know or suspect to exist in its favor, which, if known by it, may have materially affected its settlement with the party released, it has carefully considered and taken into account in determining to enter into the above releases the possible existence of such unknown losses or claims. Without limiting the generality of the foregoing, each Releasing Party expressly waives any and all rights conferred upon it by any statute or rule of Law that provides that a release does not extend to claims that the claimant does not know or suspect to exist in its favor at the time of providing the release, which, if known by it, may have materially affected its settlement with the released party.**

### *E.* ***Exculpation.***

**Effective as of the Effective Date, to the fullest extent permissible under applicable Law and without affecting or limiting either the Debtor Release or the Third-Party Release, and except as otherwise specifically provided in the Prepackaged Plan or the Confirmation Order, no Exculpated Party shall have or incur liability for, and each Exculpated Party hereby is exculpated from any Claim or Cause of Action arising during the period from the Petition Date to the Effective Date, whether direct or derivative, related to, any act or omission in connection with, relating to, or arising out of the negotiation, solicitation, confirmation, execution, or implementation (to the extent on or prior to the Effective Date) of, as applicable, the Company-Related Matters, but in all respects such Entities shall be entitled to reasonably rely on the advice of counsel with respect to their duties and responsibilities pursuant to the Definitive Documents. Notwithstanding anything to the contrary in the foregoing, an Exculpated Party shall be entitled to exculpation solely for actions taken from the Petition Date through the Effective Date, and the exculpation set forth above does not exculpate (a) any obligations arising pursuant to or after the Effective Date of any party or Entity under the Prepackaged Plan, the Confirmation Order, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Prepackaged Plan; or (b) any Causes of Action included in the Schedule of Retained Causes of Action.**

**The Exculpated Parties and other parties set forth above have, and upon confirmation of the Prepackaged Plan shall be deemed to have, participated in good faith and in compliance with the applicable Laws with regard to the solicitation of votes and distribution of consideration pursuant to the Prepackaged Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable Law, rule, or regulation governing the solicitation of acceptances or rejections of the Prepackaged Plan or such distributions made pursuant to the Prepackaged Plan.**

**Solely with respect to the exculpation provision, notwithstanding anything to the contrary in the Prepackaged Plan or Plan Supplement, each of the 1125(e) Exculpated Parties shall not incur liability for any Cause of Action or Claim related to any act or omission in connection with, relating to, or arising out of, in whole or in part, (a) the solicitation of acceptance or rejection of the Prepackaged Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code or (b) the participation, in good faith and in compliance with the applicable provisions of the Bankruptcy Code, in the offer, issuance, sale, or purchase of a security, offered or sold under the Prepackaged Plan. No Entity or Person may commence or pursue a Claim or Cause of Action of any kind against any of the Exculpated Parties or the 1125(e) Exculpated Parties that arose or arises from, in whole or in part, a Claim or Cause of Action subject to this paragraph, without the Bankruptcy Court specifically authorizing such Entity or Person to bring such Claim or Cause of Action against such Exculpated Party or 1125(e) Exculpated Party. The Bankruptcy Court will have sole and exclusive jurisdiction to adjudicate the underlying colorable Claim or Cause of Action.**

*F.* ***Injunction.***

**Except as otherwise expressly provided in the Prepackaged Plan, or for obligations issued or required to be paid pursuant to the Prepackaged Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims and Causes of Action, and liabilities whatsoever, including any derivative claims, whether known or unknown, foreseen or unforeseen, matured or unmatured, suspected or unsuspected, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable, directly or derivatively, in law (or any applicable rule, statute, regulation, treaty, right, duty or requirement), equity, contract, tort, or otherwise, asserted or assertable on behalf of any of the Debtors, their Estates, the Reorganized Debtors, or the Post-Effective Date Debtors, as applicable, that have been released, settled, or are subject to exculpation are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Exculpated Parties, or the Released Parties: (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (3) creating, perfecting, or enforcing any encumbrance of any kind against such Entities, such property, or the property or the estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; (4) asserting any right of setoff, subrogation, or recoupment of any kind, except to the extent such assertions are used as a defense to Claims or Causes of Action by the Debtors arising prior to the Effective Date, against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims or Interests unless such Holder has Filed a motion requesting the right to perform such setoff on or before the Confirmation Date, and notwithstanding an indication of a claim or interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released or settled pursuant to the Prepackaged Plan.**

