**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re:<br><br>KARYOPHARM THERAPEUTICS INC., *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 26-90827 (ARP)<br><br>(Jointly Administered) |

**DECLARATION OF RYAN KIELTY**
**IN SUPPORT OF THE DEBTORS' EMERGENCY**
**MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS**
**(I) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING, (II) AUTHORIZING THE DEBTORS TO USE CASH COLLATERAL, (III) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (IV) GRANTING ADEQUATE PROTECTION TO THE PREPETITION SECURED PARTIES; (V) MODIFYING THE AUTOMATIC STAY; (VI) SCHEDULING A FINAL HEARING; AND (VII) GRANTING RELATED RELIEF**

I, Ryan Kielty, hereby declare as follows:

1. I submit this declaration (this "Declaration") in support of the *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Claims, (IV) Granting Adequate Protection to the Prepetition Secured Parties, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* (the "DIP Motion"),[2] filed concurrently herewith.

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of the Debtors' federal tax identification numbers, are: Karyopharm Therapeutics Inc. (1704) and KPT Texas LLC (1815). The Debtors' service address is 85 Wells Avenue, Suite 210, Newton, Massachusetts, 02459.

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the DIP Motion, the *Declaration of Sean A. Gumbs in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings* (the "First Day Declaration"), and the *Joint Prepackaged Chapter 11 Plan of Karyopharm Therapeutics Inc. and Its Debtor*

2. In particular, I submit this Declaration in support of my view that the proposed DIP Facility (as defined herein) (a) is the product of an arm's-length, good-faith negotiation process, (b) is the best and, in fact the only, postpetition financing option currently available to the Debtors under the circumstances of these Chapter 11 Cases, and (c) contains reasonable economic terms and conditions, taken as a whole, under the circumstances of these Chapter 11 Cases.

3. Except as otherwise indicated herein, all statements set forth in this Declaration are based on (a) my personal knowledge or opinion of the Debtors' operations, finances, and restructuring initiatives, (b) my review of relevant documents, (c) information provided to me by the Debtors, the Debtors' management, and/or the Debtors' other advisors, (d) information provided to me by the employees and partners of Centerview Partners LLC ("Centerview") working directly with me or under my supervision, or (e) my experience as a restructuring professional. I have been actively involved in evaluating the Debtors' financing alternatives and negotiating the proposed DIP Facility. I have been actively engaged in advising the Debtors in the period leading up to the Debtors' Chapter 11 Cases.

4. I am over the age of 18 years and am authorized to submit this Declaration. If I were called to testify, I could and would testify competently to the statements set forth herein. I am not being compensated specifically for this Declaration or related testimony, other than through payments received by Centerview as a professional proposed to be retained by the Debtors, subject to approval by the Court.[3]

---

*Affiliate* (as amended, supplemented, or otherwise modified from time to time, including all exhibits, schedules, and supplements thereto, the "Plan"), as applicable, each filed contemporaneously herewith.

[3] The Debtors anticipate filing an application to retain Centerview as their investment banker, effective as of the Petition Date. Pursuant to Centerview's engagement letter with the Debtors, subject to Court approval, Centerview will be entitled to receive certain fees in connection with the transactions described in this Declaration.

## PROFESSIONAL BACKGROUND AND QUALIFICATIONS

5. I am a Partner in the Debt Advisory and Restructuring Group of Centerview, an independent investment banking firm providing mergers and acquisitions, financing, and restructuring advice across a broad range of industries. Centerview's Debt Advisory and Restructuring Group has extensive experience designing, negotiating, and implementing recapitalizations, exchange offers, financings, distressed mergers and acquisitions, and out-of-court and in-court restructurings. Centerview's professionals have collectively advised on transactions representing over $300 billion in restructured debt. Centerview and its professionals have advised on numerous in-court restructurings, including: Leslie's Pool Supplies; JoAnn Stores; Alkegen; Trinseo; Celsius Network; ACA Financial Guaranty; Cloud Peak Energy; Caesars Entertainment; Catalina Marketing; Country Road Communications; Motor Coach Industries International; Patriot Coal; Westmoreland Mining; Performance Sports Group; Residential Capital; Designer Brands; SVB Financial Group; Enjoy Technology; Toys "R" Us; SmileDirectClub; and Revlon, Inc., among others.

