**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re:<br><br>KARYOPHARM THERAPEUTICS INC., *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 26-90827 (ARP)<br><br>(Jointly Administered) |

**DECLARATION OF SEAN A. GUMBS IN SUPPORT OF THE DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS**

I, Sean A. Gumbs, pursuant to section 1746 of title 28 of the United States Code, hereby declare that the following is true and correct to the best of my knowledge, information, and belief:

1. I am a Senior Managing Director at FTI Consulting, Inc. ("FTI"), the proposed financial advisor to Karyopharm Therapeutics Inc. ("Karyopharm") and its debtor affiliate, the debtors and debtors in possession (collectively, the "Debtors" or the "Company") in the above-captioned chapter 11 cases. FTI was retained by the Company in July 2026 to assist with, among other things, liquidity management and cash-flow forecasting, contingency planning, strategic communications, and the evaluation and implementation of strategic alternatives, and I have led FTI's engagement since its inception. I am over the age of 18 and authorized to submit this declaration (this "Declaration") on behalf of each of the Debtors.

2. I hold a Bachelor of Science degree in Economics from the University of Pennsylvania and a Master of Business Administration from Harvard Business School. I have over 25 years of experience in corporate restructuring, including advising companies, boards of

[1] The Debtors in these chapter 11 cases, together with the last four digits of the Debtors' federal tax identification numbers, are: Karyopharm Therapeutics Inc. (1704) and KPT Texas LLC (1815). The Debtors' service address is 85 Wells Avenue, Suite 210, Newton, Massachusetts 02459.

directors, creditors, and other stakeholders on restructuring transactions both in chapter 11 and on an out-of-court basis, and service as a post-confirmation interim Chief Executive Officer and interim Chief Financial Officer. I am a Certified Insolvency & Restructuring Advisor and a Certified Turnaround Professional. I have been involved in a number of life sciences chapter 11 cases, including aaiPharma, Synergy Pharmaceuticals, Melinta Therapeutics, and Tricida, Inc.

3. In my capacity as financial advisor to the Debtors, I am familiar with and knowledgeable about the Debtors' day-to-day operations, business and financial affairs, and books and records, as well as the circumstances leading to the commencement of these chapter 11 cases. Since FTI's retention, I have worked closely with the Company's management team and the Company's other advisors, including Sidley Austin LLP, as counsel ("Sidley"), and Centerview Partners, as investment banker ("Centerview" and, together with FTI and Sidley, the "Advisors"). Except as otherwise indicated herein, the facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by the Debtors' management team and employees, my opinion based on my experience, knowledge, and information concerning the Debtors' operations and financial condition, or my discussions with the Debtors' management, professionals, attorneys, and advisors, including other FTI professionals working on this engagement. I believe, to the best of my knowledge, that the facts and circumstances set forth herein are true and correct. References to bankruptcy, the chapter 11 process, and related legal matters are based on my understanding of such matters in reliance on the explanation provided by counsel to the Debtors. If called upon to testify, I would and could testify competently to the facts set forth herein on that basis.

4. On the date hereof (the "Petition Date"), each of the Debtors commenced with the United States Bankruptcy Court for the Southern District of Texas (the "Court") a voluntary case

under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). I submit this Declaration to provide an overview of the Debtors, their businesses, and the chapter 11 cases, as well as to support the Debtors' chapter 11 petitions and other motions and applications that the Debtors have filed with the Court, including the "first-day pleadings" (the "First Day Pleadings").

5. This Declaration is organized into five sections. Section I provides an overview of the Restructuring Transactions (as defined below). Section II provides background information on the Company's corporate history and operations. Section III offers an overview of the Company's prepetition corporate and capital structure. Section IV describes the financial and operational circumstances resulting in the Debtors' prepetition restructuring efforts and, ultimately, the filing of these chapter 11 cases. Section V summarizes the relief requested in the First Day Pleadings.

## I. Overview

6. The Company is a commercial-stage pharmaceutical company focused on the discovery, development, and commercialization of first-in-class therapeutics for patients with life-threatening blood cancers and solid tumor malignancies. The Company's lead product, XPOVIO (selinexor) ("XPOVIO"), is approved by the U.S. Food and Drug Administration ("FDA") and marketed in the United States in two multiple myeloma indications and has been approved in more than 50 countries and territories outside the United States, where it is commercialized by the Company's licensing partners. The Company is also seeking FDA approval of selinexor, in combination with ruxolitinib, for the treatment of treatment-naïve myelofibrosis.

7. The filing of these chapter 11 cases is the next step in an over-year-long effort to restructure the Company's balance sheet and provide the best outcome for its patient population.

The Company has never generated revenue sufficient to fund its operations, its research and development programs, and the service of its funded debt, and its access to capital has depended on the progress of its clinical programs. Entering the second half of 2025, the Company faced debt maturities and payment obligations that it could not satisfy while awaiting the results of two of its Phase 3 clinical trials. As described in greater detail in Section IV herein, an ad hoc group of certain of the Company's term loan lenders and noteholders (the "Ad Hoc Group") and the Royalty Investors (as defined below) worked constructively with the Company throughout the ensuing year—first to give the Company time to reach those trial readouts and then, when the results proved disappointing, to give it time to pursue a value-maximizing transaction—through a series of payment deferrals, forbearances, and out-of-court restructuring transactions that provided new capital and extended the Company's runway. Beginning in July 2025, the Company also engaged certain of the Advisors to assist it in evaluating strategic alternatives.

8. After assessing multiple potential paths—including refinancing, equitization, and sale transactions—the Company commenced these chapter 11 cases to implement the transaction proposed by Ayrmid Ltd. ("Ayrmid"), the parent company of Gamida Cell Inc., a commercial-stage cell therapy company, through the *Joint Prepackaged Chapter 11 Plan of Karyopharm Therapeutics Inc. and Its Debtor Affiliate* (as may be amended, supplemented, or otherwise modified from time to time, including all exhibits, schedules, and supplements thereto, the "Prepackaged Plan"),[2] filed contemporaneously herewith. Under that transaction (the "Reorganization Transaction"), the Company's business will be combined with Ayrmid's business, and the Company's funded-debt creditors will exchange their claims for a majority of the equity of the combined enterprise, together with contingent value rights tied to the

[2] Capitalized terms used but not defined herein have the meanings ascribed to such terms in the Prepackaged Plan.

myelofibrosis opportunity, as described in Section IV herein. The Prepackaged Plan also preserves the Debtors' ability to consummate, in lieu of the Reorganization Transaction, a higher or otherwise better sale transaction identified through a court-supervised continuation of the Company's prepetition Marketing and Sale Process (as defined below) (any such transaction, a "Sale Transaction" and, together with the Reorganization Transaction, the "Restructuring Transactions").

9. The Restructuring Transactions have the support of the Company's key stakeholders. Prior to the commencement of these chapter 11 cases, the Debtors entered into a restructuring support agreement (the "Restructuring Support Agreement") with (a) holders of 100% of the loans under the First Lien Term Loan Facility; (b) holders of 100% of the 2028 Notes; (c) holders of 100% of the 2029 Notes; (d) holders of 100% of the Convertible Preferred Stock; and (e) the Royalty Investors, holding 100% of the claims under the Royalty Agreement (each as defined below and, collectively, the "Consenting Stakeholders"), as well as Ayrmid, as plan sponsor.

10. In July 2026, the Company, with the assistance of Centerview, launched a marketing and sale process for all or a portion of the Company's business (the "Marketing and Sale Process"), which generated significant interest from both strategic and financial parties. Although the Marketing and Sale Process produced multiple proposals, none other than Ayrmid's was actionable in the time required. The Marketing and Sale Process will continue postpetition pursuant to bidding procedures to be approved by the Court, which will include minimum requirements that any alternative bid must satisfy—including, among other things, minimum net proceeds at closing sufficient to pay in full in cash the DIP Facility (as defined below), the First Lien Term Loan Facility, and the 2028 Notes and to provide the agreed

minimum recoveries on the 2029 Notes and the Royalty Agreement (each as defined below) (the "Successful Bid Mandatory Conditions"). If the Marketing and Sale Process yields a bid satisfying the Successful Bid Mandatory Conditions that the Debtors determine to be higher or otherwise better than the Reorganization Transaction, the Debtors may, with the consents required under the Restructuring Support Agreement, elect to consummate that Sale Transaction, pursuant to the Prepackaged Plan or section 363 of the Bankruptcy Code; absent such a bid, the Debtors will consummate the Reorganization Transaction. The Reorganization Transaction thus provides a fully committed baseline for the Debtors' stakeholders while subjecting the Company's assets to a final, court-supervised market test.

11. The Company enters these chapter 11 cases with (a) commitments from the lenders under the First Lien Term Loan Facility (as defined below) to provide a $55 million new-money debtor-in-possession senior secured priming facility, together with a roll-up of a portion of the loans under the First Lien Term Loan Facility (the "DIP Facility"), and (b) the support of the Consenting Stakeholders, who have agreed under the Restructuring Support Agreement to vote to accept the Prepackaged Plan. On November 2, prior to the commencement of these chapter 11 cases, the Debtors commenced the solicitation of votes on the Prepackaged Plan through the *Disclosure Statement for the Joint Prepackaged Chapter 11 Plan* of *Karyopharm Therapeutics Inc. and Its Debtor Affiliate* (the "Disclosure Statement"). Consistent with their obligations under the Restructuring Support Agreement, the Debtors are seeking to complete the solicitation and to confirm the Prepackaged Plan at a combined hearing on the adequacy of the Disclosure Statement and confirmation of the Prepackaged Plan on an expedited basis, in accordance with the following proposed schedule:

| Proposed Confirmation Schedule | |
|---|---|
| Voting Record Date | October 27, 2026 |
| Prepetition Solicitation Commencement Date | November 2, 2026 |
| Voting Deadline | 4:00 p.m. (prevailing Central Time) on November 30, 2026 |
| Mailing of Combined Hearing Notice | Within two (2) business days following entry of the order approving the solicitation procedures, or as soon as reasonably practicable thereafter |
| Hearing to Approve Bidding Procedures | November 3, 2026 |
| Deadline to File Cure Notice | November 13, 2026 |
| Bid Protections Objection Deadline | 4:00 p.m. (prevailing Central Time) on November 23, 2026 |
| Bid Protections Hearing | November 30, 2026 (subject to the Court's availability) |
| Bid Deadline | December 16, 2026 |
| Determination of Qualified Bids | December 18, 2026 |
| Auction (if applicable) | December 21, 2026 |
| Deadline to File Post-Auction Notice | 1 Business Day following conclusion of the Auction |
| Plan Supplement Filing Deadline | December 28, 2026 |
| Sale Transaction Election Notice Deadline | December 28, 2026 |
| Opt-In and Opt-Out Deadline | 5:00 p.m. (prevailing Central Time) on January 4, 2027 |
| Proposed Objection Deadline | 5:00 p.m. (prevailing Central Time) on January 4, 2027 |
| Combined Hearing | January 11, 2027 |

## II. The Company's History and Operations

### A. Corporate History

12. XPOVIO received its initial FDA approval in July 2019 and is currently approved in the United States in two multiple myeloma indications. The Company commercializes XPOVIO in the United States directly and, outside the United States, through its licensing partners.

13. Karyopharm was incorporated in Delaware on December 22, 2008, and has its principal place of business in Newton, Massachusetts. The Company has one U.S. subsidiary, KPT Texas LLC, incorporated in Texas, and one foreign non-Debtor subsidiary, Karyopharm Europe GmbH, incorporated in Germany.[3] The Company is supported by approximately 192 employees who work remotely throughout the United States and overseas or at the Company's headquarters in Massachusetts. In addition, the Company's business operations are supported by 34 independent contractors. An illustrative chart of the Company's corporate structure as of the Petition Date is attached hereto as **Exhibit A**.

**B. Business and Operations**

14. The Company's primary focus is on marketing XPOVIO in its currently-approved indications in multiple myeloma and on developing and seeking regulatory approval of selinexor in myelofibrosis. XPOVIO is currently approved and marketed in the United States for the following indications: (a) in combination with bortezomib and dexamethasone for the treatment of adult patients with multiple myeloma who have received at least one prior therapy; and (b) in combination with dexamethasone for the treatment of adult patients with relapsed or refractory multiple myeloma who have received at least four prior therapies and whose disease is refractory to at least two proteasome inhibitors, at least two immunomodulatory agents, and an anti-CD38 monoclonal antibody.

15. The Company has historically financed its operations through a combination of proceeds from: (a) product revenue sales; (b) public and private placements of equity securities; (c) the issuance of convertible debt; (d) a term loan, (e) a deferred royalty obligation; (f) at-the-market offerings; and (g) business development activities. The Company's prepetition

[3] Karyopharm Europe GmbH is in the process of voluntary dissolution and winddown in accordance with local laws and regulations.

capital structure and long-term obligations are described in greater detail in Section III herein. As of the Petition Date, the Company had $8.1 million of cash, cash equivalents, and investments, including restricted cash.

16. As more fully detailed in Section IV herein, the Company has incurred significant operating losses since its inception and, because of disappointing trial results and delays in obtaining certain FDA approvals, the Company does not have sufficient liquidity to meet its debt obligations, support its continued operations, and maintain its research and development programs, including as the Company continues to develop and seek regulatory approval of selinexor for myelofibrosis. The Company's continued operations are dependent on its ability to raise additional funding or enter into strategic alternatives and market XPOVIO in its currently approved indications.

*i. Cancer-Fighting Products*

17. The Company's novel approach targets the export of specific proteins from the nuclei of cancer cells. The Company's compounds inhibit the nuclear export protein exportin 1 ("XPO1") and represent a new class of drug candidates with a novel mechanism of action and the potential to treat a variety of diseases with high unmet medical need.

a. XPOVIO (selinexor)

18. Selinexor, marketed as XPOVIO, is a first-in-class, oral compound that functions by binding with, and inhibiting, the nuclear export protein, XPO1, leading to the accumulation of tumor suppressor proteins in the cell nucleus. This reinitiates and amplifies their tumor suppressor function and is believed to lead to the selective induction of apoptosis in cancer cells, while largely sparing normal cells. XPOVIO was also approved in the United States under the accelerated approval pathway for the treatment of relapsed or refractory diffuse large B-cell lymphoma ("DLBCL"); however, in March 2026, at the FDA's request and because completion

of the required confirmatory trial was no longer feasible in light of the evolving treatment landscape, the Company agreed to withdraw that indication, and the withdrawal became effective on April 30, 2026. The withdrawal was not based on any safety concern and did not affect the multiple myeloma indications. XPOVIO has also been granted orphan drug designation by the FDA for myelofibrosis.

19. Outside the United States, XPOVIO (marketed as NEXPOVIO in Europe and certain other markets) was granted Conditional Marketing Authorization by the European Commission on March 29, 2021, and by the UK's Medicines and Healthcare products Regulatory Agency on May 26, 2021, which authorizations were subsequently converted to full marketing authorizations in July 2022 and February 2023, respectively, and has since been approved in more than 50 countries and territories, where it is commercialized by the Company's partners, including Menarini, Antengene, Neopharm, and FORUS. As set forth below, selinexor is also being evaluated in ongoing Phase 2 and Phase 3 clinical studies in patients with a variety of hematologic and solid tumor malignancies; in those settings, selinexor is an investigational medicine that has not been approved by the FDA or any other regulatory agency.

b. <u>Eltanexor</u>

20. Eltanexor (KPT-8602) is an investigational, second novel compound that, like selinexor, functions by binding with, and inhibiting, the nuclear export protein, XPO1, leading to the accumulation of tumor suppressor proteins in the cell nucleus. By doing so, Eltanexor reinitiates and amplifies the proteins' tumor suppressor function. This is believed to lead to the selective induction of apoptosis in cancer cells, while largely sparing normal cells.

21. In preclinical models, Eltanexor has a broad therapeutic window with reduced penetration of the blood brain barrier relative to selinexor and, therefore, has the potential to serve as a second-generation SINE compound for cancer indications. Following oral

administration, animals treated with Eltanexor have shown a lower percentage of body weight loss and improved food consumption than animals similarly treated with selinexor. This allows more frequent dosing of Eltanexor, enabling a longer period of exposure at higher levels than is possible with selinexor. As a result, the Company believes that Eltanexor represents a second-generation SINE compound.

*ii. Pipeline and Key Clinical Trials*

a. Myelofibrosis

22. The Company has been focused on utilizing its innovative technologies to combat myelofibrosis, a rare blood cancer affecting roughly 20,000 U.S. patients in which the bone marrow becomes scarred, the spleen enlarges, and patients become anemic or symptomatic. The only currently approved drug class for myelofibrosis is JAK inhibitors, such as ruxolitinib. The Company has been conducting trials for myelofibrosis treatment that utilize selinexor in combination with ruxolitinib.

23. The Company's pivotal myelofibrosis trial, SENTRY (XPORT-MF-034) ("SENTRY"), enrolled 353 patients who had not previously received a JAK inhibitor, randomized 2-to-1 to either once-weekly selinexor plus ruxolitinib or placebo plus ruxolitinib. SENTRY had two co-primary endpoints measured at week 24: (a) a reduction in spleen volume of at least 35% ("SVR35"); and (b) the average change in a patient-reported total symptom score.

24. On March 24, 2026, the Company announced topline results from SENTRY. The trial met its first co-primary endpoint, with 49.8% of patients in the combination arm achieving SVR35 at week 24 compared to 28.0% of patients receiving ruxolitinib alone ($p<0.0001$), but did not meet its second co-primary endpoint, as the improvement in total symptom score was comparable in both arms and the difference was not statistically significant. The Company also reported a promising, although not yet mature, overall survival signal in favor of the combination

and a safety profile consistent with the known profiles of each agent. The SENTRY results were presented in a late-breaking oral presentation at the 2026 American Society of Clinical Oncology Annual Meeting on June 2, 2026, with simultaneous publication in the *Journal of Clinical Oncology*, and were subsequently presented at the 2026 European Hematology Association Congress.

25. Following engagement with the FDA, including Type B and Type C meetings, on August 31, 2026, the Company submitted a supplemental New Drug Application (the "sNDA") to the FDA seeking accelerated approval for selinexor in combination with ruxolitinib for patients with myelofibrosis and requested Priority Review, which, if granted, would provide for a six-month review period. As of the Petition Date, the FDA's 60-day filing review period for the sNDA has ended and the Company has not received a refuse-to-file letter. The Company expects to receive notice of the FDA's decision on sNDA filing acceptance and, if accepted, the anticipated review timelines on or about November 10, 2026. If approved, selinexor plus ruxolitinib would be the first combination regimen approved for myelofibrosis. The Company is also evaluating selinexor as a monotherapy in the Phase 2 SENTRY-2 trial in myelofibrosis, with topline data from the 60 mg cohort expected to be reported at a medical congress in the second half of 2026.

b. Endometrial Cancer

26. XPORT-EC-042 was a global Phase 3 trial in 257 patients, testing weekly selinexor as a maintenance therapy after chemotherapy in women with TP53 wild-type advanced or recurrent endometrial cancer. Patients were randomized 1-to-1 against a placebo, with progression-free survival tested sequentially in two defined populations.

27. On July 30, 2026, the Company announced that XPORT-EC-042 did not meet its primary endpoint. In the modified intent-to-treat population of 236 patients, median progression-

free survival was 12.75 months with selinexor compared to 7.43 months with placebo—a trend favoring selinexor that did not reach statistical significance. Following these results, the Company prioritized its investment toward its myelofibrosis and multiple myeloma programs, reduced its planned investment in endometrial cancer, and is continuing long-term follow-up of enrolled patients while winding down the trial.

c. Myeloma

28. XPORT-MM-031 (EMN29) is a Phase 3 trial conducted in collaboration with the European Myeloma Network evaluating an all-oral combination of selinexor, pomalidomide, and dexamethasone in previously treated multiple myeloma patients whose most recent therapy was an anti-CD38 antibody. Enrollment is complete and patients continue to be followed until the progression-free survival events required for the primary endpoint accrue. The Company expects to report topline data from this event-driven trial in the second half of 2026. As of the Petition Date, topline data have not yet been announced.

## III. The Company's Prepetition Capital Structure and Long-Term Obligations

29. As of the Petition Date, the Debtors have approximately $390 million in total funded debt obligations as set forth below:

| Funded Debt | Maturity | Approximate Amount Outstanding as of November 1, 2026 |
|---|---|---|
| **First Lien Term Loan Facility** | May 2028 | $146 million |
| **2028 Notes** | October 2028 | $16 million |
| **2029 Notes** | May 2029 | $114 million |
| **Royalty Agreement** | September 2035 | $114 million |
| | **Total Funded Debt:** | **$390 million** |

### A. Capital Structure Overview

30. The Company's existing capital structure developed through a series of financing and restructuring transactions undertaken prior to the commencement of these chapter 11 cases. On October 16, 2018, the Company issued $150.0 million aggregate principal amount of 3.00% convertible senior notes due October 15, 2025 (the "2025 Notes") in a private offering. Subsequently, on October 29, 2018 the Company issued an additional $22.5 million aggregate principal amount of its 2025 Notes on the same terms for a total of $172.5 million aggregate principal amount of notes. In September 2019, the Company entered into the Royalty Agreement (as defined below) with the Royalty Investors, under which the Company received $75.0 million in exchange for a revenue interest in XPOVIO. In June 2021, the Company entered into an Omnibus Amendment under which the Company received an additional $60.0 million. In May 2024, the Company completed a refinancing (the "May 2024 Refinancing") in which it (a) entered into the Credit Agreement (as defined below) providing for a $100.0 million senior secured term loan facility; (b) exchanged $148.0 million aggregate principal amount of 2025 Notes for approximately $116.0 million aggregate principal amount of new 6.00% second-lien convertible senior notes due 2029 (the "Original 2029 Notes") and warrants to purchase common stock; and (c) amended the Royalty Agreement, including by making a $49.5 million cash payment to the Royalty Investors and delivering to the Royalty Investors a $15.0 million term loan under the Credit Agreement and $5.0 million of Original 2029 Notes in reduction of the amounts owed under the Royalty Agreement.

31. In October 2025, as part of the Fall 2025 Transactions (as defined below) described in Section IV herein, the Company completed a series of exchange, new-money, and amendment transactions with its term loan lenders, the holders of its convertible notes, and the Royalty Investors (collectively, the "October 2025 Exchange Transactions"). Pursuant to the

October 2025 Exchange Transactions: (a) the lenders under the Credit Agreement funded an additional $12.5 million of term loans and waived certain then-existing defaults; (b) $101.0 million aggregate principal amount of Original 2029 Notes and those certain warrants to purchase common stock issued in the May 2024 Refinancing were exchanged for $103.5 million aggregate principal amount of new 9.00% second-lien convertible senior notes due 2029 issued under a new indenture and collateral trust arrangement and new warrants to purchase common stock, and the remaining $15.0 million of Original 2029 Notes was exchanged for common stock and pre-funded warrants to purchase common stock; (c) the Company issued $15.0 million aggregate principal amount of new 9.00% second-lien convertible senior notes due 2028 for cash; (d) $24.3 million aggregate principal amount of 2025 Notes—substantially all of the 2025 Notes then outstanding—was exchanged for common stock and warrants, and the remaining $0.3 million of 2025 Notes was repaid at maturity on October 15, 2025; and (e) the Royalty Agreement was further amended to, among other things, waive royalty payments on revenue recognized between April 1, 2025, and March 31, 2026. Following the October 2025 Exchange Transactions, no 2025 Notes or Original 2029 Notes remain outstanding, and all of the Company's funded debt is secured by substantially all of the Company's assets.

32. As of the Petition Date, the Company's funded debt therefore consists of the First Lien Term Loan Facility, the 2028 Notes, the 2029 Notes, and the obligations under the Royalty Agreement, each of which is described below. The relative lien priorities of, and the allocation of collateral proceeds among, the Company's secured creditors are governed by (a) the *Amended and Restated Intercreditor Agreement*, dated as of October 10, 2025 (the "Intercreditor Agreement"), among WSFS (as defined below), as collateral agent under the Credit Agreement, WSFS, as collateral trustee for the 2L Notes (as defined below), and HCR Karyopharm SPV,

LLC, as the collateral agent under the Royalty Agreement, and acknowledged and agreed by the Company and (b) the Collateral Trust Agreement, dated as of October 10, 2025 (the "Collateral Trust Agreement"), among the Company, WSFS, as trustee under each of the Indentures (as defined below), and WSFS, as collateral trustee, which, among other things, governs the sharing of collateral between the holders of the 2028 Notes and the holders of the 2029 Notes.

**B. First Lien Term Loan Facility**

33. Karyopharm, as borrower, is party to that certain *Credit and Guaranty Agreement*, dated as of May 8, 2024 (as amended by that certain *First Amendment and Waiver to Credit and Guaranty Agreement*, dated as of October 7, 2025 (the "First Amendment"), and that certain *Second Amendment to Credit and Guaranty Agreement*, dated as of February 27, 2026 (the "Second Amendment"), and as further amended, restated, supplemented, or otherwise modified from time to time, the "Credit Agreement"), by and among Karyopharm, as borrower, the other Debtors, as guarantors, the lenders party thereto from time to time (the "Term Loan Lenders"),[4] and Wilmington Savings Fund Society, FSB ("WSFS"), as administrative agent and collateral agent, which provides for, subject to the terms and conditions set forth therein, an initial $100.0 million senior secured term loan facility (the "First Lien Term Loan Facility").[5] The First Lien Term Loan Facility is secured by first-priority liens on substantially all of the Company's assets. As of the Petition Date, approximately $146 million is outstanding under the First Lien Term Loan Facility, including accrued and unpaid interest and applicable fees and premiums.

---

[4] The original Term Loan Lenders consisted of certain holders of the 2025 Notes and certain entities managed by HCRx, whose loans were subsequently assigned to an affiliate of KKR in connection with KKR's acquisition of a majority interest in HCRx in July 2025.

[5] The Term Loan Lenders funded an additional $12.5 million in October 2025 pursuant to the First Amendment.

**C. 2028 Notes and 2029 Notes**

34. Karyopharm, as issuer, is party to (a) that certain Indenture, dated as of October 10, 2025 (the "2028 Notes Indenture"), by and among Karyopharm, the other Debtors, as guarantors, and WSFS, as trustee, pursuant to which Karyopharm issued $15.0 million aggregate principal amount of 9.00% Convertible Senior Notes due October 15, 2028 (the "2028 Notes"), and (b) that certain Indenture, dated as of October 10, 2025 (the "2029 Notes Indenture" and, together with the 2028 Notes Indenture, the "Indentures"), by and among Karyopharm, the other Debtors, as guarantors, and WSFS, as trustee, pursuant to which Karyopharm issued approximately $103.5 million aggregate principal amount of 9.00% Convertible Senior Notes due May 13, 2029 (the "2029 Notes" and, together with the 2028 Notes, the "2L Notes"). The 2L Notes bear interest at 9.00% per annum, which was payable in kind quarterly through March 31, 2026 and in cash quarterly thereafter, and are convertible at the option of the holders into shares of the Company's common stock (or pre-funded warrants to purchase common stock) at initial conversion prices of $6.64 per share (2028 Notes) and $22.50 per share (2029 Notes), subject to customary adjustments and beneficial ownership limitations.

35. The 2L Notes are secured on a second-priority basis by liens on the same collateral that secures the First Lien Term Loan Facility, held by WSFS, as collateral trustee, for the benefit of the holders of both series of 2L Notes pursuant to the Collateral Trust Agreement. Under the Collateral Trust Agreement, proceeds of the shared collateral are applied first to the 2028 Notes until paid in full and thereafter to the 2029 Notes (subject to the Intercreditor Agreement). Pursuant to the Intercreditor Agreement, the liens securing the 2L Notes are junior to the liens securing the First Lien Term Loan Facility and pari passu with the liens securing the Royalty Agreement, subject to the waterfall set forth in the Intercreditor Agreement. As of the Petition Date, approximately $16 million is outstanding under the 2028 Notes and approximately

$114 million is outstanding under the 2029 Notes, in each case including accrued and unpaid interest.

**D. Royalty Agreement**

36. Karyopharm is party to that certain *Revenue Interest Financing Agreement*, dated as of September 14, 2019 (as amended by amendments dated June 23, 2021, August 1, 2023, May 8, 2024, August 14, 2025, August 27, 2025, and October 7, 2025, and as further amended, restated, supplemented, or otherwise modified from time to time, the "Royalty Agreement"), by and among Karyopharm, the investors party thereto, HealthCare Royalty Management, LLC, as investor representative (together with the investors, the "Royalty Investors"), and HCR Karyopharm SPV, LLC, as collateral agent. The Royalty Investors' interests were assigned to an affiliate of KKR & Co. Inc. ("KKR") in connection with KKR's acquisition of a majority interest in HealthCare Royalty Management, LLC ("HCRx") in July 2025. Under the Royalty Agreement, the Company received a total of $135.0 million in exchange for the right to receive quarterly payments equal to a percentage (currently 8.0%) of the net revenues of XPOVIO and the Company's other products, including worldwide net product sales and upfront, milestone, and royalty payments received from the Company's partners.

37. Total aggregate payments to the Royalty Investors under the Royalty Agreement are capped at $263.3 million (the "Payment Cap"). The Royalty Agreement terminates on the earlier of the date on which the Royalty Investors have received payments totaling the Payment Cap and the legal maturity date of September 26, 2035, at which time any shortfall below a specified minimum return becomes payable. Upon a change of control or an event of default under the Royalty Agreement—including the Company's failure to pay amounts due to the Royalty Investors, insolvency, or a payment default or acceleration under the Company's other

indebtedness—the Company is obligated to pay the Royalty Investors an amount equal to the Payment Cap less the aggregate payments previously made.

38. The obligations under the Royalty Agreement are secured by liens on substantially all of the Company's assets, which such liens are junior to the liens securing the First Lien Term Loan Facility and share in the proceeds of the collateral with the 2L Notes in accordance with the waterfall set forth in the Intercreditor Agreement.

39. As of September 30, 2026, the Company had made $149.8 million in payments to the Royalty Investors under the Royalty Agreement. As of the Petition Date, approximately $114 million—the remaining amount payable up to the Payment Cap as of September 30, 2026—is currently due and payable in full under the Royalty Agreement.

**E. Equity Interests**

40. Karyopharm's common stock is listed on the Nasdaq Global Select Market under the symbol "KPTI." As of June 30, 2026, Karyopharm had approximately 22,680,000 shares of common stock outstanding. As described in Section IV herein, in September 2026 Karyopharm issued 20,000 shares of a newly created series of 0% Series A convertible perpetual preferred stock (the "Convertible Preferred Stock") to certain of its funded-debt creditors in satisfaction of the fees payable under the September 2026 forbearance arrangements. Karyopharm also has outstanding several series of warrants and pre-funded warrants to purchase common stock issued in connection with the May 2024 Refinancing, the October 2025 Exchange Transactions, and the March 2026 Private Placement (each as defined below) (collectively, the "Warrants") (the warrants to purchase 1,317,771 shares of common stock issued in the 2025 Private Placement and the warrants to purchase 4,421,518 shares of common stock issued in the March 2026 Private Placement expired in August 2026), as well as stock options, restricted stock units, and performance stock units issued under its equity incentive plans. Under the Prepackaged Plan, all

existing equity interests in Karyopharm, including the Convertible Preferred Stock, the common stock, and the Warrants, will be cancelled and will receive no distribution.

## IV. Circumstances Leading to Commencement of These Chapter 11 Cases

41. The Company's ability to fund its operations and service its funded debt has always depended on the success of its clinical programs and, in turn, on its access to the capital markets. When the Company's two Phase 3 readouts in 2026 fell short of expectations, and the Company faced increased liquidity constraints, the Company's secured creditors worked constructively with the Company—first to give the Company time to reach the trial readouts, and then to give it time to evaluate its alternatives in light of the results—through the payment deferrals, forbearances, and out-of-court transactions described below.

42. These efforts included: (a) the Fall 2025 Transactions (as defined below), which provided new capital, deferred near-term cash obligations, and equitized a substantial portion of the Company's convertible notes; (b) the February 2026 forbearance and payment deferrals and the March 2026 Private Placement (as defined below), which together extended the Company's runway through the readouts of the Company's two Phase 3 trials; and (c) the September 2026 forbearance, which gave the Company additional time to advance its myelofibrosis program and to continue the Marketing and Sale Process.

43. Although these efforts gave the Company the time it needed to reach its clinical readouts and to run the Marketing and Sale Process, no viable out-of-court alternative emerged that would sufficiently address the Company's liquidity constraints. The Marketing and Sale Process instead yielded Ayrmid's proposal for the Reorganization Transaction, which, together with the Restructuring Support Agreement, contemplates effectuation through these chapter 11 cases. Accordingly, the Company determined that commencing these cases would maximize the value of its assets and operations for the benefit of its creditors and other stakeholders.

**A. The Company's Operating Losses and Dependence on Clinical Milestones**

44. The Company has incurred significant operating losses since its inception. Although XPOVIO generates meaningful revenue—total revenue was $146.1 million in 2025, including approximately $114.9 million of U.S. XPOVIO net product revenue—the Company's revenue has not been sufficient to fund its research and development programs, its commercial infrastructure, and the cash interest and amortization on its funded debt. For the six months ended June 30, 2026, the Company reported a loss from operations of approximately $49.3 million and interest expense of approximately $25.7 million, and as of June 30, 2026 it had an accumulated deficit of approximately $1.8 billion. The Company has accordingly depended on periodic access to the capital markets, which in turn has depended on the progress of its clinical programs. Entering 2026, the Company publicly described the year as a potentially transformative, catalyst-rich year, with topline data from the Phase 3 SENTRY trial in myelofibrosis expected in March 2026 and topline data from the Phase 3 XPORT-EC-042 trial in endometrial cancer expected in mid-2026, and disclosed that its existing liquidity—approximately $64 million of cash, cash equivalents, restricted cash, and investments as of December 31, 2025—was expected to fund operations only into the second quarter of 2026. The Company's business therefore depended, in large part, on its ability to obtain and maintain regulatory approvals, and the outcome of those two trials and of the sNDA would largely determine both the Company's access to capital and its ability to continue as a going concern.

**B. The Fall 2025 Transactions**

45. Entering the second half of 2025, the Company faced the October 15, 2025 maturity of the remaining $24.3 million of 2025 Notes, quarterly cash interest payments under the Credit Agreement and the Original 2029 Notes and a quarterly royalty payment under the Royalty Agreement, each falling due in the third quarter of 2025, and a minimum liquidity

covenant that left little margin for error, all while the Company awaited the topline readout of the SENTRY trial—the single most important value catalyst for the business. The Company, with the assistance of its then-Advisors, determined that the most effective way to bridge to that readout was a negotiated series of transactions with its existing capital providers, together with a modest new equity raise (collectively, and together with the interim accommodations described below, the "Fall 2025 Transactions"), rather than a stand-alone capital raise on the terms then available in the market.

46. The Company first secured short-term accommodations while those transactions were negotiated. On August 14, 2025, the Company and the Royalty Investors entered into the Third Amendment to the Royalty Agreement, which deferred the quarterly royalty payment otherwise due on August 15, 2025 to August 29, 2025, and on August 27, 2025, the Company and the Royalty Investors entered into the Fourth Amendment to the Royalty Agreement, which further deferred that payment to September 30, 2025, the same date on which quarterly cash interest was due under the Credit Agreement and the Original 2029 Notes. On September 30, 2025, while the October transactions were being finalized, the Company entered into a forbearance agreement (the "2025 Forbearance Agreement") with the requisite lenders under the Credit Agreement, the holders of 100% of the Original 2029 Notes, and the investor representative under the Royalty Agreement, pursuant to which those parties agreed to forbear, through October 15, 2025, from exercising rights and remedies with respect to the anticipated defaults arising from the Company's non-payment of the interest and royalty payments due on September 30, 2025 and any resulting cross-defaults, as well as any technical defaults arising from a delay in settling the contemplated note exchanges. The 2025 Forbearance Agreement did not waive any defaults, was conditioned on the continued forbearance of each creditor group, and

was intended solely to permit the parties to sign and close the October transactions within the applicable grace periods.

47. On October 10, 2025 the Company closed the October 2025 Exchange Transactions described in Section III. Among other things, the October 2025 Exchange Transactions provided $27.5 million of new term loan and convertible note financing, temporarily reduced the Company's minimum liquidity covenant by $15.0 million, converted the Company's cash interest obligations under the First Lien Term Loan Facility and the 2L Notes to payment-in-kind through mid-2026, waived royalty payments on revenue recognized between April 1, 2025, and March 31, 2026, equitized approximately $39.3 million of convertible notes, eliminated the Company's October 2025 maturity and thereby extended the weighted-average maturity of the Company's funded debt, and resolved, through the waivers granted in the First Amendment and the Sixth Amendment to the Royalty Agreement,[6] the defaults that had been the subject of the 2025 Forbearance Agreement.

48. Concurrently with the October 2025 Exchange Transactions, the Company raised new equity capital through a private placement, pursuant to a securities purchase agreement dated October 7, 2025, of 1,489,917 shares of common stock and warrants to purchase 1,317,771 shares of common stock at an exercise price of $6.64 per share (which warrants expired in August 2026), for gross proceeds of approximately $8.8 million (the "2025 Private Placement"). The Company also entered into registration rights agreements with the participating investors and with its term loan lenders in respect of the shares and warrants issued in the Fall 2025 Transactions.

[6] To resolve a numbering discrepancy in the Royalty Agreement amendments, there is no Fifth Amendment to the Royalty Agreement.

49. In the aggregate, the Fall 2025 Transactions provided the Company with what the Company estimated at the time to be approximately $100 million of new capital and near-term financial flexibility, eliminated the Company's only remaining 2025 maturity, reduced the Company's convertible notes principal by approximately $39.3 million through equitization, and extended the Company's projected cash runway into the second quarter of 2026—beyond the expected SENTRY readout.

50. Although the Fall 2025 Transactions achieved their purpose, they did not—and were not designed to—resolve the Company's capital structure or its dependence on positive clinical results. With cash interest on the First Lien Term Loan Facility and the 2L Notes scheduled to resume in 2026, the first $15.8 million principal installment under the First Lien Term Loan Facility due on September 10, 2026, and the minimum liquidity covenant stepping back up to $25.0 million on October 10, 2026, the Company and its then-Advisors concluded in early 2026 that a further, more comprehensive solution would be required, but that it would be premature to determine that solution absent the SENTRY readout.

### C. The February 2026 Forbearance Agreement and the March 2026 Private Placement

51. In its efforts to find a comprehensive solution, and to create a stable environment in which to pursue an equity capital raise and evaluate strategic alternatives, on February 27, 2026, the Company entered into a forbearance agreement (the "February Forbearance Agreement") with the Term Loan Lenders, the holders of the 2029 Notes and the 2028 Notes, and the investor representative under the Royalty Agreement (collectively, the "Prepetition Secured Parties"), which became effective in March 2026. Under the February Forbearance Agreement, the Prepetition Secured Parties agreed not to exercise certain rights and remedies with respect to specified matters, including: (a) payment-related defaults through September 30,

2026, that would result from the Company's non-payment of the cash interest due on June 30, 2026, on the 2L Notes; and (b) any defaults that would result from the requirement under the Indentures that the Company maintain minimum liquidity greater than the lesser of (i) $10.0 million plus 50% of the net cash proceeds received from certain debt and equity issuances (excluding proceeds applied to the Capital Raise Trigger (as defined below)) and (ii) $25.0 million through October 10, 2026, which effectively aligned the minimum liquidity covenant under the Indentures with the minimum liquidity covenant under the First Lien Term Loan Facility. The February Forbearance Agreement did not constitute a waiver of any defaults or events of default, and the Prepetition Secured Parties reserved their rights and remedies, subject to the terms of the February Forbearance Agreement.

52. The effectiveness of the February Forbearance Agreement was conditioned upon, among other things, the consummation of a sale and issuance of the Company's common stock, in one or more transactions, resulting in proceeds to the Company of not less than $25.0 million actually received in cash before June 10, 2026 (the "Capital Raise Trigger"). The Capital Raise Trigger was satisfied and the February Forbearance Agreement became effective in March 2026 upon receipt of the proceeds from the March 2026 Private Placement (as defined below).

53. Concurrently, the Company and the Term Loan Lenders entered into the Second Amendment, which became effective in March 2026 together with the February Forbearance Agreement and deferred the principal installment otherwise due on June 10, 2026 to September 10, 2026 and provided for the interest otherwise payable in cash on June 30, 2026 to be paid in kind. Together with the March 2026 Private Placement (as defined below), these arrangements were intended to provide the Company with runway through the SENTRY readout and the

submission of the sNDA, and to permit the Company and its Advisors to evaluate strategic alternatives in an orderly manner.

54. On March 24, 2026—the same day the Company announced the SENTRY topline results—the Company entered into a securities purchase agreement with RA Capital Healthcare Fund, L.P. pursuant to which the Company issued and sold in a private placement (the "March 2026 Private Placement") 1,030,354 shares of common stock, pre-funded warrants to purchase up to 3,391,164 shares of common stock, and accompanying warrants to purchase 4,421,518 shares of common stock (which warrants expired in August 2026), for aggregate net proceeds of $26.9 million.

55. In addition, the Company has raised equity capital from time to time through at-the-market offerings under an open market sale agreement with Jefferies LLC, as agent, entered into in February 2023, pursuant to which the Company sold an aggregate of 2,994,441 shares of common stock during the six months ended June 30, 2026 for net proceeds of $19.8 million.

**D. Clinical and Regulatory Developments in 2026**

56. As described in Section II, the Company's two Phase 3 readouts in 2026 produced mixed results. On March 24, 2026, the Company announced that SENTRY had met its spleen-volume co-primary endpoint but not its symptom-score co-primary endpoint. Although the SENTRY data ultimately supported a regulatory submission, the mixed result foreclosed the equity-market reception that a clean positive readout would have afforded and lengthened the path to approval, making the FDA's willingness to accept an accelerated-approval filing on the basis of SVR35 a critical uncertainty. In March 2026, at the FDA's request, the Company agreed to withdraw the accelerated approval of XPOVIO in DLBCL, which became effective on April 30, 2026. On July 30, 2026, the Company announced that XPORT-EC-042 had not met its

primary endpoint, eliminating the Company's endometrial cancer opportunity and prompting the Company to reprioritize its investment toward myelofibrosis and multiple myeloma and to begin winding down the endometrial cancer program. The Company's common stock declined approximately 68.47% following the XPORT-EC-042 announcement.

57. Following the SENTRY readout, the Company engaged with the FDA regarding a potential accelerated-approval pathway and, on August 31, 2026, submitted the sNDA for selinexor in combination with ruxolitinib in myelofibrosis, requesting Priority Review. The FDA's 60 day sNDA acceptance review period expired on October 27, 2026, and the Company expects to receive notification of the sNDA review period by November 10, 2026. The Company's ability to obtain approval of selinexor in myelofibrosis remains the principal driver of the value of the Company's business and of the myelofibrosis-based contingent value rights to be issued to the Company's funded-debt creditors under the Prepackaged Plan.

### E. 2026 Employee Retention Programs

58. In the months preceding the Petition Date, to preserve the continuity of operations necessary to maintain the value of its business, the Company implemented a series of cash retention arrangements for employees whose continued service it determined to be critical (collectively, the "2026 Retention Programs"), each of which is described in the Employee Wages Motion (as defined below). On July 13, 2026, the Company's Board of Directors, upon the recommendation of its Compensation Committee and after consultation with the Company's Advisors, approved (a) a retention program for fifteen (15) employees, including critical members of the Company's executive leadership team, under which awards totaling $8,875,000 were paid in a lump sum, replaced previously guaranteed amounts under the Company's 2026 short-term incentive plan, and are subject to repayment if the recipient's employment terminates in specified circumstances before the earliest of twelve months after payment, thirty days after a

change in control, and thirty days after the Company's emergence from these chapter 11 cases; and (b) a retention program for thirty-two (32) critical non-executive employees, with awards totaling $2,982,000 payable in four equal quarterly installments through June 30, 2027, subject to continued employment in good standing.

59. The Company's Compensation Committee also approved (a) on July 22, 2026, a cash retention program for fifteen (15) medical science liaisons, nurse liaisons, and regional business directors, with awards totaling $922,000 payable in quarterly installments through June 30, 2027, and a one-time, performance-based supplement to the Company's sales commission program for its hematology/oncology sales specialists with a maximum aggregate cost of approximately $1.7 million; and (b) on September 21, 2026, one-time cash retention awards of $40,000 to each of the Company's four remaining regional business directors and $50,000 to each of two senior members of its finance organization, totaling $260,000, all of which were paid prior to the Petition Date. Prior to the Petition Date, the Company paid approximately $10.6 million under the 2026 Retention Programs; approximately $2.5 million in fixed installments remain payable, exclusive of up to approximately $1.2 million in performance-contingent payments. The purpose of the 2026 Retention Programs was to motivate key, in-demand talent and maintain business continuity during a period in which the Company expected several meaningful catalysts requiring the continued experience and expertise of the designated employees, and the Company is seeking authority in the Employee Wages Motion to continue to honor the 2026 Retention Programs in the ordinary course.

### F. The September 2026 Forbearance Agreement and Fee Agreement

60. Notwithstanding the February Forbearance Agreement and the March 2026 Private Placement, by the summer of 2026 the Company's liquidity was projected to fund operations only into September 2026. The Company did not make the cash interest payments

due on the 2L Notes on June 30, 2026 (which, together with interest accrued on the overdue amount, would have become payable upon the expiration of the forbearance period under the February Forbearance Agreement on September 30, 2026), did not pay the $15.8 million principal installment due under the Credit Agreement on September 10, 2026, did not expect to be able to pay the cash interest due on September 30, 2026 under the Credit Agreement and the Indentures, and would not satisfy the $25.0 million minimum liquidity covenant that applied under the Credit Agreement and the Indentures after October 10, 2026. These matters constituted, or would constitute (upon expiration of any applicable grace periods, cures and conditions), events of default under the Credit Agreement and the Indentures and cross-defaults under the Credit Agreement, the Indentures, and the Royalty Agreement (as detailed and defined in the September Forbearance Agreement, the "Specified Matters").

61. Therefore, on September 10, 2026, the Company entered into a forbearance agreement and limited waiver of indentures (the "September Forbearance Agreement" and, together with the February Forbearance Agreement, the "Forbearance Agreements") with the Prepetition Secured Parties and WSFS, in its capacities as administrative agent and collateral agent under the Credit Agreement, trustee under the Indentures, and collateral trustee under the Collateral Trust Agreement, to provide the Company with additional time to continue to advance its myelofibrosis program following the August 31, 2026 submission of the sNDA, to continue the Marketing and Sale Process then underway, to further negotiate with its lenders, to pursue strategic alternatives, or to consummate an equity capital raise. Under the September Forbearance Agreement, the Prepetition Secured Parties agreed to forbear, during the relevant

forbearance period, from exercising rights and remedies under the Credit Agreement, the Indentures, and the Royalty Agreement solely with respect to the Specified Matters.[7]

62. The September Forbearance Agreement provided that the forbearance period thereunder would end on the earliest of: (a) 11:59 p.m. (prevailing Eastern Time) on October 15, 2026, as such date may be extended by the parties as specified in the September Forbearance Agreement; (b) a bankruptcy or insolvency-related default under any of the Credit Agreement, the Indentures or the Royalty Agreement; (c) a material enforcement action by any creditor of the Company or its subsidiaries; (d) termination or expiration of any other forbearance or similar accommodations with respect to material indebtedness of the Company or any of its subsidiaries; and (e) delivery of a termination notice under the September Forbearance Agreement by any applicable requisite lender or noteholder group, or by the Royalty Investors, following specified events, as applicable, including the occurrence of any event of default other than the Specified Matters, a breach of the September Forbearance Agreement, a material adverse effect, the Company's consolidated liquidity falling below $10.0 million, or the FDA's refusal to accept for filing the Company's sNDA submitted for selinexor in combination with ruxolitinib for the treatment of patients with myelofibrosis or the Company's withdrawal of such sNDA. Upon termination of the forbearance period under the September Forbearance Agreement, all overdue amounts become immediately due and payable in cash and the Prepetition Secured Parties may exercise all rights and remedies, including acceleration.

63. On October 13, 2026, the Prepetition Secured Parties agreed to extend the scheduled expiration of the forbearance period from October 15, 2026, to October 22, 2026, and

[7] The September Forbearance Agreement did not waive the Specified Matters or extend the applicable payment deadlines, and the Prepetition Secured Parties reserved their rights and remedies with respect to those defaults. The September Forbearance Agreement provided limited waivers of certain mechanics under the Indentures for the payment of overdue interest, without waiving, deferring or extending the applicable payment obligations, and consents and waivers from the Prepetition Secured Parties to the Forbearance Consideration (as defined below).

on October 22, 2026, further extended it to November 1, 2026, to permit the Company to continue the Marketing and Sale Process while negotiating and documenting the Restructuring Support Agreement, the Prepackaged Plan, and the DIP Facility. The forbearance period expired on November 1, 2026, and the Consenting Stakeholders have agreed, pursuant to the Restructuring Support Agreement, to support the Restructuring Transactions in lieu of exercising remedies.

64. In consideration for the September Forbearance Agreement, on September 10, 2026, the Company entered into a fee letter agreement with certain of the Prepetition Secured Parties (the "Fee Agreement") pursuant to which the Company agreed to pay the applicable Prepetition Secured Parties fees in an aggregate amount of $20.0 million, which the Company elected to pay in kind through the issuance, on September 17, 2026, of 20,000 shares of Convertible Preferred Stock having a liquidation preference of $1,000 per share and convertible into common stock at a conversion price of $1.62 per share, subject to a cap of 4,520,000 shares plus a 19.99% beneficial ownership cap, pending stockholder approval. The Convertible Preferred Stock does not bear regular dividends, is non-voting, and is subject to a one-time holder put right on and after the third anniversary of issuance.

### G. Exploration of Strategic Alternatives

65. Beginning in July 2025, the Company, with the assistance of Centerview, evaluated a range of strategic and financing alternatives, and the Company and its Advisors engaged in regular discussions with the Ad Hoc Group and the Royalty Investors throughout that period.[8] Following the SENTRY readout, and with the Company's liquidity projected to fund operations only into September 2026, the Company determined that a formal marketing process

[8] Prior to Centerview's engagement in July 2025, the Company had previously marketed itself with the assistance of other advisors.

would provide the greatest opportunity to canvass the market for actionable transactions that could maximize the value of the Company's assets, whether through a sale, a strategic combination, or a recapitalization.

*i. The Marketing and Sale Process*

66. In July 2026, the Company, with the assistance of Centerview, launched the Marketing and Sale Process to evaluate interest in a potential sale transaction for all, substantially all, or a material portion of the Debtors' equity and assets. While the Marketing and Sale Process began in earnest in July 2026, the Company, with the assistance of Centerview, had conversations with interested potential buyers since Centerview's engagement began in 2025. Over the course of the Marketing and Sale Process and leading up to its official launch, Centerview contacted 35 potential acquirors and 83 potential equity investors, including both strategic and financial investors.

67. As explained in further detail in the Bidding Procedures Declaration,[9] in connection with this broad solicitation, I understand that the Company and its Advisors prepared significant amounts of due diligence information, which were made available to potential bidders through a virtual data room. The Company also provided the advisors to the Ad Hoc Group and the Royalty Investors with access to substantially all of the information provided to potential bidders, as well as other information requested by the Ad Hoc Group, the Royalty Investors, and their respective advisors. The Company also made available information regarding its existing capital structure, debt agreements, equity, warrants, and authorized shares so that potential

[9] "Bidding Procedures Declaration" means the *Declaration of Ryan Kielty in Support of Debtors' Emergency Motion for Entry of an Order (I)(A) Approving Bidding Procedures and Authorizing Sale Transaction; (B) Authorizing Designation of Stalking Horse Bidder and Approving Bid Protections; (C) Scheduling Auction and Sale Hearing; (D) Approving Sale Notices; (E) Approving Assumption and Assignment Procedures; and (II) Granting Related Relief*, filed contemporaneously herewith.

bidders could understand the impact on the Company's stakeholders of bids of any amount and could propose creative bid structures, if desired.

68. Of the parties contacted, 17 executed confidentiality agreements and received access to a virtual data room containing over 5,500 documents containing significant diligence and other confidential information about the Debtors' business. The Company's management team, along with Centerview, engaged in 26 diligence sessions and other transaction-related conversations, including 10 management presentations with potential counterparties. On August 31, 2026, following multiple rounds of engagement, the Company sent an initial process letter to approximately 17 parties requesting that they provide an initial indication of interest ("IOI") by September 21, 2026 (the "Initial IOI Deadline") with respect to in-court or out-of-court sale or other transactions. By or shortly after the Initial IOI Deadline, the Company received five (5) non-binding IOIs for all or a portion of the Company's business, structured variously as whole-company acquisitions, asset purchases, and recapitalization transactions. The Company and its Advisors evaluated each proposal on the basis of, among other things, (a) the structure of the proposed transaction, including whether such transaction was proposed to be consummated in court or out of court; (b) the form and amount of consideration offered, including any contingent consideration; (c) the assets to be acquired and the treatment of the Debtors' licenses, contracts, and the Royalty Agreement; and (d) regulatory, financing, contingencies, and other considerations. The Company shared the proposals received with the advisors to the Ad Hoc Group and the Royalty Investors, subject to the information-sharing protocols described below.

69. Following receipt of the IOIs, the Company and its Advisors actively engaged with each of the parties that submitted IOIs to clarify and improve their proposals, and conducted supplemental outreach to certain other parties that had demonstrated sufficient engagement in the

Marketing and Sale Process such that continued dialogue regarding a potential transaction was warranted, which yielded revised IOIs from four (4) parties.

70. While the Marketing and Sale Process generated multiple proposals, the Debtors determined that the proposal received from Ayrmid represented the highest or otherwise best actionable proposal received in the Marketing and Sale Process. Although the Company's secured creditors had not initially sought to acquire the Company or to convert their claims into equity, that transaction structure proved to provide the most effective mechanism by which to effectuate Ayrmid's proposal to combine the two businesses, with the Company's funded-debt creditors receiving a majority equity stake in a combined, better-capitalized commercial-stage oncology company together with a contingent interest in the myelofibrosis opportunity. Following negotiations among the Company, Ayrmid, the Ad Hoc Group, and the Royalty Investors, the parties agreed on the terms of the Reorganization Transaction. The Company, in consultation with its Advisors and after considering all of the proposals received, determined that the Reorganization Transaction—subject to a continued, court-supervised market test—represented the highest or otherwise best path available to maximize value for all stakeholders and to preserve patient access to XPOVIO.

71. Ayrmid is majority-owned by certain funds managed by Highbridge Capital Management, LLC ("Highbridge"), which, through certain of its funds, also holds loans under the First Lien Term Loan Facility, 2028 Notes, and 2029 Notes and is a member of the Ad Hoc Group. In light of that relationship, advisors to the Company, the Ad Hoc Group, and Ayrmid established procedures to ensure the integrity of the marketing process and, as part of those procedures, I understand that Highbridge recused itself from the Ad Hoc Group's deliberations regarding the Marketing and Sale Process and the evaluation of Ayrmid's proposal, and the

terms of the Reorganization Transaction were negotiated on behalf of the Company's secured creditors by the other members of the Ad Hoc Group and their advisors.[10] The Company's Board of Directors, advised by its independent professionals, evaluated Aymid's proposal on the same basis as every other proposal received in the Marketing and Sale Process, and the Reorganization Transaction remains subject to the court-supervised market test described below. The Debtors believe these measures have preserved, and will continue to preserve, the integrity of the Marketing and Sale Process.

72. Although the Company believes the Reorganization Transaction represents the highest or otherwise best actionable transaction available to it as of the Petition Date, the Company, in consultation with its Advisors, determined that continuing the Marketing and Sale Process under court supervision would provide a final opportunity to solicit higher or otherwise better bids. Accordingly, the Debtors will continue the Marketing and Sale Process postpetition pursuant to bidding procedures (the "Bidding Procedures") the Debtors will request the Court approve pursuant to the Bidding Procedures Motion,[11] which will include a form asset purchase agreement and the Successful Bid Mandatory Conditions. Subject to the Restructuring Support Agreement, the Successful Bid Mandatory Conditions require, among other things, that any alternative bid provide for (a) net proceeds at closing of not less than $335,384,812, of which $18,750,000, being the portion allocable to claims under the Royalty Agreement held by the Royalty Investors, may be satisfied with cash or non-cash consideration, in such form as is acceptable to them in their discretion, which amount reflects the payment in full in cash of all

[10] Ayrmid is represented by independent counsel in its capacity as plan sponsor and participant in the Marketing and Sale Process.

[11] "Bidding Procedures Motion" means the *Debtors' Emergency Motion for Entry of an Order (I)(A) Approving Bidding Procedures and Authorizing Sale Transaction; (B) Authorizing Designation of Stalking Horse Bidder and Approving Bid Protections; (C) Scheduling Auction and Sale Hearing; (D) Approving Sale Notices; (E) Approving Assumption and Assignment Procedures; and (II) Granting Related Relief*, filed contemporaneously herewith.

claims under the DIP Facility, the First Lien Term Loan Facility, and the 2028 Notes and the agreed minimum recoveries on the 2029 Notes and the Royalty Agreement; (b) the payment in full in cash or other unimpaired treatment of all general unsecured claims; (c) the payment of any Court-approved Bid Protections (as defined below); and (d) the funding in cash of a budget for the wind-down of the Debtors' remaining estates. If the Marketing and Sale Process yields a qualified bid that satisfies the Successful Bid Mandatory Conditions and is selected as the highest or otherwise best bid (a "Successful Bid"), the Debtors may, with the consent of the Required Consenting Funded Debt Parties (and, to the extent required under the Restructuring Support Agreement, the Royalty Investors), elect, by filing a notice of such election no later than the deadline to file the Plan Supplement, to consummate the Sale Transaction with the successful bidder in lieu of the Reorganization Transaction (and, if the successful bidder fails to close, with the next-highest qualified bidder or, if Ayrmid has been designated as the backup bidder, by reverting to the Reorganization Transaction), to be implemented through the Prepackaged Plan and the order confirming it or, if applicable, pursuant to a separate sale order under section 363 of the Bankruptcy Code. If no such bid is received, or the Debtors do not so elect, the Debtors will consummate the Reorganization Transaction pursuant to the Prepackaged Plan. In recognition of Ayrmid's expenditure of time and resources in negotiating the Reorganization Transaction and its agreement to serve as plan sponsor and "stalking horse bidder" and, if so designated by the Debtors, as back-up bidder, the Debtors have agreed, subject to Court approval at a hearing currently scheduled for November 30, 2026 (subject to the Court's availability), to provide Ayrmid with bid protections consisting of a break-up fee equal to 3.0% of an agreed bid protection base of $311,432,711 and reimbursement of Ayrmid's reasonable and documented out-of-pocket expenses incurred in connection with negotiating and documenting the

Restructuring Support Agreement, the Prepackaged Plan, and the Reorganization Transaction, subject to a cap of 1.0% of such base (collectively, the "Bid Protections"). The Bid Protections will be earned only if a Successful Bid submitted by a party other than Ayrmid is selected, will constitute administrative expense claims once earned, with priority over other administrative expense claims (junior only to the claims under the DIP Facility and the carve-out for professional fees), and will be payable solely from the proceeds of, and within three business days after the consummation of, the resulting alternative transaction, subject to the conditions set forth in the Restructuring Support Agreement; no Bid Protections will be payable if Ayrmid's backup bid is ultimately consummated. The Debtors' entry into the Restructuring Support Agreement reflects the Debtors' determination, in the exercise of their business judgment, that the Reorganization Transaction represents the highest or otherwise best transaction currently available to the Debtors and will be beneficial to the Debtors' efforts to maximize the value of their estates.

### H. The Restructuring Support Agreement, the Restructuring Transactions, and Commencement of the Chapter 11 Cases

73. As described above, over the past year the Company and its Advisors have evaluated the strategic alternatives available to the Company and built consensus among the Ad Hoc Group, the Royalty Investors, and Ayrmid around the Restructuring Transactions. These efforts culminated in (a) commitments from the Term Loan Lenders (the "DIP Lenders") to provide the DIP Facility; (b) agreement on the terms of the Reorganization Transaction, subject to the continued Marketing and Sale Process and the Debtors' right to pursue a higher or otherwise better Sale Transaction; and (c) the support of the Consenting Stakeholders for the Restructuring Transactions, the Prepackaged Plan, and the commencement of these chapter 11

cases. That support is memorialized in the Restructuring Support Agreement, dated as of November 2, 2026, a copy of which is attached hereto as **Exhibit B**.

74. Pursuant to the Restructuring Support Agreement, the Consenting Stakeholders and Ayrmid have agreed to, among other things, as applicable:

- vote to accept the Prepackaged Plan (subject to the terms and conditions set forth therein);
- support and provide the releases set forth in the Prepackaged Plan;
- refrain from taking any action that would delay or impede consummation of the Restructuring Transactions or the Prepackaged Plan, and refrain from supporting any alternative transaction other than a Sale Transaction that satisfies the Successful Bid Mandatory Conditions; and
- support and effectuate the Restructuring Transactions, including the Debtors' entry into the DIP Facility and, in the case of Ayrmid, the merger agreement with the Debtors, in each case as contemplated by the Restructuring Support Agreement.

75. The Restructuring Support Agreement and the Prepackaged Plan contemplate consummation of the Restructuring Transactions in accordance with the following key terms.

76. *First*, the Consenting Stakeholders support the Company's entry into the $55 million new-money DIP Facility, which will fund the administration of these chapter 11 cases, the continued operation of the Company's business (including the continued supply of XPOVIO to patients and the orderly wind-down of the Company's discontinued clinical programs), and the costs of consummating the Restructuring Transactions.

77. *Second*, if the Reorganization Transaction is consummated, the Debtors' capital structure will be reorganized in accordance with the following key terms, all as set forth in greater detail in the Prepackaged Plan: (a) the Debtors' business will be combined with Ayrmid's business under a new or existing holding company ("NewCo") through a merger to be consummated substantially concurrently with the effective date of the Prepackaged Plan pursuant

to an agreement and plan of merger to be entered into with Ayrmid; (b) all claims under the First Lien Term Loan Facility, the 2028 Notes, and the 2029 Notes (collectively, the "Funded Debt Claims"), together with any Excess DIP Claims (as defined below)—approximately $285 million in the aggregate—will be exchanged for 100% of the common stock of reorganized Karyopharm, which will in turn be exchanged in the merger for 55.0% of the common stock of NewCo (subject to dilution by the contingent equity described in clause (c) and any management incentive plan), together with contingent value rights entitling the holders thereof to a percentage of future net sales of XPOVIO in the myelofibrosis indication (the "MF CVRs"); (c) Ayrmid's existing equityholders will receive the remaining 45.0% of the common stock of NewCo (subject to dilution by any management incentive plan), together with additional contingent equity tied to the future revenues of Ayrmid's Omisirge product, which, if issued, will dilute only the NewCo common stock issued to the Company's creditors; (d) the new-money claims under the DIP Facility will be repaid in cash from (i) up to $50 million of the proceeds of loans under a new senior secured term loan facility of up to $135 million to be provided to NewCo by one or more third-party lenders (the "NewCo Facility") and (ii) the Company's unrestricted cash on hand at closing in excess of the reserves provided for in the Prepackaged Plan, and the holders of any remaining new-money claims under the DIP Facility and of the loans under the First Lien Term Loan Facility rolled up into the DIP Facility (collectively, the "Excess DIP Claims") will receive common stock of reorganized Karyopharm, (e) the claims under the Royalty Agreement will be exchanged for a new, unsecured royalty agreement with NewCo entitling the Royalty Investors to a percentage of net revenues from selinexor products for a limited period following the effective date (the "New Royalty Agreement"), and the Royalty Agreement, including any change-of-control payment thereunder, will be cancelled; (f) all general unsecured claims will be

unimpaired and paid in the ordinary course of business; and (g) all existing equity interests in Karyopharm, including the Convertible Preferred Stock, the common stock, the Warrants, and all options, restricted stock units, and performance stock units, will be cancelled and will receive no distribution. In connection with the merger, the liens and obligations under Ayrmid's existing term loan facility will be equitized into Ayrmid prior to the merger or structurally subordinated in their entirety to the claims against, and the equity interests in, NewCo, in a manner acceptable to the Required Consenting Funded Debt Parties, and no proceeds of the NewCo Facility will be used to prepay that facility.

78. *Third*, if a Sale Transaction is consummated: (a) all claims under the DIP Facility, the First Lien Term Loan Facility, and the 2028 Notes will be paid in full in cash from the proceeds of the Sale Transaction at closing, and the claims under the 2029 Notes and the Royalty Agreement will receive the treatment required by the Successful Bid Mandatory Conditions (which, for the Royalty Investors, may consist of cash or other consideration acceptable to them); (b) all other allowed claims will be paid in full in cash or otherwise rendered unimpaired; (c) the successful bidder will fund a wind-down budget for the Debtors' remaining estates; (d) if the Sale Transaction is structured as an asset sale, the Debtors' remaining estates will be administered and wound down by a plan administrator in accordance with the Prepackaged Plan; and (e) all existing equity interests in Karyopharm will be cancelled and will receive no distribution.

79. If the Reorganization Transaction is consummated, all of the Company's approximately $276 million of secured funded debt and the obligations under the Royalty Agreement will be eliminated from its balance sheet, leaving NewCo with the NewCo Facility as its only funded debt (other than the contingent obligations under the MF CVRs and the New

Royalty Agreement), and the Company's commercial and development capabilities will be combined with those of Ayrmid in a single, better-capitalized enterprise with committed financing sufficient to fund its business plan. Whether through the Reorganization Transaction or a Sale Transaction, consummation of the Prepackaged Plan will eliminate the Company's prepetition secured funded debt and provide a path forward for the XPOVIO franchise—and for the patients who depend on it—that is not available to the Company on a stand-alone basis. I believe the Restructuring Transactions represent the best available path to a value-maximizing outcome for the Debtors, their estates, their creditors, and their patients.

## V. Evidentiary Summary for the First Day Pleadings

80. Contemporaneously herewith, the Debtors have filed a number of pleadings seeking emergency relief intended to stabilize the Debtors' business operations, facilitate the efficient administration of these chapter 11 cases, and execute a swift and smooth restructuring. I have reviewed each of the First Day Pleadings and believe that the factual support set forth in each of the First Day Pleadings is correct and accurate to the best of my knowledge, information, and belief. The First Day Pleadings include the following:

**Administrative and Procedural Pleadings**

- "Automatic Stay Motion": *Debtors' Emergency Motion for Entry of an Order (I) Restating and Enforcing the Worldwide Automatic Stay, Anti-Discrimination Provisions, and Ipso Facto Protections of the Bankruptcy Code; (II) Approving the Form and Manner of Notice; and (III) Granting Related Relief*

- "Claims Agent Retention Application": *Debtors' Emergency* Ex Parte *Application for Entry of an Order Authorizing the Employment and Appointment of Stretto, Inc. as Claims, Noticing, and Solicitation Agent*

- "Creditor Matrix Motion": *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) File a Consolidated Creditor Matrix, (B) File a Consolidated List of 30 Largest Unsecured Creditors, (C) Redact Certain Personally Identifiable Information; (II) Waiving the Requirement to File a List of Equity Security Holders; (III) Approving the*

*Form and Manner of Notifying Creditors of Commencement of Chapter 11 Cases and Other Information; and (IV) Granting Related Relief*

- "Joint Administration Motion": *Debtors' Emergency Motion for Entry of an Order (I) Directing Joint Administration of the Debtors' Chapter 11 Cases; and (II) Granting Related Relief*

- "Notice of Designation as Complex Case": *Notice of Designation as Complex Chapter 11 Bankruptcy Case*

- "Request for Emergency Consideration": *Debtors' Request for Emergency Consideration of Certain "First Day" Matters*

**Operational Motions**

- "All Trade Motion": *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to Pay Prepetition Trade Claims and (II) Granting Related Relief*

- "Cash Management Motion": *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System and Maintain Existing Bank Accounts and (B) Maintain Existing Business Forms and Books and Records and (II) Granting Related Relief*

- "Customer Programs Motion": *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to Maintain and Administer Their Existing Customer Programs and Honor Certain Prepetition Obligations Related Thereto; and (II) Granting Related Relief*

- "DIP Motion": *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, (C) Grant Senior Secured Liens and Provide Claims With Superpriority Administrative Expense Status, and (D) Grant Adequate Protection to the Prepetition Secured Parties; (II) Modifying the Automatic Stay; (III) Scheduling a Final Hearing; and (IV) Granting Related Relief*

- "Employee Wages Motion": *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) Pay Prepetition Wages, Salaries, and Employee Benefits and (B) Continue the Postpetition Maintenance of Employee Benefit Programs, Policies, and Procedures in the Ordinary Course; and (II) Granting Related Relief*

- "Insurance Motion": *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) Continue Their Prepetition Insurance Coverage and Satisfy Prepetition Obligations Related Thereto, (B) Renew,*

*Amend, Supplement, Extend, or Purchase Insurance Policies, (C) Continue to Pay Brokerage Fees, and (D) Maintain the Surety Bond Program; and (II) Granting Related Relief*

- "NOL Motion": *Debtors' Emergency Motion for Entry of an Order (I) Approving Notification and Hearing Procedures for Certain Transfers of, and Declarations of Worthlessness With Respect to, Restricted Interests; and (II) Granting Related Relief*

- "Taxes Motion": *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Payment of Certain Taxes and Fees; and (II) Granting Related Relief*

- "Utilities Motion": *Debtors' Emergency Motion for Entry of an Order (I) Approving Debtors' Proposed Form of Adequate Assurance of Payment to Utility Providers, (II) Establishing Procedures for Determining Adequate Assurance of Payment for Future Utility Services, (III) Prohibiting Utility Providers From Altering, Refusing, or Discontinuing Utility Service, and (IV) Granting Related Relief*

81. I have consulted with the Debtors and the Debtors' Advisors regarding the relief requested in the First Day Pleadings, and I understand each of the First Day Pleadings and the relief requested therein. To the best of my knowledge and belief, the factual statements contained in each of the First Day Pleadings are true and accurate. Where applicable, a brief summary of the facts supporting the First Day Pleadings is set forth below. To the extent any of the First Day Pleadings contain additional facts, those facts are incorporated herein by reference. Capitalized terms used but not otherwise defined in this section of this Declaration shall have the meanings ascribed to such terms in the relevant First Day Pleadings.

82. The operational motions seek authority to, among other things, honor employee-related wages and benefit obligations, ensure the continuation of the Debtors' cash management system, pay claims of trade claimants, and maintain other operations in the ordinary course of business. The operational motions request authority to pay certain prepetition claims. I understand that Federal Rule of Bankruptcy Procedure 6003 provides, in relevant part, that the Court shall not consider motions to pay prepetition claims during the first 21 days following the

filing of a chapter 11 petition, "except to the extent relief is necessary to avoid immediate and irreparable harm." Fed. R. Bankr. P. 6003. However, I believe, based on conversations with the Advisors and the Debtors, that the Debtors urgently need the relief requested in the operational motions to continue operations uninterrupted during these chapter 11 cases, and that failure to grant the relief requested in any of the First Day Pleadings may result in immediate and irreparable harm to the Debtors, their businesses, and their estates. Accordingly, I believe and am advised that emergency consideration of such motions is warranted.

83. I further believe that the relief requested in the First Day Pleadings is necessary, in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will allow the Debtors to operate with minimal disruption and maximize value preservation during the pendency of these chapter 11 cases. Additionally, I believe that: (a) the relief requested in each operational motion is critical; (b) unless the relief is granted, the Debtors risk the probability of harm, or, alternatively, loss of economic advantage to the estates which is disproportionate to the amount of the prepetition claims sought to be satisfied; and (c) there is no practical or legal alternative by which the Debtors can deal with the claimants sought to be paid other than by payment of the claims.

84. Accordingly, for the reasons set forth herein and in each respective First Day Pleading, I believe that the Court should grant the relief requested in each of the First Day Pleadings.

**A. Automatic Stay Motion**

85. Pursuant to the Automatic Stay Motion, the Debtors seek (a) to restate and enforce the worldwide automatic stay, anti-discrimination provisions, and *ipso facto* protections of the Bankruptcy Code, (b) approval of the related form and manner of notice, and (c) authority, but not direction, to translate the Automatic Stay Motion, the related order, and the notice into

other languages to better inform non-U.S. creditors, governmental units, and other interested parties of the relief requested.

86. As described further herein, the Debtors utilize both domestic and international vendors, and the Debtors rely upon those vendors in order to, among other things, maintain their ongoing clinical trials, develop new drugs, and manufacture and deliver their products to customers. In the ordinary course of business, the Debtors rely on, and incur obligations to, suppliers of goods and/or services and other creditors, a large number of which are based outside the United States. Such creditors supply critical goods and services, which are necessary to preserve the value of the Debtors' business, inuring to the benefit of the Debtors' stakeholders and their estates. These goods and services are essential to the Debtors' business operations. Without continued support from their non-U.S. suppliers and other commercial counterparties, the Debtors would face severe interruptions to their daily operations.

87. Non-U.S. creditors operating in various other jurisdictions may be unfamiliar with chapter 11 processes, the scope of a debtor-in-possession's authority to operate its business, or the importance and implications of the automatic stay. Because certain of the Debtors' business operations may implicate the law of other jurisdictions, certain of the Debtors' non-U.S. creditors could attempt to seize assets located outside of the United States or take other actions violating the automatic stay.

88. The Debtors are party to certain agreements with non-U.S. counterparties who could attempt to take action against the Debtors or their property, such as terminating those agreements upon the commencement of these chapter 11 cases pursuant to *ipso facto* provisions. Based on my discussions with the Advisors, I understand such actions would violate sections 362 and 365 of the Bankruptcy Code. Similarly, governmental units outside the United States may

deny, suspend, terminate, or otherwise place conditions upon certain licenses, permits, franchises, or other similar grants held by a chapter 11 debtor and required for the Debtors' ongoing business operations, which I understand would also violate section 525 of the Bankruptcy Code.

89. The Debtors seek the relief requested in the Automatic Stay Motion out of an abundance of caution and to assist them in most effectively informing non-U.S. creditors of the broad protections offered by the Bankruptcy Code. Based on my discussions with the Advisors, I understand that the Debtors do not seek to expand or enlarge the rights afforded to them under the Bankruptcy Code but instead to affirm those rights. I therefore believe the relief requested in the Automatic Stay Motion is necessary to protect against improper actions taken by, and provide clarity for, non-U.S. parties in interest.

**B. Claims Agent Retention Application**

90. Pursuant to the Claims Agent Retention Application, the Debtors seek to employ and appoint Stretto, Inc. ("Stretto") as the claims, noticing, and solicitation agent for the Debtors in these chapter 11 cases.

91. As more fully described in the Claims Agent Retention Application, Stretto will, among other tasks, (a) serve as the noticing agent to mail notices to creditors, equity security holders, and other parties in interest, (b) provide computerized claims, objection, solicitation, and balloting database services, and (c) provide expertise, consultation, and assistance in claim and ballot processing and other administrative services with respect to these chapter 11 cases, pursuant to the terms and conditions set forth in the Engagement Letter (as defined in the Claims Agent Retention Application).

92. I believe that Stretto's rates are competitive and reasonable. I further believe that, based on its extensive experience serving as a claims, noticing, and solicitation agent in other

complex chapter 11 bankruptcy cases, Stretto has the expertise required for these chapter 11 cases. As set forth in the Claims Agent Retention Application, Stretto represents that it has reviewed its conflicts system to determine whether it has any relationships with the Debtors' creditors and parties in interest and that, except as disclosed in the declaration filed in support of the Claims Agent Retention Application, neither Stretto, nor any of its professionals, has any materially adverse connection to the Debtors, their creditors, or other relevant parties.

93. The Debtors anticipate that there will be numerous parties to be noticed and that many of these parties will file claims. The appointment of Stretto as the claims and noticing agent will provide the most effective and efficient means of providing that notice, as well as soliciting and tabulating votes on the Prepackaged Plan, thereby relieving the Debtors of the administrative burden associated with all of these necessary tasks. In addition, by appointing Stretto as the claims and noticing agent in these chapter 11 cases, the distribution of notices will be expedited, and the Office of the Clerk of the Bankruptcy Court will be relieved of the administrative burden of noticing. Accordingly, I believe the Claims Agent Retention Application should be granted in all respects.

**C. Creditor Matrix Motion**

94. Pursuant to the Creditor Matrix Motion, the Debtors seek (a) authority to (i) file a consolidated creditor matrix and (ii) file a consolidated list of 30 largest unsecured creditors in lieu of submitting separate mailing matrices and creditor lists for each Debtor; (b) a waiver of the requirement to file a list of Karyopharm's equity security holders and authority to serve the notices required under Bankruptcy Rule 2002(d) on the registered holders of Karyopharm's equity securities and, to the extent they are known, on beneficial holders through the appropriate broker, Depository Trust Company participant, or other intermediary; (c) authority to redact certain personally identifiable information of individuals from the documents filed with the

Court in these chapter 11 cases; and (d) approval of the form and manner of notifying creditors of the commencement of these chapter 11 cases.

95. It is my understanding that section 521(a) of the Bankruptcy Code and Bankruptcy Rule 1007(a) require each debtor to file a separate mailing matrix, each containing names and addresses of all creditors, including individuals, and that Bankruptcy Rule 1007(d) requires each debtor to file a separate list of its 20 largest unsecured creditors. Because the preparation of separate lists of creditors for each Debtor would be expensive, time consuming, and administratively burdensome, the Debtors request authority to file one Consolidated Creditor Matrix for all Debtors. Further, because a significant number of creditors may be shared among the Debtors, the Debtors request authority to file the Consolidated Top 30 Creditors List for all Debtors, rather than file separate top 20 creditor lists for each Debtor. The Consolidated Top 30 Creditors List will help alleviate administrative burden, costs, and the possibility of duplicative service, as well as assist the efforts to communicate with these creditors.

96. I further understand that Bankruptcy Rule 1007(a)(3) requires a debtor to file a list of its equity security holders and that Bankruptcy Rule 2002(d) requires that equity security holders be given notice of, among other things, the commencement of the case and the confirmation hearing. Karyopharm’s common stock is publicly traded on Nasdaq, with approximately 22.7 million shares outstanding as of the Petition Date, and Karyopharm maintains a list of only its registered equity security holders; the names and addresses of beneficial holders would have to be obtained from a securities agent. Preparing and filing a list of all equity security holders, and serving notices directly on each of them, would create undue expense and administrative burden with limited corresponding benefit to the estates or parties in interest. Karyopharm filed with its petition a list of the holders of 5% or more of its outstanding

common stock, and the Debtors intend to cause the notices required under Bankruptcy Rule 2002(d) to be served on the registered holders of Karyopharm's common stock and published in full in the national edition of The New York Times and the local edition of The Boston Globe (or in any other national or local publications that the Debtors deem appropriate), and to publish notice of the commencement of these chapter 11 cases as described below. Accordingly, I believe that waiving the requirements to file a list of, and to provide notice directly to, Karyopharm's equity security holders (other than registered holders) is appropriate.

97. The Debtors request authority to redact certain Personal Identifiable Information including (a) the names, home addresses, and email addresses of individual creditors, employees, directors, officers, and individual equity holders of the Debtors and (b) the names, home addresses, and other Personal Identifiable Information of any natural person whose information has been provided to, and is being processed by, an organization with an establishment in the United Kingdom or a member state of the European Economic Area. The Debtors propose to provide an unredacted version of the Consolidated Creditor Matrix and their schedules of assets and liabilities and statements of financial affairs to the Court, the U.S. Trustee, and any statutory committee appointed in these chapter 11 cases. Such redaction is necessary because, respectively, (i) disclosure of home address information can be used to perpetrate identity theft and phishing scams or to locate survivors of domestic violence, harassment, or stalking under 11 U.S.C. § 107(c)(1), and (ii) disclosure of names, addresses, and other Personal Identifiable Information risks violating the UK GDPR and EU GDPR, exposing the Debtors to potential civil liability and significant financial penalties. Without such relief, the Debtors (a) may be in violation of applicable data privacy law, thereby exposing them to severe monetary penalties that could threaten the Debtors' operations during this sensitive stage of their restructuring, (b) would

unnecessarily render individuals more susceptible to identity theft, and (c) could jeopardize the safety of individual creditors, employees, directors, officers, or individual equity holders of the Debtors, who, unbeknownst to the Debtors, are survivors of domestic violence, harassment, or stalking by publishing their home addresses without any advance notice or opportunity to opt out or take protective measures.

98. The Debtors propose to serve, through Stretto, a singular notice of commencement to all parties entitled to notice of commencement of these chapter 11 cases, to advise them of commencement of these chapter 11 cases and the section 341 meeting of creditors, and to publish the notice of commencement, within five (5) business days after entry of the requested order or as soon as reasonably practicable thereafter, once in the national edition of The New York Times and the local edition of The Boston Globe (or in any other national or local publications that the Debtors deem appropriate). Service of the Notice of Commencement on the Consolidated Creditor Matrix will not only prevent the Debtors' estates from incurring unnecessary costs associated with serving multiple notices to the parties listed on the Debtors' voluminous Consolidated Creditor Matrix, but also preserve judicial resources and prevent creditor confusion through the efficient service of critical information.

99. Based on the foregoing, I believe that the relief requested in the Creditor Matrix Motion is in the best interests of the Debtors, their estates, and all other parties in interest and should be granted in all respects.

**D. Joint Administration Motion**

100. Pursuant to the Joint Administration Motion, the Debtors seek joint administration of the Debtors' chapter 11 cases for procedural purposes only.

101. Given the Debtors' affiliation with one another, joint administration of these chapter 11 cases would provide significant administrative convenience. Based on my

discussions with the Advisors, I do not believe that joint administration would harm the substantive rights of any party in interest. Joint administration would avoid the preparation, replication, service, and filing, as applicable, of duplicative notices, applications, and orders, thereby saving the Debtors considerable expense and resources. The Debtors' financial affairs and business operations are closely related. Many of the motions, hearings, and orders in these chapter 11 cases will affect each Debtor and its respective estate. The Joint Administration Motion requests only administrative, and not substantive, consolidation of the estates. Each creditor shall still file its claim against a particular estate. In fact, all creditors would benefit by the reduced costs that would result from the joint administration of the chapter 11 cases. The Court also would be relieved of the burden of entering duplicative orders and maintaining duplicative files. Finally, supervision of the administrative aspects of the chapter 11 cases by the U.S. Trustee would be simplified.

102. I therefore believe that joint administration is warranted and that consolidating these chapter 11 cases will assist the Debtors in preserving the value of the estate by avoiding duplicative expenses.

**E. Notice of Designation as Complex Case**

103. Pursuant to the Notice of Designation as Complex Case, the Debtors seek to have these chapter 11 cases designated as complex chapter 11 cases.

104. The proposed counsel for the Debtors believes that these chapter 11 cases qualify as complex chapter 11 cases because (a) the Debtors have total debt of more than $10 million, and (b) there are more than 50 parties in interest in this case. For these reasons, based on my discussions with proposed counsel to the Debtors, I believe that designation of these chapter 11 cases as complex chapter 11 cases is appropriate and will contribute to the efficient administration of these cases.

**F. Request for Emergency Consideration**

105. Pursuant to the Request for Emergency Consideration, the Debtors request emergency consideration of the following First Day Pleadings: (a) Automatic Stay Motion, (b) Claims Agent Retention Application, (c) Creditor Matrix Motion, (d) Joint Administration Motion, (e) Notice of Designation as Complex Case, (f) Cash Management Motion, (g) All Trade Motion, (h) Customer Programs Motion, (i) DIP Motion, (j) Employee Wages Motion, (k) Insurance Motion, (l) NOL Motion, (m) Taxes Motion, and (n) Utilities Motion.

106. I believe that failure to approve the relief requested in these respective motions would cause immediate and irreparable harm to the Debtors and their ongoing operations. Further, I believe that based on the complexity of these chapter 11 cases and the Debtors' urgent need to continue operations during these cases, emergency consideration of such motions is warranted.

**G. All Trade Motion**

107. Pursuant to the All Trade Motion, the Debtors seek authorization to pay all Trade Claims (including the Accrued Site Payments, as defined below) owed to the Trade Claimants in the ordinary course of business and consistent with customary past practice.

108. The Debtors' ability to continue commercializing their marketed product and advancing their clinical programs,—and thus the success of these chapter 11 cases—depends on the uninterrupted supply of goods and services from numerous third-party vendors and service providers (collectively, the "Trade Claimants," and whose claims are the "Trade Claims"). The Trade Claimants include, among others: (a) contract research organizations ("CROs"), central and specialty laboratories and biorepositories, and providers of pharmacovigilance, regulatory writing, clinical-data review and analysis, regulatory compliance, and related clinical trial support and administration services that support the Debtors' clinical trials; (b) hospitals,

academic institutions, cooperative groups, and community oncology networks, in the United States and abroad, that serve as clinical trial sites; (c) suppliers of comparator and supportive care drugs, active ingredient and pharmaceutical materials, and providers of packaging, labeling, storage, and distribution of commercial, investigational, and expanded-access drug supply; (d) marketing, market-access, patient-support, commercial data and analytics, rebate-processing, and medical-education vendors that support XPOVIO; (e) providers of software, cloud hosting, systems, and telecommunications; and (f) providers of general corporate, administrative, and professional support services.

109. For the twelve-month period ending October 30, 2026, the Debtors remitted approximately $107,000,000 to Trade Claimants, comprised of approximately $38,000,000 remitted to CROs and vendors supporting clinical trials, approximately $13,000,000 remitted to clinical trial site vendors, approximately $17,000,000 remitted to suppliers of comparator and supportive care drugs, and approximately $39,000,000 remitted to commercial, information technology, facilities, and other general business vendors. As of the Petition Date, the Debtors estimate that approximately $25,000,000 is owed on account of invoiced Trade Claims. In addition, clinical trial sites frequently invoice the Debtors well after the underlying costs are incurred, and the Debtors have accordingly accrued obligations to clinical trial sites for costs incurred but not yet invoiced (the "Accrued Site Payments"), which accumulate on a rolling basis. Given the significant lag in site invoicing, the amount of the Accrued Site Payments, including the portion that will come due during these chapter 11 cases, cannot be determined with certainty at this time, and the Debtors therefore seek authority to pay all Trade Claims, including the Accrued Site Payments, in the ordinary course as they come due.

110. The Prepackaged Plan provides for the payment in full of the Trade Claims, and the Debtors' proposed budget in connection with the DIP Facility contains sufficient funding for the payment in full of the estimated $25,000,000 of Trade Claims in the ordinary course during the pendency of these chapter 11 cases. Because the Prepackaged Plan contemplates payment in full of all Trade Claims, I understand that the relief requested in the All Trade Motion affects only the timing—not the amount or priority—of such payments. Many of the Trade Claimants are the sole or limited source of highly specialized, regulated goods and services that cannot be replaced without significant delay, expense, and regulatory risk, and the Debtors' failure to timely pay Trade Claims could result in Trade Claimants stopping work for, or deliveries to, the Debtors before the Debtors could bring an action to compel performance or otherwise enforce the automatic stay. I therefore believe that the relief requested in the All Trade Motion is necessary to avoid immediate and irreparable harm and is in the best interests of the Debtors, their estates, and all parties in interest.

**H. Cash Management Motion**

111. Pursuant to the Cash Management Motion, the Debtors request entry of interim and final orders authorizing, but not directing, the Debtors to (a) continue to operate their Cash Management System, (b) honor certain prepetition or postpetition obligations related thereto, and (c) maintain existing Business Forms in the ordinary course of business, and granting related relief.

112. In the ordinary course of business, the Debtors operate a cash management system (the "Cash Management System"), a schematic of which is attached to the Cash Management Motion. The Cash Management System is a centralized system in which customer receipts for product sales and licensing partner royalties and milestones are deposited into a zero-balance account and swept nightly into the main operating account, and all other receipts are deposited

directly into the main operating account, from which the Debtors fund disbursements, including payroll, vendor payments, and other operating expenses. The Debtors' accounting department maintains daily oversight of the Cash Management System and reconciles the Debtors' books and records monthly.

113. The Cash Management System is similar to those commonly employed by businesses comparable in size and scale to the Debtors to collect and disburse cash generated by their businesses, pay their financial obligations, centrally control and monitor corporate funds and available cash, comply with the requirements of their financing agreements, obtain accurate account balances and other financial data, forecast financial performance, and ensure cash availability and liquidity. The Cash Management System is narrowly tailored to meet the Debtors' operating needs while reducing administrative expenses. The Debtors estimate that the cash receipts flowing through the Cash Management System in the twelve months prior to the Petition Date averaged approximately $13,300,000 per month. Given the economic and operational scale and complexity of the Debtors' enterprise, I understand that any disruption to the Cash Management System would have an immediate adverse effect on the Debtors' operations to the detriment of their estates and stakeholders.

114. As of the Petition Date, the Debtors maintain ten (10) bank accounts (the "Debtor Bank Accounts") at five (5) financial institutions (the "Cash Management Banks"): Wells Fargo Bank, N.A.; JPMorgan Chase Bank, N.A.; Treasury Partners; UBS Group AG; and Lloyds Banking Group plc. The Debtor Bank Accounts consist of: one (1) collection account into which customers deposit payments; two (2) operating accounts, of which the Wells Fargo account ending in x3664 is the main operating account and the Lloyds account ending in x8577 is used to fund payroll for an employee in Germany; four (4) investment accounts, one of which is a

restricted money market account at JPMorgan Chase that serves as collateral for the security deposit under the Debtors' Newton, Massachusetts headquarters lease; two (2) accounts in the name of KPT Texas LLC to hold the proposed adequate assurance deposits for utility providers and the Carve Out for Allowed Professional Fees during these chapter 11 cases; and the JPMorgan Chase account ending in x8903, which, as described below, holds only funds segregated to pay the remaining tax obligations of Karyopharm Europe GmbH (the "Segregated Tax Account"). As of the Petition Date, the Debtors have approximately $7,780,000 in unrestricted cash in the Debtor Bank Accounts and approximately $315,000 in restricted cash that serves as a security deposit in the form of a cash collateralized letter of credit for the Debtors' Newton, Massachusetts lease. Six (6) of the Debtor Bank Accounts (the four (4) Wells Fargo accounts and the two (2) JPMorgan Chase accounts) are held at institutions designated as authorized depositories by the U.S. Trustee, and the Debtors have requested a 45-day period to come into compliance with section 345(b) of the Bankruptcy Code with respect to the remaining four (4) Debtor Bank Accounts (the two (2) Treasury Partners accounts, the UBS account, and the Lloyds account), subject to the Debtors' right to seek further extensions.

115. The Debtors incur periodic service charges and other fees in connection with maintaining the Debtor Bank Accounts (the "Bank Fees"). The Bank Fees primarily consist of service charges from the Cash Management Banks. The Debtors incur approximately $3,000 per month, in the aggregate, in Bank Fees. As of the Petition Date, the Debtors do not believe that they owe the Cash Management Banks any amounts on account of unpaid Bank Fees.

116. As part of the Cash Management System, the Company uses preprinted business forms, including checks, in the ordinary course of business (collectively, the "Business Forms"). The Company also maintains books and records to document its financial results and a wide

array of operating information (collectively, the "Books and Records"). The Debtors request authorization to continue using all of the Business Forms and Books and Records in the ordinary course of business and consistent with prepetition practice, without reference to the Debtors' status as chapter 11 debtors in possession.

117. As part of the Cash Management System, the Debtors maintain one (1) credit card program administered by American Express Company to fund payments for accounts payable across the enterprise, paying certain vendors and other pre-approved expenses (collectively, the "Credit Card Program"). The Debtors' combined monthly average spend under the Credit Card Program is approximately $300,000. As of the Petition Date, the Debtors estimate that they owe approximately $425,000 in prepetition amounts on account of the Credit Card Program. However, in some circumstances the Debtors may still owe additional prepetition amounts under the Credit Card Program where, for example, charges by employees in various locations have not been offset against the balance due to processing delays by merchants, among other factors.

118. I understand that the Debtors' inability to maintain the Credit Card Program would impose a substantial hardship on the continued operation of the Debtors' businesses. It is my understanding that the Debtors rely on the Credit Card Program to pay certain of their vendors that provide services critical to the Company, and as such the use of the Credit Card Program is an integral part of the Cash Management System and is essential to the uninterrupted operation of the Debtors' business.

119. The Debtors' non-Debtor affiliate Karyopharm Europe GmbH previously maintained an operating account, which was used to pay Karyopharm Europe GmbH's quarterly trade tax prepayment and corporate income tax obligations by direct debit. The Debtors are in the process of dissolving Karyopharm Europe GmbH and no longer engage in intercompany

transactions with it, and that account has been closed. Karyopharm Europe GmbH nevertheless remains obligated to make certain tax payments in fiscal year 2026, and any late payment would result in penalties and could expose Karyopharm Europe GmbH's management, who are also members of Karyopharm's management, to potential personal liability under German law. Accordingly, prior to closing the account, the Debtors transferred the remaining funds in that account, approximately $40,000, to the Segregated Tax Account, which previously held a zero balance and in which such funds are held fully segregated from the Debtors' other cash and used solely to satisfy Karyopharm Europe GmbH's remaining tax obligations. The Debtors do not anticipate transferring any additional funds into the Segregated Tax Account and, as described below, seek authority in the Taxes Motion to pay Karyopharm Europe GmbH's remaining tax obligations from the Segregated Tax Account. Other than as described herein, the Debtors do not seek authority in the Cash Management Motion to engage in intercompany transactions between Debtors and non-Debtors.

120. Based on the foregoing, and given the economic and operational scale and complexity of the Debtors' enterprise, I believe that any disruption to the Cash Management System would be incredibly disruptive to the Debtors' daily business operations and have an immediate adverse effect on the Debtors' operations to the detriment of their estates and stakeholders. To minimize the disruption caused by these chapter 11 cases and to maximize the value of the Debtors' estates, I believe the Debtors should be authorized to continue their existing Cash Management System during the course of these chapter 11 cases.

**I. Customer Programs Motion**

121. Pursuant to the Customer Programs Motion, the Debtors seek authorization to (a) maintain and administer their existing Customer Programs and (b) honor certain related prepetition obligations on a postpetition basis in the ordinary course.

122. In the ordinary course of business, the Debtors provide their Customers with various programs that are vital to the Debtors' ability to increase sales opportunities, drive revenue generation, and position the Debtors to compete within their markets. The Debtors' business depends upon the support of their Customers, as well as their ability to attract new Customers. To maximize value to Customers, the Debtors have maintained and followed, in the ordinary course of business, certain practices and programs for the benefit of their Customers, including the Prompt Pay Discount Programs, the Specialty Distributor Fees and Specialty Pharmacy Fees, the GPO Chargebacks Program and GPO Administration Fees and Rebates, the Medicare Part D Rebates, the MDP, and the Medicare Drug Inflation Rebate Program, the Medicaid Rebates, the 340B Program, the Veteran Affairs and Military Beneficiary Programs, the Product Return Program, and the Copay Assistance Program (each as described below). In the aggregate, the Debtors estimate that approximately $15,550,000 in prepetition obligations under the Customer Programs had accrued and remained unpaid as of the Petition Date.

123. Consistent with industry practice, the Debtors provide customary discounts on XPOVIO® (selinexor) ("XPOVIO") sales to customers (together with the Debtors' other direct and indirect purchasers of their products, collectively, the "Customers") for prompt payment (such discounts, the "Prompt Pay Discounts," and the programs through which such discounts are offered, the "Prompt Pay Discount Programs"). Specifically, the Debtors offer a 1-2% prompt pay discount to specialty distributors (the "Specialty Distributors") and specialty pharmacies (the "Specialty Pharmacies"). The Specialty Distributors and Specialty Pharmacies rely on the Prompt Pay Discount Programs in their purchasing and payment practices, and discontinuing or disrupting the Prompt Pay Discount Programs could jeopardize the Debtors'

relationships with their primary distribution channels for XPOVIO. The Debtors estimate that the aggregate amount of Prompt Pay Discounts accrued as of the Petition Date is $465,000.

124. The Debtors ship XPOVIO in the U.S. to Specialty Pharmacies and Specialty Distributors. The Specialty Pharmacies resell XPOVIO directly to patients and the Specialty Distributors resell XPOVIO to healthcare entities, who then resell XPOVIO to patients. The Debtors pay fees to the Specialty Distributors (the "Specialty Distributor Fees") and the Specialty Pharmacies (the "Specialty Pharmacy Fees") for sales order management, data, and distribution services. The Specialty Distributors and Specialty Pharmacies perform services that are essential to getting XPOVIO to patients, and the Specialty Distributor Fees and Specialty Pharmacy Fees compensate them for those services. The Specialty Distributor Fees are invoiced monthly and due thirty (30) days after month end, and the Specialty Pharmacy Fees consist of a monthly fee of $6,000. As of the Petition Date, the Debtors estimate that approximately $285,000 in Specialty Distributor Fees and approximately $6,000 in Specialty Pharmacy Fees had accrued and remained unpaid.

125. Consistent with industry practice, the Debtors enter into certain arrangements with group purchasing organizations ("GPOs") for rebates, discounts, and administrative fees with respect to the purchase of the Debtors' products. Specifically, the Debtors offer chargebacks for fees and discounts (the "GPO Chargebacks Program") to provide products to qualified healthcare entities at prices lower than the list prices charged to the Debtors' Customers who purchase XPOVIO directly from the Debtors. The Debtors offer rebates to the GPOs related to the achievement of certain purchasing tiers and are also subject to an administrative fee (such rebates and fees, collectively, the "GPO Administration Fees and Rebates"). The administrative fees are 2% of gross sales of GPO purchases, and the rebates are a maximum of 6% if the

customer achieves its purchasing goals; both are invoiced quarterly and paid thirty (30) days after quarter end. As of the Petition Date, the Debtors estimate that approximately $530,000 in chargebacks under the GPO Chargebacks Program and approximately $310,000 in GPO Administration Fees and Rebates had accrued and remained unpaid.

126. Medicare is a federally administered national insurance program that primarily serves Americans over the age of 65. Medicare Part D provides prescription drug benefits to eligible patients. The Debtors are party to contracts with private insurance companies, managed care organizations, and pharmacy benefit managers with Medicare Part D business lines, under which the Debtors pay certain rebates, and, in certain cases, pay administrative or other fees related to Medicare Part D (the "Medicare Part D Rebates").

127. The Debtors are also subscribed to Medicare's Manufacturer Discount Program whereby discounts are available to eligible beneficiaries for applicable drug costs (the "MDP"). The Debtors receive Medicare Part D Rebate and MDP invoices quarterly, which are due eight (8) to ten (10) weeks thereafter, and estimate that approximately $850,000 had accrued but not been paid under the Medicare Part D Rebates and the MDP as of the Petition Date. The Debtors are also subject to Medicare's drug inflation rebate program whereby manufacturers are required to pay rebates for certain drugs and biological products with prices that increase faster than the rate of inflation, for each 12-month applicable period (the "Medicare Drug Inflation Rebate Program"). Invoices under the Medicare Drug Inflation Rebate Program are issued annually and are due sixty (60) days thereafter, and the Debtors estimate that approximately $7,420,000 had accrued but not been paid under the Medicare Drug Inflation Rebate Program as of the Petition Date. Honoring these obligations is necessary for the Debtors to maintain their participation in,

and compliance with, the Medicare programs, and failure to do so could subject the Debtors to penalties and jeopardize their participation in Medicare and other federal healthcare programs.

128. Medicaid is a health program jointly funded by state and federal governments and managed by the states that assists low-income individuals and families in obtaining healthcare. The Medicaid Drug Rebate Program requires the Debtors to enter into a national rebate agreement with the Secretary of the Department of Health and Human Services, in return for which Medicaid covers the cost of the Debtors' products for eligible individuals, and the states invoice the Debtors for rebates calculated based on a statutory formula or, for supplemental rebates, the applicable contractual formula (the "Medicaid Rebates"). The Debtors pay the Medicaid Rebates through a prefunded account maintained with Woven, which the Debtors prepay in an estimated amount approximately seventy-five (75) days after quarter end and from which Woven pays the applicable states throughout the quarter. As of the Petition Date, the Debtors estimate that approximately $965,000 in Medicaid Rebates remains unpaid. If the Debtors fail to pay the Medicaid Rebates as they become due, they risk exclusion from all federal programs, as well as penalties and fines.

129. Consistent with industry practice the Debtors also accumulate rebates and chargebacks with the Centers for Medicare and Medicaid Services ("CMS"). Specifically, the Debtors must comply with the United States Department of Health and Human Services' 340B Drug Pricing Program (the "340B Program"), established under Section 340B of the Public Health Service Act. Under the 340B Program, the Debtors must sell the Debtors' products at specified prices that reflect a substantial discount to wholesale acquisition cost ("WAC"). Failure to comply with the 340B Program may result in fines and penalties, and exclusion from other federal programs. Certain entities, as set forth in relevant statutes, provide a minimum share of

their services, set by the 340B Program regulations, to low-income patients and receive federal funds from CMS to help cover the costs of providing care to uninsured patients (such hospitals, clinics and other entities, the "340B Entities"). Pursuant to the 340B Program, the 340B Entities are entitled to receive the products at a discounted price set by statute, which is calculated on a quarterly basis. The 340B Entities purchase the products from one of the Debtors' Customers at the discounted price, and the Customer then submits a chargeback to the Debtors for the difference between the WAC that the Customer paid to the Debtors and the discounted price paid by the 340B Entity to the Customer. Continued compliance with the 340B Program is therefore essential to preserving the Debtors' access to federal healthcare programs and the revenue they generate. As of the Petition Date, the Debtors estimate that approximately $1,135,000 in chargebacks under the 340B Program had accrued and remained unpaid.

130. Consistent with industry practice, the Debtors provide veterans and military beneficiaries with prescription drug benefits (the "Veteran Affairs and Military Beneficiary Programs"). Specifically, the Debtors are enrolled in the Federal Supply Schedule Program (the "FSS") which provides pre-negotiated pricing for the Department of Veterans Affairs, Department of Defense, Public Health Service, and Coast Guard (the "Big Four") and TRICARE Retail Pharmacy Program ("TRICARE") which is a health insurance program administered by the Department of Defense for active-duty military personnel, retirees and their families. As of the Petition Date, the Debtors estimate that approximately $160,000 had accrued and remained unpaid under the FSS for the Big Four. The Debtors are also subject to an administrative Industrial Funding Fee on sales made through the FSS, which is invoiced quarterly and paid thirty (30) days after quarter end, and pay rebates under TRICARE, which are invoiced quarterly and paid seventy-five (75) days after quarter end (collectively, the "VA Fees"), which the

Debtors also pay through the prefunded Woven account. As of the Petition Date, the Debtors estimate that approximately $520,000 in VA Fees had accrued and remained unpaid.

131. Consistent with industry practice, the Debtors maintain a return policy that allows Customers and other indirect purchasers a limited right to return products for damage, defect, recall, and/or product expiry within a specified period prior and subsequent to the product expiration date (the "Product Return Program" and such returns, the "Product Returns"). Though there are variations for certain Customers, generally, Customers must return products between three (3) months prior to the product's expiration date and ending six to twelve (6 to 12) months after the product's expiration date. Certain exclusions apply, including, fees for processing third party returns, destruction charges, shipping costs that are non-reimbursable, and all Product Returns are subject to review and approval by the Debtors. When a Customer processes the Product Return on behalf of the Debtors, that Customer has the ability to deduct the Product Return value directly from the Debtors' account. The Debtors review and honor such deductions by way of setoffs through the issuance of credits against then-outstanding accounts receivable. Honoring Product Returns does not require any cash outlay by the Debtors. The Debtors estimate that the aggregate amount of Product Returns accrued and owing as of the Petition Date is approximately $2,815,000.

132. The Debtors provide a copay assistance program to provide financial assistance to eligible patients with commercial insurance (the "Copay Assistance Program"). The Debtors receive invoices under the Copay Assistance Program twice a month, and payment is due thirty (30) days thereafter. As of the Petition Date, the Debtors estimate that approximately $89,000 is payable under the Copay Assistance Program. Failure to honor the Copay Assistance Program would likely cause patients and prescribers to turn to alternatives to the Debtors' products.

133. Accordingly, the Debtors seek authority to continue the Customer Programs in the ordinary course of business and to perform and honor their prepetition obligations thereunder. I believe that continuing the Customer Programs and honoring the obligations thereunder is necessary for the Debtors to reassure their customers of the ongoing viability of the Debtors, preserve goodwill, and maintain critical business relationships. I therefore believe that continuing the Customer Programs in the ordinary course of the Debtors' business and performing and honoring prepetition obligations arising under such Customer Programs is in the best interests of the Debtors, their estates, and their creditors.

**J. DIP Motion**

134. As discussed above, for over a year, the Company has been in extensive discussions with the Ad Hoc Group and the Royalty Investors to explore strategic alternatives to address the Debtors' balance sheet. To offer the Company breathing room and additional liquidity runway to effectuate a comprehensive restructuring, the Prepetition Secured Parties agreed to enter into the Forbearance Agreements with the Company, and the Company's capital providers supported the Fall 2025 Transactions and the 2026 liquidity transactions described above. Pursuant to the DIP term sheet attached to the Restructuring Support Agreement, the DIP Lenders have committed to provide $55 million of new-money debtor-in-possession financing in the form of a senior secured superpriority term loan facility, together with a roll-up of a portion of the loans under the First Lien Term Loan Facility. Participation in the DIP Facility was offered ratably, on the same terms, to all lenders under the First Lien Term Loan Facility. As described above, under the Prepackaged Plan, in a Reorganization Transaction the new-money claims under the DIP Facility will be repaid in cash from up to $50 million of the proceeds of the NewCo Facility and the Company's excess unrestricted cash at closing, with any Excess DIP Claims receiving common stock of reorganized Karyopharm as described above, and in a Sale

Transaction all claims under the DIP Facility will be repaid in full in cash from the proceeds of the Sale Transaction.

135. In the weeks leading up to the Petition Date, FTI evaluated the Debtors' forecasted cash flow and liquidity needs in a chapter 11 scenario to determine the amount of DIP financing required to operate the Debtors' businesses and pay administrative costs during these chapter 11 cases. Moreover, FTI has evaluated the quantum of DIP financing required to consummate the transactions contemplated by the Restructuring Support Agreement and the Prepackaged Plan agreed to by the Debtors, the Consenting Stakeholders, and Ayrmid, including the Reorganization Transaction. Based on this analysis, the Debtors and their advisors determined that approximately $55 million of new money financing and access to cash collateral would be required to finance their operations and maintain positive liquidity during these chapter 11 cases through January 31, 2027.

136. Based on my review of the Debtors' books and records, the Debtors are entering chapter 11 with approximately $8.1 million of cash on hand, and available liquidity will be exhausted shortly after the Petition Date absent additional financing. As set forth in the Approved Budget, the Debtors expect that they will need at least $25 million during the interim period prior to final DIP approval, and approximately $30 million through January 31, 2027. The proposed draw structure and the interim commitment amount are necessary and appropriately tailored to the Debtors' funding needs.

137. The Debtors will require immediate access to DIP financing and the authority to use cash collateral throughout the chapter 11 process to ensure they have additional liquidity to operate their businesses, maintain business relationships with their customers, vendors, and suppliers, meet their employee payroll, pay the costs of administering the chapter 11 cases, and

satisfy other working capital and operational needs of the Debtors. The Debtors' Initial DIP Budget is attached to the Interim DIP Order as Exhibit 2. The Initial Approved Budget reflects the Debtors' need for DIP financing to fund these chapter 11 cases. Based on the assumptions used to develop the Initial Approved Budget, the DIP financing will allow the Company to maintain a positive cash balance during the period reflected in the Initial Approved Budget and, in the Debtors' business judgment, will be sufficient to fund the Debtors' operations, expenses, and administrative needs through January 31, 2027. I do not believe it would be prudent, or even possible, to administer the Debtors' chapter 11 estates on a "collateral-only" basis. Without access to the DIP Facility, the Debtors would have limited cash on hand and would be unable to generate sufficient cash flow from operations to cover their working capital needs and the projected administrative costs of these chapter 11 cases.

138. Without approval of the DIP Facility on an interim basis and access to the $25 million upon entry of the Interim DIP Order, I believe the Debtors will suffer immediate and irreparable harm, as they will be unable to continue operating their business while pursuing confirmation of the Prepackaged Plan and, instead, will likely exhaust their remaining liquidity. Delay in approving the DIP Facility will only serve to deplete the Debtors' assets to the detriment of all stakeholders.

139. I believe the proposed DIP Facility is necessary and essential to fund these chapter 11 cases and provides significant benefit to—and is fair and equitable to—the Debtors, their estates, and the Debtors' stakeholders. Entry into the DIP Facility will provide the Debtors with additional liquidity to operate their business during these chapter 11 cases, providing certainty regarding the restructuring process and instilling confidence in the Debtors' vendors,

customer base, employees, and counterparties that the Debtors will be able to continue operating in the ordinary course after the Petition Date.

140. Based on the foregoing, it is my belief that the proposed DIP Facility and use of Cash Collateral is necessary to address the Debtors' immediate liquidity needs, and that the terms and conditions of the DIP Facility are reasonable and appropriate under the circumstances. Accordingly, I believe that the proposed DIP Facility should be approved on the terms and conditions described in the DIP Documents and the Interim DIP Order, and entry into the DIP Facility reflects a sound exercise of the Debtors' business judgment.

**K. Employee Wages Motion**

141. Pursuant to the Employee Wages Motion, the Debtors seek authority to (a) pay prepetition wages, salaries, employee benefits, other compensation, and reimbursable expenses and (b) continue the postpetition maintenance of any employee benefit programs, policies, and procedures in the ordinary course of business. In the aggregate, the Debtors estimate that approximately $5,169,400 of Prepetition Employee Obligations (as defined below) had accrued and remained unpaid as of the Petition Date.

142. The Debtors' employees are key to their business—the continued service and morale of the Debtors' employees are essential to maintaining uninterrupted operations and maximizing the value of the Debtors' estates for the benefit of all stakeholders. Further, the Debtors' employees are highly trained and uniquely well-versed in the industry in which the Debtors operate. The Debtors' operations are complex and could not be continued without their employees.

143. The Debtors seek to eliminate any personal hardship to their workforce resulting from these chapter 11 cases and to minimize the disruption to the Debtors' operations. As of the Petition Date, certain of the Debtors' prepetition obligations to their workforce and other related

third-party service providers (all such wages, benefits, and other obligations described herein, collectively, the "Prepetition Employee Obligations") remain unpaid because among other things, the amounts related to the prepetition services, while accrued in whole or in part, had not yet become due and payable by the Debtors, and amounts deducted or withheld from Employees' paychecks were not then due to be paid to the intended third-party recipient or bank account, including payments on behalf of the Employees in respect of the Employee Benefit Programs or amounts due to third parties in connection therewith, and income, garnishment, state disability, unemployment, and other taxes for remittance to the appropriate federal, state, or local taxing authorities.

144. The Debtors' Employees and Independent Contractors rely on the compensation and benefits they receive through the programs described in the Employee Wages Motion to pay their daily living expenses and support their families. Granting the relief requested will enable the Debtors to maintain morale, enhance the Debtors' ability to retain and attract their valuable workforce, and otherwise eliminate any personal hardship, including to employees, as a result of these chapter 11 cases which, in turn, will maximize value for the benefit of all stakeholders.

145. The Debtors seek authority to pay, remit, and/or honor the accrued and unpaid Prepetition Employee Obligations set forth below:

| Relief Sought | Amount |
|---|---|
| **Prepetition Employee Obligations** | |
| Independent Contractors | $911,000 |
| Commission Program | $240,000 |
| Incentive Compensation Programs | |
| Short Term Incentive Plan | $2,600,000 |
| 2026 Retention Programs | $431,000 |
| Business and Out of Pocket Expenses | $425,000 |
| Director Compensation | $44,100 |

| Relief Sought | Amount |
|---|---|
| Severance Program | $117,700 |
| **Employee Benefit Programs** | |
| 401(k) Plan | $67,000 |
| Non-FTO Policy Paid Time Off | $312,000 |
| Ancillary Benefit Programs | $21,600 |
| **Total** | $5,169,400 |

146. As of the Petition Date, the Debtors employ and retain approximately 192 employees (the "Employees"). All full-time Employees are salaried Employees. Two Employees are currently on leave of absence, and none of the Employees are represented by a union or covered by a collective bargaining agreement. Throughout the pendency of these chapter 11 cases, the Employees will continue to provide critical functions to the Debtors including, but not limited to, conducting and supporting clinical development, regulatory, quality, and pharmacovigilance activities; commercializing and supporting the Debtors' marketed cancer-fighting products; managing their manufacturing, supply chain, and distribution relationships; and maintaining finance, legal, and regulatory compliance functions. The Employees are also critical to the ongoing Marketing and Sale Process and the administration of these chapter 11 cases.

147. The Debtors supplement their workforce with various contractors and consultants (collectively, the "Independent Contractors"). The Independent Contractors provide services including, but not limited to, medical information, clinical project management, medical monitoring, and scientific support within the Debtors' global medical scientific affairs, global medical research, clinical development, and biology and translational medicine functions, as well as regulatory, commercial, information technology, and finance support and project-based work on an as-needed basis. The Debtors utilize approximately thirty-four (34) Independent

Contractors at any given time, of whom approximately twenty-two (22) are engaged through Beacon Hill Staffing Group, LLC, which acts as the Debtors' managed service provider under a Managed Service Provider Agreement dated as of December 29, 2021, as amended, and places Independent Contractors directly and through other staffing suppliers (the "Professional Staffing Services Provider"), and approximately twelve (12) are engaged directly pursuant to agreements between the Debtors and the individual contractors. The Independent Contractors are not paid through the Debtors' payroll system; the Debtors are billed weekly by the Professional Staffing Services Provider, whose invoices are payable thirty (30) days from receipt, and directly engaged Independent Contractors generally submit invoices monthly, in each case paid through the Debtors' ordinary course accounts payable process.

148. In the ordinary course of business, the Debtors pay their Employees according to semi-monthly payment cycles. Employees are paid on a current basis. On average, the Debtors' aggregate gross payroll for their Employees is approximately $2.1 million per pay period. Payroll is submitted to the Payroll Processor (as defined below) approximately three (3) business days before each pay date, the related funds are debited from the Debtors' operating account at Wells Fargo Bank, N.A. one to two days before the pay date, and all Employees are paid by direct deposit. As of the Petition Date, the Debtors do not believe any amounts remain due and owing to Employees in accrued and unpaid wages and salary for prepetition services rendered through the Petition Date (the "Unpaid Compensation"). To the extent that any member of the workforce—including, for the avoidance of doubt, the Independent Contractors—is owed amounts on account of compensation and benefits in excess of the $17,150 priority limit on account of prepetition wages, salaries, or commissions under section 507(a)(4) of the Bankruptcy

Code (the "Priority Limit"), the Debtors seek authority to pay such amounts in the ordinary course of business pursuant to section 363(b)(1) of the Bankruptcy Code.

149. In connection with the wages and salaries paid to Employees, the Debtors are required by federal, state, and local law to withhold certain amounts for federal, state, and local income taxes, garnishments, and withholdings in connection with various employee benefits and other employee programs (collectively, the "Withholding Taxes and Obligations") and to remit the withheld amounts to the appropriate taxing and other governmental authorities. On average, the Withholding Taxes and Obligations total approximately $1.0 million per month in federal withholdings, $200,000 per month in state and local withholdings, and $400,000 per month in Employee 401(k) Plan deferrals. As of the Petition Date, the Debtors do not believe any amounts remain due and owing on account of the Withholding Taxes and Obligations.

150. In addition to the Withholding Taxes and Obligations, the Debtors are required by federal, state, and local law to pay employer-side payroll taxes, including the employer's share of Social Security and Medicare taxes, federal and state unemployment taxes, and other similar employment-related taxes (collectively, the "Employer Payroll Taxes"), which average approximately $130,000 per month. As of the Petition Date, the Debtors do not believe any amounts remain due and owing on account of Employer Payroll Taxes.

151. The Debtors utilize ADP, Inc. (the "Payroll Processor") as their third-party payroll processor for Employees, and the Debtors fund payroll, and certain other Prepetition Employee Obligations, by direct deposit through an electronic transfer of funds to the Employees' bank accounts. The Debtors pay approximately $5,000 every month to the Payroll Processor on account of payroll processing services (the "Processing Fees"). As of the Petition Date, there are no amounts outstanding on account of the Processing Fees.

152. On average, the Debtors pay approximately $580,000 per month on account of the Independent Contractors. The Debtors do not withhold taxes from, or make benefit contributions on account of, payments to the Independent Contractors, and no Independent Contractor earns commissions from the Debtors. As of the Petition Date, the Debtors estimate that approximately $911,000 in accrued and unpaid obligations is owed on account of prepetition services rendered by the Independent Contractors, of which approximately $700,000 is owed to the Professional Staffing Services Provider on account of Independent Contractors placed by it. Payment of the prepetition amounts owed to a limited number of Independent Contractors may exceed the Priority Limit; any such payment to an Independent Contractor directly engaged with the Debtors is subject to the Excess Priority Limit Payment Procedures described below.

153. The Debtors maintain an incentive program based on quarterly commissions (the "Commission Program") for non-Insider[12] field-based sales and market access Employees. Payment under the Commission Program is primarily determined by achievement of quarterly sales and other performance goals. Payments under the Commission Program are typically paid forty-five (45) days after quarter end and aggregate approximately $800,000 per quarter. Given that prepetition amounts due under the Commission Program are paid in arrears and have not been determined as of the Petition Date, the Debtors are unable to determine with certainty if and how much of the payments would cause Employee Obligations to exceed the Priority Limit; the Employee Wages Motion accordingly proposes procedures under which the Debtors would provide ten (10) days' advance notice to the U.S. Trustee, counsel to the Ad Hoc Group, and counsel to any statutory committee before paying any Prepetition Employee Obligations in excess of the Priority Limit to any Employee or Independent Contractor directly engaged with

[12] "Insider" has the meaning ascribed to such term in section 101(31) of the Bankruptcy Code.

the Debtors (including amounts under the Commission Program and the Severance Program) and, absent a timely objection, would be authorized to pay such amounts (the "Excess Priority Limit Payment Procedures"). As of the Petition Date, approximately $240,000 is estimated to be due and owing under the Commission Program.

154. The Debtors maintain programs to motivate, reward, and retain certain of their Employees (collectively, the "Incentive Compensation Programs"). These Incentive Compensation Programs are essential to the Debtors' ability to both recruit and retain valuable and talented employees by incentivizing Employees to perform at high levels and achieve certain sales and other metrics. Accordingly, covered Employees rely on and anticipate their compensation pursuant to these Incentive Compensation Programs.

155. The Incentive Compensation Programs are divided into two categories: (a) the Debtors' annual short-term incentive plan (the "STIP"), which is available to regular full-time Employees other than those who participate in the Commission Program, under which eligible Employees are assigned target incentive opportunities ranging from 10% to 65% of base salary and awards are determined based on corporate and individual performance and may not exceed 200% of target; and (b) the Debtors' equity-based long-term incentive arrangements under the 2022 Equity Incentive Plan, as amended, and the 2022 Inducement Stock Incentive Plan, as amended (collectively, the "LTIP"). All outstanding awards under the LTIP consist of stock options, restricted stock units, and performance stock units, each of which is settled in shares of common stock. As of the Petition Date, approximately 3.8 million equity awards were outstanding under the LTIP (approximately 1.9 million performance stock units, 1.5 million restricted stock units, and 0.5 million stock options), held by approximately 202 employees[13] and

[13] As of the Petition Date, certain equity awards are held by former employees who were terminated within the last 60 days and therefore remain in the grace period in which the stock options remain active following termination.

non-employee directors, approximately 90% of which remain unvested, and no outstanding stock option has an exercise price below $3.74 per share. The Debtors seek authority, but not direction, to honor outstanding awards under the LTIP in accordance with their terms, including the vesting of outstanding restricted stock units and performance stock units and the issuance of shares of common stock in settlement thereof. The Debtors do not intend to grant any new awards under the LTIP during these chapter 11 cases, other than as required under offer letters executed prior to the Petition Date as described above, but reserve the right to request Court authorization to do so. The Debtors also maintain the Amended and Restated 2013 Employee Stock Purchase Plan, as amended (the "ESPP"), under which eligible Employees could purchase common stock at a discount through payroll withholdings. Effective October 9, 2026, current and future offering periods under the ESPP were suspended, and all amounts withheld from participating Employees' payroll but not yet used to purchase shares were returned to the Employees through the October 15, 2026 payroll.

156. For the 2026 plan year, the STIP is being paid in four quarterly installments of 25% each (on June 30, 2026, September 30, 2026, December 31, 2026, and February 28, 2027), with the first three installments payable at target and the final installment adjusted for corporate and individual performance, in each case subject to the Debtors' determination that they have sufficient cash reserves and to the Employee's continued employment on the payment date. As a condition of the 2026 Leadership Cash Retention Program (as defined in the Employee Wages Motion), the Debtors' executive leadership team and certain non-executive leadership employees agreed to forgo their STIP installments for the remainder of the 2026 plan year. The December 31, 2026 installment will fall due during these chapter 11 cases, including payments attributable to services performed prior to the Petition Date. As of the Petition Date, the Debtors

had accrued approximately $2,600,000 under the STIP. All payments under the STIP are discretionary and may be reduced or eliminated (other than previously guaranteed amounts). The Debtors are requesting authority to make payments pursuant to the Incentive Compensation Programs in the ordinary course as such amounts may become due, subject to further Court order with respect to any payment due to an Insider.

157. As described in Section IV herein, the Debtors also implemented the 2026 Retention Programs, consisting of the 2026 Leadership Cash Retention Program, the 2026 Non-Executive Leadership Cash Retention Program, the 2026 Commercial Retention Program, the 2026 RBD Retention Program, the 2026 Finance Retention Payments, and the 2026 Sales Kicker Program (each as defined in the Employee Wages Motion). Prior to the Petition Date, the Debtors paid approximately $10.6 million under the 2026 Retention Programs, including approximately $332,000 under the 2026 Sales Kicker Program for the quarter ended September 30, 2026. Approximately $2.5 million in fixed installments remain payable (approximately $2.0 million under the 2026 Non-Executive Leadership Cash Retention Program and approximately $540,000 under the 2026 Commercial Retention Program, in each case payable in quarterly installments through June 30, 2027), exclusive of up to approximately $1.2 million in performance-contingent payments that may become payable under the 2026 Sales Kicker Program through June 30, 2027; the awards under the 2026 Leadership Cash Retention Program, the 2026 RBD Retention Program, and the 2026 Finance Retention Payments were paid in full prior to the Petition Date. As of the Petition Date, approximately $431,000 is accrued and unpaid under the 2026 Retention Programs. The Debtors seek authority to continue to honor the 2026 Retention Programs in the ordinary course.

158. Prior to the Petition Date, and in the ordinary course of business, the Debtors reimbursed Employees for certain business expenses incurred in the scope of their employment, including travel, lodging, ground transportation, meals, office supplies, seminars, professional licenses, mobile phone costs (approximately $13,000 per month in the aggregate), tuition for pre-approved courses (up to $5,000 per Employee per calendar year), and other miscellaneous business expenses (collectively, the "Business Expenses"). The Debtors utilize SAP Concur in connection with reimbursement of these Business Expenses, and field-based sales Employees also receive a car allowance under the Motus accountable allowance program. As of the Petition Date, the Debtors estimate that approximately $425,000 in Business Expenses has been incurred but not yet reimbursed.

159. Although the majority of Employees submit their reimbursement requests timely, sometimes submissions are delayed, which may result in Employees submitting requests for prepetition Business Expenses after the Petition Date. Employees incur Business Expenses on the Debtors' behalf and with the understanding that such expenses will be reimbursed fully.

160. As of the Petition Date, the Debtors have seven (7) directors (each, a "Director" and collectively, the "Directors"), six (6) of whom are non-Employee Directors. Pursuant to the Debtors' Non-Employee Director Compensation Policy, the non-Employee Directors are paid annual cash retainers of $50,000 for Board service ($85,000 for the lead independent director), $10,000 per committee membership and $20,000 per committee chair, which are earned and paid quarterly in arrears (approximately $124,000 per quarter in the aggregate), receive annual equity awards under the 2022 Equity Incentive Plan, and are entitled to reimbursement of reasonable and documented out-of-pocket business expenses (the "Director Compensation"). As of the Petition Date, approximately $44,100 is outstanding with respect to the Director Compensation.

161. The Debtors maintain a written severance policy, the Amended Severance Benefits Policy effective April 3, 2025, applicable to U.S.-based regular full-time Employees who are not Section 16 officers and who are not party to an employment agreement or offer letter that provides for severance (the "Severance Policy"). The Severance Policy establishes guidelines and does not itself create a contractual right to severance; the Debtors retain discretion to provide more, less, or no severance to any Employee, except that severance in connection with a change in control is intended to be binding. Under the Severance Policy, severance outside of a change in control is discretionary and consists of salary continuation for a period determined by reference to a severance matrix based on the Employee's level and months or years of service, and severance in connection with a change in control is non-discretionary: members of the executive leadership team are entitled to twelve (12) months of base salary continuation and 100% of target bonus, non-ELT senior vice presidents and vice presidents to six (6) months of base salary continuation and 50% of target bonus, and Employees below the vice president level to between two (2) and four (4) months of base salary continuation. Severance under the Severance Policy is conditioned on the Employee's execution of a separation and release of claims agreement in the form provided by the Debtors within sixty (60) days following termination and compliance with applicable restrictive covenants, and includes (for a change in control termination) or may include (for other terminations) the Debtors' payment of COBRA premiums for the longer of the severance period and one month. Consistent with the Severance Policy, the Debtors historically pay severance (collectively, the "Severance Obligations") to terminated Employees in appropriate circumstances based on an evaluation of the specific facts and circumstances of the applicable termination. Certain other Severance Obligations are made to Employees who are not covered by the Severance Policy pursuant to the terms of an

applicable offer letter or employment agreement; outside of a change in control, severance under such arrangements does not include a bonus component, other than for the Chief Executive Officer. The Debtors paid approximately $1.7 million in severance in each of 2024 and 2025.

162. The Debtors believe that the authority to pay the Severance Obligations is critical to maintaining existing Employee morale and loyalty and allowing the Debtors to maintain ongoing operations. In certain circumstances, the Severance Obligations are contractually obligated. As of the Petition Date, the Debtors estimate that approximately $117,700 of prepetition Severance Obligations remain outstanding, owed to nine (9) former Employees and payable through the end of 2026.

163. In the ordinary course of business, the Debtors offer private health insurance coverage and certain other welfare benefits to Eligible Employees, including, but not limited to, medical plans, dental plans, vision plans, flexible spending accounts (each an "FSA"), health savings accounts (the "HSA"), life insurance plans, short-term and long-term disability plans, other paid time off, a 401(k) plan, and other miscellaneous benefit plans (collectively, the "Employee Benefit Programs"). The Employee Benefit Programs are, in each case, available to all Employees who work the requisite hours per week for a given benefit or who otherwise satisfy the eligibility requirements for any Employee Benefit Program (the "Eligible Employees" and, with respect to each plan or program in which they participate, the "Plan Participants"). The Debtors utilize Marsh & McLennan Agency LLC as broker for the Employee Benefit Programs.

164. The Debtors offer Eligible Employees an opportunity to participate in a variety of health benefit plans, including the Medical Insurance Program, the Dental Plan, and the Vision Plan (each as defined in the Employee Wages Motion and collectively, the "Health Insurance

Plans"). The Medical Insurance Program consists of two plans (PPO HSA and PPO Value) offered through Aetna Life Insurance Company and, for Employees in Kaiser Permanente service areas, a Kaiser Permanente Added Choice plan; it is fully insured, with prescription drug coverage administered by CVS Caremark, and approximately 191 Employees were enrolled as of July 2026 (51 in the PPO HSA plan and 140 in the PPO Value plan). The Vision Plan is insured by Vision Service Plan (VSP) and the Dental Plan (PPO Plus Premier) is self-funded and administered by Delta Dental of Massachusetts. The Debtors withhold applicable amounts from Plan Participants' paychecks and pay the balance of the premiums and costs of the Health Insurance Plans, contributing 88% of the premiums for the PPO HSA plan and 84.5% of the premiums for the PPO Value plan, approximately 80% of the cost of the Dental Plan, and 84% of the premiums for the Vision Plan. The Debtors also make annual employer contributions to the health savings accounts and health reimbursement arrangements of Medical Insurance Program participants, totaling approximately $5.4 million for the 2026 plan year. The Debtors also offer a COBRA Plan administered by HRC Total Solutions, LLC, flexible spending accounts administered by HRC Total Solutions, LLC, health savings accounts administered by Inspira Financial, and basic life, accidental death and dismemberment, short- and long-term disability, and voluntary critical illness and accident insurance through Sun Life Assurance Company of Canada. As of the Petition Date, the Debtors estimate that the aggregate amount due and owing under the Health Insurance Plans is approximately $0, and that they owe approximately $400,600 in the aggregate on account of the Employee Benefit Programs.

165. The Debtors provide Eligible Employees with retirement benefits through a 401(k) plan administered by Fidelity Investments (the "401(k) Plan"). Eligible Employees may participate in the 401(k) Plan and make Roth and pre-tax contributions, up to the maximum

amount allowed under the Internal Revenue Code (the "IRC"). There are approximately 90 Employees with current account balances in the 401(k) Plan (the "401(k) Program Participants").

166. Under the 401(k) Plan, the Debtors make safe harbor matching contributions equal to 100% of the first 3% and 50% of the next 2% of eligible compensation deferred by each 401(k) Program Participant, which are funded each pay period and aggregate approximately $187,000 per month. The Debtors' contributions vest immediately. As of the Petition Date, the Debtors estimate that they owe approximately $67,000 under the 401(k) Plan. The Debtors seek authority to pay such outstanding amounts, continue to maintain the 401(k) Plan, and honor their obligations in the ordinary course.

167. The Debtors maintain workers' compensation programs and workers' compensation insurance and benefits at the levels required by law in the U.S. and make payments on account of workers' compensation claims (the "Workers' Compensation Program"). The Debtors maintain coverage under the Workers' Compensation Program through Chubb National Insurance Company and Federal Insurance Company (each a member of the Chubb group) under guaranteed-cost policies. In the twelve months before the Petition Date, the Debtors paid approximately $59,000 in fees and premiums under the Workers' Compensation Program. As of the Petition Date, the Debtors do not believe any amounts remain outstanding under the Workers' Compensation Program; however, the Debtors request authority to pay any such amounts to the extent they are outstanding and in the ordinary course, and request that the automatic stay be modified solely to permit Employees to proceed with claims under the Workers' Compensation Program.

168. In the ordinary course, all Employees are eligible for flexible time off ("FTO"), which can be used for vacation, personal appointments, family matters, sick days, school

activities, religious observances, rest and relaxation, and other personal obligations (the "FTO Policy"). The Debtors adopted the FTO Policy as of January 1, 2025, and in connection with that transition all previously unused paid time off was forfeited, except as prohibited by applicable law. FTO does not accrue and is not paid out upon termination of employment for any reason, and there are accordingly no prepetition amounts due and owing under the FTO Policy. Certain Employees (principally in California) retain accrued paid time off balances under prior policies or applicable law, and Employees who are ineligible for FTO accrue paid sick leave in accordance with applicable state or foreign law. As of the Petition Date, Employees not participating in the FTO Policy had accrued approximately $312,000 in unused paid time off, which the Debtors seek authority to honor in the ordinary course, including by paying accrued amounts upon separation where required by applicable law, subject to the Priority Limit and the Excess Priority Limit Payment Procedures. I understand that the Debtors comply with local regulations regarding paid time off for various other causes, including sick and medical leave, family leave, and government leave for voting, jury duty, and military obligations.

169. In addition to the foregoing, in the ordinary course of business, the Debtors also offer Employees a range of ancillary benefits, including, but not limited to, a wellbeing reimbursement program administered by ThrivePass (up to $1,200 per Employee per year), an employee assistance program through ComPsych Corporation, health advocacy services through Health Advocate, access to the Headspace mindfulness application, and an employee referral bonus of up to $5,000 (collectively, the "Ancillary Benefit Programs"). In the twelve-month period preceding the Petition Date, the Debtors paid approximately $20,000 per month on average on account of the Ancillary Benefit Programs. As of the Petition Date, the Debtors estimate they owe approximately $21,600 with respect to the Ancillary Benefit Programs. The

Debtors do not fund all of the Ancillary Benefit Programs, some of which are entirely employee-paid without any contributions from the Debtors.

170. The Debtors' Employees and Independent Contractors are critical to ordinary course operations because a significant portion of the value of the Debtors' business is tied to their workforce. Without the relief requested herein, the Employees and Independent Contractors may face significant financial strain and other hardships. I therefore believe the relief requested in the Employee Wages Motion is necessary to avoid immediate and irreparable harm and is in the best interests of the Debtors, their estates, and all parties in interest.

**L. Insurance Motion**

171. Pursuant to the Insurance Motion, the Debtors seek authority to (a) continue their prepetition insurance coverage and satisfy prepetition obligations related thereto, (b) renew, amend, supplement, extend, or purchase insurance coverage on a postpetition basis in the ordinary course, (c) pay or offset prepetition obligations on account of, and continue to pay on a postpetition basis, brokerage fees, and (d) maintain their surety bond program.

172. In the ordinary course of business, the Debtors maintain fifty-eight (58) insurance policies (collectively, the "Insurance Policies") with twenty-two (22) insurance carriers (collectively, the "Insurance Carriers"). The Insurance Policies provide coverage for, among other things, losses related to the Debtors' general liability, property, supply chain, automobile liability, workers' compensation, umbrella and excess liability, products liability, clinical trials liability, directors' and officers' liability, employment practices liability, fiduciary liability, crime liability, and cyber liability. In addition, certain of the Insurance Policies provide layers of excess liability coverage. Certain of the Insurance Policies, including the commercial package, umbrella, and products liability policies, also name the Debtors' non-Debtor affiliate Karyopharm Europe GmbH as an insured, and the Debtors pay all premiums on such policies.

173. To preserve the value of the Debtors' business operations, properties, and assets, I understand that it is essential that the Debtors be able to continue or renew the Insurance Policies and enter into new insurance agreements. I understand that, in many cases, regulations, laws, and contract provisions that govern the Debtors' commercial activities require the types of coverage provided for under the Insurance Policies, as well as the Bankruptcy Code and the operating guidelines issued by the United States Trustee for Region 7.

174. In the ordinary course of business, the Debtors, directly or through brokerage accounts, pay premium obligations associated with the Insurance Policies (the "Premiums"). The Debtors' insurance program consists of both (a) policies renewed annually, for which the Debtors pay aggregate annual Premiums of approximately $2,300,000, including taxes and surcharges, other fees, and broker commissions, and (b) clinical trial liability policies with variable multi-year terms (the "Local Foreign Clinical Trial Policies"), which cover the Debtors' clinical trial sites in specific jurisdictions and for which the Debtors have paid aggregate Premiums of approximately $540,000. Premiums for the Local Foreign Clinical Trial Policies are not annual charges; each is paid once, at inception, for the full duration of the applicable clinical trial, and the Debtors incur new Local Foreign Clinical Trial Policy Premiums only as trials or trial sites are added. The Debtors are not subject to any premium financing agreement. For the current Insurance Policies, the Debtors have either prepaid all Premiums in full at inception or, with respect to the Insurance Policies issued by Chubb, pay Premiums in installments billed directly by the applicable Insurance Carrier over the course of the policy period. Substantially all of the Insurance Policies placed through Sullivan (other than the Local Foreign Clinical Trial Policies) expired on October 22, 2026, and were renewed by the Debtors on that date for the policy period October 22, 2026 through October 22, 2027. The employment

practices liability and fiduciary liability policies expire on November 6, 2026; the Debtors anticipate renewing such Insurance Policies in the ordinary course of business. The Local Foreign Clinical Trial Policies remain in effect through the completion of the applicable trials, with the latest expiring December 31, 2032. With respect to the directors' and officers' liability program, on October 1, 2026 the Debtors were invoiced $1,754,370 for an extension of, and run-off coverage under, each of the ten (10) layers of the program through November 6, 2027, which the Debtors paid on October 5, 2026. As of the Petition Date, the Debtors estimate that approximately $190,000 remains outstanding on account of Premiums for the Insurance Policies.

175. Certain of the Insurance Policies require the Debtors to pay a deductible (collectively, the "Deductibles"). Generally, if a claim is made under an Insurance Policy with a Deductible, the Debtors are obligated to pay any defense costs and indemnity payments up to the amount of the Deductible. The Insurance Carriers are directly responsible for any claim under the applicable Insurance Policy to the extent such claim is in excess of the Deductible.

176. The Debtors obtain Insurance Policies primarily through two (2) insurance brokers, Sullivan Insurance Group, Inc. ("Sullivan") and CAC Specialty ("CAC" and, together with Sullivan, the "Brokers"). Sullivan places the Debtors' property, casualty, products and clinical trial liability, cyber, cargo, and foreign clinical trial liability programs, and CAC places the Debtors' directors' and officers' liability, employment practices liability, and fiduciary liability programs. Sullivan and CAC are compensated through commissions included in the Premiums paid on the Insurance Policies (the "Insurance Brokerage Fees").

177. Certain of the Insurance Policies, including workers' compensation, products liability, commercial automobile, and supply chain policies, may be subject to regular audits (the "Insurance Policy Audits"), which may result in an adjustment of the premiums owed (or a

return premium owed to the Debtors) on account thereof. Insurance Policy Audits for prepetition premium payments will not conclude until after the Petition Date. As a result, the aggregate amount of the Debtors' obligations arising from the Insurance Policy Audits, if any, is not known at this time.

178. In the ordinary course of business, the Debtors maintain surety bonds (collectively, the "Surety Bonds") to secure their obligations with respect to state and territorial wholesale drug distributor licenses and permits, including bond requirements imposed by the Mississippi Board of Pharmacy and the Puerto Rico health authorities, and U.S. customs obligations. The Debtors have two (2) surety providers: Travelers Casualty and Surety Company of America and American Alternative Insurance Corporation (together with any other provider of Surety Bonds, the "Sureties"). The Debtors' Surety Bonds consist of (a) a $75,000 non-resident wholesale drug distributor bond in favor of the Puerto Rican Secretaria Auxiliar Para la Regulacion de la Salud Publica, Seccion de Licenciamiento de Farmacias, Medicamentos y Registro de Medicamentos (SARSP), (b) a $100,000 pharmaceutical drug wholesaler bond in favor of the Mississippi Board of Pharmacy, and (c) a $50,000 formal entry importations bond in favor of the U.S. Customs and Border Protection (such program, the "Surety Bond Program"). The Debtors obtain the Surety Bonds through Sullivan and Biocair Customers Brokerage LLC. Brokerage commissions on account of the Surety Bonds are included in the Insurance Brokerage Fees. As of the Petition Date, the Debtors have three (3) Surety Bonds totaling approximately $225,000, the premiums for which are approximately $2,125 per year. As of the Petition Date, the Debtors believe there are no amounts outstanding on account of the Surety Bonds.

179. To continue business operations during the restructuring process, the Debtors must be able to provide financial assurance to certain state and regulatory authorities. This

requires the Debtors to maintain the Surety Bonds. I understand that failing to provide, maintain, back, or timely replace the Surety Bonds will prevent the Debtors from, among other things, complying with their regulatory obligations, and consequently prevent them from undertaking essential functions related to their operations.

180. Based on the foregoing, I believe that the relief requested in the Insurance Motion is in the best interests of the Debtors, their estates, and all other parties in interest and should be granted in all respects.

**M. NOL Motion**

181. Pursuant to the NOL Motion, the Debtors seek (a) approval of notification and hearing procedures for certain transfers of, and declarations of worthlessness with respect to, Karyopharm's existing common stock, preferred stock, and pre-funded warrants, or any Beneficial Ownership therein (any such record or Beneficial Ownership thereof, the "Restricted Interests", and such procedures, the "Procedures"); and (b) an order directing that any purchase, sale, or other transfer of, or declaration of worthlessness with respect to, Restricted Interests in violation of the Procedures be null and void *ab initio*.

182. The Debtors currently estimate that, as of December 31, 2025, they had approximately $861 million of federal NOLs, $114 million of federal tax credit carryforwards (consisting of approximately $29 million of research credits and approximately $85 million of orphan drug credits), $786 million of state NOLs, $14 million of state research and development tax credits, $57 million of section 163(j) carryforwards, and $267 million of section 174 carryforwards (together with certain other tax attributes of the Debtors, collectively, the "Tax Attributes"). The Debtors' tax advisors have concluded, based on an analysis of shifts in the ownership of the Debtors' stock through September 10, 2026 (which treats the Debtors' outstanding pre-funded warrants and preferred stock as stock for purposes of section 382 of the

IRC), that it is more likely than not that an ownership change occurred on October 10, 2025. As a result, the Tax Attributes generated on or before October 10, 2025 (including approximately $832 million of federal NOLs and approximately $112 million of federal tax credit carryforwards) are subject to an annual limitation under section 382 of the IRC (estimated at approximately $2.1 million, increased by approximately $10.3 million per year for the five years following the ownership change on account of a net unrealized built-in gain), while the Tax Attributes generated after October 10, 2025 (including approximately $29 million of federal NOLs generated during the remainder of the 2025 tax year and all losses generated in the 2026 tax year) are not currently limited. Further, the Debtors believe they may generate additional Tax Attributes in the 2026 tax year. A further ownership change would subject the Tax Attributes generated after October 10, 2025, including all losses generated in the 2026 tax year, to limitation under section 382 of the IRC, and could further reduce the annual limitation already applicable to the Tax Attributes generated on or before October 10, 2025.

183. The Tax Attributes are potentially of significant value to the Debtors and their estates because the Debtors may be able to carry forward certain Tax Attributes to offset future federal and state taxable income or directly offset federal and state tax liability in future years. Such Tax Attributes may also be utilized by the Debtors to offset any federal and state taxable income or federal and state tax liability generated by transactions consummated pursuant to a chapter 11 plan or other value-maximizing transaction in these chapter 11 cases. Accordingly, the value of the Tax Attributes will inure to the benefit of all the Debtors' stakeholders.

184. Sections 382 and 383 of the IRC limit the amount of U.S. federal taxable income and U.S. federal tax liability, respectively, that can be offset by a corporation's tax attributes in taxable years (or portions thereof) following an "ownership change" within the meaning of

section 382 of the IRC. Generally, an "ownership change" occurs if the percentage (by value) of the stock of a corporation owned by one or more "5-percent shareholders" (as defined in section 382 of the IRC and the Treasury Regulations promulgated thereunder) has increased by more than 50 percentage points over the lowest percentage of stock owned by such shareholders at any time during the three-year testing period ending on the date of the ownership change. To maximize the use of the Tax Attributes and enhance recoveries for the Debtors' stakeholders, the Debtors seek limited relief that will enable them to closely monitor certain transfers of Beneficial Ownership of Restricted Interests (including the exercise of certain Options with respect to Restricted Interests) and certain worthless stock deductions with respect to Beneficial Ownership of Restricted Interests so as to be in a position to act expeditiously to prevent such transfers or declarations of worthlessness, if necessary, with the purpose of preserving the Tax Attributes. Specifically, the proposed Order will affect only (a) holders that have Beneficial Ownership of approximately 4.5 percent or more by value of all issued and outstanding shares of Restricted Interests as of the Petition Date (including shares of common stock issuable upon exercise of outstanding pre-funded warrants and upon conversion of outstanding preferred stock, determined by value across all Restricted Interests held, in any combination, and not by reference to any single instrument); (b) parties who are interested in purchasing sufficient Restricted Interests to result in such party becoming a holder of 4.5 percent or more by value of Beneficial Ownership of outstanding Restricted Interests; and (c) any 50-percent shareholder seeking to claim a worthless stock deduction. The Debtors plan to publish a copy of the Order and the Procedures once in the national edition of The New York Times and the local edition of The Boston Globe, or in any other national or local publications that the Debtors deem appropriate and disclose in applicable affidavits of publication, and post the Procedures to the website established by Stretto,

Inc., the Debtors' proposed claims and noticing agent, for these chapter 11 cases. Accordingly, I believe that the relief requested in the NOL Motion is in the best interests of the Debtors, their estates, and all other parties in interest and should be granted in all respects.

**N. Taxes Motion**

185. Pursuant to the Taxes Motion, the Debtors seek authority to remit and pay (or use tax credits to offset) Taxes and Fees in the ordinary course of business that are or become payable during these chapter 11 cases.

186. In the ordinary course of business, the Debtors bill, collect, incur, remit, and/or pay income taxes, sales and use taxes, franchise taxes, various other taxes and regulatory fees, and other similar obligations (collectively, the "Taxes and Fees") to various federal, state, local, and foreign governmental units, including taxing authorities (each, a "Taxing Authority," and collectively, the "Taxing Authorities"). The Debtors have typically remitted and paid Taxes and Fees through checks and electronic transfers processed through the Debtors' cash management system. From time to time, the Debtors may also receive tax credits for overpayments or refunds in respect of Taxes and Fees. The Debtors generally use these credits in the ordinary course of business to offset against future Taxes or Fees or have the amount of such credits refunded to the Debtors.

187. I understand that the Debtors' failure to pay the Taxes and Fees could materially and adversely impact the Debtors' business operations in several ways. First, the Taxing Authorities could initiate audits, suspend operations, file liens, or seek to lift the automatic stay, which would unnecessarily divert the Debtors' attention from their restructuring process. Second, failing to pay Taxes and Fees could potentially subject certain of the Debtors' directors and officers to claims of personal liability, which likely would distract those key persons from their duties related to the Debtors' restructuring processes in these chapter 11 cases. Third,

unpaid Taxes and Fees may result in penalties, the accrual of interest, or both, which could negatively impact the Debtors' business and estate value. Additionally, I understand that nonpayment of the Taxes and Fees may give rise to priority claims under section 507(a)(8) of the Bankruptcy Code. Moreover, the Debtors collect and hold certain outstanding tax liabilities in trust for the benefit of the applicable Taxing Authorities, and these funds may not constitute property of the Debtors' estates.

188. The Debtors estimate that approximately $566,000 in the aggregate in Taxes and Fees relating to the prepetition period have accrued and may become due and owing. The following table describes the various categories of Taxes and Fees and the prepetition amounts sought to be paid pursuant to the Taxes Motion:

| Prepetition Obligations | Amount |
|---|---|
| Sales and Use Taxes | $46,000 |
| Franchise Taxes | $64,000 |
| Other Taxes and Regulatory Fees | $456,000 |
| **Total** | $566,000 |

189. The Debtors incur and are required to pay various federal and state income taxes (collectively, the "Income Taxes") in the jurisdictions where the Debtors operate. The Debtors generally remit Income Taxes, if they are owed, when they file an extension of the applicable return. In certain cases, prior-year overpayments have been applied to Income Taxes due in 2026, such that no payment was required in 2026. In 2025, the Debtors remitted approximately $6,000 in the aggregate in Income Taxes to the relevant Taxing Authorities. As of the Petition Date, the Debtors estimate that they do not owe any amount in the aggregate in Income Taxes that have not been submitted to the relevant Taxing Authorities.

190. The Debtors remit state sales and use taxes on certain goods, equipment, and services used in their operations, including use taxes self-assessed on purchases from vendors that do not collect sales tax (collectively, the "Sales and Use Taxes"). The Debtors generally remit Sales and Use Taxes on an annual basis. In 2025, the Debtors paid approximately $37,000 in the aggregate in Sales and Use Taxes to the Taxing Authorities. The Debtors do not charge or collect sales taxes on sales of their pharmaceutical products. The Debtors sell their products to wholesale distributors and specialty pharmacies that purchase the products for resale, and each such customer has furnished the Debtors with a resale or exemption certificate (including multijurisdictional uniform resale certificates and state-specific resale certificates) certifying that the customer is registered for sales and use tax in the applicable jurisdictions and purchases the Debtors' products for resale in the ordinary course of its business. Accordingly, the Debtors do not hold any sales taxes collected from customers, and the Sales and Use Taxes consist solely of the Debtors' own liability as a purchaser. As of the Petition Date, the Debtors estimate that they have incurred approximately $46,000 in the aggregate in Sales and Use Taxes that have not been submitted to the relevant Taxing Authorities.

191. The Debtors incur, and are required to pay, various state franchise taxes and similar privilege taxes for the right to operate their business in applicable jurisdictions, including franchise taxes in Alabama, Kentucky, North Carolina, Tennessee, Texas, and Delaware (the "Franchise Taxes"). The Debtors typically remit Franchise Taxes to the relevant Taxing Authorities on an annual basis, except the Delaware franchise tax is paid in quarterly installments. In 2025, the Debtors paid approximately $455,000 in the aggregate in Franchise Taxes. As of the Petition Date, the Debtors estimate that they have incurred approximately

$64,000 in the aggregate in Franchise Taxes that has not been submitted to the relevant Taxing Authorities.

192. The Debtors incur, and are required to pay, miscellaneous FDA prescription drug user fees, that certain IRS branded prescription drug fee, state annual report fees, state manufacturers fees, regulatory fees payable to governmental agencies in Germany, Belgium, and Romania, and similar fees and assessments (collectively, the "Other Taxes and Regulatory Fees"). The Debtors typically remit Other Taxes and Regulatory Fees to the relevant Taxing Authorities on an annual basis, as applicable. In 2025, the Debtors paid approximately $2,390,000 in the aggregate in Other Taxes and Regulatory Fees. As of the Petition Date, the Debtors estimate that they have incurred approximately $456,000 in the aggregate in Other Taxes and Regulatory Fees that has not been submitted to the relevant Taxing Authorities.

193. As described above in connection with the Cash Management Motion, the Debtors' non-Debtor affiliate Karyopharm Europe GmbH previously maintained an operating account (the "Karyopharm Europe GmbH Account"), which was used to pay Karyopharm Europe GmbH's quarterly trade tax prepayment and corporate income tax obligations by direct debit (the "GmbH Taxes"). The Debtors are in the process of dissolving Karyopharm Europe GmbH and no longer engage in intercompany transactions with it. The Debtors have closed the Karyopharm Europe GmbH Account. Karyopharm Europe GmbH nevertheless remains obligated to make certain tax payments in fiscal year 2026, and any late payment would result in penalties. A failure to pay timely could also expose Karyopharm Europe GmbH's management, who are also members of Karyopharm Therapeutics Inc.'s management, to potential personal liability under German law. To avoid these consequences, prior to closing the Karyopharm Europe GmbH Account, the Debtors transferred the remaining funds in that account, in the

amount of approximately $40,000, to a Debtor-owned account at JPMorgan Chase Bank, N.A. ending in x8903 (the "Segregated Tax Account"), which previously held a zero balance prior to the funds being transferred in. The Debtors established this arrangement so that the funds would remain fully segregated from the Debtors' other cash and be used solely to satisfy Karyopharm Europe GmbH's remaining tax obligations. The Debtors will not use funds in the Segregated Tax Account for any other purpose. The Debtors anticipate these funds will be sufficient to cover the tax liability and do not anticipate transferring any additional funds into the Segregated Tax Account. As of the Petition Date, the Debtors estimate that no amounts on account of the GmbH Taxes will become due and owing during these chapter 11 cases. Nevertheless, out of an abundance of caution, the Debtors seek the authority to pay the GmbH Taxes from the Segregated Tax Account if they become due and owing during these chapter 11 cases.

194. From time to time, the Debtors are subject to audits on account of tax returns and/or tax obligations for prior obligation periods (collectively, the "Audits"). As of the Petition Date, the Debtors do not have any ongoing Audits. Out of an abundance of caution, the Debtors seek authority, but not direction, to pay Taxes and Fees on account of the Audits as they arise in the ordinary course of the Debtors' business and consistent with past practice, including as a result of any settlements of issues addressed in any Audits. Further, the Debtors may occasionally contest or otherwise be involved in disputes related to certain Taxes and Fees (the "Disputed Matters"). Out of an abundance of caution, any amounts owed pursuant to the Disputed Matters are included in the current calculation of estimated amounts owed on account of the Taxes and Fees. The Debtors seek authority, but not direction, to pay Taxes and Fees on account of the Disputed Matters in accordance with the Approved DIP Budget if any such obligations become due and owing in the ordinary course of the Debtors' business.

195. In sum, failure to pay the Taxes and Fees would disrupt the Debtors' day-to-day business operations, potentially impose significant costs on the Debtors' estates and their creditors, and hinder the Debtors' efforts to successfully consummate the Restructuring Transactions. Based on the foregoing, I believe that the relief requested in the Taxes Motion is in the best interest of the Debtors, their estates, and all parties in interest and should be approved.

**O. Utilities Motion**

196. Pursuant to the Utilities Motion, the Debtors seek (a) approval of the Debtors' proposed form of adequate assurance of payment to the Debtors' utility providers, (b) the establishment of procedures for determining adequate assurance of payment for future Utility Services, and (c) to prohibit Utility Providers from altering, refusing, or discontinuing service to, or discriminating against the Debtors on account of the commencement of these chapter 11 cases or outstanding prepetition invoices.

197. To operate their business in the ordinary course and manage their office, the Debtors obtain natural gas, electricity, water, telephone, internet, waste removal, and other utility services (the "Utility Services") from a number of different utility providers (collectively, the "Utility Providers" and, each individually, a "Utility Provider"). The Debtors pay approximately 18 Utility Providers for Utility Services. Further, pursuant to certain of the Debtors' lease agreements, certain Utility Services are billed directly to the Debtors' corporate landlord and passed through to the Debtors as part of the Debtors' lease payments. Historically, the Debtors have maintained a satisfactory payment history with the Utility Providers and payments have been made on a regular and timely basis. On average, the Debtors spend approximately $23,000 per month for Utility Services.

198. Uninterrupted Utility Services are essential to the Debtors' ongoing operations and, therefore, the success of these chapter 11 cases. The Debtors rely on telephone and internet

services to conduct substantially all aspects of their business, including communicating with employees, regulators, healthcare providers, and commercial partners, maintaining their information technology systems, and supporting the ongoing development and commercialization of their products, and the Debtors' office location requires natural gas, electricity, water, telephone, internet, waste removal, and other utility services to operate. Should any Utility Provider refuse or discontinue service, even for a brief period, the Debtors' business operations could be severely disrupted, which would negatively impact the Debtors' ability to develop, commercialize, and distribute their therapeutics, and therefore revenue, to the detriment of all parties in interest. Accordingly, it is essential that the Utility Services continue uninterrupted during these chapter 11 cases.

199. The Debtors intend to pay undisputed postpetition obligations owed to the Utility Providers in a timely manner. The Debtors expect that their cash on hand, plus cash flows from operations and their proposed use of cash collateral and debtor-in-possession financing will be sufficient to pay postpetition obligations related to Utility Services in the ordinary course of business.

200. To provide the Utility Providers with additional adequate assurance pursuant to section 366 of the Bankruptcy Code, the Debtors propose depositing into a newly created segregated account for the benefit of the Utility Providers (the "Adequate Assurance Account") cash in an amount equal to two (2) weeks' cost of Utility Services, calculated using the historical average weekly cost of such services incurred for the twelve (12) months preceding the Petition Date, less any amounts guaranteed pursuant to a letter of credit issued in favor of, or deposit held by, any such Utility Provider that have not been applied to outstanding prepetition amounts (the "Adequate Assurance Deposit"), which the Debtors estimate at approximately $11,500. The

Adequate Assurance Deposit will be placed into the Adequate Assurance Account within fourteen (14) business days after the Petition Date and will be held by the Debtors for the benefit of the Utility Providers on the Utility Service List during the pendency of these chapter 11 cases.

201. I understand that the Adequate Assurance Deposit, in conjunction with cash on hand, cash flow from operations, and the proposed use of cash collateral and debtor-in-possession financing, demonstrate the Debtors' ability to pay for future Utility Services in the ordinary course of business and constitutes sufficient adequate assurance to the Utility Providers.

202. I believe the continued payment for Utility Services and the Adequate Assurance Deposit are necessary for the Debtors to effectuate their chapter 11 strategy without unnecessary and costly disruptions on account of discontinued Utility Services. I believe that it is in the best interests of the Debtors, their estates, and all other parties in interest in these cases for the Debtors to maintain the Utility Services in the ordinary course of business and provide adequate assurance to ensure uninterrupted service.

[*Remainder of page intentionally left blank.*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: November 2, 2026

*/s/ Sean A. Gumbs*

Sean A. Gumbs

Senior Managing Director, FTI Consulting, Inc.

Proposed Financial Advisor to the Debtors

# Exhibit A

## Organizational Chart

Karyopharm® Therapeutics

# Organizational Chart



# <u>Exhibit B</u>

## Restructuring Support Agreement

***Execution Version***

THIS RESTRUCTURING SUPPORT AGREEMENT IS NOT (NOR SHALL IT BE CONSTRUED TO BE) AN OFFER OR ACCEPTANCE WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE. ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE. NOTHING CONTAINED IN THIS RESTRUCTURING SUPPORT AGREEMENT SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE AGREEMENT EFFECTIVE DATE ON THE TERMS DESCRIBED HEREIN, DEEMED BINDING ON ANY OF THE PARTIES HERETO.

THIS RESTRUCTURING SUPPORT AGREEMENT IS THE PRODUCT OF SETTLEMENT DISCUSSIONS AMONG THE PARTIES HERETO. ACCORDINGLY, THIS RESTRUCTURING SUPPORT AGREEMENT IS PROTECTED BY RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND ANY OTHER APPLICABLE STATUTES OR DOCTRINES PROTECTING THE USE OR DISCLOSURE OF CONFIDENTIAL SETTLEMENT DISCUSSIONS.

THIS RESTRUCTURING SUPPORT AGREEMENT (TOGETHER WITH THE EXHIBITS AND ANNEXES ATTACHED HERETO) DOES NOT PURPORT TO SUMMARIZE ALL OF THE TERMS, CONDITIONS, REPRESENTATIONS, WARRANTIES, AND OTHER PROVISIONS WITH RESPECT TO THE RESTRUCTURING TRANSACTIONS (AS DEFINED BELOW) THAT ARE DESCRIBED HEREIN, WHICH RESTRUCTURING TRANSACTIONS WILL BE SUBJECT TO THE COMPLETION AND EXECUTION OF DEFINITIVE DOCUMENTS INCORPORATING THE TERMS SET FORTH HEREIN, AND THE EFFECTIVENESS OF ANY RESTRUCTURING TRANSACTION SHALL BE SUBJECT TO THE TERMS AND CONDITIONS SET FORTH IN SUCH DEFINITIVE DOCUMENTS AND THE APPROVAL RIGHTS OF THE PARTIES SET FORTH HEREIN OR IN SUCH DEFINITIVE DOCUMENTS.

## ***RESTRUCTURING SUPPORT AGREEMENT***

This RESTRUCTURING SUPPORT AGREEMENT (as may be amended, supplemented, or otherwise modified from time to time in accordance with the terms hereof, including all exhibits, annexes, and schedules hereto in accordance with Section 16.02, this "**Agreement**") is made and entered into as of November 2, 2026 (the "**Execution Date**"), by and among the following parties (each of the following described in sub-clauses (1) through (7) of this preamble, collectively, the "**Parties**"):[1]

1. Karyopharm Therapeutics Inc., a corporation incorporated under the Laws of the State of Delaware ("**Karyopharm**"), and each of its affiliates listed on **Exhibit A** to this Agreement that have executed and delivered counterpart signature pages to

[1] Capitalized terms used but not defined in the preamble and recitals to this Agreement have the meanings ascribed to them in Section 1.

this Agreement to each counsel to the Consenting Stakeholders (the Entities in this clause (1), collectively, the "**Company Parties**");

2. the undersigned holders or beneficial owners of, or investment advisors, sub-advisors, or managers of discretionary accounts that hold, Term Loan Claims that have executed and delivered counterpart signature pages to this Agreement, a Joinder, or a Transfer Agreement to counsel to the Company Parties (the "**Consenting 1L Lenders**");

3. the undersigned holders or beneficial owners of, or investment advisors, sub-advisors, or managers of discretionary accounts that hold, 2028 Notes Claims that have executed and delivered counterpart signature pages to this Agreement, a Joinder, or a Transfer Agreement to counsel to the Company Parties (the "**Consenting 2028 Noteholders**");

4. the undersigned holders or beneficial owners of, or investment advisors, sub-advisors, or managers of discretionary accounts that hold, 2029 Notes Claims that have executed and delivered counterpart signature pages to this Agreement, a Joinder, or a Transfer Agreement to counsel to the Company Parties (the "**Consenting 2029 Noteholders**," and, together with the Consenting 1L Lenders and the Consenting 2028 Noteholders, the "**Consenting Funded Debt Parties**");

5. the undersigned holders or beneficial owners of, or investment advisors, sub-advisors, or managers of discretionary accounts that hold, Royalty Claims that have executed and delivered counterpart signature pages to this Agreement, a Joinder, or a Transfer Agreement to counsel to the Company Parties (the "**Consenting Royalty Investors**");

6. the undersigned holders or beneficial owners of, or investment advisors, sub-advisors, or managers of discretionary accounts that hold, shares of Convertible Preferred Stock that have executed and delivered counterpart signature pages to this Agreement, a Joinder, or a Transfer Agreement to counsel to the Company Parties (the "**Consenting Preferred Shareholders**," and, together with the Consenting Funded Debt Parties and the Consenting Royalty Investors, the "**Consenting Stakeholders**"); and

7. Ayrmid Ltd., a private limited company incorporated under the Laws of England and Wales ("**Ayrmid**").

## *RECITALS*

**WHEREAS**, the Company Parties, the Consenting Stakeholders, and Ayrmid have in good faith and at arm's length negotiated or been apprised of certain restructuring and recapitalization transactions with respect to the Company Parties' capital structure on the terms set forth in this Agreement and as specified in the Plan, attached hereto as **Exhibit B**, the Disclosure Statement, attached hereto as **Exhibit C**, the DIP Term Sheet, attached hereto as **Exhibit D**, and the Ayrmid Transaction Term Sheet, attached hereto as **Exhibit E** (the transactions described in or

contemplated by this Agreement (including any Acceptable Alternative Transaction), the Plan, the Disclosure Statement, the DIP Term Sheet, and, as applicable, the Ayrmid Transaction Term Sheet, the "**Restructuring Transactions**");

**WHEREAS**, as of the Execution Date, the Consenting Stakeholders hold, own, or control, in the aggregate, the following Company Claims/Interests:

(a) the Consenting 1L Lenders hold, own, or control $128,981,939 in aggregate outstanding principal amount of the Term Loans, representing 100% of the aggregate outstanding principal amount of the Term Loans;

(b) the Consenting 2028 Noteholders hold, own, or control $15,648,085 in aggregate outstanding principal amount of the 2028 Notes, representing 100% of the aggregate outstanding principal amount of the 2028 Notes;

(c) the Consenting 2029 Noteholders hold, own, or control $107,974,339 in aggregate outstanding principal amount of the 2029 Notes, representing 100% of the aggregate outstanding principal amount of the 2029 Notes;

(d) the Consenting Royalty Investors hold, own, or control $113,536,880 in aggregate outstanding amount of Royalty Claims, representing 100% of the aggregate outstanding amount of the Royalty Claims; and

(e) the Consenting Preferred Shareholders hold, own, or control 17,749 shares of Convertible Preferred Stock, representing 100% of the aggregate outstanding shares of the Convertible Preferred Stock.

**WHEREAS**, the Company Parties intend to implement the Restructuring Transactions, including through the commencement by the Debtors of voluntary cases under chapter 11 of the Bankruptcy Code in the Bankruptcy Court (the cases commenced, the "**Chapter 11 Cases**");

**WHEREAS**, the Company Parties, through the marketing and sale process for their assets, have selected Ayrmid as the stalking horse bidder for such assets, and intend to enter into the Merger Agreement and to effectuate the Ayrmid Transaction through the Plan (subject to higher or better offers);

**WHEREAS**, certain of the Consenting Stakeholders have elected to commit to provide the DIP Facility, and the Company Parties and the Consenting Stakeholders have reached an agreement for the consensual use of cash collateral (as defined in the Bankruptcy Code);

**WHEREAS**, the Parties have agreed to take certain actions in support of the Restructuring Transactions on the terms and conditions set forth in this Agreement;

**NOW, THEREFORE**, in consideration of the covenants and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Party, on a several but not joint basis, intending to be legally bound hereby, agrees as follows:

## *AGREEMENT*

**Section 1.** ***Definitions and Interpretation***.

1.01. Definitions. The following terms shall have the following definitions:

"**2028 Indenture**" means that certain *Indenture*, dated as of October 10, 2025, providing for the issuance of the 2028 Notes, as amended, restated, amended and restated, supplemented, or otherwise modified from time to time.

"**2028 Notes**" means those 9.00% convertible senior notes due 2028 under the 2028 Indenture.

"**2028 Notes Claims**" means any Claim on account of the 2028 Notes.

"**2029 Indenture**" means that certain *Indenture*, dated as of October 10, 2025, providing for the issuance of the 2029 Notes, as amended, restated, amended and restated, supplemented, or otherwise modified from time to time.

"**2029 Notes**" means those 9.00% convertible senior notes due 2029 under the 2029 Indenture.

"**2029 Notes Claims**" means any Claim on account of the 2029 Notes.

"**Acceptable Alternative Transaction**" means, to the extent consented to in writing by the Required Consenting Funded Debt Parties and the Required Consenting Royalty Investors, any Sale Transaction with an Entity other than Ayrmid that provides for net proceeds at closing of at least $335,384,812; provided that $18,750,000 of such amount allocable to the Royalty Claims held by the Consenting Royalty Investors (or their affiliates) may be satisfied with cash or non-cash consideration, in such form as is acceptable to such holders of Royalty Claims in their discretion, having a value of not less than such portion.

"**Acceptable Alternative Transaction Notification**" means delivery of written notice by the Debtors, with the consent of the Required Consenting Funded Debt Parties, to Ayrmid of a determination to pursue an Acceptable Alternative Transaction.

"**Ad Hoc Group**" means the ad hoc group of holders of Term Loan Claims, 2028 Notes Claims, and 2029 Notes Claims represented by the Ad Hoc Group Advisors.

"**Ad Hoc Group Advisors**" means, collectively, (a) Latham & Watkins LLP, as counsel, (b) Haynes and Boone, LLP, as local counsel, (c) Houlihan Lokey Capital, Inc., as investment banker and financial advisor, and (d) any other advisor retained by or on behalf of the Ad Hoc Group.

"**Agent**" means any administrative agent, collateral agent, or similar Entity under the Term Loans, the 2028 Notes, the 2029 Notes, and/or the Royalty Agreement, including any successors thereto.

"**Agents/Trustees**" means, collectively, each of the Agents and Trustees.

"**Agreement**" has the meaning set forth in the preamble to this Agreement and, for the avoidance of doubt, includes all the exhibits, annexes, and schedules hereto in accordance with Section 16.02.

"**Agreement Effective Date**" means the date on which the conditions to the effectiveness of this Agreement as set forth in Section 2 have been satisfied or waived in accordance with this Agreement.

"**Agreement Effective Period**" means the period from the Agreement Effective Date (or, in the case of any Consenting Stakeholder that becomes a Party hereto after the Agreement Effective Date, the date on which such Consenting Stakeholder executes and delivers a Transfer Agreement or a Joinder to counsel to the Company Parties in accordance with the terms hereof) to the Termination Date applicable to that Party.

"**Alternative Restructuring Proposal**" means any inquiry, proposal, offer, bid, term sheet, discussion, or agreement with respect to a sale, disposition, new-money investment, restructuring, reorganization, merger, amalgamation, acquisition, consolidation, dissolution, financing (including any debtor-in-possession financing, cash collateral usage, or exit financing), refinancing, debt incurrence, debt investment, equity investment, liquidation, tender offer, exchange offer, recapitalization, plan of reorganization or liquidation, share exchange, business combination, joint venture, partnership, or similar transaction, or series of related transactions, involving any one or more Company Parties or any of their respective subsidiaries, or the assets, liabilities, debt, equity, or other interests of any one or more of the Company Parties or any of their respective subsidiaries, other than the Restructuring Transactions, or any other transaction involving any one or more of the Company Parties that is an alternative to or inconsistent with the Restructuring Transactions; provided, that any transaction implemented pursuant to an amendment of this Agreement effected in accordance with Section 15 shall not constitute an Alternative Restructuring Proposal.

"**Ayrmid**" has the meaning set forth in the preamble to this Agreement.

"**Ayrmid Advisors**" means, collectively, (a) Paul Hastings LLP, as counsel to Ayrmid, (b) any local counsel to Ayrmid, and (c) any other financial advisor, investment banker, or other advisor retained by or on behalf of Ayrmid.

"**Ayrmid Milestones**" has the meaning set forth in Section 4.01 of this Agreement.

"**Ayrmid Outside Date**" means the date that is 110 days after the Petition Date.

"**Ayrmid Termination Events**" has the meaning set forth in Section 14.03 of this Agreement.

"**Ayrmid Transaction**" means that proposed reorganization incorporating the Sale Transaction with Ayrmid as counterparty, as detailed in the Ayrmid Transaction Term Sheet.

"**Ayrmid Transaction Term Sheet**" means that certain term sheet containing material terms of a proposed reorganization incorporating the Sale Transaction with Ayrmid as counterparty, attached hereto as **Exhibit E**.

"**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the Southern District of Texas.

"**Bid Protections**" means the break-up fee, expense reimbursement, and other bid protections set forth in the Ayrmid Transaction Term Sheet and/or the Merger Agreement, to the extent approved in the Bidding Procedures Order or other order entered by the Bankruptcy Court.

"**Bidder Capacity**" means, with respect to the Highbridge Funds and/or Ayrmid, acting in a capacity as, or as a direct or indirect participant in, a bidder or potential bidder for all or any portion of the Company Parties' equity or assets, including pursuant to the Plan.

"**Bidding Procedures Motion**" means any motion filed by the Debtors seeking entry of the Bidding Procedures Order, together with all exhibits thereto and any declarations, affidavits, or other documents filed in connection with such motion.

"**Bidding Procedures Order**" means any order entered by the Bankruptcy Court on the docket of the Chapter 11 Cases approving the Debtors' proposed procedures for conducting a sale and marketing process for their equity and/or assets.

"**Business Day**" means any day other than a Saturday, Sunday, or "legal holiday" (as defined in rule 9006(a) of the Federal Rules of Bankruptcy Procedure), or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the state of New York.

"**Chapter 11 Cases**" has the meaning set forth in the recitals to this Agreement.

"**Claim**" has the meaning ascribed to it in section 101(5) of the Bankruptcy Code.

"**Company Claims/Interests**" means any Claim against, or Equity Interest in, a Company Party, including the Term Loan Claims, the 2028 Notes Claims, the 2029 Notes Claims, the Royalty Claims, and the Convertible Preferred Stock.

"**Company Parties**" has the meaning set forth in the preamble to this Agreement.

"**Company Party Termination Events**" has the meaning set forth in Section 14.04 of this Agreement.

"**Conditional Disclosure Statement Order**" means the order entered by the Bankruptcy Court on the docket of the Chapter 11 Cases conditionally approving the Disclosure Statement and approving the Solicitation Materials.

"**Confidentiality Agreement**" means an executed confidentiality agreement, including with respect to the issuance of a "cleansing letter" or other public disclosure of material non-public information agreement, in connection with any proposed Restructuring Transactions.

"**Confirmation Order**" means the confirmation order with respect to the Plan.

"**Consenting 1L Lenders**" has the meaning set forth in the preamble to this Agreement.

"**Consenting 2028 Noteholders**" has the meaning set forth in the preamble to this Agreement.

"**Consenting 2029 Noteholders**" has the meaning set forth in the preamble to this Agreement.

"**Consenting Funded Debt Parties**" has the meaning set forth in the preamble to this Agreement.

"**Consenting Funded Debt Party Termination Events**" has the meaning set forth in Section 14.01 of this Agreement.

"**Consenting Preferred Shareholders**" has the meaning set forth in the preamble to this Agreement.

"**Consenting Royalty Investor Termination Events**" has the meaning set forth in Section 14.02 of this Agreement.

"**Consenting Royalty Investors**" has the meaning set forth in the preamble to this Agreement.

"**Consenting Royalty Investors Advisors**" means, collectively, Hogan Lovells Cadwalader US LLP, as counsel, and Stifel Financial Corp., as financial advisor.

"**Consenting Stakeholders**" has the meaning set forth in the preamble to this Agreement.

"**Convertible Preferred Stock**" means an aggregate of 20,000 shares of 0% Series A convertible perpetual preferred stock, par value $0.0001 per share, issued by Karyopharm under that certain Certificate of Designations of 0% Series A Convertible Perpetual Preferred Stock of Karyopharm Therapeutics Inc., dated as of September 17, 2026, in connection with the Fee Agreement.

"**Debtors**" means the Company Parties that commence the Chapter 11 Cases.

"**Definitive Documents**" means the documents listed in Section 3.01.

"**DIP Agent**" means the administrative agent and collateral agent under the DIP Facility, its successors, assigns, or any replacement agent appointed pursuant to the terms of the DIP Documents.

"**DIP Budget**" has the meaning set forth in the DIP Orders.

"**DIP Documents**" means, collectively, the DIP Term Sheet, the DIP Motion, the DIP Orders, any credit agreement governing the DIP Facility, and any other agreements, documents, and instruments delivered or entered into in connection therewith, including any guarantee agreements, pledge and collateral agreements, intercreditor agreements, and other security documents, as any of the foregoing may be amended, modified, or supplemented from time to time in accordance with the terms hereof and thereof.

"**DIP Facility**" means the superpriority senior secured DIP term loan facility to be provided on the terms set forth in the DIP Documents.

"**DIP Lenders**" has the meaning set forth in the DIP Term Sheet.

"**DIP Motion**" means any motion filed by the Company Parties seeking entry of the DIP Orders, together with all exhibits thereto and any declarations, affidavits, or other documents filed in connection with such motion.

"**DIP Orders**" means, together, the Interim DIP Order, the Final DIP Order, and any other order approving the DIP Facility.

"**DIP Term Sheet**" means that certain term sheet containing the material terms of the DIP Facility, attached hereto as **Exhibit D**.

"**Disclosure Statement**" means the disclosure statement with respect to the Plan and all exhibits, appendices, and schedules thereto, each as amended, supplemented, or otherwise modified from time to time in accordance with the terms thereof or hereof, as attached hereto as **Exhibit C**.

"**Disclosure Statement Order**" means the interim and final orders of the Bankruptcy Court entered on the docket of the Chapter 11 Cases approving the Disclosure Statement (including the Conditional Disclosure Statement Order) and, to the extent necessary, approving the related Solicitation Materials, which final order may be the Confirmation Order.

"**Entity**" has the meaning set forth in section 101(15) of the Bankruptcy Code.

"**Equity Interests**" means, collectively, the shares (or any class thereof), common stock, preferred stock, limited liability company interests, and any other equity, ownership, or profits interests of any Company Party, and options, warrants, rights, or other securities or agreements to acquire or subscribe for, or which are convertible into the shares (or any class thereof) of, common stock, preferred stock, limited liability company interests, or other equity, ownership, or profits interests of any Company Party (in each case whether or not arising under or in connection with any employment agreement); provided that 2028 Notes Claims and 2029 Notes Claims shall not constitute Equity Interests.

"**Execution Date**" has the meaning set forth in the preamble to this Agreement.

"**Fee Agreement**" means that certain letter agreement, *Re: Fee Agreement Pursuant to Forbearance Agreement*, dated as of September 10, 2026, entered into by and among Karyopharm

and each of the Consenting Stakeholders party to the September 2026 Forbearance Agreement, as amended, restated, amended and restated, supplemented, or otherwise modified from time to time.

"**Final DIP Order**" means an order by the Bankruptcy Court entered on the docket of the Chapter 11 Cases approving the DIP Facility and related relief on a final basis.

"**First Day Pleadings**" means the first-day pleadings that the Company Parties, in consultation with the Required Consenting Funded Debt Parties, determine are necessary or desirable to file with the Bankruptcy Court.

"**Funded Debt**" means, collectively, the 2028 Notes, the 2029 Notes, and the Term Loans.

"**Governmental Entity**" means any "Governmental Unit" as defined in section 101(27) of the Bankruptcy Code and any applicable federal, state, local, or foreign government or any agency, bureau, board, commission, court or arbitral body, department, political subdivision, regulatory or administrative authority, tribunal, or other instrumentality thereof, or any self-regulatory organization.

"**HCR Collateral Management**" means HCR Collateral Management, LLC, as collateral agent under the Royalty Agreement.

"**HCR Karyopharm SPV**" means HCR Karyopharm SPV, LLC, as replacement collateral agent under the Royalty Agreement.

"**Highbridge Funds**" means, collectively, each holder of Company Claims/Interests whose Company Claims/Interests are beneficially owned or managed by Highbridge Capital Management, LLC or any of its affiliates, and each holder of Company Claims/Interests that is an affiliate of Ayrmid.

"**Intercreditor Agreement**" means that certain Amended and Restated Intercreditor Agreement, dated as of October 10, 2025, by and among Wilmington Savings Fund Society, FSB, as administrative agent and collateral agent under the Term Loan Credit Agreement, Wilmington Savings Fund Society, FSB, in its capacity as collateral trustee under that certain Collateral Trust Agreement, dated as of October 10, 2025, and HCR Karyopharm SPV, LLC, as royalty collateral agent, as acknowledged by Karyopharm and the other grantors party thereto, as may be amended, restated, amended and restated, supplemented, or otherwise modified from time to time.

"**Interim DIP Order**" means an order by the Bankruptcy Court entered on the docket of the Chapter 11 Cases approving the DIP Facility and related relief on an interim basis.

"**Joinder**" means an executed form of the joinder providing, among other things, that a holder of Company Claims/Interests is bound by the terms of this Agreement and substantially in the form attached hereto as **Exhibit G**.

"**Karyopharm Europe**" means Karyopharm Europe GmbH.

"**Law**" means any federal, state, local, or foreign law (including, in each case, any common law), statute, code, ordinance, rule, regulation, decree, injunction, order, ruling, assessment, writ,

or other legal requirement, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a Governmental Entity of competent jurisdiction (including the Bankruptcy Court).

"**Lender Capacity**" means, with respect to the Highbridge Funds, acting solely in their capacity as a holder of Company Claims/Interests and a member of the Ad Hoc Group.

"**Merger Agreement**" means an agreement to be entered into pursuant to the Ayrmid Transaction Term Sheet in order to effectuate the Ayrmid Transaction, including all exhibits and schedules thereto, as may be amended, modified, or supplemented in accordance with the terms thereof and this Agreement, a substantially final form of which shall be filed with the Plan Supplement.

"**MF CVR Agreement**" means the contingent value rights agreement providing for a synthetic royalty in the proceeds of XPOVIO® (selinexor) for patients with myelofibrosis, a substantially final form of which shall be filed with the Plan Supplement.

"**Milestones**" has the meaning set forth in Section 4.01.

"**New Corporate Governance Documents**" means, in the event of consummation of the Ayrmid Transaction, the documents providing for corporate governance of NewCo and/or the Reorganized Debtors, as applicable, including charters, bylaws, operating agreements, or other organizational documents or shareholders' agreements, as applicable, which (a) shall be consistent with the terms of this Agreement and the consent rights contained herein and (b) shall be filed with the Plan Supplement.

"**NewCo**" means, in the event of consummation of the Ayrmid Transaction, the Entity that, upon consummation of the transactions pursuant to the Merger Agreement, shall directly or indirectly own the equity interests and assets of Reorganized Karyopharm and Ayrmid acquired in the Ayrmid Transaction or, if the Merger Agreement so provides, is the surviving Entity of the Ayrmid Transaction, in each case as identified in the Merger Agreement and the Plan.

"**NewCo Term Loan Credit Agreement**" means the credit agreement among NewCo and certain other Reorganized Debtors and affiliates, as applicable, and the lenders and administrative and collateral agents party thereto to effectuate the issuance of the exit term loans.

"**NewCo Term Loan Documents**" means the NewCo Term Loan Credit Agreement, any security agreement, and all other documentation governing the NewCo Term Loan Facility.

"**NewCo Term Loan Facility**" means the senior secured exit term loan facility in the amount of $135,000,000 in new money loans entered into by NewCo and certain other Reorganized Debtors as set forth in the Ayrmid Transaction Term Sheet and in the NewCo Term Loan Documents.

"**NOL Motion**" means the *Debtors' Emergency Motion for Entry of an Order (I) Approving Notification and Hearing Procedures for Certain Transfers of, and Declarations of Worthlessness with Respect to, Restricted Interests; and (II) Granting Related Relief* to be filed in the Chapter 11 Cases.

"**Parties**" has the meaning set forth in the preamble to this Agreement.

"**Permit**" means any license, permit, registration, authorization, approval, certificate of authority, accreditation, qualification, or similar document or authority that has been issued or granted by any Governmental Entity, if applicable.

"**Permitted Transfer**" means each Transfer of any Company Claim/Interest that meets the requirements of Section 11 of this Agreement.

"**Permitted Transferee**" means each transferee of any Company Claims/Interests who meets the requirements of Section 11.01.

"**Petition Date**" means the first date any of the Company Parties commences a Chapter 11 Case with the Bankruptcy Court.

"**Plan**" means the joint chapter 11 plan filed by the Debtors under chapter 11 of the Bankruptcy Code that embodies the Restructuring Transactions, which shall be in form and substance reasonably acceptable to the Required Consenting Funded Debt Parties, the Company Parties and, to the extent set forth in Section 3.02, Ayrmid, attached hereto as **Exhibit B**.

"**Plan Effective Date**" means the occurrence of the effective date of the Plan according to its terms.

"**Plan Supplement**" means the compilation of documents, forms of documents, term sheets, agreements, schedules, or exhibits to the Plan (together with any amendments, supplements, or modifications thereto) that will be filed by the Debtors with the Bankruptcy Court, which shall be in form and substance reasonably acceptable to the Required Consenting Funded Debt Parties, the Company Parties and, to the extent set forth in Section 3.02, Ayrmid.

"**Qualified Marketmaker**" means an Entity that (a) holds itself out to the public, the syndicated loan market, the high yield bond market, or the applicable private markets as standing ready in the ordinary course of business to purchase from customers and sell to customers Company Claims/Interests (or enter with customers into long and short positions in Company Claims/Interests), in its capacity as a dealer or market maker in Company Claims/Interests and (b) is, in fact, regularly in the business of making a market in claims against issuers or borrowers (including term loans or debt or equity securities).

"**Reorganized Debtors**" means, collectively, Reorganized Karyopharm and each other Debtor, or any successor or assign thereto, by merger, consolidation, or otherwise (including NewCo), on and after the Plan Effective Date.

"**Reorganized Karyopharm**" means Karyopharm, as reorganized on the Plan Effective Date in accordance with the Plan.

"**Required Consenting 1L Lenders**" means, as of the relevant date and subject to Section 16.26, Consenting 1L Lenders holding at least 50.01% of the aggregate outstanding principal amount of the Term Loans that are held by the Consenting 1L Lenders; provided, that if

as of such date there are two or more Consenting 1L Lenders, Required Consenting 1L Lenders shall include at least two unaffiliated Consenting 1L Lenders.

"**Required Consenting 2028 Noteholders**" means, as of the relevant date and subject to Section 16.26, Consenting 2028 Noteholders holding at least 50.01% of the aggregate outstanding principal amount of the 2028 Notes that are held by the Consenting 2028 Noteholders; provided, that if as of such date there are two or more Consenting 2028 Noteholders, Required Consenting 2028 Noteholders shall include at least two unaffiliated Consenting 2028 Noteholders.

"**Required Consenting 2029 Noteholders**" means, as of the relevant date and subject to Section 16.26, Consenting 2029 Noteholders holding at least 50.01% of the aggregate outstanding principal amount of the 2029 Notes that are held by the Consenting 2029 Noteholders; provided, that if as of such date there are two or more Consenting 2029 Noteholders, Required Consenting 2029 Noteholders shall include at least two unaffiliated Consenting 2029 Noteholders.

"**Required Consenting Funded Debt Parties**" means, as of the relevant date and subject to Section 16.26, each of the Required Consenting 1L Lenders, the Required Consenting 2028 Noteholders, and the Required Consenting 2029 Noteholders.

"**Required Consenting Royalty Investors**" means, as of the relevant date, the Consenting Royalty Investors holding at least 50.01% of the aggregate amount of the Royalty Claims owed to the Consenting Royalty Investors.

"**Restructuring Fees and Expenses**" means all reasonable and documented accrued and unpaid fees, costs, expenses, and disbursements of each of the Ad Hoc Group Advisors, in each case, incurred, as applicable to such advisor, in connection with the Restructuring Transactions, this Agreement, the September 2026 Forbearance Agreement, the Chapter 11 Cases, and the Definitive Documents, including all such fees (including any earned and payable restructuring, sale, success, or other transaction or similar fee), costs, expenses, and disbursements incurred in connection with the diligence, development, negotiation, preparation, and execution of, and any amendment, supplement, or modification to, this Agreement, the September 2026 Forbearance Agreement, and the Definitive Documents, the diligence, analysis, consummation, and administration of the transactions contemplated hereby and thereby, and the enforcement or preservation of any rights under this Agreement, the September 2026 Forbearance Agreement, or any Definitive Document, in each case whether incurred before, on, or after the Execution Date.

"**Restructuring Transactions**" has the meaning set forth in the recitals to this Agreement.

"**Royalty Agreement**" means that certain *Revenue Interest Financing Agreement*, dated September 14, 2019, by and among Karyopharm, the Royalty Investor Representative, and certain Royalty Investors, as amended by (i) that certain *Omnibus Amendment to Transaction Documents*, dated June 23, 2021, by and among Karyopharm, Karyopharm Europe, Karyopharm Therapeutics (Bermuda) Ltd., certain Royalty Investors party thereto, the Royalty Investor Representative, and HCR Collateral Management, (ii) that certain *Second Amendment to Revenue Interest Financing Agreement*, dated August 1, 2023, by and among Karyopharm, Karyopharm Europe, certain Royalty Investors party thereto, the Royalty Investor Representative, and HCR Collateral Management, (iii) that certain *Second Omnibus Amendment to Transaction Documents*, dated May

8, 2024, by and among Karyopharm, Karyopharm Europe, certain Royalty Investors party thereto, the Royalty Investor Representative, HCR Collateral Management, and HCR Karyopharm SPV, (iv) that certain *Third Amendment to Revenue Interest Financing Agreement*, dated August 14, 2025, by and among Karyopharm, certain Royalty Investors party thereto, the Royalty Investor Representative, HCR Collateral Management, and HCR Karyopharm SPV, (v) that certain *Fourth Amendment to Revenue Interest Financing Agreement*, dated August 27, 2025, by and among Karyopharm, certain Royalty Investors party thereto, the Royalty Investor Representative, HCR Collateral Management, and HCR Karyopharm SPV, (vi) that certain *Sixth Amendment to Revenue Interest Financing Agreement*, dated October 7, 2025, by and among Karyopharm, certain Royalty Investors party thereto, the Royalty Investor Representative, HCR Collateral Management, and HCR Karyopharm SPV, and as may be further amended, restated, amended and restated, supplemented, or otherwise modified from time to time.

"**Royalty Claims**" means any Claims on account of the Royalty Agreement.

"**Royalty Investor Representative**" means HealthCare Royalty Management, LLC, as investor representative under the Royalty Agreement.

"**Royalty Investors**" has the meaning set forth in the Royalty Agreement.

"**Royalty Investors Fees**" means, collectively, (a) reasonable and documented accrued and unpaid fees for the Consenting Royalty Investors' legal counsel (subject only to objection if in excess of $600,000), and (b) with respect to the Consenting Royalty Investors' financial advisor, (i) monthly fees of $150,000 solely to the extent accruing from the Petition Date until the closing of the Ayrmid Transaction or an Acceptable Alternative Transaction and (ii) solely in the event of the consummation of an Acceptable Alternative Transaction, (A) if transaction proceeds are sufficient to pay all Funded Debt outstanding in full and in cash, then a $1,000,000 deferred fee, or (B) if transaction proceeds are insufficient to pay all Funded Debt outstanding in full in cash, then a $500,000 deferred fee, in each case payable upon consummation of such Acceptable Alternative Transaction and solely from the proceeds thereof.

"**Rules**" means Rule 501(a)(1), (2), (3), and (7) of the Securities Act.

"**Sale Order**" means any order by the Bankruptcy Court entered on the docket of the Chapter 11 Cases approving a Sale Transaction, which order may be the Confirmation Order, if applicable.

"**Sale Process Matter**" means any matter relating to the marketing, solicitation, negotiation, evaluation, selection, approval, or consummation of a Sale Transaction or any Alternative Restructuring Proposal, including (a) the Bidding Procedures Motion, the Bidding Procedures Order, the Sale Order, the Merger Agreement, and any other asset purchase agreement with respect to the Company Parties' assets, (b) bid deadlines, bid qualification and selection criteria, auction mechanics, minimum overbid increments, and stalking horse designation, (c) any bid protections, including break-up fees and expense reimbursement, (d) credit bidding, and (e) any sale-related Milestones or consent rights.

"**Sale Transaction**" means the sale of all or substantially all of the Debtors' assets to, or a merger of the Debtors with, Ayrmid or another party selected by the Debtors with the consent of

the Required Consenting Funded Debt Parties, each of which shall be effectuated pursuant to the Plan or section 363 of the Bankruptcy Code and included in the Restructuring Transactions.

"**Securities Act**" means the Securities Act of 1933, as amended.

"**September 2026 Forbearance Agreement**" means that certain *Forbearance Agreement and Limited Waiver to Indentures*, dated as of September 10, 2026, entered into by and among the Company Parties, certain of the Consenting Stakeholders, and the Agents/Trustees, as amended, restated, amended and restated, supplemented, or otherwise modified from time to time.

"**Solicitation**" means the solicitation of votes to accept or reject the Plan pursuant to sections 1125 and 1126 of the Bankruptcy Code in accordance with this Agreement and the Plan.

"**Solicitation Materials**" means all documents, ballots, forms, and other materials provided in connection with the Solicitation.

"**Term Loan Claims**" means any Claims on account of the Term Loans.

"**Term Loan Credit Agreement**" means that certain *Credit and Guaranty Agreement*, dated as of May 8, 2024, as amended by that certain *First Amendment and Waiver to Credit and Guaranty Agreement*, dated October 7, 2025, and that certain *Second Amendment to Credit and Guaranty Agreement*, dated as of February 27, 2026, and as otherwise amended, restated, amended and restated, supplemented, or otherwise modified from time to time.

"**Term Loans**" means the indebtedness under the Term Loan Credit Agreement.

"**Termination Date**" means the date on which termination of this Agreement as to a Party is effective in accordance with Sections 14.01, 14.02, 14.03, 14.04, 14.05, 14.06 or 15(b).

"**Transfer**" means to sell, resell, reallocate, use, pledge, loan, assign, transfer, hypothecate, participate, donate, tender or otherwise encumber or dispose of, directly or indirectly (including through derivatives, options, swaps, pledges, forward sales or other transactions), or to grant any proxy with respect to, deposit into any voting trust, or enter into any voting agreement with respect to, any Company Claims/Interests.

"**Transfer Agreement**" means an executed form of the transfer agreement providing, among other things, that a transferee of Company Claims/Interests is bound by the terms of this Agreement and substantially in the form attached hereto as **Exhibit F**.

"**Trustee**" means any indenture trustee, collateral trustee, or other trustee or similar Entity under the Term Loans, the 2028 Notes, the 2029 Notes, and/or the Royalty Agreement, including any successors thereto.

1.02. Interpretation. For purposes of this Agreement:

(a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and neuter genders;

(b) capitalized terms defined only in the plural or singular form shall nonetheless have their defined meanings when used in the opposite form;

(c) unless otherwise specified and without limiting the applicable consent rights of the Consenting Stakeholders as set forth in this Agreement, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions;

(d) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit shall mean such document, schedule, or exhibit, as it may have been or may be amended, restated, supplemented, or otherwise modified from time to time; provided, that any capitalized terms herein which are defined with reference to another agreement are defined with reference to such other agreement as of the date of this Agreement, without giving effect to any termination of such other agreement or amendments to such capitalized terms in any such other agreement following the date hereof;

(e) unless otherwise specified, all references herein to "Sections" are references to Sections of this Agreement;

(f) the words "herein," "hereof," and "hereto" refer to this Agreement in its entirety rather than to any particular portion of this Agreement;

(g) captions and headings to Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Agreement;

(h) references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable limited liability company Laws;

(i) the use of "include" or "including" is without limitation, whether stated or not;

(j) the phrase "counsel to the Consenting Stakeholders" refers in this Agreement to each counsel identified pursuant to Section 16.10 other than counsel to the Company Parties or counsel to Ayrmid;

(k) the phrase "hold, own, or control" shall be deemed to be followed by the words "(including through beneficial ownership or as investment advisor, sub-advisor, or manager of discretionary accounts or funds for the account of a beneficial owner)";

(l) to "beneficially own" or have "beneficial ownership" shall include having an interest in any Company Claims/Interests as a result of an open trade, total return swap, or other similar transaction; provided, that this clause (l) shall not apply for purposes of Section 11, and whether any Transfer has occurred shall be determined solely in accordance with Section 11; and

(m) to the extent any commitment, covenant, or other obligation of a Consenting Stakeholder under this Agreement requires or contemplates any action to be taken by an Agent/Trustee, such commitment, covenant, or obligation shall be construed to require only that

such Consenting Stakeholder use commercially reasonable efforts to direct the applicable Agent/Trustee, or any of its brokers, sub-agents, nominees, or custodians, to take such action; provided, that no Consenting Stakeholder shall be required to provide any Agent/Trustee, or any other person, with any indemnity, security, prefunding, or similar monetary undertaking in connection with giving any such direction.

**Section 2.** ***Effectiveness of This Agreement***. This Agreement shall become effective and binding upon each of the Parties on the date and time on which all of the following conditions have been satisfied or waived by the applicable Parties in accordance with this Agreement:

(a) each of the Company Parties shall have executed and delivered counterpart signature pages of this Agreement to counsel to each of the Parties;

(b) holders of at least 66.7% of the aggregate outstanding principal amount of the Term Loans shall have executed and delivered counterpart signature pages of this Agreement to counsel to the Company Parties;

(c) holders of at least 66.7% of the aggregate outstanding principal amount of the 2028 Notes shall have executed and delivered counterpart signature pages of this Agreement to counsel to the Company Parties;

(d) holders of at least 66.7% of the aggregate outstanding principal amount of the 2029 Notes shall have executed and delivered counterpart signature pages of this Agreement to counsel to the Company Parties;

(e) holders of at least 66.7% of the aggregate outstanding amount of the Royalty Claims shall have executed and delivered counterpart signature pages of this Agreement to counsel to the Company Parties;

(f) Ayrmid shall have executed and delivered its counterpart signature page of this Agreement to counsel to the Company Parties;

(g) the Company Parties shall have paid in full in cash all Restructuring Fees and Expenses incurred up to (and including) the Agreement Effective Date for which a reasonably detailed invoice has been received by the Company Parties no later than two (2) Business Days prior to the Agreement Effective Date; and

(h) counsel to the Company Parties shall have given notice to each counsel to the Consenting Stakeholders and counsel to Ayrmid in the manner set forth in Section 16.10 hereof (by email or otherwise) that the other conditions to the Agreement Effective Date set forth in this Section 2 have occurred.

**Section 3.** ***Definitive Documents***.

3.01. The Definitive Documents governing the Restructuring Transactions (including all exhibits, schedules, amendments, modifications, supplements, appendices, annexes, instructions, and attachments thereto) shall include the following: (a) this Agreement; (b) the Plan; (c) the Confirmation Order; (d) the Disclosure Statement; (e) the Disclosure Statement Order; (f) the

Solicitation Materials; (g) the First Day Pleadings and all orders sought pursuant thereto; (h) the DIP Documents; (i) the Plan Supplement; (j) the Bidding Procedures Motion and the Bidding Procedures Order; (k) the Sale Order; (l) the Merger Agreement or any other asset purchase agreement with respect to the Company Parties' assets; (m) the MF CVR Agreement; (n) the New Corporate Governance Documents; (o) the NewCo Term Loan Documents; (p) the restated Royalty Agreement; and (q) any and all other agreements, deeds, documentation, instruments, notices, filings, pleadings, motions, applications, briefs, objections, responses, declarations, affidavits, schedules, certificates, letters, memoranda, term sheets, stipulations, settlements, releases, and orders (and any amendments, modifications, or supplements to any of the foregoing) that are necessary or advisable (or that are executed or delivered) to implement, consummate, or document this Agreement, the Plan, and/or the Restructuring Transactions.

3.02. The Definitive Documents not executed or in a form attached to this Agreement as of the Execution Date remain subject to negotiation and completion. Upon completion, the Definitive Documents and every other document, deed, agreement, filing, notification, letter, or instrument related to this Agreement, the Plan, and/or the Restructuring Transactions shall, except as otherwise expressly provided herein, contain terms, conditions, representations, warranties, and covenants consistent with the terms of this Agreement, as they may be modified, amended, or supplemented in accordance with Section 15. Further, the Definitive Documents not executed or in a form attached to this Agreement as of the Execution Date (and any modifications, amendments, or supplements thereto) shall, except as provided herein, be in form and substance reasonably acceptable to the Company Parties and the Required Consenting Funded Debt Parties; provided, that, the Company Parties' consent rights as to the form and substance of the NewCo Term Loan Documents shall be limited to such terms that directly concern the feasibility of the Plan; provided, further, that, the Bidding Procedures Motion and the Bidding Procedures Order (and any modifications, amendments, or supplements thereto) shall be in form and substance acceptable to the Required Consenting Funded Debt Parties and, solely with respect to the portions thereof concerning the Bid Protections, Ayrmid Outside Date, and the other terms on which Ayrmid may be required to serve as back-up bidder if such requirements are inconsistent with the terms hereof or of the Ayrmid Transaction Term Sheet, Ayrmid. Notwithstanding anything to the contrary herein, until an Acceptable Alternative Transaction Notification occurs, (a) the Plan, the Disclosure Statement, the Conditional Disclosure Statement Order, the Plan Supplement, the Confirmation Order, the Bidding Procedures Motion (solely to the extent materially inconsistent with the terms of this Agreement), the Bidding Procedures Order (solely to the extent materially inconsistent with the terms of this Agreement), the Merger Agreement, the MF CVR Agreement, the NewCo Term Loan Documents, the New Corporate Governance Documents and any modifications, amendments, or supplements to the foregoing shall be in form and substance reasonably acceptable to Ayrmid, and (b) each other Definitive Document shall, solely to the extent such Definitive Document relates to, describes, or affects Ayrmid, the Ayrmid Transaction, the Bid Protections, the Ayrmid Transaction Term Sheet or otherwise affects the rights or obligations of Ayrmid hereunder or thereunder, be in form and substance reasonably acceptable to Ayrmid. Notwithstanding anything to the contrary herein, neither the Consenting Stakeholders nor Ayrmid shall have consent rights with respect to any declarations filed by the Company Parties in the Chapter 11 Cases.

**Section 4.** ***Milestones.***

4.01. On and after the Agreement Effective Date, the Company Parties shall implement the Restructuring Transactions in accordance with the following milestones (each, a "**Milestone**," and, together, the "**Milestones**"), in each case, unless extended or waived in writing (email from counsel to the Ad Hoc Group shall suffice) by the Required Consenting Funded Debt Parties in their sole discretion or extended in accordance with Section 4.02; provided, that the Milestones set forth in Sections 4.01(b)(iii), 4.01(f) and, to the extent that the Debtors have not selected an Acceptable Alternative Transaction, 4.01(h) (the "**Ayrmid Milestones**") may not be extended or waived without the prior written consent of Ayrmid (email from counsel to Ayrmid shall suffice), except as provided in Section 4.02; provided, further, that if any Milestone is not satisfied due to unavailability of the Bankruptcy Court, then such Milestone is so extended to the first day the Bankruptcy Court does have availability:

(a) no later than November 2, 2026, (i) the Petition Date shall have occurred, and (ii) the Debtors shall have filed the First Day Pleadings, the DIP Motion, the proposed Interim DIP Order, the Plan, the Disclosure Statement, the Solicitation Materials, and the proposed Bidding Procedures Order;

(b) no later than three (3) calendar days after the Petition Date, the Bankruptcy Court shall have entered on the docket of the Chapter 11 Cases (i) the Conditional Disclosure Statement Order, (ii) the Interim DIP Order, and (iii) the Bidding Procedures Order; provided, that with respect to the Bidding Procedures Order, this Milestone shall be deemed satisfied regardless of whether the Bidding Procedures Order includes approval of any break-up fee, expense reimbursement, or other bid protection identified in the Ayrmid Transaction Term Sheet;

(c) no later than thirty-five (35) days after the Petition Date, the Bankruptcy Court shall have entered on the docket for the Chapter 11 Cases the Final DIP Order;

(d) no later than sixty (60) days after the Petition Date, the Debtors shall have conducted an auction, if necessary, pursuant to the Bidding Procedures Order;

(e) no later than eighty (80) days after the Petition Date, the Bankruptcy Court shall have entered on the docket for the Chapter 11 Cases the Disclosure Statement Order;

(f) no later than eighty (80) days after the Petition Date, the Bankruptcy Court shall have entered on the docket for the Chapter 11 Cases the Sale Order (which may be the Confirmation Order);

(g) no later than eighty (80) days after the Petition Date, the Bankruptcy Court shall have entered on the docket for the Chapter 11 Cases the Confirmation Order; and

(h) no later than one hundred ten (110) days after the Petition Date, the Plan Effective Date shall have occurred.

4.02. If the Company Parties deliver an Acceptable Alternative Transaction Notification and the Acceptable Alternative Transaction is not consummated on or before one hundred ten (110) days after the Petition Date (or such other date as may be set forth in the Bidding

Procedures Order), then, subject to the terms of the Bidding Procedures Order, if Ayrmid has been designated as the back-up bidder, then the applicable Milestones set forth in Section 4.01 shall, with the consent of the Required Consenting Funded Debt Parties and, with respect to the Ayrmid Milestones only, Ayrmid (each of which is not to be unreasonably withheld), be deemed extended to the extent reasonably necessary to effectuate the consummation of the Ayrmid Transaction.

**Section 5.** ***Commitments of the Consenting Stakeholders***.

5.01. General Commitments.

(a) During the Agreement Effective Period but subject to Section 14, each Consenting Stakeholder agrees, subject to the limitations on the Highbridge Funds in Section 16.26 hereof, in respect of all of its Company Claims/Interests and on behalf of itself only, to:

(i) support the Restructuring Transactions and vote and use commercially reasonable efforts to exercise any powers or rights available to it (including in any board, shareholders', or creditors' meeting or in any process requiring voting or approval to which they are legally entitled to participate) in each case in favor of any matter requiring approval to the extent consistent with this Agreement and necessary to implement the Restructuring Transactions;

(ii) use commercially reasonable efforts to cooperate with and assist the Company Parties in obtaining additional support for the Restructuring Transactions from the Company Parties' other stakeholders;

(iii) use commercially reasonable efforts to oppose any party taking any actions contemplated in Section 5.01(b);

(iv) use commercially reasonable efforts to give any notice, order, instruction, or direction to the applicable Agents/Trustees reasonably necessary to give effect to the Restructuring Transactions; provided, that such Consenting Stakeholder shall not be required to provide the applicable Agents/Trustees, or any other person, with any indemnities or similar monetary undertakings in connection with taking any such action or direction;

(v) subject to the terms of this Agreement and the Definitive Documents, negotiate in good faith any additional or alternative provisions or agreements to address any legal, financial, or structural impediment that may arise that would reasonably be expected to prevent, hinder, impede, or delay the consummation of the Restructuring Transactions or that are reasonably necessary to effectuate the consummation of the Restructuring Transactions;

(vi) negotiate in good faith and use commercially reasonable efforts to execute and implement the Definitive Documents that are consistent with this Agreement to which it is required to be a party; provided, that subject to the terms of this Agreement, no Consenting Stakeholder shall be obligated to (1) waive (to the extent such Consenting Stakeholder has the power or right to waive) any condition to the consummation of any part of the Restructuring Transactions set forth in any Definitive Document or (2) approve any Definitive Document that is not in form and substance reasonably acceptable to such Consenting Stakeholder if such Definitive Document is required to be in form and substance reasonably acceptable to such Consenting Stakeholder pursuant to this Agreement;

(vii) consent to, be deemed to have consented to, support, and not oppose the DIP Facility and entry of the DIP Orders, to the extent consistent with the terms of this Agreement;

(viii) use commercially reasonable efforts to notify the Company Parties in writing (email being sufficient) within two (2) Business Days (or as soon as reasonably practicable) after any Consenting Stakeholder receives notice or obtains actual knowledge of (i) any event or circumstance that would be reasonably expected to permit any Party to terminate, or result in the termination of, this Agreement, (ii) any matter or circumstance that is, or is reasonably likely to be, a material impediment to the implementation or consummation of the Restructuring Transactions, (iii) any breach of this Agreement (including any breach by a Consenting Stakeholder), (iv) any representation or statement made or deemed made by any Consenting Stakeholder under this Agreement that is or proves to have been materially incorrect or misleading in any respect when made or deemed made, (v) the commencement or threat of any material governmental or third-party complaint, litigation, investigation, or proceeding, including any proceeding challenging the validity of the Restructuring Transactions or any Definitive Document, and (vi) any enforcement or remedial action taken by any creditor of any Company Party, whether under any agreement governing the Funded Debt or otherwise; and

(ix) cooperate in good faith and use commercially reasonable efforts to structure and implement the Restructuring Transactions in a manner that optimizes the tax efficiency (including by way of the preservation or enhancement of favorable tax attributes) of the Restructuring Transactions for the Company Parties, the Consenting Stakeholders and Ayrmid, as reasonably determined by the Company Parties, the Required Consenting Funded Debt Parties and Ayrmid; provided, that in the event that the Debtors elect to proceed with an Acceptable Alternative Transaction, the Consenting Stakeholders shall not be required to optimize tax efficiency for Ayrmid, nor shall Ayrmid have reasonable determination rights with respect to such Acceptable Alternative Transaction.

(b) During the Agreement Effective Period but subject to Section 14, each Consenting Stakeholder agrees, in respect of all of its Company Claims/Interests and on behalf of itself only, that it shall not directly or indirectly:

(i) object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the Restructuring Transactions;

(ii) propose, file, support, or vote in favor of any Alternative Restructuring Proposal that does not provide for payment in cash in full at closing of at least the amount set forth in the definition of "Acceptable Alternative Transaction";

(iii) file any motion, pleading, or other document with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is not materially consistent with this Agreement or the Plan;

(iv) initiate, or have initiated on its behalf, any litigation or proceeding of any kind with respect to the Chapter 11 Cases, this Agreement, the Definitive Documents, or the other Restructuring Transactions contemplated herein against the Company Parties or the other Parties

other than to enforce this Agreement or any Definitive Document or as otherwise permitted under this Agreement;

(v) exercise, or direct any other person to exercise, any right or remedy for the enforcement, collection, or recovery of any Claims against or Equity Interests in the Company Parties; or

(vi) object to, delay, impede, or take any other action to interfere with the Company Parties' ownership and possession of their assets, wherever located, or interfere with the automatic stay arising under section 362 of the Bankruptcy Code.

(c) Notwithstanding anything to the contrary in this Agreement, if the Company Parties determine to pursue an Acceptable Alternative Transaction, then (i) each Consenting Stakeholder shall be bound by, and shall comply with its commitments under Sections 5.01 and 5.02 with respect to such Acceptable Alternative Transaction, the Plan and any other Definitive Documents implementing the same and (ii) the Ayrmid Transaction Term Sheet, the Merger Agreement, and any other document that would otherwise constitute a Definitive Document, to the extent it concerns the Ayrmid Transaction, shall in each case cease (unless and until Ayrmid is both designated as the back-up bidder and subsequently selected as the successful bidder) to (x) constitute part of the Restructuring Transactions or (y) be a Definitive Document; provided, that if such Acceptable Alternative Transaction would have a material, disproportionate, and adverse effect on the Company Claims/Interests held by any Consenting Stakeholder relative to the other Consenting Stakeholders holding Company Claims/Interests of the same class, the consent of each such affected Consenting Stakeholder shall also be required.

5.02. Commitments with Respect to Chapter 11 Cases.

(a) During the Agreement Effective Period but subject to Section 14, each Consenting Stakeholder that is entitled to vote to accept or reject the Plan pursuant to its terms agrees on behalf of itself only that it shall, subject to receipt by such Consenting Stakeholder, whether before or after the commencement of the Chapter 11 Cases, of the Solicitation Materials:

(i) vote (or, with respect to any unsettled trade purchases or open swap arrangements, give a direction to each applicable trade or swap counterparty to timely vote or cause to be voted) each of its impaired Company Claims/Interests to accept the Plan by delivering its duly executed and completed ballot accepting the Plan on a timely basis following the commencement of the solicitation of the Plan and its actual receipt of the Solicitation Materials and the ballot;

(ii) to the extent it is permitted to elect whether to opt out of or opt in to the releases set forth in the Plan, as applicable, (1) elect not to opt out of or (2) elect to opt in to, as applicable, the releases set forth in the Plan by timely delivering its duly executed and completed ballot(s) indicating such election;

(iii) not change, withdraw, amend, or revoke (or cause to be changed, withdrawn, amended, or revoked) any vote or election referred to in clauses (i) and (ii) above; and

(iv) support and not oppose the release, exculpation, injunction, and related provisions in the Plan.

(b) During the Agreement Effective Period but subject to Section 14, each Consenting Stakeholder, in respect of each of its Company Claims/Interests and on behalf of itself only, will support, and will not directly or indirectly object to, delay, impede, or take any other action to interfere with any motion or other pleading or document filed by a Company Party in the Bankruptcy Court that is consistent with this Agreement.

**Section 6.** ***Additional Provisions Regarding the Consenting Stakeholders' Commitments***. Notwithstanding anything contained in this Agreement, nothing in this Agreement shall: (a) affect the ability of any Consenting Stakeholder to consult with any other Consenting Stakeholder, the Company Parties, Ayrmid (subject to Section 16.26 hereof), or any other party in interest in the Chapter 11 Cases (including any official committee and the Office of the United States Trustee); (b) impair or waive the rights of any Consenting Stakeholder to assert or raise any objection permitted under this Agreement or any Definitive Document in connection with the Restructuring Transactions; (c) prevent any Consenting Stakeholder from enforcing this Agreement or any Definitive Document or asserting or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement or any Definitive Document; (d) limit the rights of any Consenting Stakeholder in respect of the Chapter 11 Cases, including appearing as a party in interest in any matter to be adjudicated in order to be heard concerning any matter arising in the Chapter 11 Cases that is not inconsistent with this Agreement, in each case, so long as the exercise of any such right is not inconsistent with such Consenting Stakeholder's obligations hereunder; (e) limit the ability of any Consenting Stakeholder to purchase, sell, or enter into any transactions regarding any Company Claims/Interests, subject to the terms of this Agreement and applicable Law; (f) except as and to the extent explicitly set forth in this Agreement, constitute a waiver or amendment of any term or provision of, or alter or diminish any right or obligation in, the Term Loan Credit Agreement, the 2028 Indenture, the 2029 Indenture, the Royalty Agreement or any related document; (g) except as and to the extent explicitly set forth in this Agreement, constitute a termination or release of any liens on, or security interests in, any of the assets or properties of the Company Parties that secure the obligations under the Term Loan Credit Agreement, the 2028 Indenture, the 2029 Indenture, the Royalty Agreement, or any related document; (h) except as and to the extent explicitly set forth herein or in any other Definitive Document, require any Consenting Stakeholder to incur, assume, become liable in respect of, or suffer to exist any expenses, liabilities, or other obligations, modify the economic consideration being provided to any Consenting Funded Debt Party under the Definitive Documents, or agree to or become bound by any commitments, undertakings, concessions, or other arrangements that could result in expenses, liabilities, or other obligations to such Consenting Stakeholder; (i) require any Consenting Stakeholder to take any action that is in violation of applicable Law or prevent any Consenting Stakeholder from taking any action that is required in order to comply with applicable Law; provided, that, if any Consenting Stakeholder proposes to take any action that is otherwise inconsistent with this Agreement or any other Definitive Document in order to comply with applicable Law, such Consenting Stakeholder shall provide, to the extent possible without violating applicable Law, at least five (5) Business Days' advance written notice to the Parties; (j) prohibit any Consenting Stakeholder from taking any action that is not inconsistent with this Agreement; or (k) require any Consenting Stakeholder to fund or commit to fund any additional

amounts (other than as expressly agreed in the DIP Term Sheet or in connection with an executed Definitive Document) without such Consenting Stakeholder's written consent.

**Section 7.** ***Commitments of Aymrid***.

7.01. General Commitments.

(a) During the Agreement Effective Period, Aymrid agrees that, subject to Section 14, it shall:

(i) support, and take all steps reasonably necessary and desirable to implement and consummate, the Aymrid Transaction in accordance with this Agreement, including the Milestones, and the Definitive Documents (solely in connection with the Aymrid Transaction);

(ii) use commercially reasonable efforts to cooperate with and assist the Company Parties in obtaining additional support for the Aymrid Transaction from the Company Parties' other stakeholders;

(iii) use commercially reasonable efforts to oppose and object to the efforts of any person or Entity seeking to object to, delay, impede, condition, or take any other action to interfere with the acceptance, implementation, or consummation of the Aymrid Transaction (including, if applicable, in Aymrid's reasonable determination, by timely filing objections or written responses), to the extent such opposition or objection is reasonably necessary or desirable to facilitate implementation of the Aymrid Transaction; provided, that nothing in this Section 7.01(a)(iii) shall limit or reduce Aymrid's obligations set forth in Section 7.02;

(iv) negotiate in good faith any additional or alternative provisions or agreements to address any legal, financial, or structural impediment that may arise that would reasonably be expected to prevent, hinder, impede, or delay the consummation of the Aymrid Transaction or that are necessary to effectuate the consummation of the Aymrid Transaction;

(v) negotiate in good faith and use commercially reasonable efforts to execute and implement the Definitive Documents (solely in connection with the Aymrid Transaction) that are consistent with this Agreement to which it is required to be a party; provided, that, subject to the terms of this Agreement, Aymrid shall not be obligated to (1) waive (to the extent Aymrid has the power or right to waive) any condition to the consummation of any part of the Aymrid Transaction set forth in any Definitive Document or (2) approve any Definitive Document that is not in form and substance reasonably acceptable to Aymrid if such Definitive Document is required to be in form and substance reasonably acceptable to Aymrid pursuant to this Agreement (solely in connection with the Aymrid Transaction);

(vi) support, and not oppose, entry of the DIP Orders, to the extent consistent with the terms of this Agreement;

(vii) comply with those obligations set forth in the Aymrid Transaction Term Sheet and the Merger Agreement (if applicable) and use commercially reasonable efforts to promptly consummate the Aymrid Transaction, and cooperate in obtaining any approvals required by Governmental Entities (or other regulatory bodies) to facilitate the closing of the Aymrid

Transaction; provided, that subject to the terms of this Agreement, Ayrmid shall not be obligated to (1) waive (to the extent Ayrmid has the power or right to waive) any condition to the consummation of any part of the Ayrmid Transaction set forth in any Definitive Document or (2) approve any Definitive Document that is not in form and substance reasonably acceptable to Ayrmid if such Definitive Document is required to be in form and substance reasonably acceptable to Ayrmid pursuant to this Agreement;

(viii) promptly notify counsel to the Company Parties and counsel to the Consenting Stakeholders (email being sufficient) within two (2) Business Days after Ayrmid receives notice or obtains actual knowledge of (1) any breach by Ayrmid of its obligations, representations, warranties, or covenants under this Agreement (including the Ayrmid Transaction Term Sheet) or the Merger Agreement (if applicable), and (2) the occurrence, or failure to occur, of any event of which Ayrmid is aware that would be likely to cause any condition precedent in the Merger Agreement (if applicable) or any other Definitive Document not to be satisfied or to become impossible to satisfy;

(ix) support all applicable releases, exculpations, injunctions, and discharges set forth in this Agreement, the Plan, and the other Definitive Documents;

(x) serve as the back-up bidder and commit to consummating the Ayrmid Transaction if, in accordance with the Bidding Procedures Order, the Debtors select an Acceptable Alternative Transaction as the successful bid; provided, that, such commitment shall be open and irrevocable and the Debtors may elect to proceed with the Ayrmid Transaction only until the Ayrmid Outside Date and following such date Ayrmid shall have no further obligations under this Agreement (except where such obligations expressly survive termination or have been agreed to by Ayrmid pursuant to a Definitive Document) or otherwise; and

(xi) maintain its good standing (or the equivalent concept) under the Laws of the jurisdiction in which it is incorporated or organized, and act in good faith with regard to the successful consummation of the Ayrmid Transaction consistent with this Agreement.

(b) During the Agreement Effective Period, Ayrmid agrees that, subject to Section 14, it shall not directly or indirectly:

(i) object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the Restructuring Transactions;

(ii) file any motion, pleading, or other document with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is not materially consistent with this Agreement or the Plan;

(iii) initiate, or have initiated on its behalf, any litigation or proceeding of any kind with respect to the Chapter 11 Cases, this Agreement, the Definitive Documents, or the Restructuring Transactions contemplated herein against the Company Parties or the other Parties, other than in each case to enforce this Agreement or any Definitive Document or as otherwise permitted under this Agreement;

(iv) exercise, or direct any other person to exercise, any right or remedy for the enforcement, collection, or recovery of any Claims against or Equity Interests in the Company Parties;

(v) object to, delay, impede, or take any other action to interfere with the Company Parties' ownership and possession of their assets, wherever located, or interfere with the automatic stay arising under section 362 of the Bankruptcy Code;

(vi) amend, modify, supplement, waive, or terminate the Ayrmid Transaction Term Sheet, or consent to any assignment thereof, in each case in any manner that is inconsistent with this Agreement or that would be materially adverse to the Consenting Stakeholders, without the prior written consent of the Required Consenting Funded Debt Parties;

(vii) seek, solicit, propose, file, support, consent to, vote for, or enter into or participate in any discussions, agreements, understandings, or other arrangements with any person or Entity regarding, or otherwise pursue or consummate, any Alternative Restructuring Proposal; provided that Ayrmid shall not object to, delay, impede, or take any other action to interfere with any Acceptable Alternative Transaction (except to the extent such Acceptable Alternative Transaction impairs or modifies Ayrmid's Bid Protections);

(viii) object to, delay, impede, or take any other action to interfere with any motion, pleading, or other document filed by a Company Party or any Debtor in furtherance of the Restructuring Transactions that is not inconsistent with this Agreement, including the First Day Pleadings and any "second day" pleadings, the Bidding Procedures Motion, the Disclosure Statement, the Solicitation Materials, the Plan, the DIP Motion, and any other motion seeking approval of the DIP Facility or the use of cash collateral on the terms set forth in the DIP Documents;

(ix) commence, support, or join any litigation or adversary proceeding relating to the Chapter 11 Cases against any Consenting Stakeholder, or announce publicly, or inform any other party, of its intention not to support the Ayrmid Transaction; or

(x) take any action that is inconsistent in any material respect with, or that is intended to frustrate or impede approval, implementation, or consummation of, the Restructuring Transactions, this Agreement, or the Plan, subject to Section 16.27.

7.02. Commitments with Respect to Chapter 11 Cases.

(a) During the Agreement Effective Period, Ayrmid will support the Ayrmid Transaction, and will not directly or indirectly object to, delay, impede, or take any other action to interfere with any motion or other pleading or document filed by a Company Party in the Bankruptcy Court that is consistent with this Agreement.

(b) During the Agreement Effective Period, Ayrmid shall use commercially reasonable efforts to support the Debtors in obtaining entry of the Bidding Procedures Order, the Disclosure Statement Order, the Sale Order, and the Confirmation Order (solely in connection with the Ayrmid Transaction).

**Section 8.** ***Additional Provisions Regarding Ayrmid***. Notwithstanding anything contained in this Agreement, subject to Section 16.26, nothing in this Agreement shall: (a) affect the ability of Ayrmid to consult with the Company Parties, any of the Consenting Stakeholders (subject to the Bidding Procedures Order), or any other party in interest in the Chapter 11 Cases (including any official committee and the Office of the United States Trustee); (b) impair or waive the rights of Ayrmid to assert or raise any objection permitted under this Agreement or any Definitive Document in connection with the Ayrmid Transaction; (c) prevent Ayrmid from enforcing this Agreement or any Definitive Document or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement or any Definitive Document; (d) limit the rights of Ayrmid in respect of the Chapter 11 Cases, including appearing as a party in interest in any matter to be adjudicated in order to be heard concerning any matter arising in the Chapter 11 Cases that is not inconsistent with this Agreement, in each case, so long as the exercise of any such right is not inconsistent with Ayrmid's obligations hereunder; (e) limit the ability of Ayrmid to purchase, sell, or enter into any transactions regarding any Company Claims/Interests, subject to the terms of this Agreement (including Section 16.26) and applicable Law; (f) except as and to the extent explicitly set forth herein or in any other Definitive Document, require Ayrmid to incur, assume, become liable in respect of, or suffer to exist any expenses, liabilities, or other obligations, modify the economic consideration being provided by Ayrmid under the Definitive Documents, or agree to or become bound by any commitments, undertakings, concessions, or other arrangements that could result in expenses, liabilities, or other obligations to Ayrmid; (g) require Ayrmid to take any action that is in violation of applicable Law or prevent Ayrmid from taking any action that is required in order to comply with applicable Law; provided, that, if Ayrmid proposes to take any action that is otherwise inconsistent with this Agreement or any other Definitive Document in order to comply with applicable Law, Ayrmid shall provide, to the extent possible without violating applicable Law, at least five (5) Business Days' advance written notice to the Parties; (h) prohibit Ayrmid from taking any action that is not inconsistent with this Agreement; (i) require Ayrmid to fund or commit to fund any additional amounts without Ayrmid's written consent; or (j) abridge or modify Ayrmid's ability to preserve its rights as a bidder or back-up bidder or its rights to the Bid Protections.

**Section 9.** ***Commitments of the Company Parties***.

9.01. Affirmative Commitments. During the Agreement Effective Period, the Company Parties agree that, subject to Section 14 and Section 16.26, each shall:

(a) support and take all steps reasonably necessary and desirable to consummate the Restructuring Transactions in accordance with this Agreement;

(b) to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Restructuring Transactions contemplated herein, take all steps reasonably necessary and desirable to address any such impediment;

(c) use commercially reasonable efforts to obtain any and all necessary Permits, third-party consents, and regulatory approvals for the Restructuring Transactions;

(d) negotiate in good faith and use commercially reasonable efforts to execute and deliver the Definitive Documents and any other required agreements to effectuate and consummate the Restructuring Transactions as contemplated by this Agreement;

(e) use commercially reasonable efforts to seek additional support for the Restructuring Transactions from their other material stakeholders to the extent reasonably prudent;

(f) subject to any applicable orders of the Bankruptcy Court, promptly pay in full in cash the Royalty Investors Fees and all Restructuring Fees and Expenses when incurred and invoiced in accordance with Section 16.21 and the applicable engagement letters or fee arrangements (including under any DIP Order), and continue to promptly pay such amounts as they come due;

(g) subject to Section 16.26, provide to the Ad Hoc Group Advisors, the Consenting Royalty Investors Advisors, and Ayrmid Advisors draft copies of (i) the First Day Pleadings and all orders sought pursuant thereto, (ii) the Bidding Procedures Motion and the Bidding Procedures Order, (iii) the Sale Order, (iv) the Plan, (v) the Plan Supplement, (vi) the Disclosure Statement, (vii) the Conditional Disclosure Statement Order and the Disclosure Statement Order, (viii) the Solicitation Materials, (ix) the DIP Motion and the DIP Orders, (x) the Confirmation Order, and (xi) all other material motions, pleadings, filings, applications, and proposed orders relating to the Restructuring Transactions or that any Company Party intends to file with the Bankruptcy Court, in each case at least three (3) calendar days prior to the date on which the applicable Company Party files or executes such document (or, if three (3) calendar days' advance delivery is not reasonably practicable under the circumstances, as soon as reasonably practicable prior to such filing or execution), and consult in good faith with the Ad Hoc Group Advisors and Ayrmid Advisors regarding the form and substance of each of the foregoing in advance of such filing or execution;

(h) promptly, and in any event within two (2) Business Days after receipt or delivery of the same, deliver to the Ad Hoc Group Advisors and the Consenting Royalty Investors Advisors copies of all written expressions of interest, indications of interest, bids, term sheets, letters of intent, memoranda of understanding, definitive agreements, and similar documents received by, or delivered by, any Company Party or any of its investment bankers or financial advisors concerning any Alternative Restructuring Proposal or any sale, disposition, merger, recapitalization, or other restructuring transaction involving all or any material portion of the Company Parties' businesses or assets, and notify the Ad Hoc Group Advisors of all persons or Entities to whom any marketing materials have been distributed; provided, that the Ad Hoc Group Advisors shall not share such materials with the Highbridge Funds, their advisors, Ayrmid, or any personnel or advisors of the Highbridge Funds that are, in each case, acting in a Bidder Capacity;

(i) notify the Ad Hoc Group Advisors, the Consenting Royalty Investors Advisors, and Ayrmid Advisors in writing (email being sufficient) within two (2) Business Days after any Company Party receives notice or obtains actual knowledge of (i) any event or circumstance that would permit any Party to terminate, or that would result in the termination of, this Agreement, (ii) any matter or circumstance that is, or is reasonably likely to be, a material impediment to the implementation or consummation of the Restructuring Transactions, (iii) any breach of this Agreement (including any breach by a Company Party), (iv) any representation or statement made

or deemed made by any Company Party under this Agreement that is or proves to have been materially incorrect or misleading in any respect when made or deemed made, (v) the commencement or threat of any material governmental or third-party complaint, litigation, investigation, or proceeding, including any proceeding challenging the validity of the Restructuring Transactions or any Definitive Document, and (vi) any enforcement or remedial action taken by any creditor of any Company Party, whether under any agreement governing the Funded Debt or otherwise; provided, that notification to the Ayrmid Advisors shall be subject to Section 16.26 and not be required for any information concerning other bids, bidders, or potential bidders, which such information shall not be disseminated to the Ayrmid Advisors;

(j) use commercially reasonable efforts to maintain the good standing and legal existence of each Company Party under the Laws of the state or other jurisdiction in which it is incorporated, organized, or formed, except as otherwise contemplated by the Restructuring Transactions or the Definitive Documents or as results from the Chapter 11 Cases;

(k) subject to the Bidding Procedures Order and the limitations provided in Section 16.26 hereof regarding any Sale Process Matter and so long as this Agreement has not been terminated as to Ayrmid, but in each case solely to the extent the same is provided or offered to any other bidder, (i) give Ayrmid and the Ayrmid Advisors reasonable access to their officers, employees, accountants, auditors, counsel, financial advisors and consultants, (ii) furnish to Ayrmid and the Ayrmid Advisors such financial, operating, and related data and other information as such persons reasonably request (provided that such information may also be shared with all other bidders), and (iii) instruct their employees, financial advisors, consultants and other representatives to use commercially reasonable efforts to cooperate with Ayrmid and the Ayrmid Advisors in respect of the aforementioned clauses (i) and (ii); provided, that the Company Parties shall not be required to afford such access to the extent that doing so would result in the loss of any privilege or violate any applicable Law; provided, further, that Ayrmid acknowledges and agrees that any such information pursuant to this Section 9.01(k) shall be treated as confidential information and be afforded protections pursuant to any applicable Confidentiality Agreement;

(l) use commercially reasonable efforts to permit employees or contractors of Ayrmid to advise and assist the Company Parties in their efforts to migrate all server data to cloud storage (in connection with NewCo operations) that are stored at the Wells Property prior to any exit from such premises in connection with the Chapter 11 Cases, provided that nothing herein shall obligate the Company Parties to provide information or data to Ayrmid that cannot otherwise be shared with other bidders;

(m) cooperate in good faith and use commercially reasonable efforts to structure and implement the Restructuring Transactions in a manner that optimizes the tax efficiency (including by way of the preservation or enhancement of favorable tax attributes) of the Restructuring Transactions for the Company Parties, the Consenting Stakeholders and Ayrmid, as reasonably determined by the Company Parties and the Required Consenting Funded Debt Parties; and

(n) cooperate with each Consenting Stakeholder, upon request, in determining whether such Consenting Stakeholder is a "Substantial Shareholder" within the meaning of the NOL Motion as and to the extent required for the Consenting Stakeholder to timely comply with any procedures set forth in the NOL Motion.

9.02. Negative Commitments. During the Agreement Effective Period, each of the Company Parties agrees that, subject to Section 14, it shall not directly or indirectly:

(a) object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the Restructuring Transactions;

(b) take any action that is inconsistent in any material respect with, or that is intended to frustrate or impede approval, implementation, or consummation of, the Restructuring Transactions, this Agreement, or the Plan;

(c) modify or amend the Plan or any other Definitive Document, in whole or in part, in a manner that is not consistent with this Agreement in all material respects;

(d) file any motion, pleading, Definitive Document, or other document with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is not materially consistent with this Agreement or the Plan;

(e) terminate any engagement letter or fee arrangement relating to the Restructuring Fees and Expenses or the Royalty Investors Fees, except in the event of a breach by the applicable advisor or holder thereunder;

(f) withdraw or revoke the Plan, or announce publicly or inform any other party of its intention not to pursue the Plan or not to support the Restructuring Transactions, or delay the pursuit of confirmation of the Plan in a manner that is inconsistent with this Agreement, the Definitive Documents, or the Milestones;

(g) seek, solicit, encourage, propose, file, support, consent to, approve, vote for, or enter into or participate in any discussions, agreements, understandings, or other arrangements with any person or Entity regarding, or otherwise pursue or consummate, any Alternative Restructuring Proposal; provided, that, for the avoidance of doubt, actions taken by the Company Parties in accordance with the Bidding Procedures Order (which shall be in form and substance reasonably acceptable to the Required Consenting Funded Debt Parties and Ayrmid), including any such actions taken prior to entry of such order, shall not be a violation of this Section 9.02(g);

(h) sell, or file any motion or application seeking to sell, any material assets, other than in the ordinary course of business or in accordance with this Agreement or the Bidding Procedures Order;

(i) amend any of their corporate governance or organizational documents except as consented to by the Required Consenting Funded Debt Parties and Ayrmid, such consent not to be unreasonably withheld;

(j) other than as required by Law or regulation or consented to by the Required Consenting Funded Debt Parties and Ayrmid, (i) enter into or amend, establish, adopt, restate, supplement, or otherwise modify or accelerate (x) any deferred compensation, incentive, success, retention, bonus, or other compensatory arrangements, policies, programs, practices, plans, or agreements, including, without limitation, offer letters, employment agreements, consulting agreements, severance arrangements, or change in control arrangements, in the case of each of the

foregoing, with or for the benefit of their executive officers, other members of management and directors, or (y) any contracts, arrangements, or commitments that entitle any of their executive officers, other members of management and directors to indemnification from the Company Parties, or (ii) amend or terminate any existing compensation or benefit plans or arrangements (including employment agreements), unless otherwise expressly set forth as a line item in the DIP Budget;

(k) other than as required by Law or regulation or consented to by the Required Consenting Funded Debt Parties and Ayrmid, (i) enter into any settlement regarding any material Claims or Equity Interests, (ii) amend, supplement, modify, or terminate or enter into any material agreement that is inconsistent with this Agreement, (iii) knowingly allow any material agreement to expire if such expiration would frustrate or impede consummation of the Restructuring Transactions, or (iv) knowingly allow any material Permit, license, or regulatory approval to lapse, expire, terminate, or be revoked, suspended, or modified;

(l) (i) operate its business outside the ordinary course, other than the Restructuring Transactions or as contemplated by the DIP Budget, the DIP Documents, the First Day Pleadings or orders thereon, or consented to by the Required Consenting Funded Debt Parties and Ayrmid (in each case not to be unreasonably withheld), or (ii) other than as contemplated by this Agreement, transfer any material asset or right of the Company Parties (or their affiliates) or any material asset or right used in the business of the Company Parties (or their affiliates) to any person or Entity;

(m) other than as contemplated by this Agreement, engage in any material merger, consolidation, disposition, acquisition, investment, dividend, incurrence of indebtedness, or other similar transaction, or authorize or consummate any issuance or sale of equity interests of any Company Party, make any restricted payment, or make any payment with respect to the principal amount of any indebtedness, except as permitted by the DIP Documents, the First Day Pleadings, or the orders thereon;

(n) knowingly violate the terms of any Permits or regulatory approvals;

(o) commence, support, or join any litigation or adversary proceeding against any Consenting Stakeholder, any Agent, any Trustee and/or Ayrmid, other than to enforce this Agreement or any Definitive Document;

(p) prepare, commence, or support any avoidance action or other legal proceeding, or assist any third party in connection with any avoidance action or other legal proceeding, or file any motion, in each case seeking to avoid, disallow, subordinate, invalidate, limit, or recharacterize, or that otherwise challenges the amount, validity, allowance, character, enforceability, liens or encumbrances securing, or priority of, any Company Claims/Interests held by a Consenting Stakeholder, or consent to the standing of any such third party to bring such application, adversary proceeding, or cause of action;

(q) exercise, or direct any other person or Entity to exercise, any action with respect to any Company Claims/Interests that is inconsistent with the terms of this Agreement; or

(r) encourage any person or Entity, or facilitate any effort by any person or Entity, to do any of the foregoing.

**Section 10.** ***Additional Provisions Regarding Company Parties' Commitments.***

10.01. Notwithstanding anything to the contrary in this Agreement, nothing in this Agreement shall require a Company Party, or the board of directors, board of managers, or similar governing body of such Company Party, after consulting with counsel, to take any action or to refrain from taking any action with respect to the Restructuring Transactions to the extent taking or failing to take such action would be inconsistent with applicable Law or its fiduciary obligations under applicable Law, and any such action or inaction pursuant to this Section 10.01 shall not be deemed to constitute a breach of this Agreement; provided, that, no such determination, action, or inaction shall limit, impair, or impede any Consenting Stakeholder's right to terminate this Agreement in accordance with Section 14. The applicable Company Parties shall notify counsel to the other Parties in writing of any determination made in accordance with this Section 10.01 within forty-eight (48) hours following such determination. Notwithstanding anything to the contrary herein, each Consenting Stakeholder reserves its rights to challenge any action taken or not taken by any Company Party in the exercise of its fiduciary obligations.

10.02. Notwithstanding anything to the contrary in this Agreement (but subject to Section 10.01), each Company Party and its respective directors, officers, employees, investment bankers, attorneys, accountants, consultants, and other advisors or representatives shall have the rights to: (a) consider, respond to, and facilitate any Alternative Restructuring Proposal; (b) provide access to non-public information concerning any Company Party to any Entity or enter into Confidentiality Agreements or nondisclosure agreements with any Entity; (c) maintain or continue discussions or negotiations with respect to any Alternative Restructuring Proposal; (d) otherwise cooperate with, assist, participate in, or facilitate any inquiries, proposals, discussions, or negotiations with respect to any Alternative Restructuring Proposal; and (e) enter into or continue discussions or negotiations with holders of Claims against or Equity Interests in a Company Party (including any Consenting Stakeholder), any other party in interest in the Chapter 11 Cases (including any official committee and the Office of the United States Trustee), or any other Entity regarding the Restructuring Transactions or any Alternative Restructuring Proposal, in each case in a manner that is not otherwise inconsistent with the terms of this Agreement or the Restructuring Transactions. If any Company Party receives an Alternative Restructuring Proposal, then such Company Party shall: (x) within two (2) Business Days, provide the Ad Hoc Group Advisors with notice and a copy of such proposal, including all annexes, ancillary terms, and other components thereof (and, to the extent such proposal is not in writing, a detailed written summary thereof), including the identity of the person or group of persons involved; (y) provide the Ad Hoc Group Advisors with regular updates as to the status and progress of such Alternative Restructuring Proposal; and (z) promptly respond to reasonable information requests and questions from the Ad Hoc Group Advisors relating to such Alternative Restructuring Proposal; provided, that the Ad Hoc Group Advisors shall not share such materials or information with the Highbridge Funds, their advisors, Ayrmid, or any personnel or advisors of the Highbridge Funds that are, in each case, acting in a Bidder Capacity.

10.03. Nothing in this Agreement shall: (a) impair or waive the rights of any Party to assert or raise any objection permitted under this Agreement in connection with the Restructuring

Transactions; or (b) prevent any Party from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement.

**Section 11.** ***Transfer of Interests and Securities; Joinder*.**

11.01. Except as expressly provided herein, this Agreement shall not in any way restrict the right or ability of any Consenting Stakeholder to Transfer any Company Claims/Interests; provided, however, that, during the Agreement Effective Period, no Consenting Stakeholder shall Transfer any ownership (including any beneficial ownership as defined in Rule 13d-3 under the Securities Exchange Act of 1934, as amended) in any Company Claims/Interests to any affiliated or unaffiliated party, including any party in which it may hold a direct or indirect beneficial interest, unless:

(a) in the case of any Company Claims/Interests, the authorized transferee is either (i) a qualified institutional buyer as defined in Rule 144A of the Securities Act, (ii) a non-U.S. person in an offshore transaction as defined under Regulation S under the Securities Act, (iii) an institutional accredited investor (as defined in the Rules), (iv) a Consenting Stakeholder, or (v) an affiliate, affiliated fund, or affiliated entity with a common investment advisor of such Consenting Stakeholder;

(b) either (i) the transferee executes a Transfer Agreement and delivers an executed copy thereof to counsel to the Company Parties within five (5) Business Days following execution thereof or (ii) the transferee is a Consenting Stakeholder, or an affiliate, affiliated fund, or affiliated entity with a common investment advisor of a Consenting Stakeholder, and the transferee provides notice of such Transfer (including the amount and type of Company Claim/Interest so Transferred) to counsel to the Company Parties within five (5) Business Days following the closing of such Transfer; provided, that, upon any Transfer described in clause (ii) above, such transferee shall be deemed to become a Consenting Stakeholder; and

(c) such Transfer shall not violate the terms of any order entered by the Bankruptcy Court with respect to preservation of net operating losses.

11.02. Upon compliance with the requirements of Section 11.01, the transferor shall be deemed to relinquish its rights (and be released from its obligations) under this Agreement to the extent of the rights and obligations in respect of such transferred Company Claims/Interests. Any Transfer in violation of Section 11.01 shall be void *ab initio*.

11.03. This Agreement shall in no way be construed to preclude the Consenting Stakeholders from acquiring additional Company Claims/Interests; provided, however, that (a) such additional Company Claims/Interests shall automatically and immediately upon acquisition by a Consenting Stakeholder be deemed subject to the terms of this Agreement (regardless of when or whether notice of such acquisition is given to counsel to the Company Parties or counsel to the Consenting Stakeholders) and (b) such Consenting Stakeholder must provide notice of such acquisition (including the amount and type of Company Claim/Interest acquired) to counsel to the Company Parties within five (5) Business Days of such acquisition.

11.04. This Section 11 shall not impose any obligation on any Company Party or Ayrmid to issue any "cleansing letter" or otherwise publicly disclose information for the purpose of

enabling a Consenting Stakeholder to Transfer any of its Company Claims/Interests. Notwithstanding anything to the contrary herein, to the extent a Company Party and another Party have entered into a Confidentiality Agreement, the terms of such Confidentiality Agreement shall continue to apply and remain in full force and effect according to its terms, and this Agreement does not amend, modify, or supersede any rights or obligations otherwise arising under such Confidentiality Agreements.

11.05. Notwithstanding Section 11.01, a Qualified Marketmaker that acquires any Company Claims/Interests with the purpose and intent of acting as a Qualified Marketmaker for such Company Claims/Interests shall not be required to execute and deliver a Transfer Agreement in respect of such Company Claims/Interests if (a) such Qualified Marketmaker subsequently transfers such Company Claims/Interests (by purchase, sale, assignment, participation, or otherwise) within ten (10) Business Days of its acquisition to a transferee that is an entity that is not an affiliate, affiliated fund, or affiliated entity with a common investment advisor; (b) the transferee otherwise is a Permitted Transferee under Section 11.01; and (c) the Transfer otherwise is a Permitted Transfer under Section 11. To the extent that a Consenting Stakeholder is acting in its capacity as a Qualified Marketmaker, it may Transfer (by purchase, sale, assignment, participation, or otherwise) any right, title, or interest in Company Claims/Interests that the Qualified Marketmaker acquires from a holder of the Company Claims/Interests who is not a Consenting Stakeholder without the requirement that the transferee be a Permitted Transferee.

11.06. Notwithstanding anything to the contrary in this Section 11, the restrictions on Transfer set forth in this Section 11 shall not apply to the grant of any liens or encumbrances on any claims and interests in favor of a bank or broker-dealer holding custody of such claims and interests in the ordinary course of business and which lien or encumbrance is released upon the Transfer of such claims and interests.

11.07. Any holder of Company Claims/Interests that is not a party to this Agreement as of the Agreement Effective Date may, at any time after the Agreement Effective Date, become a Consenting Stakeholder by executing and delivering a Joinder to counsel to the Company Parties pursuant to which such Entity shall be bound by the terms of this Agreement.

**Section 12.** ***Representations and Warranties of Consenting Stakeholders***. Each Consenting Stakeholder severally, and not jointly, represents and warrants that, as of the date such Consenting Stakeholder executes and delivers this Agreement (or, in the case of any Consenting Stakeholder that becomes a Party after the Agreement Effective Date, as of the date such Consenting Stakeholder becomes a Party hereto):

(a) subject to customary exceptions contained in ordinary course fund financing arrangements, it is (or will be, following the closing of any currently open trades) the beneficial or record owner of the aggregate principal amount of the Company Claims/Interests, or is the nominee, investment manager, investment advisor, sub-advisor, or manager of discretionary accounts or funds that beneficially hold the Company Claims/Interests, or has investment or voting discretion with respect to, and the power and authority to bind the beneficial owners of, the principal amount of the Company Claims/Interests, in each case reflected in, and, having made reasonable inquiry, is not the beneficial or record owner of any Company Claims/Interests other

than those reflected in, such Consenting Stakeholder's signature page to this Agreement or a Transfer Agreement or a Joinder, as applicable (as may be updated pursuant to Section 11);

(b) it has the full power and authority to act on behalf of, vote and consent to matters concerning, such Company Claims/Interests;

(c) other than (i) with respect to any ordinary course pledge (1) in favor of a bank or broker-dealer at which such Consenting Stakeholder maintains an account, where such bank or broker-dealer holds a security interest in or other encumbrance over property in the account generally, or (2) to any holders of obligations owed, or securities issued, by such Consenting Stakeholder, including to any trustee for, or any other representative of, such holders, and (ii) pursuant to this Agreement, such Company Claims/Interests are free and clear of any pledge, lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal, or other limitation on disposition, transfer, or encumbrance of any kind, that would adversely affect, in any material respect, such Consenting Stakeholder's ability to perform any of its obligations under this Agreement at the time such obligations are required to be performed; and

(d) solely with respect to holders of Company Claims/Interests, (i) it is either (A) a qualified institutional buyer as defined in Rule 144A of the Securities Act, (B) not a U.S. person (as defined in Regulation S of the Securities Act), or (C) an institutional accredited investor (as defined in the Rules), and (ii) any securities acquired by the Consenting Stakeholder in connection with the Restructuring Transactions will have been acquired for investment and not with a view to distribution or resale in violation of the Securities Act.

Notwithstanding anything to the contrary in this Section 12, no Consenting Stakeholder shall be deemed to have breached any representation or warranty set forth in this Section 12 as a result of any swap agreement with respect to any Company Claims/Interests entered into in the ordinary course, so long as (i) such swap agreement is unwound or terminated, such Company Claims/Interests are returned or repurchased, or the applicable swap counterparty becomes a Consenting Stakeholder by executing and delivering a Joinder or Transfer Agreement, in each case sufficiently in advance of any voting or other deadline necessary for such Consenting Stakeholder to comply with its obligations hereunder, or (ii) the applicable swap counterparty acts in compliance with the commitments of the Consenting Stakeholders set forth in Section 5.

**Section 13.** ***Mutual Representations, Warranties, and Covenants***. Each of the Parties severally, and not jointly, represents, warrants, and covenants to each other Party, as of the date such Party executes and delivers this Agreement (or, in the case of any Consenting Stakeholder that becomes a Party after the Agreement Effective Date, as of the date such Consenting Stakeholder becomes a Party hereto):

(a) it is validly existing and in good standing under the Laws of the jurisdiction of its organization, and this Agreement is a legal, valid, and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by applicable Laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability;

(b) except as expressly provided in this Agreement, the Plan, and the Bankruptcy Code, no consent or approval is required by any other person or Entity in order for it to effectuate the Restructuring Transactions contemplated by, and perform its respective obligations under, this Agreement;

(c) the entry into and performance by it of, and the transactions contemplated by, this Agreement do not, and will not, conflict in any material respect with any Law or regulation applicable to it or with any of its articles of association, memorandum of association, or other organizational documents;

(d) except as expressly provided in this Agreement, it has (or will have, at the relevant time) all requisite corporate or other power and authority to enter into, execute, and deliver this Agreement and to effectuate the Restructuring Transactions contemplated by, and perform its respective obligations under, this Agreement; and

(e) except as expressly provided by this Agreement, it is not party to any restructuring or similar agreements or arrangements with the other Parties to this Agreement that have not been disclosed to all Parties to this Agreement.

**Section 14. *Termination Events*.**

14.01. Consenting Funded Debt Party Termination Events. This Agreement may be terminated as to all Parties by the Required Consenting Funded Debt Parties upon the occurrence of any of the following events (provided that such event does not arise as a direct or indirect result of the Company Parties terminating this Agreement pursuant to Section 14.04(a)(ii) in order to pursue an Alternative Restructuring Proposal); provided, further, that such termination is effective only upon the delivery to the Parties of a written notice in accordance with Section 16.10 hereof upon the occurrence of any of the following events:

(a) the breach in any material respect by a Company Party of any of the representations, warranties, or covenants of the Company Parties set forth in this Agreement that (i) is adverse to the Consenting Funded Debt Parties seeking termination and (ii) remains uncured for five (5) Business Days after the Required Consenting Funded Debt Parties transmit a written notice in accordance with Section 16.10 hereof detailing any such breach;

(b) the issuance by any Governmental Entity, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that (i) enjoins the consummation of a material portion of the Restructuring Transactions and (ii) remains in effect for fifteen (15) Business Days after the Required Consenting Funded Debt Parties transmit a written notice in accordance with Section 16.10 hereof detailing any such issuance; provided, that this termination right may not be exercised by any Party that sought or requested such ruling or order in contravention of any obligation set out in this Agreement;

(c) the Bankruptcy Court enters an order denying confirmation of the Plan;

(d) the entry of an order by the Bankruptcy Court, or the filing of a motion or application by any Company Party or any of its affiliates seeking an order (without the prior written consent of the Required Consenting Funded Debt Parties in their sole discretion), (i) converting

one or more of the Chapter 11 Cases of a Company Party to a case under chapter 7 of the Bankruptcy Code, (ii) appointing an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and 1106(a)(4) of the Bankruptcy Code or a trustee in one or more of the Chapter 11 Cases of a Company Party, or (iii) rejecting this Agreement;

(e) the failure to meet a Milestone, where such Milestone has not been waived or extended in a manner consistent with this Agreement;

(f) this Agreement or any Definitive Document is entered into, amended, modified, or supplemented, without the prior written consent of the Required Consenting Funded Debt Parties, in a manner that is inconsistent with this Agreement or adversely affects, in any material respect, the rights or treatment of any Consenting Stakeholder, in each case where such entry, amendment, modification, or supplement has not been withdrawn or reversed within five (5) Business Days after written notice thereof; provided, that no modification, amendment, restatement, waiver, or supplement of this Agreement effected in accordance with Section 15 shall constitute a termination event under this Section 14.01(f);

(g) any Company Party or any of its affiliates files, amends, modifies, or files a pleading seeking approval of, or seeks authority to amend or modify, any Definitive Document, motion, or pleading in a manner that is inconsistent with this Agreement or the Bankruptcy Court enters an order approving any such Definitive Document, motion, or pleading, in each case where such filing has not been withdrawn, or such order stayed, reversed, or vacated, within five (5) Business Days following written notice thereof;

(h) any Company Party, without the prior written consent of the Required Consenting Funded Debt Parties, withdraws or revokes the Plan or the Disclosure Statement, or amends or modifies, or files a motion or pleading seeking to amend or modify, the Plan, the Disclosure Statement, or any Definitive Document in a manner that is inconsistent with this Agreement or materially adverse to any Consenting Funded Debt Party, and such amendment or modification has not been reversed, or such motion or pleading withdrawn, prior to the earlier of (i) five (5) Business Days after the Company Parties receive written notice thereof and (ii) entry of an order of the Bankruptcy Court approving such motion or pleading;

(i) any Company Party or any of its affiliates (i) publicly announces, or communicates to any Consenting Stakeholder or other holder of Company Claims/Interests, its intention not to support or pursue the Restructuring Transactions, (ii) suspends or revokes, or announces its intention to suspend or revoke, the Restructuring Transactions, (iii) solicits, executes, or enters into a definitive written agreement with respect to any Alternative Restructuring Proposal, or (iv) files, proposes, or otherwise supports any plan of reorganization or liquidation other than the Plan; provided, that, for the avoidance of doubt, actions taken by the Company Parties in accordance with this Agreement with respect to the Ayrmid Transaction and the Bidding Procedures Order shall not constitute a termination event under this Section 14.01(i);

(j) the failure of any Company Party to make any payment contemplated under this Agreement as and when due, including the Royalty Investors Fees or any Restructuring Fees and Expenses payable under Section 16.21;

(k) any Company Party, or any of their respective affiliates seeks, supports, joins in seeking, consents to, fails to oppose, or obtains an order, ruling, or other relief that (i) avoids, disallows, subordinates, invalidates, limits, or recharacterizes, in any respect, any Company Claims/Interests held by a Consenting Stakeholder or any liens or collateral securing the same, or (ii) imposes liability upon, enjoins, or restricts the rights of any holder of Company Claims/Interests in its capacity as such, in each case where such violation of this Section 14.01(k) has not been cured, or such order, ruling, or relief has not been stayed, reversed, or vacated, within two (2) Business Days following written notice thereof;

(l) the entry of an order by the Bankruptcy Court or any other court of competent jurisdiction avoiding, disallowing, subordinating, invalidating, limiting, or recharacterizing, in any respect, any Company Claims/Interests held by a Consenting Stakeholder or any liens or collateral securing the same, in each case where such order has not been stayed, reversed, or vacated, within two (2) Business Days following written notice thereof;

(m) the entry of an order by the Bankruptcy Court, or the filing of a motion or application by any Company Party seeking an order, terminating the Debtors' exclusive right to file and/or solicit acceptances of a chapter 11 plan under section 1121 of the Bankruptcy Code or modifying the right of exclusivity (other than to extend the time to exercise such right), in each case where such filing has not been withdrawn, or such order stayed, reversed, or vacated, within five (5) Business Days following written notice thereof;

(n) after entry by the Bankruptcy Court of any of the DIP Orders, the Disclosure Statement Order, the Conditional Disclosure Statement Order, the Bidding Procedures Order, the Sale Order, or the Confirmation Order, any such order is reversed, dismissed, vacated, reconsidered, modified, or amended, or any Company Party files a motion, application, or other pleading seeking any of the foregoing, in each case in a manner materially inconsistent with this Agreement or materially adverse to any Consenting Funded Debt Party and without the prior written consent of the Required Consenting Funded Debt Parties, that remains uncured for a period of five (5) Business Days after written notice thereof;

(o) the Bankruptcy Court grants relief terminating, annulling, or modifying the automatic stay under section 362 of the Bankruptcy Code with regard to any asset or assets of the Company Parties having an aggregate fair market value in excess of $2 million, in each case without the prior written consent of the Required Consenting Funded Debt Parties in their sole discretion, in each case where such order has not been stayed, reversed, or vacated, within five (5) Business Days following written notice thereof;

(p) other than the Chapter 11 Cases, any Company Party, without the prior written consent of the Required Consenting Funded Debt Parties, voluntarily commences any restructuring, insolvency, winding up, liquidation, administration, or similar proceeding with respect to any Company Party or for a substantial part of any Company Party's assets, except as contemplated by this Agreement;

(q) the commencement of an involuntary petition or proceeding seeking bankruptcy, winding up, dissolution, liquidation, administration, moratorium, reorganization, assignment for the benefit of creditors, or other similar relief in respect of any Company Party, its debts, or a

substantial part of its assets, under any federal, state, or foreign bankruptcy, insolvency, administrative, receivership, or similar Law; provided, that such involuntary petition or proceeding is not dismissed, stayed, reversed, or vacated within ten (10) Business Days after the filing thereof, or any court order grants the relief sought in such involuntary petition or proceeding;

(r) the occurrence of an "Event of Default" under the DIP Term Sheet or any other DIP Document, or the acceleration of the obligations or termination of the commitments (other than a termination of commitments upon the funding of loans under the DIP Facility) under the DIP Facility, in each case that has not been cured or waived in accordance with the DIP Documents;

(s) the termination of the consensual use of cash collateral, or the entry of an order by the Bankruptcy Court terminating or modifying the Company Parties' right to use cash collateral, in each case without the prior written consent of the Required Consenting Funded Debt Parties;

(t) (i) the Ayrmid Transaction Term Sheet or Merger Agreement (if applicable) is terminated or amended, modified, supplemented, waived, or assigned in a manner materially inconsistent with this Agreement or materially adverse to the Consenting Funded Debt Parties; (ii) the occurrence of any material breach or material default by any Company Party or Ayrmid under the Ayrmid Transaction Term Sheet or the Merger Agreement (if applicable), or of any event, condition, or circumstance that would permit any party thereto to terminate the Ayrmid Transaction Term Sheet or the Merger Agreement (if applicable) or that would cause any condition precedent to the closing of the Ayrmid Transaction not to be satisfied or to become incapable of satisfaction; or (iii) any Company Party or Ayrmid (if applicable) otherwise fails to consummate the Ayrmid Transaction in accordance with this Agreement and the Milestones; provided, that, with respect to the preceding clause (ii), if such breach or default is by Ayrmid or if such event, condition, or circumstance is attributable to Ayrmid, then this termination shall only be with respect to the Consenting Funded Debt Parties' obligations to Ayrmid; provided, further, that none of the foregoing clauses (i) through (iii) shall constitute a termination event to the extent the applicable termination, amendment, modification, supplement, waiver, assignment, breach, default, event, condition, circumstance, or failure to consummate arises from or relates to the Debtors, with the consent of the Required Consenting Funded Debt Parties, determining to pursue an Acceptable Alternative Transaction;

(u) (a) this Agreement is terminated as to Ayrmid, Ayrmid withdraws from the sale process, or the Ayrmid Transaction has not been consummated by the Ayrmid Outside Date, and (b) within five (5) Business Days thereafter, (1) the Company Parties have not entered into a definitive agreement with respect to an Acceptable Alternative Transaction, and (2) the Consenting Funded Debt Parties (or the applicable Agents/Trustees on their behalf) have not submitted a credit bid for all or substantially all of the Company Parties' assets; or

(v) the issuance, promulgation, or enactment by any Governmental Entity of any statute, regulation, ruling, or final order, or any change in Law, that in each case makes illegal or otherwise prevents or prohibits the consummation of a material portion of the Restructuring Transactions, and such statute, regulation, ruling, final order, or change in Law has not been reversed, stayed, or vacated within fifteen (15) Business Days thereafter.

14.02. Consenting Royalty Investor Termination Events. This Agreement may be terminated solely with respect to the Consenting Royalty Investors by the Required Consenting Royalty Investors (provided that such event does not arise as a direct or indirect result of the Company Parties terminating this Agreement pursuant to Section 14.04(a)(ii) in order to pursue an Alternative Restructuring Proposal); provided, that such termination is not with respect to any other Party and is effective only upon the delivery to the Company Parties of a written notice in accordance with Section 16.10 hereof upon the occurrence of any of the following events:

(a) the breach in any material respect by a Company Party of any of the representations, warranties, or covenants of the Company Parties set forth in this Agreement that (i) is materially adverse to the Consenting Royalty Investors seeking termination pursuant to this provision and (ii) remains uncured for five (5) Business Days after such terminating Consenting Royalty Investors transmit a written notice in accordance with Section 16.10 hereof detailing any such breach;

(b) the issuance by any Governmental Entity, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that (i) enjoins the consummation of a material portion of the Restructuring Transactions and (ii) remains in effect for fifteen (15) Business Days after such terminating Consenting Royalty Investors transmit a written notice in accordance with Section 16.10 hereof detailing any such issuance; provided, that this termination right may not be exercised by any Party that sought or requested such ruling or order in contravention of any obligation set out in this Agreement;

(c) the Bankruptcy Court enters an order denying confirmation of the Plan;

(d) the entry of an order by the Bankruptcy Court, or the filing of a motion or application by any Company Party seeking an order (without the prior written consent of the Required Consenting Royalty Investors, not to be unreasonably withheld), (i) converting one or more of the Chapter 11 Cases of a Company Party to a case under chapter 7 of the Bankruptcy Code, (ii) appointing an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and 1106(a)(4) of the Bankruptcy Code or a trustee in one or more of the Chapter 11 Cases of a Company Party, or (iii) rejecting this Agreement;

(e) the failure to meet a Milestone, where such Milestone has not been waived or extended in a manner consistent with this Agreement;

(f) this Agreement or any Definitive Document is entered into, amended, modified, or supplemented, without the prior written consent of the Required Consenting Royalty Investors, in a manner that is inconsistent with this Agreement and adversely affects, in any material respect, the rights or treatment of any Consenting Royalty Investor, in each case where such entry, amendment, modification or supplement has not been withdrawn or reversed within five (5) Business Days after written notice thereof; provided, that no modification, amendment, restatement, waiver, or supplement of this Agreement effected in accordance with Section 15 shall constitute a termination event under this Section 14.02(f);

(g) any Company Party or any of its affiliates files, amends, or modifies a pleading seeking approval of, or seeks authority to amend or modify, any Definitive Document, motion, or

pleading in a manner that is materially inconsistent with this Agreement and materially adverse to any Consenting Royalty Investor or the Bankruptcy Court enters an order approving any such Definitive Document, motion, or pleading, in each case where such filing has not been withdrawn, or such order stayed, reversed, or vacated, within five (5) Business Days following written notice thereof;

(h) any Company Party, without the prior written consent of the Required Consenting Royalty Investors, withdraws or revokes the Plan or the Disclosure Statement, or amends or modifies, or files a motion or pleading seeking to amend or modify, the Plan, the Disclosure Statement, or any Definitive Document in a manner that is inconsistent with this Agreement and materially adverse to any Consenting Royalty Investor, and such amendment or modification has not been reversed, or such motion or pleading withdrawn, prior to the earlier of (i) five (5) Business Days after the Company Parties receive written notice thereof and (ii) entry of an order of the Bankruptcy Court approving such motion or pleading;

(i) any Company Party or any of its affiliates (i) publicly announces, or communicates to any Consenting Stakeholder or other holder of Company Claims/Interests, its intention not to support or pursue the Restructuring Transactions, (ii) suspends or revokes, or announces its intention to suspend or revoke, the Restructuring Transactions, (iii) solicits, executes, or enters into a definitive written agreement with respect to any Alternative Restructuring Proposal, or (iv) files, proposes, or otherwise supports any plan of reorganization or liquidation other than the Plan; provided, that, for the avoidance of doubt, actions taken by the Company Parties in accordance with this Agreement with respect to the Ayrmid Transaction and the Bidding Procedures Order shall not constitute a termination event under this Section 14.02(i);

(j) the failure of any Company Party to make any payment to the Consenting Royalty Investors or their advisors contemplated under this Agreement as and when due, including the Royalty Investors Fees payable under Section 16.21;

(k) any Company Party, or any of their respective affiliates seeks, supports, joins in seeking, consents to, fails to oppose, or obtains an order, ruling, or other relief that (i) avoids, disallows, subordinates, invalidates, limits, or recharacterizes, in any respect, any Company Claims/Interests held by a Consenting Royalty Investor or any liens or collateral securing the same, or (ii) imposes liability upon, enjoins, or restricts the rights of any holder of Company Claims/Interests in its capacity as such, in each case where such violation of this Section 14.02(k) has not been cured, or such order, ruling, or relief has not been stayed, reversed, or vacated, within two (2) Business Days following written notice thereof;

(l) the entry of an order by the Bankruptcy Court or any other court of competent jurisdiction avoiding, disallowing, subordinating, invalidating, limiting, or recharacterizing, in any respect, any Company Claims/Interests held by a Consenting Royalty Investor or any liens or collateral securing the same, in each case where such order has not been stayed, reversed, or vacated, within two (2) Business Days following written notice thereof;

(m) the entry of an order by the Bankruptcy Court, or the filing of a motion or application by any Company Party seeking an order, terminating the Debtors' exclusive right to file and/or solicit acceptances of a chapter 11 plan under section 1121 of the Bankruptcy Code or

modifying the right of exclusivity (other than to extend the time to exercise such right), in each case where such filing has not been withdrawn, or such order stayed, reversed, or vacated, within five (5) Business Days following written notice thereof;

(n) after entry by the Bankruptcy Court of any of the DIP Orders, the Disclosure Statement Order, the Conditional Disclosure Statement Order, the Bidding Procedures Order, the Sale Order, or the Confirmation Order, any such order is reversed, dismissed, vacated, reconsidered, modified, or amended, or any Company Party files a motion, application, or other pleading seeking any of the foregoing, in each case in a manner materially inconsistent with this Agreement and materially adverse to any Consenting Royalty Investor and without the prior written consent of the Required Consenting Royalty Investors, that remains uncured for a period of five (5) Business Days after written notice thereof;

(o) other than the Chapter 11 Cases, any Company Party, without the prior written consent of the Required Consenting Royalty Investors, voluntarily commences any restructuring, insolvency, winding up, liquidation, administration, or similar proceeding with respect to any Company Party or for a substantial part of any Company Party's assets, except as contemplated by this Agreement;

(p) the commencement of an involuntary petition or proceeding seeking bankruptcy, winding up, dissolution, liquidation, administration, moratorium, reorganization, assignment for the benefit of creditors, or other similar relief in respect of any Company Party, its debts, or a substantial part of its assets, under any federal, state, or foreign bankruptcy, insolvency, administrative, receivership, or similar Law; provided, that such involuntary petition or proceeding is not dismissed, stayed, reversed, or vacated within ten (10) Business Days after the filing thereof, or any court order grants the relief sought in such involuntary petition or proceeding;

(q) (i) the Ayrmid Transaction Term Sheet or Merger Agreement (if applicable) is terminated or amended, modified, supplemented, waived, or assigned in a manner materially inconsistent with this Agreement and materially adverse to the Consenting Royalty Investors; (ii) the occurrence of any material breach or material default by any Company Party or Ayrmid under the Ayrmid Transaction Term Sheet or the Merger Agreement (if applicable), or of any event, condition, or circumstance that would permit any party thereto to terminate the Ayrmid Transaction Term Sheet or the Merger Agreement (if applicable) or that would cause any condition precedent to the closing of the Ayrmid Transaction not to be satisfied or to become incapable of satisfaction; or (iii) any Company Party or Ayrmid (if applicable) otherwise fails to consummate the Ayrmid Transaction in accordance with this Agreement and the Milestones; provided, that, with respect to the preceding clause (ii), if such breach or default is by Ayrmid or if such event, condition, or circumstance is attributable to Ayrmid, then this termination shall only be with respect to the Consenting Royalty Investors' obligations to Ayrmid; provided, further, that none of the foregoing clauses (i) through (iii) shall constitute a termination event to the extent the applicable termination, amendment, modification, supplement, waiver, assignment, breach, default, event, condition, circumstance, or failure to consummate arises from or relates to the Debtors, with the consent of the Required Consenting Royalty Investors, determining to pursue an Acceptable Alternative Transaction;

(r) (a) this Agreement is terminated as to Aymid, Aymid withdraws from the sale process, or the Aymid Transaction has not been consummated by the Aymid Outside Date, and (b) within five (5) Business Days thereafter, (1) the Company Parties have not entered into a definitive agreement with respect to an Acceptable Alternative Transaction, and (2) the Consenting Funded Debt Parties (or the applicable Agents/Trustees on their behalf) have not submitted a credit bid for all or substantially all of the Company Parties' assets; or

(s) the issuance, promulgation, or enactment by any Governmental Entity of any statute, regulation, ruling, or final order, or any change in Law, that in each case makes illegal or otherwise prevents or prohibits the consummation of a material portion of the Restructuring Transactions, and such statute, regulation, ruling, final order, or change in Law has not been reversed, stayed, or vacated within fifteen (15) Business Days thereafter.

14.03. Aymid Termination Events.

(a) This Agreement may be terminated solely with respect to Aymid by Aymid; <u>provided</u>, that such termination is not with respect to any other Party and is effective only upon the delivery to the Company Parties of a written notice in accordance with Section 16.10 hereof upon the occurrence of any of the following events:

(i) the breach in any material respect by a Company Party of any of the representations, warranties, or covenants of the Company Parties set forth in this Agreement that (A) is materially adverse to Aymid, and (B) remains uncured for five (5) Business Days after Aymid transmits a written notice in accordance with Section 16.10 hereof detailing any such breach; <u>provided</u>, that actions taken in accordance with the Bidding Procedures Order shall not constitute a breach or termination event for purposes of this Section 14.03(a)(i);

(ii) the breach in any material respect by one or more of the Consenting Funded Debt Parties of any provision set forth in this Agreement that is materially adverse to Aymid and that remains uncured for a period of five (5) Business Days after the receipt by such breaching Consenting Funded Debt Parties of notice of such breach; <u>provided</u>, that if the non-breaching Consenting Funded Debt Parties continue to hold, in the aggregate, at least 66.7% of each of (1) the aggregate outstanding principal amount of the Term Loans, (2) the aggregate outstanding principal amount of the 2028 Notes, and (3) the aggregate outstanding principal amount of the 2029 Notes, in each case that is held by the Consenting Funded Debt Parties, then any termination pursuant to this Section 14.03(a)(ii) shall be effective solely as to the breaching Consenting Funded Debt Parties, and this Agreement shall remain in full force and effect as to all other Parties;

(iii) the issuance by any Governmental Entity, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that (A) enjoins the consummation of a material portion of the Restructuring Transactions and (B) remains in effect for fifteen (15) Business Days after Aymid transmits a written notice in accordance with Section 16.10 hereof detailing any such issuance; <u>provided</u>, that this termination right may not be exercised by Aymid if Aymid sought or requested such ruling or order in contravention of any obligation set out in this Agreement;

(iv) the Bankruptcy Court enters an order denying confirmation of the Plan;

(v) the entry of an order by the Bankruptcy Court, or the filing of a motion or application by any Company Party seeking an order (without the prior written consent of Ayrmid in its sole discretion), (A) converting one or more of the Chapter 11 Cases of a Company Party to a case under chapter 7 of the Bankruptcy Code, (B) appointing an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and 1106(a)(4) of the Bankruptcy Code or a trustee in one or more of the Chapter 11 Cases of a Company Party, or (C) rejecting this Agreement;

(vi) the issuance, promulgation, or enactment by any Governmental Entity of any statute, regulation, ruling, or final order, or any change in Law, that in each case makes illegal or otherwise prevents or prohibits the consummation of a material portion of the Restructuring Transactions, and such statute, regulation, ruling, final order, or change in Law has not been reversed, stayed, or vacated within fifteen (15) Business Days thereafter;

(vii) the Debtors select an Acceptable Alternative Transaction as the successful bid and do not select Ayrmid as the back-up bidder;

(viii) this Agreement or any Definitive Document is entered into, amended, modified, or supplemented, without the prior written consent of Ayrmid, in a manner that is inconsistent with this Agreement or adversely affects, in any material respect, the rights of Ayrmid, in each case where such entry, amendment, modification, or supplement has not been withdrawn or reversed within five (5) Business Days after written notice thereof; provided, that no modification, amendment, restatement, waiver, or supplement of this Agreement effected in accordance with Section 15 shall constitute a termination event under this Section 14.03(a)(viii); provided, further, that actions taken in accordance with the Bidding Procedures Order shall not constitute a breach or termination event for purposes of this Section 14.03(a)(viii);

(ix) except in connection with an Acceptable Alternative Transaction in accordance with the Bidding Procedures Order, any Company Party, without the prior written consent of Ayrmid, withdraws or revokes the Plan or the Disclosure Statement, or amends or modifies, or files a motion or pleading seeking to amend or modify, the Plan, the Disclosure Statement, or any Definitive Document in a manner that is inconsistent with this Agreement or materially adverse to Ayrmid, and such amendment or modification has not been reversed, or such motion or pleading withdrawn, prior to the earlier of (A) five (5) Business Days after the Company Parties receive written notice thereof and (B) entry of an order of the Bankruptcy Court approving such motion or pleading;

(x) (A) except in connection with an Acceptable Alternative Transaction in accordance with the Bidding Procedures Order, the Ayrmid Transaction Term Sheet or Merger Agreement (if applicable) is terminated or amended, modified, supplemented, waived, or assigned in a manner inconsistent with this Agreement or materially adverse to Ayrmid; (B) the occurrence of any material breach or material default by any Company Party or the Consenting Funded Debt Parties under the Ayrmid Transaction Term Sheet or the Merger Agreement (if applicable), or of any event, condition, or circumstance that would permit any party thereto to terminate the Ayrmid Transaction Term Sheet or the Merger Agreement (if applicable) or that would cause any condition precedent to the closing of the Ayrmid Transaction to become incapable of satisfaction, in each case that has not been cured or waived within five (5) Business Days after written notice thereof; or (C) any Company Party or the Consenting Funded Debt Parties (as applicable) otherwise fail to

consummate the Ayrmid Transaction in accordance with this Agreement; provided, that Ayrmid may not terminate this Agreement pursuant to the foregoing clause (B) or (C) with respect to any breach, default, or failure to consummate by the Consenting Funded Debt Parties if Ayrmid is then in breach of this Agreement or any Definitive Document;

(xi) the failure by the Company Parties to satisfy any Ayrmid Milestone by the applicable deadline (as such deadline may be extended or waived in accordance with Section 4.01), unless such failure results from a breach by Ayrmid of its obligations under this Agreement; provided, that, notwithstanding anything to the contrary in this Agreement, if the Bankruptcy Court shall not have entered the Bidding Procedures Order on or before four (4) calendar days after the Petition Date, such failure shall constitute a termination event under this Section 14.03(a)(xi); or

(xii) the Bankruptcy Court shall not have entered an order approving the Bid Protections, on the terms agreed herein, by the date that is thirty-five (35) days after the Petition Date; provided, that if such order is not timely entered due to availability of the Bankruptcy Court, then the deadline for entry of this order shall be extended to the first day the Bankruptcy Court does have availability.

14.04. Company Party Termination Events.

(a) Any Company Party may terminate this Agreement as to all Parties (except as otherwise provided herein) upon prior written notice to all Parties in accordance with Section 16.10 hereof upon the occurrence of any of the following events:

(i) the breach in any material respect by one or more of the Consenting Stakeholders of any provision set forth in this Agreement that remains uncured for a period of ten (10) Business Days after the receipt by such breaching Consenting Stakeholders of notice of such breach; provided, that if the non-breaching Consenting Funded Debt Parties continue to hold, in the aggregate, at least 66.7% of each of (1) the aggregate outstanding principal amount of the Term Loans, (2) the aggregate outstanding principal amount of the 2028 Notes, and (3) the aggregate outstanding principal amount of the 2029 Notes, in each case that is held by the Consenting Funded Debt Parties, then any termination pursuant to this Section 14.04(a)(i) shall be effective solely as to the breaching Consenting Stakeholders, and this Agreement shall remain in full force and effect as to all other Parties;

(ii) Any Company Party may terminate this Agreement as to its own obligations under this Agreement if the board of directors, board of managers, or such similar governing body of any Company Party determines, after consulting with counsel, (i) that proceeding with any of the Restructuring Transactions would be inconsistent with the exercise of its fiduciary duties or applicable Law or (ii) in the exercise of its fiduciary duties, to pursue an Alternative Restructuring Proposal; or

(iii) the issuance by any Governmental Entity, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that (i) enjoins the consummation of a material portion of the Restructuring Transactions and (ii) remains in effect for fifteen (15) Business Days after such terminating Company Party transmits a written notice in accordance with Section 16.10 hereof detailing any such issuance;

provided, that this termination right shall not apply to or be exercised by any Company Party that sought or requested such ruling or order in contravention of any obligation or restriction set out in this Agreement.

(b) Any Company Party may terminate this Agreement as to its and the Consenting Stakeholders' obligations to Ayrmid (i) if Ayrmid breaches in any material respect either this Agreement or the Merger Agreement (if applicable) and such breach remains uncured for five (5) Business Days after Ayrmid's receipt of written notice thereof delivered in accordance with Section 16.10 hereof, or (ii) if the Debtors, with the consent of the Required Consenting Funded Debt Parties, elect to proceed with an Acceptable Alternative Transaction and Ayrmid is not selected as the back-up bidder; provided, however, that in each case, subject to the terms of this Agreement and the Definitive Documents, the Consenting Stakeholders will remain bound to this Agreement and retain their obligations to support this Agreement, the Restructuring Transactions, the Plan, and the consummation of the Acceptable Alternative Transaction.

14.05. Mutual Termination. This Agreement, and the obligations of all Parties hereunder, may be terminated by mutual written agreement among each Company Party, the Required Consenting Funded Debt Parties, and Ayrmid.

14.06. Automatic Termination. This Agreement shall terminate automatically without any further required action or notice immediately after the Plan Effective Date or the consummation of an Acceptable Alternative Transaction.

14.07. Effect of Termination.

(a) Upon the occurrence of a Termination Date as to a Party, this Agreement shall be of no further force and effect as to such Party and each Party subject to such termination shall be released from its commitments, undertakings, and agreements under or related to this Agreement and shall have the rights and remedies that it would have had, had it not entered into this Agreement, and shall be entitled to take all actions, whether with respect to the Restructuring Transactions or otherwise, that it would have been entitled to take had it not entered into this Agreement, including with respect to any and all Claims or causes of action. Upon the occurrence of a Termination Date prior to the Confirmation Order being entered by the Bankruptcy Court, any and all consents or ballots tendered by the Parties subject to such termination before a Termination Date shall be deemed, for all purposes, to be null and void from the first instance and shall not be considered or otherwise used in any manner by the Parties in connection with the Restructuring Transactions and this Agreement or otherwise; provided, however, that any Consenting Stakeholder withdrawing or changing its vote pursuant to this Section 14.07 shall promptly provide written notice of such withdrawal or change to each other Party to this Agreement and, if such withdrawal or change occurs on or after the Petition Date, file notice of such withdrawal or change with the Bankruptcy Court. If this Agreement may be terminated at a time when permission of the Bankruptcy Court is required for a Consenting Stakeholder to terminate, or cause the termination of, this Agreement, the Company Parties shall not oppose any attempt by such Consenting Stakeholder to terminate, or cause the termination of, this Agreement at such time so long as the respective Consenting Stakeholder has complied with the provisions of Section 14; provided, that the Company Parties' rights to dispute whether the Consenting Stakeholder has complied with the provisions of Section 14 are preserved. Furthermore, if this Agreement is

terminated at a time when permission of the Bankruptcy Court is required for a Consenting Stakeholder to change, revoke or withdraw, or cause to change, revoke or withdraw, its vote to accept the Plan, the Company Parties shall not oppose any attempt by such Consenting Stakeholder to change, revoke or withdraw, or cause to change, revoke or withdraw, such vote at such time so long as such Consenting Stakeholder has complied with the provisions of Section 14; provided, that the Company Parties' rights to dispute whether the Consenting Stakeholder has complied with the provisions of Section 14 are preserved. Nothing in this Agreement shall be construed as prohibiting a Company Party, Ayrmid, or any of the Consenting Stakeholders from contesting whether any such termination is in accordance with its terms or to seek enforcement of any rights under this Agreement that arose or existed before a Termination Date. Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict (a) any right of any Company Party or the ability of any Company Party to protect and preserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any Consenting Stakeholder, (b) any right of any Consenting Stakeholder, or the ability of any Consenting Stakeholder, to protect and preserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any Company Party or Consenting Stakeholder, and (c) any right of Ayrmid, or the ability of Ayrmid, to protect and preserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any Company Party or any Consenting Stakeholder. No purported termination of this Agreement shall be effective under this Section 14.07 or otherwise if the Party seeking to terminate this Agreement is in material breach of this Agreement, except a termination pursuant to Section 14.04(a)(ii). Nothing in this Section 14.07 shall restrict any Company Party's right to terminate this Agreement in accordance with Section 14.04(a)(ii).

(b) Upon the occurrence of a Termination Date with respect to Ayrmid or this entire Agreement for any reason (including pursuant to Section 14.01, Section 14.03, or Section 14.04), other than: (i) a termination by the Company Parties pursuant to Section 14.04(b); (ii) the automatic termination of this Agreement pursuant to Section 14.06 following consummation of the Ayrmid Transaction; (iii) any termination (by any Party, including pursuant to Section 14.01) arising from or attributable to (w) a material breach by Ayrmid of its obligations under this Agreement (including Section 7) or any Definitive Document, (x) any material failure by Ayrmid to cooperate in obtaining any approvals required by Governmental Entities (or other regulatory bodies) to facilitate the closing of the Sale Transaction, (y) any other event, condition, or circumstance attributable to Ayrmid, including any ruling or order sought or requested by Ayrmid that materially impedes the Parties' ability to consummate the Ayrmid Transaction, or (z) Ayrmid withdrawing from the sale process, revoking or withdrawing its bid, or failing to consummate the Ayrmid Transaction by the Ayrmid Outside Date (except as a result of matters that were either directly or proximately caused by another Party); or (iv) any other termination to which Ayrmid has consented in writing, the Company Parties shall, jointly and severally, pay the break-up fee in the Bid Protections (to the extent approved by the Bankruptcy Court in the Bidding Procedures Order) to Ayrmid in full in cash within three (3) Business Days after the consummation of an Acceptable Alternative Transaction or a Sale Transaction with an Entity other than Ayrmid, and solely from the proceeds thereof. The Bid Protections, including the expense reimbursement, shall constitute allowed superpriority administrative expense claims against each of the Debtors under sections

503(b) and 507(a)(2) of the Bankruptcy Code. The obligations of the Company Parties under this Section 14.07 shall survive any termination of this Agreement.

**Section 15.** ***Amendments and Waivers***.

(a) This Agreement may not be modified, amended, or supplemented, and no condition or requirement of this Agreement may be waived, in any manner except in accordance with this Section 15.

(b) This Agreement may be modified, amended, restated, amended and restated, or supplemented, or a condition or requirement of this Agreement may be waived, in a writing signed by: (i) in the case of a waiver, the Party against whom the waiver is to be effective (it being understood that the Required Consenting Funded Debt Parties may make any such waiver on behalf of all Consenting Funded Debt Parties); and (ii) in the case of a modification, amendment, restatement, or supplement, each Company Party and the Required Consenting Funded Debt Parties; provided, however, that if the proposed modification, amendment, restatement, waiver, or supplement has a (x) material, disproportionate, and adverse effect on any of the Company Claims/Interests held by a Consenting Stakeholder relative to the other Consenting Stakeholders or (y) material and adverse effect on Ayrmid, then the consent of each such affected Consenting Stakeholder or Ayrmid, as applicable, shall also be required to effectuate such modification, amendment, restatement, waiver, or supplement, and each such materially, disproportionately, and adversely affected Consenting Stakeholder shall be entitled to terminate this Agreement as to itself only for any breach of this Section 15(b); provided, that actions taken in accordance with the Bidding Procedures Order, including selection of an Acceptable Alternative Transaction, shall not constitute a modification, amendment, restatement, or supplement that has a material and adverse effect on Ayrmid; provided, further, that any proposed modification, amendment, restatement, waiver, or supplement that (a) materially modifies the Ayrmid Transaction Term Sheet relating to the treatment of the Royalty Obligations (as defined in the Ayrmid Transaction Term Sheet) or (b) materially and adversely modifies the adequate protection of the Consenting Royalty Investors provided in the DIP Term Sheet shall in each case require the reasonable consent of the Required Consenting Royalty Investors.

(c) Any proposed modification, amendment, restatement, waiver, or supplement that does not comply with this Section 15 shall be ineffective and void *ab initio*.

(d) The waiver by any Party of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach. No failure on the part of any Party to exercise, and no delay in exercising, any right, power, or remedy under this Agreement shall operate as a waiver of any such right, power, or remedy or any provision of this Agreement, nor shall any single or partial exercise of such right, power, or remedy by such Party preclude any other or further exercise of such right, power, or remedy or the exercise of any other right, power, or remedy. All remedies under this Agreement are cumulative and are not exclusive of any other remedies provided by Law.

**Section 16.** ***Miscellaneous***.

16.01. Acknowledgement. Notwithstanding any other provision herein, this Agreement is not and shall not be deemed to be an offer with respect to any securities or solicitation of votes for the acceptance of a plan of reorganization for purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise. Any such offer or solicitation will be made only in compliance with all applicable securities Laws, provisions of the Bankruptcy Code, and/or other applicable Law.

16.02. Exhibits Incorporated by Reference; Conflicts. Each of the exhibits, annexes, signature pages, and schedules attached hereto is expressly incorporated herein and made a part of this Agreement, and all references to this Agreement shall include such exhibits, annexes, and schedules. In the event of any inconsistency between this Agreement (without reference to the exhibits, annexes, and schedules hereto) and the exhibits, annexes, and schedules hereto, this Agreement (without reference to the exhibits, annexes, and schedules hereto) shall govern. Notwithstanding the foregoing, in the event of any inconsistency between the Plan in the form attached hereto as **Exhibit B** and the Ayrmid Transaction Term Sheet, the Arymid Transaction Term Sheet shall govern, and the Parties shall modify the Plan to the extent necessary to resolve such inconsistency.

16.03. Further Assurances. Subject to the other terms of this Agreement, the Parties agree to execute and deliver such other instruments and perform such acts, in addition to the matters herein specified, as may be reasonably appropriate or necessary, or as may be required by order of the Bankruptcy Court, from time to time, to effectuate the Restructuring Transactions (but, with respect to Ayrmid, solely the Ayrmid Transaction), as applicable.

16.04. Complete Agreement. Except as otherwise explicitly provided herein, this Agreement constitutes the entire agreement among the Parties with respect to the subject matter hereof and supersedes all prior agreements, oral or written, among the Parties with respect thereto, other than any Confidentiality Agreement, the September 2026 Forbearance Agreement, and the Fee Agreement.

16.05. GOVERNING LAW; SUBMISSION TO JURISDICTION; SELECTION OF FORUM. THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN SUCH STATE, WITHOUT GIVING EFFECT TO THE CONFLICT OF LAWS PRINCIPLES THEREOF. All actions arising out of or relating to this Agreement shall be brought by the Parties in either a state or federal court of competent jurisdiction exclusively in the State of New York in the County of New York, Borough of Manhattan. Notwithstanding anything to the contrary herein, upon the commencement of the Chapter 11 Cases, each of the Parties hereby agrees that (a) the Bankruptcy Court shall have exclusive jurisdiction over all matters arising out of or in connection with this Agreement, and (b) it shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement, to the extent possible, in the Bankruptcy Court, and solely in connection with claims arising under this Agreement: (i) irrevocably submits to the exclusive jurisdiction of the Bankruptcy Court; (ii) waives any objection to laying venue in any such action or proceeding in

the Bankruptcy Court; and (iii) waives any objection that the Bankruptcy Court is an inconvenient forum or does not have jurisdiction over any Party hereto.

16.06. TRIAL BY JURY WAIVER. EACH PARTY HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

16.07. Execution of Agreement. This Agreement may be executed and delivered in any number of counterparts and by way of electronic signature and delivery, and each such counterpart, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement. Except as expressly provided in this Agreement, each individual executing this Agreement on behalf of a Party has been duly authorized and empowered to execute and deliver this Agreement on behalf of said Party.

16.08. Rules of Construction. This Agreement is the product of negotiations among the Company Parties, the Consenting Stakeholders, and Ayrmid, and in the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement, or any portion hereof, shall not be effective in regard to the interpretation hereof. The Company Parties, the Consenting Stakeholders, and Ayrmid were each represented by counsel during the negotiations and drafting of this Agreement and continue to be represented by counsel.

16.09. Successors and Assigns; Third Parties. This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors and permitted assigns, as applicable. There are no third-party beneficiaries under this Agreement, and the rights or obligations of any Party under this Agreement may not be assigned, delegated, or transferred to any other person or entity except as provided by Section 11.

16.10. Notices. All notices hereunder shall be deemed given if in writing and delivered, by electronic mail, courier, or on the next Business Day after deposit prepaid with a national overnight express delivery service, to the following addresses (or at such other addresses as shall be specified by like notice):

(a) if to a Company Party, to:

Karyopharm Therapeutics Inc.
85 Wells Avenue
Suite 210
Newton, Massachusetts 02459
Attention: Chief Legal Officer
E-mail address: Michael.Mano@karyopharm.com

with copies to:

Sidley Austin LLP
787 Seventh Avenue
New York, New York 10019

Attention: Anthony R. Grossi and Maegan Quejada
E-mail addresses: agrossi@sidley.com and mquejada@sidley.com

(b) if to a Consenting Funded Debt Party, to the address or e-mail address set forth on such party's signature page to this Agreement (or in the signature page to a Transfer Agreement or Joinder, as applicable), with a copy to:

Latham & Watkins LLP
1271 Avenue of the Americas
New York, New York 10020
Attention: David A. Hammerman and Keith A. Simon
E-mail addresses: david.hammerman@lw.com and keith.simon@lw.com

Latham & Watkins LLP
330 North Wabash Avenue, Suite 2800
Chicago, Illinois 60611
Attention: Whit Morley
E-mail address: whit.morley@lw.com

(c) if to the Consenting Royalty Investors, to the address or e-mail address set forth on such party's signature page to this Agreement (or in the signature page to a Transfer Agreement or Joinder, as applicable), with a copy to:

Hogan Lovells Cadwalader US LLP
200 Liberty Street
New York, New York 10281
Attention: Douglas Mintz and Thomas Curtin
E-mail addresses: douglas.mintz@hlc.com and thomas.curtin@hlc.com

(d) if to a Consenting Preferred Shareholder, to the address or e-mail address set forth on such party's signature page to this Agreement (or in the signature page to a Transfer Agreement or Joinder, as applicable), with a copy to:

Latham & Watkins LLP
1271 Avenue of the Americas
New York, New York 10020
Attention: David A. Hammerman and Keith A. Simon
E-mail addresses: david.hammerman@lw.com and keith.simon@lw.com

(e) if to Ayrmid, to:

Ayrmid Ltd.
780 5th Avenue, Suite 200
Naples, Florida 34102
Attention: Rory Nealon
Email: Roryn@gamida-cell.com

with copies to:

Paul Hastings LLP
71 S. Wacker Drive, Forty-Fifth Floor
Chicago, IL 60606
Attention: Matt Warren and Geoff King
E-mail addresses: mattwarren@paulhastings.com and
geoffking@paulhastings.com

Paul Hastings LLP
1197 Peachtree Street N.E., Suite 200
Atlanta, GA 30361
Attention: Zach Cochran
E-mail address: zachcochran@paulhastings.com

Any notice given by delivery, mail, or courier shall be effective when received, and any notice given or delivered by electronic mail shall be effective when sent.

16.11. Independent Due Diligence and Decision Making. Each Consenting Stakeholder and Ayrmid hereby confirms that its decision to execute this Agreement has been based upon its independent investigation of the operations, businesses, financial and other conditions, and prospects of the Company Parties.

16.12. Enforceability of Agreement. Each of the Parties, to the extent enforceable, waives any right to assert that the exercise of termination rights under this Agreement is subject to the automatic stay provisions of the Bankruptcy Code, and expressly stipulates and consents hereunder to the prospective modification of the automatic stay provisions of the Bankruptcy Code for purposes of exercising termination rights under this Agreement, to the extent the Bankruptcy Court determines that such relief is required.

16.13. Reservation of Rights. If the Restructuring Transactions are not consummated, or if this Agreement is terminated for any reason, the Parties fully reserve any and all of their rights. Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms or the payment of damages to which a Party may be entitled under this Agreement.

16.14. Specific Performance. It is understood and agreed by the Parties that money damages would be an insufficient remedy for any breach of this Agreement by any Party, and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief (without the posting of any bond and without proof of actual damages) as a remedy for any such breach, including an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder.

16.15. Several, Not Joint, Obligations; Relationship Among Parties. Notwithstanding anything to the contrary in this Agreement, the agreements, representations, warranties, duties, and obligations of the Parties under this Agreement are, in all respects, several and, for the avoidance of doubt, neither joint nor joint and several, such that no Consenting Stakeholder shall be liable or

otherwise responsible for the agreements, representations, warranties, duties, or obligations of any other Party, or for any breach or violation thereof. It is understood and agreed that no Consenting Stakeholder has, solely as a result of entering into or performing its obligations under this Agreement, any fiduciary duty, duty of trust or confidence in any form, or other duty or responsibility to any other Consenting Stakeholder, any Company Party, Ayrmid, or any of their respective creditors or other stakeholders, and, except as expressly provided in this Agreement, there are no agreements, commitments, or undertakings among or between them. No prior history, pattern, or practice of sharing confidences among or between any of the Consenting Stakeholders, the Company Parties, or Ayrmid shall in any way affect or negate this understanding and agreement. It is further understood and agreed that any Consenting Stakeholder may acquire or trade in any Company Claims/Interests or other debt or equity securities of the Company Parties without the consent of the Company Parties or any other Consenting Stakeholder, subject to applicable Law and the terms of this Agreement, and no Party shall have any responsibility for any such acquisition or trading by any other Party by virtue of this Agreement. Each Consenting Stakeholder shall be entitled to independently protect and enforce its rights under this Agreement, and it shall not be necessary for any other Consenting Stakeholder to be joined as an additional party in any proceeding for such purpose. No Consenting Stakeholder shall, as a result of its entering into or performing its obligations under this Agreement, be deemed to be part of a "group" (as that term is used in section 13(d) of the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder) with any other Consenting Stakeholder.

16.16. Severability and Construction. If any provision of this Agreement shall be held by a court of competent jurisdiction to be illegal, invalid, or unenforceable, the remaining provisions shall remain in full force and effect if essential terms and conditions of this Agreement for each Party remain valid, binding, and enforceable.

16.17. Remedies Cumulative. All rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at Law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party.

16.18. Capacities of Consenting Stakeholders. Each Consenting Stakeholder has entered into this Agreement on account of all Company Claims/Interests that it holds (directly or through discretionary accounts that it manages or advises) and, except where otherwise specified in this Agreement, shall take or refrain from taking all actions that it is obligated to take or refrain from taking under this Agreement with respect to all such Company Claims/Interests.

16.19. Survival. Notwithstanding (i) any Transfer of any Company Claims/Interests in accordance with this Agreement or (ii) the termination of this Agreement in accordance with its terms, each of the following shall survive such Transfer and/or termination and shall continue in full force and effect for the benefit of the Parties in accordance with the terms hereof and thereof: (a) the agreements and obligations of the Parties in Section 14.07 and Section 16; (b) the Confidentiality Agreements; (c) the obligations of the Company Parties in respect of the Restructuring Fees and Expenses and the Royalty Investors Fees under Section 16.21, including with respect to all such amounts incurred up to and including the applicable Termination Date; (d) any claim for breach of this Agreement that occurred, and any right or remedy in respect thereof that arose or existed, prior to such Transfer or termination; (e) the September 2026 Forbearance

Agreement and the Fee Agreement, in each case in accordance with Section 16.22; and (f) the obligations of the Company Parties in respect of the Bid Protections under Section 14.07.

16.20. Email Consents. Where a written consent, acceptance, approval, or waiver is required pursuant to or contemplated by this Agreement, such written consent, acceptance, approval, or waiver shall be deemed to have occurred if, by agreement between counsel to the Parties submitting and receiving such consent, acceptance, approval, or waiver, it is conveyed in writing (including electronic mail) between each such counsel without representations or warranties of any kind on behalf of such counsel.

16.21. Payment of Restructuring Fees and Expenses and Royalty Investors Fees.

(a) Whether or not the Restructuring Transactions are consummated, the Company Parties hereby agree, on a joint and several basis, to pay in cash the Restructuring Fees and Expenses as follows: (a) all Restructuring Fees and Expenses incurred up to (and including) the Agreement Effective Date for which a reasonably detailed invoice has been received by the Company Parties no later than two (2) Business Days prior to the Agreement Effective Date shall be paid in full in cash prior to the Agreement Effective Date; (b) after the Petition Date (to the extent permitted by order of the Bankruptcy Court), all Restructuring Fees and Expenses shall be paid in full in cash by the Company Parties on a regular and continuing basis promptly, and in any event within ten (10) Business Days, following receipt of a summary invoice (which may be redacted or limited to ensure the maintenance of all applicable legal privileges but shall otherwise comply with the requirements set forth in the applicable engagement letter); (c) upon termination of this Agreement as to any Party, all Restructuring Fees and Expenses incurred up to (and including) the applicable Termination Date shall be paid in full in cash promptly, and in any event within ten (10) Business Days, following receipt of a summary invoice; and (d) on the Plan Effective Date, all Restructuring Fees and Expenses incurred up to (and including) the Plan Effective Date shall be paid in full in cash against receipt of a summary invoice; provided, that in each case, such payment of Restructuring Fees and Expenses shall comply with any orders, procedures, or rules of the Bankruptcy Court and the Bankruptcy Code, as applicable; provided, further, that any earned and payable restructuring, sale, success, or other transaction or similar fee shall be paid from the proceeds of the DIP Facility or the Debtors' cash on hand, and NewCo shall not be responsible therefor. The Consenting Funded Debt Parties and Ayrmid shall not be required to file any application with, or obtain the approval of, the Bankruptcy Court as a condition to the payment of Restructuring Fees and Expenses, and no recipient of Restructuring Fees and Expenses shall be required to file a fee application or comply with the U.S. Trustee guidelines in respect thereof. The Plan, the DIP Orders, and any other applicable order of the Bankruptcy Court shall contain provisions giving effect to the obligations under this Section 16.21.

(b) Whether or not the Restructuring Transactions are consummated, the Company Parties hereby agree, on a joint and several basis, to pay in cash the Royalty Investors Fees, subject to the terms set forth in the definition thereof, as follows: (a) after the Petition Date, pursuant to the terms of the DIP Orders; (b) upon termination of this Agreement as to any Party other than termination as to the Consenting Royalty Investors on account of a material breach of this Agreement by the Consenting Royalty Investors, all Royalty Investors Fees incurred up to (and including) the applicable Termination Date shall be paid in full in cash promptly, and in any event within ten (10) Business Days, following receipt of a summary invoice; and (c) on the Plan

Effective Date, all Royalty Investors Fees incurred up to (and including) the Plan Effective Date shall be paid in full in cash against receipt of a summary invoice; provided, that in each case, such payment of Royalty Investors Fees shall comply with any orders, procedures, or rules of the Bankruptcy Court and the Bankruptcy Code, as applicable. The advisors to the Consenting Royalty Investors shall not be required to file any application with, or obtain the approval of, the Bankruptcy Court as a condition to the payment of the Royalty Investors Fees, and no recipient of Royalty Investors Fees shall be required to file a fee application or comply with the U.S. Trustee guidelines in respect thereof. The Plan, the DIP Orders, and any other applicable order of the Bankruptcy Court shall contain provisions giving effect to the obligations under this Section 16.21.

16.22. September 2026 Forbearance Agreement. Notwithstanding anything to the contrary in this Agreement, nothing in this Agreement shall (a) constitute an amendment, modification, waiver, or termination of any term or provision of, or alter or diminish any right, remedy, obligation, or protection under, the September 2026 Forbearance Agreement or the Fee Agreement, (b) constitute a waiver of, or a forbearance with respect to, any "Default" or "Event of Default" (as defined in or under the Term Loan Credit Agreement, the 2028 Indenture, the 2029 Indenture, or the Royalty Agreement, as applicable), whether or not forborne or waived under the September 2026 Forbearance Agreement, (c) extend, shorten, or otherwise modify the "Forbearance Period" under the September 2026 Forbearance Agreement or affect the occurrence of any "Forbearance Termination Event" thereunder, (d) affect any Consenting Stakeholder's right (to the extent it is party to the September 2026 Forbearance Agreement) to terminate the September 2026 Forbearance Agreement, (e) impair or release any obligation of any Company Party to pay any fees, expenses, or other consideration payable under the September 2026 Forbearance Agreement or the Fee Agreement, or (f) constitute a termination or release of any liens on, or security interests in, any assets or properties of the Company Parties securing the obligations under the Term Loan Credit Agreement, the 2028 Indenture, the 2029 Indenture, or the Royalty Agreement. The September 2026 Forbearance Agreement and the Fee Agreement shall each remain in full force and effect in accordance with their respective terms, and in the event of any conflict between this Agreement and the September 2026 Forbearance Agreement or the Fee Agreement, the September 2026 Forbearance Agreement or the Fee Agreement, as applicable, shall govern and control.

16.23. Disclosure; Publicity. The Company Parties shall submit drafts to the Ad Hoc Group Advisors and Ayrmid Advisors of any press releases and public documents that constitute disclosure of the existence or terms of this Agreement or any amendment to the terms of this Agreement at least two (2) Business Days before making any such disclosure, and shall afford the Ad Hoc Group Advisors and Ayrmid Advisors a reasonable opportunity to comment on such documents and disclosures and shall incorporate any such reasonable comments in good faith; provided, that if delivery of such document at least two (2) Business Days in advance of such disclosure is impracticable under the circumstances, such document shall be delivered as soon as otherwise practicable. Except as required by Law (including any rules set by the Securities and Exchange Commission, stock exchange rules, or order from the Bankruptcy Court), no Party or its advisors shall use the name of any member of the Ad Hoc Group or Ayrmid in any public manner (including in any press release or public filing) with respect to this Agreement, the Restructuring Transactions, or any of the Definitive Documents without such member's or Ayrmid's, as applicable, prior written consent (which consent may be given by counsel). The Ad Hoc Group Advisors and Ayrmid Advisors shall submit drafts to the Company Parties of any press releases

and public documents that constitute disclosure of the existence or terms of this Agreement or any amendment to the terms of this Agreement at least two (2) Business Days before making any such disclosure, and shall afford the Company Parties a reasonable opportunity under the circumstances to comment on such documents and disclosures and shall incorporate any such reasonable comments in good faith. This Section 16.23 shall not apply to the disclosure of Ayrmid's identity in any filing with the Bankruptcy Court, as determined by the Company Parties in their reasonable discretion.

16.24. Confidentiality and Redactions. No Party shall disclose to any Entity (including, for the avoidance of doubt, any other Consenting Stakeholder) the principal amount, number of shares, or percentage of any Company Claims/Interests held by any Consenting Stakeholder; provided, that: (a) a Party may disclose the foregoing information as may be required by applicable Law, including order, procedure, or rule of the Bankruptcy Court; (b) the Parties shall be permitted to disclose the foregoing information at any time to the legal, accounting, financial, and other advisors to the Company Parties, to the Ad Hoc Group Advisors and to the Ayrmid Advisors; and (c) the Company Parties shall be permitted to disclose at any time (i) the foregoing information on a confidential basis to their affiliates and (ii) the aggregate principal amount of, and aggregate percentage of, any class of Company Claims/Interests held by the Consenting Stakeholders collectively. The Consenting Stakeholders hereby consent to the disclosure of the execution, terms, and contents of this Agreement by the Company Parties in the Definitive Documents or as otherwise required by Law; provided, that (x) if any of the Company Parties determines that it is required to attach a copy of this Agreement, any Transfer Agreement, or any Joinder to any Definitive Document or any other filing or similar document relating to the Restructuring Transactions, it shall redact any reference to or concerning any specific Consenting Stakeholder's holdings of Company Claims/Interests and the identity of such Consenting Stakeholder, to the extent permitted by applicable Law, and (y) if disclosure of additional identifying information of any Consenting Stakeholder is required by applicable Law, advance notice of the intent to disclose, if permitted by applicable Law, shall be given by the disclosing Party to each affected Consenting Stakeholder (which shall have the right to seek a protective order before such disclosure). The Company Parties further agree that such information shall be redacted from "closing sets" or other representations of the fully executed Agreement, any Transfer Agreement, or any Joinder, which redacted closing sets may be shared with the Consenting Stakeholders; provided, that the unredacted "closing sets" shall be provided to the Ad Hoc Group Advisors on a "professional eyes only" basis.

16.25. Identified Business Unit(s), Platform(s), and/or Trading Desk(s). For the avoidance of doubt, where a Consenting Stakeholder enters into or accedes to this Agreement through one or more identified business unit(s), platform(s), and/or trading desk(s) in respect of any Company Claims/Interests (as specified in the signature page to this Agreement, a Transfer Agreement, or a Joinder), the terms of this Agreement shall apply only to that identified business unit(s), platform(s), and/or trading desk(s) and not to any other business unit(s), platform(s), trading desk(s), and/or affiliate(s) within the legal Entity that has not signed or acceded to this Agreement (in accordance with the terms of this Agreement) separately in respect of any Company Claims/Interests or other debt or other instrument that it legally or beneficially owns, and, therefore, such Consenting Stakeholder shall not be required to procure compliance with this

Agreement on behalf of such other business unit(s), platform(s), and/or trading desk(s) within that legal Entity.

16.26. Highbridge/Ayrmid Matters. Notwithstanding anything to the contrary in this Agreement or any Definitive Document, the Parties acknowledge and agree as follows:

(a) Subject to Section 16.26(c), unless and until Ayrmid irrevocably withdraws from the sale process in writing given in accordance with Section 16.10, the Highbridge Funds shall be walled off from, and shall recuse themselves from, all Ad Hoc Group discussions, negotiations, and positions regarding any Sale Process Matter. The terms of other bids shall not be shared with the Highbridge Funds or their advisors, and no information regarding any Sale Process Matter shared with the Ad Hoc Group shall be shared with Ayrmid or with any personnel or advisors of the Highbridge Funds acting in a Bidder Capacity.

(b) Except as set forth in the following proviso, and unless and until Ayrmid irrevocably withdraws from the sale process in writing given in accordance with Section 16.10, for purposes of determining whether any consent, approval, direction, or waiver with respect to a Sale Process Matter has been given or obtained by the Required Consenting Funded Debt Parties, the Required Consenting 1L Lenders, the Required Consenting 2028 Noteholders, or the Required Consenting 2029 Noteholders, as applicable, the Highbridge Funds and their Company Claims/Interests shall be excluded from both the numerator and the denominator of such determination, and any requirement that such group include at least two (2) unaffiliated holders shall be applied without regard to the Highbridge Funds; provided, that notwithstanding the foregoing restriction, in the event the vote of the Highbridge Funds is necessary to obtain requisite lender approval under the Term Loan Credit Agreement, the 2028 Indenture, the 2029 Indenture, or any other applicable document, appropriate protocols will be implemented at such time to permit the Highbridge Funds to make an informed vote without prejudice to the applicable Sale Process Matter.

(c) Ayrmid will receive diligence solely through the Company Parties and their advisors, and on the same terms as other bidders. Ayrmid shall be permitted to share such information with the Highbridge Funds. Any material information provided to Ayrmid that other bidders have not received will be made available to all qualified bidders. Information provided to the Highbridge Funds in their Lender Capacity (including forecasts, liquidity reporting, and diligence prepared for lenders, including pursuant to Section 9.01) will not be shared by the Highbridge Funds with the Ayrmid bidder team.

(d) Neither the Highbridge Funds nor Ayrmid will enter into any agreement, arrangement, or understanding with any other actual or potential bidder regarding bidding for or refraining from bidding on the Company Parties' assets.

(e) The Highbridge Funds may participate in forbearance and debtor-in-possession financing discussions, negotiations, and structuring, including with respect to the September 2026 Forbearance Agreement, the DIP Facility, and the DIP Documents, to the same extent as any other lender in the Ad Hoc Group, except with respect to any Sale Process Matter.

(f) Notwithstanding anything to the contrary set forth herein, the Highbridge Funds shall be entitled to receive distributions on account of their secured debt claims on an equal pro rata basis with any similarly situated secured creditor on account of such claims, and the Highbridge Funds shall not be excluded from any protections, indemnifications, participation opportunities, or any other treatment afforded to such similarly situated secured creditors, including under Section 16.21.

16.27. Aymrid Back-Up Bidder Rights and Obligations. Notwithstanding anything to the contrary in this Agreement or any Definitive Document, if the Debtors select an Acceptable Alternative Transaction as the successful bid and Aymrid is selected as the back-up bidder (in accordance with the Bidding Procedures Order), then from the date of such selection until the earlier of (a) the Debtors' determination (subject to the consent of the Required Consenting Funded Debt Parties) to proceed with the Aymrid Transaction (upon which Aymrid's rights hereunder shall be reinstated) and (b) the Aymrid Outside Date: (i) Aymrid shall remain obligated to serve as the back-up bidder through the Aymrid Outside Date; and (ii) Aymrid shall have no consent or approval rights under this Agreement or with respect to any Definitive Document, and no Aymrid Termination Event shall apply or be deemed to have occurred (other than Section 14.03(a)(xi) solely with respect to the Milestone set forth in Section 4.01(b)(iii)); provided that Aymrid shall retain such rights solely to the extent necessary to prevent (1) any extension of its obligation to serve as a back-up bidder beyond the Aymrid Outside Date or (2) any impairment of the Bid Protections or Aymrid's right to payment (including with respect to Milestones related to the Bid Protections) thereof under this Agreement and the Bidding Procedures Order.

16.28. Headings. The headings of the sections, paragraphs, and subsections of this Agreement are inserted for convenience of reference only and shall not affect the interpretation hereof or, for any purpose, be deemed a part of this Agreement.

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement on the day and year first above written.

*[Signature Pages Follow]*

**Company Party's Signature Page to**
**the Restructuring Support Agreement**

**KARYOPHARM THERAPEUTICS INC.**

DocuSigned by:

2FB26501773E499...
______________________________________

Name: Richard Paulson
Title: President and Chief Executive Officer

Address: Karyopharm Therapeutics Inc.
85 Wells Avenue, Suite 210
Newton, Massachusetts 02459

E-mail address(es): richard.paulson@karyopharm.com

**Company Party's Signature Page to**
**the Restructuring Support Agreement**

**KPT TEXAS LLC**

DocuSigned by:
Michael Mano
73DCB20D617247A...
____________________________________________

Name: Michael Mano
Title: Executive Vice President, Chief Legal Officer and Secretary

Address: Karyopharm Therapeutics Inc.
85 Wells Avenue, Suite 210
Newton, Massachusetts 02459

E-mail address(es): michael.mano@karyopharm.com

**AYRMID LTD.**

Signed by:
By: Rory Peter Nealon
70CEBFFD7E8341C...
Name: Rory Peter Nealon
Title: Chief Financial Officer

**Consenting Stakeholder's Signature Page to the Restructuring Support Agreement**

[On file with the Company Parties]

# <u>EXHIBIT A</u>

## Company Parties

1. Karyopharm Therapeutics Inc.
2. KPT Texas LLC

# EXHIBIT B

## Plan

[*Filed at Docket No. 17*]

# **EXHIBIT C**

**Disclosure Statement**

[*Filed at Docket No. 18*]

# EXHIBIT D

## DIP Term Sheet

***Proposed Execution***

**KARYOPHARM THERAPEUTICS INC., ET AL.**

**$110,000,000 SUPERPRIORITY SENIOR SECURED DEBTOR-IN-POSSESSION TERM LOAN FACILITY TERM SHEET**

**NOVEMBER 2, 2026**

This term sheet (including all annexes and exhibits hereto, this "DIP Term Sheet") sets forth the principal terms of a superpriority senior secured debtor-in-possession term loan credit facility (the "DIP Facility"; this DIP Term Sheet, the DIP Orders (as defined herein), the DIP Credit Agreement (as defined herein) and, if and to the extent required pursuant to the row titled "Documentation; DIP Term Sheet Controls" below, the other definitive financing documentation governing the DIP Facility, each of which shall be in form and substance acceptable to the Required DIP Lenders (as defined herein) and, with respect to the provisions which directly or indirectly apply to the rights and obligations of the DIP Agent (as defined herein) (collectively, the "DIP Agent Provisions"), the DIP Agent, collectively, the "DIP Documents") to be entered into with the Debtors (as defined herein). The DIP Facility will be subject to the approval of the Bankruptcy Court (as defined herein) and consummated in cases to be commenced under chapter 11 (the "Chapter 11 Cases") of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "Bankruptcy Court"), in accordance with (i) interim (a form of which is attached hereto as Exhibit A, the "Interim DIP Order") and final orders (the "Final DIP Order" and, together with the Interim DIP Order, the "DIP Orders") of the Bankruptcy Court authorizing the Debtors to enter into the DIP Facility, each of which shall be in form and substance acceptable to the Required DIP Lenders and, with respect to the DIP Agent Provisions, the DIP Agent, and (ii) the DIP Documents to be executed by the Debtors. In the event of any conflict between this DIP Term Sheet and the terms of the Interim DIP Order or the Final DIP Order, the terms of the applicable DIP Order shall govern.

Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Restructuring Support Agreement dated of even date herewith (the "RSA"), the Plan (as defined in the RSA), the DIP Orders, or that certain Credit and Guaranty Agreement, dated as of May 8, 2024 (as amended, restated, supplemented, waived or otherwise modified from time to time, the "Prepetition First Lien Credit Agreement" and, together with the other Credit Documents (as defined therein), the "Prepetition First Lien Documents" and the credit facility contemplated thereunder, the "Prepetition First Lien Facility") by and among Karyopharm Therapeutics Inc. (the "Borrower"), each of the Borrower's subsidiaries that are guarantors thereunder, the lenders party thereto from time to time (the "Prepetition First Lien Lenders") and Wilmington Savings Fund Society, FSB, as administrative agent and collateral agent (in such respective capacities, the "Prepetition First Lien Agent").

This DIP Term Sheet is being provided on a confidential basis, and the Borrower and Guarantors are not authorized to disclose this DIP Term Sheet to any person other than (i) their affiliates and their directors, officers, employees, accountants, attorneys and other professional advisors retained in connection with the transactions contemplated hereby, who shall agree to maintain its confidentiality, (ii) in a filing with the Bankruptcy Court in connection with the Chapter 11 Cases, (iii) the Office of the United States Trustee, (iv) Parties to the RSA, or (v) as may be required by applicable law.

THE TERMS AND CONDITIONS SET FORTH IN THIS DIP TERM SHEET DO NOT CONSTITUTE OR CREATE AN AGREEMENT, OBLIGATION OR COMMITMENT OF ANY KIND BY OR ON BEHALF OF ANY PARTY, UNLESS AND UNTIL EXECUTED BY EACH OF THE UNDERSIGNED PARTIES HERETO.

THIS DIP TERM SHEET IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES OF THE BORROWER OR A SOLICITATION OF ACCEPTANCES OF ANY CHAPTER 11 PLAN WITHIN

THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE OR ANY OTHER PLAN OF REORGANIZATION OR SIMILAR PROCESS UNDER ANY APPLICABLE LAW. ANY SUCH OFFER OR SOLICITATION SHALL COMPLY WITH ALL APPLICABLE LAWS, INCLUDING SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE, AS APPLICABLE.

THIS DIP TERM SHEET IS A SETTLEMENT PROPOSAL IN FURTHERANCE OF SETTLEMENT DISCUSSIONS AND IS ACCORDINGLY PROTECTED BY RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND ANY OTHER APPLICABLE STATUTES OR DOCTRINES PROTECTING THE USE OR DISCLOSURE OF CONFIDENTIAL SETTLEMENT DISCUSSIONS.

THIS DIP TERM SHEET DOES NOT PURPORT TO SUMMARIZE ALL OF THE TERMS, CONDITIONS, REPRESENTATIONS, WARRANTIES, AND OTHER PROVISIONS WITH RESPECT TO THE DIP FACILITY, WHICH ARE SUBJECT IN ALL RESPECTS TO THE DIP DOCUMENTS.

| Term | Description |
|---|---|
| **Borrower:** | Karyopharm Therapeutics Inc., as a debtor-in-possession. |
| **Guarantors:** | KPT Texas LLC, which shall be a debtor-in-possession, and any other subsidiary of the Borrower that is a debtor-in-possession under the Chapter 11 Cases (collectively the "Guarantors" and, together with the Borrower, the "Debtors").<br><br>Each of the Guarantors jointly and severally hereby irrevocably and unconditionally guarantees to the DIP Agent for the ratable benefit of the DIP Secured Parties the due and punctual payment in full in cash of all DIP Obligations when the same shall become due, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise. Each Guarantor agrees that its obligations hereunder are irrevocable, absolute, independent and unconditional and shall not be affected by any circumstance that constitutes a legal or equitable discharge of a guarantor or surety other than the indefeasible payment in full in cash of the DIP Obligations (subject to the terms of the RSA). |
| **DIP Agent:** | Wilmington Savings Fund Society, FSB ("WSFS"), as administrative agent and collateral agent for the DIP Lenders (in such respective capacities, the "DIP Agent"). All DIP Loans and payments and administrative functions shall be handled through the DIP Agent. Until entry of the Final DIP Order and execution of the DIP Credit Agreement, in acting under this DIP Term Sheet, the DIP Agent shall be entitled to all of the rights, authority, privileges, protections, immunities, indemnities, reimbursements for expenses, limitations of liability and benefits afforded to WSFS as collateral agent or administrative agent, as applicable, under the Prepetition First Lien Credit Agreement, which provisions are incorporated herein by reference, mutatis mutandis, and shall survive the termination of its fee letter and the resignation or removal of the DIP Agent (collectively, the "Agency Provisions"); provided, that any references to a "Lender" or a "Credit Party" in the Prepetition First Lien Credit Agreement shall be deemed references to a DIP Lender and a Debtor, as applicable.<br><br>Notwithstanding any other terms or provisions in the DIP Documents, any actions (including any enforcement actions or the pursuit of remedies against the Debtors and/or the DIP Collateral) required or permitted to be taken by the DIP Lenders hereunder may be taken on their behalf by the DIP Agent. |
| **DIP Lenders:** | The Prepetition First Lien Lenders and/or their respective affiliates or managed or controlled funds who elect to participate in the DIP Facility listed in Schedule 1 hereto (in such capacities, the "DIP Lenders" and, together with the DIP Agent, the "DIP Secured Parties") in the amounts set forth on Schedule 1 hereto.<br><br>The obligation of any DIP Lender to fund any loan under the DIP Facility may be fulfilled on behalf of such DIP Lender by any of such DIP Lender's affiliated or related funds or financing vehicles. |
| **Documentation; DIP Term Sheet Controls:** | In connection with entry of the Final DIP Order, the Debtors, the DIP Agent, and the DIP Lenders shall execute and enter into a debtor-in-possession credit and guaranty agreement (the "DIP Credit Agreement"), which shall be (a) attached as an exhibit to the Final DIP Order, (b) consistent with this DIP Term Sheet (except as otherwise agreed by the Borrower and the Required DIP Lenders), and |

| Term | Description |
|---|---|
| | (c) in form and substance reasonably acceptable to the Debtors, the Required DIP Lenders, and the DIP Agent (with respect to any DIP Agent Provision).<br><br>At the option of the Required DIP Lenders in their sole discretion, the Debtors shall execute other definitive financing documentation with respect to the DIP Facility, including, without limitation, guarantees and security documents, which shall be prepared by counsel to the Ad Hoc Group, in consultation with the counsel to the Debtors, based upon and giving due regard to the Prepetition First Lien Documents, in each case reasonably satisfactory in form and substance to the Required DIP Lenders, the DIP Agent (with respect to any DIP Agent Provision) and the Debtors, which shall contain the terms and conditions set forth in this DIP Term Sheet and such other terms as the Borrower, the DIP Agent (with respect to any DIP Agent Provision) and the Required DIP Lenders shall agree; provided, that such documentation (i) shall be consistent with and subject to the terms of this DIP Term Sheet unless otherwise agreed by the DIP Agent (with respect to any DIP Agent Provision) and the Required DIP Lenders and (ii) shall otherwise be on terms no less favorable to the DIP Secured Parties than the terms under this DIP Term Sheet unless otherwise agreed by the DIP Agent (with respect to any DIP Agent Provision) and the Required DIP Lenders.<br><br>The provisions of such definitive documentation shall, upon execution, supersede the provisions of this DIP Term Sheet solely to the extent of any direct conflict between such documentation and this DIP Term Sheet; provided, that prior to the execution of the DIP Credit Agreement, this DIP Term Sheet and the Interim DIP Order shall govern the DIP Facility. |
| **Required DIP Lenders:** | "Required DIP Lenders" shall mean, at any time, DIP Lenders holding a majority of the aggregate outstanding New Money DIP Loans and unfunded New Money DIP Commitments at such time. |
| **DIP Facility:** | The DIP Facility shall be a superpriority senior secured term loan financing facility in an aggregate principal amount not to exceed $110,000,000, comprising (a) first-out new money term loans in an aggregate principal amount of up to $55,000,000 (the "New Money DIP Loans" and the commitments therefor, the "New Money DIP Commitments"; the New Money DIP Commitments of each DIP Lender are set forth on Schedule 1 hereto), available in the Initial Draw (as defined herein) upon entry of the Interim DIP Order and in one Delayed Draw (as defined herein) upon entry of the Final DIP Order, and (b) the Roll-Up Loans (as defined herein) (the New Money DIP Loans together with the Roll-Up Loans, the "DIP Loans"), in each case subject to the terms and conditions set forth in this DIP Term Sheet and the DIP Documents. The draw mechanics of the DIP Facility shall be on terms mutually agreed upon by the DIP Agent, the Required DIP Lenders and the Debtors, and in accordance with the DIP Budget[1] (as defined herein); provided, that (x) until entry of the Final DIP Order and execution of the DIP Credit Agreement, the draw mechanics set forth in Section 2.1(c)(i) of the Prepetition First Lien Credit Agreement shall govern any draw of the DIP Facility, mutatis mutandis (however, (i) any references to conditions precedent shall be deemed references to the Interim Funding Conditions and (ii) references to the HCR Lender and the HCR Loans shall be |

[1] As used herein, all references to the "DIP Budget" mean the "DIP Budget (subject to Permitted Variances)".

| Term | Description |
|---|---|
| | disregarded), and (y) the DIP Agent shall maintain a register of the DIP Loans on the same terms and conditions as provided in Section 2.6(b) of the Prepetition First Lien Credit Agreement.<br><br>New Money DIP Loans made by any DIP Lender under the DIP Facility may be made directly by such DIP Lender or "fronted" by a financial institution on terms reasonably acceptable to the Debtors, the relevant DIP Lender and such fronting financial institution. |
| **Roll-Up:** | Subject to and upon entry of the Interim DIP Order, and subject to the occurrence of the Closing Date (as defined herein), $25,000,000 in aggregate principal amount of Prepetition First Lien Term Loans in respect of such Prepetition First Lien Term Loans held by those DIP Lenders that fund New Money DIP Loans (or any of their respective designated affiliates or managed or controlled funds, as determined by the applicable DIP Lender) shall be automatically deemed "rolled up" and converted into a second-out tranche of term loans under the DIP Facility (such conversion, the "Interim Roll-Up" and such converted amounts, the "Interim Roll-Up Loans"), on a cashless basis, at a ratio of $1.00 of principal amount of Prepetition First Lien Term Loans held by each DIP Lender for every $1.00 of principal amount of New Money DIP Loans funded by such DIP Lender in the Initial Draw.<br><br>Subject to entry of the Final DIP Order and upon funding of the Delayed Draw, an additional $30,000,000 in aggregate principal amount of Prepetition First Lien Term Loans shall be automatically deemed "rolled up" and converted into a second-out tranche of term loans under the DIP Facility (such conversion, the "Final Roll-Up" and, together with the Interim Roll-Up, the "Roll-Up"; such converted amounts, the "Final Roll-Up Loans" and, together with the Interim Roll-Up Loans, the "Roll-Up Loans"), on a cashless basis, at a ratio of $1.00 of principal amount of Prepetition First Lien Term Loans of each DIP Lender for every $1.00 of the aggregate principal amount of New Money DIP Commitments of such DIP Lender funded by such DIP Lender in the Delayed Draw.<br><br>For the avoidance of doubt, no Prepetition 2028 Notes Obligations, Prepetition 2029 Notes Obligations or Prepetition Royalty Obligations shall be included in, refinanced, converted, "rolled up" or otherwise deemed satisfied in connection with the Roll-Up.<br><br>As used herein, (i) all obligations in respect of the New Money DIP Loans and the commitments therefor, together with all interest, fees, premiums, costs, expenses, indemnities and other amounts accrued or payable in respect thereof, are referred to as the "First-Out New Money DIP Obligations," (ii) all obligations in respect of the Roll-Up Loans, together with all interest, fees, premiums, costs, expenses, indemnities and other amounts accrued or payable in respect thereof, are referred to as the "Second-Out Roll-Up DIP Obligations," and (iii) the First-Out New Money DIP Obligations and the Second-Out Roll-Up DIP Obligations are referred to collectively as the "DIP Obligations." Notwithstanding anything to the contrary herein, the First-Out New Money DIP Obligations shall be senior in right of payment to the Second-Out Roll-Up DIP Obligations, and all DIP Collateral and proceeds thereof shall be applied, after funding of the Carve-Out, first, to the First-Out New Money DIP Obligations until indefeasibly paid in full in cash (subject to the terms of the RSA), and second, to the Second-Out Roll- |

| Term | Description |
|---|---|
| | Up DIP Obligations. No payment or distribution shall be made on account of the Second-Out Roll-Up DIP Obligations (other than interest paid in kind in accordance with this DIP Term Sheet and the DIP Documents) unless and until the First-Out New Money DIP Obligations have been indefeasibly paid in full in cash (subject to the terms of the RSA). |
| **Treatment Under Ayrmid Transaction:** | Notwithstanding anything herein to the contrary, in the event of the consummation of the Ayrmid Transaction (as defined in the RSA), each holder of an allowed claim relating to the DIP Facility (a "DIP Claim") consents to the treatment of its DIP Claim in accordance with the Ayrmid Transaction Term Sheet. Other than as set forth in the Ayrmid Transaction Term Sheet with respect to the Ayrmid Transaction, no holder of a DIP Claim shall be deemed to have waived its right to have its DIP Claim paid in full in cash in connection with any transaction (whether a Sale Transaction, chapter 11 plan, or otherwise) without the written consent of the Required DIP Lenders. |
| **Purpose:** | The proceeds of the New Money DIP Loans shall be used to, among other things: (a) pay fees, interest, premiums, costs, and expenses associated with the DIP Facility, (b) provide for the ongoing working capital, capital expenditure, and general corporate needs of the Debtors during the pendency of the Chapter 11 Cases, (c) fund the Carve-Out (as defined herein), (d) make the adequate protection payments contemplated by the DIP Orders, and (e) fund the costs of the administration of the Chapter 11 Cases (including allowed administrative costs and expenses), the sale process, and the consummation of the Restructuring Transactions, in each case, subject to the DIP Budget; provided, that none of the foregoing shall limit the payment of Allowed Professional Fees (as defined in the Interim DIP Order attached as Exhibit A hereto) that benefit from the Carve-Out, as and when such Allowed Professional Fees are allowed by the Bankruptcy Court at any time (whether by interim order, procedural order or otherwise). |
| **Availability:** | Upon the Bankruptcy Court's entry of the Interim DIP Order, New Money DIP Loans in an aggregate principal amount not to exceed $25,000,000 (the "Interim DIP Amount") shall be available to the Borrower and borrowed on the Closing Date (as defined herein) in a single draw (the "Initial Draw"), subject to compliance with the Interim Funding Conditions (as defined herein) and the other terms, conditions and covenants set forth in this DIP Term Sheet and the DIP Orders. The Interim Roll-Up Loans shall be incurred upon entry of the Interim DIP Order and shall be in addition to, and shall not be counted against, the Interim DIP Amount.<br><br>Upon the Bankruptcy Court's entry of the Final DIP Order, the remaining New Money DIP Commitments (the "Delayed Draw Amount") shall be available to the Borrower in a single draw (the "Delayed Draw") of $30,000,000, subject to compliance with the Delayed Draw Conditions (as defined herein) and the other terms, conditions and covenants set forth in the DIP Documents. The Final Roll-Up Loans shall be incurred upon entry of the Final DIP Order and shall be in addition to, and shall not be counted against, the Delayed Draw Amount. |
| **Interim Funding Conditions:** | The initial borrowing of New Money DIP Loans in the Interim DIP Amount under the DIP Facility shall be subject to the satisfaction or written waiver by the Required DIP Lenders of the following conditions precedent (collectively, |

| Term | Description |
|---|---|
| | the "Interim Funding Conditions"; the date of satisfaction of such conditions, the "Closing Date"):<br>i. this DIP Term Sheet shall have been executed and delivered by each Debtor, each DIP Lender and the DIP Agent, and each other DIP Document (other than the DIP Credit Agreement) shall be in form and substance consistent with this DIP Term Sheet and otherwise reasonably satisfactory to the DIP Agent and the Required DIP Lenders and shall have been executed and delivered by each Debtor party thereto;<br>ii. the Petition Date shall have occurred, and each Debtor shall be a debtor and a debtor-in-possession;<br>iii. all "first day orders" (other than the Interim DIP Order) entered by the Bankruptcy Court in the Chapter 11 Cases (including a cash management order) shall be satisfactory in form and substance to the Required DIP Lenders in their reasonable discretion;<br>iv. not later than three (3) calendar days following the Petition Date (subject to the availability of the Bankruptcy Court), (1) the DIP Agent shall have received a signed copy of the Interim DIP Order entered by the Bankruptcy Court: (a) authorizing and approving the making of the DIP Loans and the granting of the superpriority claims and liens contemplated by this DIP Term Sheet and the DIP Documents; (b) authorizing the Interim Roll-Up; (c) granting the DIP Agent, for the benefit of the DIP Secured Parties, valid and perfected liens on the DIP Collateral (consistent with the priorities set forth herein) to the extent and with the priority set forth in this DIP Term Sheet, subject only to the Carve-Out and the Permitted Prior Liens[2]; and (d) otherwise containing terms and conditions consistent with Exhibit A hereto and otherwise in form and substance acceptable to the Required DIP Lenders in their sole discretion and, with respect to any DIP Agent Provision, the DIP Agent in its sole discretion; and (2) such order shall be in full force and effect and shall not have been vacated, reversed, modified, amended, or stayed in any respect;<br>v. the Debtors shall be in compliance in all respects with the Interim DIP Order;<br>vi. no trustee or examiner with expanded powers (having powers beyond those set forth in Bankruptcy Code sections 1106(a)(3) and (4)) shall have been appointed with respect to the Debtors, any of their subsidiaries, or their respective properties;<br>vii. substantially concurrently with the Closing Date, subject to the Interim DIP Order, all fees and expenses, including reasonable and documented attorneys' fees, of the DIP Secured Parties relating to the Chapter 11 |

[2] The "Permitted Prior Liens" shall have the meaning ascribed in the DIP Orders.

| Term | Description |
|---|---|
| | Cases and the DIP Facility and all other fees required to be paid to the DIP Agent and the DIP Lenders on or before the Closing Date shall have been paid (or shall be paid with the proceeds of the Initial Draw) to the extent an invoice has been delivered to the Borrower at least twenty-four (24) hours in advance of the Closing Date;<br><br>viii. all governmental and third-party consents and approvals necessary in connection with the DIP Facility and the transactions contemplated thereby shall have been obtained;<br><br>ix. there shall exist no Default or Event of Default (each as defined herein) under the DIP Facility immediately before, or after giving effect to, the funding of the Initial Draw;<br><br>x. the representations and warranties of the Debtors set forth herein shall be true and correct in all material respects or, with respect to representations and warranties qualified by materiality, in all respects (other than any such representation and warranty that by its terms refers to a specified earlier date which shall be true and correct in all material respects or, with respect to representations and warranties qualified by materiality, in all respects, as of such earlier date) immediately before, and after giving effect to, the funding of the Initial Draw;<br><br>xi. since the RSA Effective Date (as defined in the RSA), there shall not have occurred any event, change, condition, or circumstance that has had, or that could reasonably be expected to have, a Material Adverse Effect (as defined herein), other than as a result of those events leading up to and following commencement of the Chapter 11 Cases;<br><br>xii. there shall exist no unstayed action, suit, investigation, litigation or proceeding pending or threatened in writing in any court or before any arbitrator or governmental instrumentality (other than the Chapter 11 Cases) that could reasonably be expected to have a Material Adverse Effect;<br><br>xiii. the DIP Agent shall have received (x) a notice (email from the chief executive officer, president, vice president or chief financial officer (each, an "Authorized Officer") of the Borrower being sufficient) and (y) a duly executed letter of direction from the Borrower addressed to the DIP Agent directing the disbursement on the Closing Date of the proceeds of the DIP Loans made on such date substantially in the form of Exhibit B to the Prepetition First Lien Credit Agreement, in each case, in connection with such draw request no later than 11:00 a.m. (Prevailing Eastern Time) one (1) Business Day prior to the Closing Date (or such later time as the Required DIP Lenders and the DIP Agent may agree to);<br><br>xiv. the DIP Agent and the DIP Lenders shall have received a closing certificate, in form and substance reasonably satisfactory to the DIP |

| Term | Description |
|---|---|
| | Agent and the Required DIP Lenders (a "Closing Certificate") duly executed by an Authorized Officer of the Borrower, appropriately completed, by which such Authorized Officer shall certify to the DIP Agent and the DIP Lenders that all of the Interim Funding Conditions have been satisfied;<br><br>xv. the DIP Secured Parties shall have received, and be satisfied with, the initial DIP Budget;<br><br>xvi. the Debtors shall have insurance (including, without limitation, commercial general liability and property insurance) with respect to the DIP Collateral, with financially sound and reputable insurance companies reasonably acceptable to the Required DIP Lenders, and in amounts as are generally carried in accordance with sound business practice by companies in similar businesses and circumstances as the Debtors;<br><br>xvii. the DIP Lenders shall have received a certificate, in form and substance reasonably satisfactory to the Required DIP Lenders, executed by an Authorized Officer of each Debtor on behalf of each such Debtor, certifying that attached to such certificate are true, correct and complete copies of (a) (x) the certificate of incorporation, certificate of limited partnership or articles of organization, as applicable, of such applicable Debtor and (y) the by-laws, operating agreement, limited liability company agreement or limited partnership agreement, as applicable, of such applicable Debtor, in each case, then in full force and effect (including all amendments thereto) (clauses (x) and (y), collectively, the "Organizational Documents"), (b) the resolutions then in full force and effect adopted by the board of directors (or comparable governing body) of such applicable Debtor authorizing and ratifying the execution, delivery and performance by such applicable Debtor of this DIP Term Sheet and the transactions contemplated hereby, (c) a certificate of good standing or certificate of fact and certificate of account status, as applicable, dated as of a recent date, from the secretary of state (or comptroller, as applicable) of the state under whose laws such applicable Debtor was incorporated or formed, and (d) an incumbency certificate evidencing the identity, authority and capacity of each Authorized Officer thereof authorized to execute this DIP Term Sheet, the DIP Documents and any other related document to which such Debtor is a party or is to be a party and specimen signatures thereof; and<br><br>xviii. the making of the DIP Loans shall not violate any requirement of law and shall not be enjoined, temporarily, preliminarily or permanently. |
| **Delayed Draw Conditions:** | Upon entry of the Final DIP Order, the availability of the Delayed Draw Amount under the DIP Facility shall be subject to the satisfaction, or written waiver by the Required DIP Lenders, of each of the following conditions precedent (collectively, the "Delayed Draw Conditions"): |

| Term | Description |
| --- | --- |
| | i. there shall exist no Default or Event of Default under the DIP Facility immediately before, or after giving effect to, the funding of the Delayed Draw;<br>ii. the representations and warranties of the Debtors set forth under the DIP Credit Agreement shall be true and correct in all material respects or, with respect to representations and warranties qualified by materiality, in all respects (other than any such representation and warranty that by its terms refers to a specified earlier date which shall be true and correct in all material respects or, with respect to representations and warranties qualified by materiality, in all respects, as of such earlier date) immediately before, and after giving effect to, the funding of the Delayed Draw;<br>iii. the making of the Delayed Draw shall not violate any requirement of law and shall not be enjoined, temporarily, preliminarily or permanently;<br>iv. since the RSA Effective Date, there shall not have occurred any event, change, condition, or circumstance that has had, or that could reasonably be expected to have, a Material Adverse Effect (as defined herein), other than as a result of those events leading up to and following commencement of the Chapter 11 Cases;<br>v. prior to or substantially concurrently with the making of the Delayed Draw, all fees and expenses, including reasonable and documented attorneys' fees of the DIP Secured Parties shall have been paid in full (or shall be paid in connection with the Delayed Draw) to the extent an invoice has been delivered to the Borrower at least twenty-four (24) hours in advance;<br>vi. the DIP Agent shall have received a signed copy of the Final DIP Order entered by the Bankruptcy Court: (a) authorizing and approving the making of the DIP Loans and the granting of the superpriority claims and liens contemplated by this DIP Term Sheet and the DIP Documents; (b) authorizing the Final Roll-Up; (c) approving the DIP Credit Agreement in the form attached as an exhibit thereto (which shall be in form and substance acceptable to the Required DIP Lenders and, with respect to the DIP Agent Provisions, the DIP Agent); (d) granting the DIP Agent, for the benefit of the DIP Secured Parties, valid and perfected liens on the DIP Collateral (consistent with the priorities set forth herein) to the extent and with the priority set forth in this DIP Term Sheet, subject only to the Carve-Out and the Permitted Prior Liens; and (e) otherwise containing terms and conditions consistent with Exhibit A attached hereto and otherwise in form and substance acceptable to the Required DIP Lenders in their sole discretion (and the DIP Agent with respect to any DIP Agent Provision in its sole discretion);<br>vii. the Final DIP Order shall be in full force and effect and shall not have been vacated, reversed, modified, amended, or stayed in any respect, |

| Term | Description |
|---|---|
| | and the Debtors shall be in compliance in all respects with the Final DIP Order;<br>viii. receipt by the DIP Agent and the DIP Lenders of copies of the DIP Credit Agreement duly executed and delivered by the Debtors and, to the extent requested, the other DIP Documents, in each case in form and substance acceptable to the DIP Agent (with respect to any DIP Agent Provision), the Required DIP Lenders and the Debtors;<br>ix. the Debtors shall be in compliance with the Milestones;<br>x. after giving effect to the Delayed Draw, the total principal amount of New Money DIP Loans borrowed (without, for the avoidance of doubt, giving effect to any prepayments of the DIP Loans) shall not exceed the total New Money DIP Commitments;<br>xi. the DIP Agent shall have received (x) a notice (an email from an Authorized Officer of the Borrower being sufficient), and (y) a duly executed letter of direction from the Borrower addressed to the DIP Agent directing the disbursement on the Closing Date of the proceeds of the DIP Loans made on such date substantially in the form of Exhibit B to the Prepetition First Lien Credit Agreement, in each case, in connection with such draw request no later than 11:00 a.m. (Prevailing Eastern Time) one (1) Business Day prior to the requested funding date of the Delayed Draw (or such later time as the Required DIP Lenders may agree to); and<br>xii. the DIP Agent and the DIP Lenders shall have received a Closing Certificate duly executed by an Authorized Officer of the Borrower, appropriately completed, by which such Authorized Officer shall certify to the DIP Agent and the DIP Lenders that all of the Delayed Draw Conditions have been satisfied. |
| **Interest Rates and Fees:** | As set forth on Annex A hereto. |
| **Default Rate:** | Upon the occurrence and during the continuance of any Event of Default, interest shall accrue on the principal amount of the outstanding New Money DIP Loans and any overdue amount (including overdue interest) at the applicable interest rate plus 2.00% per annum. |
| **Amortization:** | None. |
| **Maturity:** | The earliest of (a) May 1, 2027 (*i.e.*, the date that is six (6) months following the Petition Date), (b) the Plan Effective Date, (c) the date of the closing of a sale of all or substantially all of the assets of the Debtors under section 363 or section 1129 of the Bankruptcy Code or otherwise, (d) the date all DIP Loans become due and payable hereunder or under the DIP Documents, whether by acceleration or otherwise, and (e) the date of the dismissal of any of the Chapter 11 Cases or the conversion of any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code (such earliest date, the "Maturity Date").<br><br>All amounts owed hereunder in respect of the DIP Loans (including, without limitation, any accrued and unpaid interest thereon, any exit fee in respect thereof |

| Term | Description |
|---|---|
| | and all other DIP Obligations) shall be paid in full in cash upon the Maturity Date (except as otherwise agreed by the Required DIP Lenders). All payments of principal, interest, and fees hereunder in respect of the New Money DIP Loans shall be made to the DIP Lenders on a pro rata basis (in accordance with the respective outstanding principal amounts thereof). All payments of principal, interest, and fees hereunder in respect of the Roll-Up Loans shall be made to the DIP Lenders on a pro rata basis (in accordance with the respective outstanding principal amounts thereof). |
| **Milestones:** | The Debtors shall achieve the Milestones (as defined in the RSA), which Milestones are incorporated into this DIP Term Sheet as if they were set forth herein, as may be modified, extended or waived pursuant to the RSA. |
| **Collateral:** | The DIP Obligations shall be secured by valid, binding, continuing, enforceable, non-avoidable and automatically and properly perfected security interests in and liens (the "DIP Liens") on all real and personal property of each of the Debtors, whether now existing or hereafter arising and wherever located, tangible or intangible (the "DIP Collateral"), including, subject to entry of the Final DIP Order, the proceeds of any avoidance actions arising pursuant to chapter 5 of the Bankruptcy Code (the "Avoidance Action Proceeds"); provided, for the avoidance of doubt, that such DIP Liens shall be subject to the Carve-Out.<br><br>The DIP Liens shall consist of (a) pursuant to section 364(d)(1) of the Bankruptcy Code, a first priority, senior priming lien on all DIP Collateral that constitutes Prepetition Collateral (including Cash Collateral), senior to and priming the Prepetition 1L Liens, the Prepetition 2L Notes Liens, the Prepetition 2L Royalty Liens, and any adequate protection liens granted to the Prepetition Secured Parties, (b) pursuant to section 364(c)(2) of the Bankruptcy Code, a first priority lien on all other real and personal property of the Debtors not subject to a Permitted Prior Lien (or subject to a lien that becomes perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code), and (c) pursuant to section 364(c)(3) of the Bankruptcy Code, a lien immediately junior to any Permitted Prior Liens on the real and personal property of the Debtors subject thereto, in each case subject and subordinate only to the Carve-Out and the Permitted Prior Liens. All of the DIP Liens shall be valid, binding, enforceable, non-avoidable and automatically and properly perfected upon entry of the applicable DIP Order, without the necessity of the execution or filing of any mortgages, security agreements, pledge agreements, financing statements, account control agreements or other agreements or instruments; provided, that the Debtors shall take all action reasonably requested by the DIP Agent (at the direction of the Required DIP Lenders) to maintain the validity, perfection, enforceability and priority of the DIP Liens and to enable the DIP Secured Parties to protect, exercise and enforce their rights in the DIP Collateral.<br><br>The relative priorities of the DIP Liens, the Prepetition 1L Liens, the Prepetition 2L Notes Liens, the Prepetition 2L Royalty Liens, and the adequate protection liens granted to the Prepetition Secured Parties are set forth on Annex C hereto (provided that (i) with respect to any obligations owed to the Prepetition Notes Secured Parties and the Prepetition Royalty Secured Parties (whether in the form of prepetition obligations, adequate protection obligations, or otherwise), any proceeds received by any such person shall be applied as between the Prepetition |

| Term | Description |
|---|---|
| | Notes Secured Parties and the Prepetition Royalty Secured Parties in accordance with Section 4.1 of the Intercreditor Agreement, mutatis mutandis and (ii) with respect to any obligations owed to the Prepetition Notes Secured Parties (whether in the form of prepetition obligations, adequate protection obligations, or otherwise), any proceeds received by any such person shall be applied as between the Prepetition 2028 Secured Parties and the Prepetition 2029 Secured Parties in accordance with Section 3.4 of the Collateral Trust Agreement, mutatis mutandis), and the DIP Orders shall be consistent therewith. |
| **DIP Superpriority Claims:** | All DIP Obligations at all times shall constitute allowed superpriority administrative expense claims, pursuant to section 364(c)(1) of the Bankruptcy Code, in the Chapter 11 Cases (the "DIP Superpriority Claims"), having priority over all administrative expenses of the kind specified in, or ordered pursuant to, sections 105, 326, 330, 331, 503(b), 506(c), 507(a), 507(b), or 726 or any other provisions of the Bankruptcy Code, subject only to the Carve-Out.<br><br>The relative priority of the DIP Superpriority Claims and the adequate protection claims granted to the Prepetition Secured Parties is set forth on Annex C hereto, and the DIP Orders shall be consistent therewith. |
| **Adequate Protection:** | As adequate protection for any diminution in value of the Prepetition Secured Parties' respective interests in the Prepetition Collateral (including the Cash Collateral) occurring from and after the Petition Date, whether or not resulting from the use, sale, or lease by the Debtors of the Prepetition Collateral (including Cash Collateral), the granting of the DIP Superpriority Claims, the granting of the DIP Liens, the subordination of the Prepetition 1L Liens, the Prepetition 2L Notes Liens, and the Prepetition 2L Royalty Liens thereto and to the Carve-Out, or the imposition or enforcement of the automatic stay of section 362(a) of the Bankruptcy Code, the Prepetition First Lien Agent, the Prepetition Notes Collateral Trustee and the Prepetition Royalty Collateral Agent, as applicable, shall receive, for the benefit of the Prepetition Secured Parties they respectively represent, the adequate protection granted to the Prepetition Secured Parties pursuant to the DIP Orders (which shall include, without limitation, (i) valid, perfected replacement security interests in and liens on all DIP Collateral, including, upon entry of the Final DIP Order, the Avoidance Action Proceeds, with the relative priorities set forth in the DIP Orders, (ii) superpriority claims as provided in section 507(b) of the Bankruptcy Code, with priority as provided therein and with the relative priorities set forth in the DIP Orders, (iii) current payment of the reasonable and documented fees, expenses and other disbursements of the Prepetition First Lien Agent and the Ad Hoc Group Advisors and of the respective agents, trustees and advisors of the Prepetition 2028 Secured Parties, the Prepetition 2029 Secured Parties, and the Prepetition Royalty Secured Parties (in the case of the Prepetition Royalty Secured Parties, (i) fees and expenses of counsel shall be subject to objection only if in excess of $600,000, and (ii) financial advisor fees to be limited to (x) monthly fees of $150,000 solely to the extent accruing from the Petition Date until the closing date of the Aymrid Transaction or the Acceptable Alternative Transaction, as applicable, and (y) solely in the event of the consummation of an Acceptable Alternative Transaction (as defined in the RSA) that results in transaction proceeds, (A) if transaction proceeds are sufficient to pay all Funded Debt (as defined in the RSA) outstanding in full in and in cash, then a $1,000,000 deferred |

| Term | Description |
|---|---|
| | fee, or (B) if transaction proceeds are insufficient to pay all Funded Debt outstanding in full in cash, then a $500,000 deferred fee, in each case payable upon consummation of such Acceptable Alternative Transaction and, in each case, solely from the proceeds thereof), in each case as it relates to the Chapter 11 Cases, and (iv) financial and other reporting; provided, that any such financial and other reporting that relates to the Debtors' sale and marketing process shall be provided only to the Ad Hoc Group Advisors and the Prepetition Royalty Secured Parties, and such information shall not be shared with any person acting in a Bidder Capacity (as defined in the RSA)); provided, further, that the Debtors shall not be required to provide any information where such provision would waive any privilege or violate applicable law. Except to the extent expressly set forth in the DIP Orders and subject to the terms of the RSA, none of the Prepetition Secured Parties shall receive or retain any payments, property or other amounts in respect of their respective section 507(b) claims unless and until all DIP Obligations (excluding contingent indemnification obligations for which no claim has been asserted) have been indefeasibly paid in full in cash.<br><br>The relative priority of the adequate protection liens and claims granted to the Prepetition Secured Parties, as among themselves and relative to the DIP Liens and the DIP Superpriority Claims, is set forth on Annex C hereto, and the DIP Orders shall be consistent therewith.<br><br>The Debtors' use of Cash Collateral and other Prepetition Collateral is based on the consent (or deemed consent) of the DIP Lenders and Prepetition Secured Parties to such use. Nothing herein or in any DIP Order shall be deemed to constitute sufficient adequate protection in connection with any proposed non-consensual use of Cash Collateral and other Prepetition Collateral. |
| **Carve-Out:** | The DIP Orders shall include a carve-out as set forth in Section 30 of the Interim DIP Order attached hereto as Exhibit A (the "Carve-Out"). |
| **Mandatory Prepayments:** | The Borrower may voluntarily, at any time, prepay any of the DIP Obligations and/or reduce the commitments under the DIP Facility at par plus accrued interest, without premium or penalty (but, for the avoidance of doubt, subject to the Exit Fee).<br><br>The following mandatory prepayments, subject to the DIP Orders, shall be required (and, in each case, shall be applied first, to the First-Out New Money DIP Obligations (including the Exit Fee in respect thereof) until indefeasibly paid in full in cash, and second, to the Second-Out Roll-Up DIP Obligations (including the Exit Fee in respect thereof)):<br><br>i. Asset Sales: Prepayments of the DIP Loans in an amount equal to 100% of the net cash proceeds of the sale or other disposition of any DIP Collateral, except for ordinary course sales (including, for the avoidance of doubt, sales of inventory) and de minimis sales and additional exceptions to be agreed;<br><br>ii. Insurance Proceeds: Prepayments of the DIP Loans in an amount equal to 100% of the net cash proceeds of insurance paid on account of any loss of any DIP Collateral, subject to exceptions to be agreed (including a |

| Term | Description |
|---|---|
| | right of the Debtors to reinvest such proceeds in assets used or useful in their business within 180 days after receipt); and<br><br>iii. Incurrence of Indebtedness: Prepayments of the DIP Loans in an amount equal to 100% of the net cash proceeds of any indebtedness incurred by the Debtors or any of their respective subsidiaries after the Closing Date (other than any indebtedness otherwise permitted under the DIP Documents), payable no later than the date of receipt. |
| **Representations and Warranties:** | In order to induce the DIP Lenders to enter into this DIP Term Sheet and provide the New Money DIP Commitments and the DIP Loans hereunder, each Debtor represents and warrants to the DIP Agent and each DIP Lender that the statements set forth in Annex B are true and correct.<br><br>For the purposes of this DIP Term Sheet, "Material Adverse Effect" shall mean (a) a material adverse change in, or a material adverse effect on, the operations, business, properties, prospects or financial condition of the Debtors, taken as a whole, (b) a material impairment of the ability of the Debtors, taken as a whole, to perform their respective payment obligations hereunder or under any of the DIP Documents, (c) a material impairment of the rights and remedies of the DIP Agent or any DIP Lender hereunder or under any of the DIP Documents, or (d) a material impairment of the legality, validity, binding effect or enforceability against any Debtor of this DIP Term Sheet or any material DIP Document to which it is a party; provided, that none of the following shall constitute a Material Adverse Effect: the commencement, administration, or prosecution of the Chapter 11 Cases and the circumstances leading thereto. |
| **Affirmative Covenants:** | The Debtors shall:<br><br>i. comply in all material respects with their respective covenants, commitments, agreements, and other obligations set forth in the RSA and the DIP Documents;<br><br>ii. without limitation of any other requirement hereunder or under any DIP Document, comply with the covenants set forth in Section 5.2, Section 5.4 (without regard to the proviso in such section), Section 5.6, Section 5.8, and Section 5.9 of the Prepetition First Lien Credit Agreement (in each case as modified as necessary to reflect the commencement of the Chapter 11 Cases and the Debtors' financial condition), except for any such non-compliance as a result of the compliance by the Debtors with their express obligations set forth in this DIP Term Sheet, any DIP Document, the RSA or any other Definitive Document, or as results from the Chapter 11 Cases;<br><br>iii. timely deliver, or cause to be timely delivered, to the DIP Lenders the DIP Budget and Variance Reports, all in accordance with the provisions set forth herein and in the DIP Orders;<br><br>iv. (a) cooperate with, consult with, and provide to the DIP Agent and the DIP Lenders all such information as reasonably required or as reasonably requested by the DIP Agent or any DIP Lender, and (b) permit any authorized representatives designated by the DIP Agent or any DIP Lender to visit and inspect any of the properties of any |

| Term | Description |
|---|---|
| | Debtor and any of its respective subsidiaries, to inspect, copy and take copies of extracts from its and their financial and accounting records, and to discuss its and their affairs, finances and accounts with its and their officers, all upon reasonable prior notice and at such reasonable times during normal business hours, absent the continuance of an Event of Default, not more than once per calendar month;<br>v. comply with the DIP Budget (subject to the Permitted Variances) and with provisions of this DIP Term Sheet and the Interim DIP Order and/or the Final DIP Order (as applicable);<br>vi. within thirty (30) days after the Closing Date (or such later date as the Required DIP Lenders may agree), (1) provide to the DIP Lenders certificates of insurance demonstrating the Debtors' compliance with clause (xvi) under the heading "Interim Funding Conditions" in this DIP Term Sheet and (2) provide that each of the Debtors' policies of insurance shall (A) in the case of each liability insurance policy, name the DIP Agent and its successors and assigns, for the benefit of the DIP Secured Parties, as an additional insured thereunder as its interests may appear, (B) in the case of each casualty insurance policy, contain a lender loss payable clause or endorsement, reasonably satisfactory in form and substance to the Required DIP Lenders, that names the DIP Agent and its successors and assigns, for the benefit of the DIP Secured Parties, as the lender loss payee thereunder, and (C) in each case, provide for at least thirty (30) days' (or ten (10) days' in the case of nonpayment of premium) prior written notice to the DIP Agent of any modification or cancellation of such policy;<br>vii. subject to the RSA, provide draft copies of: (a) the First Day Pleadings and all orders sought pursuant thereto; (b) the Bidding Procedures Motion and the Bidding Procedures Order; (c) the Sale Order; (d) the Plan; (e) the Plan Supplement; (f) the Disclosure Statement; (g) the Conditional Disclosure Statement Order and the Disclosure Statement Order; (h) the Solicitation Materials; (i) the DIP Motion and the DIP Orders; (j) the Confirmation Order; and (k) all other material motions, pleadings, filings, applications, and proposed orders relating to the Restructuring Transactions or that any Debtor intends to file with the Bankruptcy Court, in each case at least three (3) calendar days prior to the date on which the applicable Debtor files or executes such document (or, if three (3) calendar days' advance notice is not reasonably practicable under the circumstances, as soon as reasonably practicable prior to such filing or execution), and consult in good faith regarding the form and substance of each of the foregoing in advance of such filing or execution;<br>viii. comply with the schedule of Milestones (as defined in the RSA);<br>ix. timely file with the Bankruptcy Court a written objection to any motion filed with the Bankruptcy Court seeking the entry of an order (A) directing the appointment of an examiner with expanded powers or a trustee, (B) converting any of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, (C) dismissing any of the Chapter 11 |

| Term | Description |
|---|---|
| | Cases, or (D) modifying (but not including any requests to extend) or terminating the Debtors' exclusive right to file or solicit acceptances of a plan of reorganization;<br>x. not take any action that is inconsistent with, or is intended or is reasonably likely to interfere with or impede or delay consummation of, the Restructuring Transactions;<br>xi. not file or otherwise pursue a chapter 11 plan or any other Definitive Document that is inconsistent with the terms of this DIP Term Sheet or the Restructuring Transactions;<br>xii. take, or cause to be taken, all reasonably appropriate action, to do or cause to be done all things necessary, proper or advisable under applicable law, and to execute and deliver such documents and other papers, as may be required or reasonably requested by the DIP Agent (on behalf of the Required DIP Lenders) to carry out the provisions of this DIP Term Sheet, the Interim DIP Order or the Final DIP Order;<br>xiii. except to the extent contemplated by the DIP Budget or otherwise consented to by the Required DIP Lenders in writing, continue, and cause to be continued, the business of the Debtors, maintain, and cause to be maintained, the Debtors' existence and material relationships, rights and privileges, and comply with all material agreements;<br>xiv. take, or cause to be taken, all appropriate action to remain the sole owner of the DIP Collateral, free of liens other than the Permitted Prior Liens, the DIP Liens, the adequate protection liens granted hereunder and under the DIP Orders, liens granted or incurred after the Petition Date in the ordinary course of business or other liens granted or imposed pursuant to an order of the Bankruptcy Court that is in form and substance reasonably acceptable to the Required DIP Lenders and the DIP Agent (collectively, "Permitted Liens");<br>xv. take, or cause to be taken, all appropriate action to comply with all material applicable laws with respect to the DIP Collateral unless failure to comply could not reasonably be expected to result in a Material Adverse Effect;<br>xvi. subject to the DIP Budget, pay when due all material taxes imposed upon it or any of its properties or assets or in respect of any of its income, businesses or franchises, and all claims (including claims for labor, services, materials and supplies) for sums that have become due and payable, in each case prior to the time when any material penalty or fine shall be incurred with respect thereto or any lien on any of its assets may attach with respect thereto, except where (A) such tax or claim is being contested in good faith and adequate reserves have been established in accordance with GAAP, and in the case of a tax or claim that has or may become a lien against any of the DIP Collateral, such contest proceedings conclusively operate to stay the sale of any portion of the DIP Collateral to satisfy such tax or claim, or (B) to the extent |

| Term | Description |
|---|---|
| | payment and/or enforcement thereof is stayed as a result of the Chapter 11 Cases;<br>xvii. maintain its cash management system in a manner reasonably acceptable to the Required DIP Lenders (which shall be deemed satisfied if the cash management system is substantially the same as the cash management system in existence on the Petition Date, with such modifications as permitted under the cash management order, as entered); and<br>xviii. cause the Debtors' senior management and legal and financial advisors to be available to conduct a telephonic conference (in the case of the Debtors' senior management, during regular business hours) as reasonably requested by any DIP Lender, to discuss the DIP Budget, the Variance Report, the Chapter 11 Cases, the Restructuring Transactions, and the financial condition, performance and business affairs of the Debtors. |
| **Negative Covenants:** | Unless otherwise provided in the DIP Budget (subject to the Permitted Variances), no Debtor shall, without the express, prior written consent of the Required DIP Lenders, do, cause to be done, or agree to do or cause to be done, any of the following:<br>i. take any action prohibited by, or fail to take any action required by, the covenants, commitments, agreements, and other obligations of the Debtors set forth in the RSA (as may be amended, modified, or waived) or the DIP Documents;<br>ii. create, incur, assume or suffer to exist any lien, security interest or other encumbrance upon any of its property, assets, income or profits, whether now owned or hereafter acquired, except Permitted Liens which, other than the Permitted Prior Liens or other liens that are permitted to be senior to the DIP Liens by the Required DIP Lenders acting reasonably, are junior to the DIP Liens, the Prepetition 1L Liens, the Prepetition 2L Notes Liens and the Prepetition 2L Royalty Liens;<br>iii. convey, sell, lease, assign, transfer or otherwise dispose of (including through a transaction of merger or consolidation) any of its property, business or assets, whether now owned or hereafter acquired, other than (1) asset sales approved by an order of the Bankruptcy Court that is in form and substance acceptable to the Required DIP Lenders, or (2) in the ordinary course (including, for the avoidance of doubt, ordinary course sales of inventory);<br>iv. create, incur, assume or permit to exist any indebtedness for borrowed money (including any finance lease, purchase money indebtedness or sale-leaseback obligation), other than the DIP Obligations and the Prepetition Secured Obligations;<br>v. except as contemplated by the DIP Budget or the RSA, terminate, amend, modify, waive or compromise or not continue or extend any term or amount owed under a real property lease, material agreement, or other |

| Term | Description |
| --- | --- |
| | material vendor accommodation or arrangement without the consent of the Required DIP Lenders;<br>vi. incur or make any expenditure, investment, loan or other payment, other than payments in respect of vesting programs in existence on the Petition Date or otherwise in accordance with the DIP Budget, subject to the Permitted Variances;<br>vii. incur or make any Restricted Payment (as defined herein) other than in accordance with the DIP Budget;<br>viii. create, or acquire any ownership interest in, any subsidiary (whether direct or indirect) other than those existing on the Petition Date or whose creation is necessary to effect the Restructuring Transactions (which subsidiaries shall, at the written request of the Required DIP Lenders, be joined hereto and to the DIP Documents as a Debtor pursuant to documentation reasonably acceptable to the DIP Agent and the Required DIP Lenders);<br>ix. create or permit to exist any other superpriority claim which is pari passu with or senior to the claims of the DIP Lenders under the DIP Facility, except for the Carve-Out;<br>x. modify or alter (A) in any material manner the nature and type of its business or the manner in which such business is conducted or (B) its organizational documents, except (1) as required by the Bankruptcy Code, (2) in a manner that is not materially adverse to the interests of the DIP Lenders (in their capacities as such) or (3) with the prior written consent of the Required DIP Lenders;<br>xi. pay prepetition indebtedness, except for (a) adequate protection payments in the form of interest payments in respect of the prepetition indebtedness as expressly provided for herein or in the DIP Budget or (b) payments consented to by the Required DIP Lenders (which may be through approval of the DIP Budget) and approved by an order of the Bankruptcy Court; or<br>xii. engage in any activities that would result in any of the Debtors becoming an "investment company" as defined in, or subject to regulation under, the Investment Company Act of 1940.<br>As used in this DIP Term Sheet, "Restricted Payment" means, with respect to any person (a) the declaration or payment of any dividend (whether in cash, securities or other property or assets) or distribution of cash or other property or assets in respect of equity interests of such person; (b) any payment (whether in cash, securities or other property or assets) on account of the purchase, redemption, defeasance, sinking fund or other retirement of the equity interests of such person or any other payment or distribution (whether in cash, securities or other property or assets) made in respect thereof, either directly or indirectly; (c) any payment or prepayment of principal or premium, if any, or interest, fees or other charges on or with respect to, and any redemption, purchase, retirement, defeasance (including in-substance or legal defeasance), sinking fund or similar payment and any claim for rescission with respect to any indebtedness (including |

| Term | Description |
|---|---|
| | any earn-out obligations or seller financing indebtedness); and (d) any payment made to redeem, purchase, repurchase or retire, or to obtain the surrender of, any outstanding warrants, options or other rights to acquire equity interests of such person now or hereafter outstanding. |
| **Financial Covenants:** | Until the indefeasible payment in full in cash of the DIP Obligations, the Debtors shall strictly perform in accordance with the DIP Budget; provided, that with respect to any Testing Period (as defined herein), (i) the Debtors' aggregate actual cash receipts shall not be less than 80% of the projected amounts therefor set forth in the DIP Budget and (ii) the Debtors' aggregate actual cash disbursements shall not be greater than 120% of the projected amounts therefor set forth in the DIP Budget (such variances, the "Permitted Variances"); provided, further, that (A) notwithstanding anything to the contrary in this DIP Term Sheet, the Allowed Professional Fees shall not be included in any calculations for purposes of testing compliance with the DIP Budget and any Permitted Variances and (B) none of the foregoing shall limit the payment of Allowed Professional Fees that benefit from the Carve-Out, as and when such Allowed Professional Fees are allowed by the Bankruptcy Court at any time (whether by interim order, procedural order or otherwise).<br><br>Compliance with the DIP Budget shall be tested on Wednesday of each second week (or, if such day is not a Business Day, the next succeeding Business Day) (each such date, a "Testing Date") on a cumulative basis for the period commencing on the first day covered by the DIP Budget then in effect and ending as of the Sunday immediately preceding such Testing Date (each such period, a "Testing Period"), with the first such test to be conducted on November 18, 2026 for the period from the Petition Date to November 15, 2026. Compliance with the DIP Budget shall be tested based on the Variance Report required to be delivered pursuant to clause v under the heading "Reporting" in this DIP Term Sheet on the applicable Testing Date; provided that, if, as of any Testing Date, the Borrower has failed to deliver such Variance Report, the Borrower shall be deemed to be out of compliance with the DIP Budget for such Testing Date.<br><br>The Debtors shall maintain a minimum liquidity covenant requiring aggregate unrestricted cash and cash equivalents of the Debtors on a consolidated basis of not less than $10,000,000 at all times (for the avoidance of doubt, excluding the Plan Effective Date).<br><br>The Debtors shall not directly or indirectly incur or commit to incur any capital expenditures, other than capital expenditures that are contemplated by the DIP Budget (subject to Permitted Variances).<br><br>"DIP Budget" means a written budget setting forth on a line-item basis the Debtors' projected cash receipts and cash disbursements on a weekly basis, including, without limitation, disbursements on account of the reasonable and documented fees and expenses of the DIP Secured Parties and the Ad Hoc Group Advisors, which initial budget is attached as Schedule 1 to the Interim DIP Order, and shall cover the period of at least thirteen (13) weeks following the Petition Date, and which budget shall be updated on a rolling thirteen-week (13-week) basis every four (4) weeks as provided in the DIP Orders. |

| Term | Description |
|---|---|
| **Reporting:** | The Borrower shall deliver to the DIP Agent, the DIP Lenders, the Ad Hoc Group Advisors, and the advisors to the Prepetition Royalty Secured Parties:<br>i. monthly unaudited consolidated financial statements of the Borrower and its subsidiaries within 30 days after the end of each fiscal month, certified by a financial officer of the Borrower;<br>ii. quarterly unaudited consolidated financial statements of the Borrower and its subsidiaries within 45 days of the end of each fiscal quarter of the fiscal year, certified by a financial officer of the Borrower;<br>iii. annual audited consolidated financial statements of the Borrower and its subsidiaries within 90 days of the year-end, certified with respect to such consolidated statements by the Borrower's independent certified public accountants;<br>iv. 13-week cash flow forecasts, on a rolling 13-week basis, updated every four weeks and in form and substance reasonably acceptable to the Required DIP Lenders;<br>v. no later than Wednesday of each week, beginning on the second Wednesday following the Petition Date (or, if such day is not a Business Day, the next succeeding Business Day), a weekly line-by-line variance report (the "Variance Report"), which Variance Report shall (A) include line items consistent with the DIP Budget, including (without limitation) (1) "Total Receipts", (2) "Total Operating Disbursements" (including payroll & benefits, bonuses, retention payments, rent, site payments, and accounts payable), (3) "Total Professional Fees" (on a professional-by-professional basis), and (4) "Net Cash Flow" and (B) compare actual cash receipts and disbursements of the Debtors with corresponding amounts provided for in the DIP Budget on a line-by-line basis for the prior week period and the Testing Period (or such shorter period as may have elapsed from the date hereof), including written descriptions in reasonable detail explaining any material positive or negative variances, and shall otherwise be in form and substance reasonably acceptable to the Required DIP Lenders;<br>vi. copies of all reports, analyses, presentations and other materials prepared by or for the Debtors' investment bankers, financial advisors, consultants or other professionals in connection with any sale, financing, refinancing, capital raise or restructuring transaction involving the Debtors; provided, that any materials relating to the Debtors' sale and marketing process shall not be provided—by any party or its advisors—to DIP Lenders acting in a Bidder Capacity;<br>vii. all other reports and notices required to be delivered hereunder or under the DIP Documents, and such other reports and notices as may be reasonably requested by the DIP Agent or the Required DIP Lenders;<br>viii. to the extent not otherwise delivered to the DIP Agent, the DIP Lenders, the Ad Hoc Group Advisors, and the advisors to the Prepetition Royalty Secured Parties, all of the financial information, reports, notices and other information delivered to, or required to be delivered to, the Prepetition |

| Term | Description |
| --- | --- |
| | First Lien Agent and/or the Prepetition First Lien Lenders pursuant to the Prepetition First Lien Documents (including, without limitation, pursuant to Sections 5.1 and 5.9(a) of the Prepetition First Lien Credit Agreement), when the same is (or is required to be) delivered to the Prepetition First Lien Agent and/or the Prepetition First Lien Lenders; and<br><br>ix. such other documents or information reasonably required by the DIP Documents; provided, that the Debtors shall not be required to provide information that would waive any privilege or violate applicable law.<br><br>In addition, the Debtors shall, and shall direct their officers, directors, employees, advisors and other representatives to:<br><br>i. provide to the DIP Agent, the DIP Lenders the Ad Hoc Group Advisors, and advisors to the Prepetition Royalty Secured Parties (1) reasonable access, during normal business hours and on reasonable advance notice and without disruption to the operation of the Debtors' business, to the offices, properties, books and records, management, directors, employees, accountants, auditors, counsel and other advisors and representatives of the Debtors, (2) such other information regarding the Debtors' assets, business, operations, liquidity, financial condition, tax matters, regulatory matters and intellectual property as is reasonably requested by the DIP Agent, any DIP Lender or the Ad Hoc Group Advisors, and (3) upon reasonable request, participation in periodic update calls with the Debtors' management and advisors regarding the Debtors' financial performance, liquidity and the progress of the Restructuring Transactions; provided, that any materials relating to the Debtors' sale and marketing process shall not be provided—by any party or its advisors—to DIP Lenders acting in a Bidder Capacity;<br><br>ii. promptly respond to, and use reasonable best efforts to satisfy, all due diligence requests of the DIP Agent, the DIP Lenders, the Ad Hoc Group Advisors, and advisors to the Prepetition Royalty Secured Parties, including by establishing and maintaining an electronic data room to which the Ad Hoc Group Advisors are granted access, and cooperate with all business, financial, legal, tax, regulatory and intellectual property diligence reasonably requested in connection with the DIP Facility and the Restructuring Transactions; provided, that any materials relating to the Debtors' sale and marketing process shall not be provided—by any party or its advisors—to DIP Lenders acting in a Bidder Capacity;<br><br>iii. irrevocably authorize, direct and cause the Debtors' investment bankers, financial advisors, consultants and other professionals to (1) disclose fully and promptly to the DIP Agent, the DIP Lenders, the Ad Hoc Group Advisors, and advisors to the Prepetition Royalty Secured Parties all material developments concerning any sale, financing, refinancing, capital raise or restructuring transaction involving the Debtors, and (2) at a reasonable frequency requested by the Ad Hoc Group, consult with, and respond to the inquiries of, the DIP Agent, the DIP Lenders, the Ad Hoc Group Advisors, and advisors to the Prepetition Royalty Secured Parties concerning any and all matters relating to the affairs, finances, assets, business and operations of the Debtors and any aspect of any such |

| Term | Description |
|---|---|
| | transaction, including communications outside the presence of any representative of any Debtor; provided, that any materials relating to the Debtors' sale and marketing process shall not be provided—by any party or its advisors—to DIP Lenders acting in a Bidder Capacity; and<br>iv. such other documents or information reasonably required by the DIP Documents; provided, that the Debtors shall not be required to provide information that would waive any privilege or violate applicable law. |
| **Waivers:** | The Final DIP Order shall provide a waiver of the equitable doctrine of "marshaling" with respect to the DIP Collateral and the Prepetition Collateral; provided, that such waiver shall only be effective with respect to the Prepetition Collateral until the Discharge of First Lien Obligations (as defined in the Intercreditor Agreement). The Final DIP Order shall provide (i) a waiver of the "equities of the case" exception to section 552(b) of the Bankruptcy Code with respect to the DIP Lenders and the Prepetition Secured Parties, and (ii) a waiver of the ability to surcharge the DIP Collateral and the Prepetition Collateral, including under section 506(c) of the Bankruptcy Code. |
| **Credit Bid:** | The DIP Obligations may be credit bid in connection with the sale of any asset of the Debtors (in whole or in part), including, without limitation, sales occurring pursuant to section 363 of the Bankruptcy Code or included as part of any restructuring plan subject to confirmation under section 1129(b)(2)(A)(ii)–(iii) of the Bankruptcy Code. Any such credit bid shall be deemed a qualified bid, and the DIP Agent shall be deemed a qualified bidder, for all purposes of any bidding procedures or sale process. Nothing herein shall limit the right of the Prepetition Royalty Secured Parties to credit bid the Prepetition Royalty Obligations, subject to section 363(k) of the Bankruptcy Code and the Intercreditor Agreement. |
| **Events of Default:** | "Events of Default" shall be limited to the following:<br>i. failure to pay principal or interest on the DIP Loans or any fees or any other amount due under the DIP Documents when due;<br>ii. (A) failure of any Debtor or any of their respective subsidiaries to pay when due any principal of or interest on or any other amount, including any payment in settlement, payable in respect of one or more items of Material Indebtedness (as defined in the Prepetition First Lien Credit Agreement) incurred on or after the Petition Date, in each case beyond the grace period, if any, provided therefor; or (B) breach or default by any Debtor or any of its subsidiaries with respect to any other term of (1) one or more items of such Material Indebtedness, or (2) any loan agreement, mortgage, indenture or other agreement relating to such item(s) of Material Indebtedness, in each case beyond the grace period, if any, provided therefor, if the effect of such breach or default is to cause, or to permit the holder or holders of that Material Indebtedness (or a trustee on behalf of such holder or holders), with or without the passage of time, to cause, that Material Indebtedness to become or be declared due and payable (or subject to a compulsory repurchase or other redemption) prior to its stated maturity or the stated maturity of any underlying obligation, |

| Term | Description |
|---|---|
| | as the case may be, unless in each case, payment or enforcement thereof is stayed as a result of the Chapter 11 Cases;<br>iii. failure of any representation or warranty of any Debtor contained in this DIP Term Sheet or any DIP Document to be true and correct in all material respects when made (without duplication of any materiality qualifier contained therein);<br>iv. breach of any covenant hereunder or under the DIP Documents that, in the case of any affirmative covenant that is capable of being cured, has not been cured within five (5) Business Days;<br>v. any money judgment, writ or warrant of attachment or similar process involving (i) in any individual case an amount in excess of $2,500,000 or (ii) in the aggregate at any time an amount in excess of $5,000,000 (in either case to the extent not adequately covered by insurance as to which a solvent and unaffiliated insurance company has acknowledged coverage) shall be entered or filed against any Debtor or any of their subsidiaries or any of their respective assets and shall remain undischarged, unvacated, unbonded or unstayed for a period of sixty (60) days;<br>vi. any order, judgment or decree shall be entered against any Debtor or any of its subsidiaries decreeing the dissolution or split up of such Debtor or any of its subsidiaries and such order shall remain undischarged or unstayed for a period in excess of thirty (30) days;<br>vii. there shall occur one or more ERISA Events (as defined in the Prepetition First Lien Credit Agreement) that individually or in the aggregate results in or might reasonably be expected to result in liability of any Debtor or any of its subsidiaries or any of their respective ERISA Affiliates (as defined in the Prepetition First Lien Credit Agreement) in excess of $2,500,000 during the term of the DIP Facility; or there exists any fact or circumstance that reasonably could be expected to result in the imposition of a Lien or security interest under Section 430(k) of the Internal Revenue Code or ERISA (each as defined in the Prepetition First Lien Credit Agreement) or a violation of Section 436 of the Internal Revenue Code;<br>viii. a Change of Control (as defined in the Prepetition First Lien Credit Agreement) shall occur, excluding any Change of Control caused by the consummation of the Aymrid Transaction or an Acceptable Alternative Transaction;<br>ix. at any time after the execution and delivery thereof (i) any DIP Document for any reason, other than the indefeasible payment in full in cash of all DIP Obligations, shall cease to be in full force and effect (other than in accordance with its terms) or shall be declared to be null and void or any Debtor shall repudiate its obligations thereunder, or (ii) any Debtor shall contest the validity or enforceability of any DIP Document in writing or deny in writing that it has any further liability, including with respect to future advances by DIP Lenders, under any DIP Document to which it is a party or shall contest the validity of or perfection of any lien in any DIP |

| Term | Description |
|---|---|
| | Collateral granted or purported to be granted pursuant to the DIP Documents;<br>x. the United States Food and Drug Administration (or any successor thereto) or any Debtor withdraws approval for selinexor with respect to its current approved indication for use with bortezomib and dexamethasone;<br>xi. noncompliance with the DIP Budget, subject to the Permitted Variances;<br>xii. the DIP Agent shall cease to have a valid and perfected security interest in and lien on any DIP Collateral with the priority provided for herein and in the DIP Orders (other than upon a release by reason of a transaction that is permitted hereunder or under the DIP Documents);<br>xiii. failure by any Debtor to comply in any material respect with the Interim DIP Order or Final DIP Order, as applicable;<br>xiv. the entry by a court of competent jurisdiction of an order amending, modifying, staying, revoking or reversing the Interim DIP Order or Final DIP Order, as applicable, without the express written consent of the Required DIP Lenders;<br>xv. subject to the terms of the RSA, any sale or other disposition of all or a material portion of the DIP Collateral securing the DIP Loans pursuant to section 363 of the Bankruptcy Code other than as permitted by the DIP Orders (or pursuant to a transaction that is permitted hereunder or under the DIP Documents) or the Debtors file any motion or pleading seeking authority for the foregoing;<br>xvi. the entry of an order dismissing any Chapter 11 Case or converting any Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code, or the Debtors file any motion or pleading seeking authority for the foregoing;<br>xvii. the entry of an order appointing a chapter 11 trustee in any Chapter 11 Case or the Debtors file any motion or pleading seeking authority for the foregoing;<br>xviii. the entry of an order in any Chapter 11 Case appointing an examiner having expanded powers (beyond those set forth under sections 1106(a)(3) and (4) of the Bankruptcy Code) or the Debtors file any motion or pleading seeking authority for the foregoing;<br>xix. termination or expiration of the period of time during which only the Borrower and its co-debtors may file a plan pursuant to section 1121 of the Bankruptcy Code;<br>xx. failure to meet any Milestone (including, without limitation, failure of the Bankruptcy Court to enter, within thirty-five (35) calendar days following the Petition Date, the Final DIP Order);<br>xxi. other than the Carve-Out, the allowance of any claim or claims under section 506(c) of the Bankruptcy Code against or with respect to any of the DIP Collateral;<br>xxii. the existence of any claims or charges, or the entry of an order of the Bankruptcy Court authorizing any claims or charges, other than in respect |

| Term | Description |
| --- | --- |
| | of the DIP Facility and the Carve-Out or as otherwise permitted under the applicable DIP Documents, entitled to superpriority administrative expense claim status in any Chapter 11 Case pursuant to Section 364(c)(1) of the Bankruptcy Code pari passu with or senior to the DIP Superpriority Claims, or there shall arise or be granted by the Bankruptcy Court (i) any claim having priority over any or all administrative expenses of the kind specified in section 503(b) of the Bankruptcy Code or section 507(b) of the Bankruptcy Code (other than the Carve-Out) or (ii) any lien on the DIP Collateral having a priority senior to or pari passu with the DIP Liens, except, in each case, as expressly provided in the DIP Documents;<br><br>xxiii. any Debtor requests authorization, or supports any request for authorization, to obtain postpetition financing or other financial accommodations pursuant to section 364 of the Bankruptcy Code or otherwise, other than (x) from the DIP Lenders or (y) financing resulting in proceeds that are sufficient to, and are immediately applied to, indefeasibly pay the DIP Obligations, the Prepetition First Lien Obligations (as defined in the Interim DIP Order) and, following the entry of the Final DIP Order, the Prepetition Notes Obligations (as defined in the Interim DIP Order) in full in cash;<br><br>xxiv. any attempt by any Debtor to invalidate or otherwise impair the DIP Loans, the DIP Liens, the Prepetition First Lien Obligations, the Prepetition 1L Liens, the Prepetition 2028 Notes Obligations, the Prepetition 2029 Notes Obligations, or the Prepetition 2L Liens (in each case as defined in the Interim DIP Order);<br><br>xxv. the Debtors commence, join in, assist or otherwise participate as an adverse party in any suit or other proceeding against the DIP Agent, any of the DIP Lenders or any of the Prepetition Secured Parties to: (i) contest the validity or enforceability of any DIP Document, any Prepetition First Lien Document, any Prepetition 2028 Notes Document, or any Prepetition 2029 Notes Document; (ii) contest the validity, enforceability, extent, amount, perfection or priority of the DIP Liens, the DIP Superpriority Claims, the Prepetition First Lien Obligations, the Prepetition 1L Liens, the Prepetition 2028 Notes Obligations, the Prepetition 2029 Notes Obligations or the Prepetition 2L Liens held by the DIP Lenders, or (iii) assert or prosecute any claim or cause of action (including any action arising under chapter 5 of the Bankruptcy Code) against any DIP Secured Party or any Prepetition Secured Party;<br><br>xxvi. any breach by the Debtors under the RSA (subject to any applicable cure period);<br><br>xxvii. the RSA is terminated or otherwise fails to be in full force and effect;<br><br>xxviii. the entry of an Interim DIP Order or Final DIP Order in form or substance that is not acceptable to the Required DIP Lenders in their sole discretion;<br><br>xxix. (a) any Debtor files a pleading in any court seeking or supporting an order to revoke, reverse, stay, vacate, amend, supplement or otherwise modify any DIP Order or this DIP Term Sheet, in whole or in part, or (b) any material provision of the DIP Orders or DIP Term Sheet, or any other order of the |

| Term | Description |
| --- | --- |
| | Bankruptcy Court approving the Debtors' use of Cash Collateral, shall for any reason cease to be valid and binding (without the prior written consent of the Required DIP Lenders);<br>xxx. subject to the terms of the RSA, the filing with the Bankruptcy Court of a motion seeking approval of a sale under section 363 of the Bankruptcy Code or a plan of reorganization or liquidation in any of the Chapter 11 Cases that, in either case, does not provide for indefeasible payment in full in cash to the DIP Lenders of DIP Loans and all other amounts outstanding under this DIP Term Sheet and the DIP Orders, on closing of such sale or the effective date of such plan;<br>xxxi. the granting of relief from the automatic stay by the Bankruptcy Court to any other creditor or party in interest in the Chapter 11 Cases with respect to any portion of the DIP Collateral;<br>xxxii. the Debtors, except as contemplated by the RSA, (A) file any motion or application, including in connection with a plan of reorganization, seeking authority to reject, assume, assume and assign, amend, supplement, or modify any material agreement or any Prepetition Royalty Document, or (B) amend, modify, supplement, extend, terminate, or otherwise enter into a modified arrangement with respect to any material agreement or any Prepetition Royalty Document, in each case, without the prior written consent of the Required DIP Lenders;<br>xxxiii. the cessation by the Debtors, taken as a whole, of conducting all or substantially all of their business operations; or<br>xxxiv. any Debtor shall make any payment of principal or interest or otherwise on account of any prepetition indebtedness or prepetition payables other than payments (A) in respect of accrued payroll and related expenses as of the commencement of the Chapter 11 Cases and (B) in respect of certain creditors, in each case, to the extent authorized by one or more "first day" orders acceptable in form and substance to the Required DIP Lenders and consistent with the DIP Budget.<br>As used in this DIP Term Sheet, the term "Default" means any condition or event that, after notice or lapse of time or both, would constitute an Event of Default. |
| **Remedies:** | Upon the occurrence of, and during the continuation of, an Event of Default, but subject to the DIP Orders, the DIP Agent (at the direction of the Required DIP Lenders) or the Required DIP Lenders may, by delivery of a DIP Termination Declaration (as defined in the DIP Orders), and subject to the terms of the DIP Orders, take any or all of the following actions without further order of or application to the Bankruptcy Court:<br>i. immediately terminate, reduce or restrict the Debtors' use of any Cash Collateral (except to the extent such cash may be used in connection with the Carve-Out);<br>ii. terminate, reduce or restrict any undrawn New Money DIP Commitments, in whole or in part; |

| Term | Description |
|---|---|
| | iii. terminate the DIP Facility and the DIP Documents as to any future liability or obligation of the DIP Secured Parties (without affecting any of the DIP Liens or DIP Obligations, or the rights or remedies of the DIP Secured Parties in respect thereof); and<br>iv. declare all DIP Obligations to be immediately due and payable.<br>Following the expiration of the Remedies Notice Period (as defined in the DIP Orders, and as may be extended in accordance with the DIP Orders) and subject thereto, the DIP Agent (at the direction of the Required DIP Lenders) or the Required DIP Lenders may (in addition to any of the actions provided for above) take any or all of the following actions without further order of or application to the Bankruptcy Court:<br>i. freeze monies or balances in the Debtors' accounts and sweep all funds contained in the Debtors' deposit accounts;<br>ii. set-off any and all amounts in accounts maintained by the Debtors with the DIP Agent or the DIP Lenders against the DIP Obligations, or otherwise enforce any and all rights against the DIP Collateral in the possession of any of the applicable DIP Secured Parties, including, without limitation, disposition of the DIP Collateral solely for application towards the DIP Obligations;<br>iii. take any other actions or exercise any other rights or remedies permitted under the DIP Orders, this DIP Term Sheet, the DIP Documents or applicable law to effect the repayment of the DIP Obligations; and<br>iv. exercise rights and remedies subject to the terms of the DIP Orders, or applicable law (including, without limitation, direct any or all of the Debtors (or file a motion in the name of the Debtors)), (A) to enforce the terms and provisions of this DIP Term Sheet, (B) to collect accounts receivable, without setoff by any account debtor, including directing the Debtors to collect such accounts receivable, (C) to sell or otherwise dispose of any or all of the DIP Collateral on terms and conditions reasonably acceptable to the Required DIP Lenders pursuant to Sections 363, 365 and other applicable provisions of the Bankruptcy Code (and without limiting the foregoing, direct the Debtors (or file a motion in the name of the Debtors) to assume and assign any lease or executory contract included in the DIP Collateral to the DIP Lenders' designees in accordance with and subject to Section 365 of the Bankruptcy Code), (D) credit bid any or all of the DIP Obligations, (E) enter into the premises of any Debtor in connection with the orderly sale or disposition of the DIP Collateral (including, without limitation, complete any work in process), (F) exercise such other rights and remedies to realize upon the DIP Collateral, and (G) take such action as is reasonably related to or is in furtherance of the foregoing; provided, that, subject to the DIP Orders, the Debtors shall take all action that is reasonably necessary to cooperate with the DIP Lenders in the exercise of their rights and remedies and facilitate the realization upon the DIP Collateral by the DIP Lenders.<br>Notwithstanding anything to the contrary herein, during any Remedies Notice Period, the Debtors may continue to use Cash Collateral solely to meet payroll |

| Term | Description |
|---|---|
| | obligations and pay expenses necessary to avoid immediate and irreparable harm to the Debtors' estates (including to pay payroll, critical patient supply and product distribution costs, and the Carve-Out), in accordance with the DIP Budget (subject to the Permitted Variances), or that have otherwise been approved in advance in writing by the DIP Agent (at the direction of the Required DIP Lenders). |
| **Assignments and Participations:** | A DIP Lender may assign all or any part of its DIP Loans and commitments from time to time to any other person without any consent of or notice to the Debtors, but with the prior consent of the Required DIP Lenders (disregarding the assigning DIP Lender's DIP Loans and unfunded New Money DIP Commitments) (not to be unreasonably withheld, conditioned or delayed); provided, that the Required DIP Lenders (disregarding the assigning DIP Lender's DIP Loans and unfunded New Money DIP Commitments) shall be deemed to have consented to any such assignment unless they have objected to such assignment by written notice to the assigning DIP Lender within five (5) Business Days after having received notice thereof. Notwithstanding the foregoing, no consent of the Required DIP Lenders shall be required if the assignee is another DIP Lender or any affiliate or managed or controlled fund of a DIP Lender. The parties to each assignment shall execute and deliver to the DIP Agent an assignment agreement in a form substantially similar to the Assignment Agreement (as such term is defined in the Prepetition First Lien Credit Agreement) and reasonably acceptable to the DIP Agent, such other forms, certificates or other evidence, if any, that may be reasonably required by the DIP Agent, and with payment to the DIP Agent of a registration and processing fee of $3,500 (except that no such registration and processing fee shall be payable in the case of an assignee that is already a DIP Lender or is an affiliate or managed or controlled fund of a DIP Lender, which fee may be otherwise waived or reduced in the sole discretion of the DIP Agent). From and after the effective date specified in the assignment agreement, the assignee shall be a DIP Lender hereunder and the assigning DIP Lender shall be released from its obligations hereunder to the extent of the interest assigned. |
| **Expenses and Indemnification:** | All reasonable, documented, out-of-pocket expenses and costs (limited to (i) reasonable legal fees and reasonable, documented, out-of-pocket expenses of one primary counsel and one local counsel in Texas for the DIP Agent, (ii) reasonable fees and reasonable, documented, out-of-pocket expenses of the Ad Hoc Group Advisors, and (iii) with respect to the Prepetition Royalty Secured Parties, (x) reasonable and documented fees and out-of-pocket expenses of counsel (subject to objection only if in excess of $600,000), (y) with respect to a financial advisor, monthly fees of $150,000 solely to the extent accruing from the Petition Date until the closing date of the Ayrmid Transaction or the Acceptable Alternative Transaction (each as defined in the RSA) and (z) solely in the event of the consummation of an Acceptable Alternative Transaction (as defined in the RSA) that results in transaction proceeds, (A) if transaction proceeds are sufficient to pay all Funded Debt (as defined in the RSA) outstanding in full in and in cash, then a $1,000,000 deferred fee, or (B) if transaction proceeds are insufficient to pay all Funded Debt outstanding in full in cash, then a $500,000 deferred fee, in each case payable upon consummation of such Acceptable Alternative Transaction and, in each case, solely from the proceeds thereof) |

| Term | Description |
|---|---|
| | incurred in connection with, whether before or after the commencement of, the Chapter 11 Cases and the negotiation and documentation of the DIP Facility are to be paid by the Borrower, in each case following written demand and, subject to the DIP Orders, without the requirement of Bankruptcy Court approval or the filing of any fee or retention application.<br><br>The Borrower will indemnify the DIP Secured Parties, and hold them harmless from and against all reasonable, documented, and out-of-pocket costs, expenses (including but not limited to reasonable legal fees and expenses) and liabilities arising out of or relating to the transactions contemplated hereby and any actual or proposed use of the proceeds of any loans made under the DIP Facility; provided, that no such person will be indemnified for costs, expenses or liabilities to the extent determined by a final, non-appealable judgment of a court of competent jurisdiction to have been incurred by reason of the gross negligence or willful misconduct of such person; provided, further, that no person will be indemnified for costs, expenses, or liabilities that do not involve an act or omission by any Debtor or any of its affiliates and arises solely from disputes among the DIP Secured Parties, other than claims against the DIP Agent, solely in its capacity as such, which shall remain subject to the immediately preceding proviso; provided, further, that no DIP Lender shall be indemnified for costs, expenses, or liabilities that result from a claim being brought by a Debtor against such person for a material breach of such person's obligations under the DIP Documents if such Debtor has obtained a final and non-appealable judgment in its favor on such claim as determined by a court of competent jurisdiction. |
| **Governing Law:** | This DIP Term Sheet and the other DIP Documents shall be governed by, and construed in accordance with, the laws of the State of New York (except as governed by the Bankruptcy Code), without regard to the conflict of law principles thereof that would require the application of the law of any other jurisdiction. Each party hereto hereby waives all rights to a trial by jury and consents to the jurisdiction of the Bankruptcy Court. |
| **Amendments:** | No provision of this DIP Term Sheet or any DIP Document may be amended, modified or waived other than by an instrument in writing signed by the Debtors and the Required DIP Lenders. Notwithstanding the foregoing (i) any amendment, modification or waiver that would (A) extend the Maturity Date of the DIP Loans, (B) waive, reduce or postpone any scheduled repayment (but not prepayment), (C) modify or waive any condition precedent to the funding of any DIP Loan, (D) reduce the rate of interest on any DIP Loan (other than a waiver of interest at the Default Rate), (E) waive or extend the time for payment of any such interest, fees, or premiums (other than a waiver of interest at the Default Rate), (F) reduce or forgive the principal amount of any DIP Loan, or increase the New Money DIP Commitment of any DIP Lender, (G) amend, modify, terminate or waive any provision under this heading "Amendments" or any other provision of this DIP Term Sheet that expressly provides that the consent of all DIP Lenders or any specific DIP Lenders is required, (H) amend the definition of Required DIP Lenders, (I) subordinate the DIP Liens to any other lien on or security interest in the DIP Collateral other than Permitted Prior Liens or (J) alter the ratable treatment of the DIP Obligations shall, in each case, require the consent of each DIP Lender directly and adversely affected thereby and (ii) any amendment, modification or waiver that would directly or indirectly affect the |

| Term | Description |
| --- | --- |
| | rights or obligations of the DIP Agent in any adverse manner shall require the consent of the DIP Agent. |
| **Counterparts and Electronic Transmission:** | This DIP Term Sheet may be executed in any number of counterparts and by different parties hereto on separate counterparts, each of which when so executed and delivered shall be deemed an original, and all of which, when taken together, shall constitute one and the same instrument. Delivery of an executed counterpart of a signature page to this DIP Term Sheet by facsimile, "PDF" or other electronic transmission shall be effective as delivery of a manually executed counterpart of this DIP Term Sheet. |

**IN WITNESS WHEREOF**, the parties hereto have executed this DIP Term Sheet as of the date first written above.

**DEBTORS:**

KARYOPHARM THERAPEUTICS INC., a Delaware corporation

By: ________________________________
Name:
Title:

KPT TEXAS LLC, a Texas limited liability company

By: ________________________________
Name:
Title:

**DIP LENDERS:**

[●], as a DIP Lender

By: ________________________________
Name:
Title:

**DIP AGENT:**
WILMINGTON SAVINGS FUND SOCIETY, FSB,
as administrative agent and collateral agent for the DIP Lenders

By: ________________________________
Name:
Title:

**Schedule 1**

**New Money DIP Commitments**

[On file with the Company Parties]

# Annex A

## Specific Terms of DIP Facility

**Interest Rate:**

The interest rate applicable to the New Money DIP Loans will be SOFR (as defined herein) plus 900 bps, payable in kind quarterly on the last day of each March, June, September and December ending after the Closing Date (or, if such day is not a Business Day, the next succeeding Business Day) (each such date, an "Interest Payment Date"). The interest rate applicable to the Roll-Up Loans will be SOFR plus 1,225 bps, payable in kind quarterly on each Interest Payment Date. All interest and fees shall be calculated on the basis of a 360-day year for the actual number of days elapsed, and all accrued and unpaid interest in respect of any DIP Loans shall be paid in full in cash on the date on which the principal amount of such DIP Loans is paid.

"SOFR" means, for any date of determination, the greater of (i) the forward-looking term rate based on the secured overnight financing rate for a one-month tenor published by CME Group Benchmark Administration Limited (CBA) (or a successor administrator of SOFR selected by the DIP Agent) for the date that is two (2) Business Days prior to the Interest Payment Date immediately preceding such date of determination (or prior to the first Interest Payment Date, the Closing Date); provided, that if such rate is not published on such day, SOFR shall be such rate as published on the first preceding Business Day on which it was published; and (ii) 3.00%.

**Exit Fee:**

4.00% of the New Money DIP Loans (including interest paid in kind and added to the outstanding principal amount of the New Money DIP Loans) or New Money DIP Commitments, as applicable, payable upon any repayment or prepayment (including any acceleration thereof) or other satisfaction of the New Money DIP Loans or termination or reduction of the New Money DIP Commitments (other than a termination resulting from the funding of New Money DIP Loans).

8.00% of the Roll-Up Loans (including interest paid in kind and added to the outstanding principal amount of the Roll-Up Loans), payable upon any repayment or prepayment (including any acceleration thereof) or other satisfaction of the Roll-Up Loans (other than a deemed reconversion of Roll-Up Loans into allowed Prepetition First Lien Obligations, in which case there shall be no corresponding exit fee with respect to the Roll-Up Loans).

**DIP Agent Fee:**

As set forth in the fee letter, dated as of October 30, 2026, between the Borrower and the DIP Agent, together with all amounts payable to or on behalf of the DIP Agent pursuant to the Agency Provisions.

# Annex B

## Representations and Warranties

A. **Organization; Requisite Power and Authority; Qualification**. Each Debtor and each of their respective subsidiaries (a) is duly organized, validly existing and in good standing (to the extent applicable) under the laws of its jurisdiction of organization, (b) subject to the Bankruptcy Court's entry of the applicable DIP Order and any limitation under the Bankruptcy Code or other debtor relief Law, has all requisite power and authority to own and operate its properties, to carry on its business as now conducted and as proposed to be conducted, to enter into this DIP Term Sheet and the other DIP Documents to which it is a party and to carry out the transactions contemplated hereby and thereby, and (c) is qualified to do business and in good standing in every jurisdiction necessary to carry out its business and operations, except in jurisdictions where the failure to be so qualified or in good standing would not be reasonably expected to have, individually or in the aggregate, a Material Adverse Effect.

B. **Due Authorization**. The execution, delivery and performance of this DIP Term Sheet and the other DIP Documents have been duly authorized by all necessary action on the part of each Debtor that is a party thereto, in each case subject to the Bankruptcy Court's entry of the DIP Orders.

C. **No Conflict**. The execution, delivery and performance by the Debtors of this DIP Term Sheet and the other DIP Documents to which they are parties and the consummation of the transactions contemplated hereby and thereby do not and will not (i) violate any provision of any material Law applicable to the Debtors or any of their subsidiaries, any of the Organizational Documents of the Debtors or any of their subsidiaries, or any order, judgment or decree of any court or other agency of government binding on the Debtors or any of their subsidiaries; (ii) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default or give rise to any right of termination, amendment, cancellation or acceleration of any obligation or the loss of any material benefit or the triggering of any payment under any material agreement; (iii) result in or require the creation or imposition of any Lien upon any of the properties or assets of the Debtors or any of their subsidiaries (other than any liens created under any of the DIP Documents in favor of the DIP Agent, for the benefit of DIP Secured Parties); or (iv) require any approval of stockholders, members or partners or any approval or consent of any person under any material agreement except for such approvals or consents that have been obtained on or before the Closing Date and have been disclosed in writing to the DIP Lenders.

D. **Governmental Consents**. The execution, delivery and performance by the Debtors of this DIP Term Sheet and the other DIP Documents to which they are parties and the consummation of the transactions contemplated hereby and thereby do not and will not require any registration with, consent or approval of, or notice to, or other action to, with or by, any Governmental Entity except such that have been obtained or made and are in full force and effect.

E. **Binding Obligation**. The DIP Term Sheet and each other DIP Document has been duly executed and delivered by each Debtor that is a party thereto and is the legally

valid and binding obligation of such Debtor, enforceable against such Debtor in accordance with its respective terms.

F. **No Material Adverse Change**. Since the RSA Effective Date, no event, circumstance or change has occurred that has caused or evidences, either in any case or in the aggregate, a Material Adverse Effect.

G. **No Transfer**. No transfer of property is being made by any Debtor and no obligation is being incurred by any Debtor in connection with the transactions contemplated by this DIP Term Sheet and the other DIP Documents with the intent to hinder, delay or defraud either present or future creditors of any Debtor.

H. **No Indebtedness**. Except for the Prepetition Secured Obligations and the DIP Obligations, the Debtors have no other indebtedness for borrowed money.

I. **Adverse Proceedings, Etc**. Other than the Chapter 11 Cases, there are no Adverse Proceedings (as defined in the Prepetition First Lien Credit Agreement) that (i) purport to affect or pertain to this DIP Term Sheet or any other DIP Document, or any of the transactions contemplated hereby and thereby or (ii) otherwise could reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect. None of the Debtors nor any of their subsidiaries (a) is in violation of any applicable law (including Environmental Laws (as defined in the Prepetition First Lien Credit Agreement)) that could, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect, or (b) is subject to or in default with respect to any final judgments, writs, injunctions, decrees, rules or regulations of any court or any federal, state, municipal or other governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, that could reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect.

J. **Payment of Taxes**. All United States federal, state and all other material tax returns and reports of the Debtors and their subsidiaries required to be filed by any of them have been timely filed, and all taxes due and payable and all assessments, fees and other governmental charges upon the Debtors and their subsidiaries and upon their respective properties, assets, income, businesses and franchises that are due and payable have been paid when due and payable, other than any taxes the amount or validity of which are currently being contested in good faith by appropriate proceedings and with respect to which reserves in conformity with GAAP have been provided on the books of the applicable Debtor and/or its applicable subsidiary, or taxes the nonpayment for which is excused, permitted, or required by the Bankruptcy Code or stayed by the Chapter 11 Cases. With respect to the DIP Collateral, no Debtor is aware of any proposed material tax assessment against any Debtor with respect to United States federal, state or municipal taxes.

K. **Properties**. Each Debtor and each of their subsidiaries has (i) good, sufficient and legal title to (in the case of fee interests in real property), (ii) valid leasehold interests in (in the case of leasehold interests in real or personal property), (iii) valid licensed rights in (in the case of licensed interests in intellectual property), and (iv) good title to (in the case of all other personal property), all of their respective properties and assets, in each case except for minor defects in title that do not interfere with its ability to conduct its business as

currently conducted or to utilize such properties and assets for their intended purposes and assets disposed of as otherwise permitted under clause (iii) under the heading "Negative Covenants" in this DIP Term Sheet. Except for Permitted Liens, all such properties and assets are free and clear of liens.

L. **Environmental Matters**. None of the Debtors nor any of their subsidiaries nor any of their respective Facilities (as defined in the Prepetition First Lien Credit Agreement) or operations are subject to any outstanding written order, consent decree or settlement agreement with any person relating to the violation of any Environmental Law, any Environmental Claim, or any Hazardous Materials Activity (in each case as defined in the Prepetition First Lien Credit Agreement) that, individually or in the aggregate, would reasonably be expected to have a Material Adverse Effect. None of the Debtors nor any of their subsidiaries has received any letter or request for information under Section 104 of the Comprehensive Environmental Response, Compensation, and Liability Act (42 U.S.C. § 9604) or any comparable state law. There are and, to each of the Debtors' and their subsidiaries' knowledge, have been, no conditions, occurrences, or Hazardous Materials Activities that would reasonably be expected to form the basis of an Environmental Claim against any Debtor or any of their subsidiaries that, individually or in the aggregate, would reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect. None of the Debtors nor any of their subsidiaries nor, to any Debtor's knowledge, any predecessor of any Debtor or any of their subsidiaries has filed any notice under any Environmental Law indicating past or present treatment of Hazardous Materials (as defined in the Prepetition First Lien Credit Agreement) at any Facility in violation of applicable law, and none of the Debtors' or any of their subsidiaries' operations involves the generation, transportation, treatment, storage or disposal of hazardous waste, as defined under 40 C.F.R. Parts 260-270 or any state equivalent, except to the extent that such operations are undertaken in material compliance with law. Compliance with all current or reasonably foreseeable future requirements pursuant to or under Environmental Laws could not be reasonably expected, individually or in the aggregate, to have a Material Adverse Effect. No event or condition has occurred or is occurring with respect to any Debtor or any of their subsidiaries relating to the violation of any Environmental Law, any Release (as defined in the Prepetition First Lien Credit Agreement) of Hazardous Materials, or any Hazardous Materials Activity that individually or in the aggregate has had, or could reasonably be expected to have, a Material Adverse Effect.

M. **No Defaults.**

1. No event shall have occurred and be continuing or would result from the consummation of the Initial Draw or the Delayed Draw (as applicable) that would constitute an Event of Default or a Default.

2. None of the Debtors nor any of their subsidiaries is in default in the performance, observance or fulfillment of any of the material obligations, covenants or conditions contained in any material agreement, and no condition exists that, with the giving of notice or the lapse of time or both, could constitute such a default, except where the consequences, direct or indirect, of such default or defaults, if any, individually or in the aggregate, would not reasonably be expected to

result in a Material Adverse Effect or liability of the Debtors or any of their subsidiaries in excess of $2,500,000, individually or $5,000,000 in the aggregate for all such defaults, in each case as modified as necessary to reflect the commencement and administration of the Chapter 11 Cases and the Debtors' financial condition.

N. **Budget**. Attached to the Interim DIP Order as Schedule 1 is a true and complete copy of the initial DIP Budget, which shall be updated from time to time in accordance with the procedures specified in the DIP Orders; provided, that the total amount of New Money DIP Loans provided pursuant to the DIP Budget shall not exceed the total amount of the New Money DIP Commitments authorized by the DIP Orders.

O. **Governmental Regulation**. No Debtor is required to be registered as an "investment company" under the Investment Company Act of 1940, as amended.

P. **Federal Reserve Regulations; Exchange Act.**

1. None of the Debtors nor any of their subsidiaries is engaged principally, or as one of its important activities, in the business of extending credit for the purpose of purchasing or carrying any Margin Stock (as defined in the Prepetition First Lien Credit Agreement).

2. No portion of the proceeds of the Initial Draw or Delayed Draw has been or will be used in any manner, whether directly or indirectly, that causes or could reasonably be expected to cause, the Initial Draw or Delayed Draw, as applicable, or the application of such proceeds to violate Regulation T, Regulation U or Regulation X of the Board of Governors or any other regulation thereof or to violate the Securities Exchange Act of 1934, as amended.

Q. **Employee Matters**. None of the Debtors nor any of their subsidiaries is engaged in any unfair labor practice that would reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect or liability of any Debtor or any of their subsidiaries in excess of $2,500,000, individually, or $5,000,000, in the aggregate for all such practices, in each case during the term of the DIP Facility. There is (i) no unfair labor practice complaint pending against any Debtor or any of their subsidiaries, or to the best knowledge of the Debtors, threatened against any of them before the National Labor Relations Board and no grievance or arbitration proceeding arising out of or under any collective bargaining agreement that is so pending against any Debtor or any of their subsidiaries or to the best knowledge of the Debtors, threatened against any of them, (ii) no strike or work stoppage in existence or threatened involving any Debtor or any of their subsidiaries, and (iii) to the best knowledge of the Debtors, no union representation question existing with respect to the employees of any Debtor or any of their subsidiaries and, to the best knowledge of the Debtors, no union organization activity that is taking place, except (with respect to any matter specified in clauses (i), (ii) or (iii) above, either individually or in the aggregate) such as is not reasonably likely to have a Material Adverse Effect or result in liabilities in excess of $2,500,000, individually, or $5,000,000, in the aggregate for all such liabilities. No Debtor has incurred any liability or

obligation under the Worker Adjustment and Retraining Notification Act or any similar federal or state law that remains unpaid or unsatisfied and would reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect or is in excess of $2,500,000, individually, or $5,000,000, in the aggregate for all such liabilities.

R. **Employee Benefit Plans**.

1. Each Debtor, each of their subsidiaries and each of their respective ERISA Affiliates (as defined in the Prepetition First Lien Credit Agreement) are in compliance with all applicable provisions and requirements of ERISA (as defined in the Prepetition First Lien Credit Agreement) and the Internal Revenue Code of 1986, as amended (the "Internal Revenue Code") and the regulations and published interpretations thereunder with respect to each Employee Benefit Plan (as defined in the Prepetition First Lien Credit Agreement), and have performed all their obligations under each Employee Benefit Plan. Each Employee Benefit Plan that is intended to qualify under Section 401(a) of the Internal Revenue Code has received a favorable determination letter from the Internal Revenue Service indicating that such Employee Benefit Plan is so qualified and nothing has occurred subsequent to the issuance of such determination letter that would cause such Employee Benefit Plan to lose its qualified status.

2. No liability to the PBGC (other than required premium payments), the Internal Revenue Service, any Employee Benefit Plan or any trust established under Title IV of ERISA has been or is expected to be incurred by any Debtor, any of their subsidiaries or any of their ERISA Affiliates. No ERISA Event (as defined in the Prepetition First Lien Credit Agreement) has occurred or is reasonably expected to occur. Except to the extent required under Section 4980B of the Internal Revenue Code or similar state laws, no Employee Benefit Plan provides health or welfare benefits (through the purchase of insurance or otherwise) for any retired or former employee of any Debtor, any of their subsidiaries or any of their respective ERISA Affiliates.

3. The present value of the aggregate benefit liabilities under each Pension Plan (as defined in the Prepetition First Lien Credit Agreement) sponsored, maintained or contributed to by any Debtor, any of their subsidiaries or any of their ERISA Affiliates (determined as of the end of the most recent plan year on the basis of the actuarial assumptions specified for funding purposes in the most recent actuarial valuation for such Pension Plan), did not exceed the aggregate current value of the assets of such Pension Plan.

4. As of the most recent valuation date for each Multiemployer Plan for which the actuarial report is available, the potential liability of any Debtor, their subsidiaries and their respective ERISA Affiliates for a

complete withdrawal from such Multiemployer Plan (within the meaning of Section 4203 of ERISA), when aggregated with such potential liability for a complete withdrawal from all Multiemployer Plans, based on information available pursuant to Section 4221(e) of ERISA is zero. Each Debtor, each of their subsidiaries and each of their ERISA Affiliates have complied with the requirements of Section 515 of ERISA with respect to each Multiemployer Plan and are not in material "default" (as defined in Section 4219(c)(5) of ERISA) with respect to payments to a Multiemployer Plan.

S. **Compliance with Statutes, Etc**. Each Debtor and each of their subsidiaries is in compliance in all material respects with all applicable law.

T. **Disclosure**. No representation or warranty of any Debtor contained in this DIP Term Sheet or any other DIP Document or in any other documents, certificates or written statements furnished to the DIP Agent or any DIP Lender by or on behalf of any Debtor or any of their subsidiaries (other than projections, pro forma financial information and information of a general economic or industry nature) for use in connection with the Restructuring Transactions contains, as of the date furnished, any known untrue statement of a material fact or omits to state a material fact (known to such Debtor, in the case of any document not furnished by it) necessary in order to make the statements contained herein or such documents, certificates or statements, when taken as a whole, not materially misleading in light of the circumstances in which the same were made. Any projections and pro forma financial information contained in such materials are based upon good faith estimates and assumptions believed by the Debtors to be reasonable at the time made, it being recognized by the DIP Lenders that such projections as to future events are not to be viewed as facts and that actual results during the period or periods covered by any such projections may differ from the projected results and such differences may be material. There are no facts known to any Debtor (other than matters of a general economic or industry nature) that, individually or in the aggregate, would reasonably be expected to result in a Material Adverse Effect and that have not been disclosed herein or in such other documents, certificates and statements furnished or publicly available to the DIP Lenders for use in connection with the transactions contemplated hereby.

U. **Sanctions; Anti-Corruption and Anti-Bribery Laws; Anti-Terrorism and Anti-Money Laundering Laws; Etc.**

1. None of the Debtors, any of their subsidiaries, or any of their respective directors, officers or, to the knowledge of any Debtor, employees, agents, advisors, or affiliates is a Sanctioned Person (as defined in the Prepetition First Lien Credit Agreement). Each of the Debtors and each of their subsidiaries and their respective directors, officers and, to the knowledge of any Debtor, employees, agents, advisors and affiliates is in compliance with all and has not violated any (i) Sanctions, (ii) Anti-Corruption and Anti-Bribery Laws, or (iii) Anti-Terrorism and Anti-Money Laundering Laws (in each case, as defined in the Prepetition First Lien Credit Agreement). No part of the proceeds of the Initial Draw

or Delayed Draw has been or will be used, directly or indirectly, (A) for the purpose of financing any activities or business of or with any Sanctioned Person or in any Sanctioned Country (as defined in the Prepetition First Lien Credit Agreement), (B) in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value to any person in violation of any Anti-Corruption and Anti-Bribery Laws, or (C) otherwise in any manner that would result in a violation of Sanctions, Anti-Terrorism and Anti-Money Laundering Laws, or Anti-Corruption and Anti-Bribery Laws by any person.

2. Each Debtor and each of their subsidiaries have established and currently maintain policies, procedures and controls that are reasonably designed (and otherwise comply with applicable law) to ensure that each of the Debtors, their subsidiaries, and their controlled affiliates, and each of their respective directors, officers, employees and agents, is and will continue to be in material compliance with all applicable current and future Sanctions, Anti-Terrorism and Anti-Money Laundering Laws, and Anti-Corruption and Anti-Bribery Laws.

V. **Healthcare and FDA Matters.**

1. All pre-clinical and clinical studies, tests and trials conducted by or on behalf of or sponsored by any Debtor or any of their subsidiaries, or in which any Debtor or any of their subsidiaries have participated with respect to their products and product candidates, were, and if still pending are, being conducted in all material respects in accordance with all applicable Healthcare Laws, Governmental Authorizations (in each case, as defined in the Prepetition First Lien Credit Agreement) and any applicable rules, regulations, and policies to which such studies, tests or trials are or were subject. Neither any Debtor nor any of their subsidiaries has received any written notices, correspondence or other communications from any Governmental Entity, institutional review board or other entity having authority over the conduct of such studies, tests, or trials requiring or threatening the termination, material modification, clinical hold or suspension of any such studies, tests or trials being conducted or proposed to be conducted by or on behalf of such Debtor or any of its subsidiaries, other than ordinary course communications with respect to modifications in connection with the design and implementation of such studies, tests or trials, and, to the knowledge of the Debtors, there are no reasonable grounds for the same.

2. Each of the Debtors and each of their subsidiaries has operated and currently is in compliance in all material respects with all applicable Healthcare Laws, including, without limitation, the statutes, rules and regulations enforced by the FDA, the U.S. Department of Health and Human Services Office of Inspector General, the Centers for Medicare

& Medicaid Services, the Office for Civil Rights, the Department of Justice or any other Governmental Entity having jurisdiction over the Debtors, their subsidiaries or any of their respective properties. Neither any Debtor nor any of their subsidiaries (i) has received any FDA Form-483, notice of adverse finding, warning letter, untitled letter or other correspondence or notice from the FDA or any other Governmental Entity alleging or asserting noncompliance in any material respect with any Healthcare Laws applicable to any Debtor or any of their subsidiaries, or (ii) is a party to or has any ongoing reporting obligations pursuant to any corporate integrity agreements, deferred or non-prosecution agreements, monitoring agreements, consent decrees, settlement orders, plans of correction or similar agreements with or imposed by any Governmental Entity. None of the Debtors, their subsidiaries or any of their respective officers or directors or, to the knowledge of the Debtors, their independent contractors, has been excluded, suspended or debarred from participation in any U.S. federal healthcare program or human clinical research or, is subject to a governmental inquiry, investigation, proceeding, or other similar action that would reasonably be expected to result in debarment, suspension or exclusion.

3. The manufacture of the Debtors' and their subsidiaries' products and product candidates, whether by or on behalf of such Debtor or any of its subsidiaries, is being conducted in compliance in all material respects with all applicable Healthcare Laws. Since April 1, 2021, no manufacturing facility for the products and product candidates of the Debtors and their subsidiaries (whether a Facility or a contract manufacturing site for such products or product candidates) has been subject to any Governmental Entity shutdown. There have been no material recalls, field notifications, field corrections, market withdrawals or replacements, warnings, "dear doctor" letters, investigator notices, safety alerts or other comparable notice or action relating to an alleged lack of safety, efficacy, quality or regulatory compliance of the Debtors' or their subsidiaries' products (collectively, "Safety Notices"). To the knowledge of the Debtors, there are no facts that would be reasonably likely to result in (A) a material Safety Notice with respect to any Debtor's or any of its subsidiaries' products, (B) a material change in labeling of any Debtor's or its subsidiaries' products, or (C) a termination or suspension of marketing or testing of any of the Debtors' or any of their subsidiaries' products.

4. Each of the Debtors and each of their subsidiaries (i) possesses all Governmental Authorizations necessary to conduct the businesses now operated by it, and, subject to the entry of the DIP Orders, for the execution, delivery and performance by and enforcement against such Debtor of this DIP Term Sheet and the other DIP Documents and (ii) is in compliance in all material respects with the terms and conditions of

all such Governmental Authorizations. All such Governmental Authorizations are in full force and effect, and to the knowledge of the Debtors, no event has occurred which allows, or after notice or lapse of time would reasonably be expected to allow, revocation, termination, or material impairment of the rights of the holder of any material Governmental Authorization. None of the Debtors nor any of their subsidiaries has received notice of proceedings relating to the revocation or material adverse modification of any such material Governmental Authorizations and to the knowledge of the Debtors, no Governmental Entity granting any such material Governmental Authorization has taken any action to limit, suspend or revoke the same in any material respect.

5. All material reports, statements, documents, registrations, filings, or submissions required to be filed by any Debtor or any of their subsidiaries with any Governmental Entity have been so filed, properly maintained, and/or amended when required by applicable law, including all applicable Healthcare Laws. All such reports, statements, documents, registrations, submissions and filings were accurate, complete in all material respects and in material compliance with applicable law, including all applicable Healthcare Laws, when filed, or as amended or supplemented, and no material deficiencies have been asserted by any such Governmental Entity with respect to such reports and filings other than in the ordinary course of business. None of the Debtors has received any written notice that the FDA (i) has withdrawn, or intends to withdraw, the approval of any labeled indication of selinexor tablets or adversely modify, limit or restrict selinexor's approved indications for use; or (ii) has identified any serious adverse events or other material events or material trends with respect to the safety or efficacy of selinexor that would reasonably be expected to lead to the material withdrawal, restriction, limitation or adverse modification of any labeled indication of selinexor.

# Annex C

## Priorities

The following chart sets forth the relative priority of the liens and claims described in this DIP Term Sheet. Capitalized terms used in this Annex C and not defined in this DIP Term Sheet have the meanings given to them in the DIP Orders. In the event of any conflict between this chart and the DIP Orders, the terms of the applicable DIP Order shall govern. Liens and claims of the Prepetition Notes Secured Parties and the Prepetition Royalty Secured Parties listed at the same priority level shall rank pari passu with each other, and any proceeds thereof shall be applied as between them in accordance with Section 4.1 of the Intercreditor Agreement, mutatis mutandis and, with respect to the Prepetition Notes Secured Parties, in accordance with Section 3.4 of the Collateral Trust Agreement, mutatis mutandis. Nothing in this Annex C amends, alters or modifies the Intercreditor Agreement or the Collateral Trust Agreement, each of which shall remain in full force and effect in accordance with section 510(a) of the Bankruptcy Code.

| Priority | Liens on Prepetition Non-Royalty Collateral (Including Cash Collateral) | Liens on Prepetition Royalty Collateral | Liens on Unencumbered Collateral | Claims Against All Debtor Assets |
|---|---|---|---|---|
| 1 | Carve-Out; Permitted Prior Liens | Carve-Out; Permitted Prior Liens | Carve-Out | Carve-Out |
| 2 | DIP Liens | DIP Liens | DIP Liens | DIP Superpriority Claims |
| 3 | First Lien Adequate Protection Liens | First Lien Adequate Protection Liens | First Lien Adequate Protection Liens | First Lien 507(b) Claims |
| 4 | Prepetition 1L Liens | Prepetition 1L Liens | Notes Adequate Protection Liens;<br><br>Royalty Adequate Protection Liens | Notes 507(b) Claims;<br><br>Royalty 507(b) Claims |
| 5 | Notes Adequate Protection Liens | Notes Adequate Protection Liens;<br><br>Royalty Adequate Protection Liens | None | All other administrative expense claims |
| 6 | Prepetition 2L Notes Liens | Prepetition 2L Notes Liens;<br><br>Prepetition 2L Royalty Liens | None | None |
| 7 | Royalty Adequate Protection Liens | None | None | None |

# Exhibit A

## Interim DIP Order

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re:<br><br>KARYOPHARM THERAPEUTICS INC., *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 26-[•] ([•])<br><br>(Joint Administration Requested) |

**INTERIM ORDER (I) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING, (II) AUTHORIZING THE DEBTORS TO USE CASH COLLATERAL, (III) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (IV) GRANTING ADEQUATE PROTECTION TO THE PREPETITION SECURED PARTIES, (V) MODIFYING THE AUTOMATIC STAY, (VI) SCHEDULING A FINAL HEARING, AND (VII) GRANTING RELATED RELIEF**

Upon the motion (the "***Motion***")[2] of Karyopharm Therapeutics Inc. (the "***Company***") and KPT Texas LLC (together with the Company, the "***Debtors***"), as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "***Chapter 11 Cases***"), seeking entry of an interim order (this "***Interim Order***") and a final order (the "***Final Order***") pursuant to sections 105, 361, 362, 363, 364(c), 364(d), 364(e), 503, 506, 507, and 552 of title 11 of the United States Code (the "***Bankruptcy Code***") and Rules 2002, 4001, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***"), Rules 2002-1, 4001-1(b), 4002-1, and 9013-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court

[1] The Debtors in these chapter 11 cases, together with the last four digits of the Debtors' federal tax identification numbers, are: Karyopharm Therapeutics Inc. (1704) and KPT Texas LLC (1815). The Debtors' service address is 85 Wells Avenue, 2nd Floor, Newton, Massachusetts 02459.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

for the Southern District of Texas, Houston Division (the "***Local Rules***"), and the Procedures for Complex Cases in the Southern District of Texas, *inter alia*:

(i) authorizing the Debtors to obtain a senior secured priming and superpriority postpetition financing facility (the "***DIP Facility***") consisting of (a) first-out new money term loans in an aggregate principal amount of up to $55,000,000 (the "***New Money DIP Loans***" and the commitments therefor, the "***New Money DIP Commitments***"), and (b) the deemed roll-up and automatic conversion of Prepetition First Lien Loans in the aggregate principal amount of up to $55,000,000 into second-out term loans (the "***Roll-Up Loans***" and, together with the New Money DIP Loans, the "***DIP Loans***") pursuant to the terms and conditions of the DIP Documents (as defined below);

(ii) authorizing the Debtors to execute and deliver the term sheet substantially in the form attached hereto as **<u>Exhibit A</u>** (as the same may be amended, restated, supplemented, waived or otherwise modified from time to time, the "***DIP Term Sheet***") by and among the Company, as borrower (in such capacity, the "***DIP Borrower***"), each other guarantor party thereto (together with the DIP Borrower, the "***DIP Loan Parties***"), Wilmington Savings Fund Society, FSB, as administrative agent and as collateral agent (in such capacities, the "***DIP Agent***"), and the lenders party thereto from time to time (the "***DIP Lenders***" and, together with the DIP Agent, the "***DIP Secured Parties***") and, upon finalization thereof, a debtor-in-possession credit and guaranty agreement which shall be consistent with the DIP Term Sheet and otherwise in form and substance reasonably acceptable to the Debtors, the Required DIP Lenders (as defined below) and the DIP Agent (with respect to any DIP Agent Provisions) (as defined in the DIP Term Sheet) (as the same may be amended, restated, supplemented, waived or otherwise modified from time to time, the "***DIP Credit Agreement***") and any other agreements, instruments, security, or pledge agreements, intellectual property security agreements, intercreditor agreements, guarantees, fee letters, control agreements related thereto and the other documents related thereto (as amended, restated, supplemented, or modified from time to time, collectively with the DIP Term Sheet and the DIP Credit Agreement, the "***DIP Documents***") and to promptly perform such other acts as may be necessary or desirable in connection with the DIP Documents;

(iii) authorizing (a) the DIP Borrower to borrow (and the other DIP Loan Parties to guarantee) New Money DIP Loans in the aggregate principal amount of $25,000,000 (the "***Interim DIP Amount***"), subject to the terms and conditions set forth in the DIP Documents and this Interim Order, in an initial draw upon entry of this Interim Order to avoid immediate and irreparable harm (the "***Initial Draw***"), and (b) automatically upon and concurrently with such Initial Draw, the cashless conversion into Roll-Up Loans of the DIP Borrower (the "***Interim Roll-Up Loans***") (and the guaranty thereof by the other DIP Loan Parties) of Prepetition First Lien Loans held by those DIP Lenders that fund New Money

DIP Loans in the Initial Draw (or any of their respective designated affiliates or managed or controlled funds) at a ratio of $1.00 of Prepetition First Lien Loans for each $1.00 of principal amount of New Money DIP Loans funded by such DIP Lender in the Initial Draw (such conversion, the "***Interim Roll-Up***");

(iv) authorizing (a) the DIP Borrower to borrow (and the other DIP Loan Parties to guarantee), pursuant to and upon entry of the Final Order, the remaining New Money DIP Loans in the aggregate principal amount of $30,000,000 (the "***Delayed Draw***"), subject to the terms and conditions set forth in the DIP Documents and the Final Order, and (b) automatically upon and concurrently with the Delayed Draw, the cashless conversion into Roll-Up Loans of the DIP Borrower (the "***Final Roll-Up Loans***") (and the guaranty thereof by the other DIP Loan Parties) of an additional $30,000,000 in aggregate principal amount of Prepetition First Lien Loans held by the DIP Lenders (or any of their respective designated affiliates or managed or controlled funds) at a ratio of $1.00 of Prepetition First Lien Loans for each $1.00 of principal amount of New Money DIP Loans funded in the Delayed Draw (such conversion, the "***Final Roll-Up***" and, together with the Interim Roll-Up, the "***DIP Roll-Up***");

(v) granting to the DIP Agent, for the benefit of itself and the other DIP Secured Parties, in respect of the DIP Facility and all obligations owing thereunder and under the DIP Documents (collectively, and including all "DIP Obligations" as defined in the DIP Term Sheet, the "***DIP Obligations***"; the DIP Obligations in respect of the New Money DIP Loans, the "***First-Out New Money DIP Obligations***" and the DIP Obligations in respect of the Roll-Up Loans, the "***Second-Out Roll-Up DIP Obligations***"), subject to the Carve-Out (as defined below), allowed superpriority administrative expense claim status in each of the Chapter 11 Cases and any Successor Cases (as defined below), with the priorities set forth on **Exhibit B** hereto;

(vi) granting to the DIP Agent, for the benefit of itself and the other DIP Secured Parties, automatically and validly perfected security interests in and liens on all of the DIP Collateral (as defined below), including all property of the Debtors constituting "cash collateral" as defined in section 363(a) of the Bankruptcy Code (the "***Cash Collateral***"), which security interests and liens shall be subject to the Carve-Out and shall have the priorities set forth herein and on **Exhibit B** hereto;

(vii) authorizing the Debtors to pay the principal, interest, premiums, fees, expenses, and other amounts payable under the DIP Documents as such amounts become earned, due, and payable, including the exit fees, administrative agent's fees, collateral agent's fees, and the reasonable fees and disbursements of the DIP Agent's and the other DIP Secured Parties' attorneys, advisors, accountants, and other consultants, all to the extent provided in, and in accordance with, the DIP Documents;

(viii) authorizing the Debtors to use the Cash Collateral of the Prepetition Secured Parties (as defined below), solely on the terms and conditions set forth herein;

(ix) providing adequate protection to the Prepetition Secured Parties for, among other things, any diminution in value of their respective interests in the Prepetition Collateral, including the Cash Collateral, occurring on or after the Petition Date, whether or not resulting from the imposition of the automatic stay, the Debtors' use, sale, or lease of the Prepetition Collateral, including Cash Collateral, and/or the priming of the Prepetition Liens (each as defined below) (including by the Carve-Out (as defined below)) ("***Diminution in Value***");

(x) subject to entry of the Final Order, waiving (a) the Debtors' right to surcharge the DIP Collateral and the Prepetition Collateral under section 506(c) of the Bankruptcy Code, (b) the "equities of the case" exception under section 552(b) of the Bankruptcy Code, and (c) the equitable doctrine of marshaling and other similar doctrines, in each case with respect to the DIP Secured Parties and the Prepetition Secured Parties;

(xi) vacating and modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Documents and this Interim Order;

(xii) waiving any applicable stay (including under Bankruptcy Rule 6004) and providing for immediate effectiveness of the Interim Order and, upon entry, the Final Order; and

(xiii) scheduling a final hearing (the "***Final Hearing***") to consider the relief requested in the Motion and approving the form of notice with respect to the Final Hearing.

The Court having considered the Motion, the exhibits attached thereto, the *Declaration of Sean A. Gumbs in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings* [Docket No. [●]], the *Declaration of Ryan Kielty in Support of the Debtors' Emergency Motion (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection to the Prepetition Secured Parties, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* [Docket No. [●]], and the evidence submitted and arguments made at the interim hearing held on [●], 2026 (the "***Interim Hearing***"); and notice of the Interim Hearing having been given in accordance with

Bankruptcy Rules 2002, 4001(b), (c), and (d), and all applicable Local Rules; and the Interim Hearing having been held and concluded; and all objections, if any, to the interim relief requested in the Motion having been withdrawn, resolved, or overruled by the Court; and it appearing that approval of the interim relief requested in the Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates pending the Final Hearing (including to pay payroll, critical patient supply and product distribution costs, and the Carve-Out), and otherwise is fair and reasonable and in the best interests of the Debtors, their estates, and all parties-in-interest, and is essential for the continued operation of the Debtors' businesses and the preservation of the value of the Debtors' assets; and it appearing that the Debtors' entry into the DIP Term Sheet and the other DIP Documents is a sound and prudent exercise of the Debtors' business judgment; and after due deliberation and consideration, and good and sufficient cause appearing therefor;

**BASED UPON THE RECORD ESTABLISHED AT THE INTERIM HEARING, THE COURT MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:**[3]

**A.** **Petition Date**. On November [●], 2026 (the "***Petition Date***"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in this Court.

**B.** **Debtors in Possession**. The Debtors have continued in the management and operation of their businesses and properties as debtors in possession pursuant to sections 1107

[3] The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in the Chapter 11 Cases.

**C.** **Jurisdiction and Venue**. This Court has jurisdiction over the Chapter 11 Cases, the Motion, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the Southern District of Texas*, dated May 24, 2012. Consideration of the Motion constitutes a core proceeding pursuant to 28 U.S.C. § 157(b)(2). The Court may enter a final order approving the relief sought in the Motion consistent with Article III of the United States Constitution. Venue for the Chapter 11 Cases and proceedings with respect to the Motion is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

**D.** **Committee Formation**. As of the date hereof, the Office of the United States Trustee for the Southern District of Texas (the "***U.S. Trustee***") has not appointed an official committee of unsecured creditors in the Chapter 11 Cases (a "***Committee***") pursuant to section 1102 of the Bankruptcy Code.

**E.** **Notice**. Notice of the Motion and the Interim Hearing has been provided in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules, and no other or further notice of the Motion with respect to the relief requested at the Interim Hearing or the entry of this Interim Order shall be required.

**F.** **Debtors' Stipulations**. After consultation with their attorneys and financial advisors, and in exchange for and as a material inducement to the Prepetition Secured Parties to consent to the Debtors' use of the Cash Collateral and subordination of the Prepetition Liens (as defined herein) to the Carve-Out and the DIP Liens (as defined herein), without prejudice to the rights of parties in interest, including any Committee, as set forth in paragraph 36 herein, the

Debtors admit, stipulate, acknowledge, and agree as follows (paragraphs F(i) through F(xviii), collectively, the "***Debtors' Stipulations***"):

(i) *Prepetition First Lien Facility*. Pursuant to that certain Credit and Guaranty Agreement, dated as of May 8, 2024 (as amended, restated, supplemented, or modified from time to time, the "***Prepetition First Lien Credit Agreement***" and, collectively with the Credit Documents (as defined in the Prepetition First Lien Credit Agreement), each as amended, restated, supplemented, or modified from time to time, the "***Prepetition First Lien Documents***") among (a) the Company, as borrower, (b) the guarantors party thereto from time to time (in such capacities, the "***Prepetition Guarantors***" and, together with the Company, the "***Prepetition Obligors***"), (c) Wilmington Savings Fund Society, FSB, as administrative agent for the lenders and as collateral agent for the secured parties (in such capacities, the "***Prepetition First Lien Agent***"), and (d) the lenders party thereto from time to time (the "***Prepetition First Lien Lenders***" and, together with the Prepetition First Lien Agent, the "***Prepetition First Lien Secured Parties***"), the Company borrowed from the Prepetition First Lien Lenders, and the Prepetition Guarantors guaranteed, senior secured term loans (the "***Prepetition First Lien Facility***" and the term loans thereunder, the "***Prepetition First Lien Loans***").

(ii) *Prepetition First Lien Obligations*. As of the Petition Date, the Prepetition Obligors were indebted to the Prepetition First Lien Secured Parties, without defense, counterclaim, or offset of any kind, in respect of the Prepetition First Lien Loans in the aggregate principal amount of not less than $128,981,939, together with accrued and unpaid interest (including interest accruing at the Term Loan Default Rate (as defined in that certain Forbearance Agreement and Limited Waiver to Indentures, dated as of September 10, 2026, entered into by and among the Company and certain of the Prepetition Secured Parties (as defined below) (as amended,

restated, amended and restated, supplemented, or otherwise modified from time to time, the "***September 2026 Forbearance Agreement***")) under the Prepetition First Lien Credit Agreement), any premiums (including any prepayment or make-whole premium payable under the Prepetition First Lien Credit Agreement), any fees, expenses, and disbursements (including attorneys' fees, accountants' fees, and financial advisors' fees, and related expenses and disbursements), treasury and cash management obligations, bank product and derivative obligations, indemnification obligations, guarantee obligations, and other charges, amounts, and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable in respect of any of the Prepetition Obligors' obligations under the Prepetition First Lien Documents, including all "Obligations" as defined in the Prepetition First Lien Credit Agreement, and all postpetition interest (including interest at the Default Rate (as defined in the Prepetition First Lien Credit Agreement)), fees, premiums, costs, and other charges allowable under section 506(b) of the Bankruptcy Code (collectively, the "***Prepetition First Lien Obligations***").

(iii) *Prepetition 1L Liens and Prepetition Collateral*. As more fully set forth in the Prepetition First Lien Documents, prior to the Petition Date, the Prepetition Obligors granted to the Prepetition First Lien Agent, for the benefit of itself and the other Prepetition First Lien Secured Parties, first-priority security interests in and continuing liens on substantially all of their respective assets and property (with certain exceptions set out in the Prepetition First Lien Documents), including the Collateral (as defined in that certain Pledge and Security Agreement, dated as of May 8, 2024, among the Prepetition Obligors and the Prepetition First Lien Agent, as amended, restated, supplemented, or modified from time to time) and all proceeds, products, accessions, rents, and profits thereof, in each case whether then owned or existing or thereafter acquired or arising (such security interests and liens, collectively, the "***Prepetition 1L Liens***"; and

such assets, property, proceeds, products, accessions, rents, and profits, collectively, the "***Prepetition Collateral***").

(iv) *Validity, Perfection, and Priority of Prepetition 1L Liens and Prepetition First Lien Obligations.* The Debtors acknowledge and agree that as of the Petition Date (a) the Prepetition 1L Liens on the Prepetition Collateral were valid, binding, enforceable, non-avoidable, and properly perfected and were granted to, or for the benefit of, the Prepetition First Lien Secured Parties for fair consideration and reasonably equivalent value; (b) the Prepetition 1L Liens were senior in priority over any and all other liens on the Prepetition Collateral, subject only to certain liens otherwise permitted by the Prepetition First Lien Documents (solely to the extent any such permitted liens were valid, properly perfected, non-avoidable, and senior in priority to the Prepetition 1L Liens as of the Petition Date or were valid non-avoidable senior liens that were perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code, the "***Permitted Prior Liens***"); (c) the Prepetition First Lien Obligations constitute legal, valid, binding, and non-avoidable obligations of the Debtors enforceable in accordance with the terms of the applicable Prepetition First Lien Documents; (d) no offsets, recoupments, challenges, objections, defenses, claims, or counterclaims by the Debtors of any kind or nature to any of the Prepetition 1L Liens or Prepetition First Lien Obligations exist, and no portion of the Prepetition 1L Liens or Prepetition First Lien Obligations is subject to any challenge or defense including avoidance, disallowance, disgorgement, recharacterization, or subordination (equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (e) the Debtors and their estates have no claims, objections, challenges, causes of action, and/or choses in action, including avoidance claims under chapter 5 of the Bankruptcy Code or applicable state law equivalents or actions for recovery or

disgorgement, against any of the Prepetition First Lien Secured Parties or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors, or employees arising out of, based upon, or related to the Prepetition First Lien Facility; (f) the Debtors have waived, discharged, and released any right to challenge any of the Prepetition First Lien Obligations, the priority of the Debtors' obligations thereunder, and the validity, extent, and priority of the liens securing the Prepetition First Lien Obligations; and (g) the Prepetition First Lien Obligations constitute allowed, secured claims within the meaning of sections 502 and 506 of the Bankruptcy Code.

(v) *Prepetition 2028 Notes*. Pursuant to that certain Indenture, dated as of October 10, 2025 (as amended, restated, supplemented, or modified from time to time, the "***Prepetition 2028 Notes Indenture***" and, collectively with the Transaction Documents (as defined therein) and any other agreements and documents executed or delivered in connection therewith, including the Prepetition 2028 Notes (as defined below), each as amended, restated, supplemented, or modified from time to time, the "***Prepetition 2028 Notes Documents***") among (a) the Company, as issuer, (b) the Prepetition Guarantors, and (c) Wilmington Savings Fund Society, FSB, as trustee (in such capacity, the "***Prepetition 2028 Notes Trustee***"), the Company issued, and the Prepetition Guarantors guaranteed, 9.00% Convertible Senior Notes due 2028 in the original aggregate principal amount of $15,000,000 (the "***Prepetition 2028 Notes***") to the holders thereof (the "***Prepetition 2028 Noteholders***" and, together with the Prepetition 2028 Notes Trustee and the Prepetition Notes Collateral Trustee (as defined below), the "***Prepetition 2028 Secured Parties***").

(vi) *Prepetition 2028 Notes Obligations*. As of the Petition Date, the Prepetition Obligors were indebted to the Prepetition 2028 Secured Parties, without defense,

counterclaim, or offset of any kind, in respect of the Prepetition 2028 Notes in the aggregate principal amount of not less than $15,648,085 (inclusive of capitalized interest), together with accrued and unpaid interest (including interest accruing at the 2028 Notes Forbearance Rate (as defined in the September 2026 Forbearance Agreement) under the Prepetition 2028 Notes Indenture), any premiums (including any prepayment, redemption or make-whole premium payable under the Prepetition 2028 Notes Documents), any fees, expenses, and disbursements (including attorneys' fees, accountants' fees, and financial advisors' fees, and related expenses and disbursements), indemnification obligations, guarantee obligations, and other charges, amounts, and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable in respect of any of the Prepetition Obligors' obligations under the Prepetition 2028 Notes Documents, including all "Obligations" as defined in the Prepetition 2028 Notes Indenture, and all postpetition interest, fees, premiums, costs, and other charges allowable under section 506(b) of the Bankruptcy Code (collectively, the "***Prepetition 2028 Notes Obligations***").

(vii) *Prepetition 2029 Notes*. Pursuant to that certain Indenture, dated as of October 10, 2025 (as amended, restated, supplemented, or modified from time to time, the "***Prepetition 2029 Notes Indenture***" and, collectively with the Transaction Documents (as defined therein) and any other agreements and documents executed or delivered in connection therewith, including the Prepetition 2029 Notes (as defined below), each as amended, restated, supplemented, or modified from time to time, the "***Prepetition 2029 Notes Documents***"; the Prepetition 2029 Notes Documents, together with the Prepetition 2028 Notes Documents, the "***Prepetition Notes Documents***") among (a) the Company, as issuer, (b) the Prepetition Guarantors, and (c) Wilmington Savings Fund Society, FSB, as trustee (in such capacity, the "***Prepetition 2029 Notes***

***Trustee***”), the Company issued, and the Prepetition Guarantors guaranteed, 9.00% Convertible Senior Notes due 2029 in the original aggregate principal amount of $103,502,450 (the “***Prepetition 2029 Notes***” and, together with the Prepetition 2028 Notes, the “***Prepetition Notes***”) to the holders thereof (the “***Prepetition 2029 Noteholders***” and, together with the Prepetition 2029 Notes Trustee and the Prepetition Notes Collateral Trustee, the “***Prepetition 2029 Secured Parties***”; the Prepetition 2029 Noteholders, together with the Prepetition 2028 Noteholders, the “***Prepetition Noteholders***”; the Prepetition 2029 Secured Parties, together with the Prepetition 2028 Secured Parties, the “***Prepetition Notes Secured Parties***”).

(viii) *Prepetition 2029 Notes Obligations*. As of the Petition Date, the Prepetition Obligors were indebted to the Prepetition 2029 Secured Parties, without defense, counterclaim, or offset of any kind, in respect of the Prepetition 2029 Notes in the aggregate principal amount of not less than $107,974,339 (inclusive of capitalized pay-in-kind interest), together with accrued and unpaid interest (including interest accruing at the 2029 Notes Forbearance Rate (as defined in the September 2026 Forbearance Agreement) under the Prepetition 2029 Notes Indenture), any premiums (including any prepayment, redemption or make-whole premium payable under the Prepetition 2029 Notes Documents), any fees, expenses, and disbursements (including attorneys’ fees, accountants’ fees, and financial advisors’ fees, and related expenses and disbursements), indemnification obligations, guarantee obligations, and other charges, amounts, and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable in respect of any of the Prepetition Obligors’ obligations under the Prepetition 2029 Notes Documents, including all “Obligations” as defined in the Prepetition 2029 Notes Indenture, and all postpetition interest, fees, premiums, costs, and other charges allowable under section 506(b) of the Bankruptcy Code (collectively,

the "***Prepetition 2029 Notes Obligations***"). The Prepetition 2028 Notes Obligations and the Prepetition 2029 Notes Obligations are referred to herein, collectively, as the "***Prepetition Notes Obligations***."

(ix) *Prepetition 2L Notes Liens and Prepetition Collateral.* As more fully set forth in the Prepetition Notes Documents, prior to the Petition Date, the Prepetition Obligors granted to Wilmington Savings Fund Society, FSB, as collateral trustee for the Prepetition Notes Secured Parties (in such capacity, the "***Prepetition Notes Collateral Trustee***"), for the benefit of itself and the other Prepetition Notes Secured Parties, second-priority security interests in and continuing liens on the Prepetition Collateral (such security interests and liens, the "***Prepetition 2L Notes Liens***").

(x) *Validity, Perfection, and Priority of Prepetition 2L Notes Liens and Prepetition Notes Obligations.* The Debtors acknowledge and agree that as of the Petition Date (a) the Prepetition 2L Notes Liens on the Prepetition Collateral were valid, binding, enforceable, non-avoidable, and properly perfected and were granted to, or for the benefit of, the Prepetition Notes Secured Parties for fair consideration and reasonably equivalent value; (b) (i) the Prepetition 2L Notes Liens on the Prepetition Non-Royalty Collateral (as defined below) were senior in priority over any and all other liens on the Prepetition Non-Royalty Collateral, subject only to the Prepetition 1L Liens and the Permitted Prior Liens and (ii) the Prepetition 2L Notes Liens on the Prepetition Royalty Collateral (as defined below) were equal in priority to the Prepetition 2L Royalty Liens (as defined below) and senior in priority over any and all other liens on the Prepetition Royalty Collateral, subject only to the Prepetition 1L Liens and the Permitted Prior Liens; (c) the Prepetition Notes Obligations constitute legal, valid, binding, and non-avoidable obligations of the Debtors enforceable in accordance with the terms of the applicable Prepetition

Notes Documents; (d) no offsets, recoupments, challenges, objections, defenses, claims, or counterclaims by the Debtors of any kind or nature to any of the Prepetition 2L Notes Liens or Prepetition Notes Obligations exist, and no portion of the Prepetition 2L Notes Liens or Prepetition Notes Obligations is subject to any challenge or defense including avoidance, disallowance, disgorgement, recharacterization, or subordination (equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (e) the Debtors and their estates have no claims, objections, challenges, causes of action, and/or choses in action, including avoidance claims under chapter 5 of the Bankruptcy Code or applicable state law equivalents or actions for recovery or disgorgement, against any of the Prepetition Notes Secured Parties or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors, or employees arising out of, based upon, or related to the Prepetition Notes; (f) the Debtors have waived, discharged, and released any right to challenge any of the Prepetition Notes Obligations, the priority of the Debtors' obligations thereunder, and the validity, extent, and priority of the liens securing the Prepetition Notes Obligations; and (g) the Prepetition Notes Obligations constitute allowed, secured claims within the meaning of sections 502 and 506 of the Bankruptcy Code to the extent of the value of the Prepetition Collateral allocable to the Prepetition Notes Obligations.

(xi) *Collateral Trust Agreement*. Pursuant to that certain Collateral Trust Agreement, dated as of October 10, 2025, among the Company, the Prepetition Notes Collateral Trustee, the Prepetition 2028 Notes Trustee, and the Prepetition 2029 Notes Trustee (as amended, restated, supplemented, or modified from time to time, the "***Collateral Trust Agreement***"), the parties thereto have agreed, among other things and as more specifically set forth therein, to the relative rights, remedies, interests, obligations, priority, and positions of, among others, the Prepetition 2028 Secured Parties and the Prepetition 2029 Secured Parties with respect

to any shared or common Prepetition Collateral. Pursuant to section 510(a) of the Bankruptcy Code, the Collateral Trust Agreement (a) shall remain in full force and effect, (b) shall continue to govern the relative rights, remedies, interests, obligations, priority, and positions of the Prepetition Notes Secured Parties with respect to any shared or common Prepetition Collateral, and (c) shall not be deemed to be amended, altered, or modified by the terms of this Interim Order or the DIP Documents.

(xii) *Prepetition Royalty Facility*. Pursuant to that certain Revenue Interest Financing Agreement, dated as of September 14, 2019 (as amended, restated, supplemented, or modified from time to time, the "***Prepetition Royalty Agreement***" and, collectively with the Transaction Documents (as defined therein) and any other agreements and documents executed or delivered in connection therewith, each as amended, restated, supplemented, or modified from time to time, the "***Prepetition Royalty Documents***" and, together with the Prepetition First Lien Documents, the Prepetition 2028 Notes Documents, and the Prepetition 2029 Notes Documents, the "***Prepetition Secured Documents***") among (a) the Company and the Prepetition Guarantors, (b) the investors party thereto from time to time (the "***Prepetition Royalty Investors***"), (c) HealthCare Royalty Management, LLC, as investor representative (in such capacity, the "***Investor Representative***"), and (d) HCR Karyopharm SPV, LLC, as collateral agent (in such capacity, the "***Prepetition Royalty Collateral Agent***" and, together with the Investor Representative and the Prepetition Royalty Investors, the "***Prepetition Royalty Secured Parties***" and, together with the Prepetition First Lien Secured Parties and the Prepetition Notes Secured Parties, the "***Prepetition Secured Parties***"), the Prepetition Royalty Investors extended financing to the Company (the "***Prepetition Royalty Facility***").

(xiii) *Prepetition Royalty Obligations*. As of the Petition Date, the Prepetition Obligors were indebted or otherwise obligated to the Prepetition Royalty Secured Parties, without defense, counterclaim, or offset of any kind, in an aggregate amount of not less than $113,536,880 (including the Final Payment Amount (as defined in the Prepetition Royalty Agreement)), together with accrued and unpaid amounts, any fees, expenses, and disbursements (including attorneys' fees, accountants' fees, and financial advisors' fees, and related expenses and disbursements, and all fees, expenses, disbursements, and indemnities payable to the Prepetition Royalty Collateral Agent and the Investor Representative under the Prepetition Royalty Documents), indemnification obligations, guarantee obligations, and other charges, amounts, and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable in respect of any of the obligations of the Company and the other Prepetition Obligors pursuant to, or secured by, the Prepetition Royalty Documents, including all "Obligations" as defined in the Prepetition Royalty Agreement, and all postpetition interest, fees, premiums, costs, and other charges allowable under section 506(b) of the Bankruptcy Code (collectively, the "***Prepetition Royalty Obligations***" and, together with the Prepetition Notes Obligations, the "***Prepetition 2L Obligations***"; and the Prepetition 2L Obligations, together with the Prepetition First Lien Obligations, the "***Prepetition Secured Obligations***").

(xiv) *Prepetition 2L Royalty Liens and Prepetition Royalty Collateral*. As more fully set forth in the Prepetition Royalty Documents, prior to the Petition Date, the Company granted to the Prepetition Royalty Collateral Agent, for the benefit of the Prepetition Royalty Secured Parties, second-priority security interests in and continuing liens on the Prepetition Collateral constituting "Collateral" (as defined in the Prepetition Royalty Agreement) (the "***Prepetition Royalty Collateral***"; such security interests and liens, the "***Prepetition 2L Royalty***

***Liens***" and, together with the Prepetition 2L Notes Liens, the "***Prepetition 2L Liens***"; the Prepetition 2L Liens, together with the Prepetition 1L Liens, the "***Prepetition Liens***"). For the avoidance of doubt, the Prepetition 2L Royalty Liens do not extend to or otherwise encumber any Prepetition Collateral that does not constitute Prepetition Royalty Collateral (such Prepetition Collateral not constituting Prepetition Royalty Collateral, the "***Prepetition Non-Royalty Collateral***").

(xv) *Validity, Perfection, and Priority of Prepetition 2L Royalty Liens and Prepetition Royalty Obligations*. The Debtors acknowledge and agree that as of the Petition Date (a) the Prepetition 2L Royalty Liens on the Prepetition Royalty Collateral were valid, binding, enforceable, non-avoidable, and properly perfected and were granted to, or for the benefit of, the Prepetition Royalty Secured Parties for fair consideration and reasonably equivalent value; (b) the Prepetition 2L Royalty Liens on the Prepetition Royalty Collateral were equal in priority to the Prepetition 2L Notes Liens and senior in priority over any and all other liens on the Prepetition Royalty Collateral, subject only to the Prepetition 1L Liens and the Permitted Prior Liens; (c) the Prepetition Royalty Obligations constitute legal, valid, binding, and non-avoidable obligations of the Debtors enforceable in accordance with the terms of the applicable Prepetition Royalty Documents; (d) no offsets, recoupments, challenges, objections, defenses, claims, or counterclaims by the Debtors of any kind or nature to any of the Prepetition 2L Royalty Liens or Prepetition Royalty Obligations exist, and no portion of the Prepetition 2L Royalty Liens or Prepetition Royalty Obligations is subject to any challenge or defense including avoidance, disallowance, disgorgement, recharacterization, or subordination (equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (e) the Debtors and their estates have no claims, objections, challenges, causes of action, and/or choses in action, including avoidance

claims under chapter 5 of the Bankruptcy Code or applicable state law equivalents or actions for recovery or disgorgement, against any of the Prepetition Royalty Secured Parties or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors, or employees arising out of, based upon, or related to the Prepetition Royalty Facility; and (f) the Debtors have waived, discharged, and released any right to challenge any of the Prepetition Royalty Obligations, the priority of the Debtors' obligations thereunder, and the validity, extent, and priority of the liens securing the Prepetition Royalty Obligations.

(xvi) *Intercreditor Agreement*. Pursuant to that certain Amended and Restated Intercreditor Agreement, dated as of October 10, 2025, among the Prepetition First Lien Agent, the Prepetition Notes Collateral Trustee, and the Prepetition Royalty Collateral Agent, and acknowledged and agreed to by the Company and the other Grantors (as defined therein) (as amended, restated, supplemented, or modified from time to time, the "***1L/2L Intercreditor Agreement***" and, together with the Collateral Trust Agreement, the "***Intercreditor Agreements***"), the parties thereto have agreed, among other things and as more specifically set forth therein, to the relative rights, remedies, interests, obligations, priority, and positions of the Prepetition First Lien Secured Parties, the Prepetition 2028 Secured Parties, the Prepetition 2029 Secured Parties, and the Prepetition Royalty Secured Parties with respect to any shared or common Prepetition Collateral. Pursuant to section 510(a) of the Bankruptcy Code, the Intercreditor Agreements (a) shall remain in full force and effect, (b) shall continue to govern the relative rights, remedies, interests, obligations, priority, and positions of the Prepetition Secured Parties with respect to any shared or common Prepetition Collateral, and (c) shall not be deemed to be amended, altered, or modified by the terms of this Interim Order or the DIP Documents.

(xvii) *No Challenges/Claims*. No offsets, challenges, objections, defenses, claims, or counterclaims of any kind or nature to any of the Prepetition Liens or the Prepetition Secured Obligations exist, and no portion of the Prepetition Liens or the Prepetition Secured Obligations is subject to any challenge or defense including, without limitation, avoidance, disallowance, disgorgement, recharacterization, or subordination (equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law. The Debtors and their estates have no valid Claims (as such term is defined in section 101(5) of the Bankruptcy Code), objections, challenges, causes of action, and/or choses in action against any of the Prepetition Secured Parties or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors, and employees (in each case in such respective capacity) with respect to the Prepetition Secured Documents, the Prepetition Secured Obligations, or the Prepetition Liens, whether arising at law or at equity, including, without limitation, any challenge, recharacterization, subordination, avoidance, recovery, disallowance, reduction, or other claims arising under or pursuant to sections 105, 502, 510, 541, 542 through 553, inclusive, or 558 of the Bankruptcy Code or applicable state law equivalents.

(xviii) *Releases*. Subject to paragraph 36, the Debtors hereby stipulate and agree that they forever and irrevocably release, discharge, and acquit the DIP Agent, the DIP Lenders, all current and future DIP Secured Parties, the Prepetition Secured Parties, and each of their respective successors, assigns, affiliates, subsidiaries, parents, officers, shareholders, directors, employees, attorneys, and agents, past, present, and future, and their respective heirs, predecessors, successors, and assigns, each solely in its capacity as such (collectively, the "***Releasees***"), of and from any and all claims, controversies, disputes, liabilities, obligations, demands, damages, expenses (including, without limitation, reasonable attorneys' fees), debts,

liens, actions, and causes of action of any and every nature whatsoever relating to, as applicable, this Interim Order, the DIP Facility, the DIP Documents, the Prepetition Secured Obligations, the Prepetition Secured Documents, and/or the transactions contemplated hereunder or thereunder including, without limitation, (x) any so-called "lender liability" or equitable subordination or recharacterization claims or defenses, (y) any and all claims and causes of action arising under the Bankruptcy Code, and (z) any and all claims and causes of action with respect to the validity, priority, perfection, or avoidability of the liens or claims of the DIP Secured Parties or any of the Prepetition Secured Parties. The Debtors further waive and release any defense, right of counterclaim, right of set-off, or deduction to the payment of the Prepetition Secured Obligations or the DIP Obligations that the Debtors may now have or may claim to have against the Releasees arising out of, connected with, or relating to any and all acts, omissions, or events occurring prior to the Court's entry of this Interim Order.

**G.** **Cash Collateral**. All of the Debtors' cash, including any cash in their deposit accounts, wherever located, whether as original collateral or proceeds of other Prepetition Collateral, constitutes or will constitute Cash Collateral of the Prepetition First Lien Secured Parties and the Prepetition Notes Secured Parties (and, solely to the extent constituting proceeds of Prepetition Royalty Collateral, the Prepetition Royalty Secured Parties) and, upon entry of this Interim Order, of the DIP Secured Parties, as applicable, in each case subject to the priorities set forth herein and in the Intercreditor Agreements.

**H.** **Findings Regarding Postpetition Financing and Use of Cash Collateral**.

(i) *Request for Postpetition Financing and Use of Cash Collateral*. The Debtors seek authority to (a) enter into the DIP Facility and incur the DIP Obligations on the terms described herein and in the DIP Documents, including the Interim Roll-Up, and (b) use Cash

Collateral on the terms described herein, in each case, to administer their Chapter 11 Cases and fund their operations. At the Final Hearing, the Debtors will seek final approval of the DIP Facility, including the Final Roll-Up, and the use of Cash Collateral pursuant to the proposed Final Order, which shall be in form and substance acceptable to the Required DIP Lenders (as such term is defined in the DIP Term Sheet, the "***Required DIP Lenders***"). Notice of the Final Hearing and the proposed Final Order will be provided in accordance with this Interim Order.

(ii) *Priming of the Prepetition Liens*. The priming of the Prepetition Liens under section 364(d) of the Bankruptcy Code, as contemplated by the DIP Documents and as provided herein, will enable the Debtors to obtain the DIP Facility and to continue to operate their business during the pendency of the Chapter 11 Cases, to the benefit of their estates and creditors. The Prepetition Secured Parties are entitled to receive adequate protection as set forth in this Interim Order pursuant to sections 361, 363, and 364 of the Bankruptcy Code, solely to the extent of any Diminution in Value of their respective interests in the Prepetition Collateral (including Cash Collateral).

(iii) *Need for Postpetition Financing and Use of Cash Collateral*. The Debtors have a need to use Cash Collateral on an interim basis and to obtain credit in an amount equal to the Interim DIP Amount pursuant to the DIP Facility in order to, among other things, enable the orderly continuation of their operations, administer and preserve the value of their estates, and fund the administration of the sale of all or substantially all of the Debtors' assets through closing. The ability of the Debtors to maintain business relationships with their vendors, suppliers, distributors, licensees, and customers, to pay their employees, and to otherwise finance their operations requires the availability of working capital from the DIP Facility and the use of Cash Collateral, the absence of either of which would immediately and irreparably harm the

Debtors, their estates, and parties-in-interest. The Debtors do not have sufficient available sources of working capital and financing to operate their businesses or maintain their properties in the ordinary course of business prior to the entry of the Final Order without the authorization to use Cash Collateral and to borrow the Interim DIP Amount.

(iv) *No Credit Available on More Favorable Terms*. The DIP Facility is the best source of debtor-in-possession financing available to the Debtors. Given their current financial condition, financing arrangements, and capital structure, the Debtors have been and continue to be unable to obtain financing from sources other than the DIP Secured Parties on terms more favorable than the DIP Facility. The Debtors are unable to obtain unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense. The Debtors have also been unable to obtain (a) unsecured credit having priority over that of administrative expenses of the kind specified in sections 503(b), 507(a), and 507(b) of the Bankruptcy Code; (b) credit secured solely by a lien on property of the Debtors and their estates that is not otherwise subject to a lien; or (c) credit secured solely by a junior lien on property of the Debtors and their estates that is subject to a lien. Financing on a postpetition basis on better terms is not available without granting the DIP Agent, for the benefit of itself and the other DIP Secured Parties, (1) perfected security interests in and liens on the DIP Collateral, in each case as provided herein, with the priorities set forth herein; (2) superpriority claims; and (3) the other protections set forth in this Interim Order.

(v) *Use of Cash Collateral and Proceeds of the DIP Facility*. As a condition to entry into the DIP Documents, the extension of credit under the DIP Facility, and the authorization to use the Prepetition Collateral, including Cash Collateral, the DIP Secured Parties and the Prepetition First Lien Secured Parties require, and the Debtors have agreed, that proceeds

of the DIP Facility and Cash Collateral shall be used in a manner consistent with the terms and conditions of this Interim Order and the DIP Documents and in accordance with the budget (as the same may be modified from time to time consistent with the terms of the DIP Documents and subject to such variances and exclusions as permitted in the DIP Documents, and as set forth in paragraphs 17 and 18 hereof, the "***Budget***"),[4] solely for the purposes set forth in the DIP Documents and this Interim Order.

(vi) *Application of Proceeds of DIP Collateral.* As a condition to entry into the DIP Term Sheet and the other DIP Documents, the extension of credit under the DIP Facility, and the authorization to use Cash Collateral, the Debtors and the DIP Secured Parties have agreed that as of and commencing on the date of the Interim Hearing, the Debtors shall utilize the proceeds of the DIP Collateral in accordance with this Interim Order.

**I.** **Adequate Protection**. Each of the Prepetition First Lien Secured Parties, the Prepetition Notes Secured Parties, and the Prepetition Royalty Secured Parties is entitled to receive adequate protection solely to the extent of any Diminution in Value of its interests in the Prepetition Collateral, including, without limitation, the Cash Collateral. Pursuant to sections 361, 363, and 507(b) of the Bankruptcy Code, as adequate protection, subject in all respects to the Carve-Out and subject to paragraph 36 of this Interim Order, the Prepetition First Lien Secured Parties, the Prepetition Notes Secured Parties, and the Prepetition Royalty Secured Parties will receive (i) Adequate Protection Liens and 507(b) Claims (each as defined below) with the relative priorities set forth on **Exhibit B** hereto, (ii) current payment of reasonable fees, expenses, and other disbursements as set forth in paragraph 33 herein, and (iii) financial and other reporting, in each case as more fully set forth in paragraphs 13, 14, and 15 herein.

[4] A copy of the initial Budget is attached hereto as **Schedule 1**.

J. **Interim Roll-Up**. The Interim Roll-Up is an integral and inextricable component of the DIP Facility, and the Prepetition First Lien Secured Parties would not have otherwise consented to the use of the Prepetition Collateral (including the Cash Collateral) or the subordination of the Prepetition 1L Liens to the DIP Liens and the Carve-Out (in each case as set forth in this Interim Order), and the DIP Secured Parties would not otherwise be willing to provide the DIP Facility or extend credit to the Debtors thereunder, without the inclusion of the Interim Roll-Up. The Interim Roll-Up is authorized as compensation for, in consideration for, and solely on account of, the agreement of the DIP Lenders to fund the New Money DIP Loans and to permit the Debtors' use of Cash Collateral, and not as payments under, adequate protection for, or otherwise on account of, any Prepetition First Lien Obligations. The Interim Roll-Up will enable the Debtors to obtain urgently needed financing to fund the administration of the Chapter 11 Cases.

K. **Deemed Request for Adequate Protection and Relief from the Automatic Stay**. For all adequate protection purposes throughout the Chapter 11 Cases and any Successor Cases, each of the Prepetition Secured Parties shall be deemed to have requested relief from the automatic stay and adequate protection for any Diminution in Value from and after the Petition Date. For the avoidance of doubt, such request shall survive the termination of this Interim Order.

L. **Budget; No Control**. The Budget annexed hereto as **Schedule 1** has been thoroughly reviewed by the Debtors and their management and advisors and sets forth the projected cash receipts and disbursements of the Debtors for the periods covered thereby, and the Debtors believe in good faith that the Budget is achievable in accordance with the terms of the DIP Documents and this Interim Order. The DIP Secured Parties and the Prepetition First Lien Secured Parties are relying upon the Debtors' compliance with the Milestones (as defined in the

Restructuring Support Agreement), the Budget, and the other terms of the DIP Documents and this Interim Order in determining to enter into the postpetition financing and credit arrangements provided for herein. None of the DIP Secured Parties or the Prepetition Secured Parties controls the Debtors or their properties or operations, has authority to determine the manner in which the Debtors' operations are conducted, or is a control person or insider of any of the Debtors by virtue of any of the actions taken with respect to, in connection with, related to, or arising from the DIP Facility, the use of Cash Collateral, or this Interim Order.

**M. Sections 506(c) and 552(b).** In light of (i) the DIP Secured Parties' agreement that their liens and superpriority claims shall be subject to the Carve-Out; (ii) the Prepetition Secured Parties' agreement that their respective liens and claims, including any adequate protection liens and claims, shall be subject to the Carve-Out and subordinate to the DIP Liens (as defined below) as set forth herein; and (iii) the DIP Secured Parties' and the Prepetition Secured Parties' agreement to the payment (in accordance with the Budget (subject to the Permitted Variances (as defined below) and exclusions set forth herein) and subject to the terms and conditions of this Interim Order and the DIP Documents) of certain expenses of administration of these Chapter 11 Cases, upon entry of the Final Order, (a) the Prepetition Secured Parties seek a waiver of any "equities of the case" exception under section 552(b) of the Bankruptcy Code and (b) the DIP Secured Parties and the Prepetition Secured Parties each seek a waiver of the provisions of section 506(c) of the Bankruptcy Code.

**N. Good Faith of the DIP Secured Parties and the Prepetition Secured Parties.**

(i) Based upon the pleadings and proceedings of record in the Chapter 11 Cases, (a) the extensions of credit under the DIP Facility (including the Interim Roll-

Up Loans pursuant to this Interim Order) are fair and reasonable, are appropriate for secured financing to debtors in possession, are the best available to the Debtors under the circumstances, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair consideration; (b) the terms and conditions of the DIP Facility and the use of the Cash Collateral have been negotiated in good faith and at arm's length among the Debtors, the DIP Secured Parties, and the Prepetition Secured Parties with the assistance and counsel of their respective advisors; (c) the Debtors' use of Cash Collateral, including, without limitation, pursuant to this Interim Order, has been consented to in "good faith" within the meaning of section 364(e) of the Bankruptcy Code; (d) any credit to be extended, loans to be made (including the Interim Roll-Up Loans), and other financial accommodations to be extended to the Debtors by the DIP Secured Parties and the Prepetition Secured Parties, including, without limitation, pursuant to this Interim Order, have been allowed, advanced, extended, issued, or made, as the case may be, in "good faith" within the meaning of section 364(e) of the Bankruptcy Code by the DIP Secured Parties and the Prepetition Secured Parties in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code; and (e) the DIP Facility, the DIP Liens (as defined below), the DIP Superpriority Claims (as defined below), the Adequate Protection Liens, and the 507(b) Claims (each as defined below) shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated, reversed, or modified, on appeal or otherwise.

(ii) The Prepetition Secured Parties have consented to, or are deemed to have consented to, (a) the Debtors' use of Prepetition Collateral (including the Cash Collateral), solely to the extent expressly permitted under the Budget, and (b) the Debtors' entry into the DIP

Facility, the granting of the DIP Liens, the incurrence of the DIP Obligations, the DIP Superpriority Claims, the subordination of the Prepetition Liens to the DIP Liens and the Carve-Out, the Adequate Protection Liens, the 507(b) Claims (each as defined below), and the other Adequate Protection Obligations, in each case, in accordance with and subject to the terms and conditions set forth in this Interim Order and the DIP Documents.

**O.** **Immediate Entry**. Sufficient cause exists for immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(b)(2) and Bankruptcy Rule 4001(c)(2).

**P.** **Interim Hearing**. Notice of the Interim Hearing and the relief requested in the Motion has been provided by the Debtors, whether by facsimile, electronic mail, overnight courier, or hand delivery to certain parties in interest, including the Notice Parties (as defined in the Motion). The Debtors have made reasonable efforts to afford the best notice possible under the circumstances, and no other notice is required in connection with the relief set forth in this Interim Order.

Based upon the foregoing findings and conclusions, the Motion, and the record before the Court with respect to the Motion, and after due consideration and good and sufficient cause appearing therefor, **IT IS HEREBY ORDERED THAT**:

1. DIP Facility Approved on Interim Basis. The Motion is granted on an interim basis as set forth herein. The DIP Facility, in an amount equal to the Interim DIP Amount (together with the Interim Roll-Up Loans), is hereby authorized and approved to the extent set forth herein, and the use of Cash Collateral on an interim basis is authorized, in each case subject to the terms and conditions set forth in the DIP Documents and this Interim Order. All objections to this Interim Order, and all reservations of rights inconsistent with this Interim Order, to the extent not withdrawn, waived, settled, or resolved, are hereby denied and overruled. This Interim Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be fully enforceable immediately upon its entry. Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062, and 9014, or any other Bankruptcy Rule or Local Rule, any stay of the effectiveness or enforceability of this Interim Order is hereby waived and shall not apply, and the Debtors and the DIP Secured Parties are authorized to consummate the transactions contemplated hereby immediately upon entry hereof.

2. Authorization of the DIP Facility. The DIP Facility is hereby approved as set forth herein. The Debtors are expressly and immediately authorized and empowered to execute and deliver the DIP Documents and to incur and to perform the DIP Obligations in accordance with, and subject to, the terms of this Interim Order and the DIP Documents, and to deliver all instruments, certificates, agreements, and documents that may be required or necessary for the performance by the Debtors under the DIP Facility and the creation and perfection of the DIP Liens (as defined below). All collections and proceeds, whether from ordinary course collections, asset sales, debt or equity issuances, insurance recoveries, condemnations, or otherwise, will be deposited and applied as required by this Interim Order and the DIP Documents. Upon entry of this Interim Order and execution and delivery of any DIP Documents, such applicable DIP

Documents shall represent valid and binding obligations of the Debtors, enforceable against each of the Debtors and their estates in accordance with their terms. Upon the Closing Date (as defined in the DIP Documents), the DIP Obligations shall bear interest, and all fees in respect of the DIP Facility (including any exit and similar fees) shall be fully earned and non-refundable, in each case, at the rates, in the amounts, at the times, and in the manner set forth in the DIP Documents and/or one or more fee letters entered into in connection therewith (each of which may be provided to the Court, the U.S. Trustee, and counsel to any Committee (if appointed), and may be filed under seal to the extent authorized by the Court). The Debtors shall pay, in accordance with this Interim Order, the principal, interest, premiums, fees, payments, expenses, and other amounts described in the DIP Documents as such amounts become due and payable, without need to obtain further Court approval, whether or not such amounts arose before, on, or after the Petition Date, and whether or not the transactions contemplated hereby are consummated, including, without limitation, exit fees (including all fees and other amounts owed to the DIP Secured Parties), administrative agent's fees and collateral agent's fees (including all fees and other amounts owed to the DIP Agent), and the reasonable fees and disbursements of the DIP Secured Parties, including the reasonable and documented fees and disbursements of counsel and other professionals, whether or not such fees arose before, on, or after the Petition Date, in accordance with this Interim Order or the DIP Documents.

3. Authorization to Borrow. To prevent immediate and irreparable harm to the Debtors' estates, from the entry of this Interim Order through and including the earlier to occur of (i) entry of the Final Order and (ii) the DIP Termination Date (as defined below), and subject to the terms, conditions, and limitations on availability set forth in the DIP Documents and this

Interim Order, the Debtors are hereby authorized to borrow New Money DIP Loans under the DIP Facility in an aggregate outstanding principal amount equal to the Interim DIP Amount.

4. Amendment of the DIP Documents. The DIP Documents may from time to time be amended, modified, or supplemented by the parties thereto in accordance with the DIP Documents, and no further approval of this Court shall be required for any amendment, waiver, supplement, or other modification to and under the DIP Documents (and any fees paid in connection therewith) that is not material. In the case of an amendment, modification, or supplement to the DIP Documents that is material, the Debtors shall (i) provide notice (which may be provided through electronic mail or facsimile) to counsel to any Committee (if appointed), the U.S. Trustee, the DIP Secured Parties, the Prepetition First Lien Agent, the Prepetition 2028 Notes Trustee, the Prepetition 2029 Notes Trustee, the Prepetition Royalty Collateral Agent, and the Ad Hoc Group Advisors (as defined herein); (ii) provide notice to the Court; and (iii) if an objection is filed within three (3) business days after such notice, obtain approval of the Court. For the avoidance of doubt, the extension of a Milestone shall not constitute a material amendment, modification, or supplement to the DIP Documents. Notwithstanding the foregoing, no amendment, modification, supplement, or waiver of the DIP Documents or this Interim Order that affects the rights, duties, obligations, protections, immunities, or indemnities of the DIP Agent shall be effective without the prior written consent of the DIP Agent.

5. DIP Obligations.

(a) Upon entry of this Interim Order, this Interim Order shall, and upon execution and delivery of any DIP Documents, such DIP Documents shall, constitute and evidence the validity and binding effect of the DIP Obligations, which shall be enforceable against the Debtors, their estates, and any successors thereto, including, without limitation, any trustee

appointed in the Chapter 11 Cases or in any case under chapter 7 of the Bankruptcy Code upon the conversion of any of the Chapter 11 Cases, or in any other proceedings superseding or related to any of the foregoing (collectively, the "***Successor Cases***"). Upon entry of this Interim Order, the DIP Obligations will include all loans and any other indebtedness or obligations, contingent or absolute, which may now or from time to time be owing by any of the Debtors to the DIP Agent or any of the DIP Secured Parties, in such capacities, in each case, under the DIP Documents (if any) or this Interim Order or secured by the DIP Liens (as defined below), including, without limitation, all principal, accrued and unpaid interest, costs, fees, premiums, expenses, and other amounts owing under the DIP Documents. The Debtors shall be jointly and severally liable for the DIP Obligations. The DIP Obligations shall be due and payable, and the use of Cash Collateral shall automatically cease, in each case, without notice or demand on the DIP Termination Date, except as provided in paragraph 26 herein and subject to the requirements of the Carve-Out. No obligation, payment, transfer, or grant of collateral security hereunder or under the DIP Documents (including any DIP Obligation or DIP Liens (as defined below)) to or for the benefit of the DIP Secured Parties shall be stayed, restrained, voidable, avoidable, or recoverable under the Bankruptcy Code or under any applicable law (including, without limitation, under chapter 5 of the Bankruptcy Code, section 724(a) of the Bankruptcy Code, or any other provision with respect to avoidance actions under the Bankruptcy Code or applicable state law equivalents) or subject to any avoidance, reduction, setoff, recoupment, offset, recharacterization, subordination (whether equitable, contractual, or otherwise, but other than to the Carve-Out), counterclaim, cross-claim, defense, or any other challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity.

6. Interim Roll-Up. Upon entry of this Interim Order and the occurrence of the Closing Date (as defined in the DIP Term Sheet), automatically and without any further action by the Debtors, the Court, or any other party, Prepetition First Lien Loans held by those DIP Lenders that fund New Money DIP Loans in the Initial Draw (or any of their respective designated affiliates or managed or controlled funds) shall be converted on a cashless basis into Interim Roll-Up Loans at a ratio of $1.00 of Prepetition First Lien Loans for each $1.00 of the principal amount of New Money DIP Loans funded by such DIP Lender in the Initial Draw. The converted Prepetition First Lien Obligations shall automatically be substituted and exchanged for, and shall be deemed to be, DIP Obligations constituting Second-Out Roll-Up DIP Obligations, for all purposes hereunder, and shall not be subject to any contest, attack, objection, challenge, defense, claim, counterclaim, or cause of action of any nature or description whatsoever (other than as set forth in paragraph 36 hereof), and such Second-Out Roll-Up DIP Obligations shall be due and payable in accordance with the terms and conditions set forth in the DIP Documents as if originally funded thereunder on the Closing Date. From and after the Closing Date, but subject to paragraph 36 hereof, the outstanding aggregate amount of Prepetition First Lien Obligations held by each such DIP Lender (or any of its designated affiliates or managed or controlled funds) shall be automatically deemed reduced by the amount of the Interim Roll-Up Loans held by such DIP Lender (or any of its designated affiliates or managed or controlled funds). For the avoidance of doubt, the Interim Roll-Up Loans and the Second-Out Roll-Up DIP Obligations in respect thereof shall be subordinated to the payment in full of the First-Out New Money DIP Obligations in accordance with the DIP Documents. For the avoidance of doubt, no Prepetition 2028 Notes Obligations, Prepetition 2029 Notes Obligations, or Prepetition Royalty Obligations shall be included in,

refinanced, converted, rolled up, or otherwise deemed satisfied in connection with the Interim Roll-Up or the Final Roll-Up.

7. DIP Liens. As security for the DIP Obligations, effective immediately upon entry of this Interim Order, pursuant to sections 361, 362, 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, the DIP Agent, for the benefit of itself and the other DIP Secured Parties, is hereby granted valid, binding, continuing, enforceable, non-avoidable, and automatically and properly perfected security interests and liens on all real and personal property, whether now existing or hereafter arising and wherever located, tangible or intangible, of each of the Debtors (the "***DIP Collateral***") including, without limitation, (a) all cash, cash equivalents, deposit accounts, securities accounts, accounts, other receivables (including credit card receivables), chattel paper, contract rights, inventory (wherever located), instruments (including, without limitation, promissory notes), documents, securities (whether or not marketable), and investment property (including, without limitation, all of the issued and outstanding capital stock of each of the Debtors' subsidiaries, all securities accounts and security entitlements related thereto, and financial assets carried therein, and all commodity accounts and commodity contracts), hedge agreements, furniture, fixtures, equipment (including documents of title), goods, vehicles, franchise rights, trade names, trademarks and trademark licenses, service marks, copyrights and copyright licenses, patents and patent licenses, license rights, regulatory approvals and applications (including all new drug applications, supplemental new drug applications, and marketing authorizations), intellectual property, general intangibles (including, for the avoidance of doubt, payment intangibles and hedging arrangements), rights to the payment of money (including, without limitation, tax refunds and any other extraordinary payments), royalty and revenue interests, supporting obligations, guarantees, letter of credit rights, commercial tort claims,

causes of action, all substitutions and replacements for any of the foregoing, indemnification rights, all present and future intercompany debt, fee interests in real property owned by the Debtors, leasehold interests in real property leased by the Debtors, books, records, ledger cards, files, correspondence, customer lists, blueprints, technical specifications, manuals, computer software, computer printouts, tapes, disks, and other electronic storage media and related data processing software related to the foregoing, and accessions, products, rents, profits, and proceeds of the foregoing, wherever located, including insurance or other proceeds; (b) all owned real property interests and all proceeds of leased real property; (c) actions brought under section 549 of the Bankruptcy Code to recover any postpetition transfer of DIP Collateral; (d) subject to entry of the Final Order, the proceeds of any avoidance actions (such actions, "***Avoidance Actions***") brought pursuant to chapter 5 of the Bankruptcy Code (the "***Avoidance Action Proceeds***"); provided, that no liens shall attach to Avoidance Actions; (e) subject to entry of the Final Order, the proceeds of any exercise of the Debtors' rights under sections 506(c) and 550 of the Bankruptcy Code; (f) all assets and other property of the Debtors (including, without limitation, all equity in non-U.S. subsidiaries of the Debtors) that are not otherwise subject to valid, perfected, enforceable, and unavoidable security interests or liens in existence as of the Petition Date or valid liens perfected (but not granted) after the Petition Date (to the extent such perfection in respect of a prepetition claim is expressly permitted under the Bankruptcy Code) (this clause (f), the "***Unencumbered Collateral***"); and (g) all proceeds and products of the foregoing, in each case subject and subordinate to the Carve-Out and the Permitted Prior Liens, as set forth in this Interim Order and in accordance with the priorities set forth in **Exhibit B** hereto (all such liens and security

interests granted to the DIP Agent, for its benefit and for the benefit of the other DIP Secured Parties, pursuant to this Interim Order and the DIP Documents, the "***DIP Liens***").[5]

8. DIP Lien Priority. The DIP Liens securing the DIP Obligations are valid, automatically perfected, non-avoidable, senior in priority to the Prepetition Liens on the Prepetition Collateral, and superior to any security, mortgage, collateral interest, lien, or claim to any of the DIP Collateral (whether currently existing or hereafter created), except that the DIP Liens shall be subject and subordinate only to the Carve-Out and the Permitted Prior Liens, in each case with the priorities set forth on **Exhibit B** hereto. Other than as set forth herein (including with respect to the Carve-Out and as set forth on **Exhibit B** hereto) or permitted under the DIP Documents, the DIP Liens shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereafter granted in the Chapter 11 Cases or any Successor Cases and shall be valid and enforceable against any trustee appointed in the Chapter 11 Cases or any Successor Cases, upon the conversion of any of the Chapter 11 Cases to any Successor Case, and/or upon the dismissal of any of the Chapter 11 Cases or Successor Cases. The DIP Liens shall not be subject to any of sections 510, 549, or 550 of the Bankruptcy Code. The DIP Liens shall not be subject or subordinate to (i) any lien or security interest arising or granted after the Petition Date, including, without limitation, any lien or security interest granted in favor of any federal, state, municipal, or other governmental unit, commission, board, agency, or court for any liability of the Debtors, (ii) any intercompany or affiliate lien or claim of the Debtors or any of their affiliates, or (iii) any lien or security interest that is avoided and preserved for the benefit of the Debtors or their estates pursuant to section 551 of the Bankruptcy Code.

---

[5] In the event of any conflict between the text of this Interim Order and the illustrative chart contained in **Exhibit B** hereto, the text of this Interim Order shall control.

9. DIP Superpriority Claims. Subject and subordinate only to the Carve-Out, upon entry of this Interim Order, the DIP Agent, on its own behalf and on behalf of the other DIP Secured Parties, is hereby granted, pursuant to section 364(c)(1) of the Bankruptcy Code, allowed superpriority administrative expense claims in each of the Chapter 11 Cases and any Successor Cases (collectively, the "***DIP Superpriority Claims***") for all DIP Obligations (a) with priority over any and all administrative expense claims and unsecured claims against the Debtors or their estates in any of the Chapter 11 Cases or any Successor Cases, at any time existing or arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 327, 328, 330, 331, 361, 362, 363, 364, 503(a), 503(b), 507(a), 507(b), 546(c), 546(d), 726, 1113, or 1114 of the Bankruptcy Code or any other provision of the Bankruptcy Code and (b) which shall at all times be senior to the rights of the Debtors and their estates, and any successor trustee or other estate representative to the extent permitted by law, in each case with the priorities set forth on **Exhibit B** hereto. The DIP Superpriority Claims shall be payable from, and have recourse to, all DIP Collateral and all proceeds thereof, including all Cash Collateral and, subject to entry of the Final Order, the Avoidance Action Proceeds. Other than the Carve-Out and as expressly set forth in this Interim Order, no claim having a priority senior to, or *pari passu* with, the DIP Superpriority Claims shall be granted or allowed in any of the Chapter 11 Cases or any Successor Cases for so long as any DIP Obligations remain outstanding.

10. No Obligation to Extend Credit. The DIP Secured Parties shall have no obligation to make any loan or advance under the DIP Documents unless (and subject to the occurrence of the Closing Date) all of the conditions precedent to the making of such extension of

credit under the DIP Documents and this Interim Order have been satisfied in full or waived by the Required DIP Lenders in accordance with the terms of the DIP Documents.

11. Use of Proceeds of DIP Facility. From and after the Closing Date, the Debtors shall use proceeds of borrowings under the DIP Facility only for the purposes specifically set forth in this Interim Order and the DIP Documents, and, in each case, in compliance with the Budget (subject to any Permitted Variances (as defined in the DIP Term Sheet, the "***Permitted Variances***") and the exclusions set forth herein) and the terms and conditions in this Interim Order and the DIP Documents.

12. Authorization to Use Cash Collateral. Subject to the terms and conditions of this Interim Order (including paragraph 29 hereof) and the DIP Documents, and in accordance with the Budget (subject to the Permitted Variances and the exclusions set forth herein), the Debtors are authorized to use Cash Collateral until the DIP Termination Date. Nothing in this Interim Order shall authorize the disposition of any assets of the Debtors or their estates outside the ordinary course of business, or any Debtor's use of any Cash Collateral or other proceeds resulting therefrom, except as permitted in this Interim Order (including with respect to the Carve-Out), the DIP Facility, or the DIP Documents, and in accordance with the Budget (subject to the Permitted Variances and the exclusions set forth herein). The Debtors' use of Cash Collateral and other Prepetition Collateral is based on the consent (or deemed consent) of the DIP Secured Parties and the Prepetition Secured Parties to such use. Nothing herein or in any DIP Document shall be deemed to constitute sufficient adequate protection in connection with any proposed non-consensual use of Cash Collateral and other Prepetition Collateral.

13. Adequate Protection for the Prepetition First Lien Secured Parties. The Prepetition First Lien Secured Parties are entitled, pursuant to sections 361, 362, 363(c)(2), 363(e),

and 507 of the Bankruptcy Code, to adequate protection of their interests in the Prepetition Collateral, including the Cash Collateral, solely to the extent of any Diminution in Value of their interests in the Prepetition Collateral (the "***First Lien Adequate Protection Obligations***"). As adequate protection, the Prepetition First Lien Secured Parties are hereby granted the following:

(a) First Lien Adequate Protection Liens. As security for the payment of the First Lien Adequate Protection Obligations, the Prepetition First Lien Agent (for itself and for the benefit of the other Prepetition First Lien Secured Parties) is hereby granted (effective and perfected upon the date of this Interim Order and without the necessity of the execution by the Debtors of security agreements, pledge agreements, mortgages, financing statements, or other agreements) valid, perfected replacement security interests in and liens on all DIP Collateral, including, upon entry of the Final Order, the Avoidance Action Proceeds (the "***First Lien Adequate Protection Liens***"), subject and subordinate only to (i) the Carve-Out, (ii) the DIP Liens, and (iii) the Permitted Prior Liens, and with the priorities set forth on **Exhibit B** hereto, in each case subject to the Intercreditor Agreements.

(b) First Lien Section 507(b) Claims. The First Lien Adequate Protection Obligations shall constitute superpriority claims as provided in section 507(b) of the Bankruptcy Code (the "***First Lien 507(b) Claims***"), with priority in payment over any and all administrative expenses of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including, without limitation, sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726, 1113, or 1114 of the Bankruptcy Code, subject and subordinate only to (i) the Carve-Out and (ii) the DIP Superpriority Claims, and with the priorities set forth on **Exhibit B** hereto, in each case subject to the Intercreditor Agreements.

(c) First Lien Adequate Protection Payments. The Debtors shall, as adequate protection, (i) pay in cash, on a monthly basis, all reasonable and documented out-of-pocket fees and expenses (whether accruing before or after the Petition Date), including the professional fees of the Secured Party Advisors (as defined below) and all fees, expenses, and indemnities payable to the Prepetition First Lien Agent under the Prepetition First Lien Documents (including any fee letter and the reasonable and documented fees and expenses of its counsel), in each case without the need for the filing of formal fee applications (but subject to paragraph 33 hereof), and (ii) pay-in-kind interest on the Prepetition First Lien Obligations at (x) prior to the Petition Date, the Term Loan Default Rate under and as defined in the September 2026 Forbearance Agreement and (y) from and after the Petition Date, the Default Rate under and as defined in the Prepetition First Lien Credit Agreement.

(d) Information. The Debtors shall concurrently deliver to the Prepetition First Lien Secured Parties and to the legal and financial advisors to the ad hoc group of Prepetition First Lien Lenders, Prepetition 2028 Noteholders, Prepetition 2029 Noteholders, and DIP Lenders (the "***Ad Hoc Group***"), including Latham & Watkins LLP, Haynes and Boone, LLP, and Houlihan Lokey Capital, Inc. (such advisors, the "***Ad Hoc Group Advisors***"), all information, reports, documents, and other materials that the Debtors provide to the DIP Secured Parties pursuant to the DIP Documents, this Interim Order, and the Final Order, subject to the confidentiality provisions of the DIP Documents; provided, that the Debtors shall not be required to share any confidential information or materials that would constitute a waiver of any privilege, violate applicable law, or, where the recipient is, or is an affiliate of, a person acting in a Bidder Capacity (as defined in the Restructuring Support Agreement), include confidential materials relating to the Debtors' marketing and sale process; provided, further, that the recipient of such

confidential information or materials may not share information or materials that relate to the Debtors' marketing and sale process with any party that is, or is the affiliate of, a party acting in a Bidder Capacity (as defined in the Restructuring Support Agreement).

14. Adequate Protection for the Prepetition Notes Secured Parties. The Prepetition Notes Secured Parties are entitled, pursuant to sections 361, 362, 363(c)(2), 363(e), and 507 of the Bankruptcy Code, to adequate protection of their interests in the Prepetition Collateral, including the Cash Collateral, solely to the extent of any Diminution in Value of their interests in the Prepetition Collateral (the "***Notes Adequate Protection Obligations***"). As adequate protection, the Prepetition Notes Secured Parties are hereby granted the following:

(a) Notes Adequate Protection Liens. As security for the payment of the Notes Adequate Protection Obligations, the Prepetition Notes Collateral Trustee (for itself and for the benefit of the other Prepetition Notes Secured Parties) is hereby granted (effective and perfected upon the date of this Interim Order and without the necessity of the execution by the Debtors of security agreements, pledge agreements, mortgages, financing statements, or other agreements) valid, perfected replacement security interests in and liens on all DIP Collateral, including, upon entry of the Final Order, the Avoidance Action Proceeds (collectively, the "***Notes Adequate Protection Liens***"), subject and subordinate only to (i) the Carve-Out, (ii) the DIP Liens, (iii) the Permitted Prior Liens, (iv) the Prepetition 1L Liens, and (v) the First Lien Adequate Protection Liens, with the priorities set forth on **Exhibit B** hereto, in each case subject to the Intercreditor Agreements.

(b) Notes Section 507(b) Claims. The Notes Adequate Protection Obligations shall constitute superpriority claims as provided in section 507(b) of the Bankruptcy Code (collectively, the "***Notes 507(b) Claims***"), with priority in payment over any and all

administrative expenses of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including, without limitation, sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726, 1113, or 1114 of the Bankruptcy Code, subject and subordinate only to (i) the Carve-Out, (ii) the DIP Superpriority Claims, and (iii) the First Lien 507(b) Claims, and with the priorities set forth on **Exhibit B** hereto, in each case subject to the Intercreditor Agreements; provided, however, that the Prepetition Notes Secured Parties shall be deemed to have irrevocably agreed, pursuant to section 1129(a)(9) of the Bankruptcy Code, that the Notes 507(b) Claims may be paid under any plan of reorganization in any combination of cash, debt, equity, or other property having a value, as of the effective date of such plan, equal to the allowed amount of the Notes 507(b) Claims; provided, further, that the foregoing shall not apply to any fees, expenses, and indemnities owing to the Prepetition 2028 Notes Trustee, the Prepetition 2029 Notes Trustee, or the Prepetition Notes Collateral Trustee for their own account in their capacities as such, which shall be paid in full in cash on or before the effective date of any such plan, without prejudice to any charging lien under the Prepetition Notes Documents or the Collateral Trust Agreement.

(c) Notes Adequate Protection Payments. The Debtors shall, as adequate protection, (i) pay in cash, on a monthly basis, all reasonable and documented out-of-pocket fees and expenses (whether accruing before or after the Petition Date), including the professional fees of the Secured Party Advisors (as defined below) and all fees, expenses, and indemnities payable to the Prepetition 2028 Notes Trustee, the Prepetition 2029 Notes Trustee, or the Prepetition Notes Collateral Trustee under the Prepetition Notes Documents or the Collateral Trust Agreement (including any fee letter and the reasonable and documented fees and expenses

of its counsel), in each case without the need for the filing of formal fee applications (but subject to paragraph 33 hereof), and (ii) pay-in-kind interest on the Prepetition 2028 Notes Obligations.

(d) Information. The Debtors shall concurrently deliver to the Prepetition Notes Collateral Trustee and the Ad Hoc Group Advisors all information, reports, documents, and other materials that the Debtors provide to the DIP Secured Parties pursuant to the DIP Documents, this Interim Order, and the Final Order; provided, that the Debtors shall not be required to share any confidential information or materials that would constitute a waiver of any privilege, violate applicable law, or, where the recipient is, or is an affiliate of, a party acting in a Bidder Capacity (as defined in the Restructuring Support Agreement), include confidential materials relating to the Debtors' marketing and sale process; provided, further, that the recipient of such confidential information or materials may not share information or materials that relate to the Debtors' marketing and sale process with any party that is, or is an affiliate of, a party acting in a Bidder Capacity (as defined in the Restructuring Support Agreement).

15. Adequate Protection for the Prepetition Royalty Secured Parties. The Prepetition Royalty Secured Parties are entitled, pursuant to sections 361, 362, 363(c)(2), 363(e), and 507 of the Bankruptcy Code, to adequate protection of their interests in the Prepetition Collateral, including the Cash Collateral, solely to the extent of any Diminution in Value of their interests in the Prepetition Collateral (the "***Royalty Adequate Protection Obligations***" and, together with the First Lien Adequate Protection Obligations and the Notes Adequate Protection Obligations, the "***Adequate Protection Obligations***"). As adequate protection, the Prepetition Royalty Secured Parties are hereby granted the following:

(a) Royalty Adequate Protection Liens. As security for the payment of the Royalty Adequate Protection Obligations, the Prepetition Royalty Collateral Agent (for itself

and for the benefit of the other Prepetition Royalty Secured Parties) is hereby granted (effective and perfected upon the date of this Interim Order and without the necessity of the execution by the Debtors of security agreements, pledge agreements, mortgages, financing statements, or other agreements) valid, perfected replacement security interests in and liens on all DIP Collateral, including, upon entry of the Final Order, the Avoidance Action Proceeds (collectively, the "***Royalty Adequate Protection Liens***" and, together with the First Lien Adequate Protection Liens and the Notes Adequate Protection Liens, the "***Adequate Protection Liens***"), subject and subordinate only to (i) the Carve-Out, (ii) the DIP Liens, (iii) the Permitted Prior Liens, (iv) the Prepetition 1L Liens, (v) the First Lien Adequate Protection Liens, and (vi) solely with respect to the Prepetition Non-Royalty Collateral, the Notes Adequate Protection Liens and the Prepetition 2L Notes Liens, in each case with the relative priorities set forth on **Exhibit B** hereto and subject to the Intercreditor Agreements.

(b) Royalty Section 507(b) Claims. The Royalty Adequate Protection Obligations shall constitute superpriority claims as provided in section 507(b) of the Bankruptcy Code (collectively, the "***Royalty 507(b) Claims***" and, together with the First Lien 507(b) Claims and the Notes 507(b) Claims, the "***507(b) Claims***"), with priority in payment over any and all administrative expenses of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including, without limitation, sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726, 1113, or 1114 of the Bankruptcy Code, subject and subordinate only to (i) the Carve-Out, (ii) the DIP Superpriority Claims, and (iii) the First Lien 507(b) Claims, and with the priorities set forth on **Exhibit B** hereto, in each case subject to the Intercreditor Agreements; provided, however, that the Prepetition Royalty Secured Parties shall be deemed to have irrevocably agreed, pursuant to section 1129(a)(9) of the Bankruptcy Code, that

the Royalty 507(b) Claims may be paid under any plan of reorganization in any combination of cash, debt, equity, or other property having a value, as of the effective date of such plan, equal to the allowed amount of the Royalty 507(b) Claims.

(c) Royalty Adequate Protection Payments. The Debtors shall, as adequate protection, pay in cash, on a monthly basis, all reasonable and documented out-of-pocket fees and expenses (whether accruing before or after the Petition Date), including the professional fees of the Secured Party Advisors (as defined below), which shall consist of (a) reasonable and documented accrued and unpaid fees for counsel, subject to objection only if in excess of $600,000, (b) with respect to a financial advisor, monthly fees of $150,000, solely to the extent accruing from the Petition Date until the closing date of the Ayrmid Transaction or Acceptable Alternative Transaction (each as defined in the Restructuring Support Agreement), as applicable, and (c) with respect to a financial advisor, solely in the event of the consummation of an Acceptable Alternative Transaction (as defined in the Restructuring Support Agreement) that results in transaction proceeds, (i) if transaction proceeds are sufficient to pay all Funded Debt (as defined in the Restructuring Support Agreement) outstanding in full and in cash, then a $1,000,000 deferred fee, or (ii) if transaction proceeds are insufficient to pay all Funded Debt outstanding in full in cash, then a $500,000 deferred fee, in each case payable upon consummation of such Acceptable Alternative Transaction and, in each case, solely from the proceeds thereof; provided, in each case of the foregoing, without the need for the filing of formal fee applications (but subject to paragraph 33 hereof); provided, that the rights of the Prepetition Royalty Secured Parties to assert, and of all parties in interest to contest, any claim for postpetition interest under section 506(b) of the Bankruptcy Code are reserved.

(d) Information. The Debtors shall concurrently deliver to the Prepetition Royalty Secured Parties and their respective advisors all information, reports, documents, and other materials that the Debtors provide to the DIP Secured Parties pursuant to the DIP Documents, this Interim Order, and the Final Order; provided, that the Debtors shall not be required to share any confidential information or materials that would constitute a waiver of any privilege, violate applicable law, or, where the recipient is, or is an affiliate of, a party acting in a Bidder Capacity, include materials relating to the Debtors' marketing and sale process; provided, further, that the recipient of such confidential information or materials may not share confidential information or materials that relate to the Debtors' marketing and sale process with any party that is, or is an affiliate of, a party acting in a Bidder Capacity.

16. Adequate Protection Reservation. Subject to the Carve-Out, nothing herein shall impair or modify the application of section 507(b) of the Bankruptcy Code in the event that the adequate protection provided to the Prepetition Secured Parties hereunder is insufficient to compensate for any Diminution in Value of their respective interests in the Prepetition Collateral during the Chapter 11 Cases or any Successor Cases. The receipt by the Prepetition Secured Parties of the adequate protection provided pursuant to this Interim Order shall not be deemed an admission that the interests of the Prepetition Secured Parties are adequately protected. Further, this Interim Order shall not prejudice or limit the rights of the Prepetition Secured Parties to seek additional relief with respect to the use of Cash Collateral or for additional adequate protection. Except to the extent expressly set forth in this Interim Order, none of the Prepetition Secured Parties shall receive or retain any payments, property, or other amounts in respect of the 507(b) Claims unless and until all DIP Obligations (excluding contingent indemnification obligations for which no claim has been asserted) have been indefeasibly paid in full in cash.

17. Budget Maintenance. The Debtors shall use the proceeds of all borrowings under the DIP Facility and Cash Collateral in accordance with the Budget, subject in all respects to the Permitted Variances and exclusions set forth herein. The Budget annexed hereto as **Schedule 1** shall constitute the initial Budget. No later than 11:59 p.m. (Central Time) on the first Wednesday that is four (4) full calendar weeks after the Petition Date, and on the Wednesday of each fourth week thereafter, the Debtors shall provide to the DIP Secured Parties and the Ad Hoc Group Advisors an updated proposed rolling 13-week statement of the Debtors' anticipated cash receipts and disbursements for the 13-week period commencing on the Monday of the week in which such proposed budget (a "***Proposed Budget***") is delivered, which Proposed Budget shall, subject to the following sentence, modify and supersede any prior Budget on the Wednesday of the week following the delivery of any Proposed Budget. Notwithstanding the foregoing sentence, such Proposed Budget shall only modify and supersede any prior Budget if consented to in writing (such consent not to be unreasonably withheld) by the Required DIP Lenders (which consent shall be deemed given if the Required DIP Lenders have not objected in writing to such Proposed Budget within five (5) business days after delivery thereof) and, until such consent is given or deemed given, the Budget then in effect shall continue as the then-effective Budget, and any or all of the DIP Secured Parties may (but shall have no obligation to) fund such Proposed Budget. Each Budget delivered to the DIP Secured Parties and the Ad Hoc Group Advisors shall be accompanied by such supporting documentation as reasonably requested by the Required DIP Lenders or the Ad Hoc Group Advisors, and each Budget shall be prepared in good faith based upon assumptions the Debtors believe to be reasonable. A copy of the Budget shall be delivered to the Prepetition Secured Parties, the Secured Party Advisors, the legal and financial advisors to the Committee (if appointed), and the U.S. Trustee following such Budget's approval.

18. Budget and Reporting Compliance. The Debtors shall at all times comply with the Budget, subject to the Permitted Variances. The Debtors shall provide all reports and other information as required in the DIP Documents. The Debtors' failure to comply with the Budget (subject to the Permitted Variances) or to provide the reports and other information, in each case as required under the DIP Documents or this Interim Order, shall constitute an Event of Default following the expiration of any applicable grace period set forth in this Interim Order or the DIP Documents.

19. Modification of Automatic Stay. The automatic stay imposed under section 362(a) of the Bankruptcy Code is hereby modified as necessary to effectuate all of the terms and provisions of this Interim Order, including, without limitation, to: (a) permit the Debtors to grant the DIP Liens, Adequate Protection Liens, DIP Superpriority Claims, and 507(b) Claims; (b) permit the Debtors to perform such acts as the DIP Agent, the DIP Secured Parties, the Prepetition First Lien Agent, the Prepetition Notes Collateral Trustee, or the Prepetition Royalty Collateral Agent may reasonably request to assure the perfection and priority of the liens granted herein; (c) permit the Debtors to incur all liabilities and obligations to the DIP Secured Parties and the Prepetition Secured Parties under the DIP Documents, the DIP Facility, and this Interim Order, as applicable; and (d) authorize the Debtors to pay, and the DIP Secured Parties and the Prepetition Secured Parties to retain and apply, payments made in accordance with the terms of this Interim Order.

20. Perfection of DIP Liens and Adequate Protection Liens. This Interim Order shall be sufficient and conclusive evidence of the creation, validity, perfection, and priority of all liens granted herein, including the DIP Liens and the Adequate Protection Liens, without the necessity of filing or recording any financing statement, mortgage, notice, or other instrument or

document which may otherwise be required under the law or regulation of any jurisdiction or the taking of any other action (including, for the avoidance of doubt, entering into any deposit account control agreement) to validate or perfect (in accordance with applicable non-bankruptcy law) such liens or to entitle the DIP Secured Parties and the Prepetition Secured Parties to the priorities granted herein. Notwithstanding the foregoing, each of the DIP Agent, the Prepetition First Lien Agent, the Prepetition Notes Collateral Trustee, and the Prepetition Royalty Collateral Agent is authorized to file or record, as it, in its sole discretion or in the discretion of the Required DIP Lenders, deems necessary or advisable, such financing statements, security agreements, mortgages, notices of liens, and other similar documents to perfect its respective liens in accordance with applicable non-bankruptcy law, and all such financing statements, mortgages, notices, and other documents shall be deemed to have been filed or recorded as of the Petition Date; provided, however, that no such filing or recordation shall be necessary or required in order to create or perfect the DIP Liens or the Adequate Protection Liens. The Debtors shall execute and deliver, promptly upon demand, to the DIP Agent, the Prepetition First Lien Agent, the Prepetition Notes Collateral Trustee, and the Prepetition Royalty Collateral Agent, all such financing statements, mortgages, notices, and other documents as the DIP Agent (at the direction of the Required DIP Lenders) or such other agent or trustee, as applicable, may reasonably request. Each of the DIP Agent, the Prepetition First Lien Agent, the Prepetition Notes Collateral Trustee, and the Prepetition Royalty Collateral Agent may file a photocopy of this Interim Order as a financing statement with any filing or recording office or with any registry of deeds or similar office, in addition to or in lieu of such financing statements, notices of lien, or similar instrument, and all applicable officials shall accept a photocopy of this Interim Order for filing or recordation for such purpose. To the extent the Prepetition First Lien Agent is the secured party under any

security agreement, mortgage, leasehold mortgage, landlord waiver, credit card processor notice or agreement, bailee letter, customs broker agreement, financing statement, account control agreement, or any other Prepetition First Lien Document, or is listed as loss payee or additional insured under any of the Debtors' insurance policies, the DIP Agent shall also be deemed to be the secured party or the loss payee or additional insured, as applicable, under such documents. The Prepetition First Lien Agent shall serve as gratuitous bailee for the DIP Agent for purposes of perfecting the DIP Liens on all DIP Collateral that is of a type such that, without giving effect to the Bankruptcy Code and this Interim Order, perfection of a lien thereon may be accomplished only by possession or control by a secured party.

21. Protection of Rights of DIP Secured Parties and Prepetition Secured Parties.

(a) Unless the DIP Agent, at the direction of the Required DIP Lenders, and the Prepetition First Lien Agent shall have provided their prior written consent, or all DIP Obligations and all Prepetition First Lien Obligations (in each case, excluding contingent indemnification obligations for which no claim has been asserted) have been indefeasibly paid in full in cash, as applicable, and the lending commitments under the DIP Facility have terminated, it shall be an Event of Default if there shall be entered in any of these Chapter 11 Cases or any Successor Cases any order (including any order confirming any plan of reorganization or liquidation) that authorizes any of the following (unless such order provides for the simultaneous indefeasible payment in full in cash of the DIP Obligations, the Prepetition First Lien Obligations, and the First Lien Adequate Protection Obligations): (i) the obtaining of credit or the incurring of indebtedness that is secured by a security, mortgage, or collateral interest or other lien on all or any portion of the DIP Collateral or the Prepetition Collateral or that is entitled to administrative priority status, in each case that is superior to or *pari passu* with the DIP Liens, the DIP

Superpriority Claims, the Prepetition 1L Liens, the First Lien Adequate Protection Liens, or the First Lien 507(b) Claims, except as expressly set forth in this Interim Order or the DIP Documents; (ii) the use of Cash Collateral for any purpose other than to fund the Carve-Out or as permitted in the Budget (subject to the Permitted Variances and exclusions set forth herein), the DIP Documents, and this Interim Order; or (iii) any modification of the DIP Agent's, any DIP Secured Party's, or any Prepetition First Lien Secured Party's rights under this Interim Order, the DIP Documents, or the Prepetition First Lien Documents with respect to any DIP Obligations or Prepetition First Lien Obligations, as applicable. The Final Order shall provide that, from and after entry of the Final Order and until the Prepetition Notes Obligations (excluding contingent indemnification obligations for which no claim has been asserted) have been indefeasibly paid in full in cash, it shall be an Event of Default if there shall be entered in any of these Chapter 11 Cases or any Successor Cases any order that authorizes the obtaining of credit or the incurring of indebtedness that is secured by a lien on all or any portion of the DIP Collateral or the Prepetition Collateral, or that is entitled to administrative priority status, in each case that is superior to or *pari passu* with the Prepetition 2L Notes Liens, the Notes Adequate Protection Liens, or the Notes 507(b) Claims, except as expressly set forth in this Interim Order, unless (x) the Prepetition Notes Collateral Trustee (at the direction of the requisite Prepetition Noteholders) shall have provided its prior written consent or (y) such order provides for the simultaneous indefeasible payment in full in cash of the Prepetition Notes Obligations.

(b) The Debtors will, until the DIP Obligations, the Prepetition First Lien Obligations, and the Prepetition Notes Obligations (in each case, excluding contingent indemnification obligations for which no claim has been asserted) have been indefeasibly paid in full in cash: (i) maintain books, records, and accounts to the extent and as required by the

DIP Documents, the Prepetition First Lien Documents, the Prepetition 2028 Notes Documents, and the Prepetition 2029 Notes Documents; (ii) reasonably cooperate with, consult with, and provide to the DIP Agent, the DIP Secured Parties, the Prepetition First Lien Agent, the Prepetition Notes Collateral Trustee, the Prepetition Noteholders, and the Ad Hoc Group Advisors all such information and documents that any or all of the Debtors are obligated (including upon reasonable request by the DIP Agent, the DIP Secured Parties, the Prepetition First Lien Agent, the Prepetition Notes Collateral Trustee, or the Prepetition Noteholders) to provide under the DIP Documents, the Prepetition First Lien Documents, the Prepetition 2028 Notes Documents, the Prepetition 2029 Notes Documents, or the provisions of this Interim Order; (iii) upon reasonable request, authorize their independent certified public accountants, financial advisors, investment bankers, and consultants to cooperate and consult with the DIP Agent (and, so long as an Event of Default has occurred and is continuing, each DIP Secured Party), the Secured Party Advisors, the Prepetition First Lien Agent, the Prepetition Notes Collateral Trustee, and the Prepetition Noteholders; (iv) upon reasonable advance notice and during normal business hours, permit the DIP Agent, the DIP Secured Parties, the Prepetition First Lien Agent, the Prepetition Notes Collateral Trustee, and the Prepetition Noteholders (or their respective representatives or agents) to visit and inspect any of the Debtors' respective properties, to examine and make abstracts or copies from any of their respective books and records, to tour the Debtors' business premises and other properties, and to discuss their respective affairs, finances, properties, business operations, and accounts with their respective officers, employees, independent public accountants, and other professional advisors (other than legal counsel) as and to the extent required by the DIP Documents, the Prepetition First Lien Documents, the Prepetition 2028 Notes Documents, and/or the Prepetition 2029 Notes Documents; provided, that absent the occurrence and continuance of an Event of

Default, such visits and inspections shall not occur more than once per calendar month; (v) upon reasonable advance notice and during normal business hours, permit the DIP Secured Parties, the Prepetition First Lien Agent, the Prepetition Notes Collateral Trustee, the Prepetition Noteholders, and the Secured Party Advisors to consult with the Debtors' management and advisors on matters concerning the Debtors' businesses, financial condition, operations, and assets; provided, that such consultation shall occur at reasonable times and frequencies and shall not unreasonably interfere with the operation of the Debtors' businesses; and (vi) provide access for the Ad Hoc Group Advisors to any data room established in connection with third-party diligence commenced in connection with any sale of one or more of the Debtors or their assets; provided that, notwithstanding anything to the contrary in this paragraph 21, the Debtors shall not be required to share any information or materials that would constitute a waiver of any privilege, violate any law, or, where the recipient is, or is the affiliate of, a party acting in a Bidder Capacity (as defined in the Restructuring Support Agreement), include materials relating to the Debtors' marketing and sale process; provided, further, that the recipient of such information or materials may not share confidential information or materials that relate to the Debtors' marketing and sale process with any party that is, or is an affiliate of, a party acting in a Bidder Capacity.

22. Credit Bid. The DIP Agent (acting at the direction of the Required DIP Lenders) (or one or more of its designees, affiliates, or assignees) shall have the unqualified right to credit bid any or all of the DIP Obligations, including, for the avoidance of doubt, the DIP Superpriority Claims, under or pursuant to (i) section 363(k) of the Bankruptcy Code, (ii) any plan of reorganization or plan of liquidation under section 1129 of the Bankruptcy Code, or (iii) section 725 of the Bankruptcy Code. The Prepetition First Lien Agent (acting at the direction of the requisite Prepetition First Lien Lenders) (or one or more of its designees, affiliates, or assignees)

shall have the unqualified right to credit bid any or all of the Prepetition First Lien Obligations, including, for the avoidance of doubt, the First Lien 507(b) Claims, under or pursuant to (i) section 363(k) of the Bankruptcy Code, (ii) any plan of reorganization or plan of liquidation under section 1129 of the Bankruptcy Code, or (iii) section 725 of the Bankruptcy Code. The Prepetition Notes Collateral Trustee (acting at the direction of the requisite Prepetition Noteholders in accordance with the Collateral Trust Agreement) (or one or more of its designees, affiliates, or assignees) or the Prepetition Royalty Secured Parties shall have the right, subject to the Intercreditor Agreements, to credit bid any or all of the Prepetition Notes Obligations or the Prepetition Royalty Obligations, as applicable, including, for the avoidance of doubt, the Notes 507(b) Claims, under or pursuant to (i) section 363(k) of the Bankruptcy Code, (ii) any plan of reorganization or plan of liquidation under section 1129 of the Bankruptcy Code, or (iii) section 725 of the Bankruptcy Code (each such bid described in this paragraph, a "***Credit Bid***"). If the DIP Agent, the Prepetition First Lien Agent, the Prepetition Notes Collateral Trustee, or the Prepetition Royalty Secured Parties or any of their respective designees, affiliates, or assignees makes a Credit Bid in connection with any auction or other sale process relating to the sale or other disposition of any DIP Collateral or Prepetition Collateral, then for purposes of such auction or sale process or any applicable order of this Court, the DIP Agent, the Prepetition First Lien Agent, the Prepetition Notes Collateral Trustee, or the Prepetition Royalty Secured Parties, as applicable, shall be automatically deemed to be a qualified bidder and its bid shall be automatically deemed to constitute a qualified bid, regardless of whether the qualified bidder or qualified bid requirements are satisfied.

23. Proceeds of Subsequent Financing. If the Debtors, any trustee, any examiner with expanded powers, or any responsible officer subsequently appointed in these Chapter 11 Cases or any Successor Cases shall obtain credit or incur debt pursuant to

sections 364(b), 364(c), or 364(d) of the Bankruptcy Code in violation of the DIP Documents or this Interim Order at any time prior to the indefeasible repayment in full in cash of all DIP Obligations and all Prepetition First Lien Obligations, and, from and after entry of the Final Order, all Prepetition Notes Obligations (in each case, excluding contingent indemnification obligations for which no claim has been asserted) and the termination of the DIP Secured Parties' obligation to extend credit under the DIP Facility, including subsequent to the confirmation of any chapter 11 plan with respect to any or all of the Debtors (if applicable), then all the cash proceeds derived from such credit or debt shall immediately be applied in accordance with this Interim Order, the DIP Documents, and the Intercreditor Agreements.

24. Maintenance of DIP Collateral. Until the indefeasible payment in full in cash of all DIP Obligations, all Prepetition First Lien Obligations, all Prepetition Notes Obligations (in each case, excluding contingent indemnification obligations for which no claim has been asserted), and the Prepetition Royalty Obligations and the termination of the DIP Secured Parties' obligation to extend credit under the DIP Facility, the Debtors shall (a) insure the DIP Collateral as required under the DIP Documents, the Prepetition First Lien Documents, or the Prepetition Notes Documents, as applicable; (b) maintain the cash management system in effect as of the Petition Date (other than as modified with the prior written consent of the Required DIP Lenders (such consent not to be unreasonably withheld)); (c) maintain and preserve their intellectual property and all material regulatory approvals relating to their products; and (d) (i) maintain accurate records of all transfers (including intercompany transactions) within the cash management system so that all postpetition transfers and transactions shall be adequately and promptly documented in, and readily ascertainable from, their books and records, to the same extent maintained by the Debtors before the Petition Date, and (ii) provide reasonable access to such

records to the DIP Agent, the DIP Secured Parties, the Prepetition First Lien Agent, the Prepetition Notes Collateral Trustee, the Prepetition Royalty Secured Parties (including any of their advisors) and the Ad Hoc Group Advisors; provided, that the Debtors shall not be required to provide access where such access would constitute a waiver of any privilege or violate applicable law.

25. Disposition of DIP Collateral. The Debtors shall not sell, transfer, lease, license, encumber, or otherwise dispose of any portion of the DIP Collateral other than in the ordinary course of business without the prior written consent of the DIP Agent (at the direction of the Required DIP Lenders) or, after the DIP Obligations have been paid in full, the Prepetition First Lien Agent (at the direction of the requisite Prepetition First Lien Lenders) (and no such consent shall be implied from any other action, inaction, or acquiescence by any DIP Secured Party or Prepetition First Lien Secured Party), except as otherwise provided for in the DIP Documents.

26. DIP Termination Date. On the DIP Termination Date (as defined below), subject to the Carve-Out, (a) all DIP Obligations shall be immediately due and payable and all commitments to extend credit under the DIP Facility shall terminate, other than as required in paragraph 30 with respect to the Carve-Out; (b) all authority to use Cash Collateral shall cease, other than as required in paragraph 30 with respect to the Carve-Out; provided, however, that during the Remedies Notice Period, the Debtors may continue to use Cash Collateral solely to meet payroll obligations and pay expenses necessary to avoid immediate and irreparable harm to the Debtors' estates, in accordance with the Budget (subject to the Permitted Variances and exclusions set forth herein), or that have otherwise been approved in advance in writing by the DIP Agent (at the direction of the Required DIP Lenders); and (c) subject to paragraph 29, the DIP Agent shall otherwise be entitled to exercise rights and remedies under the DIP Documents in accordance with this Interim Order.

27. Events of Default. Prior to the indefeasible payment in full in cash of the DIP Obligations (excluding contingent indemnification obligations for which no claim has been asserted), the occurrence of any of the following events, unless waived by the Required DIP Lenders in writing and in accordance with the terms of the DIP Documents, shall constitute an event of default (collectively, the "***Events of Default***") under this Interim Order: (a) the failure of the Debtors to perform, in any material respect, any of the terms, provisions, conditions, covenants, or obligations under this Interim Order, or (b) the occurrence of an "Event of Default" under the DIP Documents. Upon the indefeasible payment in full in cash of the DIP Obligations (excluding contingent indemnification obligations for which no claim has been asserted) (a "***DIP Repayment***"), the foregoing Events of Default may be waived by the Prepetition First Lien Agent as set forth in the Prepetition First Lien Documents, and, upon the indefeasible payment in full in cash, upon or at any time after a DIP Repayment, of all Prepetition First Lien Obligations (in each case, excluding contingent indemnification obligations for which no claim has been asserted) (a "***First Lien Repayment***"), by the Prepetition Notes Collateral Trustee as set forth in the Prepetition Notes Documents.

28. [Reserved.]

29. Rights and Remedies Upon Event of Default.

(a) Immediately upon the occurrence and during the continuation of an Event of Default, notwithstanding the provisions of section 362 of the Bankruptcy Code, without any application, motion or notice to, hearing before, or order of the Court, but subject to the terms of this Interim Order, subject to the Remedies Notice Period (as defined below), the DIP Agent (at the direction of the Required DIP Lenders) may declare (any such declaration, a "***DIP Termination Declaration***" and the date on which a DIP Termination Declaration is delivered shall be referred

to as the "***DIP Termination Date***"): (i) all outstanding DIP Obligations owing under the DIP Documents to be immediately due and payable, (ii) the termination, reduction, or restriction of any further commitment to extend credit to the Debtors to the extent any such commitment remains under the DIP Facility, (iii) the termination of the DIP Facility and the DIP Documents as to any future liability or obligation of the DIP Agent and the DIP Secured Parties, without affecting any of the DIP Liens or the DIP Obligations, and (iv) the Carve-Out shall be triggered through the delivery of the Carve-Out Trigger Notice (as defined below) to the Debtors; and subject to the provisions in paragraph 26, the DIP Agent (at the direction of the Required DIP Lenders) may declare the termination, reduction, or restriction on the Debtors' ability to use Cash Collateral. The DIP Termination Declaration shall be delivered by electronic mail to counsel to the Debtors, counsel to a Committee (if appointed), counsel to the Prepetition First Lien Agent, the Ad Hoc Group Advisors, and counsel to the Prepetition Royalty Collateral Agent. Following a DIP Repayment, the rights of the DIP Agent and the Required DIP Lenders under clause (iv) and with respect to the use of Cash Collateral under this paragraph shall be exercisable by the Prepetition First Lien Agent (at the direction of the requisite Prepetition First Lien Lenders) and, following a First Lien Repayment, by the Prepetition Notes Collateral Trustee (at the direction of the requisite Prepetition Noteholders), in each case subject to the Intercreditor Agreements, and any declaration so delivered shall constitute a DIP Termination Declaration for purposes of this Interim Order.

(b) The automatic stay in the Chapter 11 Cases otherwise applicable to the DIP Agent, the DIP Lenders, and the Prepetition First Lien Secured Parties is hereby modified so that five (5) business days after the DIP Termination Date, which period shall be automatically extended in connection with a Stay Relief Hearing (as defined and provided in clause (c) below) prior to the expiration of such period to enable the Court to rule thereon (the "***Remedies Notice***

***Period***"), the DIP Agent (at the direction of the Required DIP Lenders) shall be entitled to exercise its rights and remedies in accordance with the DIP Documents and this Interim Order to satisfy the DIP Obligations, DIP Superpriority Claims, and DIP Liens, subject to the Carve-Out.

(c) If a DIP Termination Declaration is delivered as provided above, the DIP Lenders shall request and obtain a setting from the Court for and the Debtors hereby consent to an emergency hearing (a "***Stay Relief Hearing***") being held before this Court on an expedited basis and related motions shall be filed with the Court by the DIP Agent (at the direction of the Required DIP Lenders) on at least three (3) business days' notice (subject to the Court's availability) for the sole purpose (unless the Court orders otherwise) of considering whether an Event of Default has occurred. Unless the Court has determined that an Event of Default has not occurred and/or is not continuing or the Court orders otherwise, the automatic stay, as to all of the DIP Secured Parties and the Prepetition First Lien Secured Parties, shall automatically be terminated at the end of the Remedies Notice Period without further notice or order. The Debtors hereby waive their right to and shall not be entitled to seek relief, including under section 105 of the Bankruptcy Code or otherwise, to the extent that such relief would in any way impair or restrict the express rights and remedies granted to the DIP Agent and the other DIP Secured Parties under this paragraph 29.

30. Carve-Out.

(a) Priority of Carve-Out. Each of the DIP Liens, the DIP Superpriority Claims, the Prepetition Liens, the Adequate Protection Liens, and the 507(b) Claims shall be subject and subordinate to payment of the Carve-Out. For the avoidance of doubt, notwithstanding anything to the contrary in this Interim Order or the DIP Documents, the Carve-Out shall be senior to all liens, security interests, and superpriority claims granted hereunder, under the DIP

Documents, and/or under the Prepetition Secured Documents, and following the indefeasible payment in full of the DIP Obligations, the Carve-Out shall remain in effect as to the Prepetition Secured Obligations and the Adequate Protection Obligations, and the Debtors shall be permitted and required to continue to fund the Carve-Out Accounts in accordance with this Interim Order.

(b) Carve-Out. As used in this Interim Order, the term "***Carve-Out***" means the sum of:

(i) all fees required to be paid to the Clerk of the Court and to the U.S. Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate, if any, pursuant to 31 U.S.C. § 3717 (without regard to the notice set forth in clause (iii) below);

(ii) all reasonable and documented fees and expenses up to $100,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in clause (iii) below);

(iii) to the extent allowed at any time, whether by interim order, procedural order, final order or otherwise, all unpaid fees and expenses (the "***Allowed Professional Fees***") incurred by persons or firms retained by the Debtors (the "***Debtor Professionals***") or the Committee pursuant to sections 327, 328, 363, or 1103 of the Bankruptcy Code (the "***Committee Professionals***," and together with the Debtor Professionals, the "***Estate Professionals***") at any time before or on the first business day following delivery by the DIP Agent (acting at the direction of the Required DIP Lenders) of a Carve-Out Trigger Notice (as defined below) (or, if later, the date on which the Court determines, after a hearing thereon, that an Event of Default has occurred) and without regard to whether such fees and expenses are (a) provided for in any Budget or

(b) allowed by the Court prior to or after delivery of a Carve-Out Trigger Notice (the amounts set forth in this clause (iii) being the "***Pre-Carve-Out Trigger Notice Cap***"); and

(iv) (A) Allowed Professional Fees of Debtor Professionals in an aggregate amount not to exceed $2,750,000 plus the amount of any earned and payable restructuring, sale, success, or other transaction or similar fee (including any deferred fees) of any investment banker or financial advisor retained by the Debtors, as approved by the Court in connection with the order authorizing such retention, and (B) Allowed Professional Fees of Committee Professionals in an aggregate amount not to exceed $50,000, in each case incurred after the first business day following delivery by the DIP Agent (acting at the direction of the Required DIP Lenders) of the Carve-Out Trigger Notice (or, if later, the date on which the Court determines, after a hearing thereon, that an Event of Default has occurred), to the extent allowed at any time, whether by interim order, procedural order, final order or otherwise (the amount set forth in this clause (iv) being the "***Post-Carve-Out Trigger Notice Cap***" and, together with the Pre-Carve-Out Trigger Notice Cap and the amounts set forth in clauses (i) through (ii), the "***Carve-Out Cap***"); <u>provided</u>, that nothing herein shall be construed to impair the ability of any party in interest to object to the fees, expenses, reimbursement or compensation described in this paragraph 30(b) on any grounds.

(c) <u>Funding of Carve-Out Accounts</u>. Within five (5) business days of the initial funding of the DIP Loans, the Debtors shall fund into an account not subject to the control of the DIP Agent, the Prepetition First Lien Agent, the Prepetition Notes Collateral Trustee, the Prepetition Royalty Collateral Agent, or any of the DIP Lenders or Prepetition Secured Parties (the "***Debtor Carve-Out Account***") an amount equal to the total budgeted Debtor Professionals' fees for the first two (2) weeks of such fees set forth in the Budget and, thereafter, the Debtors are

authorized and directed to transfer into the Debtor Carve-Out Account on a weekly basis cash in an amount equal to the greater of (i) the amount estimated by each Debtor Professional in their reasonable discretion by each Monday for the next unfunded week upon notice to counsel for the DIP Secured Parties (email being sufficient) and to which no objection by any DIP Secured Party or counsel thereto has been received by such Debtor Professional (email being sufficient) within two (2) business days and (ii) the budgeted line item for each Debtor Professional for the next unfunded week set forth in the Budget (each of (i) and (ii), excluding any restructuring, sale, success or other transaction fee of any investment bankers or financial advisors); for the avoidance of doubt, to the extent an objection is received from a DIP Secured Party or counsel thereto to a Debtor Professional estimate, then the Debtor Carve-Out Account shall be funded by the amount set forth in this paragraph 30(c)(ii). Within five (5) business days of entry of this Interim Order, the Debtors shall fund into an account (x) not subject to the control of the DIP Agent, the Prepetition First Lien Agent, the Prepetition Notes Collateral Trustee, the Prepetition Royalty Collateral Agent, or any of the DIP Lenders or Prepetition Secured Parties and (y) separate from the Debtor Carve-Out Account (the "***Committee Carve-Out Account***" and together with the Debtor Carve-Out Account, the "***Carve-Out Accounts***") an amount equal to the total budgeted Committee Professionals' fees for the first two (2) weeks of such fees set forth in the Budget and, thereafter, the Debtors are authorized and directed to transfer into the Committee Carve-Out Account on a weekly basis cash in an amount equal to the greater of (1) the amount estimated by each Committee Professional in their reasonable discretion by each Monday for the next unfunded week upon notice to counsel for the DIP Secured Parties (email being sufficient) and to which no objection by any DIP Secured Party or counsel thereto has been received by such Committee Professional (email being sufficient) within two (2) business days and (2) the budgeted line item

for each Committee Professional for the next unfunded week set forth in the Budget (each of (1) and (2), excluding any restructuring, sale, success or other transaction fee of any investment bankers or financial advisors); for the avoidance of doubt, to the extent an objection is received from a DIP Secured Party or counsel thereto to a Committee Professional estimate, then the Committee Carve-Out Account shall be funded by the amount set forth in paragraph 30(c)(2). To the extent an objection by any DIP Secured Party or counsel thereto is received pursuant to this paragraph 30(c), the Debtors, the Committee and/or any party in interest shall be entitled to seek an emergency hearing (with the DIP Secured Parties pursuant to the terms of this Interim Order automatically consenting to such emergency hearing) with the Court for the purpose of determining the incremental funding (if any) for the applicable Carve-Out Account. Thereafter, the Debtors shall use such funds held in each Carve-Out Account solely to pay the applicable Estate Professionals' fees as they become allowed and payable pursuant to interim or final orders of the Court; provided, that the Debtors' obligations to pay the Allowed Professional Fees of the Estate Professionals shall not be limited or deemed limited to funds held in the Carve-Out Accounts. The Carve-Out Accounts shall not be subject to the control of the DIP Lenders, DIP Agent, or Prepetition Secured Parties, and the funds transferred to the Carve-Out Accounts shall not be subject to the DIP Liens, constitute DIP Collateral, or be available to pay the DIP Superpriority Claims, until all amounts set forth in this paragraph 30 are paid in full. The Carve-Out Accounts shall be held in trust exclusively for the benefit of the applicable Estate Professionals (and, solely as to the amounts set forth in paragraphs 30(b)(i) and 30(b)(ii), the U.S. Trustee, the Clerk of the Court, and any chapter 7 trustee, as applicable).

(d) Immediately upon the delivery of a Carve-Out Trigger Notice (as defined below), and prior to the payment of any DIP Obligations, the Debtors shall be required to

deposit into each applicable Carve-Out Account cash held by the Debtors (which deposit shall be deemed approved under the DIP Documents) in an amount equal to the difference between the Carve-Out Cap for each of the Debtor and Committee Professionals, respectively (plus, for the deposit into the Debtor Carve-Out Account, the amounts set forth in paragraphs 30(b)(i) and 30(b)(ii) above), and the balance held in the applicable Carve-Out Account as of the Carve-Out Trigger Notice Date (as defined below). Notwithstanding anything to the contrary herein or in the DIP Documents, following delivery of a Carve-Out Trigger Notice, neither the DIP Agent nor the Prepetition Secured Parties shall sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Carve-Out Accounts have been fully funded as permitted above in an amount equal to all obligations benefitting from the Carve-Out. The amounts in the Carve-Out Accounts shall be available only to satisfy Allowed Professional Fees and other amounts included in the Carve-Out until such amounts are paid in full. The amount in the Carve-Out Accounts shall be reduced on a dollar-for-dollar basis in the aggregate for Allowed Professional Fees that are paid after the delivery of the Carve-Out Trigger Notice, and the Carve-Out Accounts shall not be replenished for such amounts so paid. The failure of the Carve-Out Accounts to satisfy in full the amount set forth in the Carve-Out shall not affect the priority of the Carve-Out. For the avoidance of doubt, (i) so long as a Carve-Out Trigger Notice has not been delivered in accordance with this Interim Order, the Debtors shall be permitted to pay Allowed Professional Fees as the same may become due and payable, including on an interim basis, consistent with and in accordance with any applicable orders of the Court, and any payment or reimbursement made prior to the Carve-Out Trigger Notice Date in respect of any Allowed Professional Fees shall not reduce the Carve-Out; (ii) the incurrence or payment of any Carve-Out shall not be restricted by the Budget; (iii) disbursements by the Debtors from the Carve-Out

Accounts shall not constitute loans or indebtedness under the DIP Documents or the Prepetition Secured Documents or otherwise increase or reduce the DIP Obligations or the Prepetition Secured Obligations; and (iv) in no way shall the Carve-Out, the Carve-Out Accounts, any Budget, or anything contained herein be construed as a cap or limitation on the amount of the Allowed Professional Fees due and payable by or any other administrative expense claims that the Estate Professionals may assert against the Debtors or that may be allowed by the Court at any time (whether by interim order, final order, or otherwise).

(e) For purposes of the foregoing, "***Carve-Out Trigger Notice***" shall mean a written notice delivered by email by the DIP Agent (acting at the direction of the Required DIP Lenders) (or, after the applicable DIP Obligations have been indefeasibly paid in full and the New Money DIP Commitments terminated, the Prepetition First Lien Agent, and after a First Lien Repayment, the Prepetition Notes Collateral Trustee) to the Debtors, their restructuring counsel, the U.S. Trustee, and counsel to the Committee (if any), which notice may only be delivered following the occurrence and during the continuation of an Event of Default, stating that the Post-Carve-Out Trigger Notice Cap has been invoked. If the Court determines, after a hearing thereon, that no Event of Default has occurred, the applicable Carve-Out Trigger Notice shall be of no force or effect.

(f) On the day on which a Carve-Out Trigger Notice is received by the Debtors (the "***Carve-Out Trigger Notice Date***"), the Carve-Out Trigger Notice shall constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter (including Cash Collateral and proceeds of the DIP Loans) to fund the Carve-Out Accounts, as applicable, in cash in an amount equal to (but not to exceed) the Carve-Out Cap, and immediately following receipt of a Carve-Out Trigger Notice, and prior to the payment of any DIP Obligations,

the Debtors shall be required to deposit to the applicable Carve-Out Accounts an amount equal to the applicable Carve-Out Cap (which shall be determined, in the case of the Pre-Carve-Out Trigger Notice Cap by the applicable Estate Professionals in good faith in their reasonable discretion based on the amount of then-unpaid Allowed Professional Fees, and may include a reasonable estimate of the applicable Estate Professionals' then-incurred fees and expenses not yet allowed) less any amount then held in the applicable Carve-Out Account as of the Carve-Out Trigger Notice Date pursuant to this paragraph 30. For the avoidance of doubt, to the extent that professional fees and expenses of the Estate Professionals have been incurred by the Debtors or the Committee at any time before or on the first business day after delivery by the DIP Agent (acting at the direction of the Required DIP Lenders) of a Carve-Out Trigger Notice (or, if later, the date on which the Court determines, after a hearing thereon, that an Event of Default has occurred) but have not yet been allowed by the Court, such professional fees and expenses of the Estate Professionals shall constitute Allowed Professional Fees benefiting from the Carve-Out upon their allowance by the Court, whether by interim or final compensation order and whether before or after delivery of the Carve-Out Trigger Notice, and the applicable Carve-Out Account shall include such professional fees and expenses.

(g) The DIP Agent, the DIP Lenders and the Prepetition Secured Parties shall not be responsible for the direct payment or reimbursement of any fees or expenses of any Estate Professionals incurred in connection with the Chapter 11 Cases or any Successor Case under any chapter of the Bankruptcy Code, regardless of whether payment of such fees or disbursements has been allowed by the Court. Nothing in this Interim Order or otherwise shall be construed to obligate any of the DIP Agent, the DIP Lenders or the Prepetition Secured Parties in any way to

pay compensation to or reimburse expenses of any Estate Professional, or to guarantee that the Debtors have sufficient funds to pay such compensation or expense reimbursement.

(h) All funds in the Carve-Out Accounts shall be used first to pay all applicable obligations benefitting from the Pre-Carve-Out Trigger Notice Cap, until paid in full, and then the applicable obligations benefitting from the Post-Carve-Out Trigger Notice Cap. If either Carve-Out Account is not funded in full in the amount required by this paragraph 30, then any funds remaining in the other Carve-Out Account after payment in full of all obligations benefitting from such other Carve-Out Account shall be used to fund such shortfall prior to any distribution to the DIP Agent. If, after paying all amounts set forth in the definition of Carve-Out, the Carve-Out Accounts have not been reduced to zero, all remaining funds in the Carve-Out Accounts shall be distributed first, to the DIP Agent on account of the DIP Obligations until indefeasibly paid in full in cash, and second to the Prepetition First Lien Agent on account of the Prepetition First Lien Obligations, third in accordance with the Intercreditor Agreements, and fourth to the Debtors.

31. Limitations on Use of DIP Proceeds, Cash Collateral, and Carve-Out. No portion of the Carve-Out, the proceeds of any DIP Loans, the DIP Collateral, the Prepetition Collateral, or any Cash Collateral may be used to (or to support any other party to) litigate, object to, contest, or challenge in any manner or raise any defenses to the debt, collateral position, liens, or claims of any of the DIP Secured Parties or the Prepetition Secured Parties, whether by challenging the validity, extent, amount, perfection, priority, or enforceability of the indebtedness under the DIP Documents or the Prepetition Secured Documents, or the validity, extent, perfection, priority, or enforceability of any mortgage, security interest, or lien with respect thereto or any other rights or interests or replacement liens with respect thereto or any other rights or interests of

any of the DIP Secured Parties or the Prepetition Secured Parties, or by seeking to subordinate (other than to the Carve-Out) or recharacterize the DIP Facility, the Prepetition First Lien Facility, the Prepetition 2028 Notes, the Prepetition 2029 Notes, or the Prepetition Royalty Facility (or any amounts outstanding thereunder), or to disallow or avoid any claim, mortgage, security interest, lien, or replacement lien, or by challenging the enforceability of the Intercreditor Agreements, or by asserting any claims or causes of action, including, without limitation, any actions under chapter 5 of the Bankruptcy Code, against any of the DIP Secured Parties or the Prepetition Secured Parties, or any of their respective affiliates, officers, directors, agents, attorneys, advisors, professionals, or employees, in each case in their respective capacities as such; provided, however, that the Carve-Out and such collateral proceeds and loans under the DIP Documents may be used for allowed fees and expenses, in an amount not to exceed $50,000 in the aggregate (the "***Investigation Budget Amount***"), incurred solely by a Committee (if appointed), solely to investigate (but not to litigate, contest, initiate, assert, join, commence, support, or prosecute any Challenge) the Debtors' Stipulations, including by way of formal or informal discovery, the validity, enforceability, perfection, priority, or extent of the Prepetition Liens and the Prepetition Secured Obligations and any claims or causes of action against the Prepetition Secured Parties that would be the subject of a Challenge (the "***Investigation***") before the Challenge Deadline (as defined below). In addition, none of the Carve-Out, proceeds of DIP Loans, the DIP Collateral, the Prepetition Collateral, or any Cash Collateral shall be used in connection with (i) preventing, hindering, or delaying any of the DIP Secured Parties' or the Prepetition Secured Parties' enforcement or realization upon the DIP Collateral or the exercise of rights by the DIP Agent or any Prepetition Secured Party (in each case, subject to paragraph 29) once an Event of Default has occurred and is continuing, (ii) using or seeking to use Cash Collateral or selling, licensing, or

otherwise disposing of the DIP Collateral other than as provided herein, (iii) using or seeking to use any insurance proceeds related to the DIP Collateral without the consent of the DIP Agent (at the direction of the Required DIP Lenders) or the Prepetition First Lien Agent, as applicable, (iv) incurring Indebtedness (as defined in the DIP Term Sheet) other than in accordance with the Budget or as permitted in the DIP Documents, (v) except as provided in the Budget, paying any amount on account of any claims arising before the Petition Date, (vi) requesting authorization, or supporting any request for authorization, to obtain postpetition financing or other financial accommodations pursuant to section 364 of the Bankruptcy Code or otherwise, other than (x) financing from the DIP Lenders or (y) financing the proceeds of which are sufficient to, and are immediately applied to, indefeasibly pay the DIP Obligations and the Prepetition First Lien Obligations, and, following entry of the Final Order, the Prepetition Notes Obligations in full in cash, (vii) seeking to surcharge the DIP Collateral or the Prepetition Collateral under section 506(c) of the Bankruptcy Code, to invoke the "equities of the case" exception under section 552(b) of the Bankruptcy Code, or to invoke the doctrine of marshaling, or (viii) objecting to, contesting, or seeking any order limiting the right of any DIP Secured Party or Prepetition Secured Party to credit bid the full amount of its claims; provided, that the foregoing limitations shall not prevent the Debtors and their professionals from being heard on whether an Event of Default has occurred and is continuing.

32. Good Faith Under Section 364(e) of the Bankruptcy Code; No Modification or Stay of this Interim Order. Based on the findings set forth in this Interim Order and the record made during the Interim Hearing, and in accordance with section 364(e) of the Bankruptcy Code, in the event any or all of the provisions of this Interim Order are hereafter modified, amended, or vacated by a subsequent order of this Court or any other court of competent jurisdiction, the DIP

Secured Parties and the Prepetition Secured Parties are entitled to the protections provided in section 364(e) of the Bankruptcy Code. Any such modification, amendment, or vacatur shall not affect the validity and enforceability of any advances previously made or made hereunder, or any lien, claim, or priority authorized or created hereby, unless such authorization and the incurring of such debt, or the granting of such priority or lien, is stayed pending appeal.

33. Payment of Fees and Expenses. The Debtors shall pay all reasonable and documented prepetition and postpetition fees and out-of-pocket expenses of the DIP Agent and the other DIP Secured Parties in connection with the DIP Facility, as provided in the DIP Documents. At any time that professionals of the DIP Agent and the other DIP Secured Parties, including, without limitation, Nixon Peabody LLP, as counsel to the DIP Agent, the Ad Hoc Group Advisors, and any local counsel for the DIP Agent and the other DIP Secured Parties (such professionals, together with the professionals of the Prepetition Secured Parties entitled to payment under paragraphs 13, 14, and 15 hereof, the "***Secured Party Advisors***"), seek payment of fees and expenses from the Debtors, each professional shall provide summary copies of its fee and expense statements or invoices (which shall not be required to contain time entries and which may be redacted or modified to the extent necessary to delete any information subject to the attorney-client privilege, any information constituting attorney work product, or any other confidential information, and the provision of such invoices shall not constitute any waiver of the attorney-client privilege or of any benefits of the attorney work-product doctrine) by electronic mail to the U.S. Trustee and counsel to the Committee (if appointed) contemporaneously with the delivery of such fee and expense statements to the Debtors. The Debtors, any Committee, or the U.S. Trustee may dispute the payment of any portion of such invoiced fees and expenses (the "***Disputed Invoiced Fees***") if any Debtor, any Committee, or the U.S. Trustee notifies the submitting party

in writing, within ten (10) days of the receipt of such fee and expense statement or invoice, setting forth the specific objections to the Disputed Invoiced Fees (to be followed by the filing with the Court, if necessary, of a motion or other pleading, with at least ten (10) days' prior written notice to the submitting party of any hearing on such motion or other pleading). The Debtors shall promptly pay in full all such invoiced fees and expenses other than the Disputed Invoiced Fees. Notwithstanding the foregoing, the Debtors shall pay on the Closing Date all reasonable and documented fees, costs, and out-of-pocket expenses of the DIP Agent and the other DIP Secured Parties incurred on or prior to such date without the need for any professional engaged by the DIP Agent or by the other DIP Secured Parties to first deliver a copy of its invoice as provided for herein (other than to the Debtors); provided, that such fees and expenses shall remain subject to review by the U.S. Trustee and the Committee (if appointed) in accordance with the procedures set forth in paragraph 33. No attorney or advisor to the DIP Agent, the other DIP Secured Parties or any Prepetition Secured Party shall be required to file an application seeking compensation for services or reimbursement of expenses with the Court. Fees payable to the DIP Agent under its fee letter shall be paid when due in accordance therewith and shall not be subject to the review procedures set forth in this paragraph 33. Any and all fees, costs, and expenses paid prior to the Petition Date by any of the Debtors (i) to the DIP Agent or the other DIP Secured Parties in connection with the DIP Facility and (ii) subject to any Challenge, to the Prepetition Secured Parties in connection with the Chapter 11 Cases, are hereby approved in full.

34. Recharacterization. In the event that it is determined by a final, non-appealable order of a court of competent jurisdiction entered in connection with a timely and properly commenced Challenge that any of the Prepetition Secured Parties were not entitled to the payment of some or all of the fees, costs, and expenses received under paragraph 13(c),

paragraph 14(c), or paragraph 15(c) of this Interim Order as adequate protection for the Diminution in Value of their interests in the Prepetition Collateral, and such Prepetition Secured Parties are determined to have been undersecured as of the Petition Date, then such payments shall be applied to the principal balance of such Prepetition Secured Parties' claims, or the Court may fashion such other relief as is appropriate pursuant to such final order; provided, that in no event shall any Prepetition Secured Party be required to disgorge, repay, or return any amount previously received pursuant to this Interim Order; provided, further, that this paragraph 34 shall not apply to fees, expenses, and indemnities paid to the Prepetition First Lien Agent, the Prepetition 2028 Notes Trustee, the Prepetition 2029 Notes Trustee, or the Prepetition Notes Collateral Trustee (or their counsel) in their respective capacities as such.

35. Proofs of Claim. The DIP Secured Parties and the Prepetition Secured Parties will not be required to file proofs of claim in any of the Chapter 11 Cases or Successor Cases for any claim allowed herein. However, in order to facilitate the processing of claims, to ease the burden upon the Court and to reduce any unnecessary expense to the Debtors' estates, each of the Prepetition First Lien Agent, the Prepetition Notes Collateral Trustee, the Prepetition 2028 Notes Trustee, the Prepetition 2029 Notes Trustee, the Prepetition Royalty Collateral Agent, and the Investor Representative is authorized, in its sole discretion, to file in the Debtors' lead chapter 11 case a master proof of claim on behalf of the Prepetition Secured Parties it represents on account of any and all of their respective claims arising under the applicable Prepetition Secured Documents and hereunder (as applicable) (each, a "***Master Proof of Claim***") against each of the Debtors. Upon the filing of any such Master Proof of Claim, the applicable agent or trustee shall be deemed to have filed a proof of claim in the amount set forth therein in respect of its claims of any type or nature whatsoever with respect to the applicable Prepetition Secured Documents, and

the claim of each applicable Prepetition Secured Party (and each of its successors and assigns) named in a Master Proof of Claim shall be treated as if such entity had filed a separate proof of claim in each of the Chapter 11 Cases. The Master Proofs of Claim shall not be required to attach any instruments, agreements or other documents evidencing the obligations owing by each of the Debtors to the applicable Prepetition Secured Parties. Any proof of claim filed by any such agent or trustee shall be deemed to be in addition to and not in lieu of any other proof of claim that may be filed by any of the Prepetition Secured Parties. Any order entered by the Court in relation to the establishment of a bar date for any claim (including, without limitation, administrative claims) in any of the Chapter 11 Cases or any Successor Cases shall not apply to (i) the DIP Secured Parties, (ii) the Prepetition First Lien Secured Parties with respect to the Prepetition First Lien Obligations, (iii) the Prepetition 2028 Secured Parties with respect to the Prepetition 2028 Notes Obligations, (iv) the Prepetition 2029 Secured Parties with respect to the Prepetition 2029 Notes Obligations, or (v) the Prepetition Royalty Secured Parties with respect to the Prepetition Royalty Obligations.

36. Effect of Stipulations on Third Parties.

(a) *Generally*. The Debtors' Stipulations shall be binding on the Debtors, any successor thereto (including, without limitation, any chapter 7 or chapter 11 trustee appointed or elected after the Challenge Deadline (as defined below) for any of the Debtors or any other estate representative appointed in the Chapter 11 Cases or any Successor Cases) in all circumstances and for all purposes immediately upon entry of this Interim Order, and as to the Debtors any and all Challenges are hereby irrevocably waived and relinquished as of the Petition Date. The Debtors' Stipulations shall also be binding on all creditors and other parties in interest and all of their respective successors and assigns, including, without limitation, a Committee (if

appointed) and any other person or entity acting or seeking to act on behalf of the Debtors' estates in all circumstances and for all purposes, unless (i) the Committee or a party in interest (in each case, to the extent requisite standing is obtained pursuant to an order of this Court entered prior to the Challenge Deadline) has timely commenced an appropriate proceeding or contested matter required under the Bankruptcy Code, Bankruptcy Rules and Local Rules, including, without limitation, as required pursuant to Part VII of the Bankruptcy Rules (in each case subject to the limitations set forth in this paragraph 36) by the Challenge Deadline challenging any of the Debtors' Stipulations with respect to the Prepetition Secured Obligations, the Prepetition Liens, or the Prepetition Secured Documents (including the releases set forth in paragraph F(xviii) hereof, and any claims, counterclaims, or causes of action against any of the Prepetition Secured Parties arising out of or relating to the Prepetition Secured Documents, the Prepetition Secured Obligations, the Prepetition Liens, or the Prepetition Collateral) (each such proceeding or contested matter, a "***Challenge***") and (ii) there is entered a final non-appealable order in favor of the plaintiff in any such timely filed Challenge; provided, that any pleadings filed in any Challenge, and any motion seeking standing to assert a Challenge, shall attach a proposed complaint and shall set forth with specificity the basis for each such Challenge (and any Challenges not so specified prior to the Challenge Deadline shall be deemed forever waived, released, and barred). The Court may fashion any appropriate remedy following a successful Challenge.

(b) If any such Challenge is timely and properly filed prior to the Challenge Deadline, the Debtors' Stipulations shall nonetheless remain binding and preclusive (as provided in paragraph 36(a) hereof) on the Committee (if appointed) and on any other person or entity, the Debtors and any successor thereto (including, without limitation, any chapter 7 or chapter 11 trustee appointed or elected for any of the Debtors in the Chapter 11 Cases or any

Successor Cases), except to the extent that such Debtors' Stipulations were expressly and successfully challenged by such Challenge as set forth in a final, non-appealable order of a court of competent jurisdiction. If any such Challenge is timely and properly filed prior to the Challenge Deadline and remains pending and the Chapter 11 Cases are converted to chapter 7, the chapter 7 trustee may continue to prosecute such Challenge on behalf of the Debtors' estates; provided, that if the Challenge Deadline has elapsed and no timely and properly filed Challenge has been commenced either before or after conversion of the Chapter 11 Cases to chapter 7 cases, or any Challenge has been resolved prior to the conversion of the Chapter 11 Cases to chapter 7 cases, the chapter 7 trustee shall be bound by the Debtors' Stipulations or such resolution, as applicable.

(c) The "***Challenge Deadline***" shall mean the earliest to occur of (1) the date of confirmation of a plan of reorganization, (2) the deadline established by the Court for objections to any proposed sale of all or substantially all of the Debtors' assets, and (3) (i) as to the Committee, 60 days from the date of the formation of the Committee (if appointed) and (ii) as to any other party in interest, 75 days following the entry of this Interim Order, as such deadline may be extended (x) in writing prior to the expiration of the Challenge Deadline (which writing may be in the form of email by counsel) from time to time in the sole discretion of (I) the Prepetition First Lien Agent (at the direction of the requisite Prepetition First Lien Lenders) (with respect to the Prepetition 1L Liens and the Prepetition First Lien Obligations or the adequate protection afforded to the Prepetition First Lien Secured Parties), (II) the Prepetition Notes Collateral Trustee (at the direction of the requisite Prepetition Noteholders) (with respect to the Prepetition 2L Notes Liens, the Prepetition 2028 Notes Obligations and the Prepetition 2029 Notes Obligations or the adequate protection afforded to the Prepetition 2028 Secured Parties and the Prepetition 2029 Secured Parties) or (III) the Prepetition Royalty Collateral Agent (with respect to

the Prepetition 2L Royalty Liens and the Prepetition Royalty Obligations or the adequate protection afforded to the Prepetition Royalty Secured Parties), or (y) by this Court for good cause shown pursuant to an application filed and served by a party in interest prior to the expiration of the Challenge Deadline, and any extension pursuant to clause (y) shall apply solely to such party in interest and solely to the particular Challenge specified in such application; provided, that in no event shall the Challenge Deadline be extended beyond, nor shall any hearing on any Challenge take place after, the first day of any hearing held to consider approval of a sale of all or substantially all of the Debtors' assets, absent the prior written consent of the applicable Prepetition Secured Parties. Nothing in this Interim Order vests or confers on any Person (as defined in the Bankruptcy Code), including the Committee (if appointed) or any non-statutory committees appointed or formed in these Chapter 11 Cases, standing or authority to pursue any claim or cause of action belonging to the Debtors or their estates, including, without limitation, Challenges with respect to the Debtors' Stipulations, and all rights to object to such standing are expressly reserved. The failure of the Committee or any other party in interest to obtain an order of this Court granting standing to assert a Challenge prior to the Challenge Deadline shall not constitute a defense to the failure to commence a Challenge prior to the Challenge Deadline and shall not require or permit any extension of the Challenge Deadline. Notwithstanding anything to the contrary in this Interim Order, (i) the filing of a motion by the Committee seeking standing to assert a Challenge before the Challenge Deadline that attaches a proposed complaint setting forth each such Challenge with specificity shall extend the Challenge Deadline solely with respect to the Committee and solely with respect to the Challenges set forth in such proposed complaint until two (2) business days after the Court rules on the standing motion, or such other time period ordered by the Court in approving the standing motion, and (ii) if, prior to the Challenge Deadline, (x) the Chapter 11

Cases convert to chapter 7, or (y) a chapter 11 trustee is appointed, then, in each such case, the Challenge Deadline shall be extended, solely with respect to such trustee, until the later of the Challenge Deadline and ten (10) calendar days after such trustee's appointment.

(d) *Binding Effect*. To the extent no Challenge is timely and properly commenced by the Challenge Deadline, or to the extent such Challenge does not result in a final and non-appealable judgment or order that is inconsistent with any of the Debtors' Stipulations, then, without further notice, motion, or application to, order of, or hearing before, this Court and without the need or requirement to file any proof of claim, the Debtors' Stipulations shall, pursuant to this Interim Order, become irrevocably binding on any person, entity, or party in interest in the Chapter 11 Cases, as well as their successors and assigns, and in any Successor Case for all purposes and shall not be subject to further challenge or objection. Notwithstanding anything to the contrary herein, if any Challenge is properly and timely commenced by a party in interest, the Debtors' Stipulations shall nonetheless remain binding on all other parties in interest. To the extent any Challenge is timely and properly commenced and is unsuccessful, the applicable Prepetition Secured Parties shall be entitled to, as adequate protection, payment of the related costs and expenses, including, but not limited to, reasonable and documented attorneys' fees, incurred in defending themselves against any unsuccessful Challenge, subject, as applicable, to the Restructuring Support Agreement and any limitations imposed on such costs and expenses.

37. No Third-Party Rights. Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder, or any direct, indirect, or incidental beneficiary.

38. Section 506(c) Claims. Subject to entry of the Final Order, except to the extent of the Carve-Out, no costs or expenses of administration that have been or may be incurred

in the Chapter 11 Cases at any time shall be charged against the DIP Secured Parties, the Prepetition Secured Parties, the DIP Collateral, or the Prepetition Collateral pursuant to sections 105 or 506(c) of the Bankruptcy Code, or otherwise, without the prior written consent of the DIP Agent, the Prepetition First Lien Agent, the Prepetition Notes Collateral Trustee, or the Prepetition Royalty Collateral Agent, as applicable, and no such consent shall be implied from any action, inaction, or acquiescence by any party.

39. No Marshaling or Application of Proceeds. Subject to and upon entry of the Final Order, and subject to the priorities set forth in this Interim Order, the DIP Documents, the Prepetition Secured Documents, and the Intercreditor Agreements, in no event shall the DIP Agent, the DIP Secured Parties, the Prepetition First Lien Agent, the Prepetition Notes Collateral Trustee, the Prepetition Royalty Collateral Agent, or the Prepetition Secured Parties be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral or the Prepetition Collateral, respectively, and the DIP Obligations, at the option of the Required DIP Lenders, to be exercised in their sole and absolute discretion, shall be repaid (a) first, from the DIP Collateral comprising Unencumbered Collateral and (b) second, from all other DIP Collateral; provided that the foregoing shall be without prejudice to the terms of the Final Order with respect to the period from and after entry of the Final Order.

40. Section 552(b). Subject to entry of the Final Order, the Prepetition Secured Parties shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception thereunder shall not apply to any of them.

41. DIP Released Parties. Effective as of the date of entry of this Interim Order, the Debtors hereby absolutely and unconditionally release and forever discharge and acquit the DIP Agent and the other DIP Secured Parties and each of their respective successors, assigns,

affiliates, parents, subsidiaries, partners, controlling persons, representatives, agents, attorneys, advisors, financial advisors, consultants, professionals, officers, directors, members, managers, shareholders, and employees, past, present, and future, and their respective heirs, predecessors, successors and assigns, each in such capacity (collectively, the "***DIP Released Parties***") from any and all obligations and liabilities to the Debtors (and their successors and assigns) and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, rights, assertions, allegations, actions, suits, controversies, proceedings, losses, damages, injuries, attorneys' fees, costs, expenses, or judgments of every type (in each case, arising on or prior to the date of this Interim Order), whether known, unknown, asserted, unasserted, suspected, unsuspected, accrued, unaccrued, fixed, contingent, pending, or threatened including, without limitation, all legal and equitable theories of recovery, arising under common law, statute or regulation or by contract, of every nature and description, in each case, arising in connection with or relating to the New Money DIP Loans, the DIP Liens securing the New Money DIP Loans, or any of the DIP Documents with respect to the New Money DIP Loans; provided, that nothing herein shall relieve the DIP Released Parties from fulfilling their obligations under the DIP Documents and/or this Interim Order; provided, further, that solely with respect to the DIP Agent in its capacity as such, the foregoing release shall extend to all claims arising in connection with or relating to the DIP Facility, the DIP Liens, and the DIP Documents, and such release shall not be subject to paragraph 36.

42. Indemnification. The DIP Secured Parties and the Prepetition Secured Parties have acted in good faith, and without negligence or violation of public policy or law, in respect of all actions taken by them in connection with or related in any way to negotiating, implementing, documenting, or obtaining the requisite approvals of the DIP Facility and the use

of Cash Collateral, including in respect of the granting of the DIP Liens and the Adequate Protection Liens, any challenges or objections to the DIP Facility or the use of Cash Collateral, and all documents related to any and all transactions contemplated by the foregoing. Accordingly, to the extent provided in the DIP Documents and the Prepetition Secured Documents, as applicable, the DIP Secured Parties and the Prepetition Secured Parties shall be and hereby are indemnified and held harmless by the Debtors in respect of any claim or liability incurred in respect thereof or in any way related thereto. No exception or defense exists in contract, law, or equity to the Debtors' obligation to indemnify and/or hold harmless the DIP Secured Parties and the Prepetition Secured Parties, as applicable, as set forth in the DIP Documents or the Prepetition Secured Documents.

43. Limits on Lender Liability. Subject to entry of the Final Order, nothing in this Interim Order, any of the DIP Documents, any of the Prepetition First Lien Documents, the Prepetition 2028 Notes Documents, the Prepetition 2029 Notes Documents, the Prepetition Royalty Documents, the Intercreditor Agreements, or any other documents related thereto, shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Secured Parties or the Prepetition Secured Parties of any liability for any claims arising from any activities by the Debtors in the operation of their businesses or in connection with the administration of these Chapter 11 Cases or any Successor Cases. None of the DIP Secured Parties or the Prepetition Secured Parties shall, solely by reason of having made loans or other financial accommodations under the DIP Facility or authorizing the use of Cash Collateral, be deemed in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability

Act, 42 U.S.C. §§ 9601 *et seq.*, as amended, or any similar federal or state statute), and none of them shall be deemed to be a manufacturer, distributor, marketing authorization holder, sponsor or seller of, or otherwise responsible for, any product of the Debtors under the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. §§ 301 *et seq.*, as amended, or any similar federal or state statute. Nothing in this Interim Order or the DIP Documents shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Secured Parties or the Prepetition Secured Parties of any liability for any claims arising from the prepetition or postpetition activities of any of the Debtors.

44. Insurance Proceeds and Policies. Upon entry of this Interim Order and to the fullest extent provided by applicable law, the DIP Agent (on behalf of the DIP Secured Parties) and the Prepetition First Lien Agent (on behalf of the Prepetition First Lien Secured Parties) shall be, and shall be deemed to be, without any further action or notice, named as an additional insured and as loss payee on each insurance policy maintained by the Debtors that in any way relates to the DIP Collateral.

45. Joint and Several Liability. Nothing in this Interim Order shall be construed to constitute a substantive consolidation of any of the Debtors' estates, it being understood, however, that the Debtors shall be jointly and severally liable for the obligations hereunder and all DIP Obligations in accordance with the terms hereof and of the DIP Documents.

46. Rights Preserved. Notwithstanding anything herein to the contrary, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly: (a) the DIP Secured Parties' and the Prepetition Secured Parties' rights to seek any other or supplemental relief; (b) any of the rights of any of the DIP Secured Parties or the Prepetition Secured Parties under the Bankruptcy Code or applicable non-bankruptcy law,

including, without limitation, the right to (i) request modification of the automatic stay imposed by section 362 of the Bankruptcy Code, (ii) request dismissal of any of the Chapter 11 Cases or Successor Cases, conversion of any of the Chapter 11 Cases to cases under chapter 7, or appointment of a chapter 11 trustee or examiner with expanded powers, or (iii) propose, subject to the provisions of section 1121 of the Bankruptcy Code, a chapter 11 plan or plans; or (c) any other rights, claims, or privileges (whether legal, equitable, or otherwise) of any of the DIP Secured Parties or the Prepetition Secured Parties, in each case subject to the Intercreditor Agreements. Notwithstanding anything herein to the contrary, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, the Debtors', a Committee's (if appointed), or any party in interest's right to oppose any of the relief requested in accordance with the immediately preceding sentence except as expressly set forth in this Interim Order. Entry of this Interim Order is without prejudice to any and all rights of any party in interest with respect to the terms and approval of the Final Order and any other position which any party in interest deems appropriate to raise in these Chapter 11 Cases or any Successor Cases.

47. No Waiver by Failure to Seek Relief. The failure of the DIP Secured Parties or the Prepetition Secured Parties to seek relief or otherwise exercise their rights and remedies under this Interim Order, the DIP Documents, the Prepetition First Lien Documents, the Prepetition 2028 Notes Documents, the Prepetition 2029 Notes Documents, the Prepetition Royalty Documents, the Intercreditor Agreements, or applicable law, as the case may be, shall not constitute a waiver of any of the rights hereunder, thereunder, or otherwise of the DIP Secured Parties or the Prepetition Secured Parties.

48. Binding Effect of Interim Order. Immediately upon entry on the docket of this Court, the terms and provisions of this Interim Order shall become binding upon the Debtors,

the DIP Secured Parties, the Prepetition Secured Parties, all other creditors of any of the Debtors, any Committee, and all other parties in interest and their respective successors and assigns, including any trustee or other fiduciary hereafter appointed in any of the Chapter 11 Cases, any Successor Cases, or upon dismissal of any Chapter 11 Case or Successor Case.

49. No Modification of Interim Order. Until and unless the DIP Obligations and the Prepetition First Lien Obligations (other than contingent obligations with respect to then unasserted claims) have been indefeasibly paid in full in cash (such payment being without prejudice to any terms or provisions contained in the DIP Documents which survive such discharge by their terms), and all commitments to extend credit under the DIP Facility have been terminated, the Debtors shall be prohibited from seeking or consenting to, directly or indirectly, any modification, stay, vacatur, or amendment to this Interim Order without the prior written consent of the DIP Agent (at the direction of the Required DIP Lenders) and the Prepetition First Lien Agent, and no such consent shall be implied by any action or inaction of the DIP Agent or the Prepetition First Lien Agent.

50. Interim Order Controls. In the event of any inconsistency between the terms and conditions of the DIP Documents and this Interim Order, the provisions of this Interim Order shall control.

51. Discharge; No Plan or Sale Without Payment in Full. Subject to the terms of the Restructuring Support Agreement to the extent it remains in effect, the DIP Obligations and the obligations of the Debtors with respect to the adequate protection provided herein shall not be discharged by the entry of an order confirming any plan of reorganization in any of the Chapter 11 Cases, notwithstanding the provisions of section 1141(d) of the Bankruptcy Code, unless such obligations have been indefeasibly paid in full in cash (other than contingent indemnification

obligations for which no claim has been asserted) on or before the effective date of such plan of reorganization (or, solely with respect to the Notes 507(b) Claims and the Royalty 507(b) Claims, satisfied in accordance with paragraphs 14(b) and 15(b) hereof, respectively), or the DIP Agent (at the direction of the Required DIP Lenders), the other DIP Secured Parties, and the applicable Prepetition Secured Parties, as applicable, have otherwise agreed in writing. None of the Debtors shall propose, support, seek approval of, or consummate any chapter 11 plan, or any sale of all or substantially all of the Debtors' assets or equity interests, or seek entry of any order confirming such plan or approving such sale, that is not conditioned upon the indefeasible payment in full in cash of the DIP Obligations, the DIP Superpriority Claims, the First Lien Adequate Protection Obligations, and the First Lien 507(b) Claims on or prior to the earlier to occur of the effective date of such plan and the closing of such sale, in each case without the prior written consent of the DIP Agent (at the direction of the Required DIP Lenders) and the Prepetition First Lien Agent (at the direction of the requisite Prepetition First Lien Lenders); provided, that the foregoing shall not apply (x) to the extent such obligations are satisfied through a Credit Bid or (y) as may be agreed pursuant to the Restructuring Support Agreement to the extent it remains in effect. No DIP Lien shall be affected in any manner by the entry of an order confirming any plan of reorganization that does not provide for the DIP Obligations to be paid in full in cash or satisfied through a Credit Bid, except as may be agreed in writing pursuant to the Restructuring Support Agreement to the extent it remains in effect.

52. Survival. The provisions of this Interim Order and any actions taken pursuant hereto shall survive entry of any order which may be entered: (a) confirming any plan of reorganization in any of the Chapter 11 Cases; (b) converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code; (c) dismissing any of the Chapter 11 Cases or any

Successor Cases; or (d) pursuant to which this Court abstains from hearing any of the Chapter 11 Cases or any Successor Cases. The terms and provisions of this Interim Order shall continue in the Chapter 11 Cases, in any Successor Cases, or following dismissal of the Chapter 11 Cases or any Successor Cases notwithstanding the entry of any orders described in clauses (a)–(d) above, and all claims, liens, security interests, and other protections granted to the DIP Secured Parties and the Prepetition Secured Parties pursuant to this Interim Order and/or the DIP Documents shall maintain their validity and priority as provided by this Interim Order until: (i) in respect of the DIP Facility, all of the DIP Obligations have been indefeasibly paid in full in cash (other than contingent indemnification obligations for which no claim has been asserted); (ii) in respect of the Prepetition First Lien Facility, all of the Prepetition First Lien Obligations have been indefeasibly paid in full in cash (other than contingent indemnification obligations for which no claim has been asserted); (iii) in respect of the Prepetition 2028 Notes and the Prepetition 2029 Notes, all of the Prepetition Notes Obligations have been indefeasibly paid in full in cash (other than contingent indemnification obligations for which no claim has been asserted); and (iv) in respect of the Prepetition Royalty Facility, all of the Prepetition Royalty Obligations have been indefeasibly paid in full in cash (other than contingent indemnification obligations for which no claim has been asserted). The terms and provisions concerning the indemnification of the DIP Secured Parties and the Prepetition Secured Parties shall continue in the Chapter 11 Cases, in any Successor Cases, following dismissal of the Chapter 11 Cases or any Successor Cases, and following termination of the DIP Documents and/or the indefeasible repayment of the DIP Obligations.

53. Replacement Agent. Notwithstanding the resignation or replacement of any collateral agent, collateral trustee, administrative agent, or trustee, including the DIP Agent, the Prepetition First Lien Agent, the Prepetition Notes Collateral Trustee, and the Prepetition Royalty

Collateral Agent, the DIP Liens and the Adequate Protection Liens on the DIP Collateral shall remain continuously and properly perfected, notwithstanding the transfer of control, possession, or title of any Prepetition Collateral or DIP Collateral to a new collateral agent, collateral trustee, administrative agent, or trustee. Any successor DIP Agent appointed in accordance with the DIP Documents shall, without further order of the Court, succeed to and be entitled to all of the rights, powers, protections, immunities, and benefits of the DIP Agent under this Interim Order and the DIP Documents, and the protections afforded to any resigning or replaced DIP Agent shall survive such resignation or replacement.

54. DIP Agent. Until entry of the Final Order and execution of the DIP Credit Agreement, in acting under the DIP Term Sheet, this Interim Order, and the other DIP Documents, the DIP Agent shall be entitled to all of the rights, authority, privileges, protections, immunities, indemnities, reimbursements for expenses, limitations of liability, and benefits afforded to Wilmington Savings Fund Society, FSB, as administrative agent or collateral agent, as applicable, under the Prepetition First Lien Credit Agreement, which provisions are incorporated herein by reference, *mutatis mutandis*, and shall survive the termination of the DIP Documents and the resignation or removal of the DIP Agent; provided, that any references therein to a "Lender" or a "Credit Party" shall be deemed references to a DIP Lender and a Debtor, as applicable. In taking any action, giving any consent, delivering any notice (including any Termination Notice, DIP Termination Declaration, or Carve-Out Trigger Notice), or exercising any right or remedy under this Interim Order or the DIP Documents, the DIP Agent shall be entitled to act, or to refrain from acting, at the direction of the Required DIP Lenders, shall have no obligation to take any discretionary action absent such direction (and, where applicable, receipt of indemnity satisfactory to it), and shall have no liability to any person for any action taken or omitted at such direction or

in accordance with this Interim Order, absent its gross negligence or willful misconduct as determined by a final, non-appealable order of a court of competent jurisdiction. The DIP Agent shall have no duty to monitor the Debtors' compliance with the Budget, the Milestones, or any other covenant, or to file or record any financing statement, mortgage, or other document to create or perfect the DIP Liens. Nothing in this Interim Order shall be construed to impose any fiduciary or other implied duty on the DIP Agent.

55. Prepetition Agents and Trustees. In taking any action, giving any consent, delivering any notice (including any Carve-Out Trigger Notice), making any credit bid, maintaining or adjusting any register (including to reflect the Interim Roll-Up and any Final Roll-Up), or exercising any other right or remedy under this Interim Order, each of the Prepetition First Lien Agent, the Prepetition 2028 Notes Trustee, the Prepetition 2029 Notes Trustee, and the Prepetition Notes Collateral Trustee (each, in such capacity) shall be entitled to all of the rights, privileges, protections, immunities, and indemnities afforded to it under the applicable Prepetition Secured Documents, the Collateral Trust Agreement, and the Intercreditor Agreements, shall be entitled to act, or to refrain from acting, at the direction of the requisite Prepetition First Lien Lenders or Prepetition Noteholders, as applicable, in accordance with such documents, shall have no obligation to take any discretionary action absent such direction (and, where applicable, receipt of indemnity satisfactory to it), and shall have no liability to any person for any action taken or omitted at such direction or in accordance with this Interim Order, absent its gross negligence or willful misconduct as determined by a final, non-appealable order of a court of competent jurisdiction. None of the foregoing shall have any duty to file or record any document to perfect any Adequate Protection Lien or to monitor the Debtors' compliance with this Interim Order. Each of the foregoing may share any information received under this Interim Order with the holders it

represents to the extent permitted by the applicable Prepetition Secured Documents, subject to the limitations on sale-process materials set forth herein, and shall have no liability for any such holder's use of such information. Nothing in this Interim Order shall impair, subordinate (other than to the Carve-Out and the DIP Liens and DIP Superpriority Claims as expressly set forth herein), or otherwise affect any charging lien, priority of payment, or right to compensation, reimbursement, or indemnity of the Prepetition 2028 Notes Trustee, the Prepetition 2029 Notes Trustee, or the Prepetition Notes Collateral Trustee under the Prepetition Notes Documents or the Collateral Trust Agreement, or of the Prepetition First Lien Agent under the Prepetition First Lien Documents, each of which is expressly preserved.

56. Headings. Section headings used herein are for convenience only and are not to affect the construction of or to be taken into consideration in interpreting this Interim Order.

57. Final Hearing. The Final Hearing to consider entry of the Final Order and final approval of the DIP Facility is scheduled for **[●], 2026, at [●]:00 [a.m.] (CT)** before the Honorable [●], United States Bankruptcy Judge, at the United States Bankruptcy Court for the Southern District of Texas, Houston Division. The Final Order shall be in form and substance acceptable to the Required DIP Lenders, including with respect to any modifications made in response to objections of any other party in interest or the Court. If no objections to the relief sought at the Final Hearing are timely filed and served in accordance with this Interim Order, no Final Hearing shall be required and the Court may enter the Final Order without further notice or hearing. On or before [●], 2026, the Debtors shall serve, by email or United States mail, first-class postage prepaid, notice of the entry of this Interim Order and of the Final Hearing (the "***Final Hearing Notice***"), together with copies of this Interim Order and the Motion, on: (a) the parties having been given notice of the Interim Hearing; (b) any party which has filed prior to such date a

request for notices with this Court; (c) counsel for a Committee (if appointed); (d) the Securities and Exchange Commission; and (e) the Internal Revenue Service. The Final Hearing Notice shall state that any party in interest objecting to the entry of the proposed Final Order shall file written objections with the Clerk of the Court no later than **[●], 2026, at [●]:00 p.m. (CT)**, which objections shall be served so as to be received on or before such date by: (i) proposed counsel to the Debtors, Sidley Austin LLP, 787 Seventh Avenue, New York, New York 10019, Attn: Anthony Grossi (agrossi@sidley.com), Sidley Austin LLP, 1000 Louisiana Street, Suite 5900, Houston, Texas 77002, Attn: Maegan Quejada (mquejada@sidley.com), and Sidley Austin LLP, One South Dearborn, Chicago, Illinois 60603, Attn: Ian Ferrell (iferrell@sidley.com) and Daniela Rakowski (drakowski@sidley.com); (ii) counsel to the Ad Hoc Group, Latham & Watkins LLP, 1271 Avenue of the Americas, New York, New York 10020, Attn: David A. Hammerman, and Haynes and Boone, LLP, as Texas co-counsel, 1221 McKinney Street, Suite 4000, Houston, Texas 77010 Attn: Kelli Norfleet (kelli.norfleet@haynesboone.com), Arsalan Muhammad (arsalan.muhammad@haynesboone.com), and Imaan Patel (imaan.patel@haynesboone.com); (iii) counsel to the DIP Agent, Nixon Peabody LLP, Tower 46, 55 West 46th Street, New York, New York 10036-4120, Attn: Frank A. Oswald (foswald@nixonpeabody.com) and Elizabeth Taraila (etaraila@nixonpeabody.com); (iv) counsel to the Prepetition First Lien Agent, Nixon Peabody LLP, Tower 46, 55 West 46th Street, New York, New York 10036-4120, Attn: Frank A. Oswald (foswald@nixonpeabody.com) and Elizabeth Taraila (etaraila@nixonpeabody.com); (v) counsel to the Prepetition Notes Collateral Trustee, the Prepetition 2028 Notes Trustee, and the Prepetition 2029 Notes Trustee, Nixon Peabody LLP, Tower 46, 55 West 46th Street, New York, New York 10036-4120, Attn: Frank A. Oswald (foswald@nixonpeabody.com) and Elizabeth Taraila (etaraila@nixonpeabody.com); (vi) counsel to the Prepetition Royalty Collateral Agent and the

Investor Representative, Hogan Lovells Cadwalader US LLP, 200 Liberty Street, New York, New York 10281, Attn: Douglas S. Mintz and Thomas J. Curtin; (vii) the U.S. Trustee; and (viii) counsel to the Committee (if appointed).

58. Retention of Jurisdiction. The Court has and will retain jurisdiction to enforce the terms of, and to adjudicate any and all matters arising from or related to, the DIP Facility, the use of Cash Collateral, and/or this Interim Order.

SO ORDERED by the Court this ___ day of ___________, 2026.

THE HONORABLE [●]
UNITED STATES BANKRUPTCY JUDGE

# Exhibit A

## DIP Term Sheet

# **Exhibit B**

## **Lien Priority Ranking**

The following chart sets forth the relative priority of the liens and claims granted or described in this Interim Order. In the event of any conflict between this chart and the text of this Interim Order, the text of this Interim Order shall control. Nothing in this **Exhibit B** amends, alters, or modifies the Intercreditor Agreements, each of which shall remain in full force and effect in accordance with section 510(a) of the Bankruptcy Code.

| **Priority** | **Liens on Prepetition Non-Royalty Collateral (Including Cash Collateral)** | **Liens on Prepetition Royalty Collateral** | **Liens on Unencumbered Collateral** | **Claims Against All Debtor Assets** |
|---|---|---|---|---|
| **1** | Carve-Out;<br><br>Permitted Prior Liens | Carve-Out;<br><br>Permitted Prior Liens | Carve-Out | Carve-Out |
| **2** | DIP Liens | DIP Liens | DIP Liens | DIP Superpriority Claims |
| **3** | First Lien Adequate Protection Liens | First Lien Adequate Protection Liens | First Lien Adequate Protection Liens | First Lien 507(b) Claims |
| **4** | Prepetition 1L Liens | Prepetition 1L Liens | Notes Adequate Protection Liens;<br><br>Royalty Adequate Protection Liens | Notes 507(b) Claims;<br><br>Royalty 507(b) Claims |
| **5** | Notes Adequate Protection Liens | Notes Adequate Protection Liens;<br><br>Royalty Adequate Protection Liens | None | All other administrative expense claims |
| **6** | Prepetition 2L Notes Liens | Prepetition 2L Notes Liens;<br><br>Prepetition 2L Royalty Liens | None | None |
| **7** | Royalty Adequate Protection Liens | None | None | None |

# Schedule 1

## Initial Budget

**Consolidated Weekly Cash Flow Forecast**

Initial DIP Budget

*$ in millions*

| Week Number | Week 1 | Week 2 | Week 3 | Week 4 | Week 5 | Week 6 | Week 7 | Week 8 | Week 9 | Week 10 | Week 11 | Week 12 | Week 13 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week Beginning | 2-Nov | 9-Nov | 16-Nov | 23-Nov | 30-Nov | 7-Dec | 14-Dec | 21-Dec | 28-Dec | 4-Jan | 11-Jan | 18-Jan | 25-Jan | 13-Week |
| Week Ending | 8-Nov | 15-Nov | 22-Nov | 29-Nov | 6-Dec | 13-Dec | 20-Dec | 27-Dec | 3-Jan | 10-Jan | 17-Jan | 24-Jan | 31-Jan | Total |
| **RECEIPTS** | | | | | | | | | | | | | | |
| Collections | $ 1.8 | $ 2.6 | $ 1.9 | $ 2.4 | $ 3.9 | $ 2.0 | $ 3.5 | $ 1.6 | $ 2.9 | $ 2.4 | $ 2.4 | $ 2.4 | $ 2.4 | $ 32.3 |
| Other Inflows | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Receipts** | **$ 1.8** | **$ 2.6** | **$ 1.9** | **$ 2.4** | **$ 3.9** | **$ 2.0** | **$ 3.5** | **$ 1.6** | **$ 2.9** | **$ 2.4** | **$ 2.4** | **$ 2.4** | **$ 2.4** | **$ 32.3** |
| **DISBURSEMENTS** | | | | | | | | | | | | | | |
| **Operating Disbursements** | | | | | | | | | | | | | | |
| Compensation & Benefits | $ (0.5) | $ (2.1) | $ - | $ (2.6) | $ - | $ - | $ (2.1) | $ - | $ (5.8) | $ - | $ (2.5) | $ - | $ (2.5) | $ (18.1) |
| Accounts Payable | (8.0) | (3.3) | (4.5) | (2.8) | (2.5) | (3.6) | (1.5) | (1.5) | (10.4) | (2.4) | (3.0) | (2.4) | (2.4) | (48.5) |
| Total - Operating Disbursements | $ (8.5) | $ (5.4) | $ (4.5) | $ (5.4) | $ (2.5) | $ (3.6) | $ (3.6) | $ (1.5) | $ (16.2) | $ (2.4) | $ (5.6) | $ (2.4) | $ (4.9) | $ (66.6) |
| **Professional Fees** | | | | | | | | | | | | | | |
| Advisors | $ (1.8) | $ (1.8) | $ (1.8) | $ (1.8) | $ (1.3) | $ (1.3) | $ (1.3) | $ (1.3) | $ (1.3) | $ (1.1) | $ (1.1) | $ (1.1) | $ (11.0) | $ (28.0) |
| Bankruptcy Admin | (0.1) | (0.1) | (0.1) | (0.1) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.4) |
| Total - Professional Fees | $ (1.9) | $ (1.9) | $ (1.9) | $ (1.9) | $ (1.3) | $ (1.3) | $ (1.3) | $ (1.3) | $ (1.3) | $ (1.1) | $ (1.1) | $ (1.1) | $ (11.0) | $ (28.4) |
| **Total Disbursements** | **$ (10.4)** | **$ (7.3)** | **$ (6.4)** | **$ (7.2)** | **$ (3.8)** | **$ (4.9)** | **$ (4.9)** | **$ (2.8)** | **$ (17.5)** | **$ (3.6)** | **$ (6.7)** | **$ (3.6)** | **$ (15.9)** | **$ (95.0)** |
| **Net Cash Flow** | **$ (8.6)** | **$ (4.7)** | **$ (4.5)** | **$ (4.8)** | **$ 0.1** | **$ (3.0)** | **$ (1.4)** | **$ (1.2)** | **$ (14.7)** | **$ (1.2)** | **$ (4.3)** | **$ (1.2)** | **$ (13.5)** | **$ (62.8)** |
| **LIQUIDITY ROLLFORWARD[1]** | | | | | | | | | | | | | | |
| Beginning Cash | $ 7.8 | $ 24.2 | $ 19.6 | $ 15.1 | $ 10.3 | $ 40.4 | $ 37.4 | $ 36.0 | $ 34.8 | $ 20.1 | $ 19.0 | $ 14.7 | $ 13.5 | $ 7.8 |
| Net Cash Flow | (8.6) | (4.7) | (4.5) | (4.8) | 0.1 | (3.0) | (1.4) | (1.2) | (14.7) | (1.2) | (4.3) | (1.2) | (13.5) | (62.8) |
| DIP Draw | 25.0 | - | - | - | 30.0 | - | - | - | - | - | - | - | - | 55.0 |
| **Ending Cash** | **$ 24.2** | **$ 19.6** | **$ 15.1** | **$ 10.3** | **$ 40.4** | **$ 37.4** | **$ 36.0** | **$ 34.8** | **$ 20.1** | **$ 19.0** | **$ 14.7** | **$ 13.5** | **$ -** | **$ -** |

1. Excludes $315k of restricted cash

# EXHIBIT E

## Ayrmid Transaction Term Sheet

**KARYOPHARM THERAPEUTICS INC., et al.**
**AYRMID TRANSACTION TERM SHEET**

THIS TERM SHEET ("TERM SHEET") SETS FORTH THE MATERIAL TERMS OF A PROPOSED REORGANIZATION OF KARYOPHARM THERAPEUTICS INC. ("KPTI") AND ITS AFFILIATED DEBTOR-IN-POSSESSION (COLLECTIVELY, THE "DEBTORS") IN THEIR JOINTLY ADMINISTERED BANKRUPTCY CASES (THE "CHAPTER 11 CASES") TO BE FILED IN THE UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF TEXAS (THE "BANKRUPTCY COURT").

**THIS TERM SHEET IS NOT AN OFFER OR A SOLICITATION WITH RESPECT TO ANY SECURITIES OF THE DEBTORS, NOR IS IT A SOLICITATION OF THE ACCEPTANCE OR REJECTION OF A PLAN FOR PURPOSES OF SECTIONS 1125 AND 1126 OF THE BANKRUPTCY CODE. ANY SUCH OFFER OR SOLICITATION SHALL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE. THIS TERM SHEET AND THE TRANSACTIONS DESCRIBED HEREIN ARE SUBJECT IN ALL RESPECTS TO, AMONG OTHER THINGS, NEGOTIATION, EXECUTION AND DELIVERY OF DEFINITIVE DOCUMENTATION AND SATISFACTION OR WAIVER OF THE CONDITIONS PRECEDENT SET FORTH HEREIN AND THEREIN.**

**THIS TERM SHEET IS PRESENTED FOR DISCUSSION AND SETTLEMENT PURPOSES, AND IS ENTITLED TO PROTECTION FROM ANY USE OR DISCLOSURE TO ANY PERSON PURSUANT TO RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND ANY OTHER RULE OF SIMILAR IMPORT. NO BINDING OBLIGATIONS WILL BE CREATED BY THIS TERM SHEET UNLESS AND UNTIL SIGNATURE PAGES TO THE RSA ARE EXECUTED AND DELIVERED BY ALL APPLICABLE PARTIES.**

In connection with the restructuring and related funding transactions described in this Term Sheet, in each case solely to the extent implemented in connection with, and as part of, the Ayrmid Merger (as defined below) (and, for the avoidance of doubt, excluding any transaction that does not include the Ayrmid Merger) (collectively, the "Ayrmid Transaction"), reference is made to the following: (i) the obligations under that certain Indenture, dated as of October 10, 2025 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "2028 Indenture"), by and among KPTI, as issuer, the guarantors party thereto and Wilmington Savings Fund Society, FSB, as Trustee (the "2028 Trustee"), pursuant to which, among other things, KPTI issued 9.00% convertible senior notes due 2028 in an original principal amount of not less than $15,000,000 (the "2028 Notes," and all obligations thereunder, the "2028 Notes Obligations," and the holders thereof, the "2028 Noteholders"), (ii) the obligations under that certain Indenture, dated as of October 10, 2025 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "2029 Indenture"), by and among KPTI, as issuer, the guarantors party thereto and Wilmington Savings Fund Society, FSB, as Trustee (the "2029 Trustee"), pursuant to which, among other things, KPTI issued 9.00% convertible senior notes due 2029 in an aggregate original amount of not less than $103,502,450 (the "2029 Notes," and all obligations thereunder, the "2029 Notes Obligations," and the holders thereof, the "2029 Noteholders"), (iii) the obligations under that certain Credit and Guaranty Agreement, dated as of May 8, 2024 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "KPTI Credit Agreement"), by and among KPTI, as borrower, the guarantors thereunder, Wilmington Savings Fund Society, FSB, as administrative agent and collateral agent (in such capacities, together with its successors and assigns in such capacities, the "KPTI Facility Agent") and the lenders from time to time party thereto (the "KPTI Term Loan Lenders") in an original principal amount of not less than $100,000,000 (the "KPTI Term Loan 1L Obligations"), (iv) the "Revenue Interests" (as defined in the KPTI RIFA) and all other obligations owing under that certain Revenue Interest Financing Agreement, dated September 14, 2019 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "KPTI RIFA"), by and among KPTI, as the company, Healthcare Royalty Partners III, L.P., Healthcare Royalty Partners IV, L.P., HCRx Investments Holdco, LLC, HCR Canary Fund, L.P., and HCR Molag Fund, L.P., as investors (together, with their successors and permitted

assigns, the "KPTI RIFA Investors"), HealthCare Royalty Management, LLC, as investor representative (the "Investor Representative"), and HCR Karyopharm SPV, LLC, as collateral agent (the "Royalty Collateral Agent"), in the full amount owing thereunder (including the unpaid Hard Cap (as defined in the KPTI RIFA) and all other Obligations (as defined in the KPTI RIFA), the "KPTI RIFA Obligations"), (v) the obligations under that certain Loan and Security Agreement, dated as of December 12, 2022 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Aymrid LSA"), by and among Gamida Cell Inc., as borrower ("Gamida (US)"), Gamida Cell Ltd., as guarantor ("Gamida (Israel)"), Ayrmid Ltd. ("Ayrmid"), as holdings, Wilmington Savings Fund Society, FSB, as administrative agent and collateral agent, and the lenders party thereto from time to time, and (vi) that certain Restructuring Support Agreement, dated as of November 2, 2026 (the "RSA"), by and among the Debtors, the KPTI Term Loan Lenders party thereto, the 2028 Noteholders party thereto, the 2029 Noteholders party thereto, the Investor Representative, the holders of Existing Preferred Interests party thereto (the "Consenting Preferred Shareholders"), and Aymrid (collectively, the "RSA Parties"). All capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the RSA.

| Term | Description |
| --- | --- |
| **Overview** | |
| **Material Plan Terms** | The Debtors will file a chapter 11 plan (the "Plan") and disclosure statement providing for, or otherwise effectuating on the Effective Date, among other things, the following:<br>• 100% of the common equity of Reorganized KPTI[1] (the "KPTI Plan Consideration"), which shall be allocated as follows:<br>a. 36.096% to 37.029% pro rata to the KPTI Term Loan Lenders in full and final satisfaction of their KPTI Term Loan 1L Obligations (the "1L Plan Consideration");<br>b. 6.439% to 6.606% pro rata to the 2028 Noteholders in full and final satisfaction of their 2028 Notes Obligations (the "2028 Noteholder Plan Consideration");<br>c. 33.259% to 34.119% pro rata to the 2029 Noteholders in full and final satisfaction of their 2029 Notes Obligations (the "2029 Noteholder Plan Consideration");<br>d. 0% to 2.521% pro rata to the DIP Lenders in full and final satisfaction of their DIP Overage Claims (as defined below) (the "DIP Overage Plan Consideration"); and<br>e. 21.685% to 22.246% pro rata to the DIP Lenders in full and final satisfaction of their Roll-Up DIP Claims (as defined below) (the "Roll-Up Plan Consideration").<br>• General Unsecured Claims shall be paid in full/otherwise rendered unimpaired.<br>• On the Effective Date, unless the Debtors select an Acceptable Alternative Transaction as the Successful Bid (as described below) in accordance with the Bidding Procedures Order, Reorganized KPTI and Ayrmid shall effect a business combination transaction directly or through one or more of their respective existing or newly-formed affiliates (the surviving parent entity of the combined business, "NewCo") on the terms and conditions as agreed to by the Debtors, the Required Consenting Funded Debt Parties and Ayrmid (the "Ayrmid Merger").<br>• The "Effective Date" of the Plan shall mean: (a) the first Business Day after the entry of the order confirming the Plan (the "Confirmation Order") on which (i) no stay of the Confirmation Order is in effect and (ii) all conditions precedent to effectiveness of the Plan have been satisfied or waived in accordance with the Plan; or (b) such other date |

[1] "Reorganized KPTI" means KPTI, as reorganized on the Effective Date in accordance with the Plan.

| Term | Description |
|---|---|
| | as may be mutually agreed to by the Debtors, the Required Consenting Funded Debt Parties and Aymrid. |
| **Ayrmid Merger** | If the Ayrmid Merger is consummated:<br>1. NewCo (or such other borrower identified in the relevant documentation) and the applicable guarantors will enter into an exit facility of up to \$135,000,000 in new money (the "NewCo Facility," and the commitments and loans thereunder, the "NewCo Facility Commitments" and the "NewCo Facility Loans," respectively), the proceeds of which shall be available to be drawn in full on the Effective Date and used to refinance up to \$50,000,000 of DIP Claims in cash (and, if the outstanding DIP Claims are equal to or less than \$50,000,000, then in full), pay cure costs and other expenses of the Debtors under the Plan, and fund working capital needs, subject to the DIP Budget (as defined in the RSA).<br>2. Contemporaneously with, and as consideration for, the Ayrmid Merger:<br>a. the DIP Lenders, the 2028 Noteholders, the 2029 Noteholders and the KPTI Term Loan Lenders shall receive, in exchange for 100% of the common equity of Reorganized KPTI, and the organizational documents of NewCo and the documentation for the Ayrmid Merger shall provide, to the extent applicable, that the holders of the common equity of Reorganized KPTI shall receive, (i) their applicable pro rata share (based on each holder's holdings of the common equity of Reorganized KPTI) of 55% of the issued and outstanding common equity of NewCo as of the Effective Date (subject to dilution solely by the Omisirge Contingent Equity and any applicable management incentive plan (the "MIP")) and (ii) contingent payments pursuant to the terms and subject to the conditions of the MF CVR Agreement,[2] which shall provide:<br>i. a synthetic royalty will be triggered upon FDA approval of any application or supplement submitted to the FDA by KPTI or NewCo (including, without limitation, the supplemental New Drug Application to the FDA submitted by KPTI on or about August 31, 2026) seeking accelerated approval of XPOVIO® (selinexor) for any use in the treatment of myelofibrosis;<br>ii. the synthetic royalty will commence on the first commercial sale of XPOVIO® (selinexor) for patients with myelofibrosis and will terminate on the earlier of (1) seven years after such first commercial sale and (2) generic entry into the market; and<br>iii. the synthetic royalty, to be based on net sales of XPOVIO® (selinexor) for patients with myelofibrosis, will be equal to: (1) 20.00% of such net sales if myelofibrosis is added to the label of approved uses for XPOVIO® (selinexor) on or prior to December 31, 2027 and (2) 15.00% of such net sales if approved at any time thereafter;<br>b. the holders of equity interests in Ayrmid (the "Ayrmid Equity Holders") shall receive (or otherwise retain) 45.00% of all issued and outstanding common equity of NewCo as of the Effective Date after giving effect to the Ayrmid Merger (which shall be subject to dilution by any applicable MIP but not subject to dilution by the Omisirge Contingent Equity) and the right to receive the Omisirge Contingent |

[2] "MF CVRs" means the contingent value rights entitling the holders thereof to contingent payments in respect of a synthetic royalty in the proceeds of XPOVIO® (selinexor) for patients with myelofibrosis, pursuant to the terms and subject to the conditions of a contingent value rights agreement to be entered into with NewCo (the "MF CVR Agreement").

| Term | Description |
|---|---|
| | Equity, and the organizational documents of NewCo and the documentation for the Ayrmid Merger shall provide, to the extent applicable, that the Ayrmid Equity Holders shall receive:<br>i. up to an additional 6.50% of the issued and outstanding common equity of NewCo as of the Effective Date if global Omisirge net revenues for fiscal year 2028 exceed $70,000,000, with such amount of additional common equity increasing linearly from 0% at $70,000,000 of global Omisirge net revenue to 6.50% at $100,000,000 of global Omisirge net revenue, and<br>ii. up to an additional 2.00% of the issued and outstanding common equity of NewCo as of the Effective Date if global Omisirge net revenues for fiscal year 2028 exceed $100,000,000, with such amount of additional common equity increasing linearly from 0% at $100,000,000 of global Omisirge net revenue to 2.00% at $120,000,000 of global Omisirge net revenue.<br>3. In addition, on the Effective Date, the liens and obligations under the Ayrmid LSA will be addressed in a manner acceptable to the 2028 Noteholders, the 2029 Noteholders, the KPTI Term Loan Lenders and the Ayrmid LSA lenders; provided, that any liens and obligations with respect to the Ayrmid LSA (or any successor obligations thereto) shall be equitized into pre-Plan Effective Date Ayrmid or structurally subordinated in their entirety to claims against, and equity interests in, NewCo, in each case in a manner acceptable to the Required Consenting Funded Debt Parties in their sole discretion. |
| **KPTI RIFA Obligations** | Each KPTI RIFA Investor shall receive a *pro rata* share of revenue interests under a new royalty instrument (the "HCRx Royalty Agreement") entered into by NewCo and each of its subsidiaries that owns or controls any selinexor assets, on the one hand, and the KPTI RIFA Investors (or their designee) and the Royalty Collateral Agent (or another collateral agent designated by the KPTI RIFA Investors), on the other hand, for payment of 3% of net revenues to NewCo from all selinexor products (including XPOVIO® (selinexor) in combination with ruxolitinib for myelofibrosis) over a period of five (5) years following the Effective Date, which such interest shall be unsecured (such revenue interests, the "KPTI RIFA Consideration"). The HCRx Royalty Agreement shall include a liquidated damages provision, which shall be set at a value equal to $18.75 million.<br>HCRx may pursue an acquisition of KPTI's interests in certain other royalty agreements in an amount up to $35 million, with any diligence to be conducted within the sale milestone process outlined herein; provided, however, that there shall be no obligation or requirement for the Debtors or NewCo to consummate such a sale; provided, further, that any such sale shall be subject to the consent of the Required Consenting Funded Debt Parties and the Debtors and, to the extent that the Debtors have not selected an Acceptable Alternative Transaction, Ayrmid.<br>The HCRx Royalty Agreement shall be in form and substance acceptable to the KPTI RIFA Investors, the Required Consenting Funded Debt Parties, and Ayrmid and the proposed treatment of the KPTI RIFA Obligations as outlined herein may not be amended, modified, or supplemented without the prior written consent of the KPTI RIFA Investors. |
| **DIP Facility** | The KPTI Term Loan Lenders (in such capacity, the "DIP Lenders") will have provided KPTI with a debtor-in-possession financing facility (the "DIP Facility," and the documents related thereto, interim and final orders approving the same, and ancillary documentation, the "DIP Facility Documents") on the terms set forth in the term sheet annexed to the RSA (the "DIP Term Sheet"). |

| Term | Description |
|---|---|
| | The DIP Facility shall provide for the "DIP Loans," which shall consist of: (a) the new money term loans made available to the Debtors under the DIP Facility in an aggregate principal amount of up to $55,000,000, as more fully set forth in the DIP Facility Documents (the "DIP New Money Loans"); and (b) the junior loans under the DIP Facility deemed made upon the conversion, in accordance with the DIP Facility Documents, of KPTI Term Loan 1L Obligations into DIP Loans in an amount equal to $1.00 of KPTI Term Loan 1L Obligations for each $1.00 of DIP New Money Loans funded, as more fully set forth in the DIP Facility Documents (the "DIP Roll-Up Loans"). |
| **Executory Contracts and Unexpired Leases** | Except as otherwise provided in the Plan, all executory contracts and unexpired leases not otherwise assumed or rejected will be deemed assumed in accordance with the provisions and requirements of the Bankruptcy Code, other than those that: (a) are identified by a schedule of rejected executory contracts and unexpired leases; (b) have previously expired or terminated pursuant to their own terms; (c) have been previously assumed or rejected by the Debtors; (d) are the subject of a motion to reject that is pending on the Effective Date; or (e) have an ordered or requested effective date of rejection that is after the Effective Date; provided that the employee and employment agreements relating to the severance and COBRA entitlements set forth on Annex A shall be assumed (subject to the limitations in amount on Annex A) notwithstanding anything to the contrary herein. |
| **Management Incentive Plan** | On or after the Effective Date, NewCo shall implement the MIP on terms acceptable to Ayrmid and the Required Consenting Funded Debt Parties and approved by NewCo's post-merger board. |
| **Indemnification Claims** | All indemnification provisions in place as of the Effective Date (whether in the by-laws, certificates of incorporation or formation, limited liability company agreements, other organizational documents, board resolutions, indemnification agreements, employment contracts, or otherwise) for current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors, as applicable, shall be assumed by a newly-formed entity, which may be an Affiliate of NewCo (the "Indemnification Entity"), in scope acceptable to KPTI, Ayrmid, and the Required Consenting Funded Debt Parties and in scope no less favorable to such current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors than the indemnification provisions in place prior to the Effective Date. The obligations assumed by the Indemnification Entity shall include, for the avoidance of doubt, the obligation to fund and pay, as and when due, any self-insured retention, deductible, or similar amount required to be borne by the insureds under any of the D&O Liability Insurance Policies (including any runoff or tail policies) in connection with any claim thereunder against any such current or former director, officer, manager, employee, attorney, accountant, investment banker, or other professional of the Debtors. The obligations of the Indemnification Entity in respect of such indemnification provisions (including any such self-insured retention or deductible amounts) shall be supported by an intercompany promissory note in the principal amount of $2,500,000 issued by NewCo or an Affiliate of NewCo in favor of the Indemnification Entity on the Effective Date, on terms acceptable to KPTI, Ayrmid, and the Required Consenting Funded Debt Parties, and the Indemnification Entity shall not incur any indebtedness or other obligations other than the indemnification obligations assumed pursuant to the Plan. |
| **Treatment of Claims and Interests if the Ayrmid Merger Is Consummated** | |
| **Unclassified Claims** | |

| Term | Description |
| --- | --- |
| **Administrative, Priority Tax, and Other Priority Claims** | On or as soon as practicable after the later to occur of (a) the Effective Date and (b) the date on which such claim becomes due in the ordinary course of business, each holder of an allowed Administrative Expense Claim or Priority Tax Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such holder's Administrative Expense Claim or Priority Tax Claim, (i) cash equal to the unpaid portion of such allowed Claim, (ii) such treatment as is consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code, or (iii) such other treatment as may be agreed by the holder of such allowed Claim and the Debtors, and as is consistent with the DIP Budget or otherwise with the consent of the Required Consenting Funded Debt Parties.<br>**Not classified – non-voting.** |
| **DIP Claims** | In full and final satisfaction, compromise, settlement, release, and discharge of all obligations owing to the DIP Lenders under the DIP Facility Documents (collectively, the "DIP Claims"), except to the extent that the DIP Agent or a DIP Lender agrees to less favorable treatment with respect to such DIP Lender's DIP Claim, on the Effective Date, if the Ayrmid Merger is consummated, each DIP Lender shall receive:<br>(a) on account of its allowed DIP Claims in respect of the DIP New Money Loans:<br>i. its pro rata share of:<br>1. up to $50,000,000 of cash loan proceeds funded under the NewCo Facility; plus<br>2. any unrestricted cash (excluding, for the avoidance of doubt, proceeds of the NewCo Facility) on the balance sheet of the Debtors upon the consummation of the Ayrmid Transaction after funding: (A) the Carve-Out, (B) amounts allocated to the wind-down of Karyopharm Europe GmbH; and (C) amounts that the Debtors have reasonably estimated are necessary to pay allowed Administrative Expense Claims (including any amounts for professional advisors); and (D) amounts set forth in the DIP Budget allocated to allowed General Unsecured Claims that have not yet been paid (collectively, the purposes set forth in clauses (A) through (D), the "Reserved Purposes"); plus<br>3. after payment of amounts for the Reserved Purposes, any remaining unrestricted cash on the balance sheet of the Debtors;<br>ii. on account of the remainder (if any) of its allowed DIP Claims in respect of the DIP New Money Loans after application of the cash described in the foregoing clause (i) (such remainder, the "DIP Overage Claims"), its pro rata share of the DIP Overage Plan Consideration; and<br>(b) on account of its allowed DIP Claims in respect of the DIP Roll-Up Loans (the "Roll-Up DIP Claims"), its pro rata share of the Roll-Up Plan Consideration.<br>Nothing in this provision shall affect or dilute the 45.00% of NewCo equity received or otherwise retained by the Ayrmid Equity Holders.<br>**Not classified – non-voting.** |
| **Classes of Claims or Interests** | |
| **Other Secured Claims** | On or as soon as practicable after the Effective Date, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for any secured claim that is not an Administrative Expense Claim, Priority Tax Claim or DIP Claim (an "Other Secured Claim"), the holder of such Other Secured Claim shall receive (a) payment in cash |

| Term | Description |
|---|---|
| | in an amount equal to such Other Secured Claim, (b) the collateral securing such Other Secured Claim, (c) reinstatement of its Other Secured Claim, or (d) such other treatment so as to render such Other Secured Claim unimpaired pursuant to section 1124 of the Bankruptcy Code.<br>**Unimpaired – deemed to accept.** |
| **Priority Non-Tax Claims** | In full and final satisfaction, compromise, settlement, release, and discharge of each allowed Priority Non-Tax Claim, except to the extent that a holder of an allowed Priority Non-Tax Claim agrees to less favorable treatment, each holder of an allowed Priority Non-Tax Claim shall receive (a) cash in an amount equal to such allowed Claim or (b) such other treatment that will render such allowed Priority Non-Tax Claim unimpaired pursuant to section 1124 of the Bankruptcy Code.<br>**Unimpaired – deemed to accept.** |
| **KPTI Term Loan 1L Obligations** | The KPTI Term Loan Lenders shall receive their *pro rata* share of the 1L Plan Consideration on account of all claims related to the KPTI Term Loan 1L Obligations.<br>**Impaired – entitled to vote.** |
| **2028 Notes Obligations** | The 2028 Noteholders shall receive their *pro rata* share of the 2028 Noteholder Plan Consideration on account of all claims related to the 2028 Notes Obligations.<br>**Impaired – entitled to vote.** |
| **2029 Notes Obligations** | The 2029 Noteholders shall receive their *pro rata* share of the 2029 Noteholder Plan Consideration on account of all claims related to the 2029 Notes Obligations.<br>**Impaired – entitled to vote.** |
| **KPTI RIFA Obligations** | The KPTI RIFA Investors shall receive their *pro rata* share of the KPTI RIFA Consideration on account of all claims related to the KPTI RIFA Obligations, unless any of the KPTI RIFA Investors agree to less favorable treatment with respect to such KPTI RIFA Obligations. The KPTI RIFA Obligations may be classified separately from the 2028 Notes Obligations and the 2029 Notes Obligations.<br>**Impaired – entitled to vote.** |
| **General Unsecured Claims** | In full and final satisfaction, compromise, settlement, release, and discharge of each allowed General Unsecured Claim, except to the extent that a holder of a General Unsecured Claim agrees to less favorable treatment, on the Effective Date, or as soon as practicable thereafter, the Debtors shall continue to pay or dispute each General Unsecured Claim in the ordinary course as if the Chapter 11 Cases had never been commenced.<br>**Unimpaired – deemed to accept.** |
| **Intercompany Claims** | On the Effective Date, any and all Intercompany Claims shall, at the option of the Debtors with the consent of the Required Consenting Funded Debt Parties, be (a) extinguished, canceled and/or discharged on the Effective Date, (b) reinstated and otherwise survive the Debtors' restructuring by virtue of such Intercompany Claims being left unimpaired, or (c) otherwise addressed such that holders of Intercompany Claims will not receive any distribution on account of such Intercompany Claims. To the extent any such Intercompany Claim is reinstated, or otherwise adjusted (including by contribution, distribution in exchange for new debt or equity, or otherwise), paid or continued as of the Effective Date, any such transaction may be effected on or after the Effective Date without any further action |

| Term | Description |
|---|---|
| | by the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Person.<br><br>**Not entitled to vote.** |
| **Existing Preferred Interests** | On the Effective Date, each holder of an allowed Existing Preferred Interest shall receive no distribution on account of such interests, and all Existing Preferred Interests shall be canceled, released, and extinguished and will be of no further force or effect.<br><br>**Not entitled to vote.** |
| **Existing Common Stock Interests** | On the Effective Date, each holder of an allowed Existing Common Stock Interest shall receive no distribution on account of such interests, and all Existing Common Stock Interests shall be canceled, released, and extinguished and will be of no further force or effect.<br><br>**Not entitled to vote.** |
| **Other Equity Interests** | On the Effective Date, each holder of an allowed Other Equity Interest shall receive no distribution on account of such interests, and all Other Equity Interests shall be canceled, released, and extinguished and will be of no further force or effect.<br><br>**Not entitled to vote.** |
| **Existing Intercompany Equity Interests** | On the Effective Date, each holder of an allowed Existing Intercompany Equity Interest shall receive no distribution on account of its Existing Intercompany Equity Interest, which shall, at the election of the Debtors with the consent of the Required Consenting Funded Debt Parties, be (a) extinguished, canceled or discharged on the Effective Date or (b) reinstated and otherwise survive the Debtors' restructuring by virtue of such Existing Intercompany Equity Interest being left unimpaired.<br><br>**Not entitled to vote.** |
| **Other** | |
| **Tax Structure** | The Ayrmid Transaction contemplated by this Term Sheet will be structured in a manner reasonably acceptable to the Debtors, the Required Consenting Funded Debt Parties and Ayrmid and that, to the extent reasonably practicable: (a) minimizes any cash taxes payable as a result of the consummation of the Ayrmid Transaction; (b) maximizes the favorable tax attributes (including tax basis) of KPTI and NewCo and their respective subsidiaries going forward; and (c) otherwise achieves such tax-planning outcomes as reasonably requested by the Debtors, the Required Consenting Funded Debt Parties and Ayrmid. |
| **Transaction Expenses** | Pursuant to the Plan, the Debtors shall pay, on or prior to the Effective Date, the fees, costs and expenses of: (a) to the extent approved by order of the Bankruptcy Court, Sidley Austin LLP, Centerview Partners LLC, FTI Consulting, Inc., Stretto, Inc., and Ernst & Young LLP, as counsel, investment banker, financial advisor, claims and noticing agent, and accountant, respectively, to KPTI; (b) Latham & Watkins LLP, Haynes and Boone LLP, and Houlihan Lokey Capital, Inc., as counsel, local counsel, and investment banker, respectively, to the Ad Hoc Group; and (c) Hogan Lovells Cadwalader US LLP ("HLC") and Stifel Financial Corp. ("Stifel"), as counsel and investment banker, respectively, to the KPTI RIFA Investors; provided, with respect to clause (c), (i) amounts payable to HLC in excess of $600,000 shall be subject to objection, and (ii) with respect to Stifel, amounts payable shall include (x) monthly fees of $150,000 solely to the extent accruing from the Petition Date until the closing of the Ayrmid Transaction or an Acceptable Alternative Transaction and (y) solely in the event of the consummation of an Acceptable Alternative Transaction, (A) if |

| Term | Description |
|---|---|
| | transaction proceeds are sufficient to pay all Funded Debt outstanding in full and in cash, then a $1,000,000 deferred fee, or (B) if transaction proceeds are insufficient to pay all Funded Debt outstanding in full in cash, then a $500,000 deferred fee, in each case payable upon consummation of such Acceptable Alternative Transaction and solely from the proceeds thereof. |
| **NewCo Governance** | The organizational documents of NewCo adopted on the Effective Date (and any other documents or agreements related thereto) shall be in form and substance as determined by the Required Consenting Funded Debt Parties and Ayrmid (the "NewCo Governance Documents"). |
| **Employee Compensation and Benefits – Plans** | All employee policies, and all compensation and benefits plans, policies, and programs of the Debtors applicable to their respective employees, retirees, and nonemployee directors, including all savings plans, retirement plans, healthcare plans, disability plans, severance benefit plans, incentive plans, COBRA benefits and life and accidental death and dismemberment insurance plans that are assumed as executory contracts under the Plan pursuant to sections 365 and 1123 of the Bankruptcy Code shall be honored by NewCo in accordance with their respective terms, and NewCo shall abide by all applicable laws with respect to employee obligations; provided that such severance and COBRA benefits, for each eligible employee, retiree, and nonemployee director, shall not exceed the amounts scheduled on Annex A hereto. |
| **Employee Compensation and Benefits – Severance** | From the Effective Date through the first (1st) anniversary of the Effective Date (the "Severance Protection Period"), NewCo: (a) shall not, and shall cause its subsidiaries not to, amend or terminate any KPTI Severance Plan in any manner adverse to any Covered Employee (except as otherwise provided herein); and (b) shall provide, or shall cause its applicable subsidiaries to provide, to each Covered Employee who experiences a Qualifying Termination, severance pay and benefits no less favorable than those that the KPTI Severance Plans provide for that Covered Employee upon that termination in the amounts for each such Covered Employee not to exceed the amounts scheduled on Annex A hereto. Subject to the foregoing limitations in amount, all KPTI Severance Plans will be deemed to be, and shall be treated as, executory contracts under the Plan and, on the Effective Date, shall be assumed pursuant to sections 365 and 1123 of the Bankruptcy Code.<br><br>"Covered Employee" means each individual employed by any Debtor immediately before the Effective Date, other than any individual who is then an "executive officer" of KPTI (as defined in Rule 3b-7 under the Securities Exchange Act of 1934) (the "Exchange Act").<br><br>"KPTI Severance Plans" means each severance, separation pay, salary continuation, and termination pay or benefits plan, policy, program, guideline, and practice of the Debtors, whether written or unwritten, as in effect on the date of the RSA; provided, that any obligations owed to Covered Employees under the KPTI Severance Plans as of the Effective Date shall not exceed the amounts set forth on Annex A hereto.<br><br>"Qualifying Termination" means a termination of a Covered Employee's employment during the Severance Protection Period (a) by NewCo or any of its subsidiaries other than for cause (as defined in the applicable KPTI Severance Plan) or (b) by any Covered Employee for good reason, to the extent the applicable KPTI Severance Plan provides good reason rights or, for any Covered Employee without good reason rights under the applicable KPTI Severance Plan, following (i) a reduction in the Covered Employee's base salary or base wage rate or (ii) a relocation of the Covered Employee's primary work location by more than 35 miles, in each case without the Covered Employee's written consent.<br><br>Severance pay and benefits under this provision exclude equity and equity-based awards, including any awards under any MIP. Nothing in this provision shall limit any notice or |

| Term | Description |
|---|---|
| | severance pay or benefits that applicable law requires, and nothing herein shall constitute an admission, or otherwise modify or limit any defenses, as to any amounts owed by NewCo to affected employees under the KPTI Severance Plans. Nothing herein shall affect NewCo's ability to make changes to a Covered Employee's division or direct supervisor, or similar changes to NewCo's internal reporting lines.<br><br>The Plan and the Confirmation Order shall provide for the obligations in this provision, which shall bind NewCo and its successors and assigns. |
| **Releases** | The Plan shall provide for customary releases (including consensual third-party releases) and/or waivers, including standard carve-outs, and such other carve-outs acceptable to the Debtors, the Required Consenting Funded Debt Parties, the KPTI RIFA Investors, and Aymrid in their sole discretion, among the Debtors, the RSA Parties, and their respective affiliates, in any capacity, and each of their respective current and former directors, officers, funds, affiliates, members, employees, partners, managers, agents, representatives, principals, consultants, and professional advisors (each in their capacity as such) (collectively, the "Released Parties") of any and all claims, obligations (contractual or otherwise), suits, judgments, damages, rights, liabilities, or causes of action, whether known or unknown, foreseen or unforeseen, relating to any actions, transactions, events, or omissions on or before the Effective Date in any way relating to the Debtors, the Aymrid Transaction, this Term Sheet and any related transactions. |
| **Exculpation** | Customary exculpation provisions, including (a) each of the Debtors; (b) each of the disinterested directors of the board of directors of Karyopharm Therapeutics Inc.; and (c) any statutory committee appointed in the Chapter 11 Cases and each of its respective members, solely in their respective capacities as such, including standard carve-outs, and such other carve-outs acceptable to the Debtors, the Required Consenting Funded Debt Parties and Aymrid in their applicable sole discretion. |
| **Break-Up Fee / Expense Reimbursement / Back-Up Bid** | Subject to approval by the Bankruptcy Court (including, if applicable, through entry of an order approving the bidding procedures for the marketing process contemplated by the RSA (the "Bidding Procedures," and such order, the "Bidding Procedures Order")), in consideration of Aymrid's expenditure of time, effort, and resources in negotiating this Term Sheet, the RSA and the Restructuring Documents, and its commitment to serve as plan sponsor, upon the selection of a competing bid as the Successful Bid, Aymrid shall earn and the Debtors shall be obligated to pay (a) a cash fee equal to 3.00% of $311,432,711 (the "Bid Protection Base" and, such fee, the "Break-Up Fee"); and (b) reasonable and documented out-of-pocket fees and expenses, including those of counsel, incurred in connection with negotiating and documenting this Term Sheet, the RSA and the Aymrid Transaction but subject to an aggregate cap equal to 1.00% of the Bid Protection Base (the "Expense Reimbursement"), in each case, in accordance with the Bidding Procedures Order. The Break-Up Fee shall be payable in accordance with clause (y) of the final paragraph in this "Break-Up Fee / Expense Reimbursement / Back-Up Bid" section. Upon entry of the Bidding Procedures Order, the Break-Up Fee and Expense Reimbursement shall have administrative expense claim status pursuant to sections 105(a), 503(b), and 507(a)(2) of the Bankruptcy Code with priority over any and all administrative expenses of the kind specified in sections 503(b)(1) and 507(a) of the Bankruptcy Code, subject and subordinate to the DIP Claims and the Carve-Out.<br><br>If, in accordance with the Bidding Procedures Order and the RSA, the Debtors (with the consent of the Required Consenting Funded Debt Parties) select an Acceptable Alternative Transaction or an Alternative Restructuring Proposal as the successful bid (the "Successful Bid," and the bidder thereunder, the "Successful Bidder"), whether the Successful Bid is selected at the conclusion of an auction conducted pursuant to the Bidding Procedures |

| Term | Description |
|---|---|
| | (an "Auction") or, if no Auction is conducted, otherwise in accordance with the Bidding Procedures Order, Ayrmid shall, if the Debtors so designate in accordance with the Bidding Procedures Order, serve as the back-up bidder (in such capacity, the "Back-Up Bidder") and shall keep its commitment to consummate the Ayrmid Transaction on the terms set forth in this Term Sheet and the Plan (as such terms may be improved by Ayrmid at the Auction) (the "Back-Up Bid") open and irrevocable until the earlier of (i) the consummation of the transaction contemplated by the Successful Bid and (ii) the date that is 110 days after the Petition Date (the earlier of the dates described in clauses (i) and (ii), the "Back-Up Bid Termination Date").<br><br>If the Successful Bidder fails to consummate the Successful Bid on or before the Back-Up Bid Termination Date (or the Successful Bidder's definitive agreement with the Debtors is earlier terminated), the Debtors may, by written notice to Ayrmid delivered on or prior to the Back-Up Bid Termination Date, designate the Back-Up Bid as the Successful Bid, whereupon Ayrmid shall consummate the Ayrmid Transaction in accordance with this Term Sheet, the Plan, and the Restructuring Documents (as modified to reflect any improvements made by Ayrmid at the Auction) as promptly as practicable following satisfaction or waiver of the conditions precedent to the Effective Date, and the applicable milestones under the RSA and the DIP Term Sheet shall be deemed extended to the extent reasonably necessary to accommodate consummation of the Back-Up Bid.<br><br>Notwithstanding anything to the contrary in this Term Sheet or the RSA, if Ayrmid is designated as the Back-Up Bidder, (x) the RSA shall not terminate as to Ayrmid solely by reason of the Debtors' selection of the Successful Bid, and Ayrmid's obligations under the RSA with respect to the Back-Up Bid shall remain in full force and effect through the Back-Up Bid Termination Date; *provided*, *however*, that from and after the selection of the Successful Bid, (1) subject to the following clause (3), all obligations of the Debtors and the other RSA Parties owed to Ayrmid under the RSA and this Term Sheet shall be suspended and shall be of no force or effect, and the Debtors and the other RSA Parties shall be free to take any and all actions in furtherance of the Successful Bid without liability to Ayrmid; (2) Ayrmid shall have no right to terminate the RSA, and no termination event under the RSA in favor of Ayrmid shall be triggered, by reason of any action or inaction of the Debtors or the other RSA Parties in furtherance of the Successful Bid; and (3) the obligations described in clause (1) shall be reinstated and shall again be in full force and effect only if, and from and after the date on which, the Debtors designate the Back-Up Bid as the Successful Bid in accordance with the preceding paragraph, with the applicable milestones under the RSA and the DIP Term Sheet deemed extended as provided therein; and (y) the Break-Up Fee and the Expense Reimbursement, to the extent earned, shall be payable to Ayrmid within three (3) Business Days after the consummation of an Acceptable Alternative Transaction or Alternative Restructuring Proposal (subject in all cases to Ayrmid's compliance with the terms of this Term Sheet and the RSA), in each case from the proceeds of the Acceptable Alternative Transaction or Alternative Restructuring Proposal (or as otherwise provided in the Bidding Procedures Order); provided, that, for the avoidance of doubt, the Break-Up Fee and the Expense Reimbursement shall constitute an allowed superpriority administrative claim when earned; provided, further, that such superpriority administrative claim shall be junior to the Carve-Out and all DIP Claims. Ayrmid's commitment to serve as the Back-Up Bidder shall be without prejudice to its right to the Break-Up Fee and Expense Reimbursement if the Debtors select an Acceptable Alternative Transaction or an Alternative Restructuring Proposal. |
| **Public to Private Filing** | On the Effective Date and concurrently with the consummation of the Ayrmid Transaction, KPTI shall have completed the termination of registration of all securities under sections 13 and 15(d) of the Exchange Act and will continue as a private company. Unless otherwise |

| Term | Description |
|---|---|
| | consented by Aymrid and the Required Consenting Funded Debt Parties, upon consummation of the Aymrid Merger, the NewCo shall be a privately held entity. |
| **Conditions Precedent to the Effective Date** | The occurrence of the Effective Date shall be subject to customary conditions precedent, including, without limitation, the following:<br>1. the RSA shall not have been terminated as to all parties thereto and shall remain in full force and effect;<br>2. the Confirmation Order shall have been entered and such order shall not have been reversed, stayed, vacated, or modified;<br>3. the Plan, Confirmation Order, and all schedules, documents, supplements and exhibits to the Plan, and any other Restructuring Documents, shall be consistent with the terms of the RSA and this Term Sheet and subject to the consent and approval rights set forth therein;<br>4. the Restructuring Documents shall have been executed and delivered and all conditions precedent to the effectiveness thereof shall have been satisfied or waived in accordance with the terms thereof;<br>5. the Aymrid Merger shall have been consummated substantially contemporaneously with the occurrence of the Effective Date;<br>6. all reasonable professional fees and other amounts (including any earned and payable restructuring, sale, success, or other transaction or similar fee) required to be paid hereunder, under the RSA, the DIP Facility Documents, or any Restructuring Document, or in any order of the Bankruptcy Court related thereto shall have been paid or shall have been funded in an escrow account pending the approval of such fees and expenses by the Bankruptcy Court, as applicable; for avoidance of doubt, and unless Aymrid otherwise consents in writing, NewCo shall not be responsible for, or otherwise obligated to pay, any of the foregoing fees and expenses; and<br>7. any and all requisite governmental, regulatory, and third-party approvals and consents required to implement the Plan or the Aymrid Transaction shall have been obtained. |
| **Restructuring Documents** | Any and all agreements, instruments, pleadings, orders, and other documents, including the MF CVR Agreement, Omisirge CVR Agreement, HCRx Royalty Agreement, NewCo Governance Documents, DIP Facility Documents, NewCo Facility Documents, Plan, disclosure statement, Confirmation Order and all related exhibits, schedules, supplements, appendices, annexes, and attachments thereto that are utilized to implement or effectuate, or that otherwise relate to, the Aymrid Transaction or the RSA (collectively, the "Restructuring Documents") shall be consistent in all respects with the RSA (including the documentation consent and approval rights therein) and this Term Sheet. |
| **Documentation** | The parties shall negotiate the Restructuring Documents in good faith. Any and all documentation necessary to effectuate the Aymrid Transaction (including, without limitation, the Restructuring Documents) shall be in form and substance consistent with this Term Sheet and the RSA and otherwise reasonably satisfactory to those parties who are party to such documentation or otherwise have consent rights specified in this Term Sheet or the RSA. |
| **Reservation of Rights** | The submission of this Term Sheet to KPTI and the other RSA Parties is without prejudice to each RSA Party's rights to negotiate the definitive documentation required to reflect the terms hereof pursuant to the terms of the RSA. |

| Term | Description |
| --- | --- |
| | Nothing herein is an admission of any kind. If the Ayrmid Transaction is not consummated for any reason, all parties reserve any and all of their respective rights. |

**Annex A**

**KPTI Severance and COBRA Amounts**

[On file with the Company Parties]

# EXHIBIT F

## Form of Transfer Agreement

The undersigned ("**Transferee**") hereby acknowledges that it has read and understands the Restructuring Support Agreement, dated as of [●], 2026 (the "**Agreement**"),[1] by and among Karyopharm Therapeutics Inc. and its affiliates and subsidiaries bound thereto, the Consenting Stakeholders, including the transferor to the Transferee of any Company Claims/Interests (each such transferor, a "**Transferor**"), and Ayrmid, and agrees to be bound by the terms and conditions thereof to the extent the Transferor was thereby bound, and shall be deemed a "Consenting Stakeholder" under the terms of the Agreement.

The Transferee specifically agrees to be bound by the terms and conditions of the Agreement and makes all representations and warranties contained therein as of the date of the Transfer, including the agreement to be bound by the vote of the Transferor if such vote was cast before the effectiveness of the Transfer discussed herein.

Date Executed:

______________________________________

Name:
Title:
Address:
E-mail address(es):

with a copy to

[Counsel Contact]

| *Aggregate Amounts Beneficially Owned or Managed on Account of:* | |
|---|---|
| 2028 Notes | |
| 2029 Notes | |
| Royalty Claims | |
| Term Loans | |

[1] Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms in the Agreement.

| | |
|---|---|
| Convertible Preferred Stock | |
| Other Equity Interests | |

# EXHIBIT G

## Form of Consenting Stakeholder Joinder

The undersigned ("**Joinder Party**") hereby acknowledges that it has read and understands the Restructuring Support Agreement, dated as of [●], 2026 (the "**Agreement**"),[1] by and among Karyopharm Therapeutics Inc. and its affiliates and subsidiaries bound thereto, the Consenting Stakeholders, and Ayrmid, and shall be deemed a "Consenting Stakeholder" under the terms of the Agreement.

The Joinder Party specifically agrees to be bound by the terms and conditions of the Agreement and makes all representations and warranties contained therein as of the date of this Joinder and any further date specified in the Agreement.

Date Executed:

______________________________________
Name:
Title:
Address:
E-mail address(es):

with a copy to

[Counsel Contact]

| ***Aggregate Amounts Beneficially Owned or Managed on Account of:*** | |
|---|---|
| 2028 Notes | |
| 2029 Notes | |
| Royalty Claims | |
| Term Loans | |
| Convertible Preferred Stock | |
| Other Equity Interests | |

[1] Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms in the Agreement.