**No Person or Entity may commence, continue, amend or pursue a Claim or Cause of Action, as applicable, of any kind against the Debtors, the Reorganized Debtors, the Post-Effective Date Debtors, the Exculpated Parties, or the Released Parties, as applicable, that relates to or is reasonably likely to relate to any act or omission in connection with, relating to, or arising out of a Claim or Cause of Action, as applicable, subject to Article VIII.C, Article VIII.D, Article VIII.E, and Article VIII.F hereof, without the Bankruptcy Court (i) first determining, after notice and a hearing, that such Claim or Cause of Action, as applicable, represents a colorable Claim of any kind, and (ii) specifically authorizing such Person or Entity to bring such Claim or Cause of Action, as applicable, against any such Debtor, Reorganized Debtor, Post-Effective Date Debtor, Exculpated Party, or Released Party, as applicable. At such hearing, the Bankruptcy Court, *inter alia*, may, or shall if any Debtor, Reorganized Debtor, Post-Effective Date Debtor, Exculpated Party, Released Party, or other party in interest requests by motion (oral motion being sufficient), direct that such Person or Entity seeking to commence or pursue such Claim or Cause of Action file a proposed complaint with the Bankruptcy Court embodying such Claim or Cause of Action, such complaint satisfying the applicable Federal Rules of Civil Procedure or Bankruptcy Rules, including, but not limited to, rules 8 and 9 (as applicable) of the Federal**

**Rules of Civil Procedure, which the Bankruptcy Court shall assess before making a determination of whether such Claim or Cause of Action represents a colorable Claim of any kind.**

**The Bankruptcy Court will have sole and exclusive jurisdiction to adjudicate the underlying colorable Claim or Cause of Action.**

**Upon entry of the Confirmation Order, all Holders of Claims and Interests and their respective current and former employees, agents, officers, directors, principals, and direct and indirect Affiliates shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Prepackaged Plan. Each Holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions under or Reinstatement of such Allowed Claim or Allowed Interest, as applicable, pursuant to the Prepackaged Plan, shall be deemed to have consented to the injunction provisions set forth herein.**

*G. Protections Against Discriminatory Treatment.*

Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, all Entities, including Governmental Units, shall not discriminate against the Reorganized Debtors or Post-Effective Date Debtors, as applicable, or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtors or Post-Effective Date Debtors, as applicable, or another Entity with whom the Reorganized Debtors or Post-Effective Date Debtors, as applicable, have been associated, solely because each Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtors are granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

*H. Document Retention.*

On and after the Effective Date, the Reorganized Debtors or Post-Effective Date Debtors, as applicable, may maintain documents in accordance with their standard document retention policy, as may be altered, amended, modified, or supplemented by the Reorganized Debtors or Post-Effective Date Debtors, as applicable.

*I. Reimbursement or Contribution.*

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of allowance or disallowance, such Claim shall be forever disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Confirmation Date: (1) such Claim has been adjudicated as non-contingent or (2) the relevant Holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered prior to the Confirmation Date determining such Claim as no longer contingent.

## ARTICLE IX.
## CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN

*A. Conditions Precedent to the Effective Date.*

It shall be a condition to the Effective Date that the following conditions shall have been satisfied or waived pursuant to the provisions of Article IX.B hereof:

(a) the Bankruptcy Court shall have entered the Confirmation Order (which shall include final approval of the Disclosure Statement), which shall be a Final Order, in form and substance consistent in all respects with the Restructuring Support Agreement (including any consent rights thereunder), and which shall:

(i) authorize the Debtors to take all actions necessary or appropriate to enter into, implement, and consummate the contracts, instruments, releases, leases,

indentures, and other agreements or documents created in connection with the Prepackaged Plan;

(ii) decree that the provisions in the Confirmation Order and the Prepackaged Plan are nonseverable and mutually dependent;

(iii) authorize the Debtors, as applicable or necessary, to: (a) implement the Restructuring Transactions; (b) distribute the New Common Stock and MF CVRs (solely to the extent the MF CVRs constitute securities as defined in and for purposes of the Securities Act) pursuant to the exemption from registration under the Securities Act provided by section 1145 of the Bankruptcy Code, section 4(a)(2) of the Securities Act, or Regulation S under the Securities Act, as applicable; (c) make all distributions and issuances as required under the Prepackaged Plan, including Cash, the New Common Stock, and MF CVRs; and (d) enter into any agreements, transactions, and sales of property as set forth in the Plan Supplement, in each case, in a manner consistent with the terms of the Restructuring Support Agreement and subject to the consent rights set forth therein;