6. Prior to and since joining Centerview in 2011, I have advised and continue to advise companies, creditors, and purchasers in numerous in-court and out-of-court financings, restructurings, recapitalizations, and reorganizations. I have experience in structuring and negotiating debtor-in-possession financings. Before joining Centerview, I was an associate at Miller Buckfire & Co., an investment bank and advisory firm that provided financial advisory services to constituents in a broad range of restructuring and corporate finance transactions. I received my B.A. from Villanova University.

## CENTERVIEW'S RETENTION

7. In July 2025, the Debtors engaged Centerview to begin exploring financing alternatives with existing lenders and noteholders and potential third-party financing sources.

Since then, Centerview has worked closely with the Debtors and their advisors to evaluate a range of strategic and financing options.

8. In my representation of the Debtors, I have, among other things, provided advice on strategic transaction alternatives, restructuring options, and financings. I have participated in negotiations among the Debtors, their creditors, and other parties in interest, as well as with potential buyers. Members of my team and I have also assisted the Debtors in reviewing the terms, conditions, and potential impact of proposed transactions—including the proposed superpriority senior secured debtor-in-possession term loan facility (the "DIP Facility"). Through this and other work, my team and I have become generally familiar with the Debtors' capital structure, liquidity needs, and business operations, as well as the strategic transaction and financing options available to the Debtors.

**THE DEBTORS' EFFORTS TO OBTAIN POSTPETITION FINANCING**

9. I understand that information regarding the Debtors' general background and the need for the relief requested in the DIP Motion is addressed in the First Day Declaration, filed concurrently herewith. Based on my work with the Debtors and their advisors, I believe that the DIP Facility will provide funding to finance their business in the ordinary course, allow for uninterrupted operations, and preserve the value of the Debtors' estates for the benefit of all stakeholders. I understand that the Debtors require immediate access to the DIP Facility and Cash Collateral and that the Debtors will use the proceeds of the DIP Facility to operate their business, maintain business relationships with their customers, vendors, and suppliers, meet their employee payroll, pay the costs of administering the Chapter 11 Cases, and satisfy other working capital and operational needs.

10. For more than a year, the Debtors have been in extensive discussions with the Prepetition Secured Parties to explore strategic alternatives and potential financing options and to

address the Debtors' balance sheet. In October 2025, the Debtors, with the assistance of Centerview, entered into a series of financing transactions with certain of their existing lenders to provide additional capital and financial flexibility to extend the Debtors' cash runway beyond the expected readout of the Debtors' XPORT-MF-034 clinical trial. In February 2026 the Debtors entered into a forbearance agreement with Prepetition Secured Parties to preserve liquidity in advance of the readout of clinical trials XPORT-MF-034 and XPORT-EC-042. In September 2026, following these readouts, to preserve liquidity, create a stable environment for running a sale process, and progress restructuring negotiations among relevant stakeholders, the Debtors entered into another forbearance agreement with their Prepetition Secured Parties.

11. In July 2026, the Debtors, with the assistance of Centerview, launched a marketing and sale process for all or a portion of the Debtors' business (the "Marketing and Sale Process"),[4] which included outreach to strategic acquirors and financial sponsors and generated significant interest from both. Although the Marketing and Sale Process resulted in the selection of Ayrmid, Ltd. ("Ayrmid") as the proposed stalking horse bidder for a transaction pursuant to the Plan, the Debtors' cash on hand and other available sources of liquidity would not support ongoing operations or the successful consummation of a sale transaction with Ayrmid without an immediate infusion of financing.