(iv) authorize the implementation of the Prepackaged Plan in accordance with its terms; and

(v) provide that, pursuant to section 1146 of the Bankruptcy Code, the assignment or surrender of any lease or sublease, and the delivery of any deed or other instrument or transfer order, in furtherance of, or in connection with the Prepackaged Plan, including any deeds, bills of sale, or assignments executed in connection with any disposition or transfer of assets contemplated under the Prepackaged Plan, shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax;

(b) the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Prepackaged Plan, each of which shall not be subject to unfulfilled conditions and shall be in full force and effect, and all applicable waiting periods shall have expired or been terminated;

(c) the final version of each of the Prepackaged Plan, the Definitive Documents, and all documents contained in any supplement to the Prepackaged Plan, including the Plan Supplement and any exhibits, schedules, amendments, modifications, or supplements thereto or other documents contained therein shall have been executed or Filed, as applicable, in form and substance consistent in all respects with the Restructuring Support Agreement, the DIP Orders, and the Prepackaged Plan, and comply with the applicable consent rights set forth in the Restructuring Support Agreement or the Prepackaged Plan for such documents, and shall not have been modified in a manner inconsistent with the Restructuring Support Agreement or the DIP Orders, and shall remain in full force and effect;

(d) the Restructuring Support Agreement shall not have been terminated as to the Debtors, the Required Consenting Funded Debt Parties or, in the event of the Reorganization Transaction, Ayrmid, shall be in full force and effect, and the Debtors and the other parties thereto shall be in compliance therewith;

(e) the DIP Facility and the DIP Orders shall not have been terminated in accordance with their respective terms and shall be in full force and effect; and there shall not have occurred and be continuing any event, act, or omission that, but for the expiration of time, would permit the Required Consenting Funded Debt Parties to terminate the Restructuring

Support Agreement or the Required DIP Lenders to (or to instruct the DIP Agent to) terminate the DIP Facility in accordance with their respective terms;

(f) all Professional Fee Amounts that require the approval of the Bankruptcy Court shall have been paid in full or amounts sufficient to pay such fees and expenses after the Effective Date shall have been funded into the Professional Fee Account pending the approval of such fees and expenses by the Bankruptcy Court;

(g) all outstanding Restructuring Expenses and all outstanding reasonable and documented fees and expenses of the Prepetition Agents, including estimated fees and expenses through the Effective Date, shall have been paid in full in Cash, and all other fees, costs, and expenses required to be paid under the Restructuring Support Agreement, the DIP Facility Documents, and the other Definitive Documents shall have been paid in full in Cash in accordance therewith;

(h) in the case of a Sale Transaction, an Acceptable Alternative Transaction, or any other Alternative Restructuring Proposal, all Bid Protections earned and payable in accordance with Article IV.B hereof, the Restructuring Support Agreement, and the Bidding Procedures Order shall have been paid in full in Cash or otherwise satisfied in accordance with Article IV.B hereof;

(i) in the event of the Reorganization Transaction: (i) the Liens and obligations under the Ayrmid Term Loan shall have been equitized into pre-Effective Date Ayrmid, structurally subordinated, or otherwise addressed in accordance with Article IV.J hereof; (ii) the Merger Agreement shall be in full force and effect, all conditions to the consummation of the Merger thereunder shall have been satisfied or waived in accordance with its terms (other than those conditions that by their nature are to be satisfied at the closing of the Merger), and the Merger shall be consummated substantially concurrently with the Effective Date; (iii) the NewCo Facility Documents shall have been executed and delivered, all conditions precedent to the effectiveness thereof shall have been satisfied or waived in accordance with their terms, and the NewCo Facility shall have been funded; (iv) the MF CVR Agreement shall have been executed and delivered; and (v) the New Royalty Agreement shall have been executed and delivered;

(j) no court of competent jurisdiction or other competent governmental or regulatory authority shall have issued a final and non-appealable order making illegal or otherwise restricting, preventing or prohibiting the consummation of the Prepackaged Plan or the Restructuring Transactions;