12. During discussions in the months and weeks leading up to the Chapter 11 Cases, the majority of the Term Loan Lenders indicated that they would not consent to being primed by, or sharing lien priority with, any financing provided by a third party. The other Prepetition Secured

[4] Additional details on the Marketing and Sale Process are included in my *Declaration of Ryan Kielty in Support of Debtors' Emergency Motion for Entry of an Order (I)(A) Approving Bidding Procedures and Authorizing Sale Transaction; (B) Authorizing Designation of Stalking Horse Bidder and Approving Bid Protections; (C) Scheduling Auction and Sale Hearing; (D) Approving Sale Notices; (E) Approving Assumption and Assignment Procedures; and (II) Granting Related Relief*, filed concurrently herewith.

Parties have consented to priming liens and the use of Cash Collateral under the DIP Facility provided by the holders of First Lien Term Loans.

13. Over the last several months, the Debtors, with the assistance of Centerview, contacted alternative potential financing sources as part of the Debtors' ongoing efforts to raise capital to avoid chapter 11 and in connection with preparations for a potential chapter 11 filing to seek out-of-court and in-court financing. The Debtors, with the assistance of Centerview, also asked existing second-lien royalty provider HealthCare Royalty Partners ("HCR") to provide DIP financing on a junior basis, senior to HCR's existing lien, but junior to the Prepetition First Lien Term Loans, but HCR declined to do so. Ultimately, no party contacted made a proposal to (a) provide financing on a junior or unsecured basis with actionable terms, or (b) engage in a priming fight with the Debtors' Prepetition Secured Parties.

14. Given the foregoing, the Debtors, in consultation with their advisors, determined that they are currently unable to obtain any actionable financing other than from the DIP Lenders (as defined in the DIP Motion).

## THE PROPOSED DIP FACILITY

15. By the DIP Motion, the Debtors seek authority to obtain $55,000,000 in postpetition financing pursuant to a superpriority senior secured term loan credit facility, in the form of new money DIP Loans drawn upon or after entry of the Interim Order and Final Order (the "New Money DIP Term Loans"). The DIP Motion seeks approval for $25,000,000 to be drawn pursuant to the Interim Order, and the remaining $30,000,000 to be drawn pursuant to the Final Order. As noted in the DIP Motion, the Debtors are also seeking authority to use Cash Collateral upon entry of the Interim Order.

16. The DIP Facility also includes a roll-up of (a) $25,000,000 of Prepetition First Lien Term Loans held by those DIP Lenders that fund New Money DIP Term Loans (or any of their

respective designated affiliates or managed or controlled funds, as determined by the applicable DIP Lender) upon entry of the Interim Order (the "Interim Roll-Up" and such converted amounts, the "Interim Roll-Up Loans") and (b) an additional $30,000,000 in aggregate principal amount of Prepetition First Lien Term Loans upon entry of the Final Order (the "Final Roll-Up" and such converted amounts, the "Final Roll-Up Loans," and together with the Interim Roll-Up and the Interim Roll-Up Loans, respectively, the "Roll-Up" and the "Roll-Up Loans").

17. In connection with the DIP Facility, the Debtors have agreed, subject to Court approval, to pay interest and certain fees. Specifically, as noted in the DIP Motion, the Debtors have agreed to pay: (a) interest on each of the New Money DIP Term Loans at a rate equal to SOFR (as defined in the DIP Motion) plus 900 bps, payable in kind quarterly on the last day of each quarter after the Closing Date (the "Interest Payment Date"); (b) interest on each of the Roll-Up Loans at a rate equal to SOFR plus 1,225 bps, payable in kind quarterly on each Interest Payment Date; (c) an exit fee of 4.00% of the New Money DIP Loans (including interest paid in kind and added to the outstanding principal amount of the New Money DIP Loans), payable upon any repayment or prepayment (including any acceleration thereof) of the New Money DIP Term Loans or termination or reduction of the New Money DIP Commitments (other than a termination resulting from the funding of New Money DIP Term Loans); (d) an exit fee of 8.00% of the Roll-Up Loans (including interest paid in kind and added to the outstanding principal amount of the Roll-Up Loans), payable upon any repayment or prepayment (including any acceleration thereof) or other satisfaction of the Roll-Up Loans (other than a deemed reconversion of Roll-Up Loans into allowed Prepetition First Lien Obligations, in which case there shall be no corresponding exit fee with respect to the Roll-Up Loans); and (e) the DIP Agent's fees and expenses. As noted in the