(k) in the event of the Sale Transaction, the conditions to effectiveness of the Purchase Agreement(s) shall have been duly satisfied or waived;

(l) in the event of the Reorganization Transaction, the Reorganized Parent Common Stock (comprising the Reorganized Parent Equity Distribution) and the Merger Consideration (including the New Common Stock and the MF CVRs) shall have been issued in accordance with the Prepackaged Plan and the Merger Agreement;

(m) in the event of the Reorganization Transaction, the Debtors shall have funded the German RemainCo Winddown Account in accordance with Article IV.U hereof; and

(n) the Debtors shall have implemented the Restructuring Transactions and all transactions contemplated in the Prepackaged Plan in a manner consistent with the Restructuring Support Agreement (and subject to, and in accordance with, the consent rights set forth therein).

Notwithstanding when a condition precedent to the Effective Date occurs, for purposes of the Prepackaged Plan, such condition precedent shall be deemed to have occurred simultaneously upon the completion of the conditions precedent to the Effective Date; *provided* that, to the extent a condition precedent (a "*Prerequisite Condition*") may be required to occur prior to another condition precedent (a "*Subsequent Condition*"), then, for purposes of the Prepackaged Plan, the Prerequisite Condition shall be deemed to have occurred immediately prior to the Subsequent Condition, regardless of when such Prerequisite Condition or Subsequent Condition shall have occurred.

*B. Waiver of Conditions.*

Except as otherwise specified in the Prepackaged Plan or the Restructuring Support Agreement, any one or more of the conditions to Consummation (or component thereof) set forth in this Article IX (other than entry of the Confirmation Order) may be waived in writing by the Debtors with the prior written consent of the Required Consenting Funded Debt Parties, and otherwise subject to the consent rights set forth in the Restructuring Support Agreement, without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Prepackaged Plan; *provided* that the condition precedent set forth in Article IX.A(g) may not be waived without the prior written consent of each affected Ad Hoc Group Advisor or Royalty Investor Advisor, as applicable.

*C. Effect of Failure of Conditions.*

If Consummation does not occur as to any Debtor, the Prepackaged Plan shall be null and void in all respects as to such Debtor and nothing contained in the Prepackaged Plan, the Disclosure Statement, or the Restructuring Support Agreement as to such Debtor shall: (1) constitute a waiver or release of any Claims by the Debtors, any Holders of Claims or Interests, or any other Entity; (2) prejudice in any manner the rights of the Debtors, any Holders of Claims or Interests, or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders of Claims or Interests, or any other Entity.

*D. Substantial Consummation.*

"Substantial Consummation" of the Prepackaged Plan, as defined in 11 U.S.C. § 1101(2), shall be deemed to occur on the Effective Date.

## ARTICLE X.
## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

*A. Modification and Amendments.*

Except as otherwise specifically provided in the Prepackaged Plan and subject to the consent rights set forth in the Restructuring Support Agreement, the DIP Facility Documents, and the DIP Orders, the Debtors reserve the right to modify the Prepackaged Plan, whether such modification is material or immaterial, and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not resolicit votes on such modified Prepackaged Plan. Subject to those restrictions on modifications set forth in the Prepackaged Plan, the Restructuring Support Agreement, the DIP Facility Documents, and the DIP Orders, the requirements of section 1127 of the Bankruptcy Code, Bankruptcy Rule 3019, and, to the extent applicable, sections 1122, 1123, and 1125 of the Bankruptcy Code, each of the Debtors expressly reserves its respective rights to revoke or withdraw, or to alter, amend, or modify the Prepackaged Plan with respect to such Debtor, one or more times, after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Prepackaged Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Prepackaged Plan, the Disclosure Statement, or the Confirmation Order, in such manner as may be necessary to carry out the purposes and intent of the Prepackaged Plan.