DIP Motion, the DIP Term Sheet also incorporates certain milestones set forth in the Restructuring Support Agreement, which are, in my professional view, reasonably achievable.

**<u>THE PROPOSED DIP FACILITY IS THE BEST AND ONLY POSTPETITION FINANCING CURRENTLY AVAILABLE TO THE DEBTORS</u>**

18. Based on my experience with debtor-in-possession financing transactions as well as my involvement in the marketing efforts to secure postpetition financing for the Debtors described above, I believe that the DIP Facility, taken as a whole, is the best and only financing option currently available to the Debtors under the facts and circumstances of these Chapter 11 Cases.

19. *First*, the DIP Facility will provide the Debtors with access to capital that, based on my review of the Debtors' cash flow forecasts and discussions with the Debtors and their advisors, I believe is necessary to fund their businesses in the ordinary course, allow for uninterrupted operations, and preserve the value of the Debtors' estates for the benefit of all stakeholders while the Debtors conduct an orderly and value-maximizing restructuring, including the continued marketing of their assets.

20. *Second*, the Debtors, with the assistance of Centerview, solicited other sources of postpetition financing to determine whether the Debtors could obtain other postpetition financing arrangements on better terms. None of the other financing sources contacted, however, were willing to make any proposals to (a) provide financing on a junior or unsecured basis with actionable terms, or (b) engage in a priming fight with the Debtors' Prepetition Secured Parties.

21. *Third*, the economic terms proposed under the DIP Facility, such as the contemplated pricing, fees, and interest rates, taken as a whole, are customary for DIP financings of this type, and DIP roll-ups, similar to the Roll-Up described herein, are not uncommon features required by DIP lenders under DIP financings of this type. Additionally, based on my participation

in the negotiations, the Roll-Up was a necessary inducement for the DIP Lenders to provide the DIP Facility. I further understand that the fees under the DIP Facility were likewise necessary inducements for the DIP Lenders to provide the DIP Facility.

22. In my view, based on my discussions and involvement during the DIP negotiation process, such economic terms are an integral component of the DIP Facility, and, taken as a whole, are appropriate and represent the best terms currently available to the Debtors under the current circumstances of these Chapter 11 Cases.

## THE PROPOSED DIP FACILITY WAS NEGOTIATED IN GOOD FAITH AND AT ARM'S LENGTH

23. Based on the discussions I observed and participated in during the course of the negotiations around the DIP Facility and its terms, as well as my experience negotiating other financings, these negotiations were conducted in good faith and at arm's length.

## CONCLUSION

24. Accordingly, based on my experience, the lack of postpetition financing alternatives currently available to the Debtors, the circumstances of these Chapter 11 Cases, and the tangible benefit to the estates of having substantial postpetition financing commitments, I believe that the proposed DIP Facility is the best and only source of financing currently available to address the Debtors' liquidity needs while preserving value for the benefit of all stakeholders. In my professional opinion, the economic terms of the DIP Facility, including the Roll-Up, taken as a whole, are reasonable under the circumstances, are the product of good faith, arm's-length negotiations, and will maximize the value of the Debtors' assets for the benefit of all stakeholders. Thus, I believe that the DIP Facility is the best available financing for the Debtors and is in the best interests of the Debtors and their creditors.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated: November 2, 2026

/s/ *Ryan Kielty*
Ryan Kielty
Partner
Centerview Partners LLC