*B. Effect of Confirmation on Modifications.*

Entry of the Confirmation Order shall mean that all modifications or amendments to the Prepackaged Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

*C. Revocation or Withdrawal of Prepackaged Plan.*

To the extent permitted by the Restructuring Support Agreement, the Debtors reserve the right to revoke or withdraw the Prepackaged Plan prior to the Confirmation Date and to File subsequent plans of reorganization. If the Debtors revoke or withdraw the Prepackaged Plan, or if Confirmation or Consummation does not occur, then: (1) the Prepackaged Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Prepackaged Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected under the Prepackaged Plan, and any document or agreement executed pursuant to the Prepackaged Plan, shall be deemed null and void; and (3) nothing contained in the Prepackaged Plan shall: (a) constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of the Debtors or any other Entity; or (c) constitute an admission, acknowledgment, offer, or undertaking of any sort by the Debtors or any other Entity.

## ARTICLE XI.
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or relating to, the Chapter 11 Cases and the Prepackaged Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, and to the fullest extent permissible by 28 U.S.C. § 1334 to hear, and by 28 U.S.C. § 157 to determine, all proceedings in respect thereof, including, without limitation, for the following purposes:

(a) allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, and resolve any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims or Interests;

(b) decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Prepackaged Plan;

(c) resolve any matters related to: (i) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Cures pursuant to section 365 of the Bankruptcy Code; (ii) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (iii) the Reorganized Debtors or Post-Effective Date Debtors amending, modifying, or supplementing, after the Effective Date, pursuant to Article V hereof, the list of Executory Contracts and Unexpired Leases to be assumed or rejected or otherwise; and (iv) any dispute regarding whether a contract or lease is or was executory or expired;

(d) resolve disputes concerning Disputed Claims and consider the allowance, classification, priority, compromise, estimation, secured or unsecured status, amount or payment of any Claim, including any Administrative Claims, including any dispute over the application to any Claim of any limitation on its allowance set forth in sections 502 or 503 of the Bankruptcy Code or asserted under non-bankruptcy Law pursuant to section 502(b)(1) of the Bankruptcy Code;

(e) ensure that distributions to Holders of Allowed Claims and Allowed Interests (as applicable) are accomplished pursuant to the provisions of the Prepackaged Plan, including with respect to the MF CVRs pursuant to the MF CVR Agreement;

(f) adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

(g) adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

(h) enter and implement such orders as may be necessary to execute, implement, or consummate the provisions of the Prepackaged Plan and all contracts, instruments, releases, indentures, and other agreements or documents created or entered into in connection with the Prepackaged Plan or the Disclosure Statement, including the Restructuring Support Agreement;

(i) enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

(j) resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Prepackaged Plan or any Entity's obligations incurred in connection with the Prepackaged Plan;

(k) issue injunctions, enter and implement other orders, or take such other actions as may be necessary to restrain interference by any Entity with Consummation or enforcement of the Prepackaged Plan;

(l) resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the releases, injunctions, exculpations, and other provisions contained in Article VIII hereof and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

(m) resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or Interest for amounts not timely repaid pursuant to Article VII.F hereof;

(n) enter and implement such orders as are necessary if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

(o) determine any other matters that may arise in connection with or relate to the Prepackaged Plan, the Plan Supplement, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Prepackaged Plan or the Disclosure Statement, including the Restructuring Support Agreement;

(p) enter an order concluding or closing the Chapter 11 Cases;

(q) adjudicate any and all disputes arising from or relating to distributions under the Prepackaged Plan;

(r) consider any modifications of the Prepackaged Plan in accordance with section 1127 of the Bankruptcy Code, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

(s) determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

(t) hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Prepackaged Plan or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with the Prepackaged Plan;

(u) hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

(v) recover all assets of the Debtors and property of the Debtors' Estates, wherever located;

(w) hear and determine all disputes involving the existence, nature, scope, or enforcement of any exculpations, discharges, injunctions, and releases granted in the Prepackaged Plan, including under Article VIII hereof;

(x) enforce all orders previously entered by the Bankruptcy Court; and

(y) hear any other matter not inconsistent with the Bankruptcy Code.

As of the Effective Date, notwithstanding anything in this Article XI to the contrary, the New Corporate Governance Documents, the New Common Stock, the MF CVR Agreement, the NewCo Facility, the New Royalty Agreement, and any documents related thereto shall be governed by the jurisdictional provisions therein and the Bankruptcy Court shall not retain jurisdiction with respect thereto.

## ARTICLE XII.
## MISCELLANEOUS PROVISIONS

*A. Immediate Binding Effect.*

Subject to Article IX.A hereof and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Prepackaged Plan (including, for the avoidance of doubt, the documents and instruments contained in the Plan Supplement) shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, the Post-Effective Date Debtors, any and all Holders of Claims or Interests (irrespective of whether such Holders of Claims or Interests have, or are deemed to have, accepted the Prepackaged Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Prepackaged Plan, each Entity acquiring property under the Prepackaged Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.

*B. Additional Documents.*

On or before the Effective Date, and consistent in all respects with the terms of the Restructuring Support Agreement, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary to effectuate and further evidence the terms and conditions of the Prepackaged Plan and the Restructuring Support Agreement. The Debtors, the Reorganized Debtors, or the Post-Effective Date Debtors, as applicable, and all holders of Claims or Interests receiving distributions pursuant to the Prepackaged Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or appropriate to effectuate the provisions and intent of the Prepackaged Plan.

*C. Payment of Statutory Fees.*

All fees payable pursuant to section 1930(a) of the Judicial Code shall be paid by each of the Reorganized Debtors or the Post-Effective Date Debtors, as applicable (or the Disbursing Agent on behalf of each of the

Reorganized Debtors or the Post-Effective Date Debtors, as applicable) for each quarter (including any fraction thereof) until the earlier of entry of a final decree closing the Chapter 11 Cases or an order of dismissal or conversion.

*D. Statutory Committee and Cessation of Fee and Expense Payment.*

On the Confirmation Date, any statutory committee appointed in the Chapter 11 Cases shall dissolve and members thereof shall be released and discharged from all rights and duties from or related to the Chapter 11 Cases. The Reorganized Debtors or the Post-Effective Date Debtors, as applicable, shall no longer be responsible for paying any fees or expenses incurred by the members of or advisors to any statutory committees after the Confirmation Date.

*E. Reservation of Rights.*

Except as expressly set forth in the Prepackaged Plan, the Prepackaged Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order, and the Confirmation Order shall have no force or effect if the Effective Date does not occur. None of the Filing of the Prepackaged Plan, any statement or provision contained in the Prepackaged Plan, or the taking of any action by any Debtor with respect to the Prepackaged Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests prior to the Effective Date.

*F. Successors and Assigns.*

The rights, benefits, and obligations of any Entity named or referred to in the Prepackaged Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, manager, director, agent, representative, attorney, beneficiary, or guardian, if any, of each Entity.

*G. Notices.*

All notices, requests, and demands to or upon the Debtors to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

| **Debtors** |
| --- |
| Karyopharm Therapeutics Inc.<br>85 Wells Avenue, Suite 210<br>Newton, Massachusetts 02459<br>Attention: Michael Mano, Executive Vice President, Chief Legal Officer<br>michael.mano@karyopharm.com |

| Counsel to the Debtors | Counsel to the Ad Hoc Group |
|---|---|
| Sidley Austin LLP<br>787 Seventh Avenue<br>New York, New York 10019<br>Attention: Anthony Grossi<br>agrossi@sidley.com<br><br>and<br><br>Sidley Austin LLP<br>1000 Louisiana Street, Suite 5900<br>Houston, Texas 77002<br>Attention: Maegan Quejada<br>mquejada@sidley.com | Latham & Watkins LLP<br>1271 Avenue of the Americas<br>New York, New York 10020<br>Attention: David Hammerman and Keith Simon<br>david.hammerman@lw.com<br>keith.simon@lw.com<br><br>and<br><br>Latham & Watkins LLP<br>330 North Wabash Avenue, Suite 2800<br>Chicago, IL 60611<br>Attention: Whit Morley<br>whit.morley@lw.com |
| **Counsel to Ayrmid** | **Counsel to the Consenting Royalty Investors** |
| Paul Hastings LLP<br>71 South Wacker Drive<br>Suite 4500<br>Chicago, IL 60606<br>Attention: Matt Warren and Geoff King<br>mattwarren@paulhastings.com<br>geoffking@paulhastings.com<br><br>and<br><br>Paul Hastings LLP<br>1197 Peachtree Street NE<br>Suite 200<br>Atlanta, GA 30361<br>Attention: Zach Cochran<br>zachcochran@paulhastings.com | Hogan Lovells Cadwalader US LLP<br>200 Liberty Street<br>New York, NY 10281<br>Attention: Douglas Mintz and Thomas Curtin<br>douglas.mintz@hlc.com<br>thomas.curtin@hlc.com |

After the Effective Date, the Reorganized Debtors or the Post-Effective Date Debtors, as applicable, have the authority to send a notice to Entities that provides that to continue to receive documents pursuant to Bankruptcy Rule 2002, such Entity must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002. After the Effective Date, the Reorganized Debtors or the Post-Effective Date Debtors, as applicable, are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed such renewed requests.

*H. Term of Injunctions or Stays.*

Unless otherwise provided in the Prepackaged Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Prepackaged Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Prepackaged Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

*I. Entire Agreement.*

Except as otherwise indicated, and without limiting the effectiveness of the Restructuring Support Agreement, the Prepackaged Plan (including, for the avoidance of doubt, the documents and instruments in the Plan Supplement) supersedes all previous and contemporaneous negotiations, promises, covenants, agreements,

understandings, and representations on such subjects, all of which have become merged and integrated into the Prepackaged Plan.

*J. Plan Supplement.*

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Prepackaged Plan as if set forth in full in the Prepackaged Plan. After the exhibits and documents are Filed, copies of such exhibits and documents shall be available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the Debtors' restructuring website at https://cases.stretto.com/KPTI or the Bankruptcy Court's website at www.txs.uscourts.gov/bankruptcy. To the extent any exhibit or document is inconsistent with the terms of the Prepackaged Plan, unless otherwise ordered by the Bankruptcy Court, the non-exhibit or non-document portion of the Prepackaged Plan shall control.

*K. Severability of Prepackaged Plan Provisions.*

If, prior to Confirmation, any term or provision of the Prepackaged Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Prepackaged Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Prepackaged Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Prepackaged Plan and may not be deleted or modified without the Debtors', Reorganized Debtors', or Post-Effective Date Debtors' consent, as applicable; and (3) nonseverable and mutually dependent.

*L. Votes Solicited in Good Faith.*

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Prepackaged Plan in good faith and in compliance with section 1125(g) of the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their respective Affiliates, agents, representatives, members, principals, stockholders, officers, directors, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under the Prepackaged Plan and any previous plan, and, therefore, none of such parties or individuals, the Reorganized Debtors, or the Post-Effective Date Debtors will have any liability for the violation of any applicable Law, rule, or regulation governing the solicitation of votes on the Prepackaged Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Prepackaged Plan and any previous plan.

*M. Closing of Chapter 11 Cases.*

The Reorganized Debtors or the Post-Effective Date Debtors, as applicable, shall, promptly after the full administration of the Chapter 11 Cases, File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases.

*N. Waiver or Estoppel.*

Each Holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Prepackaged Plan, the Disclosure Statement, or papers Filed with the Bankruptcy Court prior to the Confirmation Date.

*O. Creditor Default.*

An act or omission by a Holder of a Claim or an Interest (other than the Consenting Stakeholders) in contravention of the provisions of the Prepackaged Plan shall be deemed an event of default under the Prepackaged Plan. Upon an event of default, the Reorganized Debtors or Post-Effective Date Debtors may seek to hold the defaulting party in contempt of the Confirmation Order and shall be entitled to reasonable attorneys' fees and costs of the Reorganized Debtors or Post-Effective Date Debtors in remedying such default. Upon the finding of such a default by a creditor, the Bankruptcy Court may: (a) designate a party to appear, sign, or accept the documents required under the Prepackaged Plan on behalf of the defaulting party, in accordance with Bankruptcy Rule 7070; (b) enforce the Prepackaged Plan by order of specific performance; (c) award judgment against such defaulting creditor in favor of the Reorganized Debtors or Post-Effective Date Debtors in an amount, including interest, to compensate the Reorganized Debtors or Post-Effective Date Debtors for the damages caused by such default; and (d) make such other order as may be equitable that does not materially alter the terms of the Prepackaged Plan.

*P. Deemed Acts.*

Subject to and conditioned on the occurrence of the Effective Date, whenever an act or event is expressed under the Prepackaged Plan to have been deemed done or to have occurred, it shall be deemed to have been done or to have occurred without any further act by any party, by virtue of the Prepackaged Plan and the Confirmation Order.

Dated: November 2, 2026

**KARYOPHARM THERAPEUTICS INC.**
**KPT TEXAS LLC**

*/s/ Lori Macomber*
Lori Macomber
Authorized Signatory/CFO